MEMO TO FILE

FROM:     Deliwe Kekana
          Affirmative Action Officer and Title IX Coordinator

DATE:     October 7, 2019

RE:     Investigation of Discrimination – Race against Brenda Cowan, Jonathan Farmer, Marilyn Barton, and Mary Davis.

## A. Overview of Issues

On March 23 2018, our office met with the Complainant, Marjorie Phillips, regarding a complaint of discrimination on the basis of race against the Respondents Brenda Cowan, Jonathan Farmer, Marilyn Barton, and Mary Davis. Upon receipt of the complaint, I initiated an investigation.

## B. Complainant's 1 Allegations/Statement[12]

Initially when I came to your office a few weeks ago, I didn't necessarily expect to be putting forth a complaint. I was just looking for advice. I needed a place to talk. I thought this would be a safe place. When Deliwe was not there, I didn't want to proceed. Since then, I have experienced something else in the short period of time. That's what brings me here again. In the meantime, I went to the Union first because I needed a place to talk. It was there that it was decided that I should speak with Affirmative Action. I mentioned to Isolina that I had followed up with AA earlier.

When I come to work each day, I expect to be respected, both personally and that of my culture. I have expectations of the workplace and choose where I work based on feeling comfortable.

**FIRST INCIDENT OF OCCURRENCE**: Approximately Fall 2014.

Brenda Cowan, the former Chairperson of Exhibition and Experience Design was gossiping with her program assistant, Umilta Allsop. When I mentioned to Brenda that it was rude and unprofessional to whisper and gossip, she invited me to join their conversation. She said, "Come join us at the back of the bus." She thought this was funny. I was so shocked with what she had said that I don't even remember how I responded. I remember speaking with her privately in front of the E Building later, where I told her I was highly insulted by what she had said and I told her it was discriminatory. I also said that, I didn't know what I was going to do. I can actually file a complaint against you to Human Resources". When I told her in the moment, it was offensive, she said, "I just meant this was the slow bus." I told her how her play on words was offensive and she has to know this is America. She has to know that telling an African-American to join them "at the back of the bus" is going to be offensive. She went on about how she had black friends and it wasn't what she meant. I barely remember getting

---

[1] Please note complainants furnish their own statements, and these statements may not edited by the Affirmative Action Officer.
[2] This statement has been redacted for any personally identifying information.

PLAINTIFF 29
12/16/2021 LS

DFIT000027

an apology. I am going to say I did, but it wasn't so obvious that I remembered it. She probably slid it in because she felt she had to. Since then, our relationship hasn't been that interactive.

**SECOND INCIDENT OF OCCURRENCE: Approximately** Fall 2016 Pre-election.

I came in to the office first thing in the morning and Marilyn Barton was speaking to our student aide. She was telling the student aide that African Americans were considered 3/5 of a human being. When you walk into the office there's a partition, so you can't see who's on the other side. You can't see who's coming in or who's on the other side of it. I sit in the front. When I showed myself while Marilyn was telling this student this, I was mortified. I asked her "What are you telling this student? What are you talking about? That African Americans were once considered 3/5 of a human being? Is that what you're telling her?" She went on to explain that is had something to do something with Trump and the election. She blamed the conversation on Trump. I didn't ask a lot of questions. But, I told her I was offended. I told her I was insulted. I told her I couldn't believe she was having this conversation, and with a student aide no less, who is probably 18 or 19 years old and white (Caucasian). She didn't apologize. I think there are certain things that in my opinion, you should not discuss at work. We all have discussions at home that we wouldn't have at work. Things you say at home you can say because you are in the comfort of your own home, and those things you don't say outside because you may offend someone. Whatever it was that they were discussing was not appropriate in the workplace especially when she works with two, three African-Americans. I don't know what it was, but she blamed it on Trump somehow.

The student aid was mortified. She didn't say much. She's a young girl. She looked like a deer in headlights. Based on the conversation, I let it be known that I was offended by her having this conversation in an office. It's something that a Black person is going to be offended by. This is not something I want to hear from anybody, particularly at a job, as an African American. I don't think I ever heard anyone say that in front of me in a conversation. There's one thing if I am reading a book or going over a history lesson with other African Americans maybe, but I never in my whole life had a white person reference that African Americans were once considered 3/5 of a human being. If you are speaking about Donald Trump then why are you bringing this up? I didn't ask what it had to do with Donald Trump. All I remember was that her explanation had something to do with Donald Trump. As I tried to explain to her how offensive it was, she didn't understand why I was upset. She didn't see anything wrong with what she said and why I was so upset. When Anton and Umilta arrived at work, I told them separately what Marilyn said. Both were shocked, as I was and couldn't believe it. One of the things I was really bothered by was her having this conversation with this young white impressionable young girl. It's one thing to have your own personal thoughts on things, but I think it's another to pass that along and influence the next generation with racist thoughts. This is how racism is carried from one generation to the next. The student aide saw how upset I was and both of our reactions. She's just starting out in life. She's a student aide. She hasn't started a professional life yet and this is one of those defining moments to me. I brought it up again and more so to talk to the student aide to make her understand how offended I was by what I had overheard. Marilyn Barton was trying to pretend that she wasn't listening anymore. I told her I was offended and I didn't appreciate walking into this conversation in the morning at work. She never apologized.

DFIT000028

Nevertheless, later, I asked Anton and Umilta, "What should I do?" I usually don't ask people what to do but in this case they were there and it was out in the office that this had happened, I asked them. They both didn't think I should do anything because that's how Marilyn is. I'm pretty certain part of their response was to let it go. They both think with these things, "nothing will be done about it". If the Dean had to choose between Marilyn and us, Mary would always choose Marilyn. I don't want to believe this, but they have said it multiple times. There's this old African proverb, "If you want to go fast, you go alone. If you want to go far, you go together". It's something that has been playing over and over in my head, and in that one instance I wanted them to help me make my decision about what to do. I made <u>my</u> feelings clear to Anton and Umilta, but I let it go.

DFIT000029

**THIRD INCIDENT OF OCCURRENCE:**

Furthermore, approximately one year ago, Jonathan Kyle Farmer was in our office for a meeting with the Dean, Mary Davis. As I was getting dressed to go home, Kyle said in the presence of the Dean, that I look like I was going to the hood as I put my hat on. They were standing at my desk and everybody was leaving. I was speechless. After I gathered myself, I said to him, "Don't you ever, ever say that to a black woman ever again." I didn't raise my voice. I don't remember what he said. I thought it was somewhat of a blessing that the Dean was standing right beside him.

The next day, I went up to Mary and asked her, "Why would he say something like that?" She said she didn't know. I told her I was going to speak to him and she said fine. By this time, his office was in the 'B' Building. I met with him and I asked him why he would say something so racist and offensive. He said he didn't know. His response was probably so foolish that it was not good enough for me to remember what he said. I told him that it was offensive. I told him he is a teacher and he has African-Americans in his class and making comments like that would not go over well with his students. He said he was glad that I told him. I think he was playing on being British and how race is different in England. He apologized profusely and he thanked me for saying something to him. We had a long conversation outside of his office. He apologized many times.

Please note, I don't have any regrets. With any of these incidents I could have come to AA at the time but I'm really the type that prefers to handle it myself first. I believe I have the responsibility of making an effort to have a conversation with anyone who has offended me.

**FOURTH INCIDENT OF OCCURRENCE:**

The other incident was this past Christmas. One thing I'm experiencing is that very often, when I confront a white colleague with something that has offended me, and they have no real explanation or defense, it changes the relationship. They become very careful around me. That was the situation with both Kyle and Brenda.

Whenever Brenda Cowan would travel on business, she brought things back for us in the office. Each time she gave me something, I'd ask myself "What the hell is she giving me this for?" She gave me an "eraser" and I believe a pencil. She wrapped it up and gave this to me when she came back from a trip. Another time, she gave me something which appeared to be something over-the-counter when you're at a drugstore or Duane Reade. She wrapped it up and gave this to me. A different time, I showed it to Umilta and asked her, "What the hell is this?" She doesn't have to give me anything. I was offended. I didn't want what she gave me and I was leaving for vacation so, I put it in an interoffice office envelope and gave it to Umilta to give it back to Brenda. Umilta laughed about it. When I got back, Umilta had not returned the "gift". So, I let it go.

DFIT000030

This past January, after Christmas she gave me lip balm wrapped as a present; something you get at a Duane Reade counter that you just wrap up and give to someone. I was offended and asked myself, "Why is she giving me these things? What is she doing? What's the message Brenda is trying to convey? What am I supposed to be reading from this? Is this some effort to give the appearance of trying to move forward, or to pretend we have a relationship that we don't have. She doesn't need to give me anything. This time, I had enough. No note, nothing, I placed it in an interoffice envelope and sent it back to Brenda. Sometime later she was in the office and stopped by my desk to inform me that her gift had somehow been returned. She told me that she sent a Christmas gift to me and it ended up back in her office. She wasn't looking at me. She was just talking. I told her I sent it back. She didn't hear me. I let her keep talking. She went on about how she didn't know what could've happened because she gave me this Christmas present and it just ended up back in her office. I said again that I sent it back. She asked why. I didn't say anything. She asked if she offended me or was it because I don't believe in Christmas? I just looked at her and told her she didn't have to give me anything. She walked away.

Within an half an hour Dean Mary Davis walked up to me and asked if Brenda Cowan had given me a Christmas present, and if I sent it back. I looked at her like she was crazy. I couldn't believe the Dean was asking me. The look on my face must've told her that I couldn't believe she was asking me. Mary said ok, that she was out of this and this was between Brenda and myself. Why would the Dean get involved in a Christmas present? I later walked by the Dean's office and she called me. Mary and I had discussed an upgrade last July and she has been working towards making this happen. She told me that in the spring we would have a better chance of making this happen. One of the responsibilities I had was to take on Exhibition and Experience and Art Market programs because Umilta didn't want to work with those two programs. She didn't want to work with them and they didn't want to work with her. It appears to me that Mary was just trying to prepare for what may happen at some point in time. When the Dean called me in I asked her if she was the Christmas present police." I can't believe you're asking me this. Why are you asking me about a Christmas gift between employees? This a personal matter." She said she received an email from Brenda. Well, the Dean said, "You're supposed to be working with Exhibition Design and this would not look good if you were to file a grievance against Brenda. This would not be the best situation." I did not understand why she was speaking about a grievance. As I was leaving Mary's office, I told her that Brenda and I had a situation a few years ago and she must be thinking about that situation. She believes I'm going to file some sort of grievance because she's still in that space. That was my assumption.

**FIFTH INCIDENT OF OCCURRENCE**

On March 9, Marilyn went to a funeral and came in the next day telling Umilta about the funeral. They were talking about it as I walked in in the morning. When a colleague is going to a funeral, any decent human being would inquire about it the next day and I jumped into the conversation. Marilyn was talking about her cousin finding out that his parents weren't married when he was born. He was really concerned he would be considered illegitimate and a bastard. She had mentioned illegitimacy and calling children bastards who are conceived out of wedlock once before. I didn't say anything at that time because it hit me sharply.

DFIT000031

There was a conversation between the three of us about many parents who had been married 2 or 3 months before their child was born. It wasn't necessarily so uncommon. Marilyn was saying he was concerned he would be considered illegitimate and a bastard. This time when she said it, I said, "Well my son is not a bastard, and he is not illegitimate." I am a single mother, but we don't necessarily go around discussing marital status in the office unless you choose to have the conversation. Marilyn said, "Well, in some socioeconomic groups, he would be considered this." I was so taken aback. Sometimes people say things to you and it is best not to respond - especially in a professional setting. I was speechless. No one has ever said this to me.

The following Monday when I came in to the office, I made an appointment to speak to the Dean Mary Davis and told her what was said. Her first reaction was to chuckle and she said, "Well nobody uses those terms anymore. Those terms are outdated" and this was it pretty much. I had given it a lot of thought over the weekend and I decided to remind the Dean of all the incidents I have overlooked. Everything we have discussed here in this meeting, I told Mary. When I told her what Marilyn said to the student aide, Julia about African-Americans were considered 3/5 of a human being, she replied, WELL HISTORICALLY SHE'S CORRECT.

I did not expect Dean Mary Davis to respond this way. I was deeply hurt and even MORE offended. She didn't say much. She asked if I had taken the opportunity to educate Marilyn Barton and bring some awareness. I told her, I didn't. If someone offends me in the way that she had, I wouldn't feel compelled to educate anyone. I was expecting more dialogue from the Dean. In that moment, I decided to go through the list of incidents and offenses I had overlooked. I believe she was trying NOT to show any emotion. When I wasn't getting much response, I said I did have the option of going to EEO if I wanted. She said, "There are institutions in place within the college where I can go." I responded, if I chose to follow up with these institutions, the first question anyone would ask would be, had I spoken with the person in charge? Right from the start of our conversation, unfortunately, I felt the Dean was siding with Marilyn Barton. She wasn't showing any sense of fairness or compassion for what I was clearly very upset about at the time. I wasn't sure if she just didn't care, or was this the way FIT had trained their management to respond in situations like this one.

I was extremely disappointed about how the conversation turned out. Umilta and Anton have absolutely no faith in her fairness, and strongly believe she will always side against people of color, if and, when it is between Marilyn Barton and one of us. All Mary said to me was, "If you want me to speak to her, I will."

In conclusion, one last thing that I wanted to add was that when we last met, you Deliwe said to me that it was true that at one time Africans-Americans were considered 3/5 of a human being, as if I possibly wasn't aware of my own history. Let me tell you why I was offended. Yes, historically this is true. African Americans are painfully aware that our ancestors were once legally considered to be 3/5 of a person AND historically they were also enslaved, raped, lynched, murdered, torn away and separated from their families by white people. Yes, historically this is true. But, any reasonable black person does not want to be reminded of this. Particularly by white colleagues who under normal circumstances doesn't give a damn about me or my culture. So the last thing I want to overhear by white colleagues discussing at the watercooler is that my ancestors were considered 3/5 of a person. In the wake of the 50 years yesterday that it's been that a white person shot Dr. Martin Luther King dead,

DFIT000032

the irony of what we celebrate. As we are all aware there is a lot of negativity going on in the country these days. Young African American men and boys are being gunned down every hour by racist police officers who are paid to protect us. The President of the United States has referred to African countries as shithole countries.

I went through a timeline and stated all the facts. My intention is to go on record. It is not a perfect world. We all know this, particularly right now. I have never lived in a time where everyone has been so divided and it is shameful. In the past, people kept any racist views they had to themselves and in my experience, it has not shown up in the workplace, but NOW. The one time Marilyn Barton decides to discuss race, it's not to ask a compassionate question, it was to belittle (in my opinion) her African-American colleagues at the water cooler with a Caucasian student aid. It's very telling and incredibly offensive. I'm not going to sit quietly and accept racist comments from colleagues. We are an office of women who should be empowering one another and leading by example. I have been greatly disappointed by these actions and tried to resolve it. This time enough was enough. It was extremely discriminating, personal and insensitive. I hate to say it, maybe Anton and Umilta were right.

There has to be some sort of sensitivity training. The training that is in place does not seem to be working. The incidents started in 2014 and it's still going on in 2018.

**RECOMMENDATION(S):**

**What would I like to see happen:**

Marilyn Barton, Brenda Cowan, and Dean Mary Davis and Jonathan Kyle Farmer should be reprimanded. They don't seem to feel that racist remarks are unacceptable. There are staff and people who don't feel supported. People are saying whatever they want, and they cannot behave this way in a professional work environment.

I would like to see reprimanded actions that can be executed according to Civil Rights Act of 1964 and 1968, i.e., Labor Relations and Discriminatory Laws?

I want these people to know that casual racism **IS** racism, and always bear in mind that her discriminatory comments and/or behavior is unacceptable, unprofessional and will not be tolerated. The behavior/comments were unethical and morally wrong. Under the EEO, there should be a zero tolerance for racist discriminatory remarks. Everyone must be respectful of other cultures and should be reprimanded for racist behavior.

**Further recommendations: Suspension, termination or fines and monetary compensation.** She broke the laws and all rights reserved under and pertaining to discrimination via her words and outright inconsiderate behavior. She needs to be held accountable for all said that are in Violation of the Civil Rights Acts 1964 inclusive of EEOC discriminatory Employment and Labor Relations Laws for her irrefutable, repetitive and disrespectful behavior.

The office of Affirmative Action can speak to 1) Anton Baptiste and 2) Umilta Allsop as my witnesses.

DFIT000033

## C. Respondent 1 Response[3]

The incident she's referring to occurred approximately four years ago; Marjorie had misinterpreted something I had said. She came to me later and she expressed to me what she heard me say and how it offended her. I explained what I meant, and I apologized. She said she accepted my apology. We hugged and we both verbalized, let's be friends. Since that time, there has been no issue between she and I. I don't see her often. Hardly at all.

In regard to the holiday gifts, everyone gets a holiday gift from me in the School of Graduate Studies as a token of appreciation. Everyone receives a gift of equal value, no one is given an open holiday gift in front of everyone else, and its wrapped. It is a private, personal gift for everyone.

I don't a have a response as to why she is bringing this forward.

### Supplemental Information Submitted May 31, 2018

At the table I understood that the claim is regarding the monetary value of the token gifts of holiday wishes. I understood that Margie said her belief is that the gifts are low in quality because of a misunderstanding we had many years ago. I heard what Margie stated in her claim and it wasn't entirely correct, but I thought that the issue I needed to respond to was the holiday gifts. And because Margie and I cleared up the misunderstanding many years ago and had an excellent ethical conversation about it, clarified what was said, resolved it and elevated our relationship in response.

I think I should clarify for the record what was said and I hope this can be included in my official response:

Umilta and I were engaged in a private conversation. Umilta was sharing personal information and we were chatting quietly. Margie called out from the other end of the room across several cubicles that she could hear us. We lowered our voices. Margie called out again and I responded in a lighthearted tone "Hey Margie come join us, we are gossiping children at the back of the school bus."

Margie, when we spoke later, said she understood this as offensive, and the conversation proceeded as I already put in my statement: a clarification accompanied by an apology, etc.

I also add in the monetary value of the token gifts is in accordance with FIT's code of ethics? I stay within $10-15 as described in our training. Should that be added in as well? I am trying to be clear and straightforward while giving enough information. If it's important to specify the actual monetary value of the gifts it's according to FIT code of ethics.

## D. Respondent 2 Response[3]

DFIT000034

In regard to what was said, there was a moment about two years ago or maybe more where I did make a comment to her about how amazing it looked and that it looked straight out of the hood. It was a street style fashion compliment that landed badly. Marjorie pursued me during the week and we got to speak in front of my office. She told me this was a teachable moment for me and she reprimanded me. I apologized several times to her and thanked her for talking to me about it. To find some way to apologize, I purchased a baseball cap then customized it by hand illustrating flowers all over it and gave it to her as a conciliatory gift. I don't believe I meant it the way she received it. At the time gift and my apology was accepted by Marjorie we have had a very good and cordial working relationship.

## E.  Respondent 3 Response[3]

Regarding the first complaint, I will say we agree politically in the office. We talk about politics a lot and we're a bunch of Democrats. I was having a conversation with our student aide, Julia McNamara. She was very upset about the election. She didn't understand how someone can lose the popular vote and still become president. We began talking about the history of the electoral college and Julia was saying it was a terrible system. I was a history major and I told her that I learned that it was set up like that pre-civil war, the south and north had made a compromise for voting power. The population of the South determined representation for them and Black people were counted as 3/5 of a human to help determine how many representatives they would get. They never intended for Black people to get a vote. It's the same as how each state gets two senators regardless of population. We were just talking about the insanity of it all. I don't know at what moment Marjorie began hearing the conversation. She heard less than half of a conversation. I believe she said something and I apologized. I told her I didn't intend to offend her. That was quite a while ago. Julia was taken aback from Marjorie's response.

I went to a funeral and at the service the pastor asked that we tell a story about my aunt. My cousin Steven told us that the funeral home had asked for all of this documentation. One being his parent's marriage certificates. This is when he found out that his parents had gotten married in 1949 not in 1948 like he was told. He joked about it and said, "Who knew I was a bastard?" I was telling Umilta and Ariel the story. I think Marjorie was in the office. Marjorie came to me and said, "Well I want you to know that my child is not a bastard child." I was taken aback. I don't know her son.  I told her I never said her son was a bastard, but I apologized. I guess she doesn't like the word. I was just telling them what had happened. It was just a funny story. My cousin thought it was funny. I didn't realize it was that offensive. I don't know if people use the word very much. It's a bit of an archaic word. Ariel was definitely there. Umilta might've been there. Ariel was just listening, and she thought it was somewhat amusing. The whole thing lasted 2-5 minutes.

Marjorie has a lot of really nice qualities, but sometimes I get the feeling like she's looking for a fight. Even with things that don't involve me, it seems she has a chip of shoulder. I don't think she's pretending to be offended, but again she's looking for an argument. We actually get along, at least from my point of view, fairly well. She may be like this because of things that I may not be aware of.

You can speak to Julia, Ariel, Umilta, and Anton.

## F.  Respondent 4 Response[3]

DFIT000035

I attended this meeting at the request of Deliwe Kekana, Affirmative Action Office at Title IX Coordinator.  As I am not part of the bargaining unit, I was told that I was not eligible to have UCE representation in this meeting.  Jerilee Fonseca wrote me via an email sent on 10 April 2018 that this meeting was requested as part of "an investigation of a complaint of discrimination on the basis of race," in which I had "been named a Respondent."  In a subsequent phone call, Ms. Kekana told me that the complaint was made by Marjorie Phillips, who holds the position of Research Associate in the School of Graduate Studies.  In the meeting on May 3, in response to my questions regarding the specific nature of the complaint against me, Ms. Kekana told me that the matter was categorized as "discriminatory harassment."  I was not shown the complaint and was given no further details.

When Ms. Kekana asked me what I thought may have led to the complaint, I replied that Marjorie had told me that she had overheard Marilyn Barton, also a member of the SGS administrative staff, speaking with someone in the office about an experience she (Marilyn) had just had at a family funeral.

I should note that the section of the Office of the Dean where both Marilyn and Marjorie work is an open workspace,  which allows even words spoken quietly in one part to be heard everywhere.

According to Marjorie, she overheard Marilyn describing a conversation she had at the funeral with her elderly uncle, who was relating a family history about a relative who had made a comment along the lines of "Back in my day, we would have described him as a bastard."  Marjorie said that she had walked in on this conversation, and that it upset her because she was not married when her son was born.

At Marjorie's request, she and I spoke further about the incident. I asked her if she wanted to share more of her thoughts about the comment.  She said yes, and proceeded to tell me that she felt insulted because her son should not be characterized as a "bastard."  I told her that, while I understood her point of view, since I didn't hear the conversation myself I could not evaluate it in context.  I encouraged her to speak to Marilyn directly and to come back to me if she had additional issues she wanted to discuss. I also told her that I would speak to Marilyn. The following day I spoke with Marilyn about the incident and she confirmed that she had been, in fact, retelling a conversation that took place at a funeral where her uncle made the comment described by Marjorie

At no time then or since did Marjorie say or otherwise indicate to me that she believed that the comment from Marilyn was racially motivated.  Marjorie has not raised the matter of the incident since.

In response to questions from Ms. Kakana about the general environment in the School of Graduate Studies, I provided some comments.  I noted that I aim to foster a dynamic of teamwork and mutual respect in all of our operations, which involve personnel in a number of campus locations.  In particular, there are three administrative staff housed the main office, which is Room E315: these administrative staff members are Marjorie Philips, Umilta Allsop, and Marilyn Barton. Ariele Elia, who is Industry/Program Coordinator for the Fashion Design MFA department, is temporarily housed in E315 as well, while we wait for the completion of her office space in 236 27th Street.  I also reported that as SGS has added administrative staff over the past year, specific work assignments have shifted to reflect the new organizational structure. Marjorie's primary assignments are to provide support for the Fashion and Textile Studies department, and to assist with SGS events.

DFIT000036

In response to questions from Ms. Kakana about incidents of inappropriate behavior in the SGS office, I reported that I had heard second-hand about such incidents involving Marjorie. These were not reported to me as involving racist or other discriminatory comments or actions, but rather as incidents in which Marjorie acted in a disrespectful manner. SGS faculty have voiced concerns that Marjorie is often off-putting and rude to them, as well as to students and prospective students who come to the main office for information. I have not witnessed these behaviors first-hand, and I would say that in my experience, while she can be authoritative and perhaps demanding, I have not seen her being rude. When I have received reports indicating that her behavior has been inappropriate, I have spoken to her directly. My sense of our exchanges is that they have been honest and straightforward, and that she has understood the nature of the issues at hand.

In response to questions from Ms. Kakana about interactions between Marjorie and SGS personnel, I reported that our staff member Anton Baptiste had expressed concern about his interactions with her. Specifically, Anton had told me that Marjorie questioned his relationships with women and spoke directly with him about his choice to date women of all races. When Anton spoke to me about this, I asked him if he wanted me to follow up, and he said no. Ariele Elia, who joined our staff in 2017, disclosed to me shortly after her appointment in SGS that she and Anton were involved in a romantic relationship. Upon learning this I reviewed FIT policy and confirmed that since Ariele and Anton work in separate areas with no supervisory role involved, they were not in breach of college policy. I have since observed that Marjorie has from time to time asked Ariele to let her know when she will be in the office. Ariele and the chair of her department, Professor Kyle Farmer, have raised concerns about Marjorie's behavior in this regard, as they feel that she is attempting to supervise Ariele, which is not her role. I consider this to be a temporary issue as Ariele will be relocated to 236 27th Street before the fall 2018 semester; she agreed that this situation would be resolved when she moved.

I also reported to Ms. Kakana that Marissa Hairston, the Graduate Recruitment and Admissions Manager, who was hired in 2017, told me that Marjorie has behaved inappropriately in their interactions. As an example, Marissa noted that on one occasion she was working in her private office with the door closed and locked during work hours when the door opened and Marjorie walked in without knocking. Apparently Marjorie had taken a key from the main office and let herself in without permission. Marissa also noted that Marjorie has berated her after a staff meeting, and has commented negatively on her religious and lifestyle choices.

I also reported that Lynn Weidner, the Industry/Program Coordinator for the Illustration Department, who joined SGS in 2017 spoke to me about an incident that took place within weeks of her hire. In this instance, Lynn reported, Marjorie physically pulled her into Anton's office, shut the door, and instructed Lynn on how she should do her job. Lynn reported to me that she was shocked and somewhat frightened when this occurred. When Lynn brought this to my attention, I spoke to her about it at length and asked how she wanted me to proceed; she asked that I keep it between the two of us, stating that she wanted to settle into her new job before escalating the issue.

## G. Activity[3]

DFIT000037

| Investigation Timeline | | |
|---|---|---|
| February 2018 | | The Complainant reached out to Deliwe Kekana, Affirmative Action Officer and Title IX Coordinator, for a meeting. |
| February 21, 2018 | 3:00 p.m. | Due to an emergency, Deliwe was unable to meet with the Complainant. Jerilee Fonseca attended the intake meeting in Deliwe's stead. The Complainant refused to meet with Jerilee. |
| March 19, 2018 | 3:46 a.m. | The Complainant requested a meeting with Deliwe. |
| March 23, 2018 | 10:00 a.m. | Meeting with the Complainant, UCE Representatives Isolina Perez and Amy Zaborwoski-Smith, and Human Resources Generalist Natacha Unelus. The Complainant was unable to finish submitting their complaint and was scheduled for a second meeting. |
| April 5, 2018 | 12:00 p.m. | Meeting with the Complainant, UCE Representatives Isolina Perez and Amy Zaborwoski-Smith, and Human Resources Generalist Natacha Unelus |
| April 12, 2018 | 3:30 p.m. | Meeting with Respondent 1, UCE Representative Ellen Lynch, and Human Resources Generalist Natacha Unelus |
| April 16, 2018 | 7:19 a.m. | Jerilee Fonseca sent Respondent 1 their Statement for Review. |
| April 16, 2018 | 4:28 p.m. | Respondent 1 submitted their revised statement |
| April 18, 2018 | 5:38 p.m. | Jerilee sent the Complainant their Statement for Review. |
| April 20, 2018 | 3:00 p.m. | The Complainant submitted their revised statement |
| April 30, 2018 | 11:00 a.m. | Meeting with Respondent 2, UCE Representative Ellen Lynch, and Human Resources Generalist Natacha Unelus |
| April 30, 2018 | 3:00 p.m. | Meeting with Respondent 3, UCE Representative Ellen Lynch, and Human Resources Generalist Natacha Unelus |
| April 30, 2018 | 3:51 p.m. | Jerilee sent Respondent 3 their Statement for Review |
| May 1, 2018 | 7:34 a.m. | Respondent 2 submitted their revised statement. |

[3] This is an abbreviated version of the activities pertinent to this report.  An extensive activity log is in the office of the Affirmative Action Officer.

DFIT000038

| May 2, 2018 | 11:25 p.m. | Respondent 3 submitted their revised statement. |
|---|---|---|
| May 3, 2018 | 3:00 p.m. | Meeting with Respondent 4 |
| May 7, 2018 | 12:00 p.m. | Meeting with Witness A |
| May 10, 2018 | 10:00 a.m. | Meeting with Witness B |
| May 10, 2018 | 11:00 a.m. | Meeting with Witness C |
| May 10, 2018 | 12:00 p.m. | Meeting with Witness D |
| May 31, 2018 | 6:09 p.m. | Respondent 1 submitted supplemental information to Deliwe |
| June 12, 2018 | 9:28 a.m. | Jerilee sent Respondent 4 their Statement for Review |
| June 12, 2018 | 3:06 p.m. | Jerilee sent Witness A their Statement for Review |
| June 12, 2018 | 3:30 p.m. | Jerilee sent Witness D their Statement for Review |
| June 13, 2018 | 8:58 a.m. | Jerilee sent Witness B their Statement for Review |
| June 13, 2018 | 9:28 a.m. | Jerilee sent Witness C their Statement for Review |
| June 13, 2018 | 4:28 p.m. | Witness C advised our office that they would have a UCE representative review their statement before submitting it to our office. |
| June 18, 2018 | 9:46 a.m. | Witness C submitted their revised statement and supplemental information |
| June 21, 2018 | 1:54 p.m. | Witness B submitted their revised statement |
| July 9, 2018 | 1:15 p.m. | Respondent 4 submitted their revised statement |

## H. Issues and Conclusions

Scope of investigation -
Upon reviewing the Complainant's report, the Complainant was requesting a formal investigation into five separate incidents involving four Respondents. Complainant was alleging discriminatory harassment on the basis of being African American, so this investigator determined that this investigation be processed according to the Nondiscrimination and Anti-harassment policy. This policy defines discrimination as subjecting an individual on the basis of his or her actual or perceived protected characteristics {age, citizenship status (except as required to comply with law), color, creed, disability, ethnic background, familial status, gender, gender identity, genetic information, marital status, military service or veteran status, national origin, pregnancy (including childbirth and breastfeeding), race, sex,

DFIT000039

sexual orientation, transgender status, unemployment status, an individual's relationship or association with a member of a protected category, a caregiver, or any other criterion prohibited by applicable federal, state, or local laws} to humiliating, abusive, or threatening conduct that denigrates or shows hostility or aversion toward an individual or group that is sufficiently severe, pervasive, or persistent so as to interfere with or limit a person's ability to participate in or benefit from FIT's programs or activities. Discriminatory harassment can take different forms and can consist of oral, written, graphic, or physical conduct relating to an individual's protected characteristics; accordingly, the determination of what constitutes discriminatory harassment will vary according to the particular context and circumstances. The evidentiary standard used for this investigation in accordance with the policy is a preponderance of the evidence, which asks whether it is "more likely than not" that the conduct occurred and violates the policy.

**Respondent 1:**
Complainant alleged that Respondent 1 subjected Complainant to discriminatory harassment over the course of two incidents. The first incident occurred in Fall 2014 in which Respondent 1 is alleged to have been gossiping in the office. According to Complainant's statement the Respondent invited the Complainant to join the conversation saying, "Come join us at the back of the bus." The second incident happened in December 2017 in which Respondent 1 is alleged to have been discriminatory harassing in giving the Complainant a lip balm wrapped as a gift.

Respondent 1 provided in response statements to the first incident that she said "Hey Margie come join us, we are gossiping children at the back of the bus." Respondent 1 went on to state that she apologized to the Complainant the same day as the incident. The Complainant corroborates this as happening in her statement as well. A statement referring to African-Americans sitting in the back of the bus can be discriminatory depending on the context and circumstances. The statement can be an allusion to segregation laws which prohibited African-Americans from sitting in the front of public buses. It is reasonable to believe that most Americans are aware of this history, particularly because these laws concerning public transportation were among the first challenged during the fight for civil rights and made famous with the Birmingham, Alabama bus boycotts led by Dr. Martin Luther King, Jr. The Respondent 1 alleges that she initially didn't think of the statement as discriminatory but that once it was brought to her attention she quickly recognized and apologized to Complainant. Complainant acknowledges that the first incident happened in the Fall 2014 semester and stated that the relationship has not been interactive since. Respondent 1 corroborated that stating, "I don't see her often. Hardly at all." Respondent 1 also stated that she thought she and the Complainant had "cleared up the misunderstanding" years ago and had an "excellent ethical conversation" after the incident. Respondent 1 provided in response statements to the second incident that she gives token gifts to everyone in the School of Graduate Studies around holiday time. Respondent 1 stated that she gives gifts of similar value - "within $10 - $15" - as a token of appreciation. Complainant stated that others in the department had also received a token gift and that she was the only one to return it.

This investigator finds that Respondent 1 is not responsible for having violated the discriminatory harassment in either incident. In determining what constitutes discriminatory harassment, this investigator reviewed the particular context and circumstances of these two incidents. It is reasonable to think that the Respondent 1 thought that the matter concerning the incident that occurred in Fall of 2014 was resolved. Although, a report may be filed at any time, it is reasonable that when discriminatory conduct occurs and interferes with or limits a person's ability to participate in the workplace in a severe

DFIT000040

or persistent manner, a report will be filed in a timely manner. In reviewing the context and circumstances of the incident that occurred in December 2017, this investigator found that there was equal treatment since all were given a token gift.

This matter is now closed with my office.

**Respondent 2:**

Complainant alleged that in 2017, Respondent 2 subjected Complainant to discriminatory harassment when he stated Complainant looked like she was "going to the hood" as the Complainant put her hat on. Complainant states that the Respondent "apologized profusely and he thanked me for saying something to him" Respondent states that his apology was accepted by Complainant and they had since the incident had a "very good and cordial working relationship."

Based on a preponderance of the evidence and the context and circumstances, this investigator finds that this incident does not meet the severe, persistent or pervasive standard of discriminatory harassment. However, this investigator finds this may be more appropriately handled by another office. This report will be forwarded to the Office of Human Resources Management and Labor Relations for appropriate review.

This matter is now closed with my office.

**Respondent 3:**

Complainant alleged that on two occasions - one in November 2016 and one in March 2018- Respondent 3 subjected Complainant ot discriminatory harassment. In November 2016,  Complainant alleges that she walked into the office to hear Respondent 3 speaking to a student aide. Complainant alleges that Respondent 3 said "African Americans were considered     of a human being." The Respondent 3 corroborated that she did state "African Americans were considered     of a human. The Respondent 3 went on to provide context to the conversation she had with the student aide. Respondent 3 stated that the conversation took place on November 9, 2016 - the day after Election Day. Respondent 3 stated, "She was very upset about the election. She didn't understand how someone can lose the popular vote and still become president. We began talking about the history of the electoral college and Julia was saying it was a terrible system. I was a history major and I told her that I learned that it was set up like that pre-civil war, the south and north had made a compromise for voting power. The population of the South determined representation for them and Black people were counted as 3/5 of a human to help determine how many representatives they would get. They never intended for Black people to get a vote. It's the same as how each state gets two senators regardless of population. We were just talking about the insanity of it all."

Complainant alleges that in March 2018, Complainant, Respondent 3 and Witness C were discussing a funeral the Respondent 3 had recently attended. In the course of the conversation, Complainant alleges that Respondent 3 was discussing a family member who was concerned that he would be "considered illegitimate and a bastard" because his parents weren't married when he was born. Complainant alleges she told Respondent 3, "Well my son is not a bastard, and he is not illegitimate." Respondent 3 and Witness C corroborate that there was a conversation about Respondent 3's family member. Respondent

DFIT000041

3 stated that when she was discussing the funeral, she told Witness C and Complainant that her family member made a joke during the funeral about learning that his parents were married in 1949 and not 1948 as he had been told. Witness C stated that she was "not offended, but I felt it was a deliberate statement."

Based on a preponderance of the evidence and the context and circumstances of the incident occurring in November 2016, this investigator cannot substantiate the complaint of discriminatory harassment. Based on the context and circumstances of the incident occurring in March 2018, this investigator cannot substantiate the complaint of discriminatory harassment.

This matter is now closed with my office.

**Respondent 4:**

Complainant alleges that Respondent 4 when Complainant brought forth complaints involving Respondent 3, Respondent 4 did not respond correctly. Complainant stated she was "deeply hurt and even MORE offended" when Respondent 4 told her, "WELL HISTORICALLY SHE'S ( Respondent 3) CORRECT." Complainant alleges that Respondent 4 was "siding with" Respondent 3. Complainant alleges that Respondent 4 "will always side against people of color." Respondent 4 stated that when Complainant brought forth complaints against Respondent 3, she instructed the Complainant to speak with Respondent 3 and come back to speak with her if she had additional issues she wanted to discuss. Respondent 4 also stated to Complainant that she would speak to Respondent 3, which Respondent 4 alleges she did. Respondent 4 denied ever acting in a discriminatory way. Witness B and Witness D stated they have never witnessed Respondent 4 be discriminatory.

In reviewing the context and circumstances of this complaint, this investigator is unable to substantiate the complaint of discriminatory harassment. This report will be forwarded to the Office of Human Resources Management and Labor Relations for appropriate review.

This matter is now closed with my office.

**Investigator's addendum and notes:**

I found this Complainant to be combative and argumentative. Complainant in her complaint statement wrote that she was offended when this investigator (a Black woman) replied that Respondent 3's statement that African Americans were considered     of a person was factually true. Complainant went on to state that "any reasonable Black person" would be offended upon hearing this. I took this to mean that I was not a reasonable Black person. Complainant during her initial intake meeting also stated as a motivation and explanation of why she hesitated coming forward with these various complaints because when she previously put forth a complaint of discrimianation against her former supervisor, Pamela Ellsworth, her complaint was not substantiated by a preponderance of the evidence. It appeared to this investigator that she grouped all these incidents together with the thought that it would be sufficient evidence. In May 2019, my office was alerted by Complainant that Respondent attacked her stating "I'm going to fucking kill you." The matter was addressed through the disciplinary process by the Office of Human Resources. Complainant in her intake statement also alleged that the EEOC has a "zero tolerance on racist discriminatory remarks." At the investigation close-out meeting, this investigator addressed this

DFIT000042

with Complainant quoting the EEOC guidance on "zero tolerance." Complainant also argued during the close-out meeting that Respondent 3's actions in May 2019 were retaliatory. This investigator read the definition of retaliation from the College's policy and explained why the incident in May 2019 was not retaliatory. Complainant argued that this investigator didn't understand retaliation where as "people I've spoken to can see it clearly."

DFIT000043