# EXHIBIT K

Page 1

1

2     IN THE UNITED STATES DISTRICT COURT

3     FOR THE SOUTHERN DISTRICT OF NEW YORK

4     Civil Action: 1:20-cv-00221

5     -----------------------------------x

6     MARJORIE PHILLIPS,

7                            Plaintiff,

8                  -against-

9     THE FASHION INSTITUTE OF

      TECHNOLOGY, MARY DAVIS and MARILYN

10    BARTON,

11                           Defendants.

12    -----------------------------------x

13

14                     September 9, 2021

                       10:28 a.m.

15

16              - VOLUME 1 -

17

18         Remote Deposition of MARJORIE

19    PHILLIPS, the Plaintiff in the

20    above-entitled action, located in New

21    York, New York, taken via Zoom before

22    Dawn Matera, a Shorthand Reporter and

23    Notary Public of the State of New York.

24

25              *     *     *

Page 2

```
1
2  A P P E A R A N C E S :
3
4     THE COCHRAN FIRM
          Attorneys for Plaintiff
5         55 Broadway, 23rd Floor
          New York, New York 10006
6
   By:  DEREK SELLS, ESQ.
7        MINA MALIK, ESQ.
8
9     NIXON PEABODY LLP
          Attorneys for Defendant FIT
10        50 Jericho Quadrangle
          Suite 300
11        Jericho, New York 11753-2728
12    By:  DAVID A. TAUSTER, ESQ.
          dtauster@nixonpeabody.com
13        ROSE A. NANKERVIS, ESQ.
          rnankervis@nixonpeabody.com
14
15
      SARETSKY KATZ & DRANOFF LLP
16        Attorneys for Mary Davis
          475 Park Avenue South
17        26th Floor
          New York, New York 10016
18
   By:  ERIC DRANOFF, ESQ.
19        edranoff@skdllp.com
20
21    MENKEN SIMPSON & ROZGER LLP
          Attorneys for Marilyn Barton
22        80 Pine Street
          33rd Floor
23        New York, New York 10005
24    By:  BRUCE MENKEN, ESQ.
          bmenken@nyemployeelaw.com
25
```

Page 4

```
1
2           STIPULATIONS
3       IT IS HEREBY STIPULATED AND
4   AGREED, by and among counsel for the
5   respective parties hereto, that the
6   filing, sealing and certification of the
7   within deposition shall be and the same
8   are hereby waived;
9       IT IS FURTHER STIPULATED AND
10  AGREED that all objections, except as to
11  form of the question, shall be reserved
12  to the time of the trial;
13      IT IS FURTHER STIPULATED AND
14  AGREED that the within deposition may be
15  signed before any Notary Public with the
16  same force and effect as if signed and
17  sworn to before the Court.
18           *   *   *
19
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S :  (Continued)
3
4   Also Present:
5      CRAIG JONES, Concierge
6      Mary Davis, (Morning session.)
7             ~oOo~
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1            MARJORIE PHILLIPS
2   M A R J O R I E  P H I L L I P S, having
3   been first duly sworn by Dawn Matera, a
4   Notary Public, was examined and testified
5   as follows:
6   EXAMINATION BY MR. TAUSTER:
7       Q.   Good morning, Ms. Phillips.
8       A.   Good morning.
9       Q.   My name is David Tauster and I
10  represent Fashion Institute of Technology
11  in connection with this lawsuit.  During
12  this deposition I will probably refer to
13  Fashion Institute of Technology as FIT,
14  do you understand?
15      A.   Yes.
16      Q.   Very good.  I am going to ask
17  you a series of questions regarding your
18  employment with and claims against FIT.
19  If you don't understand any of my
20  questions, please let me know and I will
21  rephrase or have the court reporter read
22  the question back.
23          I am going to ask that you keep
24  all of your answers verbal, because
25  court reporter can't take down any
```

2 (Pages 2 - 5)

MARJORIE PHILLIPS

1
2 physical movements such as nods or shrugs
3 of the shoulder.  Your attorney might
4 object to some of my questions today.
5 You're still required to answer my
6 question, notwithstanding that objection,
7 unless your attorney specifically tells
8 you not to answer the question.  Do you
9 understand?
10     A.   Yes.
11     Q.   And again, that's the response
12 and keeping everything verbal.
13     A.   Okay.
14     Q.   Very good.  Now, I do not want
15 you to guess at answers to my questions
16 today.  However, where appropriate, I am
17 entitled to your best estimate of
18 something.  Do you understand the
19 difference?
20     A.   Yes.
21     Q.   Okay.  Very good.  Now, if you
22 have any doubts about your ability to
23 answer a question, or if you don't
24 understand a question, please ask for
25 clarification.  If you answer a question,

MARJORIE PHILLIPS

1
2 I am going to assume that you understood
3 it, okay?
4     A.   Okay.
5     Q.   Very good.  So during your
6 testimony today you cannot have any other
7 computer screens open or documents in
8 your presence while testifying unless
9 prior to answering the question you
10 inform me that you're looking at a
11 document and disclose what that document
12 is.
13     A.   Okay.
14     Q.   You're also not permitted to
15 communicate in any fashion with your
16 attorney, whether through text, e-mail or
17 other electronic means, while you are
18 testifying.
19          Now, any time you need a break,
20 please let me know.  The one thing I am
21 going to ask is that we do not take any
22 breaks while there are questions pending
23 as you are not permitted to take a break
24 until you have finished answering the
25 questions.  Do you understand my

MARJORIE PHILLIPS

1
2 instructions?
3     A.   Yes.
4     Q.   Have you taken any medication
5 in the last 24 hours that would affect
6 your memory or your ability to answer my
7 questions truthfully?
8     A.   No.
9     Q.   Have you taken any drugs or
10 illegal substances in the last 24 hours?
11     A.   No.
12     Q.   Have you consumed any alcoholic
13 beverages in the last 24 hours?
14     A.   No.
15     Q.   Do you understand that you have
16 taken an oath today to tell the truth
17 under penalty of perjury?
18     A.   Yes.
19     Q.   Where are you today?
20     A.   I am at home in my bedroom.
21 One of my bedrooms.
22     Q.   Okay.  Is there anyone else
23 here?
24     A.   My son is here.
25     Q.   Okay.  Is he in the room with

MARJORIE PHILLIPS

1
2 you?
3     A.   No, he is not.
4     Q.   Okay.  Have you told him not to
5 enter the room with you for the duration
6 of the deposition?
7     A.   I didn't tell him, but I think
8 he knows that.
9     Q.   If he enters the room, we will
10 probably just break for a second just so
11 you can shoo him out, for lack of a
12 better term.
13     A.   Okay.  It froze.
14     Q.   Yeah, yeah, I think we both
15 froze.  We're good now?
16     A.   Yeah.  There is a little bit of
17 a delay.  Can you hear me clearly?
18     Q.   I can hear you.  It looks like
19 your connection may not be the strongest,
20 but we will muddle through.
21     A.   Okay.
22     Q.   Are you in a room where you can
23 be free from disturbance for the duration
24 of the deposition?
25     A.   Yes.

3 (Pages 6 - 9)

MARJORIE PHILLIPS

1
2     Q.    And again, unless you are
3  interrupted unintentionally by your son,
4  would you remain in the room for the
5  duration of the deposition?
6     A.    Yes.
7     Q.    Okay.  What type of device are
8  you using for today's deposition?
9     A.    My Mac laptop.
10    Q.    Okay.
11    A.    Desktop, desktop.
12    Q.    Do you have any documents open
13  on your desktop screen?
14    A.    No, I do not.
15    Q.    Do you have any programs open
16  on your desktop other than the Zoom
17  window?
18    A.    No, I do not.
19    Q.    Do you have your web browser
20  open?
21    A.    No, I don't have anything open
22  at all.
23    Q.    Do you have any physical
24  documents in front of you on the table?
25    A.    I do.  I do.

MARJORIE PHILLIPS

1
2     Q.    What do you have in front of
3  you?
4     A.    Some notes.  So I can't have my
5  notes out, right?
6     Q.    No, I am going to ask you to
7  pick those notes up, put them on the
8  couch or someplace else.
9     A.    Okay, okay.
10       MR. TAUSTER:  And Derek, I will
11  call for production of those notes, to
12  the extent they haven't already been
13  produced.
14       MR. SELLS:  I'll take it under
15  advisement.
16    Q.    Those notes are out of view?
17    A.    Yes.
18    Q.    You will not refer to those
19  notes during the duration of the
20  deposition.
21    A.    Okay.
22    Q.    Okay.  And so other than --
23  sorry?
24    A.    Just for my memory.
25    Q.    And other than those notes, do

MARJORIE PHILLIPS

1
2  you have any other physical documents on
3  the table in front of you?
4     A.    I have the, what do you call
5  it, the actual, the complaint, the
6  complaint.
7     Q.    Okay.  So to make it simple, I
8  am going to ask you to just clear all
9  documents off of your desk and put them
10  off to the side.
11    A.    Okay.
12    Q.    If we need you to look at the
13  document, Craig will share it up on the
14  screen.
15    A.    All right.
16    Q.    Very good.  Do you have a cell
17  phone or a mobile device?
18    A.    Yes, I do.
19    Q.    Is it on?
20    A.    Yes.
21    Q.    Can I ask you to turn it off?
22    A.    Okay.
23       (Witness complies.)
24    A.    Okay, it's off.
25    Q.    Are you aware that you can't

MARJORIE PHILLIPS

1
2  answer any calls or check any electronic
3  messages during today's deposition?
4     A.    I wasn't aware, but okay.
5     Q.    Do you have a smart watch that
6  receives notifications from your phone or
7  computer?
8     A.    No, I do not.
9     Q.    Do you have a television in the
10  room?
11    A.    I do, yes.
12    Q.    Is it off?
13    A.    Yes, it is.
14    Q.    I am just going to ask you to
15  please keep the television off for the
16  duration of the deposition.
17    A.    Okay.
18    Q.    And I am just going to ask you
19  to try to keep your voice up a little
20  bit, just to make sure the court reporter
21  can hear you.
22    A.    I am wondering, let me make
23  sure it's up.  Is this any better?
24    Q.    You are generally fine, look,
25  it's natural conversation, sometimes

4 (Pages 10 - 13)

MARJORIE PHILLIPS

1
2  voice modulation fluctuates, I'm going to
3  ask you to project as much as you can.
4      A.   Okay.
5      Q.   If we run into any issues, I
6  may ask you to get some headphones.
7          MR. TAUSTER:  Dawn, just make
8  sure you say if you can't hear
9  anything.
10         THE REPORTER:  Sure.
11     Q.   Did you do anything to prepare
12 for this deposition?
13     A.   I spoke to my attorney.
14     Q.   How many times did you speak to
15 your attorney?
16     A.   Once.
17     Q.   And for approximately how long?
18     A.   About three hours.
19     Q.   Did you review any documents to
20 prepare for this deposition?
21     A.   Yes.
22     Q.   What documents did you review?
23         MR. SELLS:  Objection.
24 Objection.  Hold on.  Objection.  Is
25 this to refresh her recollection,

MARJORIE PHILLIPS

1
2  David, because that's really the only
3  way you should be able to get that.
4          MR. TAUSTER:  Well, let me
5  rephrase the question.
6      Q.   Other than in the presence of
7  your attorney, did you review any
8  documents to prepare for this deposition?
9      A.   No, I did not.
10     Q.   Other than your attorney, did
11 you speak with anyone else about this
12 deposition?
13     A.   Just -- yes, just to say I have
14 a deposition tomorrow.
15     Q.   Who did you speak with?
16     A.   My family, my sister and my
17 son.
18     Q.   Other than advising them that
19 you had this deposition upcoming, did you
20 speak with them about anything else?
21     A.   No.
22     Q.   Did you speak with any current
23 or former employees of FIT about this
24 deposition?
25     A.   No, I did not.

MARJORIE PHILLIPS

1
2      Q.   Did you speak to any of your
3  doctors or other medical providers about
4  this deposition?
5      A.   Yes, I spoke with my therapist.
6      Q.   And who is your therapist?
7      A.   Dr. Cynthia Barnes.
8      Q.   What did you speak with
9  Dr. Barnes about this deposition?
10     A.   When I was informed what the
11 date was going to be, I told her what the
12 date was going to be, the date and the
13 time, and I told her, you know, that the
14 preparation for the deposition would be
15 the day before.  And that was pretty much
16 it, because I didn't know -- I don't know
17 what to expect, so.  That was kind of it.
18     Q.   That's our goal.  We're going
19 to try to keep you on your toes today.
20         So other than those logistical
21 issues about the timing of the deposition
22 and the timing of the preparation, did
23 you discuss anything else with Dr. Barnes
24 about the deposition?
25     A.   No.

MARJORIE PHILLIPS

1
2      Q.   And you testified earlier that
3  you spoke with your sister and your son
4  about the deposition, correct?
5      A.   Yes.
6      Q.   So I may have already asked
7  this.  Other than that this deposition
8  was occurring, did you speak with them
9  about anything else about the deposition?
10     A.   No.
11     Q.   Aside from this matter, have
12 you ever brought a lawsuit against any of
13 your employers?
14     A.   No, I have not.
15     Q.   Have you ever been a party to a
16 lawsuit before?
17     A.   No, I have not.
18     Q.   Have you ever been a witness in
19 a lawsuit?
20     A.   No, I have not.
21     Q.   Have you ever given a
22 deposition before?
23     A.   I think I did.  It was so long
24 ago that I don't even remember what it
25 was for, who it was for.  I just remember

5 (Pages 14 - 17)

MARJORIE PHILLIPS

1
2  that it was a deposition.  It had to be
3  maybe 30 years ago, so I don't remember.
4      Q.   So like you said, other than
5  the mere fact that you were deposed, you
6  remember nothing else about that matter?
7      A.   Right, right.
8      Q.   Have you ever filed a complaint
9  with the New York State Department of
10 Labor?
11     A.   I believe so.  I'm not sure.
12     Q.   What would that complaint have
13 been about?
14     A.   This case.
15     Q.   And you said you're not sure if
16 you filed a complaint with the Department
17 of Labor?
18     A.   That's right, I'm not sure.
19          MR. TAUSTER:  Derek, to the
20     extent she did file a complaint with
21     the New York Department of Labor,
22     we're going to call for production of
23     that complaint.
24          MR. SELLS:  Yes, I will take it
25     under advisement.

MARJORIE PHILLIPS

1
2  may have.  And if I did, it would have
3  been from this case in July of 2019.
4      Q.   Got it.  So other than in
5  connection with this matter, have you
6  ever filed a complaint with the New York
7  City Commission on Human Rights?
8      A.   No, I have not.
9      Q.   Have you ever filed a charge of
10 discrimination with the New York State
11 Equal Employment Opportunity Commission?
12     A.   Yes.
13     Q.   When did you file that charge?
14     A.   July of 2019 regarding this
15 case.
16     Q.   Other than in connection with
17 this matter, have you ever filed a charge
18 with the Equal Employment Opportunity
19 Commission?
20     A.   No, I have not.
21          MR. TAUSTER:  Derek, and just to
22     piggyback on earlier, just because,
23     just to make sure we have all of the
24     complaints, to the extent there was
25     some other complaint filed with the

MARJORIE PHILLIPS

1
2          MR. TAUSTER:  Okay.
3      Q.   How about, have you ever filed
4  a complaint with the United States
5  Department of Labor?
6      A.   No, I did not.
7      Q.   Have you ever filed a complaint
8  with the New York State Division of Human
9  Rights?
10     A.   Yes.  Yes.
11     Q.   When did you file that
12 complaint?
13     A.   I think it was in July of 2019
14 regarding this case.
15     Q.   Understood.  Other than in
16 connection with this matter, have you
17 ever filed a complaint with the New York
18 State Division of Human Rights?
19     A.   No.
20     Q.   Okay.
21     A.   No.
22     Q.   Have you ever filed a complaint
23 with the New York City Commission on
24 Human Rights?
25     A.   I may have, I don't know.  I

MARJORIE PHILLIPS

1
2  division or the city commission, we're
3  going to call for production of that.
4          MR. SELLS:  Understood.
5      Q.   So other than what we discussed
6  thus far, have you ever filed anything
7  with any administrative or governmental
8  agency regarding your employment with any
9  employer?
10     A.   Aside from this case, no, I
11 have not.
12     Q.   We are going to get to where we
13 start introducing the exhibits.
14          MR. TAUSTER:  Derek, do you want
15     to take five to see if we can set up
16     your account really quick and we can
17     be off to the races.
18          MR. SELLS:  Yes, that would be
19     great.  Thank you.
20          MR. TAUSTER:  So we'll jump back
21     on the record at 10:36.
22          (Off the record.)
23     Q.   Ms. Phillips, during this last
24 break, did you review any documents?
25     A.   No, I didn't.

6 (Pages 18 - 21)

Page 22

```
 1          MARJORIE PHILLIPS
 2     Q.   And did you speak with anyone
 3  about this deposition?
 4     A.   No, I didn't.
 5          MR. TAUSTER:  Craig, can you put
 6  up FIT Exhibit 1.
 7          (Exhibit 1, Complaint, was so
 8  marked for identification, as of this
 9  date.)
10     Q.   Ms. Phillips, do you recognize
11  this document?
12     A.   Yes.
13     Q.   What is this document?
14     A.   It's the complaint.
15     Q.   And did you bring a lawsuit
16  against FIT, Mary Davis and Marilyn
17  Barton in 2020?
18     A.   Yes.
19     Q.   Does this complaint set forth
20  your claims in the lawsuit?
21     A.   Yes.
22     Q.   And does the complaint set
23  forth all of your claims and allegations
24  against FIT?
25     A.   Can you repeat the question?
```

Page 23

```
 1          MARJORIE PHILLIPS
 2     Q.   Does this complaint contain all
 3  of your claims and allegations against
 4  FIT?
 5          MR. SELLS:  Objection,
 6  objection.  David, obviously this
 7  complaint was filed in January of
 8  2020.  We are now in September of
 9  2021.  So when you ask that question,
10  I don't want it to be misleading, all
11  right, because obviously Ms. Phillips
12  is still working at FIT and her claims
13  are still ongoing.  So just, you know,
14  clarify your question and make it
15  clear that as of that date, those were
16  her claims, okay?
17          MR. TAUSTER:  Okay, Derek,
18  Derek, we don't need speaking
19  objections here.  If you can object,
20  she can answer.  I think the question
21  is perfectly clear and if Ms. Phillips
22  has any additional claims against FIT,
23  she could have answered no and
24  specified those claims.
25          MR. DRANOFF:  And I would just
```

Page 24

```
 1          MARJORIE PHILLIPS
 2  like to join in, Mr. Sells, because we
 3  are operating under the federal rules,
 4  speaking objections are not permitted.
 5  We are limited to form objections, so
 6  if we can just proceed so we don't
 7  have to have colloquy during this
 8  deposition.
 9     Q.   Ms. Phillips --
10          MR. SELLS:  Let me just say
11  this, just to be clear, I do have the
12  right to clarify questions, all right?
13  And that was not a clear question.
14  That's what I did.
15          MR. TAUSTER:  Mr. Sells, Derek,
16  that's not how this is going to go.
17  If you want to ask her questions at
18  the end to clean anything up, that's
19  your right.  You don't get to do
20  speaking objections while we're asking
21  questions during a federal deposition.
22          MR. SELLS:  It wasn't a speaking
23  objection.
24          MR. TAUSTER:  Then it was your
25  testifying.  We don't need commentary
```

Page 25

```
 1          MARJORIE PHILLIPS
 2  from attorneys.  Let's stick to
 3  questioning.  If you need to clean
 4  anything up at the end, that's your
 5  right, you're more than welcome to do
 6  so.
 7     Q.   Ms. Phillips, just to circle
 8  back to my last question.  Do you have
 9  any claims against FIT that are not
10  contained in the complaint that you filed
11  in January of 2020?
12     A.   Yes.
13     Q.   What are those claims?
14     A.   Since January of 2020 a lot has
15  happened, more has happened since January
16  of 2020.
17     Q.   What has happened since January
18  of 2020?
19     A.   Well, for example, there was
20  the fashion show that took place.  I came
21  back from a leave of absence.  I returned
22  to the office in November, and January,
23  February, March, things happened after my
24  return which was after the lawsuit.  So I
25  was put in an office space in 236.  And
```

7 (Pages 22 - 25)

MARJORIE PHILLIPS

1
2  my colleagues, I don't know if it's in
3  the lawsuit, I think it may be, but I
4  just want to say, because it happened
5  more, my colleagues have felt ostracized
6  and isolated because of the lawsuit.  So
7  by the time there was a newspaper
8  article, New York Times, that came out,
9  after January of 2020, that added to my
10  stress, added to my isolation, even
11  though we were still in the office for a
12  short time, it added to my isolation from
13  my colleagues.
14      Q.   When do you mean when you say
15  that your colleagues have felt ostracized
16  by the lawsuit?
17      A.   Not them.  Me.  Not them.
18      Q.   And how has FIT caused that?
19      A.   How has FIT caused that?
20      Q.   Let me rephrase.  Do you
21  attribute being ostracized by the lawsuit
22  to FIT?
23      A.   I attribute being ostracized by
24  the behavior of the dean at the time,
25  Mary Davis, and Marilyn Barton, my

MARJORIE PHILLIPS

1
2  co-worker, my colleague.  I attribute it
3  to that.
4      Q.   Is that the behavior alleged in
5  the complaint or is that behavior alleged
6  after the lawsuit?
7      A.   Before and after.
8      Q.   What did Dean Davis do after
9  the lawsuit was filed?
10      A.   She changed.  She was cold.
11  Our relationship, working relationship
12  changed.  I no longer had the interaction
13  with her that I had had before the
14  lawsuit.  She distanced herself from me
15  and there was no more interaction in the
16  way that we had before the lawsuit.  Both
17  her and Marilyn.
18      Q.   So is it fair to say then that
19  you had a positive working relationship
20  with Dean Davis prior to January 2020?
21      A.   I thought so.
22      Q.   And is it fair to say that Dean
23  Davis was not cold towards you prior to
24  January of 2020?
25      A.   Before the lawsuit and before

MARJORIE PHILLIPS

1
2  the Affirmative Action case.
3      Q.   I'm not asking about before the
4  Affirmative Action case, I am
5  specifically referring to the filing of
6  the lawsuit -- withdrawn.
7          I am specifically referring to
8  what you're saying changed with respect
9  to Dean Davis after you filed the
10  lawsuit.
11      A.   Okay.
12      Q.   So again, focusing solely on
13  after you filed the lawsuit, what changed
14  about your working relationship with Dean
15  Davis?
16      A.   Our communication changed.  We
17  no longer communicated in the way that we
18  did prior to the lawsuit.  She was cold.
19  Dean Davis was cold.  Dean Davis did not
20  speak to me or interact with me in the
21  way that she had prior to the lawsuit.
22      Q.   Okay.  What about, did you
23  testify that your relationship with
24  Marilyn Barton changed after the lawsuit
25  was filed?

MARJORIE PHILLIPS

1
2      A.   Yes.
3      Q.   How did your relationship with
4  Marilyn Barton change after the lawsuit
5  was filed?
6      A.   She didn't say anything to me
7  at all.  There was nothing.  There was no
8  interaction at all, unless there were
9  e-mails that went between us.  Other than
10  that, she said nothing to me at all.
11      Q.   So what was your relationship
12  like before you filed the lawsuit?
13      A.   Before I filed the lawsuit, we
14  were all in the office together.  Then
15  there was a much different relationship.
16  The relationship changed when I filed the
17  lawsuit.
18      Q.   But what do you mean you were
19  all in the office together before you
20  filed the lawsuit?
21      A.   Prior to the lawsuit -- prior
22  to -- the incident happened in 2019.  I
23  took a leave of absence.  And when I
24  returned to the office, I had been
25  reassigned to another office space.  I

8 (Pages 26 - 29)

MARJORIE PHILLIPS

1
2 was told that Marilyn Barton was not
3 going to be terminated and that I was
4 going to be moved to another space. That
5 she would remain in the same space. She
6 would not be terminated. That nothing
7 happened with her. And that I was the
8 one who was going to be placed somewhere
9 else, permanently, and I was, I felt
10 discarded, I felt discarded.
11    Q.   Okay. But Ms. Phillips, just
12 to be clear, those are allegations that
13 you're asserting in this lawsuit,
14 correct?
15    A.   Yes.
16    Q.   Okay. So again focusing
17 specifically on things that happened
18 after you filed the lawsuit, what changed
19 about your relationship with Ms. Barton?
20    A.   She continued to be distant and
21 no communication. So I guess, yes, it's
22 in the lawsuit, yes.
23    Q.   So circling back to my original
24 question, are you alleging that FIT
25 engaged in any form of discrimination or

MARJORIE PHILLIPS

1
2 retaliation against you after you filed
3 the lawsuit?
4    A.   Yes.
5    Q.   Okay. How did FIT discriminate
6 against you after you filed this lawsuit?
7    A.   After I filed the lawsuit, I
8 was sent to another space. My office was
9 changed. I was no longer in the space
10 that I had been for the past seven, eight
11 years.
12    Q.   Ms. Phillips, again, that's an
13 allegation that you included in the
14 complaint, correct?
15    A.   Okay.
16    MR. SELLS:  Excuse me, excuse
17 me, David, you cut off Ms. Phillips in
18 the middle of an answer. Please let
19 her finish her answer, okay? She was
20 about to finish her answer.
21    MR. TAUSTER:  I thought she had
22 stopped speaking, but regardless,
23 she's not answering the question.
24    MR. SELLS:  You cut her off.
25    MR. TAUSTER:  She's not

MARJORIE PHILLIPS

1
2 answering the question. The question
3 was how did FIT discriminate against
4 her after she filed the lawsuit.
5 She's responding by making allegations
6 that were included in the lawsuit. So
7 I want her to focus on the question.
8    MR. SELLS:  No, no, no, no,
9 she's not doing that, David. You're
10 cutting her off. That's the way you
11 want to hear it. I am sure that's the
12 way you want to hear it. The fact of
13 the matter is FIT, FIT kept her in
14 that space prior to the lawsuit.
15    MR. TAUSTER:  You're testifying.
16    MR. SELLS:  That's what she
17 testified to and you cut her off,
18 David, she said she remained in the
19 space.
20    MR. TAUSTER:  No, she said FIT
21 moved her space.
22    Dawn, can you roll back and read
23 back Ms. Phillips' answer.
24    (Record read.)
25    Q.   Okay. So again, Ms.

MARJORIE PHILLIPS

1
2 Phillips --
3    MR. SELLS:  Okay. So then you
4 cut her off, David, she's still
5 answering the question. FIT never
6 moved her back.
7    MR. TAUSTER:  Stop testifying,
8 Derek.
9    MR. SELLS:  I'm not testifying.
10    MR. TAUSTER:  You're not the
11 witness here.
12    MR. SELLS:  You're cutting her
13 off.
14    MR. TAUSTER:  Strike all of
15 that, please. Strike all of that.
16    MR. SELLS:  You cut her off.
17 Let's take a break, take a break.
18    MR. TAUSTER:  We're not taking a
19 break.
20    MR. SELLS:  I am taking a break.
21 I don't like this, David, I don't like
22 this.
23    MR. TAUSTER:  Derek, Derek --
24    MR. SELLS:  You're cutting off
25 my witness. You're cutting her off.

9 (Pages 30 - 33)

Page 34

MARJORIE PHILLIPS

1
2  No, you're cutting her off.  So let's
3  just take a five-minute break.
4      MR. TAUSTER:  We're not taking a
5  five-minute break, we are on the
6  record.  Okay.
7      Ms. Phillips, I don't know why
8  your attorney left the deposition
9  room, we are on the record.  Is Mina
10  still in the room?
11      MR. DRANOFF:  Can the reporter
12  read back the last question --
13      MS. MALIK:  I am, but I am on a
14  call.
15      MR. TAUSTER:  Okay.  Well, maybe
16  you should tell Mr. Sells he shouldn't
17  have just stormed out of the
18  deposition room when there was a
19  question pending.
20      MS. MALIK:  I'm sorry, I didn't
21  hear you?
22      MR. TAUSTER:  Why are you in the
23  room if you are on a call?
24      MS. MALIK:  Excuse me, who are
25  you talking to?

Page 35

MARJORIE PHILLIPS

1
2      MR. TAUSTER:  I was talking to
3  you.  Are you representing Ms.
4  Phillips in this deposition or not?
5  Mr. Sells just stormed out of the
6  room.  I'm not quite sure where we're
7  at here right now.  Nobody else agreed
8  to a break and he just left the room.
9      MS. MALIK:  Okay.  Let me see if
10  I can chat with him.
11      MR. TAUSTER:  Let's go off the
12  record for a minute.
13      (Off the record.)
14  Q.   Ms. Phillips, I am going to ask
15  my last question another way.  Did FIT
16  change your seating location after you
17  filed this lawsuit?
18  A.   The lawsuit was filed in
19  January of 2020.  They changed my seating
20  in November of 2019.  I would like to add
21  more to the answer if I may.
22  Q.   Well, I will ask you another
23  question --
24      MR. SELLS:  No, no.  Hold on.
25  That's the whole point.  You cut her

Page 36

MARJORIE PHILLIPS

1
2  off.  Why are you cutting her off?
3  She wants to add more to her answer,
4  David, let her answer.
5      MR. TAUSTER:  So don't tell me
6  that she's done answering.  She should
7  just keep talking.
8      MR. SELLS:  No, you cut her off.
9      MR. TAUSTER:  I didn't cut her
10  off.
11      MR. SELLS:  Okay.  So you did
12  cut her off.
13  Q.   Ms. Phillips, just testify.
14      MR. TAUSTER:  Derek, just focus
15  on saying objection, okay?
16      MR. SELLS:  I am not -- if
17  you're going to cut her off, I am
18  going to say she should be allowed to
19  answer a question.  You did not let
20  her answer the question.
21  Q.   Ms. Phillips, please continue.
22      MR. SELLS:  Hold on.  May the
23  record reflect that you just did
24  something with your fingers, David,
25  what was that that you just did with

Page 37

MARJORIE PHILLIPS

1
2  your fingers?
3      MR. TAUSTER:  You keep talking,
4  let's move forward.
5      MR. SELLS:  Come on now, that's
6  not --
7      MR. TAUSTER:  Yeah, I know, come
8  on.
9      MR. SELLS:  That's not right.
10      MS. MALIK:  Very disrespectful.
11      MR. TAUSTER:  Is that your
12  associate who is taking a call while
13  we are in this deposition?
14      MR. SELLS:  That's my senior
15  partner.  Do you want to denigrate
16  her, David?
17      MS. MALIK:  Mr. Tauster, you
18  don't know me, do not denigrate me on
19  the record or off the record.  Do not
20  yell at me and do not try and bully me
21  like you did earlier when you yelled
22  at me.
23      MR. TAUSTER:  I didn't yell at
24  you.
25      MS. MALIK:  Yes, you did.

10 (Pages 34 - 37)

MARJORIE PHILLIPS

1
2    MR. SELLS:  We're taking a
3 break.
4    MR. TAUSTER:  We're not taking a
5 break.
6    MR. SELLS:  Yes, we are.
7    MR. TAUSTER:  Ms. Phillips, we
8 are on the record.
9    (Off the record.)
10    MS. MALIK:  Marjorie, can you
11 turn your camera off since we're not
12 in the room right now.
13    MR. TAUSTER:  It's time to come
14 back into the room.  This deposition
15 is continuing.
16    (Off the record.)
17    MR. TAUSTER:  Time to go back on
18 the record, everybody.
19    (Off the record.)
20    MR. TAUSTER:  Can you just read
21 back the last question and Ms.
22 Phillips' answer.
23    (Record read.)
24  Q.  Ms. Phillips, what would you
25 like to add to that answer?

MARJORIE PHILLIPS

1
2  A.  I would like to add that I had
3 requested, after January of 2020, I had
4 requested, there was a vacant office in
5 the space where I was.  I was out in the
6 open.  I was the only one who didn't have
7 an office space.  And I asked the dean if
8 I could occupy that vacant office space.
9 There was actually two vacant offices and
10 she told me no.  She told me she
11 couldn't.  She just said no.  She said
12 that that space was being held for
13 someone in the future.  So that happened
14 after the lawsuit.
15    And then referring back to the
16 fashion show, that racist fashion show
17 that happened after the lawsuit.  I felt
18 from the fashion show, I felt unheard.  I
19 felt unheard because it happened after I
20 had already made these complaints about
21 discrimination and retaliation within the
22 School of Graduate Studies, Fashion
23 Institute of Technology, and then there
24 was this racist fashion show that
25 confirmed what I had already told them.

MARJORIE PHILLIPS

1
2  Q.  Ms. Phillips, did FIT take any
3 action after the fashion show that you
4 just mentioned?
5  A.  Take any action with whom?
6  Q.  With regard to -- are you aware
7 if FIT took any steps or any personnel
8 measures in response to the fashion show?
9  A.  Yes, they did.
10  Q.  What measures did they take?
11  A.  There was an investigation of
12 the entire fashion show by an outside
13 counsel.
14  Q.  Are you aware if there were any
15 personnel decisions made as a result of
16 the fashion show?
17  A.  Mary Davis and Kyle Farmer were
18 put on administrative leave.  Not right
19 away, but they were put on administrative
20 leave and ultimately fired.
21  Q.  How long after the fashion show
22 were they put on administrative leave?
23  A.  I'm not sure.  I'm not sure.
24  Q.  Do you think it was within a
25 month?

MARJORIE PHILLIPS

1
2  A.  Maybe within two months.
3  Q.  Okay.  Other than conducting an
4 investigation and terminating Dean Davis
5 and Mr. Farmer, what other actions do you
6 think FIT should have taken?
7  A.  After the fashion show?
8  Q.  Yes.
9  A.  I think that they should have
10 spoken with me and possibly others in the
11 School of Graduate Studies, considering
12 that I had filed a lawsuit against them
13 very people, these very same people.  So
14 I think that they should have spoken with
15 me, if not others, in the School of
16 Graduate Studies.
17  Q.  Are you certain that they did
18 not speak to anyone else in the School of
19 Graduate Studies?
20  A.  I am not certain.
21  Q.  You're not certain?
22  A.  I am not certain.
23  Q.  When you filed your internal
24 Affirmative Action complaint, were you
25 interviewed by FIT?

11 (Pages 38 - 41)

MARJORIE PHILLIPS

1
2    A.    When I filed my Affirmative
3  Action, yes.
4    Q.    So why do you think FIT should
5  have spoken with you after the fashion
6  show?
7    A.    Because my Affirmative Action
8  complaint included those very people.
9    Q.    Did you have any additional
10  allegations concerning those very people
11  that were not already included in the
12  Affirmative Action complaint?
13    A.    Yes, yes, I believe I did.
14    Q.    Okay.  What allegations?
15    A.    I was in a class prior to the
16  fashion show, much prior to the fashion
17  show.  I had observed a class that Kyle
18  Farmer had with his students, I just was
19  an observer, and one of the students made
20  a comment about something that sounded
21  racist and political.  Both.  Sounded
22  racist and political.  And Kyle responded
23  to the student by telling them that they
24  shouldn't make comments like that and
25  they need to be careful, because it could

MARJORIE PHILLIPS

1
2  be seen as being politically incorrect
3  and sort of put them on notice as to what
4  was politically correct.
5    Q.    Did you report this incident to
6  anyone at FIT?
7    A.    Report, no, I did not.
8    Q.    Did you speak with the student
9  about this incident?
10    A.    No, I did not.
11    Q.    Do you have any reason to
12  believe that anyone at FIT was aware of
13  this incident?
14    A.    Do I have any idea that anyone
15  at FIT was aware of it besides myself and
16  the people who are in the room?
17    Q.    Yes.
18    A.    I have no knowledge of that.
19    Q.    Okay.  So other than this
20  incident, were there any other claims
21  that you believe you could have added
22  regarding Mr. Farmer or Dean Davis?
23    A.    Not that I can think of right
24  now.
25    Q.    So other than the fashion show

MARJORIE PHILLIPS

1
2  and the request for a vacant office, do
3  you have any other allegations against
4  FIT that are not included in the
5  complaint?
6    A.    Yes.  FIT never spoke to me
7  about the incident when they promised me
8  that I would be part of the
9  investigation, and I was not a part of
10  the investigation.  So they did an entire
11  investigation after the incident, within
12  a day or two after I was assured that I
13  would be called in and they would speak
14  to me.  And they never did.  The whole
15  investigation went through and I was
16  never involved.
17    Q.    What incident are you referring
18  to?
19    A.    The incident in May of 2019.
20    Q.    So again, apologies if this is
21  not clear.  I am only referring to
22  conduct that occurred after January of
23  2020.
24    A.    Okay.
25    Q.    So again with respect solely to

MARJORIE PHILLIPS

1
2  conduct after January 17th, 2020, other
3  than the fashion show and your request to
4  move into a vacant office, do you have
5  any additional allegations against FIT?
6        MR. SELLS:  Objection.  David,
7    your question is not clear, again.
8    Because when you talked about
9    allegations in the complaint, as you
10    know, we have ongoing, it's an
11    ongoing --
12        MR. TAUSTER:  Derek, you are now
13    testifying.
14        MR. SELLS:  I am not.
15        MR. TAUSTER:  You stated your
16    objection.
17        MR. SELLS:  It's in our
18    complaint.  It's in our complaint that
19    this is an ongoing matter, it's
20    ongoing.  So it's not fair for you to
21    say other than.
22        MR. TAUSTER:  It is fair.
23        MR. SELLS:  It's not fair for
24    you to say that.  Objection.
25        MR. TAUSTER:  Derek, this is a

12 (Pages 42 - 45)

MARJORIE PHILLIPS

1  MARJORIE PHILLIPS
2  deposition. It's not trial. I ask
3  the questions, she answers the
4  questions. If you have an objection
5  as to form, you state it, we move on,
6  okay?
7          MR. SELLS: I just did, I just
8  stated it.
9          MR. TAUSTER: You don't have to
10  testify on her behalf.
11  Q.  In any event --
12          MR. TAUSTER: Craig, can you
13  throw up FIT Exhibit 2.
14          (Exhibit 2, Interrogatory
15  responses, was so marked for
16  identification, as of this date.)
17          MR. JONES: Introducing Exhibit
18  2. For those of you in Egnyte,
19  Exhibit 2 is now there. Exhibit 2 is
20  now on the screen.
21          MR. TAUSTER: Very good. And I
22  have control? Excellent.
23  Q.  Ms. Phillips, did FIT send you
24  a series of questions in connection with
25  this lawsuit?

1  MARJORIE PHILLIPS
2  A.  Yes.
3  Q.  And did you provide responses
4  to those questions?
5  A.  Yes.
6  Q.  Do you see the document on the
7  screen?
8  A.  Yes.
9  Q.  Does this document contain your
10  answers to those questions?
11  A.  I have to see more of the
12  document.
13          MR. TAUSTER: Craig, can you
14  give Ms. Phillips access so she can
15  scroll through?
16          MR. JONES: Sure.
17  Ms. Phillips?
18          THE WITNESS: Yes.
19          MR. JONES: You probably got a
20  pop-up on your screen saying I am
21  passing the remote control.
22          THE WITNESS: Saying?
23          MR. JONES: I am giving you
24  control of my screen. If you try
25  taking the mouse and clicking on the

1  MARJORIE PHILLIPS
2  document. There you go. That's you
3  controlling it.
4          THE WITNESS: Okay.
5          (Witness reviews document.)
6  A.  So your question was do my
7  answers appear in the document, correct?
8  Q.  Essentially, yes.
9  A.  Yes.
10  Q.  Are these responses true and
11  accurate to the best of your knowledge?
12  A.  Yes.
13  Q.  I am just going to ask, since
14  you have the document, can you scroll to
15  the very last page.
16          Is that your signature?
17  A.  Yes.
18  Q.  So it's fair to say that you
19  verified under penalty of perjury that
20  those responses are true?
21  A.  Yes.
22  Q.  Did you speak with anyone to
23  help you gather information to respond to
24  these questions?
25  A.  My attorney Midwin Charles.

1  MARJORIE PHILLIPS
2  Q.  Other than your attorney, did
3  you speak with anyone to gather
4  information to respond to these
5  questions?
6  A.  No.
7  Q.  Ms. Phillips, what is your date
8  of birth?
9  A.  Date of birth?
10  Q.  Yes.
11  A.  July 21st, 1958.
12  Q.  Ms. Phillips, what is your
13  marital status?
14  A.  I am single.
15  Q.  Do you have a significant
16  other, for lack of a better term?
17  A.  No.
18  Q.  You testified earlier that you
19  have a son?
20  A.  I do.
21  Q.  Do you have any other children?
22  A.  I do not.
23  Q.  What is your son's name?
24  A.  Javon.
25  Q.  Can you spell that for the

13 (Pages 46 - 49)

MARJORIE PHILLIPS

1
2 court reporter?
3     A.   J-a-v-o-n.
4     Q.   And how old is your son?
5     A.   34.
6     Q.   Does he live with you?
7     A.   No, he does not.
8     Q.   Where does he live?
9     A.   He lives in Harlem.
10     Q.   Other than Javon, do you have
11 any other children?
12     A.   I do not.
13     Q.   Okay.  What is your current
14 home address?
15     A.   4 East 107th Street, New York,
16 New York, 10029.
17     Q.   Is this an apartment?
18     A.   Yes, apartment 14G as in girl.
19     Q.   Do you own or rent the
20 apartment?
21     A.   I rent.
22     Q.   Okay.  How long have you lived
23 in this apartment?
24     A.   About at least 25 years.
25     Q.   25 years, fair enough.  Other

MARJORIE PHILLIPS

1
2 than yourself and your son, do you have
3 any other immediate family?
4     A.   I do.  Immediate as in I have a
5 sister and I have lots of first cousins,
6 which are like siblings.
7     Q.   Fair enough.  Fair enough.
8 Your sister, where does she live?
9     A.   She lives in Harlem also.
10     Q.   How regularly do you interact
11 with her?
12     A.   Almost every day.  Every other
13 day.
14     Q.   Have you spoken with your son
15 about this lawsuit?
16     A.   I have.
17     Q.   What have you discussed with
18 him?
19     A.   I told him about the incident
20 that happened and that the lawsuit was a
21 result of the incident.  Discrimination
22 and retaliation by Mary Davis and Marilyn
23 Barton.
24     Q.   Did your son encourage you to
25 file this lawsuit?

MARJORIE PHILLIPS

1
2     A.   No, he did not.
3     Q.   What is your sister's name?
4     A.   Gail.
5     Q.   Gail?
6     A.   Yes.
7     Q.   Gail Phillips?
8     A.   Yes.
9     Q.   Have you spoken with your
10 sister about this lawsuit?
11     A.   I have.
12     Q.   What have you told your sister
13 about this lawsuit?
14     A.   I told her pretty much
15 everything that was happening along the
16 way.  Maybe not every single incident,
17 but I told her about the incidents that I
18 was confronting at FIT along the way and
19 to share with my sister.
20     Q.   Fair enough.  Where did you go
21 to high school?
22     A.   I went to Jamaica High School
23 out in Queens.  And I went to Long Island
24 City High School.
25     Q.   When did you graduate?

MARJORIE PHILLIPS

1
2     A.   I graduated in 1976, I think.
3     Q.   I'm sorry, which high school
4 did you graduate from?
5     A.   LIC, Long Island City High
6 School.
7     Q.   Did you attend college after
8 high school?
9     A.   I did.  I went to
10 Berkeley-Claremont.  And I also went to
11 Parsons School of Design.
12     Q.   Did you graduate from Berkeley?
13     A.   Yes, I did.
14     Q.   When did you graduate?
15     A.   In '78.
16     Q.   Okay.  And did you go to
17 Parsons before or after Berkeley?
18     A.   After.
19     Q.   So when did you graduate from
20 Parsons?
21     A.   I didn't graduate from Parsons.
22     Q.   Okay.  How long did you attend
23 Parsons?
24     A.   Maybe two years.  Maybe two
25 years.

14 (Pages 50 - 53)

MARJORIE PHILLIPS

1
2  Q.  Is there a particular reason
3  why you didn't graduate?
4     A.  Because I became pregnant and
5  it was kind of difficult for me to stay
6  in school.
7     Q.  Understood.  Understood.  Do
8  you hold any professional licenses?
9     A.  I do not.
10    Q.  Okay.  Any certifications?
11    A.  I do not.
12    Q.  Okay.  Do you have any other
13 education or professional training?
14    A.  I do not.
15    Q.  Okay.  Have you taken any
16 courses at FIT since you started working
17 there?
18    A.  I have, yes, sir.
19    Q.  What courses have you taken?
20    A.  I took several interior design
21 courses.  I took drafting classes.  I
22 took drawing classes.  I took perspective
23 drawing classes.  I took several classes.
24 I took CAD courses, computer aided
25 design.  I took several classes in the

MARJORIE PHILLIPS

1
2  interior design major.
3     Q.  Are you pursuing a degree in
4  interior design?
5     A.  I was thinking about doing it
6  at the time.
7     Q.  Is there a particular reason
8  why you didn't follow through on pursuing
9  the degree?
10    A.  I just found it hard for me --
11 hard might not be the right word.  I was
12 raising my son and I found it, you know,
13 that I chose to put more of an emphasis
14 on raising my child than to taking
15 continuing ed classes in the evening,
16 which would have taken me further away
17 from him.  So I felt I had to make a
18 choice and I chose to focus on my son.
19    Q.  Understood.
20        MR. TAUSTER:  Craig, can you
21 throw up FIT Exhibit 3.
22        (Exhibit 3, Resumé, was so
23 marked for identification, as of this
24 date.)
25        MR. JONES:  Exhibit 3 has been

MARJORIE PHILLIPS

1
2  introduced.
3        MR. TAUSTER:  Yes, good.
4     Q.  Ms. Phillips, do you recognize
5  this document?
6     A.  Yes.  It's an old resumé.
7     Q.  Do you know at what point in
8  time this resumé was current?
9     A.  It was current maybe -- we're
10 in 2021.  I don't know.  I am going to
11 say 20 years ago.
12    Q.  Fair enough.  Have you updated
13 your resumé since this last version?
14    A.  I will say yes, only because
15 that goes back so far.  I would say yes,
16 but I don't know when.  I haven't had a
17 current resumé in a long time.
18    Q.  I'm sorry, what was that, you
19 said you haven't had a current resumé in
20 a long time?
21    A.  Yes.
22        MR. TAUSTER:  Derek, I am just
23 going to say to the extent she has her
24 most recent resumé beyond this, we
25 will call for production.  I know it

MARJORIE PHILLIPS

1
2  might be a bit remote, but to the
3  extent it exists.
4        MR. SELLS:  We'll take it under
5  advisement.
6     Q.  Mindful that these are all
7  older employers, I am going to ask you a
8  more general question.  Prior to working
9  at FIT, have you been -- have you ever
10 been subjected to any disciplinary action
11 by an employer?
12    A.  No.
13    Q.  Okay.  Have you ever received a
14 negative performance evaluation from an
15 employer?
16    A.  I'm going to say yes.
17    Q.  Do you recall when?
18    A.  Maybe about 25 years ago.
19    Q.  Fair enough.  Would you recall
20 which employer that was?
21    A.  I think it was Naomi Leff,
22 L-e-f-f, Naomi Leff, it was an interior
23 designing firm.
24        MR. TAUSTER:  Craig, just really
25 quick, can you throw up FIT Exhibit 4.

15 (Pages 54 - 57)

Page 58

MARJORIE PHILLIPS

1  MARJORIE PHILLIPS
2  (Exhibit 4, Application for
3  employment, was so marked for
4  identification, as of this date.)
5  MR. JONES:  Loading now.
6  Exhibit 4 has been posted.  It's on
7  the screen.
8  Q.  Okay.  So Ms. Phillips, do you
9  recognize this document, by the way?
10  A.  Sort of, yes.
11  Q.  Did you submit an application
12  for employment in connection with your
13  employment at FIT?
14  A.  Yes.
15  Q.  Okay.  Is this your
16  handwriting?
17  A.  Yes.
18  Q.  Okay.  So I am going to scroll
19  down this document to page 3.  So do you
20  see under Naomi Leff where it says
21  reasons of leaving, conflict of interest?
22  A.  Mmm-hmm.
23  Q.  Do you recall what those
24  conflicts of interest were?
25  A.  Well, when I was hired to work

Page 59

1  at Naomi Leff, I was hired to be the
2  manager of her purchasing department.
3  And after I started, you know, I don't
4  recall -- how long did I say that, '94 to
5  '95, it was about a year.  Sometime
6  afterwards I found that what was expected
7  of me was over my head.  And so that is
8  the reason why I ultimately left that
9  position.
10  Q.  Okay.  Fair enough.  And again,
11  prior to your employment with FIT, did
12  you ever lodged any complaints of
13  discrimination or retaliation with any
14  other employer?
15  A.  Other than FIT?  Had I ever
16  lodged any complaints about
17  discrimination or --
18  Q.  Retaliation.
19  A.  I don't remember.  But I do
20  remember that when I applied for -- it
21  was a long time ago, so please forgive
22  me.  I just remember that I applied for
23  unemployment for Naomi Leff and she, she,
24  her office, declined the unemployment.

Page 60

1  MARJORIE PHILLIPS
2  And I was told by unemployment that, you
3  know, if you feel that you should be
4  receiving it, you always have the right
5  to have a trial or whatever they do with
6  unemployment so that you can get it.  So
7  I did.  I did.  Because, you know, I felt
8  that I should have gotten unemployment.
9  And so I did what needed to be
10  done in order to revisit why I wasn't
11  getting, to have my day to speak to the
12  authorities in, you know, I guess the
13  Department of Labor, to determine what
14  was her reason for denying me
15  unemployment.  And I actually ended up
16  winning the case.
17  Q.  Congratulations.  So did there
18  come a time when you applied for a job
19  with FIT?
20  A.  Did there come a time what?
21  Q.  Did you ever apply for a job
22  with FIT?
23  A.  Oh, yes.
24  Q.  Yes.  Do you recall when?
25  A.  Okay.  Can you go back to that

Page 61

1  MARJORIE PHILLIPS
2  one, the page that I just saw, the one
3  before that.
4  Q.  The one with Naomi Leff, this
5  one?
6  A.  So I probably applied to FIT, I
7  am going to guess, it's been so long,
8  I'll say in '95.
9  Q.  Right.  So you don't have to
10  guess, do you see the date in the top
11  left-hand corner?
12  A.  That's why I asked to see it,
13  right.
14  Q.  So is it fair to say you
15  applied in or around December of 1995?
16  A.  Yes.
17  Q.  Do you recall what position you
18  applied for?
19  A.  I started out at FIT as a temp.
20  I was a temp.  That's how I came to FIT,
21  I was a temp.  And then sometime
22  afterwards then I was working in HR and
23  payroll and it was recommended to me by
24  whoever was the supervisor at the time,
25  that I should apply for a permanent

16 (Pages 58 - 61)

Page 62

MARJORIE PHILLIPS

1
2 position, which I did, and I went from
3 temp to having a part-time position at
4 FIT.
5    Q.   Do you recall when you went
6 from being a temp to a part time?
7    A.   No, I don't recall.
8    Q.   Was it in or about December of
9 1995, do you think?
10    A.   I don't remember.
11    Q.   Okay.  Fair enough.  What were
12 your thoughts on your initial employment
13 at FIT?
14    A.   My initial employment, what
15 were my thoughts about what?
16    Q.   FIT in general, what did you
17 think about working there when you
18 started?
19    A.   I enjoyed it.  I enjoyed it a
20 lot.  I consider myself to be a creative
21 person.  And as you can see from my
22 resumé, I have worked for interior
23 design, architectural firms before I came
24 to FIT.  So working in a school of art
25 and design was right for me.  I enjoyed

Page 63

MARJORIE PHILLIPS

1
2 it.
3    Q.   I think we may have jumped
4 around a little bit there.  You said you
5 started out working in personnel
6 administration, payroll, correct?
7    A.   Correct.
8    Q.   Did this come a time when you
9 moved out of that office?
10    A.   Out of the HR and payroll
11 office, yes.  I think the first position
12 I applied for was in fashion design, I
13 believe.
14    Q.   Okay.  Got it.  So did there
15 ever -- did you ever start working at FIT
16 full time?
17    A.   Yes, when I worked for -- yes.
18 I eventually, I think I became full time,
19 I think I became full time while I was
20 still in HR/payroll.  Because it used to
21 be one department.  And I think I became
22 full time, again, it's so long ago, I
23 don't remember, but I either became full
24 time while I was still in HR, HR/payroll,
25 or I became full time when I moved to

Page 64

MARJORIE PHILLIPS

1
2 fashion design.  I think I was full time
3 while I was still in HR/payroll.
4    Q.   Did there ever come a time when
5 you started working in the fashion design
6 department?
7    A.   Yes.
8    Q.   Do you recall when?
9    A.   After I left HR and payroll.  I
10 don't remember what year it was exactly.
11 I can guess.  My best guess, maybe around
12 '98.  I could be wrong.  I could be
13 wrong.
14    Q.   Why did you want to switch
15 departments?
16    A.   I wanted more money.  I
17 wanted -- I considered myself to be,
18 consider myself to be a creative person,
19 and fashion design, design, was more
20 suited to Marjorie Phillips.
21    Q.   Got it.  And are you still in
22 the same position as you were when you
23 first started working in the fashion
24 design department?
25    A.   No.

Page 65

MARJORIE PHILLIPS

1
2    Q.   So what position did you start
3 out in in the fashion design department?
4    A.   I think I was a secretary, I
5 think.
6    Q.   And did there come a time when
7 you were promoted?
8    A.   I don't remember.  Honestly, I
9 really don't.
10    Q.   Well, what position are you
11 working in now in the fashion design
12 department?
13    A.   I am an office associate in the
14 School of Graduate Studies.  I work with
15 the fashion and textile studies program,
16 graduate program.
17    Q.   Got it.  Okay.  So just so that
18 I am more precise for purposes of the
19 record, is the fashion design department
20 within the School of Graduate Studies?
21    A.   No, it's not.
22    Q.   These are two separate
23 departments?
24    A.   These are -- fashion design is
25 in the undergraduate part of FIT.  FIT is

17 (Pages 62 - 65)

Page 66

MARJORIE PHILLIPS

1    an associate degree, a fashion degree or
2    a master's degree.  The undergraduate
3    part of the school, that was fashion
4    design, is fashion design.  The School of
5    Graduate Studies is for students to go
6    back to graduate school.  It's a separate
7    school.  The School of Graduate Studies.
8    It's not part of the undergraduate
9    school.
10       Q.   Fair enough.  You work in the
11   School of Graduate Studies then, not in
12   the fashion design department?
13       A.   Correct.
14       Q.   How many employees are there in
15   the School of Graduate Studies?
16       A.   I don't know.  If you want me
17   to guess, I can guess, but I honestly
18   don't know.
19       Q.   I don't need you to guess,
20   that's fine.  Who do you report to in the
21   School of Graduate Studies?
22       A.   To the dean and to the
23   chairperson of fashion textiles studies,
24   Lourdes Font.

Page 67

MARJORIE PHILLIPS

1       Q.   Do you report directly to the
2    dean of the fashion department or do you
3    have an intermediate supervisor?
4       A.   Right now, I do not report
5    directly to the dean.
6       Q.   Do you know if there are any
7    employees in the School of Graduate
8    Studies that report directly to the dean?
9       A.   Marilyn Barton.
10      Q.   Anybody else?
11      A.   Directly to the dean, no.
12   Marilyn Barton.
13      Q.   Are there other
14   African-American employees in the School
15   of Graduate Studies?
16      A.   Yes.
17      Q.   Do you know if there are
18   employees of any other races in the
19   School of Graduate Studies?
20      A.   Can you repeat your question?
21      Q.   You know what, I will withdraw
22   that question.  How many African-American
23   employees are there in the School of
24   Graduate Studies?

Page 68

MARJORIE PHILLIPS

1       A.   Including myself, three.
2       Q.   Are you aware that FIT has
3    policies prohibiting discrimination and
4    harassment in the workplace?
5       A.   I am now.
6            MR. TAUSTER:  Craig, can you
7    throw up FIT 6.
8            (Exhibit 5, Nondiscrimination
9    and Anti-Harassment Policy, was so
10   marked for identification, as of this
11   date.)
12           MR. JONES:  Loading now.
13   Exhibit 5, which was Exhibit 6, is now
14   uploaded.
15           MR. TAUSTER:  Yes.
16           MR. JONES:  And it's on the
17   screen.
18           MR. DRANOFF:  Craig, I'm sorry,
19   you said Exhibit 5.
20      Q.   Ms. Phillips, do you recognize
21   this document?
22      A.   No, I do not.
23      Q.   Have you ever seen it?
24      A.   No, I have not.

Page 69

MARJORIE PHILLIPS

1       Q.   Okay.  Are you aware that FIT
2    has a policy and procedure for employees
3    to make complaints of discrimination and
4    harassment?
5       A.   Yes.
6       Q.   Are you aware that FIT has a
7    policy in place prohibiting
8    discrimination against employees on the
9    basis of race?
10      A.   Yes.
11      Q.   Are you aware that FIT has a
12   human resources department?
13      A.   Yes.
14      Q.   And do you know where it's
15   located?
16      A.   Yes.
17      Q.   Are you aware that you could
18   bring complaints about discrimination and
19   retaliation to human resources?
20      A.   Yes.
21      Q.   And are you aware that FIT has
22   an Affirmative Action officer and Title 9
23   coordinator?
24      A.   Yes.

18 (Pages 66 - 69)

MARJORIE PHILLIPS

1
2    Q.   Are you aware of that person's
3 duties?
4    A.   Somewhat.  Not entirely.
5    Q.   Let me ask you this, what do
6 you understand their duties to be?
7    A.   You froze.  I didn't hear your
8 question at all.
9    Q.   Okay.  What do you understand
10 the Title 9 coordinator's duties to be?
11   A.   If you're referring to the
12 Affirmative Action officer, my
13 understanding is with any Affirmative
14 Action department, if an employee is
15 experiencing what they believe to be
16 racism on any level, racism, retaliation,
17 that that would be the office that one
18 would go to.
19   Q.   Okay.  Is it fair to say you
20 could go to the Affirmative Action
21 officer with discrimination complaints?
22   A.   Yes.
23   Q.   Prior to 2018, did you ever
24 lodge any discrimination complaints with
25 FIT's Office of Human Resources?

MARJORIE PHILLIPS

1
2    A.   Office of Human Resources?
3    Q.   Yes.
4    A.   I may have.  Something minor,
5 but I may have.
6    Q.   Do you recall what that
7 complaint would have been?
8    A.   I complained -- it wasn't
9 really with human resources.  I
10 complained about something that happened
11 in a classroom with a faculty.  A class
12 that I was taking.  I was a student in a
13 class.
14   Q.   Okay.  Was this a complaint
15 about discrimination in the workplace?
16   A.   No.  It was a complaint about a
17 comment that a teacher made in a
18 classroom to the students.
19   Q.   Okay.  Apologies.  Were you
20 complaining that the remark was
21 discriminatory?
22   A.   I was.
23   Q.   Okay.  What was this remark?
24   A.   The teacher at the time -- this
25 was a really long time ago, so this is

MARJORIE PHILLIPS

1
2 generally loosely.  But the teacher made
3 a comment in the class, this is an
4 interior designing class, comparing or
5 putting African-Americans and apes and
6 monkeys in the same category.
7    Q.   Do you know if human resources
8 took any action in response to this
9 complaint?
10   A.   I believe that they did.  I
11 don't know for sure, but I believe from
12 my memory, I believe that they did.
13   Q.   What do you believe that they
14 did?
15   A.   I believe that they spoke with
16 the teacher about the complaint.
17   Q.   Fair to say -- do you believe
18 that FIT appropriately addressed this
19 complaint?
20   A.   Yes.
21   Q.   So now focusing again on the
22 period prior to October of 2018, did you
23 ever lodge any complaints with the
24 Affirmative Action officer?
25   A.   Yes.

MARJORIE PHILLIPS

1
2    Q.   What was that complaint?
3    A.   I made a complaint to the
4 Affirmative Action officer about Pamela
5 Ellsworth, the personnel I was working
6 with prior to working for the chair of
7 fashion textile studies.
8    Q.   Do you recall when you made
9 this complaint?
10   A.   I do not, but it probably was
11 about, let's say eight to ten years ago.
12   Q.   Okay.  What did you complain
13 about regarding Ms. Ellsworth?
14   A.   I complained that I felt that
15 she was a racist.  I felt that she spoke
16 down to me.  She spoke to me and other
17 African-Americans differently than she
18 did white students and employees.  She
19 treated me and other African-Americans --
20 she just -- there was a difference
21 between the way that she spoke to white
22 people and the way that she spoke to
23 black people.  And I felt it was
24 denigrating and it got to a point where
25 it was intolerable, so I made an official

MARJORIE PHILLIPS

1
2 complaint.
3    Q.   Do you know if FIT commenced an
4 investigation in response to this
5 complaint?
6    A.   I was told that they did not do
7 an investigation.  That they would not --
8 in the beginning when I went in to make
9 the complaint, I was told that they would
10 not do an official investigation, but
11 that they would ask around and have
12 discussions, but there was no official
13 investigation.
14    Q.   Who was it who told you that
15 FIT would not do an investigation?
16    A.   Griselda Gonzalez, she was over
17 in Affirmative Action at the time.
18    Q.   How did you respond to Ms.
19 Gonzalez?
20    A.   I was disappointed.  I didn't
21 understand why there wouldn't be an
22 official investigation.  I couldn't
23 understand what was the difference
24 between what I was bringing versus what
25 made an official investigation and what

MARJORIE PHILLIPS

1
2 made them decide that they weren't going
3 to do an official investigation.  And I
4 asked her, but I never really understood
5 why she decided that it wasn't going to
6 be official.
7    Q.   Do you know if FIT took any
8 action in response to this complaint?
9    A.   I do not know.
10    Q.   Did you ever speak with Ms.
11 Ellsworth about these allegations?
12    A.   Yes, I did.
13    Q.   What did you discuss with Ms.
14 Ellsworth?
15    A.   I told her that I didn't like
16 the way she spoke to me.  I didn't
17 appreciate it.  I was totally offended.
18 I felt it was discriminating.  And she
19 spoke to me in a way that was vile and
20 degrading and I felt, and I couldn't go
21 to work every day because I had to deal
22 with this person that was like a monster
23 and disrespecting me every single day.
24 And it was becoming -- it was so bad that
25 it became a mental challenge to deal with

MARJORIE PHILLIPS

1
2 her every day, because of the way she
3 spoke with me, to me, the way that she
4 interacted with me.
5        And I could see the way that
6 she interacted with some of the white
7 students, white employees, that was
8 normal, the way you normally speak to
9 people.  The way any normal person
10 interacts on a job.  And that I never got
11 that from her, I never received from her.
12 And I saw that she did that to
13 African-Americans versus Caucasian
14 people.
15    Q.   Other than yourself, what
16 African-Americans are you referring to?
17    A.   The people in the department.
18 There was Umilta Allsop.  There was Anton
19 Baptise.  There was this gentleman in the
20 registrar at the time, because I deal
21 with the registrar quite a bit, I think
22 he was in charge of either, I think he
23 was in charge, his name was Andrew.  He
24 was African.  And I believe that he was
25 the director of the registrar at the

MARJORIE PHILLIPS

1
2 time.
3    Q.   Okay.  Did you speak with them
4 about your complaint about Ms. Ellsworth?
5    A.   Did I speak with who?
6    Q.   The other African-American
7 employees you just referred to.
8    A.   Oh, about my complaint?
9    Q.   Yes.
10    A.   I don't remember.  I don't
11 recall.  I don't recall if I spoke to
12 them.  Maybe I did, I really don't
13 remember.  But I do remember that I had
14 given Griselda their names as possible
15 witnesses for her to speak with.
16    Q.   Do you know if Griselda spoke
17 with them?
18    A.   I later learned that she did
19 not -- and later could be like years,
20 because they don't tell you who they talk
21 to.  But I later learned that she never
22 spoke with Umilta.
23    Q.   Did she speak with Anton?
24    A.   I don't think she did speak
25 with Anton.

MARJORIE PHILLIPS

1
2   Q.   Did she speak with the other
3   gentleman you mentioned?
4   A.   I don't know.
5   Q.   Other than this complaint on
6   Ms. Ellsworth, and again solely focusing
7   on the period before 2018, did you file
8   any other complaints with the Affirmative
9   Action Office?
10   A.   There was an Affirmative Action
11   officer, I believe, it's all very foggy
12   when you work there for 25 years, there
13   was an officer -- I complained about a
14   director who, it wasn't so much about
15   racism.  There was a director who has
16   since been terminated.  I forget her
17   name.  But I did go to the Affirmative
18   Action officer at the time.  I think his
19   name was Juan something.  I think his
20   name was Juan something.  And he has
21   since been let go.  And I complained
22   about a couple of things.
23       I felt that she was -- number
24   one, I felt that she was a criminal.  I
25   felt like she was asking us to do things

MARJORIE PHILLIPS

1
2   that I felt uncomfortable doing.  I felt
3   uncomfortable.  I had worked at the
4   college long enough to know what was
5   right.  What to do, what not to do.  What
6   is not -- what you should not be doing.
7   And she was in the habit of asking us to
8   do things that I felt -- I didn't feel
9   comfortable with.  So I wanted to let
10   someone know that I didn't feel
11   comfortable with some of the directives
12   that she was giving us.  And that's why I
13   went to them.
14   Q.   You said this was not so much
15   about racism.  Was this about any form of
16   discrimination or retaliation?
17   A.   Well, I thought there was some
18   racism involved, the person that she, her
19   personal assistant, she treated another
20   African-American, I felt like I was
21   witnessing her humiliating this person
22   every day.  The person was very often
23   brought to tears.  And it was, it was
24   ongoing.
25       And so I am the kind of person,

MARJORIE PHILLIPS

1
2   you know, if I see someone who is brought
3   to tears over the way that they are being
4   treated, I brought that to the
5   Affirmative Action officer as well, and
6   she felt --
7   Q.   Please continue.
8   A.   Go ahead.
9   Q.   No, I want you to finish your
10   answer.
11   A.   And we felt that she did things
12   based on race.  That her behavior had a
13   lot to do with her not having much
14   experience with African-Americans.
15   Sometimes -- yes.
16   Q.   Who is the "we" that you're
17   referring to there?
18   A.   The person, her name was Diana
19   Cyprus.
20   Q.   And did Diana specifically tell
21   you that she thought this was racism?
22   A.   Yes, she did.
23   Q.   Did this director, did you ever
24   see her use any racial slurs?
25   A.   No, I did not.

MARJORIE PHILLIPS

1
2   Q.   Did Ms. Cyprus ever indicate
3   that she ever used any racial slurs?
4   A.   I don't recall.
5   Q.   I think for lack of a better
6   term, other than the fact that Ms. Cyprus
7   was African-American and this director
8   was not, is there any other basis to
9   attribute this to racism?
10   A.   Well, she didn't -- well, let
11   me think before I speak, because that was
12   a long time ago.  Yeah, I remember that
13   there was a white gentleman who came to
14   that department to work with us, for us,
15   and may have even been a temp, but I
16   don't remember.  I think he knew
17   somebody, I think he was connected to
18   somebody in the college.  And she treated
19   him better than she treated Diana and I.
20   And he was a drug addict.  And the school
21   learned later on that he was a drug
22   addict.  And she treated him with more
23   respect than she did Diana and I.  And
24   that young man was a drug addict who used
25   to come to work high on drugs, which is

21 (Pages 78 - 81)

Page 82

MARJORIE PHILLIPS

1    why, I think I remember thinking that he
2    must know somebody in the college to even
3    be able to maintain a job, when he was a
4    drug addict. And I believe from my
5    memory, that he was fired or terminated
6    or let go or whatever, because they
7    learned, I guess, it was exposed that he
8    was a drug addict. He was high. He used
9    to come to work high. Visibly, visibly
10   high. Like nodding. Nodding. Slurring.
11   And she treated him better than she
12   treated Diana and I.
13      Q.   Do you know who he knew at the
14   college?
15        MR. SELLS: David, can we take a
16   break, we have been going for almost
17   an hour now.
18        MR. TAUSTER: No, we haven't.
19   We took a few too many breaks earlier.
20        MR. SELLS: David, I am going to
21   take a break whether you say so or
22   not, you can't stop me from taking a
23   break, okay.
24        MR. TAUSTER: Derek, there is a

Page 83

MARJORIE PHILLIPS

1    question pending. I am literally in
2    the middle of a line of questioning.
3    I don't know why we would be taking a
4    break right now.
5        MR. SELLS: Dawn, when did we
6    last go back on the record?
7        THE REPORTER: 11:25.
8        MR. TAUSTER: Only 40 minutes.
9        MR. SELLS: From when?
10       MR. TAUSTER: When we last went
11   on the record.
12       MR. SELLS: I am taking a break.
13   Marjorie, do you want to turn
14   off your video?
15       MR. TAUSTER: No, no, Derek,
16   this is not your deposition, this is
17   not your deposition. I am in the
18   middle of a line of questioning, why
19   are you declaring a break?
20       MR. SELLS: Because I need to
21   take a break. I need to take a break.
22       MR. TAUSTER: I am in a line of
23   questioning. Derek, this is not how
24   it goes.

Page 84

MARJORIE PHILLIPS

1        MR. SELLS: Okay. How many more
2    questions do you have, David?
3        MR. TAUSTER: I am literally
4    trying to flush out something.
5        MR. SELLS: You said you're in a
6    line of questions, how many questions
7    do you have, David?
8        MR. TAUSTER: I don't know --
9    Derek, I am talking to your client
10   about an allegation of discrimination
11   and you literally interrupted.
12       MR. SELLS: An allegation of
13   discrimination that hasn't been made
14   in this case, right? It's not even
15   about this case, is it, David, or is
16   it not? Tell me how is it relevant to
17   this case, David.
18       MR. TAUSTER: How is it relevant
19   to this case?
20       MR. SELLS: Is it in the
21   complaint? Is it in the complaint? I
22   am wondering.
23       MR. TAUSTER: Derek, I think you
24   need to calm down a little bit.

Page 85

MARJORIE PHILLIPS

1        MR. SELLS: I asked if we could
2    take a break.
3        MR. TAUSTER: We don't need to
4    take a break. This is ridiculous, I
5    think we need to get the magistrate
6    involved here. You don't get to keep
7    taking breaks because you're tired.
8    Unbelievable, unbelievable.
9        THE REPORTER: Are we off the
10   record?
11       MR. TAUSTER: Apparently.
12       (Off the record.)
13       (Record read.)
14   BY MR. TAUSTER:
15      Q.   Ms. Phillips, can you please
16   answer the question?
17      A.   No, I do not.
18      Q.   Okay. Is it possible that any
19   differential treatment was due to who he
20   knew at the college rather than due to
21   racism?
22      A.   I don't know.
23      Q.   Okay. So other than the issue
24   with Ms. Ellsworth and the complaint

22 (Pages 82 - 85)

Page 86

MARJORIE PHILLIPS

1        MARJORIE PHILLIPS
2   about the director, did you lodge any
3   other complaints with the Affirmative
4   Action Office prior to 2018?
5       A.   No.
6       Q.   Did you lodge any complaints
7   with the Affirmative Action officer in
8   2018?
9       A.   Yes.
10          MR. TAUSTER:  Craig, can you
11      throw up FIT 7, which will be our 6.
12          (Exhibit 6, Timeline of
13      complaint to Affirmative Action, was
14      so marked for identification, as of
15      this date.)
16          MR. JONES:  Exhibit 6 has been
17      introduced.  I will bring it up now.
18      It's now on the screen.
19          MR. TAUSTER:  Very good.
20      Q.   Okay.  Ms. Phillips, do you
21   recognize this document?
22      A.   Yes.
23      Q.   I'm sorry, what was that?
24      A.   Yes.
25      Q.   What is this document?

Page 87

MARJORIE PHILLIPS

1        MARJORIE PHILLIPS
2       A.   It is a timeline of a complaint
3   that I made to Affirmative Action, for
4   Affirmative Action.
5       Q.   And did you lodge this
6   complaint on March 23rd, 2018?
7       A.   Yes.
8       Q.   What is the first allegation
9   that you assert in this complaint?
10      A.   The first incident is Brenda
11   Cowan.
12      Q.   Okay.  What are your
13   allegations regarding Ms. Cowan?
14      A.   Ms. Cowan made a comment that
15   was racist and discriminatory when we
16   were in an office together and she asked
17   me to come join her at the back of the
18   bus.
19      Q.   Okay.  What was the racist
20   comment that she made?
21      A.   She asked me -- we weren't in a
22   bus.  We were sitting in the office.  And
23   I expressed something to her about, you
24   know, her whispering, and she said, oh,
25   come join us at the back of the bus.  We

Page 88

MARJORIE PHILLIPS

1        MARJORIE PHILLIPS
2   weren't in a bus, we were in an office.
3   So that reference, that historical
4   reference to me was racist and
5   discriminatory.  And I didn't understand
6   why she would make a remark like that.
7       Q.   Why do you believe Ms. Cowan
8   was using that remark in a racial
9   fashion?
10      A.   Why?  I do not know why she
11   would do that.  I don't know.
12      Q.   No, I mean -- withdrawn.
13          Do you believe Ms. Cowan was
14   trying to be racist when she made this
15   remark?
16      A.   Yes.
17      Q.   Why?
18      A.   I don't know why.  I don't know
19   why.
20      Q.   Did you have a positive
21   relationship with Ms. Cowan prior to this
22   incident?
23      A.   I didn't have a relationship
24   with her at all.
25      Q.   Do you know if Ms. Cowan had

Page 89

MARJORIE PHILLIPS

1        MARJORIE PHILLIPS
2   any other African-American friends or
3   colleagues?
4       A.   I have no idea.
5       Q.   And so is it fair to say that
6   you were just speculating that Ms. Cowan
7   was using this term in a racially
8   discriminatory fashion?
9       A.   Can you repeat that question?
10      Q.   Is it fair to say that you are
11   just speculating that Ms. Cowan was
12   seeking to be racist?
13      A.   No, she was -- that was a
14   racist statement that she made.
15      Q.   Is it possible that she had any
16   other intentions regarding that
17   statement?
18      A.   I don't know.  I know what she
19   said and I know the historical context
20   and it was racist.
21      Q.   Is there any other context in
22   which people might go to the back of the
23   bus?
24      A.   No.
25      Q.   You never heard of bad children

23 (Pages 86 - 89)

Page 90

1        MARJORIE PHILLIPS
2   being seated in the back of the bus?
3        A.   Not to me.
4        Q.   Did Ms. Cowan make any
5   reference at that time to come join the
6   bad kids in the back of the bus?
7        A.   No, she did not.
8        Q.   Did you ever speak to Ms. Cowan
9   about this comment?
10       A.   Yes, I did.
11       Q.   Did you tell her you thought it
12  was racist?
13       A.   Yes, I did.
14       Q.   And how did she respond?
15       A.   She claimed that that was not
16  her intention.  That's not what she
17  meant.  She didn't really say a whole
18  lot.  She didn't really say a whole lot.
19  That was pretty much it.
20       Q.   Did she mention anything to you
21  about referring to children in the back
22  of the bus?
23       A.   No, she did not.
24       Q.   When did this incident with Ms.
25  Cowan occur?

Page 91

1        MARJORIE PHILLIPS
2        A.   I have approximately fall of
3   2014.
4        Q.   Did you file a complaint in
5   2014?
6        A.   I did not.  I spoke with her.
7        Q.   Why did you not file a
8   complaint in 2014?
9        A.   Because I spoke with her.  And
10  I don't file complaints for every single
11  thing that someone says to me.  I speak
12  to the person and then I take it from
13  there.
14       Q.   Why did this differ from the
15  complaint against Ms. Ellsworth?
16       A.   I did not work with Brenda.  I
17  did not work for Brenda.  I did not have
18  the same interaction with Brenda daily.
19       Q.   Did you speak to anyone else at
20  FIT about this incident?
21       A.   No.  Just Affirmative Action.
22       Q.   Just referring to the complaint
23  here, what is this line when you say
24  "When I told her in the moment it was
25  offensive, she said 'I just meant this

Page 92

1        MARJORIE PHILLIPS
2   was the slow bus'"?
3        A.   You're asking me what did she
4   mean?
5        Q.   I am asking what is this
6   reference?  You testified earlier that
7   she didn't make any reference to kids on
8   the bus or anything, correct?
9        A.   I didn't.  I don't even
10  remember that.  I don't even remember --
11  I don't know what that means.  All I know
12  is what she said.
13       Q.   Okay.
14       A.   And I didn't believe her.
15       Q.   Do you say here that you barely
16  remember getting an apology?
17       A.   Yes.
18       Q.   Okay.  Did you get an apology?
19       A.   No, I don't remember getting an
20  apology.  I do not remember getting an
21  apology.
22       Q.   Okay.  Let me ask you this, you
23  conclude here by saying, "Since then, our
24  relationship hasn't been that
25  interactive," correct?

Page 93

1        MARJORIE PHILLIPS
2        A.   Okay.  That's what it says.
3        Q.   Okay.  So what were your -- so
4   how interactive was your relationship
5   with Ms. Cowan before this complaint?
6        A.   I was in the Dean's Office.  So
7   there were four of us in the Dean's
8   Office.  And I would see her pretty
9   often, at least weekly in the office.
10       Q.   Did you interact with her
11  weekly?
12       A.   No, I did not.
13       Q.   Did you interact with her at
14  all prior to this incident?
15       A.   Prior to this incident?
16       Q.   Yes.
17       A.   Not very much.
18       Q.   So why would you say that
19  "Since then, our relationship hasn't been
20  that interactive"?
21       A.   Because when I spoke to her,
22  then she stopped speaking.  When I told
23  her how I felt, then she stopped
24  speaking.
25       Q.   Okay.  But what do you mean by

24 (Pages 90 - 93)

MARJORIE PHILLIPS

1
2   your relationship hasn't been that
3   interactive, because you just said you
4   didn't have an interactive relationship
5   with her, correct?
6      A.   Whatever we had changed,
7   because I would see her frequently in the
8   office. After I spoke with her about the
9   incident, the relationship that we did
10  have, relationship, changed.
11     Q.   What was the relationship that
12  you had with her?
13     A.   Maybe hello, how are you doing.
14     Q.   So is it your testimony that
15  she never said hello, how are you doing
16  to you after fall of 2014?
17     A.   It was less and less and less
18  until it was nothing.
19     Q.   What is your second allegation
20  in this complaint?
21     A.   I am trying to move the
22  document down so I can read it and I am
23  not able to move it down.
24     Q.   I'll move it down.
25     A.   Okay.

MARJORIE PHILLIPS

1
2      (Witness reviews document.)
3      Q.   Are you nodding because you're
4   ready, Ms. Phillips?
5      A.   I'm ready.
6      Q.   Is your allegation against
7   Defendant Barton is that she stated that
8   African-Americans were considered
9   three-fifths of a human being?
10     A.   Yes.
11     Q.   When did she make this
12  statement?
13     A.   I can't move the document up
14  and down.
15     Q.   Okay. So just to clarify, when
16  do you recall her making the statement?
17     A.   This was sometime around, just
18  before Trump was nominated.
19     Q.   And was she speaking to you?
20     A.   She was speaking to a student
21  aide that we had in the office.
22     Q.   How close were you to this
23  conversation?
24     A.   I'm sorry, repeat that?
25     Q.   How close were you to the

MARJORIE PHILLIPS

1
2   conversation?
3      A.   I walked in. It was first
4   thing in the morning. And I walked in
5   and just heard her saying this.
6      Q.   So you didn't hear anything
7   prior -- please continue.
8      A.   As I stepped into the room.
9      Q.   So did you hear Ms. Barton say
10  anything prior to African-Americans were
11  considered three-fifths of a human being?
12     A.   No, I did not.
13     Q.   So you did not know the context
14  of this remark at the time?
15     A.   No, I did not. No.
16     Q.   Other than yourself, Ms. Barton
17  and the student, was anyone else present
18  when she made the comment?
19     A.   I don't recall.
20     Q.   How would you describe Ms.
21  Barton's demeanor when she made the
22  comment?
23     A.   She didn't really care. She
24  showed no remorse. She didn't apologize.
25     Q.   Just to be clear, Ms. Phillips,

MARJORIE PHILLIPS

1
2   I am talking about at the time she made
3   the remark, what was her demeanor toward
4   the student?
5      A.   Toward the student?
6      Q.   Yes.
7      A.   Again, she showed no remorse.
8   And she didn't apologize.
9      Q.   Did you confront Ms. Barton
10  about this comment?
11     A.   I did. I made comments, I
12  asked her what was she talking about, why
13  would she say -- what was she talking
14  about, why would she say such a thing?
15     Q.   And what did she say?
16     A.   She said something about Trump.
17  I don't remember exactly. It's in the
18  statement. She didn't really try to make
19  me understand -- I didn't understand.
20  Even after what she said to me, she
21  wasn't really trying to make me
22  understand. She didn't apologize. And
23  she showed no remorse. And that was it.
24     Q.   Why did you complain about this
25  remark?

25 (Pages 94 - 97)

MARJORIE PHILLIPS

1
2   A.   Because I was offended.  I felt
3   because she didn't apologize, if there
4   were, if there were some reason,
5   something that I was misunderstanding,
6   she didn't explain to me, she didn't
7   bother to explain, like she didn't feel
8   it was necessary to explain what I had
9   overheard.  It didn't seem important to
10  her at all.  It seemed racist.  It was
11  discriminating.  And she knew.  And she
12  didn't seem bothered by it at all.
13      Q.   You testified earlier that she
14  tried to give you an explanation
15  regarding Donald Trump, right?
16      A.   No, that's not what I said.  It
17  wasn't an explanation.  It was sort of,
18  it was about Trump.  I mean that's not an
19  explanation.  To say she was talking
20  about Trump, that's not an explanation.
21  She didn't make me understand what I had
22  heard and what she meant by what I had
23  heard.  She did not make me understand.
24  Because if she did, it might have been
25  different.  But she did not.

MARJORIE PHILLIPS

1
2   Q.   But why did you consider this
3   remark to be offensive?
4       A.   Because it is offensive to
5   refer to African-Americans as
6   three-fifths of a human being.  I have
7   never worked at a job where someone said
8   that African-Americans were three-fifths
9   of a human being.
10      Q.   Well, first, is it not a matter
11  of historical fact that under the U.S.
12  Constitution, African-Americans held in
13  bondage were treated as three-fifths of a
14  human being for historical purposes?
15      A.   Yes.  It's also historical that
16  Jewish people were held in concentration
17  camps and all sorts of terrible things
18  were done to them.  But I would not,
19  never, ever say that in an office to
20  another person.  Because I wouldn't want
21  to offend anyone at all.  I would never
22  say that.
23      Q.   You would never say what?
24      A.   There are all sorts of
25  historical references that are

MARJORIE PHILLIPS

1
2   disrespectful to the person who it
3   pertains to.  And so I would never say
4   anything to her that would offend her in
5   that way.  I would never.  And if I did,
6   I would have apologized.  She didn't seem
7   to care.  She didn't seem to care.  She
8   didn't care about what I felt.
9       Q.   But did she say this remark to
10  you?
11      A.   No, she was speaking to a
12  student aide.  A young girl.  A young
13  white girl.
14      Q.   And you testified earlier that
15  you did not know what she said before
16  this statement, correct?
17      A.   Repeat your question, please.
18      Q.   You testified earlier that you
19  did not know what she said before making
20  this statement?
21      A.   I don't know what you mean.
22      Q.   Did you hear anything that Ms.
23  Barton said prior to saying
24  African-Americans were considered
25  three-fifths of a human being?

MARJORIE PHILLIPS

1
2       A.   Prior to, no, I did not.
3       Q.   Had Ms. Barton made any racist
4   remarks prior to this incident?
5       A.   I don't recall.
6       Q.   Did you file a complaint about
7   this incident in 2016?
8       A.   Yes, I did.
9       Q.   In 2016?
10      A.   I filed the complaint when I
11  filed the Affirmative Action case.
12      Q.   Right.  So what I am asking you
13  is when this remark was made in 2016, did
14  you file a complaint?
15      A.   I did not.
16      Q.   Why not?
17      A.   Because I don't file a
18  complaint every time someone makes a
19  discriminating remark, a microaggression
20  in the office every single time, I would
21  be filing reports every week if I did
22  that.  And I did not.
23      Q.   Okay.  How did this differ from
24  the situation with Ms. Ellsworth?
25      A.   Because I work for Ms.

26 (Pages 98 - 101)

MARJORIE PHILLIPS

1   MARJORIE PHILLIPS
2   Ellsworth.  She was my supervisor.
3       Q.   Did you work with Ms. Barton?
4       A.   With.
5       Q.   Okay.  So you didn't -- you did
6   not think it was appropriate to file a
7   complaint about a co-worker in the fall
8   of 2016?
9       A.   I didn't say I didn't think it
10  was appropriate.  I said I didn't file a
11  complaint.  I didn't say it wasn't
12  appropriate.  I spoke with her and I did
13  not file the complaint at that time.
14      Q.   Did you expect FIT to be able
15  to take any action on this complaint --
16  withdrawn.
17          Did you complain about an
18  incident involving Kyle Farmer in your
19  2018 complaint?
20      A.   Yes, I did.
21      Q.   What did you allege about
22  Mr. Farmer?
23      A.   That he's a racist.  That he
24  made a racist remark.
25      Q.   What was the racist remark that

MARJORIE PHILLIPS

1   MARJORIE PHILLIPS
2   you allege that he made?
3       A.   He walked up to me after him
4   and Mary Davis had come out of a meeting
5   at the end of the day and I was putting
6   on my coat and hat, it was the
7   wintertime, and I was leaving, we were
8   all leaving, and he walks up to my desk
9   and told me that I looked like I was
10  going to the hood.
11      Q.   What was his demeanor when he
12  made this remark to you?
13      A.   As if he was joking.  He
14  thought it was funny.
15      Q.   Is Mr. Farmer American?
16      A.   Not to my knowledge.
17      Q.   Okay.  Did you confront
18  Mr. Farmer about this comment?
19      A.   Yes, I did.
20      Q.   And what did he say?
21      A.   He said that he didn't mean
22  anything by it.  He was glad that I
23  brought it to his attention and that he
24  apologized.
25      Q.   Did he do anything else?

MARJORIE PHILLIPS

1   MARJORIE PHILLIPS
2       A.   He said that he was glad that I
3   brought this to his attention because he
4   has African-American students and he was
5   just very thankful that I brought this to
6   his attention that I felt he was a racist
7   and made a racist remark.  He
8   acknowledged it.
9       Q.   Did he give you any sort of
10  gifts after this interaction?
11      A.   Gifts?
12      Q.   Did he give you a gift after
13  this interaction?
14      A.   I don't remember.  I remember
15  him speaking about he had a hat or
16  something for me.  But I never received
17  anything from him.
18      Q.   Do you believe that Mr. Farmer
19  was trying to discriminate against you
20  when he made this remark?
21      A.   Yes, I do.
22      Q.   Why?
23      A.   Because making remarks like
24  that are discriminating, whether you
25  intend to do it or not, that's what

MARJORIE PHILLIPS

1   MARJORIE PHILLIPS
2   you're doing.  So your intention is
3   almost irrelevant.  You make a racist
4   remark, it's a racist remark.  Whether
5   you intended to do so or not.  And that's
6   what he did.  That's what Marilyn did.
7   Whether she intended to do it or not.
8   And Kyle apologized.  Marilyn didn't even
9   apologize.  So it doesn't matter whether
10  it's intentional or not, it's still a
11  racist remark.
12      Q.   Do you believe it's possible
13  for a white person to make a remark about
14  a black person without it being
15  discriminatory?
16      A.   Of course.
17      Q.   Do you believe it's possible
18  for a white person to discuss race
19  without it being discriminatory?
20      A.   Yes, of course, yes.
21      Q.   So do you believe that there is
22  a context where someone could say I,
23  don't know, African-Americans were
24  considered to be three-fifths of a human
25  being without it being a discriminatory

MARJORIE PHILLIPS

1  
2   remark?
3       A.   No, I do not.
4       Q.   Did you file a complaint
5   against Mr. Farmer in 2017?
6       A.   Yes, I did.
7       Q.   In 2017?
8       A.   When it happened, yes.
9       Q.   Who did you file that complaint
10  with?
11      A.   Mary Davis.
12      Q.   Was this a written complaint?
13      A.   No.  I spoke with her in her
14  office the very next day.
15      Q.   What did Dean Davis say?
16      A.   She said she didn't know why he
17  would make such a remark.  She said you
18  know that he's English.  Because I asked
19  her why would he say such a thing to me?
20  Why?  I said you were standing right
21  there and he said that right in front of
22  me and you didn't say anything.  And she
23  said she didn't know why he made that
24  kind of remark.  She couldn't answer.
25  And she said, well, you know that he's

MARJORIE PHILLIPS

1  
2   English.  As if that was to explain
3   something.
4       Q.   Did you file a complaint with
5   Affirmative Action in 2017?
6       A.   No.  I made a complaint to my
7   supervisor Mary Davis, our supervisor.
8       Q.   Were you satisfied with
9   Mr. Farmer's response?
10      A.   I wouldn't say satisfied.  I
11  accepted it.
12      Q.   Do you believe he was
13  remorseful?
14      A.   No, I do not.
15      Q.   Why not?
16      A.   Because actions speak louder
17  than words.  And I just felt they were
18  words, but I accepted it.  I still view
19  him as a racist.
20      Q.   Did you discuss the incident
21  involving Ms. Cowan with Dean Davis?
22      A.   No, I did not.
23      Q.   Did you discuss the
24  three-fifths incident with Dean Davis?
25      A.   Yes, I did.

MARJORIE PHILLIPS

1  
2       Q.   Okay.  Did you discuss it with
3   her at the time?
4       A.   I discussed it with her when I
5   decided that I -- well, I went to her
6   first.  My intention was not to go
7   directly to Affirmative Action.  My
8   intention was to speak with my supervisor
9   about these incidents.  And when I went
10  in to talk to her, I just told her
11  everything that I had experienced.  And
12  that was, these incidents were all
13  included.  I just told her everything.
14  Some of them I had already told her about
15  and others she was hearing for the first
16  time.
17      Q.   So going back to, though, the
18  fall 2016 incident with Ms. Barton, in
19  the fall of 2016 at the time this remark
20  was made, did you report this to Dean
21  Davis?
22      A.   At the time, I don't believe
23  so.  I don't believe so.  But I'm not
24  sure.
25      Q.   Why not?

MARJORIE PHILLIPS

1  
2       A.   Why not what?
3       Q.   Why didn't you report this to
4   Dean Davis?
5       A.   Immediately, you mean, because
6   I did report it to her.
7       Q.   Yes, immediately.
8       A.   I don't remember.  I would be
9   guessing.  I would be guessing.  I don't
10  remember.
11      Q.   Did you complain about any
12  other incidents in the 2018 Affirmative
13  Action complaint?
14      A.   Whatever appears here on this
15  complaint is what I complained about,
16  what is in writing.  There was nothing
17  outside of that, at that time.
18      Q.   Did you make -- I'm sorry, what
19  was that?
20      A.   At that time.
21      Q.   Okay.  Did you include in here
22  a complaint about Brenda Cowan giving you
23  a gift?
24      A.   Did I complain about it?
25      Q.   Yes.

28 (Pages 106 - 109)

Page 110

MARJORIE PHILLIPS

1
2    A.   I didn't make a complaint about
3  it.  I didn't accept it.
4    Q.   I would like to refer you to --
5  let me just see something, if this
6  continues.  Referring to the bottom of
7  this page for the fourth incident of
8  occurrence, can you review that and let
9  me know when you're finished reading.
10       (Witness reviews document.)
11    A.   I would like to scroll down, I
12  don't know if I am seeing the whole
13  thing.
14    Q.   You are, because this goes to
15  the fifth incident of occurrence.
16    A.   What was your question now?
17    Q.   What was this fourth incident
18  of occurrence that you felt compelled to
19  include in a discrimination complaint?
20    A.   I don't understand your
21  question.
22    Q.   Why did you include this
23  incident in your discrimination
24  complaint?
25    A.   About the gift?

Page 111

MARJORIE PHILLIPS

1
2    Q.   Yes.
3    A.   Because I am a 63-year-old
4  woman.  At the time I wasn't 63, but I am
5  older than probably half of the staff
6  there in the School of Graduate Studies,
7  referring to Brenda Cowan at the time.
8  And I was offended.  I was offended by
9  the things she was giving me.  I couldn't
10  understand, was there a message.  I was
11  offended.  And I didn't know what she was
12  trying to say to me.  It seemed like she
13  was demeaning me.  I felt like -- I
14  didn't understand what she was trying to
15  communicate with me.  I mean I am an
16  adult.  I don't know how old she is.  But
17  to give someone who may be your senior a
18  pencil as a gift, I didn't understand
19  that.  I still don't understand that.
20    Q.   A few questions about this.
21  First you say in here she would bring
22  things back for us in the office; is that
23  correct?
24    A.   She would brings things back,
25  yes.  Not necessarily -- yes, yes.  Not

Page 112

MARJORIE PHILLIPS

1
2  always for everyone, yes.
3    Q.   So did she get gifts for your
4  other co-workers?
5    A.   Yes.  I wasn't always aware of
6  it, but I would say yes.
7    Q.   So just for the gifts that
8  you're aware of, were they different from
9  the gifts that you were receiving?
10    A.   I wasn't comparing, I don't
11  know.  I wasn't comparing.  It wasn't a
12  matter of comparison.
13    Q.   What I am asking, I guess, do
14  you believe she was giving white
15  co-workers better gifts than
16  African-American co-workers?
17    A.   I don't know.  I just know what
18  I received.
19    Q.   But why do you -- actually, let
20  me take a step back here.  When did she
21  start giving you these gifts?
22    A.   I don't recall.
23    Q.   Was it before --
24    A.   I mean, I think you're
25  overstating it a bit.  Maybe it was two

Page 113

MARJORIE PHILLIPS

1
2  gifts.  And I don't remember when.
3    Q.   I don't know what I can be
4  overstating, because you included --
5    A.   I just want it to be clear that
6  it's maybe two gifts.  I just want that
7  to be clear.
8    Q.   So two gifts over the entirety
9  of your employment?
10    A.   Possibly, yes.  Yes.
11    Q.   Okay.  Well, I mean in this
12  fourth incident of occurrence, you appear
13  to be saying she gave you an eraser, a
14  pencil and something from Duane Reade; is
15  that correct?
16    A.   Yes.
17    Q.   So it's at least three gifts,
18  correct?
19    A.   They may have been together.
20  It could have been two in one.
21    Q.   And this was in, I'm sorry,
22  when was this?  Do you recall?
23    A.   No, I don't recall.
24    Q.   Was this after 2014?
25    A.   I don't recall.

29 (Pages 110 - 113)

MARJORIE PHILLIPS

1
2     Q.   Was this after the back of the
3   bus incident with Ms. Cowan?
4     A.   I don't know if it was before
5   or after.
6     Q.   Let me ask you this.  Based on
7   the fact that you listed it as the fourth
8   incident of occurrence in your complaint,
9   do you believe that occurred after this
10  incident?
11    A.   Can you repeat that again?
12    Q.   Given that this is the fourth
13  incident of occurrence and the back of
14  the bus was the first incident of
15  occurrence, do you believe that this
16  incident occurred after that?
17    A.   No, I think it happened before.
18  I am pretty certain it happened before.
19    Q.   You're pretty certain that the
20  gift return happened before the back of
21  the bus comment?
22    A.   I can't be sure of the
23  timeline.  I can't be sure.
24         MR. TAUSTER:  Craig, can you
25    throw Exhibit 1 back up there again.

MARJORIE PHILLIPS

1
2     Q.   Okay.  Withdrawn.  Let's go
3   back to number 6.  So the fourth incident
4   of occurrence you list Brenda returning
5   the gift.  What is this fifth incident of
6   occurrence?
7         (Witness reviews document.)
8     A.   Okay.  What was your question?
9     Q.   So I am going to focus I guess
10  on the second half of this.  So what was
11  this discussion regarding, for lack of a
12  better term, the March 9th discussion
13  after Marilyn went to a funeral, tell me
14  about that?
15    A.   She had come into the office
16  after the funeral and she was talking
17  about it a little bit, and she said that
18  a cousin of hers was really upset, I
19  guess the cousin, I don't remember, was
20  really upset because he learned, again
21  loosely, I don't remember, he learned his
22  parents may have not been married and he
23  was, he would be considered a bastard, an
24  illegitimate child.  And something along
25  that nature.  And I found that to be

MARJORIE PHILLIPS

1
2   disrespectful and very insensitive and
3   just callous, because she knew, and it
4   wasn't the first time, she knew that I
5   was a single mother.  And I said to her
6   that, I don't remember my exact words,
7   but I expressed how I felt about what she
8   said, using those words, "bastard,"
9   "illegitimate," and I said, well, my son
10  isn't a bastard, he isn't illegitimate.
11  And she said, well, there are some
12  socioeconomic circumstances he would be
13  considered that.
14    Q.    So let me ask you this.  When
15  Ms. Barton was first discussing the
16  funeral, was she talking to you?
17    A.    Yes, she was talking to Umilta
18  and myself.
19    Q.    Because you say here "They were
20  talking about it as I walked in in the
21  morning."
22    A.    And I joined the conversation.
23  So she was talking to both of us.
24    Q.    So it's fair to say you
25  inserted yourself into this conversation?

MARJORIE PHILLIPS

1
2     A.    No, I didn't insert myself --
3   we're in an office that's probably about
4   10 by 12, so we often join in on
5   conversations.  I wasn't being excluded
6   in other words.
7     Q.    Was Ms. Barton saying her uncle
8   was concerned that he was going to find
9   out he was going to be a bastard?
10    A.    Cousin or uncle or something,
11  yes.
12    Q.    So why would that be offensive
13  to you?
14    A.    Because she knows -- first of
15  all, it wasn't the first time that she
16  threw that word around.  She had said
17  that before.  I don't remember, but I
18  know it wasn't the first time.  The first
19  time I didn't say anything.
20         And she knew that I was a
21  single mother.  She knew that.  That was
22  common knowledge.  And that was -- and
23  she knew that.  So to say that, I was
24  hurt by what she said, the way she was
25  tossing it around.  And when I clarified

MARJORIE PHILLIPS

1
2  and questioned her a little bit about
3  what she said, she just shrugged her
4  shoulders and said, well, in some
5  socioeconomic groups he would be
6  considered a bastard, he would be
7  considered illegitimate.  Even after I
8  told her how I felt.  I told her how I
9  felt.  I would never have said that to
10 her.
11      Q.   Do you believe she was having
12 this discussion about her relative at a
13 funeral to discriminate against you on
14 the basis of your race?
15      A.   No, I believe when she came to
16 the office and was telling us about it
17 and was being insensitive, that she knew
18 what she was doing.  I mean she didn't
19 have to come to the office and share
20 that, but she did.
21      Q.   But is she not able to come to
22 the office and share discussion with her
23 colleagues?  I am a little confused why
24 this incident would have tracked back to
25 you.

MARJORIE PHILLIPS

1
2      A.   Because I am a single mother.
3  And I told her that my son is not a
4  bastard.  And he's not illegitimate.  And
5  she was generalizing.
6      Q.   Prior to filing this 2018
7  Affirmative Action complaint, did you
8  have any discussions with Dean Davis
9  about a change in your job title or
10 salary?
11      A.   Yes, I did.
12      Q.   When did these discussions take
13 place?
14      A.   In 2018, as you suggested.
15      Q.   No, I mean prior to 2018.  Do
16 you remember when you had these
17 discussions?
18      A.   Prior to 2018?
19      Q.   Yes, prior to filing the
20 Affirmative Action complaint, did you
21 have any discussions with Dean Davis
22 about a change in job title or salary?
23      A.   Yes, I did, yes.
24      Q.   When?
25      A.   I don't remember what month it

MARJORIE PHILLIPS

1
2  was.  I went to Affirmative Action in
3  March/April of 2018, so it definitely was
4  before March of 2018.  Early 2018.  Could
5  have been 2017.  Late 2017.
6          MR. TAUSTER:  Craig, can you
7      throw up FIT Exhibit 8.
8          MR. JONES:  Exhibit 7 has been
9      introduced and it's coming up now.
10         (Exhibit 7, Phillips job
11     description emails with HR 2017, was
12     so marked for identification, as of
13     this date.)
14      Q.   Could you just review this
15 exhibit and tell me if this refreshes
16 your recollection about the time frame?
17      A.   Yes, I said late 2017 or early
18 2018, yes.
19      Q.   So did you meet with Natacha
20 Unelus to discuss a job title change or
21 salary change?
22      A.   Yes.
23      Q.   What did you discuss with her?
24      A.   I told her that Mary Davis and
25 I had had a conversation about an upgrade

MARJORIE PHILLIPS

1
2  and a new job title.  She had more
3  responsibility, she was going to give me
4  more responsibility.  We had discussed
5  what would be involved in this new
6  position.  And she asked me, Dean Davis
7  had asked me to look into a job title
8  that would reflect this new job.  And so
9  we had -- so in that discussion with Dean
10 Davis, we had decided that I was going to
11 go to human resources, because, you know,
12 they could help me with that.  And I
13 would decide what was the best job title
14 for this position that we were
15 discussing.
16      Q.   Okay.  Were you required to
17 submit any paperwork to human resources
18 in connection with this process?
19      A.   In connection with having a
20 meeting with Natacha about a job title,
21 no.
22      Q.   You just said you were going to
23 go to human resources because they can
24 help you with --
25      A.   I went to human resources.

31 (Pages 118 - 121)

MARJORIE PHILLIPS

1
2  Q.   Right.  So I am asking did you
3  submit any documents to human resources?
4  A.   No, I just sent an e-mail
5  requesting an appointment to talk about
6  what the dean and I had discussed and to
7  talk about a job title with the input of
8  HR based on my discussion with the dean.
9  Q.   Did you have that meeting with
10 HR?
11 A.   I did.
12 Q.   So what had you -- what was the
13 outcome of that meeting?
14 A.   Natacha sent me a couple of,
15 talked about steps, different steps, you
16 know, at FIT everything is based on
17 salary schedule and step.  And she sent
18 me a couple of job descriptions.
19 Different, a couple of different job
20 descriptions that we might consider for
21 this new position.
22 Q.   Did you have any further
23 discussions with Natacha on this point?
24 A.   No, because that's, that is
25 what I needed from her.

MARJORIE PHILLIPS

1
2  Q.   Does FIT have a process in
3  place to change job titles and salary?
4  A.   Yes.
5  Q.   Are you familiar with that
6  process?
7  A.   I haven't done it in a long
8  time, but there is some paperwork
9  involved in an upgrade, yes.
10 Q.   Are you tasked with completing
11 any of that paperwork?
12 A.   No.  The last time I received
13 an upgrade, I didn't have to do it
14 myself.  The person, my supervisor, who I
15 worked for, did it himself, and I
16 basically didn't have to do anything.  We
17 had a discussion, the same that I had
18 with Mary Davis, and he came back to me,
19 he talked a little bit about what the job
20 title would be.  What he had discussed
21 with HR.  And to see if I was in
22 agreement and then I got an upgrade.  So
23 I didn't have to do it, he did it.
24 Q.   So after this meeting with
25 Natacha, did you sit down with Dean Davis

MARJORIE PHILLIPS

1
2  to discuss the upgrade?
3  A.   No, because by then, I was sort
4  of going, based on the conversation that
5  we had, and going by what happened the
6  last time they let me see the upgrade, by
7  now the Affirmative Action case, I had
8  made the complaint in the Affirmative
9  Action case, and the temperature in the
10 office had changed.  The relationship
11 between the dean and I had changed.
12       And when you go for an upgrade,
13 a large part of it is the supervisor
14 driving, because again, that was my
15 experience, and coupled with the
16 Affirmative Action complaint, the
17 discrimination that we had discussed, I
18 felt that the dean was retaliating
19 against me for the Affirmative Action
20 case.  So she never, we never had any
21 further discussion.  She never brought it
22 up again, and it sort of like died in the
23 water, because I felt like she was
24 retaliating because of the Affirmative
25 Action case.

MARJORIE PHILLIPS

1
2  Q.   So you said she never brought
3  it up again.  Did you ever bring it up
4  with her again?
5  A.   I didn't.  I felt
6  uncomfortable.  I felt very uncomfortable
7  at that time.  And, you know, I even
8  reached out to the Affirmative Action
9  Officer Deliwe to ask her, I told her
10 that I felt uncomfortable, and I asked
11 her would the Affirmative Action case
12 impact my discussion and my getting an
13 upgrade.  And she said that it shouldn't.
14 And she told me that I should speak with
15 the dean.
16       I felt very uncomfortable,
17 because by then the relationship had
18 changed and she was very standoffish.
19 She changed from who she was -- that
20 conversation that we had before the
21 Affirmative Action case was not the same
22 person that I was dealing with after the
23 Affirmative Action case, complaint.
24 Q.   And you said Deliwe, is this
25 Deliwe Kekana?

MARJORIE PHILLIPS

1
2   A.   Yes.
3   Q.   So after she told you to speak
4   with Dean Davis, did you?
5   A.   No, I did not.  I felt
6   uncomfortable.
7   Q.   So fair to say that you stopped
8   pursuing the upgrade after you filed your
9   Affirmative Action complaint?
10   A.   I felt that the dean was the
11   one who was going to make it happen.  We
12   had had a full discussion and she wanted
13   it to happen, then the ball was really
14   sort of -- the ball was in her court.
15   And so she didn't do anything.  She
16   didn't do -- I felt very uncomfortable.
17   I felt like she was retaliating against
18   me.  That there was definite
19   discrimination and retaliation because of
20   the discrimination case.
21   Q.   Did you have an incident with
22   Defendant Barton on May 16th, 2019?
23   A.   Yes, I did.
24   Q.   Okay.  Tell me about this
25   incident.

MARJORIE PHILLIPS

1
2   A.   Well, on May 16th of 2019, a
3   student had come into the School of
4   Graduate Studies office, the dean's
5   office, and -- excuse me, let me get some
6   water.
7        So it was around graduation
8   time, and the students were coming into
9   the office to pick up their pre-ordered
10   regalia.  Their robes.  And each student
11   was expected to pay for the robe in
12   advance and then come into the dean's
13   office to pick it up.
14        So this particular student came
15   in, and she was one of the students from
16   my program, the fashion and textile
17   studies, so I knew the student pretty
18   well, or well enough.  And so I attempted
19   to help her.  So she was sort of talking,
20   and as she was telling us that she had
21   not placed an order for the regalia, that
22   she had not done anything, and she went
23   down to the gym, wherever they were
24   supposed to be picking up these robes,
25   she went down there first and no one knew

MARJORIE PHILLIPS

1
2   anything.  No one could really help her.
3   And they sent her up to the School of
4   Graduate Studies.
5        So when she came up there, she
6   told us this and I offered and Marilyn
7   offered, both of us were saying that she
8   should speak with Carla, because Carla
9   was the person downstairs in the gym who
10   was in charge of that whole process for
11   gowns, robes.  And it started getting a
12   little, Marilyn was talking to her, and I
13   was talking to her.  And Marilyn said at
14   one point, I was suggesting that the
15   student go back downstairs and I was
16   going to try to work on her behalf by
17   calling Carla directly and speaking with
18   her and so just running interference for
19   the student so that Carla could help her,
20   so that's what the procedure was.
21        That's what we were directed to
22   do, because we didn't have a robe because
23   she hadn't paid for one.  So I thought
24   that Carla could help her in whatever
25   way.  And so then Marilyn sort of took

MARJORIE PHILLIPS

1
2   over the conversation, and she went out
3   into the hallway and I guess she had some
4   robes left over from last year in the
5   cabinet.  So she took one out and she
6   gave it to the student.  I didn't see it,
7   but that's what she did.  And then she
8   came back into the office without the
9   student.  And when she came back in, I
10   asked her why would she do that, because,
11   you know, is that the procedure for
12   someone who doesn't, hadn't paid for the
13   gowns, we just give them one out of the
14   cabinet, is that what we're doing.  And
15   she said, I just made an executive
16   decision.  I just made an executive
17   decision.  I was trying to be nice.
18        So I said, well, that seems
19   like preferential treatment.  Why would
20   you -- I mean is that what we're doing.
21   If someone else walks in, is that what we
22   do, just walk into the cabinet.  And she
23   got really angry because I was asking her
24   questions.  And I couldn't understand why
25   she was getting so angry, because what

MARJORIE PHILLIPS

1
2 she did was not the procedure. We knew
3 what the procedure was. You don't have a
4 gown if you have not purchased it, if you
5 have not paid for it prior to that day,
6 then you speak with Carla downstairs.
7        And so she got really angry
8 that I was asking her questions and she
9 said to me that she made this executive
10 decision. She doesn't give a fuck what I
11 do. Fuck you. Shut the fuck up.
12 Fucking I'll kill you. And she just got
13 louder and louder and louder. And she
14 said, I'm tired of your bullshit. I'm
15 tired of your shit. Fuck you. Fuck you.
16 Fuck you. I'll fucking kill you. I'm so
17 fucking sick and tired of you, like that.
18 Like that, but worse.
19        I feel kind of embarrassed that
20 I'm doing this right now. Because it was
21 even worse than that. And she was in my
22 face. She had walked over to me from her
23 desk and she was in my face, and she was
24 foaming at the mouth. She had foam. And
25 she was like this close to me. She's

MARJORIE PHILLIPS

1
2 like, I'm tired of your shit. I'm tired
3 of your bullshit. Shut the fuck up.
4 Fucking fuck you. I'll fucking kill you.
5 Over and over and over and over and over.
6 She kept on saying that. And she told me
7 she was going to fucking kill me and to
8 shut the fuck up. Over and over. I am
9 tired of your shit. Over and over.
10        And then she got so close to me
11 and she put her hands on my chest like to
12 push me, and I stood up, I stood up, I
13 put my hands up, I stood up, and I said,
14 calm down. She said, don't fucking tell
15 me to fucking calm down. Fuck you. Shut
16 the fuck up. And she was all in my face.
17 Over and over and over. Yelling and
18 screaming. And yelling and screaming.
19 And I just kept saying, calm down. Calm
20 down. And I couldn't -- I couldn't even
21 believe, I was so afraid that she was
22 going to fucking kill me. That she had a
23 weapon or something, because she just
24 kept saying, I'm going to fucking kill
25 you. And I was scared for my life. I

MARJORIE PHILLIPS

1
2 couldn't take my eyes off of her. I was
3 paralyzed with fear. And she just kept
4 yelling and telling me she's going to
5 fucking kill me, and I was scared for my
6 life. I didn't know what she was going
7 to do. If she had a weapon. And she was
8 just screaming these things. And I was
9 paralyzed with fear. I was paralyzed
10 with fear. I thought she was going to
11 kill me.
12        My life flashed in front of me,
13 but I couldn't do anything. I was
14 paralyzed. And then after saying it
15 probably 20 times and yelling, don't
16 fucking tell me to calm down, shut the
17 fuck up, fuck you, I'm tired of your
18 shit, I'm tired of your shit, and then
19 she turned and she walked out of the
20 office.
21    Q.   So you testified that Ms.
22 Barton physically put her hands on you?
23    A.   Yes, she did.
24    Q.   Did she push you?
25    A.   She did. And that's when I

MARJORIE PHILLIPS

1
2 stood up. That's when I stood up. And I
3 said -- when she put her hands on me,
4 that's when I stood up. And I said, calm
5 down. At that point I was afraid. It's
6 one thing -- I was afraid already. I was
7 already afraid, but then when she touched
8 me and she put her hands on me and she
9 pushed me, like I didn't know what she
10 was going to do next. I just didn't know
11 what was coming next. And I was -- I was
12 scared to death. I was scared to death.
13 I was scared to death. But I was
14 paralyzed. I was paralyzed. It's like a
15 bad dream that you can't get out of.
16 Like you're stuck and you can't move.
17 Like I just -- that's what happened. And
18 then she left the office, just like that.
19 She stormed out of the office.
20    Q.   Other than yourself and Ms.
21 Barton, did anyone else at FIT witness
22 this incident?
23    A.   Umilta was in the office. She
24 was there.
25    Q.   Anybody else?

34 (Pages 130 - 133)

MARJORIE PHILLIPS

1
2    A.    No.
3    Q.    Did you bring this incident to
4    the attention of HR?
5    A.    Yes.
6    Q.    Who within HR did you inform
7    about the incident?
8    A.    Natacha.
9    Q.    What did you tell Natacha?
10    A.    I told her, I explained the
11    whole entire incident to her, just what I
12    described to you.  I told her everything
13    that happened.
14    Q.    What did she say in response?
15    A.    I told her that I felt Marilyn
16    was retaliating because of the
17    Affirmative Action case that was
18    lingering.  And that it was a clear case
19    of discrimination and retaliation, and
20    that if it hadn't gone on for so long, I
21    felt that FIT was responsible and had put
22    me in this position because it was
23    lingering and nothing was done about it
24    for months and months and months and
25    months and months.  They never gave me a

MARJORIE PHILLIPS

1
2    conclusion.  They never, they never
3    called me in.  And so this was lingering.
4          And I believe that their
5    failure to take action is what led to
6    this incident.  And I told Natacha that.
7    And she said no, I don't think that.  I
8    don't think that at all.  No.
9          And I was like what?  You don't
10    think that.  Are you freaking kidding me.
11    I didn't say that in that way.  I was
12    like shocked.  One plus one is two, and
13    she says, no, I don't think that one has
14    anything to do with the other.
15          I said she's retaliating
16    because of this case, because nothing is
17    being done and it's been going on, this
18    investigation is never ending.  Nothing
19    has happened.  This is a clear case of
20    retaliation.  I was so upset.  And she
21    kept saying to me, no, I don't think so.
22    I don't see how you make the connection.
23    That's what she said.  That was what
24    Natacha said.  Clearly, clearly
25    discrimination and retaliation.  Clearly.

MARJORIE PHILLIPS

1
2    Q.    Is Ms. Barton your supervisor?
3    A.    No, she is not.
4    Q.    Do you report to her in any
5    fashion?
6    A.    No, I do not.
7    Q.    Is she authorized to discipline
8    you in any way?
9    A.    No, she is not.
10    Q.    Is she authorized to physically
11    assault you in any way?
12    A.    No, she is not.
13    Q.    Why did you believe this
14    incident was discrimination?
15    A.    I have never seen her act that
16    way with a white person.  I have never
17    seen her behave that way with a white
18    person.  And the only other person that
19    was in the office was another
20    African-American, so she felt free to do
21    what she wanted to do because the college
22    wasn't doing anything.  The college had
23    not reprimanded her.  Whatever was going
24    on at that time, she felt free enough.  I
25    would never in 10 zillion years do that

MARJORIE PHILLIPS

1
2    or act like that with anyone, with
3    anyone.
4          When you go to work, no one has
5    the expectation of coming to work and
6    being threatened to be killed.  And
7    because this Affirmative Action case was
8    hovering over all of our heads, which at
9    the time I can say in my mind, it will
10    take as long as it will take.  I asked
11    Deliwe about it a couple of times.  She
12    said they are still working on it.  I
13    don't know how long these things take.  I
14    don't know.  So I wasn't hurrying it
15    along.  I did ask about it on a couple of
16    occasions, but I didn't get angry about
17    it.
18          But Marilyn had to live with
19    this uncertainty, her and Mary, every
20    day, because there was no resolution.
21    And Marilyn cracked.  She just went off
22    on me.  She told me she was tired, I am
23    tired of your fucking shit.  In my face.
24    Foaming at the mouth.  Telling me she's
25    going to fucking kill me.  Retaliation,

Page 138

MARJORIE PHILLIPS

1
2 discrimination. Never saw her behave
3 like that with any white person.
4     Q.   Did she use any racial slurs
5 during the outburst?
6     A.   No, she did not.
7     Q.   And, you know, just to take a
8 step back, other than the three-fifths
9 comment, are you aware of Ms. Barton
10 making any other racially -- any other
11 remarks that you consider to be racially
12 disparaging?
13     A.   Marilyn has said things that --
14 yes, Marilyn has said things that I
15 thought were racially insensitive. She
16 wasn't talking to me, I overheard her
17 saying things that were just, I just
18 shook my head. Because we're all in the
19 space together, so if one person is
20 talking, you can almost hear everybody's
21 conversation, unless you're whispering.
22 Yes. So the answer is yes.
23     Q.   What were those remarks?
24     A.   Well, one that I can remember
25 off the top of my head was the incident

Page 139

MARJORIE PHILLIPS

1
2 with, she wasn't talking to me, with the
3 black face. There were some incidents in
4 the news, in the media, about black face.
5 I think it was -- I really don't
6 remember. It may have been one of the
7 designers. I don't remember. I just
8 know that it had to do with black face,
9 you know. The caricature. The racially
10 insensitive denigrating discriminating
11 black face. And she was having a
12 discussion with someone else in the
13 office. I heard them saying something
14 about black face. They were kind of
15 giggling about it. All I heard -- then I
16 knew, I heard that that is what they were
17 talking about. And they were giggling
18 about it.
19          I don't find anything funny
20 about that. But I wasn't in the
21 conversation. She wasn't talking to me.
22 So I just, I didn't say anything. I
23 didn't say anything.
24     Q.   Other than that comment,
25 anything else that springs to mind?

Page 140

MARJORIE PHILLIPS

1
2     A.   I don't know if this would
3 count, I don't know if this would count,
4 but I remember Umilta was sharing
5 something about a member of her family
6 got accepted into some wonderful
7 fantastic program, maybe they were a
8 doctor or doctoral program, I don't
9 remember, but it was an amazing
10 opportunity, so she was sharing this.
11 And Marilyn had a habit of -- let me
12 rephrase this. Marilyn went onto her
13 computer and typed up something to verify
14 what Umilta had just told her, like she
15 didn't believe Umilta. She didn't
16 believe what she said. So she went on
17 Google and did something there. And she
18 was like, oh, yeah.
19          Like who does that, you share
20 something, some good news with your
21 colleagues, and someone doesn't believe
22 it. And so she had to verify. Umilta
23 was insulted. Umilta was insulted.
24     Q.   Other than those two incidents,
25 is there anything else that springs to

Page 141

MARJORIE PHILLIPS

1
2 mind?
3     A.   Looking for incidents?
4 Incidents that happened over the years
5 with Marilyn, I can't recall at this
6 moment.
7     Q.   Do you recall when the black
8 face incident occurred?
9     A.   Well, I was still in the
10 office. So now it would have been 2019,
11 because I didn't leave until 2019. So it
12 would have been 2018, 2019.
13     Q.   Was it before or after you
14 filed your internal Affirmative Action
15 complaint?
16     A.   I think it was after, but I
17 can't be sure.
18     Q.   Did you raise this issue with
19 Deliwe?
20     A.   No, because she wasn't talking
21 to me.
22     Q.   What do you mean she wasn't
23 talking to you?
24     A.   She wasn't speaking directly to
25 me, so what, you know, no. So the answer

36 (Pages 138 - 141)

MARJORIE PHILLIPS

1
2  is no.
3      Q.   The same question with Umilta,
4  the incident, for lack of a better term,
5  with Umilta, did you report that to the
6  Affirmative Action Office?
7      A.   Did I report the incident that
8  happened with Umilta to Affirmative
9  Action?  No, I did not.
10     Q.   Did she?
11     A.   Did what?
12     Q.   Do you know if Umilta reported
13 it to Affirmative Action?
14     A.   I do not know.
15     Q.   So you brought this incident to
16 the attention of human resources, did you
17 file any sort of complaint with FIT
18 public safety or security?
19     A.   Yes, I did.
20     Q.   Did you file a police report?
21     A.   Yes, I did.
22     Q.   Okay.  Did you end up pressing
23 charges?
24     A.   Against Marilyn?
25     Q.   Yes.

MARJORIE PHILLIPS

1
2      A.   I filed a police report, yes.
3      Q.   Did the police end up pursuing
4  charges against Ms. Barton?
5      A.   No, because they told me that
6  this wasn't something that they could
7  file charges for.
8      Q.   Did you tell Dean Davis about
9  this incident?
10     A.   They told me if it happened
11 again, that I could come back and charges
12 could be filed, if it happens again.
13     Q.   Got it, okay.  Did you inform
14 Dean Davis about this incident?
15     A.   Which incident are you
16 referring to?
17     Q.   The incident with Ms. Barton.
18 I am circling back to the May 2019
19 incident.
20     A.   Oh, yes, yes, I did.  Yes.
21     Q.   How did you inform her about
22 the incident?
23     A.   She called me into her office.
24 And Marilyn had gone into her office
25 first, and so she already knew about it.

MARJORIE PHILLIPS

1
2  She spoke with Marilyn before she spoke
3  with me, so she already knew about it.
4  And she said Marilyn had informed her
5  about what happened.  That she felt that
6  it was totally unacceptable.  And that,
7  you know, she apologized, and this is the
8  type of behavior that is completely
9  unacceptable.
10     Q.   Did she say anything else?
11     A.   That was pretty much it.
12     Q.   Did you say anything in
13 response?
14     A.   I told her everything that
15 happened, as I just described to you.  I
16 acted it out.  I told her.  Because I
17 didn't know what Marilyn had said to her.
18 And I told her that I felt like Marilyn
19 was retaliating, and that it was
20 discrimination.  And I really didn't --
21 she didn't ask me a whole lot of
22 questions.  Marilyn didn't ask me a whole
23 lot of questions.  She just said that it
24 was unacceptable and that this kind of
25 behavior, that they were not going to put

MARJORIE PHILLIPS

1
2  up with this kind of behavior.  It was
3  very short.  It was maybe five minutes.
4  Ten minutes, maybe.  It was short.
5      MR. TAUSTER:  Craig, can you
6      just bring back up FIT number 2.
7      Sorry, not FIT number 2, Exhibit 2.
8      Yup.  Very good.  I am just
9      going to scroll down here.  Sorry,
10     first let's look at Exhibit number 1
11     for a second.
12     Q.   So Ms. Phillips, just really
13 quick, take a look at paragraph 25, I've
14 just scrolled to it, and just confirm for
15 me that we are discussing the same
16 incident here.
17     A.   Number 25, yes.
18     Q.   Okay.  So now referring back to
19 your interrogatory responses at Exhibit
20 2, our interrogatory number 6 asked you
21 to identify each and every individual
22 whom you believe may have knowledge or
23 information concerning the events alleged
24 in paragraph 25 of the complaint,
25 correct?

MARJORIE PHILLIPS

1
2   A.   Yes.
3   Q.   Okay.  So can you tell me why
4   you included Anton Baptiste on this list?
5   A.   Because I learned later on that
6   he had seen what happened.
7   Q.   Did you ever discuss the
8   incident with Anton?
9   A.   Anton saw the incident.  So
10  when I was going to public safety to make
11  a report, Anton and Umilta were in the
12  office and I told them that, you know,
13  you tell people where you are going.  And
14  I told them I was going to make an
15  official complaint.  And Anton said,
16  you're better than me.  Because if
17  somebody would have done that to me, I
18  would not have a job.  You're much better
19  than me.
20  Q.   Fair enough.
21  A.   And I saw --
22  Q.   Apologies, continue.
23  A.   I saw the way she was yelling
24  and screaming and standing over you and
25  talking to you.  I mean, his comment was

MARJORIE PHILLIPS

1
2   that if it had been him, it would have
3   been different.  It would have been a
4   different outcome.
5   Q.   Other than the day it happened,
6   did you discuss the incident with Anton
7   again?
8   A.   I don't believe so.  I don't
9   believe so.
10  Q.   Why did you list that Henry
11  Wallace would have knowledge of this
12  incident?
13  A.   Because he, I learned later,
14  afterwards, that he and Anton were
15  looking in the office when it was
16  happening.  She was so loud and it was
17  just, she was cursing and so abusive and
18  so vile, her behavior was so crazy, that
19  you could hear it and they heard it.  And
20  Henry and Anton had heard it and saw it
21  and witnessed it, I learned after.
22  Q.   Did you ever speak with Henry
23  about the incident?
24  A.   No, I don't believe so.  I
25  don't believe so.

MARJORIE PHILLIPS

1
2   Q.   What about Kristina Johnson?
3   A.   Kristina Johnson is the
4   chairperson -- not the chair, the
5   Chancellor of the SUNY colleges.  And I
6   felt so, like I wasn't getting -- I
7   didn't feel protected.  I felt so
8   vulnerable and I was afraid to go to
9   work.  I felt like I was going into an
10  office every day with a racist supervisor
11  and a racist colleague and I had to go to
12  work.  And I just felt unprotected.  I
13  wasn't sure what Marilyn was going to do
14  every day.  I didn't know if she was
15  going to follow me home.  I didn't know
16  if she was going to kill me.  I didn't
17  know if she had a weapon.  I didn't know
18  what to expect.  And I didn't feel, I
19  didn't feel protected by FIT.  I know
20  what the words, but I did not feel
21  protected.  I felt as though they were --
22  that I was experiencing discrimination,
23  retaliation, and the college was not
24  doing anything about it because I was
25  afraid.  I was afraid.  I was afraid

MARJORIE PHILLIPS

1
2   every single day.  I mean, it never
3   stopped.
4        I am still afraid.  I'm still
5   afraid.  I am still afraid to go to work.
6   I am still afraid I have to see her.  I
7   am still afraid.  Every day I don't know
8   what's going to happen.  I don't know if
9   she's going to go off on me again.  If
10  she is going to kill me.  I don't know
11  what to expect from Marilyn Barton.
12       So at the time I was so broken.
13  I was so broken.  I didn't know what to
14  do.  I didn't know who to turn to.  So I
15  wrote a letter to the SUNY chair --
16  Chancellor, Chancellor.  And I told her
17  that I didn't feel safe at FIT.  And that
18  the incident that occurred, occurred
19  because FIT had taken no steps to protect
20  me.  FIT took no steps to resolve this
21  incident which led to this outburst,
22  which led to Marilyn Barton threatening
23  to kill my life.
24       So I explained everything to
25  her in a letter.  I felt that I needed to

MARJORIE PHILLIPS

1   go to the top and let them know. I just
2   had to go outside of FIT. I felt so
3   vulnerable every day.
4       MR. TAUSTER: Craig, you might
5   as well throw both of these up there.
6   Can you throw 12 and 13 up there. FIT
7   12 and 13.
8       MR. JONES: 12 is going to be
9   Exhibit 8.
10      (Exhibit 8, e-mail from Marjorie
11   Phillips to Kristina Johnson, was so
12   marked for identification, as of this
13   date.)
14      MR. JONES: And 13 is loading
15   now, which will be Exhibit 9.
16      (Exhibit 9, Response from SUNY,
17   was so marked for identification, as
18   of this date.)
19      MR. JONES: They both posted,
20   which one would you like up on the
21   screen?
22      MR. TAUSTER: Put them up in
23   order. I want to ask her about 8 and
24   then ask her about 9 really quick.

MARJORIE PHILLIPS

1       MR. JONES: Sure. You have
2   control.
3       MR. TAUSTER: Thank you.
4       Q.   Ms. Phillips, just to confirm,
5   is this, when you refer to the e-mail
6   that you sent to Ms. Johnson, is this
7   that e-mail?
8       A.   Yeah, because it was only one.
9       Q.   Okay. And did you receive a
10   response from SUNY?
11      A.   Yes, I did.
12      Q.   Okay. And referring to Exhibit
13   9, is that the response that you received
14   from SUNY?
15      A.   Yeah. There was only one, so
16   it has to be it.
17      Q.   And do you see here in the
18   third paragraph down where SUNY said that
19   they can assure you that a thorough
20   investigation was conducted and
21   appropriate action is being taken
22   pursuant to the terms and conditions of
23   the relative collective bargaining
24   agreements?

MARJORIE PHILLIPS

1       A.   I see that.
2       Q.   Is FIT's ability to take
3   disciplinary action against employees
4   limited by a collective bargaining
5   agreement?
6       A.   I don't know.
7       Q.   Let me ask you this, are you a
8   member of a union at FIT?
9       A.   Yes, I am.
10      Q.   And is your employment governed
11   by a collective bargaining agreement?
12      A.   I guess so, yes.
13      Q.   Have you ever reviewed that
14   collective bargaining agreement?
15      A.   Generally, yes.
16      Q.   Are you aware if it has any
17   provisions in there regarding
18   disciplinary actions, discharge,
19   et cetera?
20      MR. SELLS: Objection. It calls
21   for a legal conclusion.
22      Q.   You can answer.
23      A.   I'm not aware.
24      Q.   Okay. Are you aware if FIT has

MARJORIE PHILLIPS

1   any procedure that it's required to take
2   under the CBA before disciplining or
3   discharging an employee?
4       A.   Can you repeat your question?
5       Q.   Sure. Are you aware if there
6   is any procedure under the CBA or
7   otherwise that FIT has to take before it
8   can discipline or discharge an employee?
9       A.   I am not aware.
10      Q.   So is it fair to say then that
11   the reference to being pursuant to the
12   terms and conditions of the relevant
13   collective bargaining agreements, you are
14   not directly aware of what provisions may
15   have been at issue?
16      MR. SELLS: Objection. There
17   are multiple parts to that question.
18   I ask that you rephrase it.
19      Q.   If you understand it, you can
20   answer, Ms. Phillips.
21      MR. SELLS: No, no, no. You
22   asked multiple questions in one, so
23   she can't answer it. If you want it
24   read back, you can, David. But you

MARJORIE PHILLIPS

1
2    asked multiple things in that
3    question.  So which one is she
4    answering?
5        Q.   Are you aware of the terms and
6    conditions of the relevant collective
7    bargaining agreements that are being
8    referenced in this letter?
9        A.   No.
10       Q.   Okay.  Let's circle back to the
11   interrogatory responses.  Why do you
12   allege that Isolina Perez has knowledge
13   of this incident?
14       A.   Because she was my union
15   representative.  That's who I went to in
16   the union.
17       Q.   Did you have any discussions
18   with Isolina about the incident?
19       A.   Yes, I told Isolina everything.
20       Q.   What did she tell you?
21       A.   She suggested that I write
22   everything up.  Put it in a timeline.
23   And we would schedule an appointment with
24   Affirmative Action.
25       Q.   And did you speak with

MARJORIE PHILLIPS

1
2    Affirmative Action about the incident?
3        A.   Yes, I did.
4        Q.   What else did you discuss or do
5    with Isolina Perez regarding this
6    incident?
7        A.   Regarding this incident,
8    Isolina was my go-to person.  You know, I
9    spoke more to Isolina than I did anyone
10   else at FIT, because Isolina actually
11   took an interest from the very beginning
12   when I went to her and explained to her
13   what I was going through or what I was
14   dealing with, she took an interest.
15            And so, she, you know, we have
16   the right to go to the union and you get
17   a union representative, and Isolina was
18   the union representative for me.  So I
19   shared everything that I was going
20   through and I let her direct and guide
21   me.
22       Q.   What did Isolina tell you about
23   the incident?
24       A.   Isolina felt that it was
25   completely outrageous.  She asked me had

MARJORIE PHILLIPS

1
2    I filed a police report.  She told -- I
3    am pretty certain that, because I did
4    that relatively quickly, she asked me --
5    she wanted to be involved in the
6    discussions with HR, you know, to be
7    there along with me.  It was sort of like
8    my attorney, the union to some degree was
9    like my attorney before I had an
10   attorney.  And she would be there to
11   support and represent me.
12       Q.   Did you discuss with her at all
13   the possible disciplinary actions that
14   might be taken?
15       A.   Yes.  Yes.  She told me -- yes,
16   I did.  Yes, I did.
17       Q.   What did you discuss?
18       A.   I just assumed that Marilyn
19   would be fired after the incident.  And I
20   believe that Isolina was under the same
21   impression, that Marilyn would be fired.
22   We were both under the impression that,
23   you know, if you threaten to kill
24   someone, and you attack and assault
25   someone in the workplace, that that would

MARJORIE PHILLIPS

1
2    be considered workplace violence.  And
3    that would be grounds for a termination.
4            So we both were on the same
5    page in terms of that.  We both had the
6    same understanding and belief that
7    Marilyn would be terminated.  And Isolina
8    was involved in conversations that I was
9    not involved in.  A few that -- as a
10   union representative.  And she told me a
11   few things that I didn't know, just to
12   keep me informed about what was going on
13   behind the scenes.
14       Q.   What were those few things that
15   she told you?
16       A.   Well, she explained to me
17   that -- let me get it right, because I
18   just kept asking her and telling her that
19   Marilyn and Mary had retaliated against
20   me for this Affirmative Action case.  And
21   that the message that was being sent to
22   the others in my immediate department was
23   that if you file an Affirmative Action
24   case, that this is what could happen to
25   you.  This is what happens.  That you can

40 (Pages 154 - 157)

MARJORIE PHILLIPS

1  be attacked. You can be assaulted in the
2  office. And threatened to kill somebody,
3  somebody could threaten to kill you and
4  the college would, in essence, do nothing
5  to protect you, because I was put in this
6  position as a result of filing the
7  Affirmative Action case.
8       And so Isolina was of the same
9  opinion. I told her why would I go to
10 them for help if they are going to turn
11 around and the college, and I say Mary
12 Davis, Marilyn Barton, that's the
13 college, and retaliate because I filed a
14 complaint. So I couldn't understand how
15 they allowed this to happen when the
16 whole point for me to go to them was for
17 help. I was telling them that I was
18 being discriminated against. And that
19 because of this formal complaint that I
20 filed, that it had even gotten worse.
21 And now I am afraid to come to work every
22 day because I don't know what is going to
23 happen.
24      I need a job. I need to have a

MARJORIE PHILLIPS

1  job. I had to have a job. I can't quit
2  my job, but I am afraid. I am in fear
3  every single day to come to work to see
4  Marilyn Barton because I did not know
5  what she was going to do and I did not
6  feel that Mary was supporting both of us.
7  I felt that Mary was supporting Marilyn.
8  And that is what I had to walk into every
9  single day.
10      I had to look forward to going
11 to work every day and seeing and being in
12 the office space with a supervisor and a
13 colleague who were in cahoots. They knew
14 what happened and did nothing. Mary did
15 nothing to make me feel better. Nothing.
16 She sided with Marilyn. She never -- as
17 a matter of fact, she stepped back and
18 she let everybody else take over. She
19 had that ten-minute conversation with me
20 on the day of, and she never said another
21 word about it. Not to offer any comfort
22 at all. None whatsoever. So she sided
23 with Marilyn.
24      MR. SELLS: David, before you

MARJORIE PHILLIPS

1  ask another question, can we take a
2  break, it's 2 o'clock?
3       MR. TAUSTER: Let's take the
4  lunch break now.
5       Actually, Derek, can we go
6  through another couple of minutes, I
7  just want to push through on this line
8  of questioning, because something -- I
9  just realized that I don't think she
10 actually answered my last question.
11      MR. SELLS: I just said to
12 finish your line of questioning,
13 David.
14 Q.   So one thing I didn't hear in
15 that response, and maybe I missed it,
16 what were the things that you didn't know
17 that Isolina told you?
18 A.   One of the things that I didn't
19 definitely remember was I was asking
20 her -- I asked Deliwe a couple of times,
21 you know, how close are we to this being
22 wrapped up. And there was never any
23 clear date. And Isolina and I were
24 talking kind of about the same thing.

MARJORIE PHILLIPS

1  And Isolina said that she was in a
2  meeting and Jack Oliva, the vice
3  president of academic affairs, told them
4  to wrap this up. Get this over with. He
5  wanted to know when this -- wrap it up.
6  Get this over with. I am tired of
7  hearing about it.
8       And so Isolina said that he was
9  surprised, it sounded like he was
10 surprised to hear that the investigation
11 was still going on and that it had not
12 been wrapped up. And somehow Umilta's
13 name came up, I don't know how. And she
14 told me that Jack Oliva said that Umilta
15 Allsop could not be objective.
16 Q.   Anything else that Isolina told
17 you?
18 A.   She tried to keep me informed
19 about what she knew, which was not very
20 much than what I knew. But she
21 ultimately felt they were going to side
22 with Marilyn. And she told me that.
23 Q.   And did you speak with her --
24 withdrawn. Just two more questions about

MARJORIE PHILLIPS

1  this interrogatory response.  I think
2  it's just two quick ones.
3
4      Why do you allege that Arlene
5  Spivack had knowledge about this
6  incident?
7      A.   Because we spoke about it.  I
8  talked to her.
9      Q.   Who is Arlene Spivack?
10     A.   She's the executive assistant
11 of the president.
12     Q.   What did you discuss with her
13 about the incident?
14     A.   I told her the whole incident,
15 everything from beginning to end.  I told
16 her what happened.  Everything that I
17 described to you, I told Arlene.  And I
18 told her that I didn't feel safe.  I was
19 afraid to go to work every day.  I was
20 afraid of what Marilyn was going to do
21 next.  I felt that was being retaliated
22 against.  Discrimination.  Retaliation.
23     Q.   And did she say anything in
24 response?
25     A.   She said that she was surprised

MARJORIE PHILLIPS

1
2  that Marilyn had done something like
3  that.  And she also said that -- because
4  I was talking about Marilyn should be
5  terminated.  You know, that's the clear
6  solution.  And she said that she felt
7  that both of us should -- what were her
8  exact words?  That we both should be
9  reprimanded or something of that nature.
10     Q.   The last part of this line and
11 then we'll break.
12     Why do you allege that Jennifer
13 Loturco had knowledge of this incident?
14     A.   Because I spoke with her too.
15 I had the same conversation with her as
16 well.
17     Q.   And what did she say to you in
18 response?
19     A.   Well, she didn't really seem
20 interested.  She didn't -- she didn't,
21 she didn't seem very interested.  She was
22 kind of, all right.  I just didn't feel
23 like she was interested in what I was
24 saying at all.  She was rushing me
25 through the conversation.  She was sort

MARJORIE PHILLIPS

1
2  of -- not sort of, she was very
3  confrontational with me, and I didn't
4  understand where that was coming from,
5  because I didn't know her.  She didn't
6  know me.  And she was very
7  confrontational.  And so, you know, this
8  all led me to feel unsupported,
9  retaliation, discrimination, retaliation,
10 discrimination.  I just felt like, I felt
11 like alone.  I felt like alone.  I didn't
12 know who I could trust.  I didn't know if
13 anyone really cared to hear anything from
14 me.  Just me having a conversation or
15 sharing, explaining with whomever I was
16 talking to at FIT seemed to be something
17 that they weren't really interested in.
18     Even if it was your role to
19 have these conversations, to, you know,
20 have a discussion about it, I didn't feel
21 as if they were really interested.  And I
22 just felt that if the roles were
23 reversed, and I had done to Marilyn what
24 she did to me, I am certain that I would
25 have been fired.  I may have even been

MARJORIE PHILLIPS

1
2  arrested.  I am certain.  There is no
3  doubt in my mind that if the roles were
4  reversed, it would have been a different
5  situation altogether.  And I was so hurt
6  and so offended that here I am, sort of
7  fighting for people to -- I almost felt
8  like they didn't believe it.  Even though
9  there was a witness, even though -- the
10 reaction was astounding.  This vile
11 treatment.  This assault.  She threatened
12 my life in the office.  She told me she
13 was tired of my shit.  Fuck you and fuck
14 the horse that you rode in on.  Fuck you.
15 And, you know, I felt like I was the only
16 one who was outraged.
17     Isolina was equally outraged,
18 but I felt so alone.  It's like you tell
19 somebody that somebody tried to kill you,
20 they said, oh, I'm sorry to hear that.
21 That's what I felt.  I felt out there in
22 a situation where I was alone.
23     And the message that was being
24 sent to my colleagues, this is what
25 happens.  Poster child.  Scarlet letter

Page 166

MARJORIE PHILLIPS

1  over my head. My forehead, my chest.
2  This is what happens when you file an
3  Affirmative Action complaint and they
4  retaliate against you.
5        What is happening to Marjorie,
6  this is what happens. So why would
7  anybody come behind me and file a
8  complaint when they see that this is what
9  happens when you do that? No one. No
10 one will file any cases having seen that.
11 No one. No one would want to deal with
12 that. No one would want to go through
13 that. No one.
14        And I thought these offices
15 that are put in place to take your
16 complaints to file a report, I thought
17 that that was the remedy. I never, I
18 never thought that I would be the one
19 with the scarlet letter at the end of all
20 of this. That I would be ostracized and
21 isolated from my colleagues and
22 co-workers.
23        MR. TAUSTER: Okay. Let's go
24 off the record.

Page 167

MARJORIE PHILLIPS

1
2        (Off the record.)
3        (Lunch recess: 2:19 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 168

MARJORIE PHILLIPS

1        Afternoon Session
2        3:14 p.m.
3  M A R J O R I E   P H I L L I P S,
4  having been previously duly sworn, was
5  examined and testified further as
6  follows:
7  EXAMINATION (Continued)
8  BY MR. TAUSTER:
9     Q.   Ms. Phillips, during the last
10 break, did you review any documents?
11    A.   No. I ate, I was starving.
12    Q.   Fair enough. Referring back to
13 the May 25th, 2019 incident. To what
14 knowledge, withdrawn --
15       MR. SELLS: Hold on, hold on.
16 David, I think you meant May 16th.
17       MR. TAUSTER: The May 2019
18 incident.
19       MR. SELLS: I think you said
20 May 25th, I want the record to be
21 clear.
22       MR. TAUSTER: Yes.
23    Q.   With respect to that incident,
24 what actions did FIT take to address that

Page 169

MARJORIE PHILLIPS

1  incident?
2     A.   I cannot be certain, because
3  when I asked, originally I thought that I
4  was going to be part -- I was told that I
5  was going to be part of the
6  investigation, so I waited to be called
7  in and I was never called in. And then
8  when I learned about the results of the
9  investigation, I wasn't told very much.
10 Not even enough to tell you anything. I
11 wasn't told very much. I wasn't told
12 anything, really.
13    Q.   Were you interviewed by anyone?
14    A.   Like the next day, when I
15 reported it. At that time.
16    Q.   Yes. Who conducted the
17 interview?
18    A.   Natacha in HR, her last name is
19 Unelus, I believe. I don't know how to
20 pronounce it.
21    Q.   That's U-n-e-l-u-s. Do you
22 know if FIT conducted an investigation?
23    A.   They said that they did.
24 Cynthia said they did.

43 (Pages 166 - 169)

MARJORIE PHILLIPS

1
2    Q.   Did you talk to any of your
3  co-workers about it?
4    A.   About the investigation?
5    Q.   Yes.
6    A.   The only one that was even
7  interested, besides myself, was Umilta,
8  and neither one of us had any
9  information.
10    Q.   Do you know, was Umilta
11  interviewed in connection with any
12  investigation?
13    A.   I don't know.  I do not know.
14  I take that back, she gave a statement.
15    Q.   Do you know if any other
16  employees in the office gave statements?
17    A.   I don't know.
18    Q.   Do you know if any disciplinary
19  action was taken against Marilyn Barton?
20    A.   I was told that they did, but
21  they wouldn't share with me what it was.
22    Q.   So you were told that she was
23  disciplined, but you were not told what
24  it was?
25    A.   Right.

MARJORIE PHILLIPS

1
2    Q.   Did you hear from anybody what
3  it might have been?
4    A.   No, I did not.
5    Q.   Okay.  You touched -- we
6  touched on this a bit earlier, did FIT
7  move your desk?
8    A.   No, they did not.  Physically
9  move the desk or move me?
10    Q.   Withdrawn.  Did FIT move your
11  seating location?
12    A.   Yes, they did.
13    Q.   And did FIT move Defendant
14  Barton?
15    A.   No, they did not.
16    Q.   Okay.  Did you ever ask
17  Defendant Davis if she ever considered
18  moving Ms. Barton?
19    A.   Yes, I did.  I am Ms. Phillips,
20  yes.  That sounded like you called me Ms.
21  Barton.
22    Q.   No, I was saying did you ever
23  speak with Ms. Davis about whether she
24  ever considered moving Ms. Barton?
25    A.   Yes, I did.

MARJORIE PHILLIPS

1
2    Q.   Yes, yes.  In case I wasn't
3  clear.  Do you recall when?
4    A.   Somewhere around, let me think,
5  yeah, somewhere around the time --
6  because I went on a leave.  I took a
7  leave of absence.  And somewhere before
8  the time that I actually went back, I
9  asked -- before I returned, I asked the
10  dean.
11    Q.   How did she respond?
12    A.   She told me that, no, she had
13  never considered it.  It was not a viable
14  option, because, and that would mean that
15  she would have to move.
16    Q.   Do you think that was accurate?
17    A.   Her statement was accurate?
18    Q.   Yes.
19    A.   Her statement told me that she
20  chose to keep Marilyn and to move me.
21  That's what she told me.  Because I asked
22  her, did she ever consider, the question
23  you said, did she ever consider that
24  Marilyn move, and she said no, she did
25  not, for those reasons.

MARJORIE PHILLIPS

1
2    Q.   Did you testify earlier that
3  Ms. Barton directly supported Dean Davis
4  at that time?
5    A.   You mean as her supervisor?
6    Q.   Yes.
7    A.   Yes.
8    Q.   And do you think that might
9  have played any role in the decision of
10  who got moved or who did not?
11    A.   I didn't think that it should.
12      MR. SELLS:  Objection.  Calls
13  for speculation.
14    Q.   Did FIT take any other
15  action -- withdrawn.
16      Do you know if FIT took any
17  other actions to address this incident?
18    A.   I don't know.  I don't know
19  what those actions were.
20    Q.   Do you know if FIT hosted any
21  sort of radical empathy workshop in the
22  School of Graduate Studies?
23    A.   Yes, they had one.
24    Q.   Do you know if this is in
25  response to your complaint?

MARJORIE PHILLIPS

1
2    A.   It appeared to be.
3    Q.   Did you attend this workshop?
4    A.   I did.
5    Q.   Did you stay for the whole
6 time?
7    A.   I did not.
8    Q.   Why not?
9    A.   Because I felt uncomfortable, I
10 felt uncomfortable.  And I just couldn't,
11 I couldn't stay in the room any longer,
12 so I left.  I was afraid to be in the
13 room with Marilyn.  I stayed for as long
14 as I could, and then I just couldn't do
15 it anymore so I left.
16    Q.   I'm curious, was Ms. Barton
17 doing anything during the meeting that
18 made you uncomfortable?
19    A.   The fact that I was in the room
20 with her made me uncomfortable.  When
21 someone threatens to kill you, you don't
22 choose to be in the room with that
23 person.  That was not my choice.
24    Q.   Are there any circumstances
25 where you would be comfortable being in

MARJORIE PHILLIPS

1
2 the same room as Ms. Barton?
3    A.   Comfortable?  I don't know if
4 comfortable is the right word.  If I felt
5 protected.
6    Q.   Were you alone with Ms. Barton
7 in the room for this workshop?
8    A.   No.
9    Q.   So did you not feel protected?
10    A.   No, I did not.
11    Q.   What would make you feel
12 protected from Ms. Barton?
13    A.   At that time, I was told that
14 we would not be in the same room, the
15 same space at the same time.  And that
16 didn't happen.
17    Q.   Okay.  But just as a general
18 matter, I guess what I am asking is what,
19 in your mind, are the steps that FIT
20 could take to make you feel safe in the
21 same room as Ms. Barton?
22    A.   At that time, then and now?
23    Q.   Then and now, yes.
24    A.   For her to be terminated.  Then
25 I would feel fully secure with going to

MARJORIE PHILLIPS

1
2 work every day, if she was terminated.
3 Then I would feel safe.
4    Q.   My question is, any
5 circumstances where you would feel safe
6 in the same room as Ms. Barton?
7    A.   No.  No.  I still feel very
8 uncomfortable.
9    Q.   Other than the empathy workshop
10 that we just discussed, is there any
11 other steps that you're aware of that FIT
12 took to address this incident?
13    A.   No, I am not aware.
14    Q.   Did FIT hire an independent
15 mediator to conduct any sort of conflict
16 resolution process between you and Ms.
17 Barton?
18    A.   Yes, yes, they did.  Yes, they
19 did.
20    Q.   And who did FIT retain as the
21 mediator?
22    A.   A psychiatrist by the name of
23 Kirkland Vaughn.
24    Q.   Did FIT ask you to participate
25 in this mediation?

MARJORIE PHILLIPS

1
2    A.   Yes, they did.
3    Q.   And did you participate?
4    A.   Yes, I did.
5    Q.   When did the mediation take
6 place?
7    A.   In November, I believe it was,
8 after I came back from the leave of
9 absence.
10    Q.   Do you think that the mediation
11 was useful?
12    A.   No, I do not.
13    Q.   Why not?
14    A.   Because the mediation -- I
15 didn't feel like I needed to be in
16 mediation.  I didn't do anything wrong
17 and so I didn't feel that I needed to
18 speak to a mental health professional.  I
19 was the one who was attacked.  My life
20 was threatened.  So I didn't see why it
21 was necessary for me to speak to a mental
22 health professional.
23    Q.   Is it fair to say that even
24 before this incident, you and Ms. Barton
25 had had some friction in the workplace?

45 (Pages 174 - 177)

MARJORIE PHILLIPS

1
2    A.   No, I do not.  Before the
3  incident, no, we did not, other than --
4    Q.   You --
5    A.   We didn't speak, we didn't
6  talk, so there was no friction.  There
7  was this looming something that were
8  going on, but there were no words that
9  were exchanged.
10   Q.   I am talking about even before
11 you filed the internal Affirmative Action
12 complaint.  I mean you made several
13 allegations of racial discrimination
14 against Ms. Barton, correct?
15   A.   I went to Affirmative Action
16 against her one time.  She was part of
17 that complaint.  So your question to me
18 is, was there any friction between
19 Marilyn Barton and I before the
20 complaint?
21   Q.   Yes.
22   A.   Everything that I told you
23 previously.  The incidents that I've told
24 you.
25   Q.   So you don't think there would

MARJORIE PHILLIPS

1
2  have been any use to you and Ms. Barton
3  having a mediation to the extent that she
4  was going to remain in the workplace?
5    A.   No.  Because she attacked me.
6  She assaulted me.  It went way beyond
7  anything when she threatened to kill me.
8  Now it's no longer just trying to figure
9  out how you're going to work together
10 productively.  She threatened my life.  I
11 feared my life.  I was afraid to go to
12 work.  I was afraid of her.  I am afraid
13 of her.  I am still -- I am afraid of
14 her, today I am afraid to go to work and
15 encounter her, even today.
16       She took it beyond a normal
17 disagreement in the workplace.  She
18 threatened to kill me.  Workplace
19 violence.  No one has ever threatened to
20 kill me, ever.  And I take it seriously.
21 I took that threat, and I still take that
22 threat today very seriously.
23   Q.   Do you know if Dr. Vaughn has
24 made any sort of recommendation in
25 connection with the mediation?

MARJORIE PHILLIPS

1
2    A.   There was a letter of
3  recommendation that went to, that he
4  sent -- let me think about.  So the
5  answer is yes, there was a letter.  It
6  was not very much that he was
7  recommending.  I don't remember it
8  exactly without seeing it again, but from
9  my recollection, he felt, he suggested to
10 them that I didn't feel heard.  Marjorie
11 Phillips did not feel heard, and his
12 suggestion to them was to do whatever was
13 necessary or whatever they could so that
14 this employee was made to feel like she
15 was being heard.
16   Q.   And is it fair to say that
17 there was no action that FIT could have
18 taken that would have made you feel heard
19 other than terminating Ms. Barton's
20 employment?
21   A.   Correct.
22   Q.   Okay.
23   A.   Correct.  Correct.
24   Q.   When is the last time that you
25 interacted with Ms. Barton?

MARJORIE PHILLIPS

1
2    A.   We returned to school on, I
3  think it was August 16th, I did.  My
4  first time back.  And I saw her, the
5  chairperson and I for fashion textile
6  studies had a meeting with the dean.  And
7  so we saw her.  And -- kind of.  She
8  wasn't there when I arrived, but she was
9  there when I left.
10       And then I needed, on a
11 different occasion, I needed to take care
12 of some orders, a whole bunch of things,
13 I had a huge project that I had to take
14 care of that happened over the summer,
15 over the time that I was on vacation and
16 I needed to get into a room, I needed the
17 key to get into that room.  So I had to
18 go to Marilyn and get the key from the
19 space where she works.  You know, I asked
20 her if she would leave the key somewhere,
21 put the key somewhere.  And she didn't do
22 it.  So I had to go into the space and I
23 had to see her against my will.  I had
24 to -- it didn't happen in the same day.
25 I had to go home.  I had to pray on it.

MARJORIE PHILLIPS

1
2 I had to think about it. I had to get
3 ready to do it. I had to prepare myself
4 to see her. It didn't happen in the same
5 day. I had to prepare myself. And
6 that's what I did.
7     Q.   Did you ask anybody else if
8 they could just get the key for you?
9     A.   No, because there really was no
10 one else that I could ask in that office
11 other than her. I had called Anton when
12 I came back, and Anton, called him, I
13 sent him an e-mail. He never returned my
14 call so I couldn't reach out to him. And
15 he's really the only other person. No
16 one works in that office besides the
17 dean.
18     Q.   Okay. You said that this
19 meeting on August 16th was with the dean.
20 Was this Dean Davis?
21     A.   No. Dean Davis is gone.
22     Q.   So who is the current dean?
23     A.   Brooke Carlson, C-a-r-l-s-o-n.
24     Q.   Brooke Carlson. So when is the
25 last time that you interacted with Ms.

MARJORIE PHILLIPS

1
2 Davis?
3     A.   Interacted, before the fashion
4 show.
5     Q.   What was that interaction?
6     A.   I don't recall. There were a
7 few e-mails went back and forth between
8 she and I. And I didn't see her. There
9 were e-mails. We were interacting via
10 e-mail before the fashion show. And then
11 I saw her on the day of the fashion show,
12 but we didn't interact.
13     Q.   Now, turning back to the 2018
14 Affirmative Action complaint, did Ms.
15 Kekana issue a report at the conclusion
16 of her investigation?
17     A.   No.
18     Q.   Are you certain that she did
19 not issue a report?
20     A.   I am positive.
21     MR. TAUSTER:  Craig, can you
22 throw FIT 9 up on the screen.
23         (Exhibit 10, Investigation
24 report, was so marked for
25 identification, as of this date.)

MARJORIE PHILLIPS

1
2     MR. JONES:  This will be Exhibit
3 10. It's loading now. Here you go.
4     Q.   Ms. Phillips, do you recognize
5 this document?
6     A.   Yes, I do.
7     Q.   Okay. And what is this
8 document?
9     A.   This is the document that came
10 in October of 2019.
11     Q.   And is this an investigation
12 report from Ms. Kekana?
13     A.   It is an investigation report
14 that happened after the incident on
15 May 16th that happened after I had asked
16 her, and never got anything, after I had
17 met with her to get the conclusion in
18 person, face to face, on July either 1st
19 or July 8th.
20         When we met, we were in the
21 office together for maybe less than 20
22 minutes. She told me the conclusion, but
23 I never saw a document. I asked her for
24 the document. I never saw a document. I
25 asked her for a document several times

MARJORIE PHILLIPS

1
2 afterwards. Never a document. It
3 surfaced October 2019. June, July,
4 August, September, five months after the
5 incident. Five months, August,
6 September, October, three months after my
7 meeting with her. And it did not -- she
8 didn't lay all of this out to me. She
9 didn't. The meeting was less than 20
10 minutes. So, no, she didn't share this
11 with me until October after the incident.
12 After I was assaulted. After I was
13 threatened. And after I had met with her
14 office. Months after. Months after.
15 And after I had asked her numerous times.
16     Q.   But I just want to clarify
17 something. You met with her, did you say
18 in July of 2019?
19     A.   Correct.
20     Q.   And during that meeting, did
21 she tell you the conclusion of her
22 investigation?
23     A.   Yes, she did.
24     Q.   And what did she tell you that
25 conclusion was?

MARJORIE PHILLIPS

1
2    A.   She told me that the conclusion
3  was that my complaints did not rise to
4  the level of discrimination and that
5  loosely, loosely, and that all of these
6  incidents were really microaggressions,
7  they were really microaggressions.
8    Q.   Now, just to clarify, this
9  investigation covered the subjects that
10  were raised in your 2018 Affirmative
11  Action complaint, correct?
12    A.   Correct.
13    Q.   I want to turn your attention
14  back to --
15    MR. TAUSTER:  Craig, can you
16    give me back control.
17    MR. JONES:  You should have
18    control.
19    Q.   I want to refer you to
20  paragraph 21 of the complaint.
21    A.   21?
22    Q.   Yup.
23    A.   Yes.
24    Q.   So how did Ms. Cowan's alleged
25  comments in 2014 create a hostile work

MARJORIE PHILLIPS

1
2  environment in 2018?
3    A.   Because discrimination is
4  hostile.  Discrimination is hostile.  To
5  an African-American, discrimination is a
6  hostile action.  And so when you have to
7  go to work with someone who you feel is
8  discriminating against you, it makes you
9  feel very uncomfortable.  It makes the
10  environment feel hostile.  That was one
11  of many.  But yes, discrimination is
12  hostile.  Discrimination equals hostile.
13    Q.   What do you mean when you
14  allege that your safety was put at risk?
15    A.   Marilyn threatened to kill me.
16  And I was informed that we were going to
17  continue to work together.  That she was
18  not going to be terminated.  I thought
19  that she -- I assumed that when you
20  threaten to kill someone that you lose
21  your job, automatically.  That was --
22  that was my assumption.  And when that
23  didn't happen, I was so shocked that now
24  I have to go to work every day and deal
25  with a person who threatened to kill me,

MARJORIE PHILLIPS

1
2  who threatened to take my life, every
3  single day.  And I am being forced to
4  work with this person.  To interact with
5  this person every day, from that day
6  until last week.
7    Then, during, after, I am still
8  being expected to work with Marilyn
9  Barton, a person who threatened my life
10  at my job.  Who could have killed me.
11  Who threatened to kill me.  That's not a
12  very comfortable position.  It's very
13  uncertain.  I don't know what she's
14  capable of.  She showed me what she is
15  capable of.  So that makes it so
16  uncertain.  Everything is uncertain.  I
17  don't know what to expect from her so I
18  expect the worst.  I expect the worst
19  from her.  And it makes me feel very,
20  very unprotected.
21    Q.   So I just want to clarify
22  something about the allegations in this
23  case.  Can you review paragraph 17 of the
24  complaint.  I have it up on the screen.
25    A.   Yes.

MARJORIE PHILLIPS

1
2    Q.   Okay.  So I want to clarify,
3  are you alleging that Marilyn Barton
4  stated that African-Americans are
5  three-fifths of a human being or that she
6  stated that African-Americans were
7  considered to be three-fifths of a human
8  being?
9    A.   The way I heard it, she said
10  African-Americans are three-fifths of a
11  human being.
12    Q.   Well, hold on a second.  Sorry,
13  I just want to refer you back to --
14    MR. TAUSTER:  Craig, can you
15    bring back up Exhibit 6.
16    Q.   So I want you to read the first
17  paragraph under second incident of
18  occurrence and I want you to tell me
19  which allegation is correct in this
20  lawsuit.
21    A.   Say that again.
22    Q.   Withdrawn.  In your internal
23  Affirmative Action complaint, you allege,
24  "She," Ms. Barton, "was telling the
25  student aide that African-Americans were

48 (Pages 186 - 189)

MARJORIE PHILLIPS

1
2  considered three-fifths of a human
3  being," correct?
4     A.   That's what she said.  That's
5  what she told me after.
6     Q.   Which allegation is correct?
7     A.   I walked in.  What I heard with
8  my own ears, African-Americans are
9  three-fifths of a human being.
10    Q.   Then why did you say in your
11  internal complaint that she said
12  African-Americans were considered
13  three-fifths of a human being, and then
14  you may even go forward and say, "What
15  are you talking about that
16  African-Americans were once considered
17  three-fifths of a human being," correct?
18    A.   Because that's what she said.
19  That's what she said that she said to try
20  to clarify.  That was her clarification.
21    Q.   Can you review the second
22  incident of occurrence in your
23  March 23rd, 2018 EEO internal complaint
24  and tell me where you say that Marilyn
25  Barton said to you that African-Americans

MARJORIE PHILLIPS

1
2  are three-fifths of a human being.
3     A.   She didn't say it to me.
4     Q.   Okay.  So you tell me where you
5  reported to internal EEOC that Marilyn
6  Barton said that African-Americans are
7  three-fifths of a human being.
8     A.   As I stated, when I walked in
9  the office I heard what I heard.  Her
10  clarification that African-Americans, as
11  if it were something in the past.
12    Q.   I am going to scroll down a
13  little bit here.  So look here at the
14  bottom of this page where you talk about
15  "The following Monday when I came into
16  the office, I made an appointment to
17  speak to the Dean Mary Davis."  You
18  allege "When I told her what Marilyn said
19  to the student aide Julia about
20  African-Americans were considered
21  three-fifths of a human being," so does
22  that refresh your recollection about what
23  you allege that Marilyn Barton said about
24  the three-fifths compromise?
25    A.   She said we were.  That means

MARJORIE PHILLIPS

1
2  we were.  African-Americans were
3  considered three-fifths -- I don't
4  know -- I am not understanding.  Maybe
5  from your perspective it's not the same.
6  From my perspective it is the same.  From
7  your perspective maybe it isn't the same.
8  But from my perspective, as an
9  African-American, it is the same.  It is
10  absolutely the same.  And you're
11  splitting hairs.  You're splitting then,
12  now.  That's what she said.  And I am not
13  splitting hairs.  I am not.  I am not
14  doing that.  That's what she said.  She
15  used that language, which was offensive
16  to me and it's offensive to
17  African-Americans and I was insulted.  I
18  was insulted.
19    Q.   Do you think that there would
20  be a difference between saying
21  historically under the three-fifths
22  compromise, African-Americans were
23  considered three-fifths of a human being
24  as opposed to African-Americans are
25  three-fifths of a human being, do you see

MARJORIE PHILLIPS

1
2  any difference between those two?
3     A.   I see the difference, but there
4  is talk that you have in the office and
5  there is talk that you do not have in an
6  office environment.  You do not stand
7  around the water cooler saying that
8  African-Americans were, are, whatever,
9  three-fifths of a human being.  That's
10  just not the conversation that you have
11  in the office workplace.  You're
12  insulting people.  And you, maybe from
13  your perspective that's not how you see
14  it.  That's how I see it.  That's how I
15  received it.  And I was offended.
16    Q.   But you did testify earlier --
17  I'm sorry.
18    A.   You go ahead.
19    Q.   I thought I heard somebody
20  talking there.  But you testified earlier
21  that you did not hear anything prior to
22  Marilyn Barton making the three-fifths
23  remark, correct?
24    A.   Correct.  That's correct.
25    Q.   Take a look at your allegation,

MARJORIE PHILLIPS

1
2    paragraph 23 of the complaint.
3        A.   Yes.
4        Q.   So how do you know that
5    Defendant Barton received an upgrade?
6        A.   Because Umilta told me.
7        Q.   Okay.  What do you mean here
8    when you say upgrade?
9        A.   Upgrade is the language that's
10   used at FIT for a raise and a promotion.
11   They don't say raises and promotion, they
12   say an upgrade.  But that's what an
13   upgrade means.
14       Q.   Are you alleging that FIT
15   treated you less favorably than Ms.
16   Barton?
17       A.   Yes.
18       Q.   Why do you believe you were
19   treated less favorably than Ms. Barton?
20       A.   For beginners, I had a
21   conversation with Dean Mary Davis about
22   an upgrade and we agreed that there would
23   be an upgrade.  We went as far as
24   discussing what the new role, the new
25   responsibilities would include, what they

MARJORIE PHILLIPS

1
2    would include.  What it would look like.
3    What the future, how the future in this
4    role would unfold.  We discussed the
5    salary, along with upgrade, there is a
6    promotion, and then there is a salary
7    that goes along with it.  So there is the
8    salary schedule and then there is the
9    raise that coincides with it.  So if you
10   move up in steps.  If you're step 95,
11   let's say, for example.  If you're step
12   95, and you get an upgrade from 95 to 99,
13   which would be four steps up, you would
14   get four steps up in salary, in monetary
15   value.  So your salary would go from a 95
16   to a 99.
17       So we discussed this.  Mary and
18   I discussed this.  And we discussed the
19   possible steps that I could consider.
20   And so we had a full discussion about it.
21   The only thing that we didn't really
22   finalize.  You know there was more to be
23   done.  But we sort of stopped because we
24   didn't know -- she didn't come up with
25   and I couldn't come up with a title

MARJORIE PHILLIPS

1
2    associated with this upgrade.  So I told
3    her we decided, she told me, I told her,
4    that I would have a conversation with HR
5    to come up with a title that was
6    commensurate with the upgrade.  So that
7    meant like a little bit of dialogue with
8    HR to come up with something that would
9    be in line with what Mary and I agreed
10   upon.
11       Q.   And you testified earlier that
12   you stopped pursuing this because you
13   believed you were being retaliated
14   against after the 2018 complaint,
15   correct?
16       A.   Not I believe, I was being
17   retaliated against, because she stopped
18   talking about it.  She didn't -- you
19   know, we were all, we were in agreement.
20   And there was no angst, because this had
21   happened before the Affirmative Action
22   complaint.  And then the Affirmative
23   Action complaint happened and she
24   changed.  And she was no longer proactive
25   about making this happen for me.  There

MARJORIE PHILLIPS

1
2    was no more discussion about it at all.
3    And I was already uncomfortable because
4    of the lawsuit -- of the Affirmative
5    Action complaint.  So it just became very
6    uncomfortable.  And you can't get an
7    upgrade without your supervisor.
8        Q.   Who initiated the upgrade
9    discussions in 2017?
10       A.   Let me think about it.  I felt
11   like it was mutual.  Let me think.  I
12   feel like it was mutual, because from
13   what I remember, I was taking on and she
14   was giving me more and more
15   responsibility, like different things
16   that she wanted to see happen in the
17   School of Graduate Studies.  She's like,
18   Marjorie, let's just talk about this.  I
19   see you as doing A, B and C and D.  And,
20   you know, this is the way that this rolls
21   out.  I can see this happening.  You
22   would be responsible for this.  And you
23   would be responsible for that.
24       And I had already started -- it
25   wasn't like -- everything wasn't in the

MARJORIE PHILLIPS

1
2  future.  I had already started doing some
3  of these things.  I was pretty open to
4  doing more and more and more.  So I think
5  from my memory, because I can't say for
6  sure, she offered more responsibility.
7  And before I even came to the meeting, I
8  was taking on more responsibility.  So I
9  guess she wanted to really make it firm,
10  to put it in writing.  To give me a new
11  title.  To give me new responsibilities
12  and to explain to me how she wanted, how
13  she saw the future in this new role.
14      Q.   And then after you filed the
15  2018 Affirmative Action complaint, you
16  didn't send her any ticklers, any
17  e-mails, anything to try to push this
18  forward?
19      A.   No, I waited for her.
20      Q.   Turning your attention to
21  paragraph 50 of the complaint.  Right
22  there.  Just tell me when you've had a
23  chance to read it.
24          (Witness reviews document.)
25      A.   Yes.

MARJORIE PHILLIPS

1
2      Q.   So here you allege that
3  "Defendants treated plaintiff less
4  favorably than similarly situated white
5  employees in the terms and conditions of
6  plaintiff's employment."  Correct?
7      A.   Yes.
8      Q.   Are you referring to Marilyn
9  Barton when you refer to white employees?
10      A.   Yes.
11      Q.   Are you referring to any other
12  white employees?
13      A.   Primarily Marilyn Barton.  But
14  I felt that in addition to -- primarily
15  Marilyn Barton, because we all worked in
16  the office together, and I knew more of
17  what was going on with her than people
18  outside of the department.  When she
19  started bringing in other new people into
20  the department, and isolating out Umilta
21  and I.
22          So we all started -- it started
23  with, for example, we would all have
24  staff meetings and it was all of us.  And
25  then as the department began to grow, the

MARJORIE PHILLIPS

1
2  other administrators, white
3  administrators that came in, then she
4  started having meetings excluding Umilta
5  and I.  Meetings that normally we all
6  were a part of.
7      Q.   And you attribute this to what
8  exactly?
9      A.   I didn't understand, neither of
10  us, Umilta or I, both felt excluded from
11  these meetings.  We are all program
12  assistants.  Everyone's program is a
13  little different.  But in the past we
14  were all in these staff meetings
15  together.  But she started having like
16  other staff meetings that we weren't
17  included in.  That I wasn't included in.
18  That Umilta wasn't included in.
19      Q.   Were there any other
20  African-American employees in these staff
21  meetings?
22      A.   No.
23      Q.   You're certain of that?
24      A.   I am positive.  I know who was
25  in the meetings.

MARJORIE PHILLIPS

1
2      Q.   Who was in these meetings?
3      A.   Doreen, Lynne, Michael and
4  Ariel.
5      Q.   You said -- can you repeat
6  those with last names, please?  If you
7  know them.
8      A.   I don't know Lynne's last name.
9  Michael, I think his last name is
10  Batista, I'm not really sure.  Ariel
11  Aliah.  Doreen Catlin.  Ariel, Lynne,
12  Doreen -- Lynne Weidner.
13      Q.   Let me ask a bit of a broad
14  question, because I am trying to figure
15  out what this allegation is about.  What
16  exactly do you mean when you say that
17  defendants treated you less favorably
18  than similarly situated white employees
19  in the terms and conditions of your
20  employment?
21      A.   We are all expected to do the
22  same job and that is to support our
23  programs.  The expectation is the same
24  for all of us.  Each program is a little
25  bit different or a lot different but the

51 (Pages 198 - 201)

MARJORIE PHILLIPS

1       MARJORIE PHILLIPS
2   expectation is the same.  If you want to
3   know about my program, you have the same
4   expectation of Doreen's program, Lynne's
5   program.  We are all program assistants.
6   So when we are all meeting and then
7   employees that come in after us, now at
8   some point, all of a sudden it's like you
9   break off and you start seeing them
10  behind closed doors and you're not seeing
11  us, rather, we're not being included in
12  these meetings, what is one to think.  We
13  were meeting together at one time and
14  then that stopped.  That changed.
15      Q.   When did it change?
16      A.   I can't give a date as to when
17  it changed.  But what happens -- I don't
18  want to go off on a tangent.
19      Q.   Let me ask you this.  What do
20  you mean when you say "terms and
21  conditions of plaintiff's employment"?
22  What were the terms and conditions that
23  you were referring to?
24      A.   I thought that's what I was
25  just explaining, that we were being

MARJORIE PHILLIPS

1   treated differently.
2       Q.   So other than in terms of being
3   excluded from meetings, how were you
4   treated differently?  That's what I'm
5   trying to figure out here.
6       A.   There was no upgrade when we
7   clearly had an agreement to have one, to
8   make one.  Other employees were being
9   called to, for example, Marilyn was --
10  Mary started sending her to different
11  meetings to participate in different
12  meetings, and Michael Batista, outside of
13  our department.
14      So sometimes you participate in
15  schoolwide meetings, let's just say,
16  right?  But she never asked us to
17  participate in these schoolwide meetings.
18  Marilyn participated in the schoolwide
19  meetings.  Michael participated in the
20  schoolwide meetings, for example.
21      Q.   Just to clarify, you can't tell
22  me when these meetings occurred, correct?
23      A.   No, I can't give you a date.
24      Q.   So other than the upgrade and

MARJORIE PHILLIPS

1   included in meetings, how were you
2   treated differently from similarly
3   situated white employees in the terms and
4   conditions of your employment?
5       A.   We were not given the same
6   privileges.  We were not given the same
7   advantages.  We were not allowed to
8   participate in the college, in the
9   college activities, meetings, committees,
10  the way that our colleagues were.
11  Knowing that I didn't get an upgrade.
12  That's the most important thing.  I am
13  not -- I won't speak for anyone else.
14      Q.   Let me ask you this, and I
15  don't know that you would have an answer.
16  Do you believe you did not receive the
17  upgrade because of discrimination or
18  retaliation?
19      A.   Both.  Discrimination and
20  retaliation.  Both.  Absolutely both.
21  Absolutely.
22      Q.   I'm sorry, please continue.
23      A.   That's it.
24      Q.   Why do you believe Dean Davis

MARJORIE PHILLIPS

1   discriminated against you on the basis of
2   your race?
3       A.   Because she was not happy that
4   I had gone to HR, to Affirmative Action
5   to complain about her.  I went on record
6   to file a complaint about her and she
7   wasn't happy about it.  I complained
8   about what she should have done, the
9   actions she should have taken as the
10  leader, what I believe she should have
11  done as the leader of our department.
12      Q.   Did she ever make any
13  discriminatory remarks to you?
14      A.   No, she did not.
15      Q.   Do you know if she ever made
16  any discriminatory remarks about any
17  other employees?
18      A.   I don't know.
19      Q.   Okay.  So you mentioned earlier
20  steps under the CBA; is that correct?
21      A.   Yes.
22      Q.   So do you know, where were you
23  on the step scale at this point?
24      A.   I believe that I am a 90 or a

MARJORIE PHILLIPS

1  91, somewhere like that.
2    Q.   Okay.  Do you know, if this is
3  not clear, let me know.  Had you reached
4  the top step of your salary scale, for
5  lack of a better term?
6    A.   Yes.
7    Q.   Do you know what salary
8  schedule Ms. Barton was in as of 2019?
9    A.   I think she was a 91.  I think
10  she was a 91.  I am not certain, but I
11  think she was a 91.
12    Q.   And do you know if she was at
13  the top step of her CBA scale?
14    A.   I don't know.
15    Q.   Is it fair to say that it's
16  possible that any salary increase or
17  upgrade that Barton received was because
18  of the CBA?
19    A.   Yeah.
20    MR. SELLS:  I am going to object
21  because that question called for
22  speculation.
23    Q.   Ms. Phillips, prior to
24  commencing this action, did you file a

MARJORIE PHILLIPS

1  charge of discrimination with the EEOC?
2    A.   Yes, I did.
3    MR. TAUSTER:  Craig, can you
4  throw up FIT Exhibit 21.
5    (Exhibit 11, Charge of
6  discrimination filed with EEOC, was so
7  marked for identification, as of this
8  date.)
9    Q.   Ms. Phillips, do you recognize
10  this document?
11    A.   Loosely, yes.
12    Q.   Is this the charge of
13  discrimination that you filed with the
14  EEOC?
15    A.   I don't see -- yes, yes, yes.
16    Q.   And on the bottom left there,
17  do you see this was digitally signed by
18  Marjorie Phillips on August 12th, 2019?
19    A.   Yes.
20    Q.   So fair to say this is the
21  charge of discrimination that you filed
22  with the EEOC?
23    A.   Yes.
24    (Witness reviews document.)

MARJORIE PHILLIPS

1    A.   Yes.
2    Q.   Did you submit any other --
3  apologies, you said yes?
4    A.   Yes.
5    Q.   Did you submit any other
6  documents to the EEOC other than this
7  charge of discrimination?
8    A.   I don't recall.
9    Q.   So let's flip back to the
10  complaint and paragraph 29.  So again a
11  broad question, but can you please
12  explain how it is clear from the facts
13  that you were discriminated against
14  because of your race by FIT?
15    A.   What number are you referring
16  to?
17    Q.   Paragraph 29.
18    MR. SELLS:  Hey, David, I am
19  going to object.  Are you asking her
20  to repeat everything that she said?
21  Are you saying anything other than
22  what she already said?  She testified
23  a lot today about things she felt were
24  discriminatory.  Now you're asking her

MARJORIE PHILLIPS

1  to repeat it?  Is that what you want
2  her to do?
3    MR. TAUSTER:  I guess at the end
4  of the day, if she's saying she's
5  relying on everything she said before,
6  that can be her testimony here.  I am
7  trying to get her explanation of the
8  allegation, that's all.
9    MR. SELLS:  Is there anything
10  else other than what she testified to,
11  that's what I am trying to find out.
12    MR. TAUSTER:  That's what I'm
13  trying to find out.  Again, she can
14  answer the question.  You know, at the
15  end of the day, she wants to answer
16  the question by saying it's what I
17  told you today, that's her answer.  I
18  am not going to testify for her and
19  neither can you.
20    Q.   So you can answer, Ms.
21  Phillips.
22    A.   Again, it's the same answer
23  that I have given earlier.  It looks like
24  the same question, just put a different

MARJORIE PHILLIPS

1   way. I really don't see that much of a
2   difference from previous questions.
3   
4      Q.   Okay.  So continuing with this
5   allegation, what do you mean when you say
6   that FIT, and I am referring specifically
7   to FIT, created a hostile work
8   environment because of your race?
9      A.   I feel like I keep answering
10  that question over and over again.  I
11  feel like you keep asking me that same
12  question.  I will answer it now, but I
13  feel like I keep saying -- I feel like I
14  am repeating myself.  I will repeat
15  myself again.
16         FIT created a hostile work
17  environment before, during and after, as
18  it pertains to discrimination and
19  retaliation.  I went to AA, I filed an
20  Affirmative Action complaint against
21  Marilyn and all of the people that you
22  have listed.  I was attacked by and
23  threatened by my co-worker.  She
24  threatened to kill me in the office.  And
25  she was not terminated.  I was expected

MARJORIE PHILLIPS

1
2   to continue to work with her before,
3   during and after, even until today, I am
4   still being asked to work with a person
5   that threatened my life and said they
6   were going to kill me.
7         I don't feel, didn't, don't
8   feel then, during, or even now that I was
9   protected until I went outside of the
10  college and hired an attorney.  I hired
11  an attorney because I just didn't feel
12  like the college was protecting me.
13     Q.   This may seem a little out of
14  sequence.  So Dean Davis is no longer
15  head of the School of Graduate Studies,
16  correct?
17     A.   Correct.
18     Q.   Have you had any upgrade
19  discussions with the new dean?
20     A.   She just started about two
21  weeks ago.
22     Q.   Was there an interim dean?
23     A.   Yes.  Yes, there was.
24     Q.   Who was the interim dean?
25     A.   Joanne Arbuckle.

MARJORIE PHILLIPS

1
2      Q.   And did you mention anything to
3   Joanne Arbuckle about an upgrade
4   discussion or anything of that sort?
5      A.   No, I did not.
6      Q.   So fair to say that you haven't
7   affirmatively pursued that since Dean
8   Davis left?
9      A.   Since Dean Davis left, we have
10  been in the middle of the COVID-19
11  pandemic.  None of us have been in the
12  office.  Over 600,000 people have died,
13  some of whom are my family and relatives.
14  The whole country is still in turmoil
15  over the COVID-19 pandemic.  There is a
16  delta variant going on right now.  I just
17  returned to work two weeks ago.  I
18  haven't seen any of my colleagues since
19  last March 16th of 2020.  So, no.  The
20  COVID-19 took over everybody's life since
21  we left the college last March.  That
22  took priority.
23     Q.   Were you still working remotely
24  during the COVID-19 pandemic?
25     A.   Yes, I was.

MARJORIE PHILLIPS

1
2      Q.   Do you know if anyone else at
3   the college has received an upgrade or
4   salary change or anything of that sort
5   since the pandemic started?
6      A.   I do not know.
7      Q.   Okay.  So I want to turn to
8   your allegations in paragraph 37 of the
9   complaint.  Actually, apologies,
10  paragraph 41 of the complaint.
11     A.   41?
12     Q.   Yes.
13         (Witness reviews document.)
14     A.   Yes.
15     Q.   What do you mean when you say
16  that the move made you feel embarrassed
17  and ashamed?
18     A.   That did and still does, since
19  the incident where I was attacked, I was
20  assaulted, I was the person who was the
21  victim.  I was moved to an inferior space
22  away from the office that I was in.  I
23  did nothing wrong, and it gave the
24  appearance that I had done something
25  wrong because I was the one who was

54 (Pages 210 - 213)

Page 214

```
1           MARJORIE PHILLIPS
2  moved.  And I was the one who was moved
3  to an inferior space.  So I don't know
4  what my colleagues know.  I don't know
5  what they know, what they don't know, but
6  I know what they see.  And what they see
7  is that Marjorie was moved after an
8  incident in the office between her and
9  Marilyn.
10       So just by looking from what
11 happened, incident, Marjorie's moved,
12 Marjorie is in an inferior space,
13 Marjorie is disconnected from the
14 department, Marjorie has this scarlet
15 letter written over her chest, Marjorie
16 did something -- Marjorie must have done
17 something wrong.  We don't know the whole
18 story, but Marjorie must have done
19 something wrong, just from the evidence.
20 She had to have done something wrong,
21 which is so far from the truth.  It is
22 not true.  But that is the appearance.
23       So I am being retaliated
24 against once again, over and over and
25 over and over every day, by being
```

Page 215

```
1           MARJORIE PHILLIPS
2  discarded, ostracized, isolated from the
3  space that I was in.  And I was the
4  person who was attacked.  So that's what
5  I mean.
6      Q.  I'm curious, how do you know
7  that your co-workers have speculated
8  about what happened?
9      A.  I was moved to another space.
10 After the incident I was moved to an
11 inferior space.  I was removed.  Marilyn
12 stayed.  The offender stayed.  And
13 nothing changed.  She's still there.  She
14 was there.  She is there.  She was there
15 yesterday, the last time I was in the
16 office.  There has been no change with
17 the status of Marilyn's employment.  But
18 I was moved.  I get nothing from that
19 except that it's clear to me that that is
20 discrimination and retaliation.
21 Discrimination and retaliation.
22       Retaliation because I made a
23 complaint about several people.  They
24 didn't like it, so now they are going to
25 make an example of Marjorie Phillips, so
```

Page 216

```
1           MARJORIE PHILLIPS
2  that anyone who comes behind me and
3  wants, considers, thinks about making an
4  Affirmative Action complaint about
5  somebody, if they are aware of this case,
6  they are not going to do it.  And they
7  don't have to know the details.  All they
8  need to know is what they see.  She was
9  here.  She was part of this office.  She
10 was part of that staff.  Now she's
11 somewhere.  She's somewhere over there.
12 We don't even know where she is.  We
13 don't even know where she is.  She's been
14 removed.  And the person who threatened
15 to kill her is still sitting in that
16 office.
17       You don't have to know the
18 details.  You can see with your eyes that
19 that is not -- that's discrimination.
20 That is discrimination when the person
21 who was threatened, a black person who
22 was threatened, someone was going to take
23 my life.  I didn't know whether or not I
24 was going to leave that office that day
25 dead or alive, and I was moved.  And the
```

Page 217

```
1           MARJORIE PHILLIPS
2  offender is still there today.  You don't
3  have to know the details, the optics, the
4  visual says it all.  And I can't say -- I
5  don't know what the next African-American
6  or the next or the next or the next who
7  knows about this loosely, intimately,
8  whatever they know about it, I cannot
9  imagine that they would be running to
10 Affirmative Action to make complaints.
11 They're not going to do that.  They're
12 not going to do that.  Because the
13 college has made an example of what
14 happens to a person who complains.  And
15 cries discrimination and retaliation.  I
16 am being made an example for
17 African-Americans coming behind me.  They
18 won't say much.
19     Q.  You went on leave after the
20 incident with Ms. Barton, correct?
21     A.  Yes, I did.
22     Q.  And you testified earlier that
23 you are not aware of any discipline that
24 Ms. Barton received, correct?
25     A.  Yes, because I asked and I
```

55 (Pages 214 - 217)

MARJORIE PHILLIPS

1
2   wasn't told.
3      Q.   Would it surprise you if Ms.
4   Barton was suspended?
5      A.   No, it wouldn't surprise me.  I
6   was loosely aware of that.  The
7   specifics, suspended could have been
8   three days.  I don't know.  Suspension
9   could have been two months.  It wasn't
10  two months.  So she was suspended.  Okay?
11  For how long?  I am not asking you, I am
12  just saying.
13     Q.   And did you talk to --
14     A.   I don't know what that
15  involved.  I don't know what that
16  involved.
17     Q.   Okay.  And you never
18  discussed -- did you ever discuss the
19  disciplinary action with your co-workers?
20     A.   No one knew.  No one knew.
21  Umilta was asking me.  I didn't know.
22  Neither one of us knew.  Neither one of
23  us knew.  She was just as much invested
24  in this as I was.
25     Q.   Do you know if Umilta has ever

MARJORIE PHILLIPS

1
2   filed a discrimination complaint?
3      A.   I do not know.
4      Q.   Has she ever told you that she
5   wanted to do so?
6      A.   I don't recall.  I don't
7   remember.
8      Q.   Has she ever told you that she
9   feels dissuaded from doing so because of
10  what happened to you?
11     A.   No, because we have not had any
12  conversations since I've gone back, since
13  I returned to the office, which was, you
14  know, after the incident, after January
15  2020.  And there was two months.  And
16  then we all left for the pandemic.  So,
17  no, there was no conversation.
18     Q.   So you allege in paragraph 42
19  of the complaint that your co-workers are
20  now awkward and standoffish towards you
21  and you feel ostracized, correct?
22     A.   Yes.
23     Q.   Who is being awkward and
24  standoffish to you?
25     A.   Well, I feel -- not I feel,

MARJORIE PHILLIPS

1
2   Anton is awkward and standoffish.  Ariel,
3   when she was still there, was awkward and
4   standoffish.  Doreen was awkward and
5   standoffish when I moved over to the
6   space.
7         Everybody feels like -- it
8   feels awkward for everyone when they
9   encounter me.  Like they don't know what
10  to say.  It's like a deer in headlights.
11  They don't feel relaxed to just be who
12  they were before this happened.  They
13  almost don't say anything.  They don't
14  say anything.
15     Q.   But you haven't discussed this
16  specifically with any of your co-workers,
17  correct?
18     A.   No, but the awkward and the
19  standoffishness is not relating to me
20  having a discussion with them.  Whatever
21  they know, whatever that is, is enough
22  for them to stand back, to stand back.
23  To not be the same.  And I feel
24  embarrassed because I feel punished.  I
25  feel punished.  I feel punished for doing

MARJORIE PHILLIPS

1
2   what was right, for doing what the school
3   asked and my employer.  Not just the
4   school, my employer makes this available
5   to you.  Makes this department.  Gives
6   you the opportunity to come to them when
7   you have a situation when you feel that
8   you need them.
9         I took advantage of that and it
10  worked against me.  It's working against
11  me.  I feel worse now than I did before.
12  Every day.  Every day.  Every day.  Every
13  day.
14     Q.   So I want to ask you a
15  question, and it might be a difficult
16  one, but I am really trying to parse the
17  complaint and trying to get to the, you
18  know, allegations here.
19         Is there any way that you
20  can -- is there any conduct that you
21  attribute specifically to discrimination
22  as opposed to retaliation and vice versa?
23  Does that make sense to you, Ms.
24  Phillips?
25     A.   I think so.  You're asking me

56 (Pages 218 - 221)

**Page 222**

MARJORIE PHILLIPS
1
2  to separate the two and what conduct I
3  would attribute to the discrimination?
4      Q.   Right, what you would consider
5  to be discrimination, and what you would
6  consider to be retaliation.  And even a
7  step further, if you want to create a box
8  that you believe would be a little of
9  column A and a little of column B, we can
10  do that as well.
11      MR. SELLS:  Objection.
12      THE WITNESS:  Thank you.
13      MR. SELLS:  Calls for a legal
14  conclusion, David.  And you know that.
15      MR. TAUSTER:  No, I think I'm
16  allowed to ask her what she feels she
17  would attribute to discrimination
18  versus retaliation.  These are -- this
19  is her complaint.  She can answer that
20  question.
21      MR. SELLS:  It calls for a legal
22  conclusion.
23      MR. TAUSTER:  Okay.  She can
24  answer it.
25      A.   I don't know the legal

**Page 223**

MARJORIE PHILLIPS
1
2  definition of discrimination.  But I know
3  the definition, the definition of
4  discrimination.  And, again, I feel like,
5  I feel like you're asking me the same
6  question over and over in really the same
7  way.
8      I'm not sure what I am not
9  getting across to you where I am being
10  treated differently.  I am an
11  African-American women.  Marilyn is a
12  white women.  And I am being treated
13  differently.  I am being treated
14  inferior.  I am being treated less than.
15  I am being treated like a criminal.  I am
16  being treated like I was the offender
17  when I did nothing wrong.  I did nothing
18  wrong.  It's like, you know, the crooked
19  painting on the wall where you walk into
20  the room and the painting is crooked and
21  I keep telling you, David, your painting
22  is crooked.  And you're like, no, it's
23  not.  No, it's not.  David?  No, it's
24  not.  And you insist, insist, insist that
25  it's not.

**Page 224**

MARJORIE PHILLIPS
1
2      I'm telling you, I am black.  I
3  didn't do anything.  She's white.  She
4  threatened to kill me.  She threatened to
5  end my life.  She told me I will fucking
6  kill you.  Over and over and over.  She
7  was in my face.  Foaming at the mouth.
8  Foam, around her mouth in my face, this
9  close to me.  Telling me she didn't give
10  a fuck about me over and over and over
11  and over.  She put her hands on me.  She
12  assaulted me.
13      I tried to contain the
14  situation because I was fearful and I
15  didn't know what was going to happen.
16  That is clearly wrong.  I don't have to
17  keep saying it over and over again.
18  That's wrong.  That is clearly wrong.
19      But then, as a result of it, I
20  get moved to another space because
21  Marilyn doesn't have to move.  Marilyn
22  works for the dean.  Marilyn is a white
23  girl.  Marjorie is a black girl.  Nobody
24  cares about Marjorie.  Let's just
25  separate them.  And if we -- have to

**Page 225**

MARJORIE PHILLIPS
1
2  separate them, so who is going to go,
3  Marjorie is going to go.  The black woman
4  is going to go.  Not the person who did
5  something wrong.
6      The solution, in my mind,
7  should be the person who did something
8  wrong should be the person who's
9  punished.  That's common sense to me, not
10  the person who did nothing.  Nothing
11  wrong, except show up at work that day
12  and in the workplace be threatened.  Told
13  that my life is going to be taken.  I
14  didn't know what she had.  I don't know
15  what she has tomorrow.  I don't know
16  what's going to happen tomorrow with
17  Marilyn.  I don't know what she's capable
18  of.  She's already shown me.  She doesn't
19  have to keep proving it to me.  She's
20  already shown me what she's capable of
21  doing.  So I believe her.  You may not
22  want to, I believe her.  She's
23  demonstrated what she's capable of doing.
24      So you keep asking me over and
25  over as if I did something wrong.  It's

57 (Pages 222 - 225)

Page 226

MARJORIE PHILLIPS

1
2 the same question. And I'm not sure how
3 I can answer it any differently. I was
4 made to suffer. I am still being made to
5 suffer. Every single day. It is
6 discrimination. It is retaliation.
7 Discrimination, retaliation. That's what
8 it is. And I don't understand why if you
9 posed a question, you know, change a
10 little here, tweak it here, it's the same
11 question. I keep saying the same thing
12 over and over again.
13         MR. SELLS: Why don't we take a
14 break.
15         MR. TAUSTER: I just want to ask
16 one more question.
17         MR. SELLS: No, no.
18         MR. TAUSTER: No, no, because
19 it's right on the same line.
20         MR. SELLS: David, come on.
21 David, look --
22         MR. TAUSTER: Derek, Derek, I am
23 allowed to finish this line of
24 questioning.
25         MR. SELLS: You're not even on a

Page 227

MARJORIE PHILLIPS

1
2 line of questioning, David. You're
3 not even on a line of questions.
4         MR. TAUSTER: Derek, I am going
5 to ask one more question. She can
6 answer yes or no. I am going to ask
7 one more question.
8         MR. SELLS: Listen, listen, Ms.
9 Phillips needs a break. We have been
10 going for over an hour. Let's take a
11 break. Thank you.
12         MR. TAUSTER: We're not taking
13 more than two minutes. We're trying
14 to move this along --
15         MR. SELLS: We are going to take
16 a ten-minute break.
17         MR. TAUSTER: We'll take a
18 five-minute break.
19         MR. SELLS: Ten minutes. Ten
20 minutes.
21         MR. TAUSTER: Derek, no, Derek,
22 five minutes, okay, if we are wrapping
23 this at 5:30, let's take five minutes.
24 Why don't you let us finish --
25         MR. SELLS: We're coming back

Page 228

MARJORIE PHILLIPS

1
2 tomorrow. David, we are going back
3 tomorrow. Take it easy, all right.
4 Ten minutes is not going to kill you.
5         THE REPORTER: Off the record.
6         (Off the record.)
7 BY MR. TAUSTER:
8     Q.   Ms. Phillips, since I know we
9 were going back and forth a little bit
10 about trying to get to what I was asking.
11 I want to ask one question and I think it
12 might clarify this a little bit.
13         So do you believe that if you
14 had not made your affirmative complaint,
15 that you would have received the upgraded
16 issue in this complaint, in this
17 litigation?
18     A.   Yes.
19     Q.   So is it fair to say that you
20 were denied this upgrade as an act of
21 retaliation rather than discrimination?
22     A.   It's both. The retaliation is
23 a result of the discrimination. It's
24 both, I cannot separate the two. I filed
25 a complaint. I called them out

Page 229

MARJORIE PHILLIPS

1
2 officially. I called them out. And then
3 they retaliated. One goes along with the
4 other. It doesn't end with the
5 discrimination. They retaliated. I
6 can't separate the two.
7     Q.   I want to scroll up to
8 paragraph 36 of the complaint regarding
9 the move of your work station. So you
10 allege that this move inconvenienced you,
11 correct?
12     A.   Yes. Yes.
13     Q.   How did this move inconvenience
14 you?
15     A.   It separated me from everyone.
16 In the space where I was located, in that
17 same building, on another floor, a couple
18 of floors up, is my whole, it's dedicated
19 to fashion and textile studies. That
20 whole floor is dedicated to fashion and
21 textile studies. That's the program that
22 I assist.
23         And so I was right there. I am
24 right there. And then going in that
25 building makes it convenient for the

58 (Pages 226 - 229)

MARJORIE PHILLIPS

1
2  faculty, for the chairperson, for the
3  students to, you know, as an
4  administrator, you're more the go-to
5  person than even the chairperson.  More
6  the go-to person than even the dean.  I
7  am the person who the faculty called
8  upon.  I am the person who the students
9  called upon.
10       So to remove me from that space
11  and put me in a place where no one even
12  really knows where I am at.  The students
13  don't even know where I am at.  And when
14  the students need something, they have to
15  rely upon e-mails.  Some of the students
16  in the past, since this has happened, and
17  all of this disruption has happened, they
18  don't even know who I am.  They have
19  never seen me.  They don't even know who
20  I am.
21       So it disrupted, not just
22  Marjorie Phillips, it disrupted my
23  department.  It disrupted my department.
24  Because when -- another reason, when
25  faculty has an issue, questions,

MARJORIE PHILLIPS

1
2  whatever, something that they need, would
3  like to discuss, they are there.  They
4  are adjuncts.  They are only there for a
5  short amount of time.  They are not going
6  to walk a block away to have a
7  conversation with Marjorie when she used
8  to be in the previous space right
9  downstairs.  Take the elevator right
10  downstairs.  But now, she's in, some of
11  them, as I said, don't even know where I
12  am, so that's number one.
13       And then given the choice
14  between, okay, I'll walk down there, no,
15  I'll call her.  I'll send her an e-mail.
16  So I am so isolated from my own
17  department that I don't get to interact
18  with my department anymore.  On occasion
19  somebody may come over.  But it disrupted
20  my department.  It's not just Marjorie
21  Phillips.  I represent that department.
22  I am the glue of that department.  And I
23  have been removed from this space where
24  my department is.  And nobody is going to
25  try to find me.  They will just send me

MARJORIE PHILLIPS

1
2  an e-mail.  They will call me.
3       Like I said, some of the
4  students over the past couple of years,
5  they don't even know who I am.  They have
6  never even seen me.
7       Q.   The last year they wouldn't
8  have had any occasion to see you anyway,
9  correct?
10       A.   Since this happened, correct.
11       Q.   But you were moved in November
12  of 2019, correct?
13       A.   Correct.
14       Q.   So how long were you in this
15  different location before FIT went fully
16  remote?
17       A.   For a few months.  For a few
18  months.
19       Q.   And now, in terms of
20  inconvenience, did this increase your
21  commuting expenses or anything of that
22  sort in any material way?
23       A.   No.
24       Q.   Now, when you allege that FIT
25  moved your work space, did they take any

MARJORIE PHILLIPS

1
2  steps to try and make that move easier
3  for you in any way?
4       A.   No.  No, they did not.
5       Q.   Okay.
6       MR. TAUSTER:  Craig, can you
7  throw up FIT 23?
8       MR. JONES:  Okay.  Exhibit 12
9  has been marked.  It's coming up now.
10       (Exhibit 12, e-mail chain, first
11  e-mail from Cynthia Glass, was so
12  marked for identification, as of this
13  date.)
14       MR. TAUSTER:  All right.  Thank
15  you, Craig.
16       Q.   So Ms. Phillips, I want you to
17  first read this -- you know what, take a
18  moment, read this whole e-mail chain and
19  then we'll discuss it.
20       A.   Okay.
21       MR. TAUSTER:  Craig, why don't
22  you give Ms. Phillips control so she
23  can scroll.
24       MR. JONES:  Ms. Phillips, if you
25  click on the screen.  There you go.

59 (Pages 230 - 233)

MARJORIE PHILLIPS

1
2     (Witness reviews document.)
3     Q.   Ms. Phillips, you produced this
4  e-mail, but it looks like the e-mail all
5  the way at the top is the first e-mail
6  and then it goes in chronological order
7  from there.
8     A.   Okay.
9     Q.   This first e-mail, this is from
10  Cynthia Glass, FIT's vice president for
11  human resource management and labor
12  relations, correct?
13     A.   Yes.
14     Q.   Did you speak with Ms. Glass
15  about the office move?
16     A.   Verbally, no.
17     Q.   Now, Ms. Glass says that she
18  understands that you have concerns
19  regarding the designated space and that
20  you feel the work space suggests that
21  it's more for the performance of
22  reception duties, is that correct?
23     A.   Yes.
24     Q.   And that's what you allege in
25  this action, correct?

MARJORIE PHILLIPS

1
2     A.   Yes.
3     Q.   And so now Ms. Glass further
4  alleges, not alleges, withdrawn.
5     Ms. Glass then says that they
6  visited the space and determined that
7  placing you at the work station located
8  behind one station over away from the
9  entrance to the space would eliminate
10  your concern.
11     So did FIT move you to that
12  work space that Ms. Glass is referring to
13  there?
14     A.   Yes.
15     Q.   And then from there, Ms. Glass
16  says that your computer will be moved to
17  this new location and will be ready for
18  your arrival on Monday; is that correct?
19     A.   Yes.
20     Q.   And was your computer at the
21  location when you arrived on Monday?
22     A.   Yes.
23     Q.   And so now I just want to
24  scroll to the end, your e-mail back to
25  Dr. Glass.  I don't know why I called her

MARJORIE PHILLIPS

1
2  Dr. Glass.  "I appreciate the effort
3  extended and look forward to a
4  finalization of the matter."
5     Is that what you state in that
6  e-mail?
7     A.   I did.
8     Q.   Is it fair to say that FIT at
9  least took some steps to try to make this
10  move convenient and less burdensome for
11  you?
12     A.   No.  No, it's not.
13     Q.   Why not?
14     A.   Because I objected to the move.
15  I told Mary Davis that I objected to this
16  move.  I objected to being thrown away
17  and popped into this inferior space all
18  together.  I was bullied by Mary Davis
19  and Cynthia Glass to go into this space
20  against my will.  What do you do when
21  you're bullied and you have no choice.
22  These are your two choices.  You either
23  do it or you quit.  Those were the only
24  two choices that I had.  You either do
25  what they ask for you to do or you quit.

MARJORIE PHILLIPS

1
2  I wasn't going to quit.
3     And the way that I wrote the
4  last e-mail, I appreciate the effort
5  extended.  You've got to be a team player
6  and look forward to a finalization,
7  because to me, that wasn't -- these
8  e-mails was not the final.  It was not
9  final to me.  I objected being thrown
10  into that space.
11     And Mary Davis and Cynthia
12  Glass bullied me, Marjorie Phillips, to
13  be in that space.  They gave me no
14  choice, even though I objected over and
15  over and over.  I told Mary Davis that I
16  felt like I was being punished because I
17  made this Affirmative Action complaint
18  against her.  She said nothing.  She
19  didn't say I agree.  I don't agree.
20  You're right.  You're wrong.  She said
21  nothing.
22     I was bullied into going into
23  that space.  I had no choice.  I mean in
24  the work world, what are you going to do?
25  Two choices.  You either do it or you

MARJORIE PHILLIPS

1      MARJORIE PHILLIPS
2   quit.  I wasn't going to quit.
3         So, no, FIT was not being so
4   gracious and generous and wonderful to
5   Marjorie Phillips, no, they were not.
6   They were not.
7      Q.  Ms. Phillips, that's not the
8   question I asked you.  I asked you
9   specifically with the move of your work
10  station, did FIT take any steps, again
11  specifically with respect to the move of
12  your work station, to make moving your
13  work station a bit less burdensome on
14  you.
15     A.  No, they did not.  I answered,
16  no.  No.  The answer is no.
17     MR. SELLS:  And that wasn't the
18  question.  Just for the record, David,
19  that wasn't the question you asked.
20     MR. TAUSTER:  Okay.  Well, then
21  I am asking the question right now.
22     MR. SELLS:  No, no.
23     MR. TAUSTER:  No, I am.
24     Dawn, can you please read back
25  the question.

MARJORIE PHILLIPS

1      MARJORIE PHILLIPS
2      MR. SELLS:  Dawn, can you read
3   back the last two questions.
4      (Record read.)
5      Q.  Let's move on to paragraph 68
6   of the complaint.  So take a moment to
7   read this allegation for me.
8      (Witness reviews document.)
9      A.  I am going to read it one more
10  time.
11     (Witness reviews document.)
12     A.  Okay, I think I understand what
13  I am reading.
14     Q.  So what management employees
15  are you referring to in this paragraph
16  68?
17     A.  If I am understanding it
18  correctly, what it is saying is that Mary
19  Davis was not properly equipped as a
20  manager, as a supervisor to handle this
21  situation.  That she handled it poorly.
22  Mary Davis is probably the reason we are
23  here today.  If Mary Davis had handled
24  this entire situation different, and I
25  mean each thing that we discussed, it's

MARJORIE PHILLIPS

1      MARJORIE PHILLIPS
2   very possible that we may not have been
3   here today.
4         She handled it poorly.  And
5   then it went from her up the chain.  So
6   she wasn't trained properly.  She didn't
7   get the proper training.  She came in
8   with, you know, with no knowledge, or
9   maybe she didn't care.  I am just going
10  to assume that she didn't have knowledge
11  of how to deal with a situation like
12  this.  And then she didn't care enough to
13  try and find out.  Maybe she didn't
14  understand.  She didn't even care enough
15  to try to find out.  She didn't even care
16  enough to pretend to appear like she was
17  trying to find out.
18        I think she was ill equipped to
19  handle this entire situation.  She
20  bumbled the whole thing.  And because of
21  Mary Davis, we're all here today.  It
22  didn't have to come to this.  Remember,
23  now, I went to her first, before I went
24  to Affirmative Action, I went to Mary.  I
25  always went to Mary first.  You know,

MARJORIE PHILLIPS

1      MARJORIE PHILLIPS
2   there were steps.  She created this mess.
3   She created discrimination, retaliation.
4   She created this mess.  And didn't try to
5   figure out how she could do anything.
6   She didn't care.
7         I mean everybody doesn't know
8   what to do.  You ask questions.  You ask
9   around.  You ask your colleagues.  You
10  inquire.  She created this mess.  If I
11  understand that correctly, that's what I
12  mean.  Discrimination, retaliation.
13     Q.  Circling back, I understand
14  you're asserting the claim against Dean
15  Davis.  Are there any other management
16  employees who you believe -- who you are
17  referring to in this first sentence of
18  paragraph 68 who, the management
19  employees who perpetuated the hostile
20  work environment and discrimination.
21  Which management employees are you
22  referring to there?
23     A.  Mainly, primarily, first and
24  last, Mary Davis.  And then after Mary
25  Davis, Jack Oliva.  That was her boss,

61 (Pages 238 - 241)

Page 242

MARJORIE PHILLIPS

1
2  Jack Oliva, vice president of academic
3  affairs. He just co-signed everything
4  that she did. He was her boss. He
5  co-signed everything that she did. He
6  said make it go away. He said Umilta
7  couldn't be objective. At no point did
8  either -- either they didn't care. I
9  think maybe that was more it. I don't
10  know. I don't know. I don't know. They
11  did a terrible job at handling this
12  entire situation. They handled it all
13  wrong.
14      Q.   When did Jack Oliva say that
15  Umilta couldn't be objective?
16      A.   I don't know. All I know is
17  that maybe -- I wasn't there, you know, I
18  am just hearing this. But Umilta's name
19  came up in relationship to the
20  investigation. And I am guessing, all I
21  know is that's what he said. And Isolina
22  was there when he said it. He said
23  Umilta could not be objective. I told
24  Umilta.
25      Q.   So this is Isolina told him

Page 243

MARJORIE PHILLIPS

1
2  that you said this?
3      A.   No.
4      Q.   Sorry, sorry, sorry.
5  Withdrawn.
6          Isolina told you that Jack
7  Oliva said that Umilta couldn't be
8  objective?
9      A.   Correct.
10      Q.   But you don't know when?
11      A.   When, no. Exactly, no. I
12  wasn't there.
13      Q.   Did you ever speak with Jack
14  Oliva about the allegations in your
15  complaint?
16      A.   No.
17      Q.   Other than Mary Davis and Jack
18  Oliva, are you referring to any other
19  management employees who perpetuated the
20  hostile work environment and
21  discrimination?
22      A.   I think it's the entire
23  institution. It's all of them. I spoke
24  with everyone. I went up the chain. And
25  I did it in the proper way. I started

Page 244

MARJORIE PHILLIPS

1
2  with my supervisor. I went to
3  Affirmative Action. I went to HR. I
4  spoke with everyone that I needed to
5  speak with. I did everything that I was
6  expected to do in the order that I was
7  expected to do it. I didn't start out
8  by, you know, going to the police
9  department before I spoke to Mary. I did
10  everything that I believe what was
11  expected of me. I don't believe I did
12  anything wrong. I made them all aware in
13  the order that it should have happened.
14          Like I said, I think it could
15  have stopped at Mary Davis. I think it
16  could have stopped there, if she had
17  handled it differently.
18      Q.   Do you believe Jack Oliva
19  engaged in any discriminatory conduct
20  towards you?
21      A.   I do. I do. I believe -- yes,
22  I do.
23      Q.   What do you believe he did?
24      A.   He took Mary's side. Maybe
25  that's not, you know, maybe that's what

Page 245

MARJORIE PHILLIPS

1
2  he's supposed to do, maybe that's what
3  you think. I don't think anyone was
4  being fair. I can't name one person --
5  no, there is one. Isolina. Outside of
6  my union representative, and her hands
7  were tied, I cannot say that anyone was
8  being fair to me.
9      Q.   Now, the second sentence of
10  paragraph 68, I'm just going to ask the
11  question, do you have any firsthand
12  knowledge of the training that FIT
13  supervisors received regarding
14  discrimination and harassment?
15      A.   We are still talking about that
16  same number 68, right?
17      Q.   Yes, 68, the second sentence
18  now.
19      A.   Kinda sorta, but not
20  specifically. My understanding -- Mary
21  Davis, she wasn't new, but compared to
22  most of the other employees in -- I was
23  there when she was hired. And she
24  probably was the newest, except for some
25  of the administrators. So I believe in

62 (Pages 242 - 245)

Page 246

MARJORIE PHILLIPS

1     MARJORIE PHILLIPS
2   the first five years, I could be wrong,
3   it could be three years, I don't know,
4   they send out sort of like an evaluation
5   on all new administrators who work -- so
6   if you work with this particular
7   administrator, you get to weigh in on
8   this evaluation. I don't believe it's
9   called an evaluation, but that's what it
10  is.
11        And so, you know, you're asked
12  like a series of questions. And it
13  really is addressed to, or rather the
14  people who complete it are people who
15  interact and actually have a relationship
16  with the person, for example, Mary Davis.
17  So if you get it and you have a
18  relationship with Mary Davis, then you're
19  not going to fill it out.
20        My understanding was that Mary
21  Davis, for a while, in the beginning,
22  wasn't doing very well. Wasn't getting
23  very good evaluations. And that she was
24  asked to get some managerial training,
25  that the college arranged for her to get

Page 247

1     MARJORIE PHILLIPS
2   some managerial training.
3     Q.   Do you know if she got that
4   training?
5     A.   I can't say with all certainty.
6   It would be a guess.
7     Q.   This can be a tiptoe area, but
8   a couple of questions I am trying to
9   flesh out here. And I do not want you to
10  get into the sum and substance with
11  discussions, but I am trying to get a
12  timeline of events here.
13        When did you first contact
14  Midwin Charles about this case?
15        MR. SELLS: Objection.
16     Q.   Again, not asking sum and
17  substance. I am just asking the first
18  time you contacted her.
19        MR. SELLS: Objection. You're
20     getting into communications. And it's
21     not, that's not appropriate.
22        MR. TAUSTER: I am not asking
23     for privileged matter, I am asking
24     when she first retained an attorney.
25        MR. SELLS: That's not what you

Page 248

1     MARJORIE PHILLIPS
2   asked.
3     Q.   Did you retain Midwin Charles
4   before you filed your EEOC charge?
5        MR. SELLS: Objection.
6        Don't answer.
7        MR. TAUSTER: Again, this is a
8   simple yes or no question. I am not
9   asking --
10        MR. SELLS: No, it's not.
11        MR. TAUSTER: Yes, it is.
12        MR. SELLS: No, it's not. The
13  very act of retention involves
14  attorney/client communication, David.
15  So no, she's not answering the
16  question. Take it up. Take it up.
17        MR. TAUSTER: Okay.
18        Dawn, I am going to ask you to
19  flag that line in the transcript. We
20  are going to probably have to come
21  back around to that one.
22        (Transcript marked.)
23        MR. TAUSTER: Craig, can you
24  throw up FIT Exhibit 19, please.
25        (Exhibit 13, Letter, was so

Page 249

1     MARJORIE PHILLIPS
2   marked for identification, as of this
3   date.)
4        MR. JONES: Exhibit 13 has been
5   introduced.
6        MR. TAUSTER: Give Ms. Phillips
7   control of it. I want her to review
8   the letter and let me know when you're
9   done with that.
10        MR. JONES: Ms. Phillips, if you
11  click on the screen, you will take
12  control.
13        MR. SELLS: Hold on for a
14  second. I object to this letter. I
15  object. We'll have to take it up.
16  This was, this was for settlement
17  purposes only. It's a confidential
18  document. It's not allowed to be used
19  for any other purpose. So I object to
20  its use and you can take it up.
21        Ms. Phillips, do not answer any
22  questions about this letter.
23        MR. DRANOFF: If I can just
24  comment on that.
25        MR. TAUSTER: Where does this

63 (Pages 246 - 249)

1  MARJORIE PHILLIPS
2  say it's an FRE 408 letter?
3      MR. SELLS: It's contained
4  within the language. It's for
5  settlement purposes.
6      MR. TAUSTER: Where is it --
7      MR. SELLS: Oh, okay, you want
8  to go to the second page, David? How
9  about we look at the second page. Oh,
10  a settlement amount of 150,000. So
11  we're not answering any questions
12  about this letter.
13      MR. TAUSTER: No, she's going to
14  answer one question though.
15      MR. SELLS: No.
16      MR. TAUSTER: I am allowed to
17  ask one question here.
18      MR. SELLS: Take it up. Take it
19  up.
20      Ms. Phillips, do not answer the
21  questions --
22      MR. DRANOFF: Can I just make
23  one statement?
24      MR. SELLS: -- about this
25  letter.

1      MARJORIE PHILLIPS
2      MR. DRANOFF: If you're talking
3  about settlement, that issue you're
4  raising, Derek, would pertain to a
5  trial objection. Certainly the
6  content of a letter is fair game in
7  discovery. You're not at trial right
8  now.
9      MR. SELLS: I am not letting her
10  answer any questions about --
11      MR. DRANOFF: Maybe we can
12  resurrect --
13      MR. SELLS: I am not going --
14  we're not waiving any privilege, okay?
15      MR. DRANOFF: It's not a
16  privilege.
17      MR. SELLS: No, no.
18      MR. DRANOFF: There is no
19  privilege. The letter is in front of
20  us.
21      MR. SELLS: It's a confidential
22  document.
23      MR. DRANOFF: It's directed to
24  third parties.
25      MR. SELLS: It's a confidential

1  MARJORIE PHILLIPS
2  document that was written by her
3  attorney at the time.
4      MR. DRANOFF: Addressed to third
5  parties. No privilege can possibly
6  apply to this letter. It was sent to
7  third parties, so there is no
8  privilege there. And, again, as far
9  as any discussion of settlement, that
10  certainly would be a legitimate claim,
11  perhaps, at trial, but not now during
12  a deposition.
13      MR. SELLS: I appreciate your
14  perspective. We are not answering any
15  questions. If you want to --
16      MR. DRANOFF: Maybe we can all
17  take a fresh look at it and talk about
18  it tomorrow.
19      MR. TAUSTER: Mark that line.
20      MR. DRANOFF: I just wanted to
21  put my position in front of you.
22      MR. SELLS: No worries.
23      MR. DRANOFF: All right.
24      (Transcript marked.)
25  Q.  Prior to October 31st, 2019,

1      MARJORIE PHILLIPS
2  did you have anyone reach out to FIT to
3  assert any claim of discrimination?
4      MR. SELLS: I am not following
5  you.
6      MR. TAUSTER: You're not
7  answering the question, she's
8  answering the question.
9      MR. SELLS: No, no. Hold on,
10  your question is designed to elicit
11  attorney/client communications. I am
12  just going to ask if you can repeat my
13  question, because my objection is it
14  elicited, it's designed to elicit
15  attorney/client communications, so you
16  can just repeat the question.
17      (Record read.)
18      MR. SELLS: Okay. Yeah, don't
19  answer that question.
20  Q.  Ms. Phillips, did you have any
21  non-attorney reach out to FIT prior to
22  October 31st, 2019 to assert a claim of
23  discrimination?
24  A.  No, I did not.
25  Q.  Thank you. Ms. Phillips, are

64 (Pages 250 - 253)

MARJORIE PHILLIPS
1
2  you seeking damages from FIT in this
3  lawsuit?
4      A.  Yes, yes.
5          MR. TAUSTER:  Give me two
6  seconds here.
7          Craig, can you load up FIT
8  Exhibit 22 for me, please.
9          MR. JONES:  Exhibit 14.
10         (Exhibit 14, Initial
11  Disclosures, was so marked for
12  identification, as of this date.)
13         MR. SELLS:  22.
14         MR. JONES:  Which will be
15  Exhibit 14, has been introduced, and I
16  am bringing it up now.
17     Q.  So Ms. Phillips, how were you
18  damaged by FIT?
19         MR. SELLS:  Other than what
20  she's already described?
21         MR. TAUSTER:  I am asking
22  economic damages, Derek.
23         MR. SELLS:  Okay.
24     Q.  Did you freeze, Ms. Phillips?
25     A.  No.  I am trying to understand

MARJORIE PHILLIPS
1
2  how the question that you're asking me
3  now is different from what I've already
4  answered.  Could you clarify a little
5  more?
6      Q.  Sure.  On Exhibit 14 -- why
7  don't you take a look at bullet point C
8  there.
9      A.  Okay.
10     Q.  Let's walk through each of
11  these.  What do you allege your
12  out-of-pocket expenses from FIT to be in
13  this lawsuit?
14     A.  Out of pocket, I am just going
15  to guess and say about, I am guessing,
16  $15,000 maybe.
17     Q.  What do you attribute that
18  $15,000 to?
19     A.  My attorney.
20     Q.  That's a fee payment?
21     A.  I am paying, yes.
22     Q.  So other than what you're
23  paying your attorney, what other
24  out-of-pocket expenses do you have in
25  this litigation?

MARJORIE PHILLIPS
1
2      A.  I paid my therapist, I have
3  been seeing a therapist for two years, so
4  I pay her.  I had a physical therapist
5  that I pay because physically, sometimes
6  mentally things can affect you
7  physically.  So I had a physical
8  therapist.  So I put out money for the
9  physical therapist.  Physical therapist,
10  psychiatrist, my lawyer.
11     Q.  Are the psychiatrist or
12  physical therapy expenses, are any of
13  those covered by your medical insurance?
14     A.  Yes.
15     Q.  Would it be fair to say that
16  your claims would be above and beyond
17  what is covered by insurance?
18     A.  Correct, yes.
19     Q.  Other than the medical or legal
20  expenses, do you have any other
21  out-of-pocket expenses in connection with
22  this lawsuit?
23     A.  Not that I can think of at this
24  moment.
25     Q.  Now, I am going to jump over

MARJORIE PHILLIPS
1
2  to -- so you say "Plaintiff claims back
3  pay in lost wages."  Can you specify a
4  little bit what lost wages you believe
5  you incurred in this lawsuit?
6      A.  Well, I believe that if things
7  had gone differently about the upgrade,
8  the discussion about the upgrade, the way
9  it was moving along positively in the
10  right direction, we had agreed upon it.
11  We came very close to making it happen,
12  until the Affirmative Action case, I
13  believe that today I would have had a
14  different salary based on my last
15  discussion with Mary Davis about an
16  upgrade.
17         That was the whole point.  It's
18  like you go to ask for a promotion or a
19  raise because you want to make more
20  money.  And you and your supervisor are
21  in agreement about that.  And then this
22  happens.  Changes everything.  And then
23  there is no movement after that.  It's
24  off the table.
25         So what I thought I was going

65 (Pages 254 - 257)

MARJORIE PHILLIPS

1  MARJORIE PHILLIPS
2  to be gaining fell off the table. And I
3  am right at the place where I started. I
4  am still at the place where I started.
5     Q.   So other than wages that would
6  have been attributed to the upgrade, are
7  there any other back wages that you
8  believe you lost in connection with this
9  lawsuit?
10    A.   Not that I can think of.
11    Q.   Okay.
12    A.   I reserve the right, if I think
13 of something later on, will I be able to
14 introduce that later if I think of
15 something? If I think of anything?
16       MR. SELLS: Ms. Phillips, you're
17 not anticipating any questions right
18 now.
19       THE WITNESS: Okay. I answered
20 it.
21       MR. TAUSTER: Also Derek, I am
22 going to note obviously that Rule 26
23 calls for a computation of damages, so
24 we are going to call for supplemental
25 initial disclosures that actually

1  MARJORIE PHILLIPS
2  are you experiencing?
3     A.   I have trouble sleeping. I
4  have continued to have nightmares. I
5  continue to feel subconsciously
6  traumatized. I have nightmares. And I
7  have problems sleeping.
8     Q.   Can I ask how does physical
9  therapy help you deal with nightmares?
10    A.   No, the physical therapy was
11 because I had a pain in my leg, in my
12 thigh area that sort of came out of
13 nowhere. I couldn't -- I didn't know --
14 like it just came on all of a sudden
15 during all of this. And the therapist
16 said to me that sometimes mental stress
17 can create physical stress and physical
18 conditions. Mentally sometimes things
19 contribute to physical issues that you're
20 having, because it just sort of came out
21 of nowhere during that period of time.
22 And it got so bad that I had to seek
23 physical therapy for it, which I did, for
24 a while, for a few months, until I
25 couldn't do it anymore.

1  MARJORIE PHILLIPS
2  quantify the damages rather than just
3  saying that the amount will be
4  quantified by a jury.
5       MR. SELLS: We will. And we
6  will have an expert also.
7       MR. TAUSTER: Okay.
8     Q.   Ms. Phillips, you said you're
9  in physical therapy in connection with
10 this litigation?
11    A.   I was, yes, until the pandemic.
12    Q.   So when is the last time you
13 went to physical therapy?
14    A.   Before the pandemic. So that
15 would have been, I don't know, before
16 March of last year.
17    Q.   So fair to say you have not
18 been in physical therapy since March of
19 2020?
20    A.   Since the pandemic, no, I have
21 not.
22    Q.   Okay. Are you still
23 experiencing any physical symptoms?
24    A.   Yeah. Yes, I am.
25    Q.   Okay. What physical symptoms

1  MARJORIE PHILLIPS
2     Q.   You said a therapist told you
3  that this could be physical
4  manifestations of emotional distress?
5     A.   Yes.
6     Q.   The physical therapist said
7  this?
8     A.   The physical therapist.
9     Q.   Who referred you to the
10 physical therapist?
11    A.   Who referred me to the physical
12 therapist? I think it was one of my
13 doctors. I think it was my
14 rheumatologist. I have a rheumatologist
15 who I talk to about everything as well.
16 You know, anything going on in my body,
17 because I want him to be aware of what is
18 going on in my entire body. So he was
19 the one who recommended the physical
20 therapist. He gave me the prescription
21 for the physical therapist.
22    Q.   Were you seeing this
23 rheumatologist before the incident,
24 before -- withdrawn.
25       Were you seeing this

**66 (Pages 258 - 261)**

MARJORIE PHILLIPS

1
2  rheumatologist prior to 2018?
3     A.   Yes.
4     Q.   Who is the rheumatologist?
5     A.   Dr. Tassiulas at Mount Sinai
6  Hospital.
7     Q.   Do you remember the name of the
8  physical therapist who told you that
9  this, you know, about the physical
10 manifestations of emotional distress?
11    A.   Yeah, her name, I just remember
12 because I saw it on the documents,
13 Christine DiSimone.
14    Q.   How many times did you see Ms.
15 DiSimone?
16    A.   They write a prescription for a
17 certain amount of times, so you always
18 see her according to the prescription.
19 So I saw her for one full prescription, I
20 think it was six times.  And then I put
21 in another prescription for another six
22 visits.  And let's say about 12 times.
23 But it was based on the prescription.  I
24 couldn't go over the prescription, the
25 number of times that were outlined in the

MARJORIE PHILLIPS

1
2  prescription.  I would have to keep going
3  back.
4     Q.   Since the pandemic started,
5  have you requested a prescription for
6  physical therapy?
7     A.   No, I have not.
8     Q.   Have you tried to pursue any
9  sort of remote physical therapy exercises
10 that you can do from home, things like
11 that?
12    A.   No, I have not.
13    Q.   You mentioned trouble sleeping
14 and nightmares.  Are you seeing any
15 specialists relating to these sleep
16 issues?
17    A.   I just discussed it with my
18 therapist.
19    Q.   Dr. Barnes?
20    A.   Yes.
21    Q.   Okay.  Have you sought a
22 prescription for any sort of sleep aid?
23    A.   Yes.
24    Q.   Are you taking a sleep aid?
25    A.   Not every single day, but yes,

MARJORIE PHILLIPS

1
2  when I feel that I need it.  If I am
3  having, you know -- yes, but not every
4  single day.
5     Q.   What sleep aid do you take?
6     A.   What is it called.  It's a
7  common name.  I don't remember.  I could
8  get it and look at it.  I don't remember
9  the name.  I just say sleeping pills, but
10 I have them.
11    Q.   Do you experience any side
12 effects from those sleeping pills?
13    A.   No, no, no side effects.
14    Q.   When did you first start seeing
15 Dr. Barnes?
16    A.   I think it was in August 2019.
17    Q.   Prior to August 2019, had you
18 sought any sort of therapy?
19    A.   No.
20    Q.   Why didn't you seek therapy
21 after -- withdrawn.
22         Why didn't you see a therapist
23 until August 2019?
24    A.   Because I didn't need to.  I
25 didn't feel that I needed a therapist

MARJORIE PHILLIPS

1
2  before August of 2019.
3     Q.   So what happened in August of
4  2019 that prompted you to go see a
5  therapist?
6     A.   I had been going back and
7  forth, kind of sharing with my family,
8  with Isolina.  You know, I am a person of
9  faith.  I believe in God.  And so I had
10 been praying over the entire situation.
11 Kind of leaving everything pretty much in
12 God's hands.  Thinking that it would work
13 out best that way.  Until it got to a
14 point where people were suggesting --
15 mainly, mainly, Isolina was one of the
16 people who suggested that I see a
17 therapist because I was talking to her
18 about things.
19         There is a difference between
20 talking to your family, your sister, and
21 Isolina is not a therapist.  My sister is
22 not a therapist.  So she suggested that I
23 speak to someone who was qualified.  And
24 I took her advice.
25    Q.   How did you find Dr. Barnes?

67 (Pages 262 - 265)

MARJORIE PHILLIPS
1
2     A.   A friend of mine who is a
3  doctor suggested Dr. Barnes.
4     Q.   So I am going to flip back to
5  paragraph 31 of the complaint.  Just take
6  a moment and review that allegation.
7     A.   Yes, okay.
8     Q.   So other than seeing
9  Dr. Barnes, are you seeing anyone else
10 for post-traumatic stress disorder?
11    A.   No.
12    Q.   Okay.  Are you receiving any
13 medication for your emotional distress
14 symptoms in this litigation?
15    A.   Just sleeping pills.
16    Q.   So no antidepressant, nothing
17 of that sort?
18    A.   No.
19    Q.   And similarly, you say that you
20 suffer from anxiety.  Do you receive any
21 medication specifically for anxiety?
22    A.   No, I do not.
23    Q.   Have your emotional distress
24 symptoms prevented you from working in
25 any way?

1          MARJORIE PHILLIPS
2     Q.   Okay.  Who is your primary care
3  physician?
4     A.   My primary care physician has
5  changed since the pandemic.  But at the
6  time Dr. Sabrina Gard at Mount Sinai
7  Hospital was my primary physician.  And
8  she left.  She moved on.  So I have a
9  different primary physician who's brand
10 new now.
11    Q.   Sorry to circle back on this,
12 but are you still seeing Dr. Barnes?
13    A.   Barnes, yes.
14    Q.   Okay.  How regularly do you see
15 Dr. Barnes?
16    A.   Once a week.
17    Q.   Once a week.  And have you been
18 seeing her once a week since you first
19 started seeing her?
20    A.   Yes.
21    Q.   Okay.  Have you missed any
22 sessions?
23    A.   No.  Today.
24    Q.   Fair enough.  Okay.  So other
25 than today, you haven't missed any

1          MARJORIE PHILLIPS
2     A.   No.  Today.
3     Q.   I'm sorry, what is that?
4     A.   Today.
5     Q.   Let me ask you this, at any
6  point did your emotional distress
7  symptoms prevent you from working?
8     A.   After the incident.  After the
9  incident, when I took the leave.
10    Q.   When the leave started, why did
11 you not promptly go see a therapist?
12    A.   I was seeing a therapist by the
13 time the leave started.  I was seeing a
14 therapist.
15    Q.   Fair enough.  Fair enough.  Did
16 you lose any wages or suffer any monetary
17 loss during that leave?
18    A.   I lost some sick days, which is
19 money.
20    Q.   So the leave time was paid
21 through leave entitlements?
22    A.   Yes.
23    Q.   Okay.  So other than -- and did
24 you have a primary care physician?
25    A.   Yeah, I did.

1          MARJORIE PHILLIPS
2  sessions?
3     A.   No.
4     Q.   Okay.  Did you ever communicate
5  with anybody from FIT's employee
6  assistance program?
7     A.   No.  No.
8     Q.   Did FIT or anyone at FIT ever
9  offer to set you up with the employee
10 assistance program?
11    A.   I don't believe so.  I mean
12 maybe it was offered.  Maybe it was
13 offered.  I don't recall, because I have
14 a therapist.
15         MR. TAUSTER:  Craig, just throw
16 up FIT Exhibit 20.
17         (Exhibit 15, e-mails, was so
18 marked for identification, as of this
19 date.)
20         MR. JONES:  Introduce it or no?
21         MR. TAUSTER:  Yes, introduce it.
22         MR. JONES:  Okay.  Exhibit 15
23 has been introduced.  Here you go.
24    Q.   So Ms. Phillips, I just want to
25 refer you to, there is no easy way to

68 (Pages 266 - 269)

1          MARJORIE PHILLIPS
2  straddle the page so --
3          MR. JONES:  I can do it.
4          MR. TAUSTER:  Yeah, yeah, so
5  essentially -- scroll down to Isolina
6  Perez.  There we go.  I want her to be
7  able to read that e-mail.
8          MR. JONES:  Okay.
9          MR. TAUSTER:  Good.
10     Q.    Just take a second to review
11  that e-mail, Ms. Phillips, and let me
12  know when you're finished.
13          (Witness reviews document.)
14     A.    Okay, I read it.
15     Q.    Does this refresh your
16  recollection as to whether anyone at FIT
17  mentioned the employee assistance
18  program?
19     A.    Yes.
20     Q.    So now this e-mail, this is an
21  e-mail from Isolina Perez to your
22  personal Gmail account, correct?
23     A.    Yeah.
24     Q.    So as of the date of this
25  e-mail, May 23rd, 2019, were you seeing

1          MARJORIE PHILLIPS
2  Dr. Barnes at that time?
3     A.    No, I was not.  Well, the one
4  you were just pointing to was
5  November 1st, the last one, which
6  suggested the EAP.  And then the one
7  above it is May 23rd, which is a
8  different e-mail.
9     Q.    No, no, so just so I can see,
10  you can see at the top the 11/1/2020,
11  that's the date I think that you printed
12  this out from --
13     A.    Oh, okay.
14     Q.    -- from your e-mail.  I'm not
15  trying to trip you up or anything of that
16  sort.  But that's what I understand that
17  November 1st date to be, because it's
18  also up at the top over here.
19     A.    Okay.
20     Q.    So -- sorry, go ahead.
21     A.    I was going to say I
22  acknowledge it, yes.
23     Q.    So between May 2019 and August
24  2019, were you receiving any treatment
25  for emotional distress?

1          MARJORIE PHILLIPS
2     A.    From May to August, no, I was
3  not.
4     Q.    Do you have a Facebook page?
5     A.    Yes, I do.
6     Q.    Okay.  Are you currently -- are
7  you friends with any FIT employees?
8     A.    No, I am not.
9     Q.    I know the feeling.  Have you
10  made any postings on Facebook about your
11  job?
12     A.    No.  I mean, in general, yes.
13  Not about the incident.  And not
14  recently.  I mean over the years, is that
15  your question?
16     Q.    Yeah, have you made any
17  postings on Facebook that would relate to
18  your allegations in this lawsuit?
19     A.    No.  No.
20     Q.    Do you have a LinkedIn account?
21     A.    No, I do not.
22     Q.    Okay.  Do you have any other
23  social media accounts?
24     A.    Yeah, I have an Instagram
25  account.

1          MARJORIE PHILLIPS
2     Q.    Do you have any posts on
3  Instagram that relate to the allegations
4  in this lawsuit?
5     A.    No.
6     Q.    What is your name on Instagram?
7     A.    Marjie, Marjie Phillips, I
8  believe.
9     Q.    Marjorie Phillips?
10     A.    Marjie.
11     Q.    Marjie, can you spell that?
12     A.    M-a-r-j-i-e.
13     Q.    And Marjie Phillips, one word?
14     A.    No, two words.
15     Q.    Is it a private account or
16  publicly accessible account?
17     A.    I don't know, I don't know
18  enough about it.  I don't know.
19     Q.    Are you active on Instagram?
20     A.    Active would be like every day,
21  every week, no.  But I am on there.
22          MR. TAUSTER:  I am just going to
23  request the production of a printout
24  of Ms. Phillips' Instagram page.
25     Q.    Ms. Phillips, and this is

69 (Pages 270 - 273)

```
1           MARJORIE PHILLIPS
2  actually evident from the exhibit we have
3  on the screen, you have a personal e-mail
4  address phillipmarj@gmail.com, correct?
5     A.   Yes.
6     Q.   Do you have any other personal
7  e-mail accounts?
8     A.   Yes.
9     Q.   What other personal e-mail
10 accounts do you have?
11    A.   Another personal e-mail
12 account.  Is that a question that I have
13 to answer?  Do I have to answer that?
14    Q.   Yes.  I am trying to flush out
15 if there are any other documents that we
16 need to request from Mr. Sells.
17    A.   Okay.  So my question is do I
18 have to answer that question and you're
19 saying I have to answer that question, I
20 have no choice?
21    Q.   Yes.
22         (Following answer
23 Confidential.)
24    A.   Yes, I do have, I do have
25 another e-mail account.  The name of it
```

```
1           MARJORIE PHILLIPS
2  is sppunlimited.
3         MR. SELLS:  And, Dawn, can you
4     just mark that answer as confidential.
5         THE REPORTER:  Sure.
6     Q.   Is that sppunlimited@gmail.com?
7     A.   Yes.
8         (End of Confidential portion.)
9         MR. TAUSTER:  And go ahead and
10    mark that part as well, so we can get
11    that cleared up.
12    Q.   I'm curious, what is the
13 purpose of that e-mail account?
14    A.   The purpose of that e-mail
15 account is because I have the right to
16 have as many e-mail accounts that I want
17 to.  That's the first reason.  I can do
18 whatever I want to do with my life.
19 That's the first reason.
20         And the second reason is
21 because FIT seized my personal e-mail
22 account shortly after this lawsuit and
23 they told me that anything that was on my
24 personal e-mail account, that they had
25 access to.  And so I was completely,
```

```
1           MARJORIE PHILLIPS
2  completely like devastated from that.  It
3  was like a total invasion of privacy.
4  And I asked a lot of questions.  Legal
5  questions about what does that mean.  And
6  so I felt like it was a complete invasion
7  of my privacy.  So I set up another
8  e-mail account because I wanted to be
9  able to communicate with my lawyer
10 without FIT looking at my e-mail.
11    Q.   What do you mean that FIT
12 seized your personal e-mail account?
13    A.   I was told that FIT had access
14 to my personal e-mail account.  And
15 that's what I mean.  And they are able to
16 look at my personal e-mail account.
17 That's what they told me.
18    Q.   Who told you that FIT has
19 access to your personal e-mail account?
20    A.   Tuttle.  Tuttle.  Stephen
21 Tuttle.
22    Q.   Did he tell you this verbally
23 or in writing?
24    A.   I think it was both.  I think
25 it was both.  Because I remember
```

```
1           MARJORIE PHILLIPS
2  confirming, asking and confirming this
3  with him.  And he said that, you know,
4  something to the nature of while you're
5  at FIT -- I guess, these are Marjorie's
6  words.  I am not a technological person.
7  Something to the extent that FIT
8  employees are allowed to put their
9  personal e-mail account onto their FIT
10 accounts.  So I can go to work and have
11 Marjorie_Phillips.nyu.edu, which everyone
12 has that, but I can also have my personal
13 e-mail account, they gave us permission
14 to do that, many years ago.  They gave
15 everyone permission to do that.  I guess
16 at some jobs maybe you can't look at
17 personal e-mails.  So it was there.  And
18 so once all of this began, then I was
19 told that they can look at my e-mails if
20 they wanted to.
21         So whatever I had on that
22 e-mail, whatever was there, they could
23 see it.  They could look at it.  And it
24 just felt like an invasion of privacy.  I
25 asked around.  I don't know if the
```

Page 278

```
1           MARJORIE PHILLIPS
2    explanation that I was given was
3    accurate, but that's what I was told.
4        Q.   Okay.  And what you received
5    from Mr. Tuttle, was that, for lack of a
6    better term, a document preservation
7    notice?
8        A.   Yeah, that sounds, that
9    sounds -- yeah, that sounds right.
10       Q.   And to be clear, I think I know
11   what you're talking about, but I am just
12   trying to flush it out in my own head.
13          So with respect to this other
14   e-mail address that you created, have you
15   communicated about this lawsuit using
16   that e-mail address with anyone other
17   than your attorney?
18       A.   It was set up solely for my
19   attorney.
20       Q.   Okay.  Just to the extent that
21   you happen to have accidentally sent an
22   e-mail from that account to someone else
23   that would be relevant to this
24   litigation, we would be calling for
25   production of, you know, any such
```

Page 279

```
1           MARJORIE PHILLIPS
2    non-privileged e-mails from this e-mail
3    account.
4           MR. TAUSTER:  Okay.  So we're at
5       5:27.  I don't think I will have much,
6       you know, if I have to go for a little
7       bit first thing tomorrow morning, that
8       will be about it, but other than that,
9       I am pretty much wrapped up here, so
10      if we want to break now and go back at
11      10 tomorrow, we can go from there.
12          MR. SELLS:  That's fine.  Can
13      you just do me a favor and e-mail me
14      all of the exhibits that were used
15      today?
16          (Off the record.)
17          (Time noted:  5:39 p.m.)
18
19
20
21
22
23
24
25
```

Page 280

```
1
2           ACKNOWLEDGMENT OF DEPONENT
3
4           I have read the foregoing transcript
5    of my deposition and except for any
6    corrections or changes noted on the errata
7    sheet, I hereby subscribe to the transcript
8    as an accurate record of the statements made
9    by me.
10      _____
                 MARJORIE PHILLIPS
11
12   SUBSCRIBED AND SWORN before
13   and to me this ____ day of _____,
14   2021.
15      _____
16               NOTARY PUBLIC
17
18   My Commission Expires:
19
20
21
22
23
24
25
```

Page 281

```
1
2           CERTIFICATION
3
4           I, DAWN MATERA, a Notary Public for
5    and within the State of New York, do hereby
6    certify:
7           That the witness whose testimony as
8    herein set forth, was duly sworn by me; and
9    that the within transcript is a true record of
10   the testimony given by said witness.
11          I further certify that I am not
12   related to any of the parties to this action
13   by blood or marriage, and that I am in no way
14   interested in the outcome of this matter.
15          IN WITNESS WHEREOF, I have hereunto
16   set my hand this 13th day of September, 2021.
17
18
19          Dawn Matera
20      _____
                 DAWN MATERA
21
22
23
24
25
```

71 (Pages 278 - 281)

Page 282

```
1
2                I N D E X
3   Witness                    Page
4   MARJORIE PHILLIPS               5
5
6          E X H I B I T S
7   No.                         Page
8   Exhibit 1 Complaint          22
9   Exhibit 2 Interrogatory responses  46
10  Exhibit 3 Resumé             55
11  Exhibit 4 Application for employment  58
12  Exhibit 5 Nondiscrimination and   68
              Anti-Harassment Policy
13
14  Exhibit 6 Timeline of complaint to   86
              Affirmative Action
15  Exhibit 7 Phillips job description   120
              emails with HR 2017
16
17  Exhibit 8 e-mail from Marjorie    150
              Phillips to Kristina
              Johnson
18
19  Exhibit 9 Response from SUNY     150
20  Exhibit 10 Investigation report     183
21  Exhibit 11 Charge of discrimination   207
               filed with EEOC
22  Exhibit 12 e-mail chain, first e-mail  233
               from Cynthia Glass
23
24  Exhibit 13 Letter              248
25  Exhibit 14 Initial Disclosures      254
    Exhibit 15 e-mails             269
```

Page 284

```
1
2           ERRATA SHEET
            VERITEXT
3
4   CASE NAME: Marjorie Phillips v Fashion
              Institute of Technology
5   DATE OF DEPOSITION: September 9, 2021
    WITNESS'S NAME: MARJORIE PHILLIPS
6
7   PAGE/LINE(s)/   CHANGE      REASON
        /        /
8       /        /
9       /        /
10      /        /
11      /        /
12      /        /
13      /        /
14      /        /
15      /        /
16      /        /
17      /        /
18      /        /
19      /        /
20
           MARJORIE PHILLIPS
21
    Subscribed and Sworn To
22  Before Me This_____ Day
    of_____, 2021.
23
24    Notary Public
25  My Commission Expires_____
```

Page 283

```
1
2
    Transcript Marked:
3
    Pg: 248 and 252
4
5   Confidential Answer:
    274, Line 22 to 275 Line 8
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```