# EXHIBIT L

Page 285

```
 1

 2   IN THE UNITED STATES DISTRICT COURT

 3   FOR THE SOUTHERN DISTRICT OF NEW YORK

 4   Civil Action: 1:20-cv-00221

 5    - - - - - - - - - - - - - - - - - - -x

 6   MARJORIE PHILLIPS,

 7                      Plaintiff,

 8          -against-

 9   THE FASHION INSTITUTE OF TECHNOLOGY, MARY
     DAVIS and MARILYN BARTON,

10
                      Defendants.
11

      - - - - - - - - - - - - - - - - - - -x

12

13

                     September 10, 2021
14                   10:02 a.m.

15

16            - Volume II -

17

18      ZOOM DEPOSITION of MARJORIE PHILLIPS,

19   the Plaintiff in the above-entitled

20   action, located in New York, New York,

21   taken before Dawn Matera, a Shorthand

22   Reporter and Notary Public of the State

23   of New York.

24

25            *     *     *
```

Page 286

```
 1
 2 APPEARANCES:
 3
     THE COCHRAN FIRM
 4      Attorneys for Plaintiff
        55 Broadway, 23rd Floor
 5      New York, New York 10006
 6 BY: DEREK SELLS, ESQ.
 7 BY: MINA MALIK, ESQ.
 8
 9 NIXON PEABODY LLP
        Attorneys for Defendant FIT
10      50 Jericho Quadrangle
        Suite 300
11      Jericho, New York 11753-2728
12 BY: DAVID A. TAUSTER, ESQ.
        dtauster@nixonpeabody.com
13
     BY: ROSE A. NANKERVIS, ESQ.
14      rnankervis@nixonpeabody.com
15
     SARETSKY KATZ & DRANOFF LLP
16   Attorneys for Mary Davis
        475 Park Avenue South
17      26th Floor
        New York New York 10016
18
     BY: ERIC DRANOFF, ESQ.
19      edranoff@skdllp.com
20
21
22
23
24
25
```

Page 287

```
 1
 2 APPEARANCES(Continued):
 3
     MENKEN SIMPSON & ROZGER LLP
 4      Attorneys for Marilyn Barton
        80 Pine Street
 5      33rd Floor
        New York, New York 10005
 6
     BY: BRUCE MENKEN, ESQ.
 7      bmenken@nyemployeelaw.com
 8
 9
   Also Present:
10
   Craig Jones, Concierge
11
12
13
14
15
16        *   *   *
17
18
19
20
21
22
23
24
25
```

Page 288

```
 1       MARJORIE PHILLIPS
 2 M A R J O R I E   P H I L L I P S, the
 3 Plaintiff herein, having previously been
 4 duly sworn by the Notary Public, was
 5 examined and testified as follows:
 6 CONTINUED EXAMINATION
 7 BY MR. TAUSTER:
 8    Q.   Ms. Phillips, since we
 9 concluded yesterday, have you reviewed
10 any documents?
11    A.   No.  I didn't have the energy,
12 no.
13    Q.   Do you have any documents in
14 front of you right now?
15    A.   I do not.
16    Q.   Other than the Zoom window, do
17 you have any windows open on your
18 desktop?
19    A.   I do not.
20    Q.   Is there anybody else in the
21 room with you?
22    A.   No.
23    Q.   Is there anybody else in your
24 apartment today?
25    A.   No.
```

Page 289

```
 1       MARJORIE PHILLIPS
 2       MR. TAUSTER:  At this stage,
 3 subject to any need for cross or
 4 anything of that sort, I am going
 5 to -- FIT has no further questions at
 6 this time.
 7       THE WITNESS:  I am going to turn
 8 off my cell phone.
 9       MR. TAUSTER:  Yes.
10       THE WITNESS:  Done.
11 EXAMINATION BY MR. DRANOFF:
12    Q.   Good morning, Ms. Davis, my
13 name is Eric Dranoff.  I am representing
14 Mary Davis.  Feel free to call me Eric.
15 I am feeling very casual today, as you
16 can see.
17       I am not going to remind you of
18 the instructions that Mr. Tauster gave
19 yesterday morning.  We'll just proceed so
20 we can move things along, okay?
21    A.   You called me Ms. Davis.  My
22 name is Marjorie Phillips.
23    Q.   I said I represented Ms. Davis.
24 I apologize.
25    A.   It's okay.  That's all right.
```

2 (Pages 286 - 289)

1       MARJORIE PHILLIPS
2    Q.   Yesterday you were talking
3 about a little bit about physical therapy
4 that you went through.  And if I am
5 correct you said you stopped physical
6 therapy because of the onset of COVID; is
7 that correct?
8    A.   Yes.
9    Q.   Have you seen your physical
10 therapist records?
11    A.   No, I have not.
12    Q.   Just for the sake of perhaps
13 jolting your memory a little bit.  Is it
14 true that you last were at a physical
15 therapist in November of 2019?
16    A.   Could be.
17    Q.   So it may not have been stopped
18 because of COVID; is that accurate?
19    A.   It could be, yeah.
20    Q.   Now, the other thing I ask is
21 whether or not you had missed any
22 physical therapy sessions that caused the
23 therapist to terminate your treatment, do
24 you have any knowledge of that?
25    A.   No, I do not.  I did miss some

1       MARJORIE PHILLIPS
2 sessions, yes, that I know for sure.
3    Q.   Do you recall that you missed
4 three consecutive sessions?
5    A.   Possibly, yes.
6    Q.   Okay.  And as a result of
7 missing those three consecutive sessions,
8 the therapist terminated treatment?
9    A.   That I wasn't aware of, no,
10 because I did go back.
11    Q.   And do you recall any diagnosis
12 that the therapist gave for your
13 condition?
14    A.   No, I do not.
15    Q.   Okay.  Would it refresh your
16 recollection if you were diagnosed with
17 hamstring tendonitis?
18    A.   Yes.
19    Q.   So you were diagnosed with
20 hamstring tendonitis, correct?
21    A.   Yes, that sounds right.
22    Q.   Did any medical practitioner at
23 all attribute your hamstring tendonitis
24 to any of the issues or complaints you
25 had concerning your experience at FIT?

1       MARJORIE PHILLIPS
2    A.   No.
3    Q.   Okay.  And in your history with
4 the physical therapist, you informed the
5 therapist that you've had a history of a
6 left leg injury; is that correct?
7    A.   Not a history, that was the
8 reason why I was there.  It wasn't a
9 history.
10    Q.   So you --
11    A.   The reason I went there was
12 because of that.  It wasn't a history.
13    Q.   Okay.  So you had an injury to
14 your leg?
15    A.   It wasn't an injury.  It just
16 came about.  Like no injury.  It just
17 came about.
18    Q.   The apartment that you live in,
19 was that a walk-up apartment?
20    A.   No, it's --
21    Q.   It's elevator?
22    A.   Yes.
23    Q.   Okay.  Are you still suffering
24 any symptoms from your leg issue to this
25 day?

1       MARJORIE PHILLIPS
2    A.   I am not, no.
3    Q.   Now, I want to talk about the
4 upgrade a little bit that we were
5 referring to.  Was that to be a new
6 position created for you?
7    A.   Yes.
8    Q.   Do you have any understanding,
9 as far as the collective bargaining
10 agreement is concerned, whether or not
11 there are any procedures that have to be
12 followed before a new position may be
13 created?
14    A.   Generally, generally, yes.
15    Q.   You have a general knowledge
16 of, correct?
17    A.   General.
18    Q.   Okay.  Can you tell me what
19 your general knowledge is, please?
20    A.   My general knowledge is that an
21 upgrade -- one can only receive an
22 upgrade when you're doing more than
23 you've been doing.  That there is an
24 agreement between the supervisor and
25 the -- it could be the more the

3 (Pages 290 - 293)

MARJORIE PHILLIPS
2 supervisor wants to give you.  You have
3 been doing more and it's being
4 acknowledged.
5        So when a supervisor has
6 agreed, you can go to the supervisor, the
7 supervisor can come to you, whoever, and
8 that the upgrade is done, as I mentioned
9 yesterday or can be done solely by the
10 superstructure.
11       As I mentioned yesterday, the
12 last time I got one, was a discussion
13 between supervisor and myself.  One or
14 two discussions.  He went, he made it
15 happen, came back to me.  One time he
16 talked about the title.  The new title.
17 And we agreed upon a title.  He made it
18 happen.  So once we agreed, he made it
19 happen.
20    Q.   Okay.  Now, you said that there
21 are times when the superstructures can,
22 on their own, do an upgrade and that
23 would include, to your understanding,
24 that a supervisor can unilaterally, with
25 you, increase your salary?

MARJORIE PHILLIPS
2    A.   Correct, right.
3    Q.   Are there situations that
4 you're aware of where a supervisor
5 cannot, by themselves, make the
6 determination to do an upgrade?
7    A.   No.  The whole point of an
8 upgrade in normal everyday terms is you
9 ask for a promotion, you ask for a raise.
10 Anyone, anywhere.  You ask for a
11 promotion.  You ask for a raise.
12 Supervisor either says yes or no and
13 gives you reasons.  But if they agree
14 that it's going to be done, then the
15 supervisor makes it happen.
16       Now, at FIT there is more
17 involved, there is paperwork involved.
18 But if the supervisor doesn't want for it
19 to happen, it doesn't go any further, the
20 discussion doesn't go any further.
21       So I am not aware of the
22 supervisor wanting to give an upgrade and
23 it not happening.  I am not aware of
24 that.
25    Q.   But one thing I am a little

MARJORIE PHILLIPS
2 unclear about is you're saying that if
3 the supervisor doesn't want it to happen
4 it goes no further.  But if a supervisor
5 does want it to happen, I am asking if
6 there are procedures that you are aware
7 of under the collective bargaining
8 agreement or any policy or agreement,
9 that had to be followed before those
10 upgrades can actually come into effect?
11    A.   Yes.
12    Q.   Do you have any awareness of,
13 if we assume a supervisor wanted an
14 upgrade to occur, what those procedures
15 would be?
16    A.   I cannot state that
17 definitively, no.
18    Q.   Okay.  And in your prior
19 answer, you referred to there being some
20 paperwork that has to be done.  Can you
21 describe for me a little bit what that
22 paperwork is and what the processes are
23 for that paperwork?
24    A.   Honestly, I cannot, because
25 it's been so long since I've been in the

MARJORIE PHILLIPS
2 School of Graduate Studies working under
3 Mary Davis, that there has been no
4 promotion, no upgrade, no anything.  It's
5 just been such a long time that I cannot
6 describe it to you, no.
7    Q.   You're still in the School of
8 Graduate Studies, correct?
9    A.   Correct.
10    Q.   Working, okay.  Am I to
11 understand then that there are different
12 procedures for upgrades, depending on
13 where in the School of Graduate Studies
14 you were actually working?
15    A.   Not to my knowledge.  But
16 that's possible.
17    Q.   Okay.  Have you at any time
18 reviewed the collective bargaining
19 agreement with respect to upgrades,
20 reclassifications, new jobs, any of that
21 subject matter?
22    A.   Not recently.  Not in a long
23 time.
24    Q.   When was the last time you
25 think you might have reviewed the CBA for

4 (Pages 294 - 297)

Page 298

```
 1        MARJORIE PHILLIPS
 2  any reason?
 3     A.   For any reason, about a
 4  year-and-a-half ago.  Less than two years
 5  ago.
 6     Q.   Okay.  And what was the reason
 7  for you reviewing the CBA, meaning
 8  collective bargaining of course?
 9     A.   The reason I looked at was
10  because I wanted to take -- I was advised
11  that I should take a leave and I wanted
12  to know, both my attorney and I, wanted
13  to know what was in the collective
14  bargaining agreement with regard to
15  medical leave or leave in general.
16     Q.   And when you say your attorney,
17  are you talking about Ms. Charles?
18     A.   Yes.
19     Q.   So with respect to the
20  collective bargaining agreement, I am
21  going to ask you if you are familiar with
22  the concept of posting of positions; have
23  you ever heard that concept?
24     A.   Of course.
25     Q.   Can you explain to me what your
```

Page 299

```
 1        MARJORIE PHILLIPS
 2  understanding is of posting of a
 3  position?
 4     A.   Any time a position is vacant,
 5  in layman's terms, in the way it's
 6  handled now -- I can't say how it's
 7  handled now, but when there is a position
 8  that's vacant, the position is posted and
 9  it first goes out to the -- internally,
10  you know, to the employees of FIT.  Used
11  to be posted so that we can see it,
12  electronically posted and physically
13  posted.  Now everything is online
14  electronically.  And if you're interested
15  to a position, then you apply to HR for
16  that position.
17        Now everything, as I mentioned,
18  is electronic.  So after a certain number
19  of days or weeks, whatever their
20  guidelines are, when it's not filled
21  internally, then it goes out externally
22  to the general public.
23     Q.   And would the same be true of a
24  new position, would that have to be
25  posted, based on your understanding of
```

Page 300

```
 1        MARJORIE PHILLIPS
 2  the collective bargaining agreement?
 3     A.   I can't say for sure.
 4     Q.   Excuse me?
 5     A.   I cannot say for sure.
 6     Q.   Can you tell me what your
 7  understanding of a new position is?
 8     A.   A new position would be one
 9  that did not exist, had not existed
10  before.  That's my understanding.
11     Q.   And if I am repetitive forgive
12  me, but I just want to ask if you are
13  aware of any written procedures at FIT
14  with respect to the process of an upgrade
15  or an increase in salary?
16     A.   Can you repeat the question?
17     Q.   Sure.
18        MR. DRANOFF:  Ms. Matera, can
19  you read that question back, please.
20        (The record was read as follows:
21        "Question:  And if I am
22  repetitive forgive me, but I just want
23  to ask if you are aware of any written
24  procedures at FIT with respect to the
25  process of an upgrade or an increase
```

Page 301

```
 1        MARJORIE PHILLIPS
 2  in salary?")
 3        MR. SELLS:  Eric, just to be
 4  clear, are you asking besides what
 5  Ms. Phillips just answered regarding
 6  the collective bargaining agreement?
 7        MR. DRANOFF:  I am asking about
 8  any procedure, Derek, at all.  Are you
 9  aware of any written procedures
10  whatsoever.
11        MR. SELLS:  Written, all right.
12        MR. DRANOFF:  Concerning -- I
13  will ask you first with respect to an
14  upgrade.  Derek, I thought you were
15  going to object because I was
16  compounding my question.  So I am
17  going to ask one at a time.
18        MR. SELLS:  I just want to get
19  clarity.
20        MR. DRANOFF:  I am still 62
21  years old trying to get clarity, too,
22  on many things.
23     Q.   In any event, Ms. Phillips, as
24  far as written procedures, it could be
25  the CBA or anything that you're aware of
```

Page 302

MARJORIE PHILLIPS

1         MARJORIE PHILLIPS
2  that is in writing that would govern the
3  process of an upgrade?
4     A.   I am aware, yes, that there are
5  written procedures.  Specifically, no.
6  But I am aware, yes.
7     Q.   So as you sit here today,
8  you're unable to identify what those
9  written procedures are?
10    A.   Correct.
11    Q.   Now, let's talk about then the
12  salary increases.  Are you aware of any
13  written procedures at all within FIT, and
14  it could be the CBA or anything else,
15  that govern salary increases?
16    A.   I am aware that there are.
17  Specifically, I cannot tell you what they
18  are.  But, yes, I am aware.
19    Q.   Okay.  So again, as you sit
20  here today, you are not aware of any such
21  written documents, correct?
22    A.   I am aware, but I cannot tell
23  you what they are.
24    Q.   Okay.  So bring it full circle,
25  you are aware that there are written

Page 303

MARJORIE PHILLIPS

1         MARJORIE PHILLIPS
2  documents that embody the procedures for
3  getting an upgrade, but as you sit here
4  today you're unable to identify those
5  documents, correct?
6     A.   Yes.
7     Q.   And again, with respect to
8  salary upgrades, you're aware that there
9  are written documents that deal with the
10  issue of getting salary increases, but
11  you're unable to identify what those
12  specific written documents are as you sit
13  here today, correct?
14    A.   Yes.
15    Q.   Now, I believe yesterday
16  Mr. Tauster might have referred to the
17  nondiscrimination and antiharassment
18  policy; do you recall that?
19    A.   Yes, I do.
20    Q.   And have you recently
21  reviewed -- I will not say recently.  But
22  within the past 30 days, have you
23  reviewed the antiharassment --
24  nondiscrimination and antiharassment
25  policy?

Page 304

MARJORIE PHILLIPS

1         MARJORIE PHILLIPS
2     A.   No, I have not.
3     Q.   When is the last time, if ever,
4  that you reviewed the nondiscrimination
5  and antiharassment policy?
6     A.   I never did.  I wasn't aware
7  that it existed.
8     Q.   Okay.  So to this very day, you
9  have not ever reviewed the
10  nondiscrimination and antiharassment
11  policy?
12    A.   No.
13    Q.   Have you had any discussions
14  with anybody about the content of the
15  nondiscrimination and antiharassment
16  policy, except counsel, of course?
17    A.   I have not.
18    Q.   Are you aware of whether or not
19  the antidiscrimination and harassment
20  policy contains provisions with respect
21  to now investigations of allegations of
22  discrimination are conducted?
23    A.   Can you repeat your question?
24    Q.   Let me rephrase that.
25         Are you aware of any source

Page 305

MARJORIE PHILLIPS

1         MARJORIE PHILLIPS
2  whatsoever that the nondiscrimination and
3  antiharassment policy contains specific
4  provisions about how an allegation of
5  discrimination is investigated?
6         MR. SELLS:  That question would
7     call -- would also include attorneys.
8     So if you can --
9         MR. DRANOFF:  Except any
10    attorneys.  You can have that as an
11    ongoing given the questions that I
12    have, if attorney communications would
13    be implicated.
14    Q.   Do you have the question now,
15  Ms. Phillips?
16    A.   I believe so.  And I would say
17  loosely, yes.
18    Q.   Loosely?
19    A.   Yes.
20    Q.   What do you mean by loosely?
21    A.   What I mean is that it is
22  possible that that is something, this is
23  something that Deliwe may have talked
24  about a little bit with the Affirmative
25  Action.

6 (Pages 302 - 305)

Page 306

MARJORIE PHILLIPS
1
2   Q.   As far as nondiscrimination and
3   antiharassment policy, are you aware from
4   any source as to whether it addresses who
5   specifically at FIT can actually
6   administer and make decisions concerning
7   disciplinary actions?
8   A.   I can't say with any certainty,
9   no.
10   Q.   Do you have any understanding
11   of whether or not Mary Davis on her own
12   can administer any discipline to an
13   employee that's a member of the union?
14   A.   No, not to my knowledge.
15   Q.   So she can't, herself,
16   discipline anybody, correct?
17   MR. SELLS:  Objection.
18   Objection.  Objection.
19   MR. DRANOFF:  What's the
20   objection, Derek?  We can have a
21   conversation.
22   MR. SELLS:  Sure.  The point is
23   that Ms. Phillips already indicated
24   that she's not aware of any of the
25   policies and now you're trying to put

Page 307

MARJORIE PHILLIPS
1
2   words in her mouth suggesting that she
3   knows that Mary Davis couldn't
4   administer, that she couldn't
5   administer discipline to someone in
6   the union.  What I am suggesting to
7   you there is no foundation for that
8   question.  And you're basically asking
9   Ms. Phillips to speculate since she
10   has no such knowledge.
11   So I want -- I appreciate it.
12   That's very subtle and I probably used
13   that technique myself.  But I think
14   you're asking Ms. Phillips to
15   speculate because she already said she
16   has no foundation of knowledge to be
17   able to answer that question.
18   MR. DRANOFF:  I appreciate it,
19   Derek, but I have to confess I am
20   really not that clever.
21   I hate to do it to you,
22   Ms. Matera, but can you read back my
23   last question.  I think what Derek
24   says makes sense, but now I have to
25   see if I can connect the dots here.

Page 308

MARJORIE PHILLIPS
1
2   (The record was read as follows:
3   "Question:  So she can't,
4   herself, discipline anybody,
5   correct?")
6   MR. DRANOFF:  And the objection
7   is because she testified she has no
8   knowledge of the actual procedures?
9   MR. SELLS:  Right, so you're
10   basically trying to put that -- I am
11   not trying to -- if you didn't know
12   that's what you're doing.  All I can
13   say is even a broken clock is right
14   twice a day.
15   MR. DRANOFF:  Exactly, now I
16   have to keep my eye on you because you
17   said you do it.
18   Q.   Ms. Phillips, let me rephrase
19   the question this way then.
20   Do you have any understanding,
21   from any source, whether it's oral,
22   written, from osmosis, whatever it is, of
23   whether Ms. Davis has the power to
24   administer discipline to any employee?
25   A.   I believe that she does, yes.

Page 309

MARJORIE PHILLIPS
1
2   Q.   Now, what's your belief based
3   on?
4   A.   Because there are incidents
5   that have happened throughout my course
6   of working at the college where you would
7   be -- someone, not me, anyone could be
8   called in to have a discussion about
9   something with their supervisor.
10   Q.   So is it my understanding then
11   that if Ms. Davis or anyone has a
12   discussion with someone, you understand
13   that to be a form of discipline?
14   A.   In a way, yes, because when
15   you're being called in to discuss it, to
16   me, that's a form of discipline, yes.
17   Q.   Okay.  Would it be fair to use
18   the word "counseled" instead of
19   "disciplined," or you'll stay on the word
20   "discipline"?
21   A.   It could be.
22   Q.   Okay.  Now, let's talk about --
23   strike that.
24   A.   I am just going to turn this
25   air-conditioning off, it's cold.

7 (Pages 306 - 309)

Page 310

MARJORIE PHILLIPS

1
2    Q.   Now when we're talking about
3  the upgrade that you understood that you
4  were going to receive at the time you
5  testified that you were having
6  discussions with Ms. Davis about an
7  upgrade, do you recall exactly what your
8  gross salary was at that time?
9    A.   At that time, I could guess.  I
10 could guess.
11    Q.   Don't guess, give me your best
12 recollection.  We won't hold it to you
13 exactly.  I am just trying to get the
14 flavor for it, too?
15    A.   72,000.
16    Q.   You said 72K?
17    A.   I am just guessing, yeah.
18    Q.   So with respect to your
19 discussions about an upgrade, was there a
20 specific dollar amount that you would be
21 receiving should you receive an upgrade?
22    A.   Yes.
23    Q.   And what was that dollar
24 amount?
25    A.   When I say specific, an upgrade

Page 311

MARJORIE PHILLIPS

1
2  in salary goes along with the promotion.
3  So I can't give you an exact dollar
4  because we had not settled on what the
5  step and the schedule was going to be, so
6  I don't know what it would have been.
7    Q.   So those steps would be found
8  in the collective bargaining agreement,
9  correct?
10    A.   Yes, based on what you decide,
11 yes.
12    Q.   You just set a light bulb over
13 my head.  It's not an aura, as you can
14 see, a light bulb.  And certainly not a
15 halo, I tell you that.
16    A.   I am sure.
17    Q.   In any event, you mentioned
18 upgrade, and I am understanding, and
19 correct me if I am wrong, that upgrade
20 refers only to salary, am I correct in --
21    A.   A promotion and an increase in
22 salary.  You don't get an increase in
23 salary if you're not getting a promotion.
24    Q.   So the promotion then is the
25 new position and the upgrade is the

Page 312

MARJORIE PHILLIPS

1
2  salary that goes with the new position;
3  is that correct?
4    A.   The salary goes with the
5  promotion, yes.
6    Q.   Okay.  So you can't have the
7  upgrade without the promotion then,
8  correct?
9    A.   I can't imagine that you could.
10    Q.   All right.  So let's talk about
11 the promotion, is that something
12 different than a reclassification?
13    A.   Upgrade versus
14 reclassification.  Let me think.  Let me
15 give it some thought.
16       It's not exactly the same, no.
17    Q.   Can you explain to me how they
18 differ?
19    A.   The reclassification, my
20 understanding -- I haven't had one in
21 such a long time, it's hard to
22 remember -- but a reclass is when you
23 are, I guess maybe it could have applied
24 to me.  It could have applied to me when
25 you're duties are going to change

Page 313

MARJORIE PHILLIPS

1
2  somewhat.  Your total position is not
3  necessarily going to change, but it's
4  being reclassified because new
5  responsibilities are being introduced
6  into your position.  So it's being
7  reclassified.
8    Q.   Okay.  And that's to be
9  distinguished from a promotion how?
10    A.   Because an upgrade could be a
11 new position altogether.
12    Q.   I am not talking upgrade.
13 Because I thought we were saying that the
14 upgrade comes with the promotion, right?
15 So the reclassification is there were
16 additional job duties, but not
17 necessarily a new position; is that
18 correct?
19    A.   Yes.
20    Q.   And a promotion is a whole
21 different job altogether; is that
22 correct?
23    A.   No.
24    Q.   How am I wrong?  I need help
25 here.

8 (Pages 310 - 313)

Page 314

MARJORIE PHILLIPS

1    A.    Promotion is not necessarily a
2 brand new job altogether.
3    Q.    So --
4    A.    It includes new
5 responsibilities.
6    Q.    The promotion includes new
7 responsibilities?
8    A.    It can include new
9 responsibilities.
10    Q.    And then is a reclassification
11 essentially a reconstruction of a job
12 description to better match the actual
13 responsibilities that are being done by
14 an employee?  Nothing new, stuff you are
15 already doing, but they are rewriting
16 your job description to make them all
17 harmonize with one another?
18    A.    Yes, but also in addition --
19 yes, but in addition to what you just
20 said, for example, I had -- yes, the
21 answer is yes.  But if you are taking on
22 new responsibilities without any
23 discussion about end to money, reclass,
24 upgrade, you're just taking on new

Page 315

MARJORIE PHILLIPS

1 responsibilities.  And not necessarily --
2 just because you want to do more.  And it
3 could be the reason that you're able to
4 sit at a table and have that discussion
5 about an upgrade from either the
6 supervisor or for yourself because you're
7 taking on these new responsibilities.
8       In addition to that, you could
9 be open to taking on even more
10 responsibilities.  And that was the
11 position that I was in, Marjorie Phillips
12 was in.  And that is the position that
13 brought me to having these discussions.
14    Q.    Okay.  So with respect to your
15 particular situation, were you getting a
16 reclassification or a promotion?
17    A.    We don't use the word
18 "promotion" at FIT.  We use the word
19 "upgrade."  We don't use the word
20 "promotion."  The terminology at FIT is
21 upgrades and reclassification.  It does
22 mean a promotion, but that's not the
23 terminology that FIT uses.
24    Q.    All right.  So I am going to

Page 316

MARJORIE PHILLIPS

1 also need some help from you with, I
2 think it's a union lingo.  But if someone
3 is in a certain job description and it
4 says, you know, "I am going to work on
5 Excel" and that's in the description, and
6 all of the things that you're supposed to
7 do in a particular job, whatever that job
8 is.  If the position evolves where you're
9 doing a lot of stuff that's not in the
10 description, is there a union phrase
11 associated with that, like working out of
12 turn or something of that nature?
13       Have you ever heard a phrase
14 that's used to describe when people are
15 doing things outside of their job
16 description?
17    A.    I can't speak to that, no.
18    Q.    So I am going to ask you then
19 to describe, if you could, any phrase you
20 would use for the situation where someone
21 is actually performing a lot of work or
22 any work that's not in their job
23 description.  Is there a phrase that you
24 use for that?

Page 317

MARJORIE PHILLIPS

1    A.    A good employee.
2    Q.    Okay.  Touche, Ms. Phillips.
3       Moving on, yesterday you were
4 talking about Ms. Davis.  And correct me
5 if I am wrong, I am not trying to put
6 words in your mouth, but what I came away
7 with is you said that none of this would
8 have happened and the suit may not have
9 even happened if it weren't for
10 Ms. Davis.  Am I correct in kind of
11 summarizing what you said about that?
12       MR. SELLS:  I am going to object
13    to that.  Eric, I think we should let
14    the transcript speak for itself and
15    not, not sort of use your recollection
16    or rephrasing as a question.  I think
17    it's better to just ask a question
18    without reference to what she
19    testified to yesterday.
20       MR. DRANOFF:  Well taken, Derek.
21    Q.    So Ms. Phillips, is it your
22 position that what occurred, and that
23 could be dealing with Marilyn Barton, you
24 commencing this lawsuit, was all because

9 (Pages 314 - 317)

Page 318

```
1         MARJORIE PHILLIPS
2 of things Mary Davis did not do?
3    A.   No.
4    Q.   Is it your position at all that
5 Mary Davis did not follow certain FIT
6 policies or procedures?
7    A.   Yes.
8    Q.   Can you describe what policies
9 you believe Ms. Davis did not follow?
10   A.   Well, for example, my
11 understanding, when I went to Mary to
12 discuss, you know, some of the complaints
13 that I had with some of the other
14 coworkers, my understanding with regard
15 to discrimination, retaliation, that it
16 would have been her responsibility to
17 take these matters, I would talk to her
18 about what I felt, what I was
19 experiencing, and have my official
20 complaint presented to her.  And then she
21 would go to HR and take over from there.
22 And she didn't do that.
23   Q.   Okay.  Where is your
24 understanding coming from?
25   A.   My understanding, I have an
```

Page 319

```
1         MARJORIE PHILLIPS
2 understanding that the supervisor is the
3 one who goes to HR and you speak to the
4 supervisor and then the supervisor speaks
5 to HR.
6    Q.   At any time, up to this day --
7 no, forget up to this day.  We'll talk
8 with up to today.  Up to today, have you
9 ever looked at the nondiscrimination and
10 antiharassment policy to confirm or not
11 your belief as to what the procedure
12 should have been?
13   A.   No, I answered that --
14       MR. SELLS:  Eric, we're not
15 talking about yesterday and Exhibit 5?
16       MR. DRANOFF:  I don't know what
17 Exhibit 5 is, Derek.  Tell me what
18 Exhibit 5 is.
19       MR. SELLS:  So Exhibit 5 is the
20 nondiscrimination and antiharassment
21 policy that Ms. Phillips saw during
22 her testimony.  And specifically
23 references that an employee at FIT can
24 complain to their manager and an
25 investigation is supposed to be
```

Page 320

```
1         MARJORIE PHILLIPS
2 conducted.  So other than that.
3       MR. DRANOFF:  Okay.
4    Q.   So Ms. Phillips, you just heard
5 what Mr. Sells said.
6       MR. SELLS:  Why don't we pull it
7 up.  Do you want to pull it up?
8       MR. DRANOFF:  No.
9       MR. SELLS:  We can pull it up.
10       MR. DRANOFF:  I want to get it
11 all done while I'm still young.
12       MR. SELLS:  All right.  I don't
13 want you to -- I don't want you to
14 rely on --
15       MR. DRANOFF:  I am not going to
16 misquote anything because I am not
17 interested in reading it right now.
18 And I am not going to try to trick
19 Ms. Phillips, because you will see
20 with the next question.
21   Q.   The belief that you talked
22 about is to what you think Ms. Davis
23 should have done; did there ever come a
24 time where you looked at the
25 nondiscrimination and antiharassment
```

Page 321

```
1         MARJORIE PHILLIPS
2 policy to confirm whether your belief was
3 accurate?
4    A.   No.
5       MR. DRANOFF:  Wasn't that easy,
6 Derek?
7    Q.   Now, I want to just talk about
8 Ms. Barton for a second or two or three.
9 With respect to the incident that you had
10 with Ms. Barton, do you have any
11 understanding as to whether or not
12 Ms. Davis could, herself, have
13 disciplined Ms. Barton for that incident?
14   A.   Do I have any knowledge of
15 whether she --
16   Q.   Do you have any understanding
17 of whether Ms. Davis had the power or
18 authority to discipline Ms. Barton for
19 that incident?
20   A.   No.
21   Q.   Are there any FIT policies or
22 procedures that you claim Ms. Davis did
23 not follow as far as the Barton incident
24 was concerned?
25   A.   Can you repeat your question?
```

10 (Pages 318 - 321)

Page 322

MARJORIE PHILLIPS

1  
2 Q.  Sure.
3     MR. DRANOFF:  Ms. Matera, can
4 you please read the question back.
5 (The record was read as follows:
6     "Question:  Are there any FIT
7 policies or procedures that you claim
8 Ms. Davis did not follow as far as the
9 Barton incident was concerned?")
10    MR. SELLS:  And just for
11 clarity, Eric, when you say the Barton
12 incident, obviously Ms. Phillips
13 reported multiple Barton incidents.
14 And so are you referring to the one on
15 May 16th?
16    MR. DRANOFF:  I am referring to
17 the May 16th, and to be clear, what
18 Ms. Phillips claims was an assault by
19 Ms. Barton, okay?
20    A.   Repeat your question one more
21 time, please.
22    (The record was read as follows:
23    "Question:  Are there any FIT
24 policies or procedures that you claim
25 Ms. Davis did not follow as far as the

Page 323

MARJORIE PHILLIPS

1  
2 Barton incident was concerned?")
3    A.   Possibly, yes.
4    Q.   Okay.  When you say possibly,
5 what's running through your mind about
6 what procedures, specifically, are you
7 thinking about?
8    A.   What's running through my mind
9 was what actually happened that day.
10 Marilyn Barton spoke with Mary Davis
11 before me, before Mary spoke with me.
12 Marilyn Barton was in communication with
13 Mary Davis before Mary spoke with me.
14 The conversation with Marilyn Barton came
15 before Mary sat with me.
16    Then when Mary and I spoke she
17 claimed that she knew everything that had
18 happened because she had had a discussion
19 with Marilyn.  She didn't really say a
20 whole lot in our discussion.  She really
21 didn't say a whole lot in our discussion.
22 And -- she didn't say a whole lot in our
23 discussion.
24    Q.   Okay.  So let's bring it back
25 then to policies and procedures.  I

Page 324

MARJORIE PHILLIPS

1  
2 believe that the question related to
3 whether Ms. Davis violated any policies
4 or procedures.  And you said possibly.
5 But with that, can you specifically tell
6 all of us what written policies or
7 procedures Ms. Davis did not follow with
8 respect to that May 16th, 2019 incident?
9    A.   She did not direct me -- I
10 spoke with her twice.
11    Q.   But what I am asking is if
12 you're aware of any specific policy or
13 procedure that she violated, as
14 distinguished from what you and she might
15 have talked about.
16    I am just interested in if you
17 know of any policies or procedures that
18 Ms. Davis may have violated.  I am
19 talking about FIT procedures of course.
20    A.   I am going to say no.
21    MR. DRANOFF:  All right.  You
22 all want to take a break and then
23 Bruce follow through because I think I
24 am done.
25    (Off the record.)

Page 325

MARJORIE PHILLIPS

1  
2 EXAMINATION BY MR. MENKEN:
3    Q.   Good morning, Ms. Phillips.
4    A.   Good morning.
5    Q.   My name is Bruce Menken.  I am
6 representing Marilyn Barton in a case
7 that you brought in Southern District
8 federal courthouse.  I am going to ask
9 you some questions, okay?
10    A.   Yes.
11    Q.   You understand that the oath
12 you took yesterday administered by
13 Ms. Matera is something that you need to
14 follow today as well, right?
15    A.   Yes.
16    Q.   Excellent.  FIT is located in
17 the 20s in Manhattan, right?
18    A.   Yes.
19    Q.   What's the exact address?
20    A.   227 West 27th Street or 7th
21 Avenue at 27th Street.
22    Q.   And you live currently on East
23 107th Street?
24    A.   Yes.
25    Q.   How long have you lived at East

11 (Pages 322 - 325)

Page 326

```
 1        MARJORIE PHILLIPS
 2  107th Street?
 3     A.   At least 25 years.
 4     Q.   So for the duration of your
 5  employment at FIT you lived at that
 6  location on East 107th Street?
 7     A.   Yes.
 8     Q.   And typically, how would you
 9  travel to and from work from East 107th
10  Street to FIT on 27th Street and 7th
11  Avenue?
12     A.   By subway.
13     Q.   And what subway would you take?
14     A.   Number 2.
15     Q.   And that's the express line?
16     A.   Yes.
17     Q.   And where would you get on?
18     A.   On at 110th Street and Lenox
19  Avenue.
20     Q.   So you would walk there from
21  your apartment?
22     A.   Yes.
23     Q.   And then you would walk home
24  from the subway stop at the end of the
25  day?
```

Page 327

```
 1        MARJORIE PHILLIPS
 2     A.   Yes.
 3     Q.   And where would you get off to
 4  get to FIT?
 5     A.   On 42nd Street.
 6     Q.   And would you walk down from
 7  42nd Street to 27th?
 8     A.   No, then I would switch over to
 9  the local train, the number 1.  And then
10  I get off on 28th Street.
11     Q.   And you would do the same thing
12  on the way back, as well?
13     A.   Yes.
14     Q.   Do you drive a car?
15     A.   No, I do not.
16     Q.   You don't own a car?
17     A.   No, I do not.
18     Q.   May 16, 2019, it was a
19  Thursday, correct?
20     A.   Yes.
21     Q.   And you were at work that day
22  and that was a day that you got into
23  this, or I should say Ms. Barton,
24  according to you, got in your face,
25  correct?
```

Page 328

```
 1        MARJORIE PHILLIPS
 2     A.   Yes.
 3     Q.   What time do you recall getting
 4  to work that day?
 5     A.   I don't recall.
 6     Q.   What time did you typically get
 7  to work at FIT during that time period?
 8     A.   About 9:30.
 9     Q.   And what was your -- what time
10  would you leave at the end of the day?
11     A.   That particular day or in
12  general?
13     Q.   In general?
14     A.   5:30.
15     Q.   And among you, Ms. Barton and
16  Ms. Davis, who typically worked -- who
17  got in earlier, if you could sort of
18  generally say who got in first, who got
19  in second, who got in third during 2019,
20  before the incident?
21     A.   Typically, any average day
22  Umilta is the first one to arrive.  She
23  usually gets in around 8:30.  I'm usually
24  about the second to arrive.  I get in
25  about 9:30.  Mary Davis and Marilyn --
```

Page 329

```
 1        MARJORIE PHILLIPS
 2  Mary kind of ranges around 10:00.  And
 3  Marilyn comes in at 10:00.
 4     Q.   So on May 16th, 2019, you took
 5  the number 2 to the number 1 to get to
 6  the office that day?
 7     A.   Yes.
 8     Q.   And do you recall what the
 9  weather was that day?
10     A.   No, I do not.
11     Q.   And is it your memory that you
12  arrived at about 9:30, like you just
13  testified you typically do?
14     A.   Typically, yes.
15     Q.   And how soon after you arrived
16  did Marilyn Barton arrive, if she arrived
17  after you?
18     A.   I don't remember.
19     Q.   Did you arrive before her on
20  May 16th, 2019, to work?
21     A.   I don't remember.
22     Q.   How soon after you arrived at
23  work did this student come into the
24  office to discuss the issue of the
25  convocation regalia?
```

12 (Pages 326 - 329)

1          MARJORIE PHILLIPS
2      A.   I don't remember the exact
3  time.
4      Q.   Generally how soon after you
5  arrived that day at approximately 9:30
6  did she come into the office?
7      A.   Generally, around 11, maybe.
8  Maybe 11:30.  I don't remember.  I
9  honestly don't remember.
10     Q.   And could you describe the
11 student, what she looked like?
12     A.   She was a young girl.  Actually
13 she's one of my students, fashion and
14 textile studies.  So a young white girl.
15 Sort of blondish, brownish hair.  Just
16 young.
17     Q.   Did you say a white girl or a
18 black girl, I didn't hear you?
19     A.   A white girl.
20     Q.   And is she taller than you?
21     A.   Yes.
22     Q.   When you say she was a young
23 girl, because it's a School of Graduate
24 Studies, I am assuming she was older than
25 21, correct?

1          MARJORIE PHILLIPS
2      A.   Yes.
3      Q.   Was she as old as 25 or
4  somewhere between 21 and 25?
5      A.   I don't know how old she was.
6      Q.   Fair to say she was between 21
7  and 25?
8      A.   I don't know how old she is.
9      Q.   When Ms. Barton was talking to
10 her, would you say that Ms. Barton's tone
11 was calm and measured?
12     A.   Yes.
13     Q.   And by the way, on May 16,
14 2019, how did you get home from work?
15     A.   I took the train.
16     Q.   And that means you walked up,
17 you walked to 28th Street.  You took the
18 number 1 train to 42nd Street.  And then
19 you transferred ought 42nd Street and
20 took the 2 to 110th and Lenox and walked
21 home?
22     A.   Maybe I did, maybe I didn't.  I
23 could have taken the number 1 all the way
24 home.  I could have taken the number 1 to
25 72nd Street and then switched over.  I am

1          MARJORIE PHILLIPS
2  not that predictable.
3      Q.   When you took the public
4  transportation home, on May 16th, 2019,
5  you were by yourself, correct?
6      A.   Yes.
7      Q.   And what time did you arrive
8  home at May 16th, 2019?
9      A.   Around 5:30, maybe.
10     Q.   You went to a police precinct
11 on that day or no?
12     A.   No.  Not that day.
13     Q.   The incident of May 16th, 2019,
14 as we're calling it, you reported to FIT
15 Public Safety Office, correct?
16     A.   Yes.
17     Q.   Human resources FIT, correct?
18     A.   Yes.
19     Q.   The union, correct?
20     A.   Yes.
21     Q.   Office of Affirmative Action
22 FIT, correct?
23     A.   Yes.
24     Q.   And NYPD?
25     A.   Not on -- NYPD, not on that

1          MARJORIE PHILLIPS
2  day.
3      Q.   Got you.  So you reported it to
4  FIT Public Safety, FIT HR, FIT
5  Affirmative Action, and your local union
6  on May 16th, 2019?
7      A.   Yes.
8      Q.   Where was the first complaint
9  made?
10     A.   The first complaint was, I
11 believe, it was either Affirmative Action
12 or the union.
13         MR. SELLS:  Just to be clear on
14     that question, Bruce, since you did
15     not put a time frame, are you still
16     referring to the May 16th incident?
17         MR. MENKEN:  I am.
18         MR. SELLS:  Okay.
19     Q.   So Ms. Phillips, you just
20 testified that you didn't know if it was
21 FIT Affirmative Action or the union.  How
22 did you complain to the affirmative -- to
23 FIT Affirmative Action, FIT, the union.
24     A.   The e-mail.
25     Q.   And did you send those e-mails

Page 334

MARJORIE PHILLIPS

1      MARJORIE PHILLIPS
2  from your office at FIT?
3      A.   Yes.
4      Q.   And that office was located
5  where?
6      A.   The E building, Goodman
7  building E, room E315.
8      Q.   And as of May 16th, 2019, where
9  was Marilyn Barton's office?
10     A.   We were in the same office.
11     Q.   She was in E315 as well?
12     A.   Yes.
13     Q.   So who was in E315 --
14  withdrawn.
15        Who was assigned and regularly
16  going to E315, other than you and
17  Ms. Barton, on May 16th, 2019?
18     A.   Mary Davis and Umilta Allsop.
19     Q.   So it was the four of you?
20     A.   Yes.
21     Q.   Do you know what race or color
22  Umilta identifies as?
23     A.   African American.
24     Q.   What office did Anton Baptiste
25  work out of as of May 16th, 2019?

Page 335

1      MARJORIE PHILLIPS
2      A.   I don't know the room number,
3  but he was about two doors down from us.
4      Q.   And was it the practice at the
5  time for E315 to have the doors open?
6      A.   No.
7      Q.   And did Mr. Baptiste -- does
8  Mr. Baptiste identify as African American
9  as well?
10     A.   Yes.
11     Q.   And you had a colleague in SGS
12  named Henry Wallace, correct?
13     A.   Yes.
14     Q.   What was his job title?
15     A.   He was a technician for fashion
16  design.
17     Q.   And where was his office as of
18  May 16th, 2019?
19     A.   In 236 West 27th Street, I
20  believe.  I think he was working for us
21  at that time.  I honestly don't remember
22  if he was working for us at that time,
23  because he used to come to our office
24  before he started working for the School
25  of Graduate Studies.

Page 336

MARJORIE PHILLIPS

1      MARJORIE PHILLIPS
2      Q.   When you say he used to come to
3  your office, what do you mean by that?
4      A.   He's Anton's friend, so he
5  would visit Anton often.
6      Q.   I understand.  And how old is
7  Anton Baptiste about?
8      A.   About, I am guessing, 38.
9      Q.   And how about Henry Wallace,
10  how old was he, about?
11     A.   Maybe about the same age.  I
12  don't know.  I am just guessing.  I don't
13  know.
14     Q.   And do you know what race or
15  color Henry Wallace identifies as?
16     A.   I do not know.  I do not know.
17     Q.   Okay.  From his physical
18  appearance, how would you describe it?
19     A.   From his physical appearance,
20  he looks African American.
21     Q.   So would you say that the first
22  time that you saw Ms. Barton on May 16th,
23  2019, was it about 10:00 in the morning
24  or some time later?
25     A.   I don't know.  I don't remember

Page 337

1      MARJORIE PHILLIPS
2  the time.
3      Q.   How much time after Ms. Barton
4  arrived on May 16th, 2019 at work elapsed
5  before she got in your face?
6      A.   I don't remember.  I don't
7  recall.
8      Q.   Do you remember the first time
9  that you met Marilyn Barton?
10     A.   The first time?  I don't
11  remember the first time.  No.
12     Q.   You have been at FIT for
13  approximately 20 years?
14     A.   Probably closer to 25.
15     Q.   And Ms. Barton has got a little
16  bit more seniority than you at FIT,
17  correct?
18     A.   Yes.
19     Q.   Have you ever socialized with
20  her, just the two of you?
21     A.   No, I have not.
22     Q.   Have you ever gone to a social
23  event outside of FIT with her and others?
24     A.   Yes, I have.
25     Q.   And on how many occasions?

14 (Pages 334 - 337)

Page 338

MARJORIE PHILLIPS

1
2    A.   A couple.  Two, three.  Maybe
3  four occasions.
4    Q.   And can you describe the
5  occasions?
6    A.   Christmas parties.  Office
7  events that were outside of the college.
8    Q.   And would they be at
9  restaurants or --
10   A.   Yes, at restaurants.
11   Q.   And did you consume alcohol on
12 those occasions?
13   A.   I am certain, yes.
14   Q.   And did Ms. Barton consume
15 alcohol at those occasions?
16   A.   Yes.
17   Q.   And at those occasions, there
18 were both white people and African
19 American people, fair to say?
20   A.   Yes.
21   Q.   Ms. Phillips, other than
22 Ms. Barton's behavior on May 16, 2019,
23 when she got in your face, what, if any,
24 information do you have that would, that
25 made you feel as if Ms. Barton was going

Page 340

MARJORIE PHILLIPS

1
2  obscene language, correct?
3    A.   Correct.
4    Q.   Have you had any remote or
5  virtual contact with Ms. Barton since May
6  16th, 2019?
7    A.   Yes.
8    Q.   Under what circumstances?
9    A.   Staff meetings with everyone
10 else, we are just part of a group.
11   Q.   And Dr. Vaughns, he's African
12 American, correct?
13   A.   Yes.
14   Q.   And when he met with you, did
15 he, at any of those sessions, also meet
16 with Marilyn Barton?
17   A.   Yes.
18   Q.   But I guess I just want to be
19 clear, did you and Ms. Barton meet
20 together with Dr. Vaughns?
21   A.   No.
22   Q.   Did FIT ever communicate an
23 interest to you that the two of you meet
24 together with Dr. Vaughns?
25   A.   Yes.

Page 339

MARJORIE PHILLIPS

1
2  to kill you on May 16th, 2019?
3    A.   Prior to May 16th, I had no
4  information that she was going to do
5  that.
6    Q.   And since May 16th, 2019, how
7  many times have you seen Ms. Barton in
8  person?
9    A.   Since then, I don't know for
10 sure is the answer.  I don't know for
11 sure.
12   Q.   Less than 10 times?
13   A.   Yes.
14   Q.   And during those less than 10
15 times, I assume they were at work at FIT?
16   A.   Yes.
17   Q.   And at no time during those
18 less than 10 times on May 16th, 2019, has
19 Ms. Barton physically threatened you,
20 correct?
21   A.   Correct.
22   Q.   And she hasn't raised her voice
23 at you, correct?
24   A.   Correct.
25   Q.   And she hasn't used vulgar or

Page 341

MARJORIE PHILLIPS

1
2    Q.   And as a result, did you end up
3  doing that or no?
4    A.   No, did not.
5    Q.   And that's because you decided
6  that you didn't want to be in the same
7  room as Ms. Barton?
8    A.   Yes.
9    Q.   Because you were afraid of your
10 safety?
11   A.   Yes.
12   Q.   And you were afraid that
13 Ms. Barton would kill you?
14   A.   Yes.
15   Q.   Now, you mentioned yesterday a
16 woman named Arlene Spivack?
17   A.   Yes.  Spivack.
18   Q.   Is she an FIT employee?
19   A.   Yes.
20   Q.   How long has she been an FIT
21 employee for?
22   A.   I don't know.
23   Q.   What's her job title?
24   A.   She is the executive assistant
25 to the president.

15 (Pages 338 - 341)

MARJORIE PHILLIPS

1
2   Q.   And that's Ms. Brown, correct,
3 or Dr. Brown?
4   A.   Yes.
5   Q.   And she told you, according to
6 your testimony, that she was surprised
7 that Marilyn Barton did what she did on
8 May 16th, 2019, correct?
9       MR. SELLS:  Can you just clarify
10 that question?  You mentioned two
11 different --
12      MR. MENKEN:  Can you just read
13 the question back, Dawn.
14      MR. SELLS:  Well, hold on, read
15 back the last two, if you could, Dawn,
16 only because you made reference to two
17 different women and she said she, and
18 I didn't know which one you were
19 referring to.
20      MR. MENKEN:  Let's make sure the
21 record is clear, thanks, Dawn.
22      (The record was read as follows:
23      "Question: Now, you mentioned
24 yesterday a woman named Arlene
25 Spivack?

MARJORIE PHILLIPS

1
2      "Answer:  Yes.  Spivack.
3      "Question:  Is she an FIT
4 employee.
5      "Answer:  Yes.
6      "Question:  How long has she
7 been an FIT employee for?
8      "Answer:  I don't know.
9      "Question:  What's her job
10 title?
11      "Answer:  She is the executive
12 assistant to the president.
13      "Question:  And that's
14 Ms. Brown, correct, or Dr. Brown?
15      "Answer:  Yes.
16      "Question:  And she told you,
17 according to your testimony, that she
18 was surprised that Marilyn Barton did
19 what she did on May 16th, 2019,
20 correct?")
21   Q.   Can you answer the question,
22 Ms. Phillips?
23   A.   Yes.
24      MR. SELLS:  Are you referring --
25 so are you referring to Dr. Brown or

MARJORIE PHILLIPS

1
2 are you referring to --
3       MR. MENKEN:  Spivack.
4       MR. SELLS:  That was the source
5 of my objection.  The last woman's
6 name that came up was Dean Brown.  So
7 why don't you make it clear, Bruce,
8 thank you.
9   Q.   Ms. Phillips, you were
10 surprised, as well, when Ms. Barton did
11 what she did on May 16th, 2019 in the FIT
12 office, correct?
13   A.   Yes.
14   Q.   It was something completely out
15 of the blue that you had never seen
16 Ms. Barton do, correct?
17   A.   Correct.
18   Q.   Have you ever heard Ms. Barton
19 use the word "fuck" to a colleague at
20 FIT?
21   A.   Use the word, yes.  Yes.
22   Q.   But not in the aggressive way
23 that she used it with you, correct?
24   A.   No.
25   Q.   How many years, Ms. Phillips,

MARJORIE PHILLIPS

1
2 have you worked in the same E315 office
3 with Ms. Barton, up until May 16th, 2019?
4   A.   Approximately eight years.
5   Q.   And what, if anything,
6 separates her desk from your desk?
7   A.   Nothing.
8   Q.   Was there a partition or a
9 divider, anything like that?
10   A.   Yes.
11   Q.   And what is the divider made
12 of?
13   A.   Fabric.
14   Q.   And I am assuming if someone
15 would stand up, you could see over the
16 divider, correct?
17   A.   No, not necessarily.
18   Q.   Maybe I should ask you this,
19 how high is the divider between your
20 withdrawn -- withdrawn.
21      How high was the divider
22 between your desk and Ms. Barton's desk
23 on May 16th, 2019?
24   A.   The divider is not between
25 Barton and myself.

16 (Pages 342 - 345)

1          MARJORIE PHILLIPS
2     Q.    Could you describe it for the
3  record so I am clear?
4     A.    The partition is behind me and
5  I can see Marilyn, there is no partition
6  between Marilyn and I.
7     Q.    So if you're sitting at your
8  desk, Ms. Phillips --
9          MR. SELLS:  Hold on a second,
10  hold on for one second.
11          MR. MENKEN:  Derek, could you
12  hold on one second.  It would be
13  better if you just say objection to
14  form.
15          MR. SELLS:  Bruce, if that's
16  what I wanted to do, I would.  But the
17  reason I am stopping the proceedings
18  right now, Bruce, is because I noticed
19  that Mary Davis is on the line.  And I
20  see that her camera is off and I just
21  want to make sure that she's in the
22  room by herself and that there is
23  nobody --
24          MR. MENKEN:  Sure.
25          MR. SELLS:  -- involved in this

1          MARJORIE PHILLIPS
2  proceeding that shouldn't be involved.
3  So that's the reason for stopping,
4  okay.
5          MR. MENKEN:  Eric, do you want
6  to question Ms. Davis so we can get it
7  on the record?
8          MR. DRANOFF:  Tell you what, let
9  me call Ms. Davis and have a
10  conversation with her to see where she
11  is, that would be much more
12  appropriate, the call coming from me.
13  So if you want to wait for a couple of
14  minutes.
15          MR. SELLS:  Can we take another
16  10 minutes, is that all right?
17          MR. DRANOFF:  Sure.
18          (Off the record.)
19          MR. DRANOFF:  Dawn, could you
20  read back the last question, I am not
21  sure if it was answered or not.
22          (The record was read as follows:
23          "Question:  How high was the
24  divider between your desk and
25  Ms. Barton's desk on May 16th, 2019?

1          MARJORIE PHILLIPS
2          "Answer:  The divider is not
3  between Barton and myself.
4          "Question:  Could you describe
5  it for the record so I am clear?
6          "Answer:  The partition is
7  behind me.  And I can see Marilyn,
8  there is no partition between Marilyn
9  and I.
10          "Question:  So if you're sitting
11  at your desk, Ms. Phillips --")
12  CONTINUED EXAMINATION
13  BY MR. MENKEN:
14     Q.    So if you're sitting at your
15  desk, Ms. Phillips, as of May 16, 2019,
16  what part of Marilyn Barton's body could
17  you see if you are just looking straight
18  ahead?
19     A.    As of May 16th I was sitting at
20  the middle desk and the partition is in
21  front of me and there is no separation
22  between, there is nothing separating us.
23  I can see her.  She can see me.  There is
24  nothing blocking our view between each
25  other.

1          MARJORIE PHILLIPS
2     Q.    In feet, how far away were you
3  sitting from her on May 15, 2019, if
4  you're both at your desks?
5     A.    On May 15th, if we're both at
6  our desks, 10 feet.
7     Q.    And how far away is Umilta?
8     A.    From Marilyn and I?
9     Q.    Yes.
10     A.    Umilta is about four feet from
11  me, three feet from me, four feet from
12  me.  And she's about the same distance
13  from Marilyn, but there is a wall between
14  Marilyn and Umilta, so they cannot see
15  each other.
16     Q.    And how high is that wall?
17     A.    It's an eight-foot wall.  It's
18  a full --
19     Q.    Okay.  Okay.  So it's not a
20  partition, it's a wall, sorry.
21     A.    No, a wall.
22     Q.    I understand.  And where was
23  Dean Davis's work space during that time?
24     A.    To the right.  She has -- she's
25  the only one who has an office and it's

17 (Pages 346 - 349)

Page 350

MARJORIE PHILLIPS
2 to the right of Marilyn Barton's face.
3    Q.   And you and Marilyn both had
4 desktop computers as of May 16th, 2019?
5    A.   Yes.
6    Q.   And you both had FIT e-mail
7 addresses?
8    A.   Yes.
9    Q.   And you both had telephones
10 there?
11    A.   Yes.
12    Q.   Now, when you made that first
13 complaint on May 16th, 2019 to FIT
14 Affirmative Action or the union by
15 e-mail, you did that from that desk at
16 E315, correct?
17    A.   Yes.
18    Q.   And how long after Ms. Barton
19 was in your face did you make that first
20 complaint by e-mail?
21    A.   After she left the office.
22    Q.   And how much time had elapsed
23 from the time she got in your face until
24 she left the office?
25    A.   I don't know.  So you're asking

Page 351

MARJORIE PHILLIPS
2 me for the timing of the incident from
3 the time it started until the time that
4 it ended?  I do not know.
5        MR. SELLS:  Actually, Bruce, you
6    keep using the phrase "in your face."
7    What does that mean?  You heard
8    Ms. Phillips testify yesterday about
9    the event.  And you're trying to like
10   minimize it to in your face.  What
11   does it mean?  What does that mean?
12   Can you clarify?
13    Q.   Ms. Phillips, if there is a
14 question that I ask you that you don't
15 understand, please make sure to ask me to
16 rephrase it, okay?
17    A.   Yes, I will.
18    Q.   Thank you.
19        Ms. Phillips, is it fair to say
20 that the incident with Ms. Barton took
21 place in the morning of May 16th, 2019?
22    A.   Yes.
23    Q.   Is it fair to say that it took
24 place between 10:30 and 11:00 in the
25 morning?

Page 352

MARJORIE PHILLIPS
2    A.   It's fair.
3    Q.   And after you made that first
4 complaint, who did you next complain to?
5    A.   Public Safety.  Well,
6 Affirmative Action and the union, which I
7 already said.
8    Q.   Okay.
9    A.   And then Public Safety.
10    Q.   Public Safety.  And just so
11 we're clear, you're not sure if it was
12 Affirmative Action first or the union
13 first; it was one or the other, correct?
14    A.   Correct.
15    Q.   And you complained to both the
16 Affirmative Action Office at FIT and the
17 union both by e-mail, correct?
18    A.   Correct.
19    Q.   And were those -- was it in one
20 e-mail or separate e-mails?
21    A.   I think it was one e-mail.
22    Q.   And then you complained to
23 Public Safety.  And did you do that by
24 e-mail as well?
25    A.   No.

Page 353

MARJORIE PHILLIPS
2    Q.   How did you make that
3 complaint?
4    A.   I went over to Public Safety.
5 I walked over there.
6    Q.   And where is that located --
7 well, describe how you got there from
8 E315, please?
9    A.   I walked over to the next
10 building over, which is in -- you don't
11 have to go outside.  You can go from one
12 building to another, staying inside.  And
13 they are in the next building over.  They
14 are in the D building on the 4th floor.
15 So I walked.  Took the elevator upstairs.
16    Q.   And you made that trip to
17 Public Safety by yourself, correct?
18    A.   Yes, I did.
19    Q.   And how long -- well, do you
20 recall who you complained to at Public
21 Safety, if anybody?
22    A.   The name of the person, no, I
23 do not.
24    Q.   So you complained verbally to
25 an FIT Public Safety employee?

18 (Pages 350 - 353)

1        MARJORIE PHILLIPS
2    A.   Yes, I did.
3    Q.   And you explained what happened
4 to you, correct?
5    A.   Correct.
6    Q.   Did the Public Safety person
7 who listened to your complaint take what
8 you said down, either on a computer or in
9 writing?
10   A.   Yes.
11   Q.   And how long were you at Public
12 Safety for?
13   A.   15 minutes, maybe.
14   Q.   And from there, did you go back
15 to E315?
16   A.   I don't recall.
17   Q.   At some point in time that day,
18 did you go back to E315?
19   A.   Yes, I did.
20   Q.   And then what did you do when
21 you returned back to E315?
22   A.   I was in shock.  I just sat
23 there in shock.
24   Q.   And you just sat there sitting
25 in your office cubicle?

1        MARJORIE PHILLIPS
2    A.   Yes.
3    Q.   And when you were sitting there
4 in shock, do you recall what time it was?
5    A.   No, I do not.
6    Q.   Was it before lunchtime or
7 after lunchtime?
8    A.   I don't know.
9    Q.   Did you eat lunch that day?
10   A.   I did not.
11   Q.   What did you typically have
12 your lunch prior to May 16th, 2019, when
13 you were working at FIT?
14   A.   There is nothing specific that
15 I have all the time.  I can't say what I
16 have.
17   Q.   Well, more precisely, do you
18 bring your own lunch from home?
19   A.   No.
20   Q.   Do you go out for lunch?
21   A.   No.
22   Q.   Do you regularly go out for
23 lunch?
24   A.   No.
25   Q.   Before May 16th, 2019, did you

1        MARJORIE PHILLIPS
2 regularly go out for lunch when you
3 worked at FIT?
4    A.   No.
5    Q.   You ever go out to lunch with
6 Marilyn Barton?
7    A.   No.
8    Q.   How about Mary Davis?
9    A.   No.
10   Q.   After making the complaint to
11 Public Safety, you then made a complaint
12 to human resources?
13   A.   Yes.
14   Q.   I am sorry?
15   A.   I attempted to.
16   Q.   And was that also May 16th,
17 2019?
18   A.   Yes.
19   Q.   Fair to say that was the fourth
20 complaint you made that day, after
21 Affirmative Action and/or the union and
22 then Public Safety, you then
23 complained -- you then attempted to make
24 a complaint to HR?
25   A.   Yes.

1        MARJORIE PHILLIPS
2    Q.   And how did you attempt to make
3 that complaint to HR?
4    A.   I walked over to HR.
5    Q.   And can you describe the trip
6 you took from E315 to HR?
7    A.   I walked -- I was going home.
8 I left because I didn't want to be in
9 that space with her anymore, so I left
10 for the day.  And the subway is, you have
11 to pass the subway in order to get to the
12 building where HR is.  And I decided that
13 I was going to HR instead of getting on
14 the subway.
15       So I went to 28th Street and
16 Seventh Avenue and didn't get on the
17 subway, didn't go downstairs to the
18 subway.  I decided that I was going to go
19 to HR and tell them what had happened.
20 And that's what I did.
21   Q.   What time is that when you went
22 to HR to tell them what happened?
23   A.   Around 4:30, maybe.
24   Q.   Okay.  And did you speak to
25 anyone from HR?

Page 358

MARJORIE PHILLIPS

1
2    A.   I did.
3    Q.   And who did you speak to?
4    A.   I spoke to a receptionist at
5 the front desk.
6    Q.   Do you recall her name?
7    A.   I do not.
8    Q.   And was she writing or taking
9 your information down on a computer?
10    A.   No.  I went there to HR and
11 asked for Natacha, who was the generalist
12 for the School of Graduate Studies.  So I
13 asked for Natacha.  And I was asked to
14 wait.  So I sat in the lobby waiting for
15 Natacha.
16    Q.   And then what happened with HR?
17    A.   I waited and waited for
18 approximately a half an hour with the
19 receptionist going back and forth saying,
20 you know, "She'll be out, she'll be out,
21 she'll be out."  And around 5:00 -- I
22 know it was around 5:00 because the
23 reception was putting her coat on --
24 around 5:00, Natacha came out and I had
25 been sitting there for about a half an

Page 359

MARJORIE PHILLIPS

1
2 hour.  And Natacha said she couldn't talk
3 to me.  She asked me if I could call her
4 and make an appointment.  So I never
5 spoke with her.
6    Q.   And did that upset you?
7    A.   Yes, it did.
8    Q.   And after that, you went home?
9    A.   Yes.
10    Q.   Okay.  Ms. Phillips, at any
11 time after the incident on May 16th,
12 2019, until you went home after leaving
13 FIT's HR office, did you see Marilyn
14 Barton?
15    A.   That day on May 16th?
16    Q.   Yes.
17    A.   No, I did not.
18    Q.   Who, if anyone, did you see
19 during that time period after Marilyn
20 Barton left the office?
21    A.   I need clarification.
22    Q.   Sure.
23    A.   What specific time are we
24 talking about?
25    Q.   Sure.  So the incident occurs.

Page 360

MARJORIE PHILLIPS

1
2 Marilyn Barton leaves the office, right?
3    A.   Right.
4    Q.   From that time after she left
5 the office until the time you left the HR
6 office to go home, did you see Dean
7 Davis?
8    A.   Yes.
9    Q.   But you didn't see Marilyn
10 Barton, correct?
11    A.   I did see Marilyn Barton,
12 because she came back.
13    Q.   And how long after the incident
14 was it that she came back?
15    A.   A couple of hours, maybe.  I
16 thought she was gone.
17    Q.   And what, if anything, did she
18 do when she returned to E315?
19    A.   She walked right -- she came
20 back with Mary.  Mary came in and Marilyn
21 was right behind her, and they went into
22 Mary's office.
23    Q.   Did Marilyn talk to you at any
24 point at that time?
25    A.   No, she followed Mary.

Page 361

MARJORIE PHILLIPS

1
2    Q.   Did she look at you at any
3 point during that time?
4    A.   I don't recall.
5    Q.   At that time, when you saw Dean
6 Davis and Ms. Barton following Dean Davis
7 into Dean Davis's office, were you just
8 sitting at your desk?
9    A.   Yes.
10    Q.   By yourself or with other
11 people?
12    A.   Umilta was in the office.
13    Q.   And were you talking to Umilta
14 at that time?
15    A.   Not really, no.
16    Q.   And did you see -- withdrawn.
17       Ms. Phillips, from 11:00 in the
18 morning on May 16th, 2019 until 4:30 in
19 the afternoon on May 16th, 2019, did you
20 call your son Javon?
21    A.   I don't think so.  I don't
22 believe so.
23    Q.   Did you call your sister Gail
24 during that same time period?
25    A.   Gail, I don't, I don't

20 (Pages 358 - 361)

1        MARJORIE PHILLIPS
2   remember.
3      Q.   Have you ever heard Marilyn
4   Barton talk about guns or knives?
5      A.   No, I have not.
6      Q.   I am assuming you never saw her
7   with a gun or a knife, correct?
8      A.   No, I have not.
9      Q.   Have you ever seen her
10  physically punch anyone else?
11     A.   No, I have not.
12     Q.   Ms. Phillips, do you believe
13  that Anton Baptiste is a truthful person?
14     A.   I can't say with any certainty.
15     Q.   How long have you known him
16  for?
17     A.   About eight years.
18     Q.   Have you ever caught him in a
19  lie?
20     A.   I can't say.
21     Q.   How about Henry Wallace, do you
22  think he tells the truth?
23     A.   I don't know him well enough to
24  answer that question.
25     Q.   Prior to May 16th, 2019,

1        MARJORIE PHILLIPS
2   Ms. Phillips, did Ms. Barton ever accuse
3   you of bullying her?
4      A.   Not to my knowledge.
5      Q.   Did she ever accuse you of
6   talking aggressively to her?
7      A.   Maybe she did.  I don't recall.
8      Q.   Did she ever complain to you
9   that you proselytize?
10     A.   No.
11     Q.   Ms. Phillips, are you taller or
12  shorter than Ms. Barton?
13     A.   Shorter.
14     Q.   I hate to ask this question,
15  but do you think you're heavier or
16  lighter than Ms. Barton?
17     A.   Lighter.
18     Q.   You're lighter than Ms. Barton?
19     A.   Yes.
20     Q.   Okay?
21        MR. SELLS:  Bruce, can you tell
22  us how much more you think you have?
23        MR. MENKEN:  I can't say, sorry.
24        MR. SELLS:  Dawn, can you tell
25  us what the count is?

1        MARJORIE PHILLIPS
2        THE REPORTER:  6 hours and 50
3   minutes.
4        MR. SELLS:  You have 10 minutes.
5        MR. MENKEN:  Derek, we are three
6   lawyers.  Your client has brought
7   substantial allegations, and if you
8   insist on cutting us off at seven
9   hours, that's fine, I will make an
10  application to the Court.  I would
11  say --
12        MR. SELLS:  Bruce, you haven't
13  said how much more, that's why I asked
14  the question.
15        MR. MENKEN:  So Derek, don't
16  interrupt.  I respect you, please
17  respect me.  If I can finish in one
18  hour, would that be an acceptable
19  compromise?
20        MR. SELLS:  I don't know.
21        MR. MENKEN:  Do you want to
22  speak to your client about that?
23        MR. SELLS:  I am just saying,
24  Bruce, because you're asking a lot of
25  questions that have no meaning and no

1        MARJORIE PHILLIPS
2   purpose.  If you tell me what the
3   areas are, then maybe I will give it
4   to you, maybe I won't.  If you're
5   going to keep asking about what subway
6   routes she takes or if you're going to
7   go roundabout on things that have
8   absolutely nothing to do with what my
9   client has made complaints about, then
10  absolutely I am going to cut you off.
11  Where she lives and what train she
12  takes to work and whether she has a
13  car and whether she drives has nothing
14  to do with this case.  So I am not
15  going to let you keep going on for
16  ever ad nauseam, all right, Bruce,
17  that's what I am trying to say to you.
18        When I ask you how much more you
19  have and you tell me you don't have
20  any more, I'm skeptical.  Maybe you'll
21  ask her what generally is the color of
22  the sky and when you walk to work,
23  maybe are there clouds in the sky or
24  not, because it has nothing to do with
25  what we are talking about here, Bruce.

21 (Pages 362 - 365)

Page 366

1      MARJORIE PHILLIPS
2   So we'll let you go for the next 10
3   minutes and see what you ask.
4       MR. MENKEN:  I appreciate your
5   perspective, okay.  But each lawyer's
6   perspective is different on what's
7   relevant and what's not relevant.  I
8   don't appreciate being put under a gun
9   for a certain period of time.  I
10   proposed a compromise, and if you
11   don't want to agree with the
12   compromise to give me another hour,
13   then we can call the Magistrate Judge
14   Friedman now.  That's fine.  So you
15   want to do it that way or do you want
16   to give me an hour?
17       MR. SELLS:  Ask the next ten
18   minutes and I will let you know.
19       MR. MENKEN:  I don't want to be
20   scrutinized like that.  That's
21   inappropriate and it's not right.
22   Q.   Ms. Phillips --
23       THE WITNESS:  May I ask you a
24   question?  Can you read back the last
25   question?

Page 367

1      MARJORIE PHILLIPS
2       THE REPORTER:  Sure.
3       (The record was read as follows:
4   "Question:  Ms. Phillips, are
5   you taller or shorter than Ms. Barton?
6       "Answer:  Shorter.
7       "Question:  I hate to ask this
8   question, but do you think you're
9   heavier or lighter than Ms. Barton?
10       "Answer:  Lighter.")
11       THE WITNESS:  Can you read back
12   the question before that?
13       (The record was read as follows:
14   "Question:  Did she ever
15   complain to you that you proselytize?
16       "Answer:  No.")
17   A.   With regard, I would like to
18   change my answer, one of my answers.  May
19   I do that?  The question pertaining to
20   had she ever told you before May 16th
21   that you were aggressive, the answer is
22   definitively no.
23   Q.   Ms. Phillips, why are you
24   changing your answer now?
25   A.   Because I read in the many,

Page 368

1      MARJORIE PHILLIPS
2   many, many, many documents that's where I
3   saw that, in one of these documents since
4   the incident.  There has been many
5   documents that I have read.  And that's
6   where I saw that.  It didn't come from
7   her prior to the incident.  I read it in
8   the documents.
9   Q.   Ms. Phillips, are you aware
10   that Ms. Barton had fractured her wrist
11   in February of 2019?
12   A.   Vaguely.  Vaguely.
13   Q.   And she wore a cast to work,
14   correct?
15   A.   Vaguely.
16   Q.   Was she wearing a cast, a soft
17   cast on May 16th, 2019?
18   A.   I don't recall.
19   Q.   She might have, correct?
20   A.   I don't recall.
21   Q.   Let me ask you this, because I
22   want to be clear, how far away did
23   Ms. Barton get to you, in your face when
24   she was shouting the word "fuck" at you?
25   A.   Did you say how far?

Page 369

1      MARJORIE PHILLIPS
2   Q.   Yes.
3   A.   Do you mean how close she was?
4   Q.   Yes.
5   A.   Like this close (indicating.)
6   Q.   Would you say six inches?
7   A.   Yeah.
8   Q.   And when she was six inches
9   away from you, you were looking at her
10   face, correct?
11   A.   Yes.
12   Q.   So you didn't know if there was
13   something that she was holding in her
14   hands, correct?
15   A.   No.
16   Q.   She could have been holding a
17   cup of coffee, correct?
18   A.   Yes.
19   Q.   Or sugar packets, correct?
20   A.   Yes.
21   Q.   You can't say --
22   A.   I know for sure she was not
23   holding a cup of coffee.  I know that for
24   sure.
25   Q.   You were looking at her face,

22 (Pages 366 - 369)

1         MARJORIE PHILLIPS
2 correct?
3     A.   Yes.  But she came to me from a
4 distance.  So if she had coffee in her
5 hand, I would have seen that.
6     Q.   You don't know if she was
7 holding anything in her hands at the time
8 that she was six inches from your face,
9 correct?
10    A.   Correct.  Correct.
11    Q.   And you don't know if she had a
12 soft cast on one of her wrists on May
13 16th, 2019, when she was six inches away
14 from you, correct?
15    A.   Correct.
16    Q.   Did you speak to Anton Baptiste
17 at all on May 16th, 2019, after
18 Ms. Barton left the office?
19    A.   Briefly.
20    Q.   And what did you say to him?
21    A.   I told him and Umilta, they
22 were in the same office, I told them that
23 I was walking over to Public Safety to
24 complain about Marilyn, and Anton offered
25 that he saw everything that went on.  And

1         MARJORIE PHILLIPS
2 he was in shock.  And if it had been him,
3 it would have ended differently.  It
4 would have been an entirely different
5 situation if he was in my place.
6     Q.   Did you write that down
7 somewhere, what he just said, what he
8 testified to?
9     A.   No, I did not.
10    Q.   So Anton would be a witness to
11 support your allegations in this case?
12        MR. SELLS:  Objection.  It calls
13    for speculation.
14    Q.   You can still answer it,
15 Ms. Phillips.  If you can't answer it,
16 then you can't answer it.  Can you answer
17 the question, please?
18    A.   I cannot say.  I don't know
19 what he saw.
20    Q.   You were able to see
21 Ms. Phillips when Ms. Barton, six inches
22 from you, that she was foaming out of the
23 mouth, correct?
24    A.   Correct.
25    Q.   And you testified yesterday

1         MARJORIE PHILLIPS
2 that she put her hands on your chest?
3        MR. SELLS:  Objection.
4    Objection.  The record will speak for
5    itself from yesterday.
6        MR. MENKEN:  Well, Ms. Phillips,
7    I don't want to put words in your
8    mouth.
9     Q.   Did Ms. Barton, at any point in
10 time, put her hands on your chest?
11    A.   Yes.
12    Q.   And was that both hands or one
13 or the other hand?
14    A.   One.
15    Q.   And which one was that?
16    A.   It was her finger.
17    Q.   So she put her finger -- for
18 the record, you're indicating your
19 pointer finger?
20    A.   Yes, like that.
21    Q.   So she put her pointer finger
22 at your chest?
23    A.   Yes.
24    Q.   Now, when you say chest, it was
25 above your breast line, correct?

1         MARJORIE PHILLIPS
2    A.   Yes.
3    Q.   Did you suffer any physical
4 injuries as a result of that touching?
5    A.   No.
6    Q.   And for the record, you sort of
7 prodded your finger back and forth.  Is
8 it your testimony that she touched you
9 with that pointer finger on more than one
10 occasion?
11    A.   No.
12    Q.   Just once?
13    A.   Yes.
14    Q.   And Ms. Phillips, from the time
15 Ms. Barton got six inches away from your
16 face and was foaming at the mouth, and
17 used the word "fuck" to you, how much
18 time transpired from that moment until
19 she left that area and she was no longer
20 six inches away from your face?
21    A.   I don't know how much time
22 transpired.
23    Q.   Was it less than 20 seconds?
24    A.   No.
25    Q.   Was it more than five minutes?

23 (Pages 370 - 373)

Page 374

1    MARJORIE PHILLIPS
2    A.   Yes.
3    Q.   So she was six inches away from
4 you in your face for at least five
5 minutes?
6    A.   I don't know.
7    Q.   Well, can you say with any
8 certainty how much time --
9         MR. SELLS:  She's already
10 answered, Bruce.  She's already
11 answered.  She said she doesn't know.
12 So you can ask was she there a year,
13 you can say five years.  Whatever time
14 you say, she is going to say she
15 doesn't know.  So why don't we move
16 on.
17        MR. MENKEN:  Let me remind you
18 that what's good for the goose is good
19 for the gander.
20        MR. SELLS:  You don't need to
21 remind me.  You don't need to remind
22 me.  And you don't need to threaten
23 me.
24        MR. MENKEN:  You need to stop
25 talking over people.  You need to stop

Page 375

1    MARJORIE PHILLIPS
2 talking over people.  That's what you
3 need to do.
4         MR. SELLS:  I don't know what it
5 is that you had for breakfast this
6 morning, but don't ever threaten me,
7 my friend.  Don't ever threaten me.
8         MR. MENKEN:  Don't talk over me,
9 that's not right.
10        MR. SELLS:  So then don't say
11 what's good for the goose is good for
12 the gander.  I don't like being
13 threatened.
14        MR. MENKEN:  I am telling you
15 when Ms. Barton is deposed I am going
16 to interrupt just like you, because
17 that's not right.
18        MR. SELLS:  I don't care what
19 you do.
20        MR. MENKEN:  Good.
21        MR. SELLS:  But don't threaten
22 me.
23    Q.   So Ms. Phillips, it was more
24 than 20 seconds but less than five
25 minutes, is that what you said?

Page 376

1    MARJORIE PHILLIPS
2    A.   I don't know.
3         MR. SELLS:  She's already
4 answered.  She's already answered.
5         Don't answer it, Marjorie.
6    Q.   Ms. Phillips, can you testify
7 as to how long a period of time
8 Ms. Barton was six inches away from you
9 while foaming at the mouth and using the
10 "fuck" word to you?
11        MR. SELLS:  She already answered
12 it.
13        MR. MENKEN:  Can you please
14 answer that question.
15        MR. SELLS:  Dawn, can you please
16 repeat or read back the whole series
17 of questions and answers relating to
18 how much time this incident occurred.
19 Bruce, why don't you listen, Bruce.
20        MR. MENKEN:  Thanks for the
21 patronizing behavior.  Come on, will
22 you?  What is going on?
23        (The record was read as follows:
24 "Question:  And Ms. Phillips,
25 from the time Ms. Barton got six

Page 377

1    MARJORIE PHILLIPS
2 inches away from your face and was
3 foaming at the mouth, and used the
4 word "fuck" to you, how much time
5 transpired from that moment until she
6 left that area and she was no longer
7 six inches away from your face:
8    "Answer:  I don't know how much
9 time transpired.
10   "Question:  Was it less than 20
11 seconds?
12   "Answer:  No.
13   "Question:  Was it more than
14 five minutes?
15   "Answer:  Yes.
16   "Question:  So she was six
17 inches away from you in your face for
18 at least five minutes?
19   "Answer:  I don't know.
20   "Question:  Well, can you say
21 with any certainty how much time --")
22   Q.   Ms. Phillips, do you know that
23 Ms. Barton campaigned not to get
24 President Trump elected?
25   A.   No.

24 (Pages 374 - 377)

Page 378

MARJORIE PHILLIPS
1
2    Q.   Do you know that Ms. Barton has
3  attended at least one Black Lives Matter
4  public demonstrations?
5    A.   I didn't know that.
6    Q.   Did you know that?
7       MR. SELLS:  Objection.  We're
8  assuming facts not in evidence.
9       MR. MENKEN:  That's a trial
10 objection.  That's a trial objection.
11      MR. SELLS:  Why don't you
12 rephrase the question.
13      MR. MENKEN:  That's a trial
14 objection.
15      MR. SELLS:  Rephrase it.
16      MR. MENKEN:  I'm not going to
17 rephrase it because she understands
18 it.
19      MR. SELLS:  No.
20      MR. MENKEN:  Say objection to
21 form.  You protected the witness, now
22 move on.
23      MR. SELLS:  You're trying to
24 establish facts that are not in
25 evidence.

Page 379

MARJORIE PHILLIPS
1
2       MR. MENKEN:  I don't.
3       MR. SELLS:  How do we know that
4  that's true?  Did you know, did you
5  know.  Like she did it.  Like come on.
6  Let's not do that.
7       MR. MENKEN:  If you can't answer
8  the question, Ms. Phillips, feel free
9  to not answer it, okay.
10   Q.   Ms. Phillips, did you ever see
11 Ms. Barton act the way she acted with you
12 on May 16th, 2019 to anybody else?
13   A.   No, I did not.
14   Q.   Never to a white person,
15 correct?
16   A.   No, I did not.
17   Q.   And never to another black
18 person, correct?
19   A.   No, I did not.
20   Q.   So Ms. Phillips, you took a
21 vacation in the summer of 2019, correct?
22   A.   Yes.
23   Q.   And you took it from July 8 to
24 August 11; is that correct?
25   A.   I don't remember the exact

Page 380

MARJORIE PHILLIPS
1
2  dates.
3    Q.   Where did you go on vacation?
4    A.   Part of my vacation I went to
5  Georgia, which is where my family is
6  located.
7    Q.   And did you go to a family
8  reunion?
9    A.   I did.
10   Q.   And where else did you go
11 during that vacation?
12   A.   I don't believe I went anywhere
13 else.
14   Q.   Did you talk to anyone about
15 the incident on May 16th, 2019 while you
16 were on vacation?
17   A.   I don't believe so.
18   Q.   Do you believe that -- is Dean
19 Davis a racist?
20   A.   Yes.
21   Q.   Is Marilyn Barton a racist?
22   A.   Yes.
23   Q.   Is Brenda Cowan a racist?
24   A.   Yes.
25   Q.   Is Jonathan Kyle Farmer a

Page 381

MARJORIE PHILLIPS
1
2  racist?
3    A.   Yes.
4    Q.   Is Lynne Weidner a racist?
5    A.   I do not know.
6    Q.   Is Pamela Elsworth a racist?
7    A.   Yes.
8    Q.   Cynthia Glass a racist?
9    A.   I do not know.
10   Q.   Natacha Unelus, is she a
11 racist?
12   A.   I do not know.
13   Q.   And how about Deliwe Kekana, is
14 she a racist?
15   A.   I do not know.
16   Q.   Did you ever say to Ms. Barton
17 it would be nice if Jewish people would
18 donate to charities besides their own
19 causes?
20   A.   I do not recall saying that to
21 her.
22   Q.   Did you ever say anything to
23 Ms. Barton that was hostile to Jewish
24 people?
25   A.   No, not to my knowledge.

25 (Pages 378 - 381)

Page 382

```
1            MARJORIE PHILLIPS
2     Q.   Or tell Ms. Barton that you
3  dislike Iranian people?
4     A.   No.
5     Q.   Did you ever accuse Lynne
6  Weidner of racism?
7     A.   No.
8     Q.   Who is Lynne Weidner?
9     A.   If you're referring to Lynne in
10 our department, who works for
11 illustration?
12    Q.   Ms. Phillips, would you agree
13 that Ms. Barton has never taken --
14 withdrawn.
15        Did you regularly take
16 vacations, prior to 2019 and in 2019,
17 during the summer that lasted five to six
18 weeks?
19    A.   Yes.
20    Q.   And is it true that you were
21 the only SGS employee who took those
22 extended five to six-week vacations?
23    A.   No.
24    Q.   Did Ms. Barton ever take a five
25 to six-week vacation?
```

Page 383

```
1            MARJORIE PHILLIPS
2     A.   Yes.
3     Q.   When Ms. Barton was six inches
4  away from you -- withdrawn.
5        MR. MENKEN:  Could you, Craig,
6     put up number 8, please.
7        (Exhibit 16, E-mail dated
8     June 19, 2019 from Ms. Phillips to
9     Kristina Johnson, Joyce Brown,
10    Elizabeth Garvey, was so marked for
11    identification, as of this date.)
12       MR. JONES:  Loading now.  We're
13    continuing with yesterday's numbering,
14    so this will be Exhibit 16.
15       MR. MENKEN:  That's great.
16       MR. JONES:  Exhibit 16 has been
17    introduced, would you like me to pull
18    it up on the screen?
19       MR. MENKEN:  Please.  I would
20    like to ask Ms. Phillips a question or
21    two first that I just remembered.
22    Q.   Ms. Phillips, did you ever
23 scold Anton Baptiste for not dating black
24 women?
25    A.   No, I did not.
```

Page 384

```
1            MARJORIE PHILLIPS
2     Q.   Did you ever talk to anyone
3  about Anton Baptiste only dating white
4  women?
5     A.   Yes.
6     Q.   And who did you talk to about
7  that?
8     A.   Umilta and Marisa.
9     Q.   And what did you say to Umilta
10 and Marisa about that?
11    A.   Well, it wasn't one
12 conversation with the two of them.  In my
13 conversation to Umilta, we were both
14 aware that he dated several women at the
15 college who were all white.  We were both
16 aware of it.
17        And in my conversation with
18 Marisa, it was one conversation and it
19 wasn't a negative conversation.  It was
20 just information that I was talking to
21 Marisa.
22    Q.   What is it that caused you to
23 communicate that information to Marisa
24 and Umilta?
25    A.   Again, you can't group them
```

Page 385

```
1            MARJORIE PHILLIPS
2  both together because they are two
3  separate conversations.
4        So with regards to Marisa, it
5  was one conversation.  And Marisa was a
6  relatively new person, you know, a few
7  months at the job.  And Anton is a very
8  handsome young man.  And I don't believe
9  I knew if Marisa was married yet.  I
10 don't think I knew if she was married
11 yet.  And, you know, kind of like being a
12 matchmaker, in a way.  It was like a
13 matchmaker conversation.
14    Q.   Were you -- were you offended
15 that Anton Baptiste was dating a white
16 woman?
17    A.   No.
18    Q.   Ms. Phillips, I direct your
19 attention to Barton Exhibit 8, which is
20 now identified as Exhibit 16 on the
21 bottom right of the document?
22    A.   Yes.
23    Q.   Okay.  Can you confirm that
24 it's a June 19, 2019 e-mail that you sent
25 to Kristina Johnson, Joyce Brown,
```

26 (Pages 382 - 385)

Page 386

MARJORIE PHILLIPS

1
2  Elizabeth Garvey and bcc'd someone named
3  Boyer at Abyssinian Church?
4     A.   Yes.
5     Q.   Who is Boyer?
6     A.   My pastor.
7     Q.   And what's that person's first
8  name?
9     A.   Calvin Otis Butts.
10    Q.   And you referenced him in the
11 seventh paragraph of the Exhibit 16,
12 correct?
13    A.   Yes.
14    Q.   Why did you refer to him in
15 this document?
16    A.   Because he is, was the
17 president of a SUNY university as well.
18 And I have been going to this church for
19 well over 30 years.  And he's been the
20 president of that college for well over
21 20 years.  And has always spoken very
22 highly about the SUNY universities and
23 have always proudly and highly, from the
24 pulpit -- not to me, from the pulpit,
25 about the SUNY universities, and so that

Page 387

MARJORIE PHILLIPS

1
2  was -- that was my understanding of how
3  he felt about the SUNY colleges from the
4  way that he spoke about it from the
5  pulpit.
6     Q.   Did you reference him in this
7  letter to try to influence Ms. Johnson to
8  do something in response to your
9  complaint?
10    A.   No.
11    Q.   And who is Kristina Johnson?
12    A.   Kristina was the chancellor of
13 the SUNY universities, state
14 universities, state universities.
15    Q.   Do you know if she's white or
16 black?
17    A.   She's white.
18    Q.   So going to the second
19 paragraph of this letter, Ms. Phillips,
20 the last sentence, the few sentences you
21 write:  "While I was still sitting on my
22 desk she put her hands on my chest and
23 pushed me.  I stood up and tried to move
24 away from her for my safety."
25        And that's true, right?

Page 388

MARJORIE PHILLIPS

1
2     A.   Correct.
3     Q.   So while you were sitting, she
4  was able to -- well, let me clarify this.
5        Here you say she put her hands
6  on your chest, but just earlier you just
7  testified that she pointed with her
8  pointer finger in your chest?
9     A.   That's her hand, right.
10    Q.   But which is more precise?
11    A.   Her finger.
12    Q.   And it was just one finger, not
13 both of her fingers with two hands?
14    A.   It was her finger.
15    Q.   And with that finger it's your
16 testimony that she pushed you?
17    A.   Yes.
18    Q.   Now, you were sitting at the
19 desk at the time, correct?
20    A.   Yes.
21    Q.   Did you, at any point in time,
22 try to block Ms. Barton from getting in
23 your space?
24    A.   I stood up -- as soon as she
25 put her finger as to push me -- when she

Page 389

MARJORIE PHILLIPS

1
2  put her hands on me, let me put it this
3  way, when she put her hands on me and
4  pushed me, it's one thing for her to be
5  away from me.  When she put her hands on
6  me, then I stood up in self-defense.  I
7  stood up in self-defense.  I didn't know
8  what she was going to do next.  I became
9  more fearful.
10    Q.   So Ms. Phillips, you before
11 said that she pointed once into your
12 chest above your breast line and now
13 you're saying she pushed you with her
14 hands.  Could you clarify that, please?
15    A.   I didn't say that.
16        MR. SELLS:  Objection.
17 Objection, Bruce, that's not what she
18 said.
19        MR. MENKEN:  I want to clarify.
20 Can you clarify?
21        MR. SELLS:  You don't need to
22 clarify it.  Bruce, Bruce.
23        MR. MENKEN:  I need to clarify
24 it.
25        MR. SELLS:  Tell you what, Dawn,

27 (Pages 386 - 389)

Page 390

```
1        MARJORIE PHILLIPS
2    what time are we at now?
3    Q.   Ms. Phillips, can you answer
4    the question?
5        MR. SELLS:  No, don't say
6    another word, what time are we at,
7    Dawn?
8        THE REPORTER:  We are at seven
9    hours 15 minutes.
10       MR. SELLS:  We're done.
11       MR. MENKEN:  Ms. Matera, please
12   note for the record that plaintiff's
13   counsel at 12:29, just all of a sudden
14   said we're done and got off of the
15   deposition.  Okay?
16       THE REPORTER:  Yes, of course.
17       (Off the record.)
18       (Time noted:  12:29 p.m.)
19
20
21
22
23
24
25
```

Page 391

```
1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I have read the foregoing
5    transcript of my deposition and except
6    for any corrections or changes noted on
7    the errata sheet, I hereby subscribe to
8    the transcript as an accurate record of
9    the statements made by me.
10
11       _____
12            MARJORIE PHILLIPS
13
14
15   SUBSCRIBED AND SWORN before
16   and to me this _____ day of _____,
17   2021.
18       _____
19            NOTARY PUBLIC
20
21
22   My Commission Expires:
23
24
25
```

Page 392

```
1
2            CERTIFICATION
3
4    I, DAWN MATERA, a Notary Public for
5    and within the State of New York, do
6    hereby certify:
7    That the witness whose testimony as
8    herein set forth, was duly sworn by me;
9    and that the within transcript is a true
10   record of the testimony given by said
11   witness.
12   I further certify that I am not
13   related to any of the parties to this
14   action by blood or marriage, and that I
15   am in no way interested in the outcome of
16   this matter.
17   IN WITNESS WHEREOF, I have hereunto
18   set my hand this 13th day of September,
19   2021.
20
21    Dawn Matera
22   _____
             DAWN MATERA
23
24        *    *    *
25
```

Page 393

```
1            I N D E X
     Witness              Page
2
     MARJORIE PHILLIPS       288
3
4        E X H I B I T S
5                    Page
6    Exhibit 16 E-mail dated June 19, 2019  383
        from Ms. Phillips to
7        Kristina Johnson, Joyce
         Brown, Elizabeth Garvey
8
9            -O0O-
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

28 (Pages 390 - 393)

Page 394

```
1
2          ERRATA SHEET
3          VERITEXT
   CASE NAME:  Phillips v. FIT
   DATE OF DEPOSITION:  September 10, 2021
4  WITNESS'S NAME: Marjorie Phillips
5  PAGE/LINE(s)/  CHANGE      REASON
        _____/_____/_____/_____
6       _____/_____/_____/_____
        _____/_____/_____/_____
7       _____/_____/_____/_____
        _____/_____/_____/_____
8       _____/_____/_____/_____
        _____/_____/_____/_____
9       _____/_____/_____/_____
        _____/_____/_____/_____
10      _____/_____/_____/_____
        _____/_____/_____/_____
11      _____/_____/_____/_____
        _____/_____/_____/_____
12      _____/_____/_____/_____
        _____/_____/_____/_____
13      _____/_____/_____/_____
        _____/_____/_____/_____
14      _____/_____/_____/_____
        _____/_____/_____/_____
15      _____/_____/_____/_____
        _____/_____/_____/_____
16      _____/_____/_____/_____
        _____/_____/_____/_____
17      _____/_____/_____/_____
        _____/_____/_____/_____
18      _____/_____/_____/_____
        _____/_____/_____/_____
19      _____/_____/_____/_____

20          _____
            MARJORIE PHILLIPS
21  Subscribed and Sworn To
    Before Me This_____Day
22  of_____, 2021.
23  _____
        Notary Public
24
    My Commission Expires_____
25
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400