# EXHIBIT M

ORIGINAL

392

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

MARJORIE PHILLIPS,

                Plaintiff,

        - against –                    CASE NO.:
                                       1:20-cv-00221
THE FASHION INSTITUTE OF TECHNOLOGY,
MARY DAVIS AND MARILYN BARTON,

                Defendants.

-------------------------------------X

                        October 20, 2021
                        9:33 A.M.


            CONTINUED DEPOSITION OF

MARJORIE PHILLIPS, the Plaintiff herein, taken by

the attorneys for the Defendants, held via web

conference, pursuant to Court Order, and held

before Deborah Thier, a Notary Public of the State

of New York at the above-stated time and date.

                *    *    *    *

```
1                                                    393

2     A P P E A R A N C E S :

3         THE COCHRAN FIRM
                  Attorneys for the Plaintiff
4                 55 Broadway - 2nd Floor
                  New York, New York  10006
5
          BY:  DEREK SELLS, ESQ.
6                MINA MALIK, ESQ.

7
          NIXON PEABODY, LLP
8                 Attorneys for the Defendant
                  THE FASHION INSTITUTE OF TECHNOLOGY
9                 50 Jericho Quadrangle - Suite 300
                  Jericho, New York  11753-2728
10
          BY:  ROSE A. NANKERVIS, ESQ.
11

12        SARETSKY, KATZ & DRANOFF
                  Attorneys for the Defendant
13                MARY DAVIS
                  475 Park Avenue South - 26th Floor
14                New York, New York  10016

15        BY:  ERIC DRANOFF, ESQ.

16
          MENKEN SIMPSON & ROZGER, LLP
17                Attorneys for the Defendant
                  MARILYN BARTON
18                80 Pine Street - 33rd Floor
                  New York, New York  10005
19
          BY:  BRUCE MENKEN, ESQ.
20

21

22        ALSO PRESENT:

23            MARY DAVIS

24

25
```

```
 1                                              394

 2            COURT REPORTER:   It is stipulated and

 3       agreed by and between counsel for all parties

 4       present that pursuant to CPLR section 3113(d)

 5       this deposition is being conducted remotely

 6       by video conference, and that the court

 7       reporter, witness and all counsel are in

 8       separate remote locations and participating

 9       via Zoom or any web conference meeting

10       platform under the control of Bee Reporting

11       Agency, Inc.

12            It is further stipulated that this

13            video conference will not be recorded in any

14       manner and that any recording without the

15       express written consent of all parties shall

16       be considered unauthorized, in violation of

17       law and shall not be used for any purpose in

18       this litigation or otherwise.

19            Before I swear in the witness, I will

20       ask each counsel to stipulate on the record

21       that I, the court reporter, may swear in the

22       witness even though I am not physically in

23       the presence of the witness and that there is

24       no objection to that at this time, nor will

25       there be an objection at a future date.
```

```
 1                                          395
 2              MR. MENKEN:  No objection.
 3              MR. SELLS:  No objection.
 4              MR. DRANOFF:  No objection.
 5              MS. NANKERVIS:  No objection.
 6    M A R J O R I E     P H I L L I P S,
 7         The witness herein, having first been duly
 8    sworn by Deborah Thier, a Notary Public in and
 9    for the State of New York, was examined and
10    testified as follows:
11              COURT REPORTER:  Please state your name
12         for the record.
13              THE WITNESS:  Marjorie Phillips.
14              MR. MENKEN:  The deposition is being
15         conducted pursuant to the federal rules.  The
16         parties have agreed to continue this
17         deposition from September 9th and September
18         10th for a period of ninety minutes.
19    CONTINUED EXAMINATION BY
20    BRUCE MENKEN, ESQ.:
21         Q    Good morning, Ms. Phillips.
22         A    Good morning.
23         Q    Could you just confirm for me that
24    there's no one else in the room with you?
25         A    No one else in the room.
```

```
 1                   Marjorie Phillips          396

 2       Q     Can you confirm for me that to the

 3   extent you have any technology in the room, like a

 4   cell phone or iPad, other than what you're looking

 5   into, is turned off?

 6       A     Yes.

 7       Q     Ms. Phillips, you testified on

 8   September 9 and September 10 about various things

 9   that Marilyn Barton said to you on May 16, 2019 at

10   the office at E315 at F.I.T.

11             I just wanted to ask you, with regard

12   to anything she said on that day, would you

13   consider any of it racist in nature?

14       A     No, I don't know.  I can't say for

15   sure.  It was aggressive, it was angry.

16       Q     She repeatedly said the word fuck to

17   you; is that correct?

18       A     Yes.

19       Q     Is it your contention that she said

20   that to you because you are African American?

21       A     She said it to me because she said she

22   was sick and tired of my shit.

23       Q     On May 16, 2019, Ms. Phillips, did Ms.

24   Barton physically push you?

25       A     Yeah, she did.  She put her finger on
```

```
 1                    Marjorie Phillips              397

 2     my chest to push me.   Push.

 3          Q     For the record, I know we're appearing

 4     remotely, but you're indicating that she pushed

 5     you with what appears to be her right pointer

 6     finger?

 7          A     I don't know if it was her right

 8     finger.  She pushed me with her finger.  I don't

 9     know which hand it was.

10          Q     She did not push you with two hands?

11          A     No, she did not.

12          Q     At some point on May 16, 2019 during

13     this incident, Ms. Phillips, did you stand up from

14     your chair in the office?

15          A     During the incident?

16          Q     Yes.

17          A     At the end.  Yes, towards the end.

18          Q     Why is it that you stood up out of your

19     chair?

20          A     Because she pushed me.  She actually

21     put her hands on me.  Prior to that she had just

22     been in my face and she was yelling and screaming

23     and cursing me out and saying all these vulgar

24     things to me, but when she actually put her hands

25     on me, then that took it to another place and
```

```
 1              Marjorie Phillips          398
 2    that's when I stood up.  I didn't know what she
 3    was going to do.  I didn't know what was going to
 4    be next.
 5         Q     So you just testified about her putting
 6    her hands on you, but previously you mentioned she
 7    just pointed.
 8              She touched you with her finger?
 9         A     Right.
10         Q     So I just want to be clear for the
11    record what, in fact, she did.
12         A     She touched me, she touched me.  She
13    pushed me with her finger, and when she did that,
14    that was more than what she had already said.
15              She was cursing and yelling and
16    screaming at me prior to that and in my face prior
17    to that.  When she physically put her hands on me,
18    that took it to another level in my mind because I
19    didn't know what was -- what she was gonna do
20    next.  So at that point is when I stood up and I
21    put my hands up.
22         Q     But she didn't put her hands, plural,
23    on you, she put her finger on you; correct?
24         A     Correct, correct.
25         Q     And she put it above your breast bone
```

```
 1                    Marjorie Phillips              399

 2   level; correct?

 3        A      My chest area.

 4        Q      And that was the finger.

 5               When you stood up from your chair in

 6   office E315, did you stand up in self-defense?

 7        A      I stood up to get away from her.

 8        Q      Did you, in fact, thereafter try to

 9   flee the area?

10        A      No.

11        Q      Did you attempt in any way, Ms.

12   Phillips, to calm Ms. Barton down at that point?

13        A      I used those words, yes.

14        Q      What words did you precisely use, if

15   you remember?

16        A      Calm down, calm down, calm down.  I

17   kept saying it over and over again.

18        Q      And you just testified in a somewhat

19   quieter voice.

20               Is that the way you said it --

21        A      Yeah.

22        Q      Hold on one second.  Let me finish.

23               Is that the way you said it on May 16,

24   2019 in the E315 office at F.I.T.?

25        A      Yes.
```

```
 1                    Marjorie Phillips              400

 2        Q      She, of course, according to your

 3   testimony, was raising her voice at a very high

 4   level?

 5        A      She was screaming at me.

 6        Q      And she was foaming at the mouth;

 7   right?

 8        A      Yes.

 9        Q      You testified last month about what I'm

10   just going to describe as a blackface incident.

11             Can you explain what, if any,

12   involvement Marilyn Barton had with what you

13   allege to be some black face incident?

14        A      Marilyn was having a conversation with

15   another co-worker in our department in our office

16   about the blackface and they -- I overheard the

17   conversation somewhat, not every single word, but

18   I overheard -- I heard them say that, and that's

19   what got my attention.

20        Q      How far in feet, if you recall, were

21   you from Marilyn Barton when you overheard this?

22        A      About ten feet maybe.  Ten feet.

23        Q      Who else other than you and Ms. Barton

24   was in E315 at the time?

25        A      I don't actually recollect.  Natasha
```

```
 1                    Marjorie Phillips              401

 2   Deacon was in the office.  I don't know if Mary

 3   Davis and Umilta was in the office.  I'm not sure

 4   if they were in the office.

 5        Q     Is Natasha a woman of color?

 6        A     No, she's not.

 7        Q     Who, if anyone, was Ms. Barton talking

 8   to at that point?

 9        A     Natasha.

10        Q     Is Natasha currently employed at

11   F.I.T.?

12        A     Yes.

13        Q     Do you know what her job title is?

14        A     She's the chairperson of the art market

15   program.

16        Q     Did you ever speak to Natasha about the

17   parts of this blackface conversation that you

18   overheard?

19        A     I did not.

20        Q     I think it was unclear in September

21   when you last testified the year or month when you

22   overheard part of this conversation.

23        A     Yeah, it is unclear, yes.

24        Q     Could it be as far back as 2016 or

25   2017?
```

1                    Marjorie Phillips              402

2        A     The only more clarity I can give is it

3   was around the time when there was a lot of

4   incidents in the newspaper -- not a lot, but there

5   were some incidents in the newspaper with people

6   in the fashion design industry, blackface images.

7   It was around that time.

8              So that was -- I would say everything

9   sort of goes back sort of to 2019 forward.  So

10  maybe it was 2018.  If I had to guess, 2019, 2018.

11  I don't know, '18, '19.

12       Q     As far as I could tell, you never

13  complained to F.I.T.'s affirmative action

14  committee about that; correct?

15       A     Correct.

16       Q     And you never complained to F.I.T.'s

17  human resources office about that; correct?

18       A     Correct.

19       Q     But you did, in fact, complain to Dean

20  Davis about that?

21       A     No, I did not.

22       Q     Did you make any complaints to anyone

23  affiliated with F.I.T. within thirty days after

24  overhearing to some extent this blackface

25  discussion incident?

```
  1                    Marjorie Phillips              403

  2        A      I did not.

  3        Q      Other than the May 16, 2019 incident

  4   with Ms. Barton, did you have any other heated

  5   arguments, to say the least, with Marilyn Barton

  6   prior to May 16, 2019?

  7        A      Heated, maybe once.  Maybe once.

  8        Q      What was that about?

  9        A      I don't recall.  It was pretty early

 10   on.  I can't remember when it was, but it was

 11   many, many, many years ago and she had said or

 12   done something that I didn't like and I spoke to

 13   her about it and I went over to her desk and I --

 14   you know, I spoke to her about it, and when I

 15   spoke to her about it -- I don't even remember

 16   what the incident was, I just remember the

 17   outburst and she got angry because I was, you

 18   know, asking her about it, and again she stood up

 19   and she walked into the center of the office.

 20             Now, granted the office is not large at

 21   all, but she walked away from me and me speaking

 22   and she went to the center of the office as if she

 23   wanted everyone around to hear her and to see her,

 24   and she started yelling at me and she started

 25   responding to what I said and yelling at me in
```

```
1                    Marjorie Phillips              404

2   front of everyone.

3        Q     Do you have any memory of what the

4   issue of contention was about?

5        A     I do not.  It was a very, very long

6   time ago.

7        Q     Did either she or you during that long

8   time ago incident use any vulgarity or obscene

9   language?

10       A     I don't recall.

11       Q     Did either you touch her or did she

12  touch you during that long ago incident?

13       A     No, I don't recall.  I don't think so,

14  no.

15       Q     Ms. Phillips, prior to May 16, 2019

16  would you agree that Ms. Barton knew the address

17  where you lived?

18       A     Prior to 2016?

19       Q     No, prior to May 16, 2019.

20       A     Oh, yes, she knows my address.  Yes.

21       Q     Did you know her address?

22       A     No, I do not.

23       Q     Ms. Phillips, did you ever tell Ms.

24  Barton that when you gave birth to your son,

25  Jayvon (phonetics) Phillips, that you were not
```

```
1                  Marjorie Phillips              405

2    married at the time?

3         A     I don't remember those exact words.  I

4    don't remember those exact words, no.

5         Q     Well, how about in general terms, do

6    you know if you ever told Ms. Barton that you were

7    not married at the time?

8         A     I don't recall having that

9    conversation.

10                MR. MENKEN:  Debbie, could you put

11            Exhibit 9 on the screen, please, and this

12            will be marked Exhibit 17.

13                (Whereupon, the police report was

14            marked as Defendant's Exhibit 17 for

15            identification, as of this date.)

16        Q     Ms. Phillips, have you reviewed what's

17   been marked as Plaintiff's 17 of this deposition?

18        A     Plaintiff's 17?

19        Q     Let's just call it number 17.  I think

20   it's gotta be 17 so that internal number?

21        A     Are you waiting for me?

22        Q     Ms. Phillips, it's currently marked as

23   Barton Exhibit 9, but based on our able court

24   reporter's statement, it's going to be marked as

25   Defendant's 17, and all counsels consent.  It's a
```

```
 1                    Marjorie Phillips              406

 2      four-page document.  It was Bates stamped and

 3      produced by your attorneys and it's approximate

 4      Plaintiff Phillips 225 through 228.  The top page

 5      says the City of New York, New York City Police

 6      Department, 10th Precinct, 230 West 20th Street,

 7      New York, 10011.

 8                    Have you seen this document before?

 9      A      I believe so, yes.

10      Q      Would you agree that it's a police

11      report?

12      A      Yes.

13      Q      Is it true that on May 16, 2019 you

14      walked from the F.I.T. campus to the 10th Precinct

15      at 230 West 20th Street in Manhattan?

16      A      No, it was not on May 16th.

17      Q      You didn't go on May 16th?

18      A      I did not.

19      Q      I apologize, if you could go to the

20      next page, Ms. Phillips, if you could scroll down

21      and if you could see the box where it says

22      occurrence from.

23                    You see that spot?

24      A      Yes.

25      Q      It says reported May 21, 2019 at 16:35
```

```
 1                   Marjorie Phillips              407

 2   in the day.

 3              Do you see that?

 4       A    I do.

 5       Q    Having us both seen that, does that

 6   confirm that you made a report to the New York

 7   City Police Department 10th Precinct on May 21,

 8   2019 at 16:35 military time?

 9       A    Yes, but that was not my first time

10   there.

11       Q    Did you go there before?

12       A    I went on the 17th.

13       Q    I believe that was a Friday; correct?

14       A    Right.

15       Q    So you went to work on Friday, May 17

16   or no?

17       A    No.

18       Q    But you walked into the precinct on

19   your own on May 17, 2019?

20       A    I did.

21       Q    How did you get there?

22       A    I walked there.  I took the train

23   downtown because I wasn't sure if I should make a

24   complaint in my area where I live or if I should

25   go downtown to where the incident happened at
```

```
 1                  Marjorie Phillips              408
 2   F.I.T., and so I made the decision that because it
 3   happened down there that I should go to a precinct
 4   down there.  So I went downtown and I went to the
 5   precinct downtown in Chelsea.
 6        Q    So you took the subway from your
 7   apartment and went to the 10th Precinct?
 8        A    I did.
 9        Q    And you went by yourself?
10        A    I did.
11        Q    At some point in time you met with an
12   employee of the New York City Police Department?
13        A    I did.
14        Q    Was that person in uniform or not?
15        A    In uniform.
16        Q    Do you know what an order of protection
17   is, Ms. Phillips?
18        A    I do, yes.
19        Q    How is it that you know what an order
20   of protection is?
21        A    I think that's kind of common.  I
22   believe it's common, so that's how I know.
23        Q    Have you ever had an experience where
24   you sought an order of protection or someone
25   sought an order of protection against you?
```

```
 1                  Marjorie Phillips              409
 2        A    No.
 3        Q    As far as you know, what is an order of
 4   protection?
 5        A    An order of protection is something
 6   that a person who -- a victim, a victim has the
 7   right to request of the police department if they
 8   want to ensure that the offender or the attacker
 9   stays away from them.  It's like an official
10   document to ensure that the attacker stays away
11   from them.
12        Q    When you were at the police precinct on
13   May 17, 2019 and May 21, 2019, did you request an
14   order of protection from the police department?
15        A    I did not at that time.  At that time I
16   did not, but I honestly thought about it.
17        Q    At any point in time thereafter did you
18   seek an order of protection against Marilyn
19   Barton?
20        A    I did not, but I thought about it, and
21   the reason that I did not do it is because I
22   thought that F.I.T. was going to protect me.  I
23   was certain that F.I.T. was going to protect me at
24   that time.
25        Q    Could you scroll up to the first page
```

```
1                    Marjorie Phillips              410

2      of this exhibit, please, Ms. Phillips.

3          A    Go to the first page?

4          Q    Please.

5          A    Okay.  Yes.

6          Q    You see the second paragraph on the

7      first page of this document, the first and second

8      sentence, it offers free and confidential services

9      of victims of crime managed by Safe Horizon?

10         A    I do.

11         Q    Did you take advantage of these free

12     and confidential services that the police

13     department offered you in May of 2019?

14         A    Well, this notice did not come to me on

15     the date that you're stating.  I don't even -- and

16     these are four separate documents.  These

17     documents did not come altogether.  So this is one

18     document, the complaint is another document.  So

19     this particular document did not come until much

20     later.  That's number one.

21              THE WITNESS:  For some reason the

22         screen went away.  Let me come back.  I know

23         what it is, I'm getting a call and it flipped

24         me out of the meeting.  Hold on.  I'm going

25         to see if I can decline because my cell phone
```

```
 1                     Marjorie Phillips           411

 2          is turned off.  I can't see the document that

 3          was up anymore.

 4                MR. MENKEN:  Off the record.

 5                (Whereupon, there was a break in the

 6          deposition.)

 7          Q     Ms. Phillips, is the document in front

 8     of you now on the screen?

 9          A     It is, yes.

10          Q     Can you tell us what day, if you

11     remember, you received the first page of Exhibit

12     17?

13          A     It certainly would be a guess, but I do

14     remember saying to myself when I received it --

15                MR. SELLS:  Please don't guess.

16                THE WITNESS:  Okay.

17          Q     Ms. Phillips, if you can go to the last

18     page of the document, please.

19          A     Okay.

20          Q     At the bottom right of the last page

21     all the way down, please, you --

22          A     Okay.

23          Q     -- see a date, September 26, 2019.

24                Do you see that?

25          A     Yes, I do.
```

```
1                    Marjorie Phillips            412

2        Q      Is that around the time that you

3   received some or all of this four-page document?

4        A      It could be, 'cause like I said, those

5   are four separate documents.  So yes, yes.

6        Q      In order to obtain this document or

7   parts thereof, did you yourself go to the 10th

8   Precinct to pick it up?

9        A      No, I had to go to One Penn Plaza.

10       Q      That's where you got it?

11       A      Hm-hm, yeah.

12       Q      Ms. Phillips, you testified that on May

13  16, 2019 that you were living alone; correct?

14       A      Correct.

15       Q      When you got home on May 16 and went to

16  bed, did you have trouble sleeping that night?

17       A      Yes, of course.  Yes, I did.

18       Q      Did you have trouble sleeping the

19  following night, May 17?

20       A      Yes, I did.

21       Q      Did you have trouble sleeping

22  continuously for a number of weeks or months?

23       A      Yes, I did.

24       Q      That was because of the May 16, 2019

25  incident?
```

```
 1                    Marjorie Phillips              413

 2      A     Yes, it was.

 3      Q     What, if anything, did you do to treat

 4  that trouble sleeping through that period of time?

 5      A     Well, I didn't initially do anything

 6  about it, I just sort of tossed and turned.  I

 7  didn't do anything.  I didn't try anything to, you

 8  know, change my sleep patterns.  I didn't do

 9  anything initially.

10            So at that time that you're speaking

11  of, I didn't do anything at that time.

12      Q     Did you go see a physician,

13  psychologist, psychiatrist, social worker, mental

14  health practitioner?

15      A     Yes, I did.

16      Q     That wasn't until August of 2019;

17  correct?

18      A     Correct.

19      Q     From May 16, 2019 until August of 2019

20  did you seek treatment from any health care

21  practitioner as a result of the incident that

22  occurred on May 16, 2019 at F.I.T. with Marilyn

23  Barton?

24      A     I had an internist that I went to see.

25  I don't remember what the date was, I don't
```

```
 1                    Marjorie Phillips              414

 2    remember that, but I saw my internist.

 3         Q     How soon after May 16, 2019 did you see

 4    the internist?

 5         A     I don't remember.

 6         Q     Is that Sabrina Gard?

 7         A     Correct.

 8         Q     Did you speak to her, Dr. Gard, about

 9    what happened on May 16, 2019 with Ms. Barton?

10         A     I did.

11         Q     At some point in time Dr. Gard was no

12    longer your internist and you got another

13    internist; correct?

14         A     Yes.

15         Q     When was that, about?

16         A     I just got a new internist recently.

17    It takes a long time to find an internist, one

18    that you want to have.

19         Q     Did you call up Dr. Gard to receive an

20    appointment at some time after May 16, 2019?

21         A     I never was able to call her because we

22    -- at that time we had kind of rolled into the

23    pandemic and I was never able to see her after

24    that initial time, after the first time.

25         Q     Just so we're clear, is it your
```

```
 1                    Marjorie Phillips              415

 2    testimony that between May 16, 2019 and let's say

 3    August 8, 2019, did you see Dr. Sabrina Gard in

 4    person?

 5         A      No.

 6         Q      Did you speak to her on the phone --

 7         A      No.

 8         Q      -- between May -- let me finish the

 9    question.

10                Did you speak to Dr. Gard between May

11    16, 2019 and August 8, 2019?

12         A      No.

13         Q      What month and year, if you recall, did

14    you start taking any treatment to help you sleep

15    better?

16         A      I don't recall exactly.

17         Q      Do you have a general idea of when you

18    started taking some sort of sleep aid to help you

19    with your sleep problem after May 16, 2019?

20         A      Maybe in August when I started seeing

21    the psychiatrist.

22         Q      On the night of the incident did you

23    experience any nightmares when you were sleeping?

24         A      Yes, I did.

25         Q      Did you experience any nightmares
```

```
 1                  Marjorie Phillips              416
 2   thereafter May 16, 2019?
 3        A      Yes, I did.
 4        Q      What do those nightmares consist of?
 5        A      I've had a lot of nightmares since the
 6   incident.  I've had a lot of nightmares.  I'm the
 7   kind of person that prior to this incident I would
 8   say that I didn't dream.
 9               You know, everybody supposedly dreams,
10   but I would always say that I didn't dream because
11   I would go to sleep and then have a good night's
12   rest.  I could sleep eight or nine hours and then
13   get up in the morning and I would always -- very
14   rarely do I remember my dreams, so I really felt
15   like I didn't dream very much.
16               Then after this happened then I started
17   dreaming a lot.  I started dreaming a lot and I
18   started having -- and they weren't dreams, they
19   were nightmares, and they've gone on from that
20   time until the present.  Until the present.
21               I have nightmares now and they're so
22   scary that it made me cry just to think about it.
23   Just to think about it because they're really
24   scary and they involve Mary and they involve
25   Marilyn and they involve like lions and alligators
```

```
 1                    Marjorie Phillips              417

 2      and being attacked, and they just -- I have a lot

 3      of nightmares now.

 4           Q      Do you still have those nightmares now?

 5           A      Yeah.  It's not every night, but I went

 6      from not dreaming at all to now having nightmares.

 7           Q      Throughout the summer of 2019 after the

 8      May 16, 2019 incident were you having nightmares

 9      on a nightly basis?

10           A      Not every night, no, not every single

11      night.

12           Q      How frequently were you having them

13      throughout the summer of 2019?

14           A      I don't remember.

15           Q      Did you write down in a journal or a

16      diary anything about what your nightmares

17      consisted of?

18           A      No.  I really talked to my therapist

19      about it.

20                  MR. MENKEN:  Could you put up on the

21           screen, Debbie, Exhibit 6, and this will be

22           marked Exhibit 18.

23                  (Whereupon, chain of e-mails were

24           marked as Defendant's Exhibit 18 for

25           identification, as of this date.)
```

```
 1              Marjorie Phillips              418

 2              (Whereupon, Defendant's Exhibit 18 was

 3         screen shared.)

 4    Q    Ms. Phillips, I'm making a record, feel

 5  free to correct me if I'm reading something

 6  incorrectly, but Defendant's 18, which is still

 7  marked Barton Exhibit 6 now, is an e-mail

 8  communication produced by your lawyers Bates

 9  stamped Phillips 239 and 240, and it takes place

10  in August of 2019; is that correct?

11    A    Is that a question to me?

12    Q    Yes.  Did I read that correctly,

13  describe the document?

14    A    Can you repeat the question?

15         MR. MENKEN:  Debbie, would you read it

16    back, please.

17         (Whereupon, the requested section was

18         read back.)

19    A    Yes, it is.

20    Q    Ms. Phillips, one more question going

21  back to the sleeplessness and the nightmares.

22         When you say you're still having

23  nightmares now, how frequently is it, nightly,

24  weekly, a couple of times a week, once a month?

25    A    No, like now I feel like I haven't had
```

1                    Marjorie Phillips              419

2     one in about like maybe since, I'm guessing, I'm

3     guessing, it's just a guess, for a couple of

4     months maybe.

5          Q     And you've told Dr. Barnes about the

6     nightmares?

7          A     Yes, I did.

8          Q     Going to this Exhibit 18, can you

9     please read it, and I guess it's from -- read it

10    to yourself chronologically.  It's from bottom to

11    top I believe.

12         A     I'm done.

13         Q     I think, Ms. Phillips, at the end of

14    the first page it says August 8, 2019.  That's the

15    first e-mail.

16         A     On the first page you're referring to?

17         Q     Yes, the bottom of the first page

18    indicates that Cynthia Glass sent you an e-mail

19    that you responded to on August 12.  If you could

20    take a look at that.

21         A     Okay.

22         Q     Let me know when you're finished

23    reviewing it.

24         A     Okay.

25         Q     If you can go to the top of the first

```
 1                    Marjorie Phillips              420
 2   page now, please.
 3              The top of the first page is an e-mail
 4   from you to Ms. Unelus and others, including Ms.
 5   Glass, dated August 13, 2019 at 1:50 in the
 6   afternoon, and it references that you're just back
 7   from a five week vacation.
 8        A    Yes.
 9        Q    When it says that it's my first day
10   back and it's dated August 13, 2019, are you in
11   the F.I.T. office that day or were you at home?
12        A    I was in the office.
13        Q    Who, if anyone, do you recall seeing in
14   office E315 that day?
15        A    I don't recall.  Only person that I
16   know for sure that was in the office would have
17   been Mary.  I can't remember who else was in the
18   office, and I don't mean physically in, I just
19   mean in that day.
20        Q    Sure.  I understand.
21              Do you recall who you saw physically
22   that day?
23        A    No, I do not.
24        Q    You did not see Marilyn Barton that
25   day; correct?
```

```
 1                  Marjorie Phillips              421
 2       A     No, I believe that Marilyn was on
 3  vacation.
 4       Q     Where were you on your five week
 5  vacation?
 6       A     Where did I go?
 7       Q     Yes.
 8       A     I went to Georgia.
 9       Q     That was a family reunion of sorts, Ms.
10  Phillips?
11       A     Yes, it was.
12       Q     Did you have trouble sleeping during
13  that five week vacation?
14       A     I did.
15       Q     Did you have nightmares during that
16  five week vacation?
17       A     I don't recall.
18       Q     Did you speak to anyone during that
19  five week vacation who's a medical or health care
20  practitioner?
21       A     During the vacation?
22       Q     Yes.
23       A     I don't recall.
24       Q     Did you speak to any family members
25  about your challenges sleeping during that five
```

```
 1                    Marjorie Phillips           422

 2    week vacation or did you not have those challenges

 3    then?

 4        A      During the vacation I did not speak to

 5    anyone about my challenges, no one in my family

 6    during my vacation.

 7        Q      But you did have trouble sleeping

 8    during that five week period?

 9        A      During the vacation?

10        Q      Yes.

11        A      I was having problems sleeping from the

12    time the incident has happened to the present.

13    Not every day, not every week, but I've been

14    having sleeping problems the entire time.

15        Q      You see at the bottom of the first

16    page, if you'll go there, --

17        A      The bottom of the first page?

18        Q      Right there.  It's dated August 8, 2019

19    at 11:24 in the morning.  Ms. Glass sends you the

20    e-mail concerning Dr. Kirkland Vaughans.

21               Do you see that?

22        A    Yes.

23        Q      At that point had you reached out to

24    Dr. Vaughans to make an appointment?

25        A      I did.  I consulted Dr. Vaughans about
```

1                    Marjorie Phillips              423

2    this e-mail that I received from Cynthia Glass.

3         Q     My question is, when did you first have

4    contact with Dr. Vaughans, was it before August 8

5    at 11:24 in the morning or is it after?

6         A     When did I first -- do you mean the

7    very first appointment, is that what you mean?

8         Q     When you first had contact with her

9    office, when you first called her or e-mailed or

10   texted her?

11        A     Oh, it was before this.

12        Q     Is Dr. Vaughans a member of your church?

13        A     I believe she is, yes, but -- I believe

14   she is.  I didn't know her.

15        Q     So you had no prior contact with her

16   socially or professionally prior to when you first

17   obtained treatment from her?

18        A     I did not.  I still don't.

19        Q     How is it that you learned that she was

20   a member of your church too?

21        A     I think -- I don't recall.  I have to

22   think about how I learned it, but -- I don't

23   recall how I learned it, but I didn't know that

24   she was a member of my church.

25        Q     You said she was referred to you by a

```
1                    Marjorie Phillips              424

2    friend; is that correct?

3         A     Yes.

4         Q     Who is that friend?

5         A     Dr. Michelle Alexander.

6         Q     Dr. Michelle Alexander does not treat

7    you medically but she's a friend of yours?

8         A     Correct.

9              MR. MENKEN:  Debbie, If you can go to

10             Exhibit number 7, and this will be Exhibit

11             19.

12             (Whereupon, the document dated August

13             8, 2019 was marked as Defendant's Exhibit 19

14             for identification, as of this date.)

15             (Whereupon, Defendant's Exhibit 19 was

16             screen shared.)

17        Q     Ms. Phillips, Exhibit 19 are records

18   produced by your attorney and they contain notes

19   and documents from Dr. Cynthia D. Barnes, M.D.,

20   child and adult psychiatrist, and it starts

21   Plaintiff's 441 and it ends at 475, and I'm just

22   going to ask you some particular questions about

23   particular entities real quickly; okay?

24        A     Okay.

25        Q     On the first page of the document, if
```

```
1                    Marjorie Phillips              425

2       you can go there, please.

3            A      The very top?

4            Q      Yes.

5            A      Yes.

6            Q      Is that your handwriting?

7            A      Yes, it is.

8            Q      Did you fill this out when you were at

9       her office or some other time?

10           A      I'm pretty sure -- I believe I filled

11      it out at her office.  I believe so.

12           Q      What time of day, if you remember, on

13      August 8, 2019 did you fill this first page of

14      Defendant's 19 out while you were at Dr. Barnes'

15      office?

16           A      I don't know.

17           Q      Going to the third page of the

18      document, Ms. Phillips, it's Plaintiff 443, you

19      see the top entry it's dated 8-8-2019?

20           A      Right.

21           Q      Referred by Michelle Alexander, as you

22      just testified to?

23           A      Right.

24           Q      So beneath that it says, been wanting

25      to go in therapy for long time.
```

```
 1                  Marjorie Phillips              426

 2              Do you see that?

 3       A     Yeah, I do.

 4       Q     I guess tell me if I'm making the wrong

 5   conclusion, but I'm concluding that this

 6   handwriting is Dr. Barnes' handwriting; correct?

 7       A     Yes, it is.

 8       Q     Why is it that you wanted to go into

 9   therapy for a long time?

10       A     Well, for a couple of reasons.  One

11   reason is that my pastor -- I been going to this

12   church for thirty years and one of the things that

13   my pastor says over and over and over to the

14   congregation is that we all, we all, everyone

15   needs a checkup from the neck up.

16              So in addition to our medical -- you

17   know, our doctors and all the different

18   specialists that we see for all the different

19   parts of our bodies, in addition to that that

20   everyone could use a checkup from the neck up, and

21   he says that all the time, that there's no shame

22   in seeking therapy.  As a matter of fact, it could

23   add value.  So that's number one.

24              Number two is that for that very reason

25   I don't see any shame or anything wrong with
```

```
 1                    Marjorie Phillips              427
 2   people seeking therapy.  So for that reason.
 3            Those are the reasons, health and
 4   wellness.
 5       Q      Other than that, there were no
 6   particular challenges or issues that you wanted to
 7   discuss in therapy prior to August 8, 2019?
 8       A      No.
 9       Q      After seeing Dr. Barnes in person, due
10   to COVID you saw her remotely?
11       A      Yes.
12       Q      Did health insurance cover the
13   treatment?
14       A      Yes -- well, we were actually speaking
15   on the telephone, not Zoom.  We've been doing
16   phones throughout the pandemic.
17       Q      Phone sessions?
18       A      Yeah.
19       Q      Was there a co-pay or any additional
20   pay that you had to pay Dr. Barnes for the
21   treatment that you started on August 8, 2019?
22       A      Yes, I have a co-pay, yes.
23       Q      Other than the co-pays, is there
24   anything else you've had to pay to Dr. Barnes?
25       A      No.
```

```
1                    Marjorie Phillips              428

2         Q       When did you first seek legal

3    representation to prosecute this case?

4         A       I believe it was in either late August

5    or September.

6         Q       Did you speak to or have contact with

7    any attorney other than Midwin Charles before

8    September 2019?

9         A       Yes, I did.  I was looking for an

10   attorney, yes.

11        Q       When did you first have contact with

12   that attorney, or those attorneys?

13        A       I believe I started looking for an

14   attorney in July, I think.  I don't recall

15   exactly, but I believe around July.

16        Q       So while you were in Georgia you were

17   looking for an attorney?

18        A       Before, during and after.

19        Q       So while you were on vacation in

20   Georgia you were looking for an attorney?

21        A       No, but I was thinking about it.  So in

22   my mind it's the same thing.

23        Q       Did you reach out to any attorneys by

24   e-mail?

25        A       Yes, I did.
```

```
1                    Marjorie Phillips              429

2        Q     Who were they?

3        A     I don't remember the names of all of

4  the attorneys.  One of the attorneys that I did

5  reach out to whose name I can remember is the

6  attorney that was working with Mary, but I was

7  working with her first because she was one of the

8  people who I was seeking -- Marjorie Berman I

9  believe her name is.  She's one of the lawyers

10 that I had reached out to, one of the many.

11       Q     Did you reach out to any attorneys by

12 text?

13       A     I don't think so.  I don't recall.

14       Q     When you say many, how many attorneys

15 did you reach out to?

16             Was it more than ten?

17       A     No, it wasn't more than ten.

18       Q     Ms. Phillips, did Dr. Barnes or anyone

19 affiliated with her office provide you with

20 receipts for those co-payments you made?

21       A     Yes.

22       Q     Did you retain those receipts?

23       A     Not really.  I mean, I throw them in my

24 bag, so....

25       Q     So you might have some of them or no?
```

```
 1                    Marjorie Phillips              430
 2       A     No -- I mean, I could get them if I had
 3  to, but, no, I don't have them.
 4       Q     Did you suffer emotional distress
 5  damages as a result of the May 16, 2019 incident
 6  and anything else that happened thereafter or
 7  before?
 8       A     Absolutely.
 9       Q     Has Ms. Barton contributed to your
10  suffering from emotional distress damages?
11       A     Absolutely.
12       Q     That's because of what happened on May
13  16, 2019?
14       A     Absolutely.
15       Q     How much money do you think Ms. Barton
16  owes you for those emotional distress damages?
17       A     I don't know.  I haven't put a figure
18  on it.  I don't know.
19       Q     Would you say it's more than five
20  thousand dollars?
21            MR. SELLS:  Objection.  She already
22       answered the question, Bruce.
23       Q     Ms. Phillips, you mentioned that you've
24  paid legal fees.  How much in legal fees have you
25  paid to your attorneys to date?
```

```
 1                    Marjorie Phillips              431

 2               MR. SELLS:  Objection.

 3               Don't answer that question.

 4               MR. MENKEN:  On what grounds?  She's

 5        seeking damages.

 6               Let me ask this way.

 7         Q     Ms. Phillips, as a part of this

 8    lawsuit, are you seeking reimbursement of

 9    attorneys fees paid to your attorneys?

10               MR. SELLS:  Objection.

11               Don't answer the question.

12               MR. MENKEN:  We'll consider whether to

13        approach the magistrate judge on that.

14               MR. SELLS:  Okay.

15         Q     Ms. Phillips, you testified that you're

16    a person of faith and you believe in God; correct?

17         A     Yes.

18         Q     Do you go to church every Sunday?

19         A     Pretty much.

20         Q     And you're active in the church?

21         A     Yes, I am.

22         Q     You belong to some committees and

23    stuff?

24         A     Yes.

25         Q     Have you held leadership roles in the
```

```
1                    Marjorie Phillips              432
2    church?
3         A     Yes.
4         Q     Do you regularly read the bible?
5         A     Yes, I do.
6         Q     Are you familiar with the Sermon on the
7    Mount?
8         A     No.
9         Q     Where Matthew in chapter five, verse
10   forty-four --
11              MR. SELLS:  Okay, Bruce, excuse me,
12         where are we going with this?
13              MR. MENKEN:  You want to let me ask the
14         question and then if you want to object, you
15         can?
16              MR. SELLS:  Okay.  Go ahead.
17              She just said she's not familiar with
18         it, so you want to keep going on about
19         something she's not familiar with?  I don't
20         quite understand that.  But go ahead, Bruce,
21         be my guest.
22         Q     Ms. Phillips, you're familiar with the
23   scripture about turning the other cheek and loving
24   your enemies?
25         A     Yes, I am.
```

```
1                    Marjorie Phillips            433

2              MR. MENKEN:  Could you put up exhibit

3         number 10.  This will be marked Exhibit 20.

4              (Whereupon, the Complaint was marked as

5         Defendant's Exhibit 20 for identification,

6              as of this date.)

7              (Whereupon, Defendant's Exhibit 20 was

8              screen share.)

9         Q    First I wanted to ask you before we ask

10        questions about the exhibit in front of you --

11             MR. SELLS:  Hold on for a second.

12             Just for clarification, Bruce, are you

13        going to mark this?  I think this has already

14        been admitted -- I mean not admitted, but

15        it's already been used as an exhibit during

16        this deposition.  I forget what number.

17             MR. MENKEN:  I guess because we have

18        different court reporting services, it

19        probably makes sense just to remark it.

20             MR. SELLS:  Okay.  It's being marked as

21        Exhibit 20?

22             MR. MENKEN:  Exactly.

23        Q    Ms. Phillips, do you know Isolina

24        Perez?

25        A    Yes.
```

```
1                  Marjorie Phillips              434

2        Q     How long have you known her?

3        A     Many years.

4        Q     How do you know her?

5        A     She is an employee as a union delegate

6    for the Fashion Institute of Technology.

7        Q     Have you ever socialized with her

8    outside of work?

9        A     No, I have not.

10       Q     What's your opinion of her work

11   performance as a union representative for the

12   F.I.T. employees?

13       A     I think she's excellent.

14       Q     Now, Exhibit 10 is a copy of a

15   Complaint that was filed by your attorneys at the

16   time.

17             MR. SELLS:  Exhibit 20.

18             MR. MENKEN:  Thank you very much.

19       Q     Exhibit 20 is the Complaint that was

20   previously marked at a prior Davis deposition in

21   September.  It was drafted by your prior

22   attorneys.

23             If you could go to the bottom of page

24   ten, Ms. Phillips.

25             You see count two?
```

```
1                    Marjorie Phillips              435

2        A     Yes.

3        Q     It basically includes a title saying

4   that you're alleging race discrimination and

5   harassment against all defendants, which includes

6   Ms. Barton; correct?

7        A     Correct.

8        Q     How did Ms. Barton discriminate against

9   you based on race?

10             MR. SELLS:  This was asked previously,

11        Bruce, during the depositions.

12             MR. MENKEN:  It was surely asked by Mr.

13        Tauster on behalf of his client, but I'd like

14        to ask the witness on behalf of my client.

15             MR. SELLS:  No, I think he went into

16        great detail about each of the individuals,

17        and if you'll recall, Bruce, there was

18        substantial testimony on the nature of the

19        complaints that were made to F.I.T., and in

20        particular the human resources department

21        there, and she was asked specifically about

22        your client, about Ms. Davis, as well as a

23        number of other people, and she already

24        answered that question.

25             I mean, I can find it in the transcript
```

```
 1              Marjorie Phillips            436
 2    if you'd like, but --
 3         MR. MENKEN:  No, no, I'm not going to
 4    belabor this, but I'd like to ask the
 5    question.
 6         MR. SELLS:  No, I hear you, but the
 7    problem is that when you ask the same
 8    question multiple times -- you know, she's
 9    already answered it, so, you know, what is it
10    more that you want her to say?
11         Let me -- I mean, if you just give me a
12    minute, I'll find it in the transcript, and
13    then you could have -- I'm sure you read
14    through the transcript, didn't you?
15         MR. MENKEN:  Feel free to suit
16    yourself, Derek.  You can take a break to
17    find it now and tell me where it is, that's
18    great.
19         MR. SELLS:  Sure.  Why don't we come
20    back about 11:31.  Give me five minutes.
21         MR. MENKEN:  Sure.
22         (Whereupon, a short break was taken.)
23         MR. SELLS:  In response to where Ms.
24    Phillips talked about why she believed your
25    client, Ms. Barton, discriminated against
```

```
 1                 Marjorie Phillips            437
 2      her, I point you to pages 95 to 102 of the
 3      transcript where she discussed Ms. Barton
 4      making a comment regarding African Americans
 5      being three-fifths of a person.
 6           I also direct you to pages 108 and 109
 7      where it talks about that as well.
 8           I then point you to pages 115 to 119
 9      where Ms. Phillips describes Ms. Barton's
10      comments regarding something -- a
11      conversation that she had regarding a funeral
12      that she attended where she made reference to
13      someone being born out of wedlock.
14           Then I point you to pages 127 through
15      136 of the transcript where Ms. Phillips
16      describes the incident where Ms. Barton
17      assaulted her and Ms. Phillips' testimony
18      that she believed that the assault was based
19      upon race discrimination.
20           In fact, on page 136 she was asked
21      directly, why did you believe this incident
22      was discrimination, and Ms. Phillips
23      answered, I have never seen her act that way
24      with a white person.  I have never seen her
25      behave that way with a white person, and the
```

```
 1                    Marjorie Phillips              438
 2       only other person that was in the office was
 3       another African American, so she felt free to
 4       do what she wanted to do because the college
 5       wasn't doing anything.  The college had not
 6       reprimanded her.  Whatever was going on at
 7       that time she felt free enough.  I would
 8       never in a -- ten zillion years do that or
 9       act like that to anyone.  When you go to
10       work, no one has the expectation of coming to
11       work and be threatened to be killed, and
12       because this affirmative action case was
13       hovering over all of our heads, which at the
14       time I can say in my mind it will take as
15       long as it will take, I asked Gelaway
16       (phonetics) about it a couple of times and
17       she said they were still working on it.
18            I mean, you get the point.  The point
19       is that she answered that question before.
20            I'll read this part, but Marilyn had to
21       live with this uncertainty, her and Mary
22       every day because there was no resolution and
23       Marilyn cracked.  She just went off on me.
24       She told me I'm tired of your fucking shit
25       foaming at the mouth, she's telling me she's
```

```
1                    Marjorie Phillips              439

2       going to fucking kill me.  Retaliation,

3       discrimination.  Never saw her behave like

4       that with any white person.

5              Okay, so she's answered that in

6       multiple places, and I haven't even gone -- I

7       can still go through if you'd like, but, I

8       mean, she's answered that so many times

9       already and she's gone through multiple

10      incidents where she believed it showed Ms.

11      Barton's discriminatory intent.

12             So, again, I ask you to move on.

13             MR. MENKEN:  So just for the record,

14      you said you'd take about four or five

15      minutes.  You took about twenty minutes.

16      Number one.

17             Number two, you haven't come back to

18      show that the question that I asked was the

19      question that has been asked before.

20             With that said --

21             MR. SELLS:  It was.  I just said that.

22      I just said that.  What do you mean?  The

23      question was right there, why do you believe

24      this incident was discrimination.  That was

25      the direct question on page 136.  Why do you
```

```
1              Marjorie Phillips          440
2     believe this incident was discrimination?
3          I mean, I just read most of the answer
4     into the record, so what are you saying that
5     she hasn't been asked the question?  She was
6     asked directly about that incident and about
7     the complaint she made in 2018, which
8     included the comment that your client made
9     about blacks being three-fifths of a person,
10    and then the comments that came out of your
11    client's mouth following her going to a
12    funeral.  That's all been testified to,
13    Bruce.
14         MR. MENKEN:  For the record, the
15    question that I sought to ask was, can you
16    tell me how Marilyn Barton engaged in race
17    discrimination against you.
18         But you know something, I'm okay, I've
19    heard you just testify over the past three or
20    four minutes on behalf of your client and you
21    have this --
22         MR. SELLS:  I'm not testifying.  This
23    is from the record.  That's not from me.
24         Let's be clear about it, Bruce, let's
25    be clear about it.  I'm not testifying, okay,
```

```
1                    Marjorie Phillips            441
2       I'm reading -- you asked me to read from the
3       record, to come with the record.  I gave you
4       the record.  If you want to take time to read
5       the pages that I gave you, then you'll see
6       that it's not me testifying, it's my client.
7             She's been asked these questions over
8       multiple pages of the record, okay, so don't
9       make it seem like I'm testifying.
10            Why don't you take a moment.  I gave
11      you the pages, 95 to 102, 108 to 109, 115 to
12      119, 127 to 136.  Why don't you take a
13      minute, just a minute to read through it
14      before you accuse me of testifying for
15      minutes.
16            I'm not testifying here, okay, I'm just
17      showing you that she was asked these
18      questions about how your client discriminated
19      against her over multiple pages of this very
20      extensive deposition transcript.
21            Before today the transcript was 391
22      pages, so forgive me if it took me a moment
23      to go through and pick out all the times that
24      my client answered questions about how your
25      client discriminated against her, and I don't
```

```
1                    Marjorie Phillips              442

2        think it's fair for you to now ask her again

3        those same questions.

4             MR. MENKEN:  You simply could have just

5        identified the pages where you claim that the

6        question was asked, instead you read it.  I'm

7        not so sure why you read it, but you read it.

8             Thank you very much.

9             MR. SELLS:  Come on?  Why do you keep

10       attacking me?  Why do you keep attacking me?

11       Just say on the record either, yes, your

12       client has answered it before, or no, I don't

13       think she has.  Why are you referring to me?

14       I don't get it.  Bruce, I don't get it.

15            Just did she or did she not answer the

16       questions, that's the point.  It's not

17       whether I read anything into the record.  I

18       directed you to the record and you still

19       haven't gone there.  You still haven't gone

20       there, so I don't know what your intent is.

21            MR. MENKEN:  You persist in raising

22       your voice and cutting me off.  I really

23       would appreciate it --

24            MR. SELLS:  It's not about you and me,

25       Bruce, it's about whether my client answered
```

```
1                    Marjorie Phillips              443

2      the question.  Let's not get off track, okay?

3      Let's not get off track.

4          My client answered the question.  You

5      want to take time to look through those

6      sections and see for yourself that she was

7      asked directly about it, then please do so.

8      But if you keep attacking me, I'm telling

9      you, I'm gonna end it right now.  I'm not

10     dealing with this.  I didn't do this to

11     attack you personally, all right?  I took the

12     time to show you that my client has answered

13     these questions, okay?  She's answered them.

14         Now, if you want to address that

15     aspect, please do so, but do not attack me

16     personally, okay?  Don't do that.

17         MR. MENKEN:  Are you finished?

18         MR. SELLS:  As long as you don't attack

19     me, Bruce, yeah, I'm finished, but don't

20     start making allegations about me.  Answer

21     that question, my client did or didn't?

22         MR. MENKEN:  What I'm going to do is

23     I'm going to agree to disagree with your

24     contention and I'm going to move on.

25         MR. SELLS:  Thank you.
```

```
1                    Marjorie Phillips              444

2         Q     Ms. Phillips, I'm hoping to be finished

3    in the next ten to fifteen minutes; okay?

4         A     Okay.

5         Q     We clarified that May 16, 2019 was a

6    Thursday and the following day, May 17, was a

7    Friday.

8               Do you recall what, if anything, you

9    did on the weekend of May 18 and May 19, 2019?

10        A     I don't recall.

11        Q     Ms. Phillips, did you do anything on

12   May 18 and May 19, 2019, that weekend, that is

13   different than what you did the prior weekend or

14   any other weekend?

15        A     I don't recall.

16        Q     Prior to May 16, 2019 what would you

17   typically do on weekends?

18        A     Socialize with my friends, go to

19   church.

20        Q     As a result of what happened on May 16,

21   2019, particularly with regard to what Ms. Barton

22   said to you on May 16, 2019, is there anything

23   that you physically cannot do that you used to do

24   before that date?

25        A     I am not socializing with my friends in
```

```
 1                    Marjorie Phillips            445
 2     the way that I had been prior to this incident.
 3          Q      That's currently?
 4          A      I'm unable to move around in the way
 5     that I was prior to this incident.
 6          Q      Well, maybe if you could testify for
 7     the record and explain how you moved around before
 8     the incident and how you've moved around since the
 9     incident.
10          A      Before the incident I moved around
11     freely, I didn't think about anything.  After the
12     incident I think about my movements, I think about
13     where I'm going.
14                 When I go to F.I.T., I am afraid I'm
15     going to run into Marilyn, so I changed my hours
16     at F.I.T. to hopefully avoid running into her, and
17     looking over my back when I get there at all times
18     to prevent bumping into her.
19                 I am just afraid.  I'm afraid.  When I
20     get to F.I.T., I'm afraid.  So I, in essence, just
21     stay in my corner, and if I have to go out and if
22     I have to interact with others, I make sure -- I
23     try to make sure that I know that Marilyn Barton
24     is not going to be around.
25          Q      That still happens up until today,
```

```
 1                    Marjorie Phillips              446

 2    October 20, 2021?

 3         A    I fear for my life from Marilyn Barton

 4    as of today.  She threatened to kill me.

 5         Q    That's because of what happened on May

 6    16, 2019 in the F.I.T. office E315; correct?

 7         A    Yes.

 8         Q    You testified that Anton Baptist told

 9    you that if Marilyn Barton did what he did to you

10    to him, he would not have his job.

11              Do you remember that?

12         A    Yes.

13         Q    What did you understand that to mean?

14         A    That her behavior towards me, her

15    aggressiveness, her anger, her attacking me in the

16    way that she did, that Anton would not have

17    accepted it from her.

18         Q    Did you understand Anton's comments to

19    mean that he would have physically responded to

20    Ms. Barton's actions?

21         A    I don't know.

22         Q    Ms. Phillips, do you distrust white

23    people?

24         A    No, I do not.

25         Q    Do you trust African American people
```

1                    Marjorie Phillips                447

2    more than you trust white people?

3        A    No, I don't believe so.  No.

4        Q    On May 16, 2019 when that student came

5    in to speak about graduation, did she come in to

6    speak to you, Ms. Barton or someone else?

7        A    She didn't come in to speak to any one

8    person in particular.

9        Q    Who was she initially speaking to?

10       A    She came in and just was sort of

11   talking out loud, because we all sit very close,

12   so she was talking to all of us.

13       Q    Was it Ms. Barton who initially

14   responded to her?

15       A    It was both of us.

16       Q    So initially you were involved in the

17   discussion as well?

18       A    Yes.

19       Q    Do you know if Ms. Barton had ever

20   had any prior contact with that student before?

21       A    I don't know.

22       Q    Did you have any prior contact with

23   that student before?

24       A    Yes, I did.

25       Q    When was that?

```
 1                   Marjorie Phillips              448

 2        A     The student is a fashion and textile

 3   studies student, so that's the program that I

 4   handle.   She's one of my students.

 5        Q     Did you ever have any face-to-face

 6   verbal communication with her prior to May 16,

 7   2019?

 8        A     Yes, I did.

 9        Q     When was that?

10        A     The student -- I don't know the date,

11   but we had a conversation in an elevator at F.I.T.

12        Q     How long before May 16, 2019?

13        A     I don't know.   I don't know.

14        Q     Do you know what the conversation was

15   about?

16        A     The student was in an accident at

17   F.I.T. and she cut her hand up very badly, very

18   badly, and had to be taken to the hospital, and it

19   was a big incident and I was asking the student

20   how is she doing, how was her hand, how was she

21   making out.

22        Q     Did she come into E315 or you just saw

23   her?

24        A     We were in the elevator.

25        Q     Okay.   Sorry.
```

```
1                    Marjorie Phillips              449

2              So you just came into contact with her

3     by happenstance in the elevator?

4         A     That was one of the times that I

5     recall, yes.

6         Q     So were there other times that you had

7     contact with her before May 16, 2019 as well?

8         A     Probably, yes.

9         Q     What were the circumstances surrounding

10    those other times, as far as you remember?

11        A     It was in regard to the accident.  She

12    was in a room by herself, and she should not have

13    been in the room by herself, and as a result of

14    her being in the room by herself she got into an

15    accident and she cut herself.  That's the program

16    that I handle.

17        Q     What's her name?

18        A     I don't recall.

19              MR. MENKEN:  I have no other questions,

20        Ms. Phillips.  Thanks for your time.

21              Rose, do you have any questions?

22              MS. NANKERVIS:  I do not have any

23        questions.

24              MR. MENKEN:  Eric, any questions?

25              MR. DRANOFF:  I'm done.
```

```
1                    Marjorie Phillips              450

2            MR. MENKEN:  I'm going to order an

3       original and copy.

4            MS. NANKERVIS:  I'll take a copy as well.

5            MR. DRANOFF:  We don't want on our end.

6            (Whereupon, the examination of.

7       this witness was concluded at 12:09 P.M.)

8

9                    *       *       *       *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                                              451

2                    A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK)

5                        )ss.:

6    COUNTY OF          )

7

8

9         I, MARJORIE PHILLIPS, hereby certify

10   that I have read the transcript taken under oath

11   in my deposition of October 20, 2021; that the

12   transcript is a true, complete and correct record

13   of what was asked, answered and said during this

14   deposition, and that the answers on the record as

15   given by me are true and correct.

16

17

18                                _____

19                                MARJORIE PHILLIPS

20   Subscribed and sworn to

21   before me on this _____ day

22   of _____, 2021.

23

24   _____

25       NOTARY PUBLIC
```

```
 1                                              452

 2                      I N D E X

 3

 4   EXAMINATION OF              BY            PAGE

 5   Marjorie Phillips      Mr. Menken        395

 6

 7                   E X H I B I T S

 8   DEFENDANT'S            DESCRIPTION        PAGE

 9      17              Police report          405

10      18              E-mails                417

11      19              Document dated 8/8/19  424

12      20              Complaint              433

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                              453

 2               C E R T I F I C A T I O N

 3

 4            I, DEBORAH THIER, a Notary Public

 5   of the State of New York do hereby certify:

 6            That the testimony in the within

 7   proceeding was held before me at the aforesaid

 8   time and place.  That said witness was duly sworn

 9   before the commencement of the testimony, and that

10   the testimony was taken stenographically by me,

11   then transcribed under my supervision, and that

12   the within transcript is a true record of the

13   testimony of said witness.

14            I further certify that I am not related

15   to any of the parties to this action by blood or

16   marriage, that I am not interested directly or

17   indirectly in the matter in controversy, nor am I

18   in the employ of any of the counsel.

19            IN WITNESS WHEREOF, I have hereunto set

20   my hand this 19th day of November, 2021.

21

22

23            _____

24                 DEBORAH THIER

25
```

# ERRATA SHEET

NAME OF CASE:_____

DATE OF DEPOSITION:_____

NAME OF DEPONENT:_____

The following corrections, additions or deletions are noted for the following reasons:

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

Subscribed and Sworn to Before Me
This _____ day of _____, 20__.

_____
WITNESS' SIGNATURE

_____   _____
NOTARY PUBLIC                    Commission Expires:

**A**

A.M 392:11
able 405:23 414:21,23
above-stated 392:18
Absolutely 430:8,11,14
accepted 446:17
accident 448:16 449:11,15
accuse 441:14
act 437:23 438:9
action 402:13 438:12 453:15
actions 446:20
active 431:20
add 426:23
addition 426:16,19
additional 427:19
address 404:16,20,21 443:14
admitted 433:14,14
adult 424:20
advantage 410:11
affiliated 402:23 429:19
affirmative 402:13 438:12
aforesaid 453:7
afraid 445:14,19,19,20
African 396:20 437:4 438:3 446:25
afternoon 420:6
Agency 394:11
aggressive 396:15
aggressiveness 446:15
ago 403:11 404:6,8,12
agree 404:16 406:10 443:23
agreed 394:3 395:16
ahead 432:16,20
aid 415:18
Alexander 424:5,6 425:21
allegations 443:20
allege 400:13
alleging 435:4
alligators 416:25
altogether 410:17
American 396:20 438:3 446:25
Americans 437:4
anger 446:15
angry 396:15 403:17
answer 431:3,11 440:3 442:15
  443:20
answered 430:22 435:24 436:9
  437:23 438:19 439:5,8 441:24
  442:12,25 443:4,12,13 451:13
answers 451:14
Anton 446:8,16
Anton's 446:18
anymore 411:3
apartment 408:7
apologize 406:19
appearing 397:3
appears 397:5
appointment 414:20 422:24 423:7
appreciate 442:23

approach 431:13
approximate 406:3
area 399:3,9 407:24
arguments 403:5
art 401:14
asked 435:10,12,21 437:20 438:15
  439:18,19 440:5,6 441:2,7,17
  442:6 443:7 451:13
asking 403:18 448:19
aspect 443:15
assault 437:18
assaulted 437:17
attack 443:11,15,18
attacked 417:2
attacker 409:8,10
attacking 442:10,10 443:8 446:15
attempt 399:11
attended 437:12
attention 400:19
attorney 424:18 428:7,10,12,14,17
  428:20 429:6
attorneys 392:15 393:3,8,12,17
  406:3 428:12,23 429:4,4,11,14
  430:25 431:9,9 434:15,22
August 413:16,19 415:3,11,20
  418:10 419:14,19 420:5,10
  422:18 423:4 424:12 425:13
  427:7,21 428:4
Avenue 393:13
avoid 445:16

**B**

B 452:7
back 401:24 402:9 410:22 418:16
  418:18,21 420:6,10 436:20
  439:17 445:17
badly 448:17,18
bag 429:24
Baptist 446:8
Barnes 419:5 424:19 427:9,20,24
  429:18
Barnes' 425:14 426:6
Barton 392:8 393:17 396:9,24
  399:12 400:12,21,23 401:7 403:4
  403:5 404:16,24 405:6,23 409:19
  413:23 414:9 418:7 420:24 430:9
  430:15 435:6,8 436:25 437:3,16
  440:16 444:21 445:23 446:3,9
  447:6,13,19
Barton's 437:9 439:11 446:20
based 405:23 435:9 437:18
basically 435:3
basis 417:9
Bates 406:2 418:8
bed 412:16
Bee 394:10
behalf 435:13,14 440:20
behave 437:25 439:3

behavior 446:14
belabor 436:4
believe 406:9 407:13 408:22
  419:11 421:2 423:13,13 425:10
  425:11 428:4,13,15 429:9 431:16
  437:21 439:23 440:2 447:3
believed 436:24 437:18 439:10
belong 431:22
beneath 425:24
Berman 429:8
better 415:15
bible 432:4
big 448:19
birth 404:24
black 400:13
blackface 400:10,16 401:17 402:6
  402:24
blacks 440:9
blood 453:15
bodies 426:19
bone 398:25
born 437:13
bottom 411:20 419:10,17 422:15
  422:17 434:23
box 406:21
break 411:5 436:16,22
breast 398:25
Broadway 393:4
Bruce 393:19 395:20 430:22
  432:11,20 433:12 435:11,17
  440:13,24 442:14,25 443:19
bumping 445:18

**C**

C 393:2 451:2 453:2,2
call 405:19 410:23 414:19,21
called 423:9
calm 399:12,16,16,16
campus 406:14
care 413:20 421:19
case 392:6 428:3 438:12
cause 412:4
cell 396:4 410:25
center 403:19,22
certain 409:23
certainly 411:13
certify 451:9 453:5,14
chain 417:23
chair 397:14,19 399:5
chairperson 401:14
challenges 421:25 422:2,5 427:6
change 413:8
changed 445:15
chapter 432:9
Charles 428:7
checkup 426:15,20
cheek 432:23
Chelsea 408:5

**E**

E 393:2,2 395:6 451:2,2 452:2,7 453:2
e-mail 418:7 419:15,18 420:3 422:20 423:2 428:24
e-mailed 423:9
e-mails 417:23 452:10
E315 396:10 399:6,24 400:24 420:14 446:6 448:22
early 403:9
eight 416:12
either 404:7,11 428:4 442:11
elevator 448:11,24 449:3
emotional 430:4,10,16
employ 453:18
employed 401:10
employee 408:12 434:5
employees 434:12
ends 424:21
enemies 432:24
engaged 440:16
ensure 409:8,10
entire 422:14
entities 424:23
entry 425:19
Eric 393:15 449:24
ESQ 393:5,6,10,15,19 395:20
essence 445:20
everybody 416:9
exact 405:3,4
exactly 415:16 428:15 433:22
examination 395:19 450:6 452:4
examined 395:9
excellent 434:13
excuse 432:11
exhibit 405:11,12,14,23 410:2 411:11 417:21,22,24 418:2,7 419:8 424:10,10,13,15,17 433:2 433:3,5,7,10,15,21 434:14,17,19
expectation 438:10
experience 408:23 415:23,25
explain 400:11 445:7
express 394:15
extensive 441:20
extent 396:3 402:24

**F**

F 453:2
F.I.T 396:10 399:24 401:11 402:23 406:14 408:2 409:22,23 413:22 420:11 434:12 435:19 445:14,16 445:20 446:6 448:11,17
F.I.T.'s 402:13,16
face 397:22 398:16 400:13
face-to-face 448:5
fact 398:11 399:8 402:19 426:22 437:20
fair 442:2

faith 431:16
familiar 432:6,17,19,22
family 421:9,24 422:5
far 400:20 401:24 402:12 409:3 449:10
fashion 392:7 393:8 402:6 434:6 448:2
fear 446:3
federal 395:15
feel 418:4,25 436:15
fees 430:24,24 431:9
feet 400:20,22,22
felt 416:14 438:3,7
fifteen 444:3
figure 430:17
filed 434:15
fill 425:8,13
filled 425:10
find 414:17 435:25 436:12,17
finger 396:25 397:6,8,8 398:8,13 398:23 399:4
finish 399:22 415:8
finished 419:22 443:17,19 444:2
FIRM 393:3
first 395:7 407:9 409:25 410:3,7,7 411:11 414:24 419:14,15,16,17 419:25 420:3,9 422:15,17 423:3 423:6,7,8,9,16 424:25 425:13 428:2,11 429:7 433:9
five 420:7 421:4,13,16,19,25 422:8 430:19 432:9 436:20 439:14
flee 399:9
flipped 410:23
Floor 393:4,13,18
foaming 400:6 438:25
following 412:19 440:11 444:6
follows 395:10
forget 433:16
forgive 441:22
forty-four 432:10
forward 402:9
four 410:16 412:5 439:14 440:20
four-page 406:2 412:3
free 410:8,11 418:5 436:15 438:3,7
freely 445:11
frequently 417:12 418:23
Friday 407:13,15 444:7
friend 424:2,4,7
friends 444:18,25
front 404:2 411:7 433:10
fuck 396:16
fucking 438:24 439:2
funeral 437:11 440:12
further 394:12 453:14
future 394:25

**G**

G 451:2

Gard 414:6,8,11,19 415:3,10
Gelaway 438:15
general 405:5 415:17
Georgia 421:8 428:16,20
getting 410:23
give 402:2 436:11,20
given 451:15
Glass 419:18 420:5 422:19 423:2
go 406:17,19 407:11,25 408:3 410:3 411:17 412:7,9 413:12 416:11 419:25 421:6 422:16 424:9 425:2,25 426:8 431:18 432:16,20 434:23 438:9 439:7 441:23 444:18 445:14,21
God 431:16
goes 402:9
going 398:3,3 400:10 405:24 409:22,23 410:24 418:20 419:8 424:22 425:17 426:11 432:12,18 433:13 436:3 438:6 439:2 440:11 443:22,23,24 445:13,15,24 450:2
gonna 398:19 443:9
good 395:21,22 416:11
gotta 405:20
graduation 447:5
granted 403:20
great 435:16 436:18
grounds 431:4
guess 402:10 411:13,15 419:3,9 426:4 433:17
guessing 419:2,3
guest 432:21

**H**

H 395:6 452:7
hand 397:9 448:17,20 453:20
handle 448:4 449:16
hands 397:10,21,24 398:6,17,21,22
handwriting 425:6 426:6,6
happened 407:25 408:3 414:9 416:16 422:12 430:6,12 444:20 446:5
happens 445:25
happenstance 449:3
harassment 435:5
heads 438:13
health 413:14,20 421:19 427:3,12
hear 403:23 436:6
heard 400:18 440:19
heated 403:4,7
held 392:15,16 431:25 453:7
help 415:14,18
hereunto 453:19
high 400:3
Hm-hm 412:11
Hold 399:22 410:24 433:11
home 412:15 420:11
honestly 409:16

minutes 395:18 436:20 439:15,15
  440:20 441:15 444:3
moment 441:10,22
money 430:15
month 400:9 401:21 415:13 418:24
months 412:22 419:4
morning 395:21,22 416:13 422:19
  423:5
Mount 432:7
mouth 400:6 438:25 440:11
move 439:12 443:24 445:4
moved 445:7,8,10
movements 445:12
multiple 436:8 439:6,9 441:8,19

**N**

N 393:2 451:2,2 452:2 453:2
name 395:11 429:5,9 449:17
names 429:3
NANKERVIS 393:10 395:5
  449:22 450:4
Natasha 400:25 401:5,9,10,16
nature 396:13 435:18
neck 426:15,20
needs 426:15
never 402:12,16 414:21,23 437:23
  437:24 438:8 439:3
new 392:3,18 393:4,4,9,14,14,18
  393:18 395:9 406:5,5,7 407:6
  408:12 414:16 451:4 453:5
newspaper 402:4,5
night 412:16,19 415:22 417:5,10
  417:11
night's 416:11
nightly 417:9 418:23
nightmares 415:23,25 416:4,5,6,19
  416:21 417:3,4,6,8,16 418:21,23
  419:6 421:15
nine 416:12
ninety 395:18
NIXON 393:7
Notary 392:17 395:8 451:25 453:4
notes 424:18
notice 410:14
November 453:20
number 405:19,20 410:20 412:22
  424:10 426:23,24 433:3,16
  435:23 439:16,17

**O**

O 395:6 451:2 453:2
oath 451:10
object 432:14
objection 394:24,25 395:2,3,4,5
  430:21 431:2,10
obscene 404:8
obtain 412:6
obtained 423:17

occurred 413:22
occurrence 406:22
October 392:11 446:2 451:11
offender 409:8
offered 410:13
offers 410:8
office 396:10 397:14 399:6,24
  400:15 401:2,3,4 402:17 403:19
  403:20,22 420:11,12,14,16,18
  423:9 425:9,11,15 429:19 438:2
  446:6
official 409:9
Oh 404:20 423:11
okay 410:5 411:16,19,22 419:21,24
  424:23,24 431:14 432:11,16
  433:20 439:5 440:18,25 441:8,16
  443:2,13,16 444:3,4 448:25
once 403:7,7 418:24
opinion 434:10
order 392:16 408:16,19,24,25
  409:3,5,14,18 412:6 450:2
original 450:3
outburst 403:17
outside 434:8
overheard 400:16,18,21 401:18,22
overhearing 402:24
owes 430:16

**P**

P 393:2,2 395:6,6
P.M 450:7
page 406:4,20 409:25 410:3,7
  411:11,18,20 419:14,16,17 420:2
  420:3 422:16,17 424:25 425:13
  425:17 434:23 437:20 439:25
  452:4,8
pages 437:2,6,8,14 441:5,8,11,19
  441:22 442:5
paid 430:24,25 431:9
pandemic 414:23 427:16
paragraph 410:6
Park 393:13
part 401:22 431:7 438:20
participating 394:8
particular 410:19 424:22,23 427:6
  435:20 447:8
particularly 444:21
parties 394:3,15 395:16 453:15
parts 401:17 412:7 426:19
pastor 426:11,13
patterns 413:8
pay 427:20,20,24
PEABODY 393:7
Penn 412:9
people 402:5 427:2 429:8 435:23
  446:23,25 447:2
Perez 433:24
performance 434:11

period 395:18 413:4 422:8
persist 442:21
person 408:14 409:6 415:4 416:7
  420:15 427:9 431:16 437:5,24,25
  438:2 439:4 440:9 447:8
personally 443:11,16
Phillips 392:4,14 395:13,21 396:1
  396:7,23 397:1,13 398:1 399:1
  399:12 400:1 401:1 402:1 403:1
  404:1,15,23,25 405:1,16,22
  406:1,4,20 407:1 408:1,17 409:1
  410:1,2 411:1,7,17 412:1,12
  413:1 414:1 415:1 416:1 417:1
  418:1,4,9,20 419:1,13 420:1
  421:1,10 422:1 423:1 424:1,17
  425:1,18 426:1 427:1 428:1
  429:1,18 430:1,23 431:1,7,15
  432:1,22 433:1,23 434:1,24
  435:1 436:1,24 437:1,9,15,22
  438:1 439:1 440:1 441:1 442:1
  443:1 444:1,2,11 445:1 446:1,22
  447:1 448:1 449:1,20 450:1
  451:9,19 452:5
Phillips' 437:17
phone 396:4 410:25 415:6 427:17
phones 427:16
phonetics 404:25 438:16
physically 394:22 396:24 398:17
  420:18,21 444:23 446:19
physician 413:12
pick 412:8 441:23
Pine 393:18
place 397:25 419:8 453:8
places 439:6
Plaintiff 392:5,14 393:3 406:4
  425:18
Plaintiff's 405:17,18 424:21
platform 394:10
Plaza 412:9
please 395:11 405:11 410:2,4
  411:15,18,21 418:16 419:9 420:2
  425:2 443:7,15
plural 398:22
point 397:12 398:20 399:12 401:8
  408:11 409:17 414:11 422:23
  437:2,8,14 438:18,18 442:16
pointed 398:7
pointer 397:5
police 405:13 406:5,10 407:7
  408:12 409:7,12,14 410:12 452:9
practitioner 413:14,21 421:20
precinct 406:6,14 407:7,18 408:3,5
  408:7 409:12 412:8
precisely 399:14
presence 394:23
present 393:22 394:4 416:20,20
  422:12
pretty 403:9 425:10 431:19

sessions 427:17
set 453:19
shame 426:21,25
share 433:8
shared 418:3 424:16
shit 396:22 438:24
short 436:22
show 439:18 443:12
showed 439:10
showing 441:17
sick 396:22
simply 442:4
SIMPSON 393:16
single 400:17 417:10
sit 447:11
sleep 413:8 415:14,18,19 416:11,12
sleeping 412:16,18,21 413:4
   415:23 421:12,25 422:7,11,14
sleeplessness 418:21
social 413:13
Socialize 444:18
socialized 434:7
socializing 444:25
socially 423:16
somewhat 399:18 400:17
son 404:24
soon 414:3
Sorry 448:25
sort 402:9,9 413:6 415:18 447:10
sorts 421:9
sought 408:24,25 440:15
South 393:13
SOUTHERN 392:3
speak 401:16 414:8 415:6,10
   421:18,24 422:4 428:6 447:5,6,7
speaking 403:21 413:10 427:14
   447:9
specialists 426:18
specifically 435:21
spoke 403:12,14,15
spot 406:23
ss 451:5
stamped 406:2 418:9
stand 397:13 399:6
start 415:14 443:20
started 403:24,24 415:18,20
   416:16,17,18 427:21 428:13
starts 424:20
state 392:17 395:9,11 451:4 453:5
statement 405:24
STATES 392:2
stating 410:15
stay 445:21
stays 409:9,10
stenographically 453:10
stipulate 394:20
stipulated 394:2,12
stood 397:18 398:2,20 399:5,7

403:18
Street 393:18 406:6,15
student 447:4,20,23 448:2,3,10,16
   448:19
students 448:4
studies 448:3
stuff 431:23
Subscribed 451:20
substantial 435:18
subway 408:6
suffer 430:4
suffering 430:10
suit 436:15
Suite 393:9
summer 417:7,13
Sunday 431:18
supervision 453:11
supposedly 416:9
sure 396:15 401:3 407:23 420:16
   420:20 425:10 436:13,19,21
   442:7 445:22,23
surely 435:12
surrounding 449:9
swear 394:19,21
sworn 395:8 451:20 453:8

T

T 451:2 452:7 453:2,2
take 410:11 419:20 436:16 438:14
   438:15 439:14 441:4,10,12 443:5
   450:4
taken 392:14 436:22 448:18 451:10
   453:10
takes 414:17 418:9
talked 417:18 436:24
talking 401:7 447:11,12
talks 437:7
Tauster 435:13
technology 392:7 393:8 396:3
   434:6
telephone 427:15
tell 402:12 404:23 411:10 426:4
   436:17 440:16
telling 438:25 443:8
ten 400:22,22 429:16,17 434:24
   438:8 444:3
terms 405:5
testified 395:10 396:7 398:5 399:18
   400:9 401:21 412:12 425:22
   431:15 440:12 446:8
testify 440:19 445:6
testifying 440:22,25 441:6,9,14,16
testimony 400:3 415:2 435:18
   437:17 453:6,9,10,13
text 429:12
texted 423:10
textile 448:2
Thank 434:18 442:8 443:25

Thanks 449:20
therapist 417:18
therapy 425:25 426:9,22 427:2,7
thereof 412:7
Thier 392:17 395:8 453:4,24
thing 428:22
things 396:8 397:24 426:12
think 401:20 404:13 405:19 408:21
   416:22,23 419:13 423:21,22
   428:14 429:13 430:15 433:13
   434:13 435:15 442:2,13 445:11
   445:12,12
thinking 428:21
third 425:17
thirty 402:23 426:12
thought 409:16,20,22
thousand 430:20
threatened 438:11 446:4
three 440:19
three-fifths 437:5 440:9
throw 429:23
Thursday 444:6
time 392:18 394:24 400:24 402:3,7
   404:6,8 405:2,7 407:8,9 408:11
   409:15,15,17,24 412:2 413:4,10
   413:11 414:11,17,20,22,24,24
   416:20 422:12,14 425:9,12,25
   426:9,21 434:16 438:7,14 441:4
   443:5,12 449:20 453:8
times 418:24 436:8 438:16 439:8
   441:23 445:17 449:4,6,10
tired 396:22 438:24
title 401:13 435:3
today 441:21 445:25 446:4
told 405:6 419:5 438:24 446:8
top 406:4 419:11,25 420:3 425:3
   425:19
tossed 413:6
touch 404:11,12
touched 398:8,12,12
track 443:2,3
train 407:22
transcribed 453:11
transcript 435:25 436:12,14 437:3
   437:15 441:20,21 451:10,12
   453:12
treat 413:3 424:6
treatment 413:20 415:14 423:17
   427:13,21
trouble 412:16,18,21 413:4 421:12
   422:7
true 406:13 451:12,15 453:12
trust 446:25 447:2
try 399:8 413:7 445:23
turned 396:5 411:2 413:6
turning 432:23
twenty 439:15
two 397:10 426:24 434:25 439:17

| | |
|---|---|
| 393 393:1 | 449 449:1 |
| 394 394:1 | 450 450:1 |
| 395 395:1 452:5 | 451 451:1 |
| 396 396:1 | 452 452:1 |
| 397 397:1 | 453 453:1 |
| 398 398:1 | 475 393:13 424:21 |
| 399 399:1 | |

**4**

| | |
|---|---|
| 400 400:1 | **5** |
| 401 401:1 | 50 393:9 |
| 402 402:1 | 55 393:4 |
| 403 403:1 | |
| 404 404:1 | **6** |
| 405 405:1 452:9 | 6 417:21 418:7 |
| 406 406:1 | |
| 407 407:1 | **7** |
| 408 408:1 | 7 424:10 |
| 409 409:1 | |
| 410 410:1 | **8** |
| 411 411:1 | 8 415:3,11 419:14 422:18 423:4 |
| 412 412:1 |   424:13 425:13 427:7,21 |
| 413 413:1 | 8-8-2019 425:19 |
| 414 414:1 | 8/8/19 452:11 |
| 415 415:1 | 80 393:18 |
| 416 416:1 | |
| 417 417:1 452:10 | **9** |
| 418 418:1 | 9 396:8 405:11,23 |
| 419 419:1 | 9:33 392:11 |
| 420 420:1 | 95 437:2 441:11 |
| 421 421:1 | 9th 395:17 |
| 422 422:1 | |
| 423 423:1 | |
| 424 424:1 452:11 | |
| 425 425:1 | |
| 426 426:1 | |
| 427 427:1 | |
| 428 428:1 | |
| 429 429:1 | |
| 430 430:1 | |
| 431 431:1 | |
| 432 432:1 | |
| 433 433:1 452:12 | |
| 434 434:1 | |
| 435 435:1 | |
| 436 436:1 | |
| 437 437:1 | |
| 438 438:1 | |
| 439 439:1 | |
| 440 440:1 | |
| 441 424:21 441:1 | |
| 442 442:1 | |
| 443 425:18 443:1 | |
| 444 444:1 | |
| 445 445:1 | |
| 446 446:1 | |
| 447 447:1 | |
| 448 448:1 | |

# LAWYER'S NOTES

| PAGE | LINE | NOTES... |
|------|------|----------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |