# EXHIBIT N

**1**

```
 1
 2      THE UNITED STATES DISTRICT COURT
 3      SOUTHERN DISTRICT OF NEW YORK
        -----------------------------------------X
 4      MARJORIE PHILLIPS,
 5                          Plaintiff,
 6
 7          -against-        Civil Action No.:
                             17-cv-00221 (GBD)
 8
 9      THE FASHION INSTITUTE OF TECHNOLOGY, MARY
10      DAVIS, and MARILYN BARTON,
11                          Defendants.
        -----------------------------------------X
12
                        DATE:  December 16, 2021
13                      TIME:  10:12 a.m.
14
15
16
17                      DEPOSITION of the
18      30(b)(6) Witness, DELIWE KEKANA, by the
19      Plaintiff, pursuant to a Notice, held via
20      Video Conferencing, before Lesley Simpson, a
21      Notary Public of the State of New York.
22
23
24
25
```

**2**

```
 1
 2      A P P E A R A N C E S :
 3
 4      THE COCHRAN FIRM, P.C.
            Attorneys for Plaintiff
 5          One Exchange Place, 23rd Floor
            New York, New York 10006
 6
        BY: DEREK S. SELLS, ESQ.
 7          MINA MALIK, ESQ.
            MONIQUE MILNER, ESQ.
 8
 9      NIXON PEABODY LLP
10          Attorneys for Defendant
            THE FASHION INSTITUTE OF TECHNOLOGY
11          50 Jericho Quadrangle
            Suite 300
12          Jericho, New York 11753
13      BY:  NICHOLAS MELITO, ESQ.
             ROSE NANKERVIS, ESQ.
14
15      SARETSKY KATZ & DRANOFF LLP
16          Attorneys for Defendant
            MARY DAVIS
17          475 Park Avenue South
            New York, New York 10016
18
        BY:  ERIC DRANOFF, ESQ.
19
20      BERANBAUM MENKEN LLP
21          Attorneys for Defendant
            MARILYN BARTON
22          80 Pine Street
            33rd Floor
23          New York, New York 10005
24      BY:  BRUCE MENKEN, ESQ.
25
```

**3**

```
 1
 2      A L S O   P R E S E N T :
 3      MARJORIE PHILLIPS, Plaintiff
 4      MARY DAVIS, Defendant
 5      ANDRE THOMAS, Exhibit Manager
        PFP Reporting
 6
 7      CRYSTAL ESPINAL, Exhibit Manager
        PFP Reporting
 8              *           *           *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1
 2      F E D E R A L   S T I P U L A T I O N S
 3
 4          IT IS HEREBY STIPULATED AND AGREED by and
 5      between the counsel for the respective parties
 6      herein that the sealing, filing and
 7      certification of the within deposition be
 8      waived; that the original of the deposition
 9      may be signed and sworn to by the witness
10      before anyone authorized to administer an
11      oath, with the same effect as if signed before
12      a Judge of the Court; that an unsigned copy of
13      the deposition may be used with the same force
14      and effect as if signed by the witness, 30
15      days after service of the original & 1 copy of
16      same upon counsel for the witness.
17
18          IT IS FURTHER STIPULATED AND AGREED that
19      all objections except as to form, are reserved
20      to the time of trial.
21
22
23
24
25
```

**5**

1
2      D E L I W E   K E K A N A, having been first
3      duly sworn before a Notary Public of the State
4      of New York was sworn and testified as
5      follows:
6      EXAMINATION BY
7      MR. SELLS:
8          Q.  Can you please state your name and
9      address for the record.
10         A.  Deliwe Kekana.  38 Pershing Avenue,
11     Valley Stream, New York 11581.
12         Q.  Would that be a private house or an
13     apartment?
14         A.  That's a private home.
15         Q.  And can you please spell "Pershing"
16     for me?
17         A.  Certainly.  It is P, as in Paul,
18     E-R-S, as in Sam, H-I-N-G.
19             MR. SELLS:  Eric, you had a
20         question that I am responding to now.
21         This deposition will be held with the
22         federal stips; if that is okay with
23         everyone?
24             MR. DRANOFF:  Okay.  As long as
25         we all understand what "federal

**6**

1                   D. KEKANA
2      stips" are, okay.
3             MR. SELLS:  Absolutely.
4             MR. MENKEN:  To me what that
5         means, Derek, this deposition is
6         being done pursuant to the federal
7         Rules of Professional Conduct federal
8         procedure, correct?
9             MR. SELL:  Correct.  Got it.
10         Q.  Good morning, Ms. Deliwe --
11         A.  Good morning.
12         Q.  My name is Derek Sells; and I, along
13     with my partner, Mina Malik and our colleague
14     Monique Milner, represent Marjorie Phillips
15     in a lawsuit against F.I.T. and others
16     concerning acts of discrimination and
17     retaliation that she made complaints about.
18             Do you understand why you are here
19     today?
20         A.  Yes.
21         Q.  Okay.
22             What is your understanding of why
23     you are here today?
24         A.  I'm here to speak about my knowledge
25     as it pertains to the incident involving

**7**

1                   D. KEKANA
2      Ms. Phillips complaints of discrimination.
3             MR. DRANOFF:  Derek, I'm sorry
4         to interrupt.  It just hit me in the
5         head.
6             Bruce, when we were talking
7         about the stipulations, you said we
8         agreed to abide by the federal rules.
9         Are we abiding by federal rules or
10        are we abiding by certain
11        stipulations?
12             MR. SELL:  Is that fair with
13        everyone?  We are doing a Zoom
14        mediation; and we are going consent
15        to doing it virtually as the notice
16        indicated.
17             MR. DRANOFF:  That is fine.
18        But what I'm wondering, for instance,
19        to move the deposition along today do
20        you want to stipulate that we are
21        preserving all objections except to
22        form, or do you prefer that counsel
23        interpose objections on other grounds
24        as well?
25             That is why I wanted to clarify

**8**

1                   D. KEKANA
2      are you going by the federal rules or
3      do you want to go with the
4      stipulations?  I'm fine with either.
5      I just want to make sure we all have
6      clarity.
7             MR. SELLS:  I think we are
8      going to do both, right?  I mean,
9      it's the stips that you make an
10     objection and it is an objection and
11     it is preserved as to whatever the
12     objection might be.  You know you
13     will state it simply.  No speaking
14     objections and so forth.  I don't
15     think it's a big deal, Eric, really.
16             MR. DRANOFF:  Okay.  Well --
17        okay.  That's fine.
18             MR. SELLS:  All right.  So --
19             MR. DRANOFF:  Yeah.
20         Q.  So, Ms. Kekana, do you understand
21     that you are also here in addition to
22     answering questions concerning Ms. Phillips's
23     complaints, you're also here as a
24     representative of F.I.T. to speak about
25     certain issues relating to human resources

D. KEKANA

functions, complaint procedures, as well as the relationship between the union and F.I.T. as it relates to unionized employees?

MR. MELITO: Objection.

Q. Do you understand that?

MR. MELITO: Objection. She is designated as the witness for the following 30(b)(6) topics, the EEOC policies including reporting discrimination or retaliation, investigating complaints of discrimination and retaliation, employee discipline relating to discrimination retaliation and employee training relating to discrimination retaliation. The other topics were designated for the next 30(b)(6) deponent.

MR. SELLS: Okay.

Q. Do you understand that, Ms. Kekana?

A. Can you repeat the question?

Q. Sure.

Do you understand that you are also here as a representative witness for F.I.T.



D. KEKANA

on the topics of EEOC, complaint procedures, employee discipline, as well as employee training as it relates to EEOC topics? Are you aware of that?

A. Yes, I'm aware of that.

Q. Okay.

Is there any reason that you will not be able to understand questions that are asked of you today?

A. No.

Q. So you are not taking any medication or you are not under the influence of any drug that could affect your ability to listen and understand questions that are asked of you today?

A. No.

Q. Okay. All right.

Then I will assume that when I ask you a question and you answer it that you understood the question that I asked you and you are answering that question. Is that fair?

A. Yes.

Q. All right.



D. KEKANA

And if for any reason you do not understand the question that I have asked you, please tell me so that I can rephrase it or otherwise help you to understand what that question. Is that fair enough?

A. Yes.

Q. Okay.

Now, today you're free pretty much at any time to take a break. All you have to do is ask me. The one thing that I'll ask is, If there is a pending question that you answer that question before you take a break. Is that fair?

A. Yes.

Q. Okay.

Can you tell us how you are currently employed?

A. Can you rephrase the question?

Q. Sure. Where do you work?

A. I work at the Fashion Institute of Technology.

Q. All right.

And what is your title?

A. My title is director of affirmative



D. KEKANA

action and Title 9 coordinator.

Q. All right.

And how long have you held that position?

A. I have been in this position for the past six years.

Q. And prior to that, what position were you in?

A. My prior position was affirmative action specialist.

Q. Was that with F.I.T. as well?

A. Yes.

Q. When did you become an affirmative action specialist for F.I.T.?

A. That was in 2013.

Q. Did you work at F.I.T. before 2013?

A. Yes.

Q. What position did you hold at F.I.T. before 2013?

A. Administrative aide to the affirmative action officer.

Q. And how long were you in that position?

A. I was in that position for five

13

D. KEKANA

1
2  years.
3      Q.  So, that would have been sometime
4  around 2008; that is correct?
5      A.  Yes.
6      Q.  When did you start at F.I.T.?
7      A.  April 1st, 2008.
8      Q.  Before starting at F.I.T., did you
9  work anywhere else?
10      A.  Yes.
11      Q.  Tell me where you worked.
12      A.  Immediately preceding, I worked for
13  the Blackstone Group.
14      Q.  The what?
15      A.  The Blackstone Group.
16      Q.  Okay.
17          And what was your position at the
18  Blackstone Group?
19      A.  Administrative assistant.
20      Q.  In what area?
21      A.  I was what was referred to as a
22  floater, so I worked within several
23  departments within the Blackstone Group.
24      Q.  For how long did you work for the
25  Blackstone Group?

14

D. KEKANA

1
2      A.  Two years.
3      Q.  And when would those two years have
4  been?
5      A.  That would have been 2006 through
6  2008.
7      Q.  Where did you work prior to
8  Blackstone Group?
9      A.  I worked for John Jay College of
10  Criminal Justice.
11      Q.  And what did you do at John Jay?
12      A.  I was an office manager.
13      Q.  For how long did you work at John
14  Jay?
15      A.  Five years.
16      Q.  So, that would have been from 2002
17  to 2008?
18      A.  No, that would have been from 2001
19  to 2008.
20      Q.  Oh, sorry.  Okay.
21          And what did you do before John Jay?
22      A.  I was a student.
23      Q.  Where did you go to school?
24      A.  John Jay College of Criminal
25  Justice.

15

D. KEKANA

1
2      Q.  Did you graduate?
3      A.  I did.
4      Q.  What year did you graduate?
5      A.  2001.
6      Q.  Before John Jay, what did you do?
7      A.  I was a student.
8      Q.  Where were you a student?
9      A.  Brooklyn Technical High School.
10      Q.  Right from high school you went to
11  John Jay; is that correct?
12      A.  Correct.
13      Q.  When did you graduate high school?
14      A.  1997.
15      Q.  You went to John Jay in 1997?
16      A.  Correct.
17      Q.  Got it.
18          You graduated 2001; is that correct?
19      A.  Correct.
20      Q.  Got it.  All right.  So I think I'm
21  all caught up.
22          Now, did you ever get fired from a
23  job?
24      A.  No.
25      Q.  Have you ever experienced race

16

D. KEKANA

1
2  discrimination?
3          MR. MELITO:  Objection.
4      Q.  You could answer.
5          MR. MELITO:  You could answer,
6      Ms. Kekana.
7      A.  Yes.
8      Q.  Tell me about it.  When was the
9  first time you remember experiencing race
10  discrimination?
11          MR. MELITO:  Objection.  You
12      could answer.
13      A.  As a small child living in South
14  Africa.
15      Q.  Okay.
16          What was it that you felt?
17          MR. MELITO:  I'm just going to
18      note, so I do not keep interrupting
19      this line of questioning, I'm going to
20      state a standing objection.
21          MR. SELLS:  That's fine.
22      Q.  What was your experience?
23      A.  I lived in a black township which is
24  where black people in South Africa during
25  that time were relegated to live based on the

17

```
1              D. KEKANA
2   apartheid system.
3       Q.  Which township was that?
4       A.  Diepkloof Soweto, Zone 3.  D, as in
5   David; I-E-P-K-L-O-O-F, as in Frank.
6       Q.  What about living in -- you said
7   that was in Soweto; is that right?
8       A.  Correct.
9       Q.  So, was that the same township that
10  Nelson Mandela and his family lived in?
11      A.  Soweto is comprised of multiple
12  townships.  So, Nelson Mandela it's from
13  Orlando Township, which is a neighboring
14  township to Diepkloof.
15      Q.  Got it.
16          And he lived just a block away from
17  Bishop Tutu, right?
18      A.  Correct.
19      Q.  So, that was also in that township?
20      A.  Correct.
21      Q.  "Soweto," what does that stand for;
22  is it the southwest township?
23      A.  That's correct, Soweto stands for
24  southwest township.
25      Q.  Got it.
```

18

```
1              D. KEKANA
2          When you say you first experienced
3   racial prejudice, how did it make you feel?
4          MR. MELITO:  Objection.
5       Q.  How did it make you feel?
6          MR. MELITO:  To the extent this
7   is harassing, I will also raise a new
8   objection that it could be harassing
9   to the witness to the extent --
10         MR. SELLS:  All right.  All
11  right.  Hold on --
12         MR. MELITO:  She can answer.
13         MR. SELLS:  Okay.  All right.
14  Fine.
15         MR. MELITO:  She is not the one
16  raising any discrimination claims
17  here.  This is going, I think, out
18  of --
19         MR. SELLS:  Lesley, can you
20  make sure that when these speaking
21  objections take place, I don't want
22  this coming out of my time.  All
23  right?  I mean, I thought we just
24  went through this.  Nicholas, you
25  just said you have a standing
```

19

```
1              D. KEKANA
2   objection to all the questions.  You
3   don't need to keep saying objection.
4          MR. MELITO:  This --
5          MR. SELLS:  You got it.  You
6   got it.
7          MR. MELITO:  This is a new
8   objection for harassing the witness;
9   and to the extent she does not feel
10  comfortable answering, she does not
11  have to.
12         MR. SELLS:  Please, answer the
13  question.
14         MR. MELITO:  To the extent you
15  feel comfortable.
16      A.  Can you repeat the question?
17         (Whereupon, the requested
18  portion of the transcript was read
19  back.)
20      A.  Can you rephrase the question?
21      Q.  Yes.  Growing up in Soweto when you
22  said you first experienced racial prejudice,
23  how did it make you feel?
24      A.  As a child, I was scared.
25      Q.  And why were you scared?
```

20

```
1              D. KEKANA
2          MR. MELITO:  Objection.
3       A.  (No Response.)
4          MR. MELITO:  Ms. Kekana, I can
5   see you are distraught from this line
6   of questioning.  And since I believe
7   it is harassing and in no way
8   relevant to anything in this
9   litigation, I'm going to instruct you
10  not to respond to this line of
11  questioning.
12         Please, move onto a different --
13         MR. SELLS:  I'm not going move
14  on, Nicholas --
15         MR. MELITO:  We could get the
16  court on the phone.  I'm instructing
17  her not to answer.  You can --
18         MR. SELLS:  Okay --
19         MR. MELITO:  This is way
20  outside the scope of anything, so --
21         MR. SELLS:  Oh really?  It is?
22         MR. MELITO:  Yeah.  Yes, you're
23  talking about --
24         MR. SELL:  I tell you what,
25  we'll mark this part of the
```

21

D. KEKANA

1
2      deposition and we'll come back to it.
3      I will move forward.
4         Q.  When you said you felt scared did
5      you feel scared for your life --
6             MR. MELITO:  Objection.  This
7         is the same line of questioning about
8         her -- I instructed her not to
9         answer; please move on to a different
10        line of questioning --
11            MR. SELLS:  Okay --
12            MR. MELITO:  I will --
13            MR. SELLS:  New to the case --
14        I know you're new to case, Nicholas.
15            MR. MELITO:  You're not going
16        to -- I'm going --
17            MR. SELLS:  Hold on.  I know
18        you are new to the case, Nicholas;
19        but one of the allegations to the
20        case is that my client, Ms. Phillips,
21        after experiencing race
22        discrimination felt scared for her
23        life, and that's why I think this is
24        entirely appropriate; because --
25            MR. MELITO:  It is not --

22

D. KEKANA

1
2             MR. SELLS:  Because Ms. Kekana
3         is the one who investigated my
4         client's claims that is a question of
5         bias, all right.  So please, you know
6         when you make these arguments,
7         there's basis for my question.
8             Now, do you want to withdraw
9         your instruction to Ms. Kekana and
10        tell her she can answer the question
11        now that I have made my -- my purpose
12        in asking the question known?
13            MR. MELITO:  No, I will not
14        withdraw my objection.
15            MR. SELLS:  Okay.
16            MR. MELITO:  You can contact
17        the court, and I will note for the
18        record that Ms. Kekana is physically
19        distraught.  She looks like she is
20        crying because of your harassing
21        questions.  I will note that for the
22        record.
23            MR. SELLS:  All right.
24        Q.  By the way, Ms. Kekana, did you
25     investigate Ms. Phillips's complaints of

23

D. KEKANA

1
2      discrimination and retaliation?
3         A.  Yes.
4         Q.  Okay.
5             One of the things that Ms. Phillips
6      complained about in terms of that was her
7      fear?
8             MR. MELITO:  Objection.
9         Q.  Is that right?
10            MR. MELITO:  Objection.
11        Q.  Is that right, Ms. Kekana?
12        A.  When Ms. Phillips came to me with
13     her initial complaint she did not indicate
14     that she was fearful in any way.
15        Q.  That was not my question,
16     Ms. Kekana.  I said, You investigated my
17     client's claims of discrimination and
18     retaliation claims, correct?
19        A.  I investigated her complaint of
20     discrimination.
21        Q.  Oh.  You didn't investigate the
22     complaint of retaliation when my client
23     claimed that Ms. Barton threatened to kill
24     her?  You didn't investigate that; is that
25     right?

24

D. KEKANA

1
2             MR. MELITO:  Objection.
3         A.  No, that --
4         Q.  Go ahead --
5             MR. MELITO:  Go ahead.
6         Q.  -- you can answer.
7         A.  No, that was handled by the Human
8      Resources Office.
9         Q.  So you never even heard that, right?
10     You never heard from Ms. Phillips directly
11     that she felt scared for her life because of
12     what Marilyn Barton said to her on May 16 of
13     2019; is that correct?
14            MR. MELITO:  Objection.
15        A.  I did speak to Ms. Phillips.  She
16     indicated that she had had -- that she did
17     feel fearful.  I instructed her in writing to
18     go to Public Safety --
19        Q.  Okay.  Okay.  I didn't ask you all
20     that.  I didn't ask you all that, Ms. Kekana.
21     I just asked you whether or not my client
22     indicated to you that she was afraid for her
23     life as a result of her complaints of
24     discrimination and/or retaliation; isn't that
25     right --

25

```
1                D. KEKANA
2            MR. MELITO:  Objection --
3       Q.  -- that's what I asked you.  Is that
4  what I asked you, Ms. Kekana --
5            MR. MELITO:  Objection.  You
6       are being very -- you are harassing
7       the witness right now with your tone.
8       I would ask you to --
9            MR. SELLS:  Nicholas --
10           MR. MELITO:  Professional --
11           MR. SELLS:  Nicholas.
12      Nicholas, I tell you what.  Say
13      objection.  All right.  Say
14      objection.  All right.  I'm not going
15      to tolerate you speaking throughout
16      my deposition, okay.  So don't do it.
17           MR. MELITO:  Just for the -- I
18      will note for the record --
19           MR. SELLS:  Listen, Nicholas --
20           MR. MELITO:  I have to give an --
21           MR. SELLS:  Nicholas.
22      Nicholas.  Nicholas, stop.  Please
23      stop.
24           MR. MELITO:  Derek.
25           MR. DRANOFF:  I would like to
```

26

```
1                D. KEKANA
2       ask the reporter something.  If I
3       could ask the reporter something.
4            MR. SELLS:  You know what, I'm --
5       you got to stop, Nicholas.
6       Seriously, you got to stop.  All
7       right.  It's ridiculous --
8            MR. MELITO:  I'm allowed to
9       note an objection --
10           MR. SELLS:  I'm allowed to ask
11      questions, Nicholas --
12           MR. MELITO:  Yes, and I'm
13      allowed to note an objection.  And
14      this is the precise behavior that you
15      yourself have done in Ms. -- during
16      defendant's deposition of Plaintiff.
17      So --
18           MR. SELLS:  All right --
19           MR. MELITO:  So, I will note my
20      objections when appropriate if they
21      need to be elaborated.
22           MR. DRANOFF:  If I may,
23      gentlemen.
24      Q.  Ms. Kekana.  Ms. Kekana, if we could
25  just get back on track.
```

27

```
1                D. KEKANA
2            MR. DRANOFF:  If I may for one
3       second, I want to ask the reporter
4       because this was noticed as a video
5       deposition.
6            MR. SELLS:  This is not noticed
7       as a video deposition.  So I don't
8       know what you're talking about with
9       that, Eric.
10      Q.  So, Ms. Kekana, if we could just get
11      back on track.  So, you felt scared when you
12      first experienced racial discrimination; is
13      that correct?
14           MR. MELITO:  Objection.  If we
15      need to --
16      A.  Yes, as a two-year old I felt scared
17      when I experienced racial discrimination.
18      Q.  Got it.
19           How did you express that fear as a
20  two-year old?
21           MR. MELITO:  Objection.  Do not
22      answer.
23           If you are going to ask about
24      my -- about Ms. Kekana's personal
25      experiences when she was two years
```

28

```
1                D. KEKANA
2       old as a child, we need to get the
3       court on the phone because you're
4       waisting your time right now.  You
5       are because you are wasting your
6       time; and if not, let's move on to a
7       different line of questioning.
8       Q.  Did that fear persist after --
9            MR. MELITO:  Objection.
10      Objection.  We are going -- I'm
11      making a point.  We will call the
12      court right now.
13           MR. SELLS:  On what basis?
14      What basis, Nicholas?
15           MR. MELITO:  Because you're
16      harassing -- you're not following the
17      Rules of Professional Conduct federal
18      procedure.  You are harassing the
19      witness.  This is a completely
20      inappropriate line of questioning.  I
21      asked you multiple times to change
22      your line of questioning and you want
23      to proceed with it.  So let's get the
24      Judge on the phone so I don't have to
25      keep objecting to it.  Let's get the
```

29

```
 1              D. KEKANA
 2   Judge on the phone.
 3         MR. SELLS:  All right.  We'll
 4   get the Judge on the phone.
 5         Lesley, I asked about five
 6   minutes worth of questioning, not
 7   even --
 8         MR. MELITO:  Yup, this is fully
 9   counted towards your time, Mr. Sells.
10         MR. SELLS:  Okay.
11         (Whereupon, a brief recess was
12   taken at 10:38 a.m.; after which, the
13   proceedings continued at 10:40 a.m.
14   as follows.)
15         (Mr. Melito is calling Judge
16   Daniels.)
17         MR. MELITO:  I believe the
18   proper thing is to is to go to magistrate
19   on this by reading Judge Daniels'
20   rules.  Unless anyone --
21         MR. SELLS:  What about the
22   rule?  What about the rule, Nicholas?
23         MR. MELITO:  I'm bringing it
24   up, hold on.  Telephone calls -- this
25   is Judge Daniels' rules.  Telephone
```

30

```
 1              D. KEKANA
 2   calls to chambers are permitted only
 3   in emergency situations requiring
 4   immediate attention.  The following
 5   calls are never permitted.  One is
 6   going down to calls requesting
 7   substantive or procedural legal
 8   advice.  So that is one of the
 9   exceptions that a call is never
10   permitted; so I would think --
11         MR. SELLS:  It has nothing do
12   to do with procedure, does it?
13         MR. MELITO:  It does.  I'm
14   saying you're acting outside of
15   federal procedure for your line of
16   questioning --
17         MR. SELLS:  I'll call Judge
18   Daniels, and we'll get him on the
19   line right now.
20         MR. MELITO:  Ms. Simpson, when
21   the judge goes -- just please put
22   this on the record for the deposition
23   that we are calling Judge Daniels,
24   and please transcribe to the best
25   that you can when the Judge is on the
```

31

```
 1              D. KEKANA
 2   phone.
 3         MR. SELLS:  Hi, this is Derek
 4   Sells calling from The Cochran Firm.
 5   I'm calling in reference to a
 6   deposition that is taking place
 7   currently where I'm the one who is
 8   questioning a witness in the Marjorie
 9   Phillips versus --
10         CHAMBER SECRETARY:  What is the
11   docket number on the case?
12         MR. SELLS:  Yes, it's CV-00 --
13   it's CV-00221- -- 1-20CV00221.
14         CHAMBER SECRETARY:  Hold on.
15         MR. SELLS:  Can everybody hear
16   me?
17         (All parties respond
18   affirmative.)
19         CHAMBER SECRETARY:  Good
20   morning, Judge Daniels' chambers.
21   How can I help you?
22         MR. SELLS:  Yes.  Hi, this is
23   Derek Sells from The Cochran Firm.  I
24   represent the plaintiff, Marjorie
25   Phillips, in a case against Fashion
```

32

```
 1              D. KEKANA
 2   Institute of Technology, Mary Davis
 3   and Marilyn Barton.  I'm in the
 4   process of taking a deposition of a
 5   fact witness in a 30(b)(6) Witness.
 6         CHAMBER SECRETARY:  Okay.
 7         MR. SELLS:  And Counsel for the
 8   witness has instructed her not to
 9   answer questions that I have asked --
10         CHAMBER SECRETARY:  Okay.
11         MR. SELLS:  -- without getting
12   a ruling.  So we are calling to see
13   if we could get a ruling.
14         CHAMBER SECRETARY:  Okay.  And
15   what is the nature of the question
16   that you are seeking to ask?
17         MR. SELLS:  Yes, okay.  So this
18   is a case relating to claims of race
19   discrimination and retaliation.
20         CHAMBER SECRETARY:  Okay.
21         MR. SELLS:  The person that we
22   are asking the question of is the
23   affirmative action employee for
24   F.I.T. who is going to be talking
25   about investigating my client's
```

33

```
1        D. KEKANA
2    claims as well as F.I.T.'s policies
3    as it relates to that.
4        I asked her specifically if she
5    herself had faced discrimination in
6    her life, and she indicated that she
7    had, and I sought to inquire about
8    it.  I asked her how she felt about
9    the discrimination she faced that she
10   stated she felt fearful, and I wanted
11   to continue that line of questioning
12   when she indicate that had she felt
13   fearful when she first experienced it
14   as a two-year old.
15       I wanted to try and bring her
16   further along to see whether that
17   fear continued as she grew older, and
18   I was prevented from asking that
19   question.  The reason --
20       CHAMBER SECRETARY:  Okay --
21       MR. SELLS:  The reason I wanted
22   to pursue it is because I believe it
23   goes to the witness' bias because my
24   client, when she made complaints of
25   discrimination to F.I.T. including
```

34

```
1        D. KEKANA
2    her, indicated that she felt fearful
3    and that's one of the disputed issues
4    in this case; and so I think it goes
5    to the heart of the matter.
6        CHAMBER SECRETARY:  To make
7    sure I understand, you want to ask
8    about, the affirmative action
9    employee officer, you want to ask
10   about her personal experience with
11   discrimination from the ages of two
12   until just generally.
13       MR. SELLS:  No.  I want to take --
14   I want to try and find out -- I want
15   to inquire about how long she felt
16   this fear and whether it was
17   something that persisted up until
18   this day, but I'm not even -- I
19   haven't -- the witness has been
20   instructed not to answer, and so I
21   cannot pursue that line of questions.
22       CHAMBER SECRETARY:  Okay.
23       MR. MELITO:  If I may note --
24       CHAMBER SECRETARY:  This person
25   is a 30(b)(6) Witness and a fact
```

35

```
1        D. KEKANA
2    witness?
3        MR. SELLS:  That's correct.
4        CHAMBER SECRETARY:  Okay.
5        MR. MELITO:  If this is -- this
6    is Defense Counsel Nicholas Melito
7    for F.I.T.
8        CHAMBER SECRETARY:  Okay.
9        MR. MELITO:  I would just like
10   to note our objection before you
11   speak to the Judge.
12       CHAMBER SECRETARY:  Yes.
13       MR. MELITO:  The line of
14   questioning has nothing to do with
15   this matter, and it's very harassing
16   and the witness is physically
17   distraught over it.  You can see that
18   she is tearing up and crying over the
19   line of questioning being brought up
20   since she was two years old.
21       So our objection is because it
22   is harassing the witness.
23       CHAMBER SECRETARY:  Okay.  And
24   do you have any -- is it just the
25   objection to asking about her
```

36

```
1        D. KEKANA
2    childhood or anything within these
3    lines of questioning at any age?
4        MR. MELITO:  This line of
5    questioning.
6        CHAMBER SECRETARY:  Okay.
7    Understood.  Please hold and I will
8    convey this to Judge Daniels.
9        MR. MELITO:  Thank you.
10       MR. SELLS:  Thank you.
11       (On hold.)
12       CHAMBER SECRETARY:  Counsel,
13   Judge Daniels said the parties should
14   move on to a different topic.
15       MR. MELITO:  Thank you.
16       CHAMBER SECRETARY:  Okay.
17   Thank you.  Have a good day.
18       MR. SELLS:  All right.
19   Q.  Now, Ms. Kekana --
20       MR. MELITO:  I'm sorry.  Before
21   you go, can I just take five with the
22   witness just so she can regroup after
23   that line of questioning so she can,
24   you know, calm her nerves after the
25   harassing line of questioning?
```

37

```
          D. KEKANA
1
2       Please.  She just needs --
3            MR. SELLS:  You need some time,
4       Ms. Kekana.
5            THE WITNESS:  I would like to
6       take a break, please.
7            MR. SELLS:  Sure.  How long do
8       you need?
9            THE WITNESS:  Can we have 10
10      minutes, please.
11           MR. SELLS:  Sure.  We'll come
12      back at eleven o'clock; is that all
13      right?
14           MR. MELITO:  Yes.
15           (Whereupon, a brief recess was
16      taken at 10:51 a.m.; after which, the
17      proceeding continued at 11:02 a.m. as
18      follows.)
19           MR. SELLS:  Are we all set to
20      go?
21      Q.  Ms. Kekana, are you all right?
22      A.  I'm okay.
23      Q.  Okay, good.  I see you're smiling
24  now.  You feel better?  You feel a little bit
25  better now?
```

38

```
          D. KEKANA
1
2       A.  I'm okay.
3       Q.  Okay, well that's good.  Good.
4            So Ms. Kekana, before you --
5            MR. MELITO:  Before you -- are
6       we back on?
7       Q.  You indicated your title is director
8   of affirmative action and the Title 9
9   coordinator; is that correct?
10      A.  That is correct.
11      Q.  You held that position for six
12  years; is that right?
13      A.  That is correct.
14      Q.  All right.
15           And what are your responsibilities
16  as the director of affirmative action and
17  Title 9 coordinator
18      A.  Among my responsibilities and job
19  duties include overseeing compliance as it
20  relates to issues of affirmative action.
21  Title 9, Title 7, education law -- New York
22  State education law 129B as well as
23  overseeing investigation of any complaints of
24  discrimination, discriminatory harassment,
25  sexual harassment or sexual misconduct.
```

39

```
          D. KEKANA
1
2       Q.  Did you receive any training in any
3   of those areas?
4       A.  I did.
5       Q.  All right.
6            Tell me what training you received
7   in connection with those topics.
8       A.  I've received training via the
9   Cornell Professional Studies School in
10  handling employee investigations as well as
11  in producing affirmative action plans and
12  issues in and around diversity, equity and
13  inclusion.  I have also been certified by the
14  American Association for Access Equity and
15  Diversity as a certified affirmative action
16  professional.
17      Q.  Is that it?
18      A.  I continue to have on a yearly basis
19  additional continuing learning objectives
20  that I must meet in order to keep up with my
21  certifications; so there are various sorts of
22  education webinars, conferences and
23  presentations that I have to attend in order
24  to be certified and continue my
25  certification.
```

40

```
          D. KEKANA
1
2       Q.  Okay.
3            Do you belong to any organizations?
4       A.  Yes.  I belong to NADOHE, which is
5   the National Association of Diversity
6   Officers in Higher Education.  I belong to
7   Triple AED, again, that is the American
8   Association for Access Equity and Diversity
9   as it relates to my job.
10      Q.  Got it.
11           And have you ever received any
12  training from attorneys who practice in the
13  area of defending companies or institutions
14  from lawsuits --
15           MR. MELITO:  Objection --
16      Q.  -- related to discrimination?
17           MR. MELITO:  Objection.  Don't
18      answer.  It will breech
19      attorney/client privilege.
20           MR. SELLS:  No.  No.  I'm not
21      talking about in connection with any
22      lawsuit.
23      Q.  I'm just asking in general, have you
24  received any training from any lawyers
25  related to the topics that you oversee?
```

41

D. KEKANA

1
2      MR. MELITO:  Again, objection;
3   because even though it's not within
4   this litigation, it could have been
5   subject to attorney/client privilege
6   in other matters or in general.
7      MR. SELLS:  Are you telling
8   your her not answer?
9      MR. MELITO:  Yes, because it
10  may breech attorney/client privilege.
11  Q.  The first question is, Have you ever
12  received any training that was given by a
13  lawyer?  I'm not talking about in the context
14  of a lawsuit.  I'm just talking in general as
15  part of your responsibilities.
16     MR. MELITO:  And I'm -- and I'm
17  objecting because in general it could
18  be part of attorney/client privilege --
19     MR. SELLS:  Okay.  Come on
20  Nicholas.  Please --
21     MR. MELITO:  I'm not going to
22  potentially breech -- wave
23  attorney/client privilege just to
24  please you with this.  It could be
25  attorney/client privilege --

42

D. KEKANA

1
2      MR. SELLS:  I'm not asking
3   about the attorneys in this case, all
4   right --
5      MR. MELITO:  Well, she --
6      MR. SELLS:  I'm asking about
7   her training.
8   Q.  Out of all the training that you
9   have had, out of all the programs you said
10  that you have attended, were any of them done
11  by attorneys?
12     MR. MELITO:  Let me just state
13  with that clarification, Derek, I
14  will allow it as long as it is
15  nothing to do with F.I.T. training
16  you did as part of your position with
17  F.I.T.
18     If it's outside, like the
19  Triple AED, was an attorney doing
20  that?  That is what Mr. Sells is
21  asking.  Anything in these
22  third-party vendors, if an attorney
23  was actually conducting.
24     THE WITNESS:  Thank you for
25  clarifying.

43

D. KEKANA

1
2   A.  Yes.
3   Q.  Okay.
4      So tell me what law firm the
5   attorney worked for?
6   A.  There have been several.  Some --
7   the Clear Law Institute, I don't know what
8   firms the attorneys come from, but they offer
9   several webinars throughout the year from
10  multiple attorneys.  I am not familiar with
11  the law firms that they might originate from.
12     For example, as well as with the
13  Triple AED there are some attorneys who are
14  members of the Triple AED who will give
15  webinars, presentations, present at the
16  annual conference.  I don't know what firms --
17  you know, I can't tell you off top of my head
18  what firms they might come from; but they do
19  have JD listed next to their name when they
20  are on the program.
21  Q.  Okay.
22     How many of these would you estimate
23  you have attended in your professional
24  career?
25  A.  I average about six to eight each

44

D. KEKANA

1
2   year.
3   Q.  And beginning when?
4   A.  This would be starting as far bag as
5   2013.
6   Q.  And continue to today?
7   A.  Correct.
8   Q.  So, you have had somewhere between
9   48 and 64 trainings by attorneys on how to
10  handle your job; is that right?
11  A.  I would say I have attended that
12  many webinars, presentations, conferences
13  that have topics that contain my job and my
14  duties.
15  Q.  Got it.  All right.
16     And with regard to F.I.T.'s, their
17  policy as it relates to discrimination, what
18  is your understanding of it?
19  A.  As far as it relates to the F.I.T.'s
20  non-discrimination and antiharassment policy,
21  it is a policy that lays out prohibited
22  misconduct, defines for the campus community
23  discrimination, discriminatory harassment,
24  some terminology that is used.  It also lays
25  out the process that governs the

---

45

D. KEKANA

1
2    investigation process for those who put forth
3    complaints of discrimination or
4    discriminatory harassment.
5        Q.  Got it.  So let's talk about that
6    policy --
7        A.  It's breaking up for me.
8        Q.  Okay.
9            In terms of the antidiscrimination
10    policy, who does that policy apply to?
11        A.  That policy applies to the entire
12    F.I.T. community, which includes our
13    students, our employees, our contract
14    employees on campus and visitors to the
15    campus.
16        Q.  And in terms of -- you mentioned
17    there was a complaint process that is
18    associated with the discrimination policy; is
19    that right?
20        A.  That's correct.
21        Q.  Can you explain that process?
22        A.  Certainly.  What is outlined in the
23    policy describes the role of the affirmative
24    action officer, an investigator, what they
25    will do and conduct as -- once they have

---

46

D. KEKANA

1
2    learned of a complaint.  One of the first
3    steps is to determine that this is the
4    appropriate policy under which the complaint
5    falls; meaning that it would implicate this
6    policy.
7            The next is to ask the question that
8    if true, would this be a violation of the
9    policy and then we proceed with an
10    investigation.  It goes through what the
11    rights are allowed of all parties --
12    Complainants, Respondents as well as
13    witnesses as part of this, including advisors
14    of choice, including rights to present
15    evidence, rights to present witnesses.  And
16    then it also outlines for discipline where
17    the Respondent is a student, discipline where
18    Respondent is an employee as well as
19    discipline if the Respondent were to have
20    been a third-party member; meaning a
21    contractor or a visitor.
22        Q.  And what is your understanding of an
23    "act of discrimination"?
24        A.  An act of discrimination would be
25    anything meant to humiliate, threaten,

---

47

D. KEKANA

1
2    denigrate something based on a protected
3    characteristic or class.  And these protected
4    characteristics are all listed in the policy
5    but they could include for example age, race,
6    citizenship, status, gender identity,
7    religion, disability whether actual or
8    perceived, pregnancy status.  The list is
9    much more expansive than I have just given
10    here.
11        Q.  All right.
12            And does this discrimination policy,
13    does it also include the topic of
14    retaliation?
15        A.  Yes, it does.
16        Q.  And what is your understanding of
17    that?
18        A.  So this policy specifically will
19    investigate any claims of retaliation of
20    treatment to -- that is threatening,
21    humiliating or in another way adverse against
22    somebody who has participated in the process
23    and that treatment must be based because of
24    someone's participation in the process.
25        Q.  All right.

---

48

D. KEKANA

1
2            And so what is your understanding if
3    someone makes a complaint of discrimination
4    and then subsequently believes and complains
5    that they have been retaliated against?  How
6    is that supposed to be investigated?
7        A.  The investigation can look different
8    ways, obviously, based on context because
9    some retaliation may occur in various sorts
10    of ways.
11            So for example, if a student earns a
12    grade that they don't believe is correct
13    because they believe it's due to their
14    complaint that they have put in, we'd first
15    examine if there's any sort of plausibility
16    to that complaint or is it that this is a
17    complaint of a student who earned a grade
18    that they may not be worthy but has nothing
19    to do with the fact that they have put forth
20    a complaint.  That is an example of one of
21    the assessments that we'll do contextually to
22    determine if this would be retaliation that
23    would be investigated through my office or if
24    it would be investigated through another
25    office on campus.

---

49

D. KEKANA

2    Q.  Who makes that decision about
3  whether or not a complaint is investigated
4  through your office or through another
5  office?
6    A.  Those determinations again can ---
7  you know once there is evidence that's been
8  presented, depending on the context,
9  sometimes it involves conversations with a
10  number of groups or people on campus that are
11  actually spelled out in the policy.  This can
12  include the vice president for academic
13  affair, the department chairperson, the dean
14  of students, our human resources personnel.
15    Q.  Is there a specific person that
16  decides who is going to make the or who is
17  going to do the investigation or what
18  department is going to do the investigation?
19  Is there a person that decides it?
20    A.  This is typically something that's
21  done after conversation.  It is not one
22  person.  It is done through conversation,
23  through discussion and the determination is
24  made collectively based on the nature of the
25  complaint.

50

D. KEKANA

2    Q.  And who is involved in this
3  collective decision on who is going to do the
4  investigation?
5    A.  Again, while my office is
6  coordinating and corralling this information,
7  we are involved primarily; but it can differ,
8  again, as I listed before.  Depending upon
9  the context, it could be Human Resources.  It
10  can be the Dean of Students, it can be
11  Academic Affair, it can be the department
12  chairperson.  It varies based on the context
13  of nature of the complaint.
14    Q.  Got it.
15    So let's say one employee makes a
16  complaint that another employee has acted in
17  a discriminatory way.  Whose responsibility
18  is it to investigate that complaint?
19    A.  So if we are talking about someone
20  has been discriminatory, that comes under the
21  auspicious of my office.  The affirmative
22  action and Title 9 office.
23    Q.  Got it.
24    So if one F.I.T. employee complains
25  about discriminatory conduct from another

51

D. KEKANA

2  F.I.T. employee, your office investigates
3  that; is that correct?
4    A.  That is correct.
5    Q.  Are there any exceptions?
6    A.  If for any reason -- and this is
7  also spelled out as part of the policy.  If
8  based on the context there is any reason my
9  office for lack of a better term there is a
10  conflict of interest, there is determination
11  that it would be made by, you know, where --
12  where I would have to maybe recuse myself or
13  a different office would have to recuse
14  themselves.  There are instances where that
15  can happen and it's allowed for as part of
16  the policy.
17    Q.  So if there is no conflict of
18  interest, then a complaint of discrimination
19  by one employee against another at F.I.T.
20  will always be investigated by your office,
21  correct?
22    A.  Correct.
23    Q.  Let's talk about that complaint.  If
24  one employee in F.I.T. makes a complaint
25  about another employee regarding

52

D. KEKANA

2  discriminatory conduct, what would your
3  office do upon receiving that complaint?
4  What are you supposed to do?
5    A.  Certainly.  So if the complaint is
6  found to meet the merits of coming under the
7  scope of the non-discrimination and
8  antiharassment policy, my office would then
9  commence an investigation.
10    That would include first meeting
11  with the Respondent to have the Respondent be
12  presented with the complaint summary, the
13  allegations and be given the opportunity to
14  respond to those allegations.  Then, the
15  opportunity will present itself for
16  Complainant witnesses to be interviewed, for
17  Respondent witnesses to be interviewed and
18  any witnesses that the investigator feels
19  would be pertinent are there also
20  interviewed.  And any evidence that may have
21  been submitted that supports or refutes the
22  complaint is also reviewed.
23    Q.  Backing up for a moment with regard
24  to the actual complaint of discrimination
25  that one employee makes against another

53

D. KEKANA

1                    D. KEKANA
2  employee by F.I.T., who is eligible -- under
3  the policy who is eligible to receive that
4  complaint?
5      A.  Certainly.  As our
6  non-discrimination and antiharassment policy
7  states, anyone who is in a supervisory
8  capacity and receives a complaint of
9  discrimination must forward -- and the word
10 is "must" in the complaint -- in the policy,
11 excuse me -- must forward the complaint to
12 the Affirmative Action Office.
13     Q.  Got it.
14         Now, what would happen under the
15 F.I.T.'s policies if an employee made a
16 complaint to a supervisor about
17 discrimination by another F.I.T. employee and
18 the supervisor did not report it?  What is
19 the protocol?
20         MR. MELITO:  Objection.  You
21     can answer.
22     A.  I don't have a role with regards to
23 any sort of discipline or sanction of any
24 employee for meeting or not meeting their job
25 duties; so I cannot say what will happen

54

1                    D. KEKANA
2  necessarily to someone.
3         If there was that accusation, that
4  will -- and I receive it in my office, I will
5  report it to Human Resources.
6      Q.  Okay.
7         Would it be a violation of F.I.T.'s
8  policies if a supervisor received a complaint
9  of discrimination from an employee and failed
10 to report it to you or HR?
11     A.  Yes --
12         MR. MELITO:  Objection.  That's
13     okay, you can answer.  I just wasn't
14     sure if Derek was finished, that's
15     why I waited.
16     A.  Yes.
17     Q.  But as far as you know, there is no
18 written policy of disciplining or otherwise
19 addressing a supervisor's failure to report a
20 complaint of discrimination made to them by
21 an employee at F.I.T.; is that right?
22         MR. MELITO:  Objection.
23         THE WITNESS:  May I answer?
24         MR. MELITO:  Yes.
25     A.  Okay.  I want to clarify what I

55

1                    D. KEKANA
2  said.  I didn't say that there's no policy.
3  I said I am not the person who does that; so
4  I don't know what action would potentially be
5  take but there is a discipline process at the
6  college for any violation into a policy.  It
7  is outlined not only as part of the
8  collective bargaining agreement, but it is
9  also in keeping with, you know, just HR
10 practices when it applies to discipline of
11 employees for not doing -- not fulfilling
12 their job duties.
13         I want to clarify that I am not the
14 person who has that role; so I cannot say
15 definitively what specific action would be
16 done; but I do --I will say that that's --
17 that is something that's under the purview of
18 Human Resources which has the expressed job
19 of discipline and sanctioning including, you
20 know, progressive discipline as well.
21     Q.  Okay.
22         So again, I'll repeat my question.
23 You're not aware of any written policy or any
24 written rule that specifically addresses the
25 failure of a supervisor at F.I.T. to report a

56

1                    D. KEKANA
2  complaint of discrimination that was made to
3  them by another F.I.T. employee; is that
4  correct?
5         MR. MELITO:  Objection.
6         Asked and answered.
7         Mischaracterizing prior testimony and
8         also I would say it is outside the
9         scope of her duties as 30(b)(6).  To
10        the extent she answers would be on
11        behalf of in her personal capacity.
12        You may answer.
13     A.  As I mentioned before, if -- there
14 is a written collective bargaining agreement
15 that outlines how to discipline functions
16 folks and employees on campus who are part of
17 the collective bargaining agreement.  There
18 is also a written employee manual.  I cannot
19 say with any specificity.
20        But I can tell you as an employee at
21 the college that this is something that is
22 addressed through Human Resources.
23     Q.  But you cannot point to me -- you
24 can't say, all right this is the policy, this
25 is what happens to a supervisor who didn't do

57

D. KEKANA

1
2  it, who didn't report a complaint of
3  discrimination that was made to them; you
4  can't point me to that specific policy,
5  right?
6      MR. MELITO:  Objection.  You
7  can answer.
8      THE WITNESS:  Okay.
9      MR. MELITO:  Again -- again,
10  this is in her personal capacity.
11  A.  In my personal capacity, there's --
12  Q.  I'm not asking about -- I just asked
13  a question.  I'm not talking about personal
14  capacity.  I am asking you whether there is a
15  specific policy at F.I.T. that will implement
16  discipline for a supervisor who fails to
17  report a complaint of discrimination that was
18  made to them by another F.I.T. employee?
19      MR. MELITO:  Objection.  Again,
20  asked and answered --
21      MR. SELLS:  Nicholas.
22  Nicholas, please --
23      MR. MELITO:  No.  No, I have to
24  Derek; because this is -- this is a
25  hybrid deposition.  She is also

58

D. KEKANA

1
2  appearing as a 30(b)(6) --
3      MR. SELLS:  All right.  All
4  right.  I'll withdraw the question.
5  Can we pull up Exhibit 3?
6  Let's put up Exhibit 3.
7      MR. MELITO:  I'm sorry.  Is
8  this newly Exhibit 3, or are you
9  pulling from Defendant's Exhibit 3
10  from the prior deposition?
11      MR. SELLS:  Well, this is the
12  way I marked the deposition exhibits
13  for this purpose.  So we're going to
14  view Plaintiff's Exhibit 3.  We can
15  call it Plaintiff's 3.
16      (Whereupon, Plaintiff's Exhibit
17  3, 12-page document Bates stamped
18  T361 through 372, was marked for
19  identification as of this date.)
20      MR. SELLS:  If agreeable to
21  everybody, the way that we have
22  identified our exhibits is for our
23  internal use; but if it is good with
24  everybody, why don't we just go in
25  order.  So, this will be marking

59

D. KEKANA

1
2  Exhibit 3 -- as Exhibit 3.
3      (Counsel is sharing the
4  computer screen image.)
5      MR. SELLS:  For the record
6  Plaintiff's Exhibit 3 is a document,
7  12 pages, Bates stamped T361 through
8  372.
9  Q.  Now, do you recognize this,
10  Ms. Kekana?
11  A.  Yes.
12  Q.  Is this the policy that you were
13  just describing?
14  A.  Yes.
15  Q.  Okay.
16      Now you indicated -- and if we
17  could go down to page -- Bates
18  stamped page 369, Page 9.  There we
19  go, stop.
20      In the discrimination policy
21  where it says "complaint and
22  investigation procedure where an
23  employee is the Respondent."
24      Is that where we get the "must"
25  language that you're talking about?

60

D. KEKANA

1
2  A.  That's correct.
3  Q.  All right.
4      Now, tell me within the
5  non-discrimination policy where there is a
6  discipline stated for someone with supervisory
7  responsibility who fails to make that
8  complaint and fails to report it to the
9  Affirmative Action Office; where is there a
10  policy for discipline failing to do that?
11      MR. MELITO:  Objection.  Are
12  you going to allow her to scroll
13  through the policy to find -- does
14  she have control of this document?
15  Q.  Are you familiar with this policy,
16  Ms. Kekana.
17  A.  Yes.
18  Q.  Okay.
19      Where in the policy can we find a
20  discipline for a supervisor who fails to
21  report the complaint to you --
22      MR. MELITO:  Objection --
23      THE WITNESS:  Sorry.
24  A.  There is no discipline in this
25  policy.  There is no discipline in this

61

D. KEKANA

1
2  policy 'cause this office does not oversee
3  discipline.  Discipline is handled where
4  employees are concerned by the Office of
5  Human Resources.  So if there is a violation
6  to this policy, any part of this policy, it
7  is reported to the Human Resources Office.
8       Q.  Where in the policy does it say
9  that?
10       MR. MELITO:  Objection.  If you
11       give her control of the document, she
12       can point you to it.
13       Q.  Does it exist in the document,
14  Ms. Kekana?
15       MR. MELITO:  Objection.  If you
16       would like to take a minute to
17       refresh your recollection of this
18       document, you may request of Derek to
19       give you control of this so you can --
20       MR. SELLS:  Are you instructing
21       her, Nicholas?  What are you talking
22       about now?  Are you making an
23       objection, or are you just telling
24       the witness what to do --
25       MR. MELITO:  I objected -- I

62

D. KEKANA

1
2  mean --
3       MR. SELLS:  Objection on what
4  basis?
5       MR. MELITO:  Cause --
6       MR. SELLS:  I asked her a
7       simple question.  Does it exist in
8       this document?
9       MR. MELITO:  Proper way to
10       introduce an exist is to allow the
11       witness to review it prior to
12       answering questions.  Since you
13       introduced it, she has every right to
14       review it to give --
15       MR. SELLS:  Nicholas.
16       Nicholas.  Nicholas, I tell you what.
17       Just stop.
18       Q.  Ms. Kekana, is there such a
19  provision in this policy that says that a
20  supervisor who fails to report a complaint of
21  discrimination to the affirmative action
22  officer will be reported to HR --
23       MR. MELITO:  Objection --
24       Q.  -- does it say that in this
25  document?

63

D. KEKANA

1
2       MR. MELITO:  Objection.
3       Ms. Kekana, if you would like to
4       refresh your recollection of this
5       document, please request Derek to
6       allow you to review it.
7       A.  I wish to review the document so
8  that I could actually find the space where it
9  discusses this.
10       Q.  Okay.  So why don't we go off the
11  record --
12       MR. MELITO:  We're not going
13       off the record.
14       MR. SELLS:  Yes, we are.
15       MR. MELITO:  No.
16       MR. SELLS:  She wants to review
17       it.  She will review on her own time.
18       MR. MELITO:  No.
19       MR. SELLS:  Yes.
20       MR. MELITO:  No.
21       MR. SELLS:  Yes.
22       MR. MELITO:  This continues
23       time on or off the record.
24       MR. SELLS:  We will go off the
25       record right now and --

64

D. KEKANA

1
2       MR. MELITO:  No --
3       MR. SELLS:  And you could
4       review the document.
5       MR. MELITO:  Objection.  This
6       is inappropriate.
7       Q.  What page do you want to go to,
8  Ms. Kekana?  What page do you want to go to
9  tell me where you want to look?
10       A.  I'd like to start at the --
11       MR. MELITO:  At the --
12       Q.  Sure.  Let's go to the beginning.
13  Ms. Kekana, can we skip through the policy
14  statement or do you need to read it?
15       A.  I'm reading it.  Thank you.
16       Q.  Okay.
17       It's in the policy statement, right,
18  that HR -- that a supervisor who fails to
19  report a complaint is subject to discipline.
20  It's --
21       MR. MELITO:  Objection --
22       Q.  -- statement, right?
23       MR. MELITO:  Objection.
24       Document speaks for itself, and now
25       you're just testifying for the

65

D. KEKANA

1
2    witness.  So allow her to review it,
3    and she'll point you to the pertinent
4    section.
5         And we are still on the record,
6    correct, Ms. Simpson?
7         THE COURT REPORTER:  We will
8         never be off the record unless
9         parties agree and say we're off the
10        record.
11   Q.  Where are you up to now?  Are you up
12   to the first sentence yet, Ms. Kekana?  I
13   know you want to take as much time as you
14   want, so just tell me where are you at now --
15        MR. MELITO:  Objection.  Stop
16        harassing the witness please --
17   Q.  Okay.
18        Tell me --
19        MR. MELITO:  Disrespectful and
20        unprofessional.
21   Q.  Is this funny to you, Ms. Kekana?  I
22   see you laughing.
23        MR. MELITO:  She's laughing at
24        you disrespecting her.  Stop
25        harassing the witness and allow her

66

D. KEKANA

1
2    to review the document.  You're being
3    very unprofessional and you are
4    borderline operating outside of our
5    attorney code of conduct and also the
6    lawful rules of this court.
7         MR. SELLS:  Okay.  Yeah.  Yeah.
8         Anything else, Nicholas?
9         MR. MELITO:  No.  I think I
10        noted my objection of your behavior.
11        MR. SELLS:  Okay.
12   Q.  If we could just go down to who is
13   "responsible for this policy."  Do you see
14   that?
15   A.  Yes, I see it.
16   Q.  Is it in there?  Is it in there or
17   can we move onto the next page?
18   A.  Yes.
19   Q.  Okay.  Let's go to the next page.
20   So is it in any of these things?  Is it in
21   the definition section?
22        MR. MELITO:  Again objection --
23   Q.  Ms. Kekana, I am asking you a
24   question.  Is it in the definition section
25   what happens to a supervisor who fails to

67

D. KEKANA

1
2    make a complaint or refer a complaint to you?
3    Is it --
4         MR. MELITO:  Again --
5    Q.  -- is it in your definition section,
6    Ms. Kekana?
7         MR. MELITO:  Objection.  If you
8         keep up this behavior, we will get
9         back the court on the phone.  I will
10        not have you harass this witness.
11        Okay?  Act professional within the
12        attorney code of conduct or local
13        rules of this court, the federal
14        rules and we can continue.  If you
15        keep up these tactics, we will get
16        the Judge back on the phone.
17   Q.  Ms. Kekana, is it in the definition
18   section?
19   A.  No, it is not.
20   Q.  Okay.
21        So can we skip to the next part --
22   A.  Oh.
23        MR. MELITO:  What were you
24        going to say, Ms. Kekana --
25   Q.  Please go to the next page.  Keep

68

D. KEKANA

1
2    going.  We are still in the definition
3    section.  Keep going.  Next page.
4    "Principles."  Is it in the "principles"
5    section?
6    A.  I'm sorry.  I can't read this at
7    this time.  It seems to be scrolling really
8    quickly --
9    Q.  Okay.
10        I am asking you is it in the
11   "principles" --
12        MR. MELITO:  Objection.  She is
13        telling you she needs to review the
14        policy --
15        MR. SELLS:  I tell you what,
16        we'll take it off.  Let's take it
17        down, and we'll move onto another
18        topic.
19   Q.  Have you been instructed to take as
20   much time to look through documents as
21   possibly possible, Ms. Kekana so as to drag
22   on the deposition?  Have you been --
23        MR. MELITO:  Objection --
24   Q.  -- instructed to do that?
25        MR. MELITO:  Objection.  Do not

69

D. KEKANA

1   answer.  Objection.
2       MR. SELLS:  Okay.
3       Q.  Because you know I have 14 hours
4   with you; so if you want to be here for 14
5   hours, then just keep it up —
6       MR. MELITO:  Ms. Kekana,
7   objection.  You do not have to
8   answer, and he does not have 14 hours
9   with you —
10      MR. SELLS:  She is being
11  produced as a 30(b)(6) Witness as
12  well as a personal witness; so I have
13  14 hours.  So keep it up.
14      MR. MELITO:  And every
15  applicable case law states otherwise —
16      MR. SELLS:  Got it.
17      MR. MELITO:  I will take a
18  break because, again, you are
19  harassing our witness and she would
20  like a 10 minutes break.  We will go
21  off the record —
22      MR. SELLS:  So, let me just ask
23  this —
24      Q.  Ms. Kekana —

71

D. KEKANA

1   take 10 minutes —
2       Q.  Ms. Kekana, where is your cell
3   phone?  Where is your cell phone?  Where is
4   your cell phone, Ms. Kekana?
5       A.  My cell phone is in my pocketbook.
6       Q.  Okay.
7       How many screens do you have —
8       THE WITNESS:  Can I take a
9   break, please?  Can I take a break,
10  please?
11      MR. MELITO:  Yes, take a break.
12  You do not have to answer anymore.
13      Q.  Are you going to start smiling again
14  when you come back, or you going to just put
15  on the crying face —
16      MR. MELITO:  Ms. Kekana, please
17  go into the breakout room.  Please,
18  go into the breakout room.  You do
19  not have to be subjected to Derek's
20  harassing ways, and we will get the
21  court on the phone during this break.
22      Thank you.  You can go into the
23  breakout room, Ms. Kekana; and we
24  will go off the record.

70

D. KEKANA

1       MR. MELITO:  No —
2       Q.  — read your mind?  Do you have some
3   kind of signals that you are sending to one
4   another?  How is it that he can say you are
5   feeling harassed right now?  How is it —
6       MR. MELITO:  Because we are all
7   witnessing —
8       Q.  You have a method of signalling each
9   other?
10      MR. MELITO:  — we are all
11  listening to your harassing
12  deposition right now; so yes —
13      Q.  Ms. Kekana, I am asking you a
14  question?
15      MR. MELITO:  You do not have to
16  answer —
17      Q.  Do you have a method of signalling
18  Mr. Melito —
19      MR. MELITO:  Ms. Kekana, you do
20  not have —
21      Q.  — so he knows what is in your head?
22      MR. MELITO:  You do not have to
23  answer.  He is being harassing in
24  asking improper questions.  We will

72

D. KEKANA

1       (The witness has exited the
2   conference room.)
3       MR. MELITO:  Derek, you want to
4   get the court back on the phone if
5   you're going to keep up these tactics
6   and I expect better from an
7   experienced, respected attorney like
8   yourself so we could go — we could
9   go call the court, if you are still
10  there; but you turned off your mic
11  and your video.
12      (Mr. Sells exited the video
13  room.)
14      MR. MELITO:  We will see you
15  all.  We are going into the breakout
16  room; please let us know if and when
17  Derek returns.
18      (Whereupon, a recess was taken
19  at 11:43 a.m.; after which, the
20  proceeding continued at 11:55 a.m. as
21  follows.)
22      MR. MELITO:  Derek, I am going
23  to call the court if you continue in
24  this affirmative action.  Do you want

73

```
 1              D. KEKANA
 2      to call the court?
 3           MR. SELLS:  You call the court.
 4      It is your motion.
 5           (Mr. Melito is calling the
 6      court.)
 7           THE DEPUTY:  Judge Daniels'
 8      chambers.
 9           MR. MELITO:  This is Defense
10      Counsel in connection with the
11      Phillips V Fashion Institute matter.
12           THE DEPUTY:  What is the docket
13      number, sir.
14           MR. MELITO:  Sure.
15      20-CV-00221, and I would like to just
16      let you know we are on the record at
17      this deposition.
18           THE DEPUTY:  You are on the
19      record?
20           MR. MELITO:  Yes.
21           THE DEPUTY:  Okay.
22           MR. MELITO:  Would you like us
23      to go off the record for this call?
24           THE DEPUTY:  I'm the deputy.  I
25      don't know what the question is; and
```

74

```
 1              D. KEKANA
 2      the judge is not available right now.
 3      He is on the bench.  So we can go off
 4      the record.
 5           MR. MELITO:  Sure.  Okay.  Yes,
 6      we can go off.
 7           (Whereupon, an off-the-record
 8      discussion was held.)
 9           CHAMBER SECRETARY:  Calling
10      from judge's chambers.
11           MR. MELITO:  Yes, thank you.  I
12      just want to make sure Plaintiff's
13      counsel is by -- we're in the middle
14      of a deposition.  All parties are
15      here.  With your permission we would
16      like to go on the record at the
17      deposition?
18           CHAMBER SECRETARY:  There is a
19      ruling that you've requested from the
20      judge.  I'm just here to get both
21      parties arguments, then I will relate
22      to the judge.
23           MR. MELITO:  If you do not
24      mind, we would like to put our
25      positions --
```

75

```
 1              D. KEKANA
 2           MR. SELLS:  Actually, actually
 3      I would like the judge to be here;
 4      because I want the record of the
 5      deposition to be read to the judge.
 6      Counsel for the witness has
 7      obstructed this deposition from the
 8      outset.  He's been making speaking
 9      objections almost every single
10      question.  He's mischaracterized the
11      record, and I would like the Judge to
12      hear the transcript; so please ask
13      the Judge to get on the -- to come in
14      and listen to a read back of the
15      questioning of this witness, please.
16           MR. MELITO:  And I obviously,
17      Counsel for Defendant, F.I.T.,
18      vehemently disagree with everything
19      that opposing counsel just said as to
20      the reality of what is actually going
21      on in this deposition has occurred in
22      the matter of two hours in the taking
23      of the deposition, and we already had
24      a prior ruling from Judge Daniels
25      regarding Plaintiff Counsel's
```

76

```
 1              D. KEKANA
 2      behavior.
 3           MR. SELLS:  That is a
 4      mischaracterization.
 5           CHAMBER SECRETARY:  Yes --
 6           MR. SELLS:  This witness cried
 7      because she was upset about a
 8      personal experience that she had;
 9      that was the only time and then she
10      was laughing when we came back on the
11      record.  This is clearly something
12      that they have decided was going to
13      be a strategy, and if the judge will
14      just --
15           CHAMBER SECRETARY:  I'm Judge
16      Daniels' law clerk; and I'm trying to
17      get your arguments so that I can
18      convey them to him and he makes a
19      ruling as to whether he is going to
20      go on the record or join you in the
21      call.
22           So what information -- is the
23      request, I believe, that you would
24      like Judge Daniels to call in so that
25      you could read him certain testimony?
```

77

D. KEKANA

1
2          MR. MELITO:  I think it would
3    be best that we terminate the
4    deposition, and the parties can
5    submit papers to Judge Daniels with
6    appropriate citations to the record.
7          MR. SELLS:  No, we have
8    scheduled this deposition; and we're
9    going forward with it.  This is not
10   gonna --
11         MR. MELITO:  No --
12         MR. SELLS:  We want Judge
13   Daniels to listen to this transcript --
14         MR. MELITO:  Not with your
15   harassing --
16         MR. DRANOFF:  If I may.  This
17   is Eric Dranoff representing one of
18   the co-defendants; and certainly
19   under Rule 30D of the Civil Rules, an
20   objecting party or any party can
21   request and demand that a deposition
22   be suspended or terminated to allow
23   for the court to issue an order.  And
24   having observed this deposition and
25   prior depositions, on behalf of Mary

78

D. KEKANA

1
2    Davis and perhaps the other
3    defendants will join, our position is
4    that this deposition should be
5    suspended until we can get some type
6    of decision based upon papers.
7          CHAMBER SECRETARY:  Understood.
8    So Defense Counsel believes that the
9    deposition should be suspended until
10   ruling submitted on paper and
11   Plaintiff's Counsel would like the
12   deposition to go forward and would
13   like Judge Daniels to join on the
14   line and listen to the read back of
15   testimony because defense has been
16   obstructing the deposition; is that
17   correct?
18         MR. SELLS:  Correct.  Yes.
19         MR. MELITO:  Again, this is
20   Defense Counsel for F.I.T.  We'll be
21   here all day if we are going to have
22   to read the record back to Judge
23   Daniels because it's Plaintiff's
24   behavior that is what prompted the
25   call, and that's why we think it is

79

D. KEKANA

1
2    the most prudent course of action is
3    to suspend the deposition and submit
4    papers to the Judge.
5          CHAMBER SECRETARY:  Okay.  How
6    much testimony -- if Plaintiff's
7    Counsel could let me know how much
8    testimony does he feel he wants Judge
9    Daniels to hear?
10         MR. SELLS:  Oh, it's not much.
11   Maybe like just two or three pages of
12   speaking objections and interruptions
13   by Defense Counsel.  Some of it isn't
14   even objections, he is directing the
15   witness to, you know, refresh her
16   recollection and to -- oh, you could
17   take your time and read this.
18   Read -- you know, stopping the --
19   stopping the -- the -- the
20   proceeding; it's ridiculous and all
21   he needs to do is just listen to a
22   brief snippet and he'll understand
23   what is going on --
24         MR. MELITO:  He does not need
25   to listen -- for proper context, he

80

D. KEKANA

1
2    needs to read way more than just two
3    pages of transcript.  Again, we are
4    saying the best course of action in
5    the interest of Judge Daniel's time
6    is to submit papers.
7          CHAMBER SECRETARY:  Understood.
8    Is there anything else the parties
9    would like to relay?
10         MR. MELITO:  Not at this time,
11   thank you.
12         CHAMBER SECRETARY:  Okay.  I
13   will relay that to Judge Daniels and
14   return your call.  Thank you.
15         MR. MELITO:  Thank you.
16         Court's clerk disconnected the
17   call, and she will call us back when
18   there is a ruling.
19         MR. MELITO:  Judges chambers is
20   calling.
21         CHAMBER SECRETARY:  Calling
22   from Judge Daniels chambers.
23         MR. MELITO:  Yes, how are you?
24   I'm waiting for Plaintiff's Counsel
25   to come on my screen for the Zoom.

81

D. KEKANA

1
2  Okay, he is here.  Are we allowed to
3  go on the record for the ruling?
4         CHAMBER SECRETARY:  No, I'm a
5  law clerk.  Go off the record.
6         (Whereupon, an off-the-record
7  discussion was held; after which, at
8  12:24 p.m. the proceeding continued
9  as follows.)
10         MR. MELITO:  I'm going to pop
11  out and get the witness out of the
12  breakout room.
13         MR. SELLS:  Are we ready?
14         MR. MELITO:  Yes.
15  Q.  Ms. Kekana, we were talking about
16  the complaint process as it relates to
17  complaints of discrimination made by an
18  employee that are investigated by your
19  office.
20         My next question is, When an
21  employee at F.I.T. makes a complaint of
22  retaliation, does it go to your office as
23  well?
24  A.  If it relates to a complaint, the
25  retaliation is because of a complaint filed

82

D. KEKANA

1
2  with my office, it would be investigated by
3  my office --
4  Q.  Got it --
5  A.  -- if it relates to something
6  different, it would not.
7         THE WITNESS:  My screen froze
8  after I gave my answer, so I don't
9  know if it happened to anyone else.
10         (Whereupon, the requested
11  portion of the transcript was read
12  back.)
13  Q.  Just so I understand, if an employee
14  makes a complaint of discrimination against
15  another employee that your office, the
16  Affirmative Action Office investigates, if
17  that same employee makes a complaint of
18  retaliation against one of the people that
19  the complaint was made against, your office
20  would investigate that complaint of
21  retaliation as well; is that correct?
22  A.  If the retaliation is in regards to
23  their participation in the investigation, my
24  office conducts it.
25  Q.  Got it.

83

D. KEKANA

1
2         Is there any exceptions to that?
3  A.  The exceptions would be if the
4  claims of retaliation are not related to my
5  office.
6  Q.  Got it.
7         But that would be the only
8  exception, correct?
9  A.  Correct --
10         MR. MELITO:  Objection.
11  Q.  All right.
12         Now, how does your office -- if
13  there is a situation where there is an
14  underlying complaint of discrimination made
15  and subsequent to that complaint being made by
16  an employee against another employee the
17  employee complains that they have been
18  subjected to retaliation, would those two
19  complaints be investigated as part of one
20  complaint or would there be two separate
21  investigations?
22  A.  If the complaint of retaliation is
23  in relation to an investigation under the
24  non-discrimination and antiharassment
25  complaint, it would be conducted through the

84

D. KEKANA

1
2  same investigation.
3  Q.  Got it.
4         And what is the process after an
5  investigation of a complaint of
6  discrimination and/or retaliation is
7  finished, what is your office's
8  responsibility assuming your office did it?
9  A.  To communicate in writing, not only
10  in writing but also verbally, the outcome of
11  the investigation to Complainant and
12  Respondent parties.
13  Q.  Is there any exception to that?
14  A.  I cannot think of one at this time.
15  Q.  Got it.
16         So according to you, if an employee
17  makes a complaint of discrimination at F.I.T.
18  against another employee and subsequently
19  makes a complaint of retaliation against that
20  same employee, your office, if you got both
21  complaints, would investigate both and write
22  a concluding summary for both of those
23  complaints as part of a single investigation,
24  correct?
25         MR. MELITO:  Objection --

85

D. KEKANA

1
2     A.  If the complaint of retaliation were
3  related to the complaint of discrimination,
4  yes.
5     Q.  Got it.
6        Now, who makes the determination
7  about whether a complaint of retaliation made
8  by an employee against another employee is
9  related to the complaint of discrimination
10 that's made by the same employee against the
11 same employee?  Who makes that decision?
12    A.  That is a dem- -- a determination
13 that is made in conjunction with various
14 offices around the college to determine based
15 on the context and information available
16 about the behavior that is retaliatory.
17    Q.  Got it --
18       MR. DRANOFF:  Just to
19       interrupt, can you let me back into
20       the room?
21          (Whereupon, Mr. Dranoff returns.)
22    Q.  Now, Ms. Kekana, you said the
23 decision about whether an employee's
24 complaint of retaliation is in fact connected
25 to that employee's complaint of

86

D. KEKANA

1
2  discrimination that is a collective
3  determination between your office and others.
4  Can you tell me who the "others" are?
5     A.  As I said before, it determine --
6  it's based on the context.  If we are talking
7  about a student in a department versus a
8  grade and they are saying that their grade
9  was retaliatory, that would include the VP of
10 Academic Affairs and possibly the department
11 chairperson in making that determination
12 because it may not be -- come under the
13 auspicious of discrimination.  It may come --
14 it may also include the Dean of Students
15 Office.  It may also include Human Resources
16 Office.
17    Q.  What I'm talking about specifically
18 though is a complaint, a discrimination
19 complaint made by one employee against
20 another employee.  I'm not talking about
21 students --
22    A.  Mm-hmm --
23    Q.  In a situation where you have an
24 employee making a complaint of discrimination
25 against another employee and subsequently the

87

D. KEKANA

1
2  same employee who made the discrimination
3  complaint complains about retaliation against
4  the same employee that they made the
5  complaint of discrimination against, who
6  makes the decision about whether the
7  complaint of retaliation is associated with
8  the complaint of discrimination?
9     A.  That would be made between my office
10 and the office of Human Resources.
11    Q.  And who within the Office of Human
12 Resources at F.I.T. would be responsible for
13 communicating with you to make the
14 determination?
15    A.  The vice president of human
16 resources.
17    Q.  And who is that person?
18    A.  At the current time, Ms. Cynthia
19 Glass.
20    Q.  And how long has Cynthia Glass been
21 in that position?
22    A.  Since 2019, I believe.
23    Q.  When in 2019?
24    A.  I don't recall.
25    Q.  And who before Cynthia Glass was in

88

D. KEKANA

1
2  that position?
3     A.  That would have been -- the interim
4  vice president was Eric Hogan.
5     Q.  And how long was Eric Hogan in that
6  position?
7     A.  I don't recall how long he was in
8  the position.
9     Q.  Now, this notion that your office in
10 conjunction with HR would determine whether
11 or not a complaint of retaliation by an
12 employee against another employee is related
13 or not related to a complaint of
14 discrimination by the same employee against
15 the same employee, where is that policy
16 located that you have to collaborate to
17 determine that?  Where is that located?
18    A.  That's not part of any policy that I
19 am aware of.
20    Q.  Oh, it's not.  Okay.
21       So when did that come up?  When did
22 that have to come up that you have to confer
23 with HR in order to decide whether or not
24 there's a connection between the complaint of
25 retaliation and discrimination?

89

D. KEKANA

2     A. That is a practice that the office
3 has utilized the entire time that I have been
4 here.
5     Q. And it is not written down anywhere;
6 is that correct?
7         MR. MELITO: Objection. Go
8     ahead. You can answer.
9     A. That is correct.
10     Q. Where did you learn this policy
11 from?
12     A. Well, this is not a policy. This is
13 a practice. It is based on a number of
14 things including our campus culture, past
15 practice on our campus culture as well as
16 some best practice advice that we have
17 received.
18     Q. And none of this has been written
19 down anywhere; is that correct?
20         MR. MELITO: Objection --
21     Q. -- what you have just described as
22 like "campus culture, best practices" and all
23 the other things that you have just mentioned
24 that went into this "practice" that you have
25 been following, none of it is written

90

D. KEKANA

2 anywhere; is that correct?
3         MR. MELITO: Objection. You
4     can answer.
5     A. Not to my knowledge.
6     Q. And so, who came up with this
7 practice? What person?
8     A. I don't know.
9     Q. What is your understanding of the
10 difference between a complaint of
11 discrimination versus a complaint of
12 retaliation?
13     A. A complaint of retaliation involves
14 an added layer of dissuading or otherwise
15 punishing someone for participating in good
16 faith in a complaint process.
17     Q. Now under F.I.T.'s policies, can one
18 person make a complaint of discrimination
19 that is deemed unfounded but a subsequent
20 complaint of retaliation based upon that
21 original complaint could be substantiated --
22         MR. MELITO: Objection.
23     Q. Do you understand the question?
24     A. Can you repeat the question, please.
25     Q. Yes.

91

D. KEKANA

2     Is F.I.T.'s policy that an employee
3 that makes a complaint of discrimination and
4 retaliation could have the complaint of
5 discrimination not substantiated but have the
6 complaint of retaliation substantiated?
7         MR. MELITO: Objection. You
8     can answer.
9     A. Yes, that's possible.
10     Q. And who makes that decision?
11     A. That can be -- I mean, that would be
12 multiple people potentially or it could be
13 the same person potentially.
14     So, if the complaint of retaliation
15 is in regards to someone's participation in a
16 complaint of discrimination and we then
17 investigate a complaint of retaliation and
18 find that there was retaliation because of
19 someone's participation in a complaint of
20 discrimination, that could all be within the
21 Office of Affirmative Action.
22     If the retaliation is based on
23 something else, it could be a decision that's
24 made by a different office.
25     Q. And again, that's that morphous

92

D. KEKANA

2 policy F.I.T. has that is not written down
3 anywhere about whether or not your office
4 will deem or HR and your office will deem a
5 retaliation complaint associated with a
6 discrimination complaint made by an employee,
7 right?
8     A. Correct.
9         MR. MELITO: Objection.
10     Q. Now, what is F.I.T.'s policy about
11 the length of time it's supposed to take for
12 an investigation to conclude?
13     A. F.I.T. does not have a defined
14 length of time for an investigation to be
15 concluded.
16     Q. All right.
17     But --
18     A. -- policy.
19     Q. But what's your understanding of it;
20 what is the length of time that you give your
21 investigators or yourself to investigate a
22 claim or a complaint of discrimination?
23         MR. MELITO: Objection. You
24     can answer.
25     A. I endeavor to complete an

93

D. KEKANA

1  investigation between 45 to 60 days; that is
2  not always possible for various reasons that
3  can happen.
4      Q.  So, you try and give yourself 45 to
5  60 days; is that correct?
6      A.  That is correct.
7      Q.  Why do you give yourself that much
8  time?
9      A.  Ultimately, to have it effected as
10  quickly as possible.
11      Q.  And do you give priority to
12  investigations or is there a policy where you
13  give certain time for certain complaints and
14  different times for other complaints?
15          MR. MELITO:  Objection.  You
16      can answer.
17      A.  I endeavor in all complaints to
18  investigate them in that timeframe.  However,
19  when it comes to concluding investigations
20  there are certain types of investigations
21  that do take priority over other types of
22  investigations.  Yes.
23      Q.  Tell me what it is; what is the
24  policy in terms of what investigations get

94

D. KEKANA

1  priority over other investigations?
2          MR. MELITO:  Objection.  You
3      can answer.
4      A.  This isn't policy.  This is
5  something that my office determines based on
6  the types of investigations we're conducting.
7  For example, an investigation that involves
8  sexual assault, particularly violent sexual
9  assault, will take priority over another type
10  of investigation just because of the violent
11  nature in addition, you know.
12      Q.  Sexual assault.  What about
13  attempted murder?
14          MR. MELITO:  Objection.  You
15      can answer.
16      A.  I have not investigated attempted
17  murder.
18      Q.  Even if it is part of a retaliation
19  complaint?
20          MR. MELITO:  Objection.
21      A.  I don't investigate attempted
22  murder.
23      Q.  What about threats to kill as part
24  of a retaliation claim?

95

D. KEKANA

1          MR. MELITO:  Objection.
2      A.  I don't investigate threats to kill
3  unless they are discriminary in nature.
4      Q.  What about if they are retaliatory
5  in nature?
6          MR. MELITO:  Objection.
7      A.  I think I have answered this
8  question already.
9      Q.  No, you haven't --
10          MR. MELITO:  Objection.
11      Q.  I see you are smiling; is there
12  something funny?
13          MR. MELITO:  Objection.  No,
14      she is not smiling.
15          MR. SELLS:  She is not?
16      Q.  Are you smiling right now,
17  Ms. Kekana?
18      A.  No, I'm waiting to hear what you
19  guys are talking about so I can answer.
20  That's my resting face.  I said that several
21  times to --
22      Q.  That's your resting face --
23      A.  That's just how my face looks.
24          MR. MELITO:  Can we note that

96

D. KEKANA

1  for the record if it is possible, the
2  misconduct by Derek Sells.  I may
3  have to go back to that in a
4  forthcoming sanctions motion, if
5  necessary.
6      Q.  Ms. Kekana, I'm asking it in terms
7  of a potential retaliation investigation
8  where it is alleged that an employee who made
9  a complaint against another employee of
10  discrimination and subsequently that employee
11  who was the subject of the complaint of
12  discrimination threatens to kill the person
13  who made the complaint, would your office be
14  responsible for investigating that complaint
15  of retaliation?
16          MR. MELITO:  Objection.
17      A.  If it were deemed to be retaliatory
18  on a discriminatory basis.
19      Q.  Got it.
20          So we get back to that morphous
21  policy between HR and the Affirmative Action
22  Office about whether you're going to
23  determine the retaliation complaint
24  associated with the discrimination complaint;

97

D. KEKANA

1    is that correct?
2        MR. MELITO:  Objection.
3    A.  That is correct.
4    Q.  Got it.
5        So now in terms of this whole how
6    you prioritize your investigative work, when
7    do you complete an investigation such that
8    you can then implement disciplinary measures;
9    how long does it take --
10       MR. MELITO:  Objection --
11   A.  -- my office does not implement
12   discipline.
13   Q.  I'm sorry?
14   A.  I don't implement discipline.
15   Q.  Do you recommend discipline?
16   A.  No, I do not.
17   Q.  Who does?
18   A.  The Office of Human Resources
19   conducts our disciplinary process.
20   Q.  Got it.
21       So you just submit your
22   investigative results to HR; is that the
23   process?
24   A.  Correct.
25

98

D. KEKANA

1    Q.  And then HR decides what they're
2    going to do with it; is that correct?
3    A.  That is correct.
4    Q.  Got it.
5        So if you do not give HR the results
6    of your investigation and if HR doesn't do
7    the investigation themselves, then HR cannot
8    take any disciplinary measures until after
9    you've concluded your investigation; is that
10   correct?
11       MR. MELITO:  Objection.
12   A.  That is to my knowledge, yes.
13   Q.  Got it.
14       Do you know who Mary Davis is?
15   A.  Yes.
16   Q.  How do you know Mary Davis?
17   A.  Mary Davis served as the dean for
18   the graduate school at the college.
19   Q.  Does Mary Davis still serve as a
20   dean at F.I.T.?
21   A.  No.
22   Q.  Why not?
23       MR. MELITO:  Objection.
24   A.  As I understand it, she is no longer
25

99

D. KEKANA

1    with the college.
2    Q.  I know.  But why?
3    A.  I'm not --
4        MR. MELITO:  Objection --
5    A.  -- of the reason.
6        MR. MELITO:  Sorry.  If you
7    could just pause --
8    Q.  You are not aware of the reason?
9        MR. MELITO:  Can you just pause
10   before you answer so I could raise my
11   objections.  Thank you.
12       This is outside the scope of a
13   30(b)(6), so any answer will be in a
14   personal capacity.
15       MR. SELLS:  This goes to her
16   personal knowledge.  This goes to her
17   personal knowledge.
18       MR. MELITO:  That's what I just
19   said.
20       MR. SELLS:  Okay, good.
21   Q.  So, you're saying that you have no
22   idea why Mary Davis is no longer with F.I.T.;
23   is that your honest answer?
24   A.  That is my honest answer.
25

100

D. KEKANA

1    Q.  So, you have not read any newspaper
2    articles about it?
3        MR. MELITO:  Objection.
4    A.  I have not read any newspaper
5    articles about her termination or anything of
6    the like.  I do know there was a reference to
7    her being placed on administrative leave.  I
8    believe I read that in the New York Post.
9    Q.  Put on administrative leave --
10   A.  Correct --
11   Q.  -- for what?  My question to you is,
12   What was your understanding of why she is no
13   longer at the college?
14       MR. MELITO:  Objection.
15   A.  To my knowledge, there was an
16   incident that happened at a graduate fashion
17   show.  While it was being investigated, Mary
18   Davis was placed on administrative leave.  I
19   don't know what happened as a result of that
20   investigation.  I was not part of that
21   investigation.  I only know she is no longer
22   here because I work here, and I know that she
23   is not on e-mails.
24       MR. SELLS:  Can we pull up and
25

101

D. KEKANA

1
2  mark Exhibit 31.
3       (Whereupon, Plaintiff's Exhibit
4  31, New York Times article dated
5  February 23rd of 2020, was marked for
6  identification as of this date.)
7       (Counsel is sharing the
8  computer screen image.)
9       MR. MELITO:  Just for the
10  record, we will keep this as
11  Plaintiff's Exhibit 31.
12       MR. SELLS:  For the record —0
13  Exhibit 31 for the record is a New
14  York Times article dated February
15  23rd of 2020.  It is entitled "F.I.T.
16  model refuses to wear clearly racist
17  accessories."
18       Q.  Have you seen this before,
19  Ms. Kekana?
20       A.  I don't think I've seen this
21  specific one; but I do recall media at that
22  time that went out about this —
23       Q.  Got it —
24       A.  — so I do know the incident.
25       Q.  So, were you familiar with a

102

D. KEKANA

1
2  complaint that was made by a model, an
3  African-American model who refused to
4  participate in this fashion show because it
5  was racist?
6       MR. MELITO:  Objection.
7       A.  I learned about — I did not receive
8  a complaint; but I learned about the incident
9  when I was forwarded an article, as I said,
10  from the New York Post that they had
11  interviewed the model.
12       Q.  All right.
13       Well if you could see from this
14  newspaper, it says "in a public letter the
15  school's President, Dr. Joyce Brown —" do you
16  know her, Joyce Brown?
17       A.  Yes.
18       Q.  And who is she?
19       A.  She serves as the president of the
20  college.
21       Q.  Okay.
22       So, she said in a public letter that
23  "the February 7th show intended to demonstrate
24  the work of recent graduates."
25  You see that, right; that section?

103

D. KEKANA

1
2       A.  Yes.
3       Q.  And that "failed to recognize or
4  anticipate the racist references and cultural
5  insensitivities that were obvious to almost
6  everybody else."
7       Do you see that language?
8       A.  Yes.
9       Q.  All right.
10       And did you read that public letter
11  from your —
12       MR. MELITO:  Objection —
13       Q.  — from your president?
14       A.  Yes.
15       Q.  I see.
16       But you said that before you had no
17  idea why Mary Davis was no longer at that the
18  college, right?  Wasn't that your original
19  answer?  I have no idea why she is not there;
20  didn't you say —
21       MR. MELITO:  Objection —
22       Q.  — say that before, Ms. Kekana?
23       MR. MELITO:  Objection.
24       MR. DRANOFF:  Objection as
25  well.

104

D. KEKANA

1
2       A.  To clarify my answer, I was made
3  aware that she was placed on administrative
4  leave as a result of this show.  I do not
5  know what happened after that.  As I
6  understand it, it was during the
7  investigation of this show.
8       I don't know why ultimately she was
9  no longer with us.  There was no
10  announcement, there was no letter that went
11  out about her separation from the college.  I
12  only learned this when there was no longer an
13  e-mail available for her.
14       Q.  I see.
15       So your office, the Office of
16  Affirmative Action, did not get to
17  investigate a complaint of racist behavior by
18  Dean Davis?
19       MR. MELITO:  Objection.
20       MR. DRANOFF:  Wait a minute.
21  There is no complaint of racist
22  behavior by Dean Davis.  Objection.
23       MR. SELLS:  Oh, is that right?
24       MR. DRANOFF:  There's nothing
25  in hear suggests that.

105

D. KEKANA

1
2      MR. SELLS: Nothing?  Huh.
3      Q.  Well, have you seen the complaint
4  that Dean Davis filed against F.I.T. where
5  she specifically says that she was disparaged
6  because the school referred to her as being
7  racist?  Did you not see that complaint,
8  Ms. Kekana --
9      MR. MELITO:  Objection.
10  Objection.
11     MR. DRANOFF:  I'm not under the
12  -- go ahead, Nicholas.
13     MR. MELITO:  Sorry.  I'm not
14  sure who he is directing his question
15  to in that regard.  Again, this is
16  outside the scope of 30(b)(6).  This
17  is personal capacity.  Go ahead,
18  Eric, if you had an objection.
19     MR. DRANOFF:  I was just going
20  to say that this is --
21     MR. SELLS:  No.  No.  No.
22  Wait.  Wait.  Why are we doing
23  speaking objections?  What are we
24  talking about?
25     MR. DRANOFF:  You asked me --

106

D. KEKANA

1
2      MR. SELLS:  I just asked a
3  simple question, Are you aware that
4  Dean Davis sued F.I.T. claiming that
5  the statement by Joyce Brown, the
6  president, disparaged her by
7  referring to her as being racist and
8  that she's demanding hundreds of
9  millions of dollars because she was
10  defamed; are you aware of that that
11  is my question.
12     MR. DRANOFF:  Question to me?
13  Who is that question to?
14     MR. SELLS:  No, my question to
15  Ms. Kekana --
16  A.  I am not aware --
17  Q.  You are not aware?
18     MR. DRANOFF:  I'll --
19     MR. MELITO:  I'll raise an
20  objection to that question, but
21  continue.
22     MR. SELLS:  Can we put up
23  Exhibit 32.
24     (Whereupon, Plaintiff's Exhibit
25  32, New York Post article dated

107

D. KEKANA

1
2  February 18th, 2020, was marked for
3  identification as of this date.)
4      (Counsel is sharing the
5  computer screen image.)
6      MR. SELLS:  For the record
7  Exhibit 32 is a February 18th, 2020
8  news article from the New York Post
9  with a picture beneath a caption
10  saying "F.I.T. apologizes for clearly
11  racist alumni fashion show".
12  Q.  Have you seen this article,
13  Ms. Kekana?
14     MR. MELITO:  Objection.  You
15  can answer.
16     MR. DRANOFF:  I join.
17  A.  I believe this is the article that I
18  viewed.  I know there was other ones; but I
19  know I did view a New York Post article about
20  the fashion show.  I don't -- I'm not certain
21  if it was this specific one because I don't
22  recognize this title.
23  Q.  All right.
24     Did you investigate the complaint of
25  a clearly racist alumni fashion show that took

108

D. KEKANA

1
2  place at F.I.T.?  Did you investigate that --
3      MR. MELITO:  Objection --
4  Q.  Did you investigate or your --
5      MR. DRANOFF:  Objection --
6  Q.  -- your office?
7  A.  I would like to clarify two things
8  you said that were incorrect.  The first is
9  there was a complaint made to F.I.T.; there
10  was no complaint made to F.I.T.  We first
11  learned about the complaint via the New York
12  Post; so there was not a complaint lodged
13  with F.I.T.
14     The second part that I want to
15  clarify as incorrect is that you stated that
16  this alumni fashion show took place at
17  F.I.T.; to my knowledge, this did not take
18  place on campus.
19  Q.  Well, how did you learn that?
20  A.  I actually learned this from the
21  newspaper article.
22  Q.  I see.
23     So what was F.I.T.'s involvement in
24  this fashion show?
25     MR. MELITO:  Objection.

109

D. KEKANA

1          Outside the scope.  This is in your
2          personal capacity.
3      A.  I can refer to things that I learned
4  from the article.  I don't have knowledge;
5  but as I understand it, this was a show or
6  fashion show for recent F.I.T. graduates that
7  was put on.
8      Q.  That was clearly racist, right?
9          MR. MELITO:  Objection.
10         MR. DRANOFF:  Objection.
11     Q.  You could answer.
12         MR. MELITO:  I don't know if
13     that was a question.  Objection.
14     A.  Is there a question?  I'm sorry.
15  Can you repeat it?
16     Q.  The fashion show was clearly racist,
17  correct?
18         MR. MELITO:  Objection.
19         MR. DRANOFF:  Objection.
20     A.  Are you asking for my opinion?
21     Q.  Yes.
22         MR. MELITO:  Objection.
23     A.  There is imagery here that is a
24  minstrel in nature and is discriminatory.

110

D. KEKANA

1      Q.  When you say "discriminatory," is it
2  to you "clearly racist"?
3          MR. MELITO:  Objection.
4          Again, this is outside the
5      scope of the 30(b)(6) and objection
6      to the form as well.
7          MR. DRANOFF:  Join.
8          MR. MELITO:  I'll have standing
9      objection as outside the scope of the
10     30(b)(6).  I'll just raise objections
11     to form so not to keep interrupting
12     you, Derek; if that is okay with you.
13     Q.  Please answer the question.
14     A.  Okay.  I would -- I would
15  characterize this in my personal opinion as
16  racist.  Yes.
17     Q.  And why?
18     A.  This is --
19         MR. MELITO:  Objection --
20     A.  In my opinion, this is imagery that
21  has been historically used to -- in
22  propaganda in discriminatory fashions and,
23  again, minstrel imagery against many
24  different races of people not only in this

111

D. KEKANA

1  country but throughout the world,
2  specifically Asian people and black people.
3      Q.  Okay.
4          As you look at the picture that is
5  part of Exhibit 32, what in particular would
6  you characterize as being minstrel in nature
7  and clearly racist --
8          MR. MELITO:  Objection.
9      Objection.
10     Q.  -- what?
11     A.  In my personal opinion, the
12  accessory of the lips and the accessory of
13  the large ears appears minstrel in nature.
14     Q.  All right.
15         MR. SELLS:  We could take that
16     down.  Thank you.
17     Q.  Now in determining whether or not an
18  individual who has been complained about as
19  being or having done something of a racist
20  nature, do you look at that person, the
21  person whose been complained about, do you
22  look at whether or not there's evidence of a
23  discriminatory motive or a discriminatory
24  history as it relates to the complaint?

112

D. KEKANA

1          MR. MELITO:  Objection.  You
2      have --
3          MR. DRANOFF:  Objection.
4          MR. MELITO:  I'm going to say
5      again this is outside the scope of
6      the 30(b)(6).
7          MR. SELLS:  This goes to the
8      investigation.  I'm just asking about
9      the investigation --
10         MR. MELITO:  It wasn't clear --
11         MR. SELLS:  Excuse me.  Let me --
12     I'll make it very clear.
13     Q.  As part of your practice of
14  investigating complaints of discrimination,
15  does F.I.T. look at actions of the F.I.T.
16  employee who is being investigated that would
17  speak to a discriminatory motive or a
18  discriminatory past as it relates to the
19  complaint?
20         MR. MELITO:  Objection.
21     A.  In an investigation we will look at
22  the employee's complete employee concerns;
23  their performance, whether it is related to
24  discrimination or other sorts of past

113

D. KEKANA

1
2  performance concerns that may be relevant or
3  show pattern.
4       Q.  Got it.
5           So let's say that with regard to
6  that clearly racist imagery that you have
7  described that one or more F.I.T. employees
8  who were complained about as having engaged
9  in racist behavior or discriminatory behavior
10 based on race, would you look at whether or
11 not those employees had any role in allowing
12 for those clearly racist images to be
13 presented --
14          MR. DRANOFF:  Objection to
15      form.
16          MR. MELITO:  Yeah --
17          MR. SELLS:  Can you let me
18 finish my question.  I know you're a
19 little bit --
20          MR. DRANOFF:  Well --
21          MR. SELLS:  -- nervous now, but
22 could you let me finish my question.
23          MR. MELITO:  Derek, you keep
24 breaking up.  There is a delay.
25          MR. SELLS:  Lesley, please read

114

D. KEKANA

1
2  back what I had before I was
3  interrupted.
4           (Whereupon, the requested
5      portion of the transcript was read
6      back.)
7       Q.  -- publicly?
8           MR. MELITO:  Are you finished?
9  Can we raise objections now?
10          MR. SELLS:  That was my
11 question.  Can the witness just
12 answer the question?
13          MR. DRANOFF:  Objection to
14      form.
15          MR. MELITO:  Objection.
16          MR. SELLS:  All right.
17 Objection to form.
18          MR. MELITO:  Objection also is
19 outside the 30(b)(6).
20          MR. SELLS:  No, this has to do
21 with the investigation, but go ahead.
22          MR. MELITO:  Which
23 investigation?
24          MR. SELLS:  Any investigation.
25          MR. MELITO:  Okay.  If it's any

115

D. KEKANA

1
2  investigation --
3           MR. SELLS:  The question is
4  what it is.  Will you stop, please?
5  Nicholas, please.  I'm begging you.
6           MR. MELITO:  I'm trying to
7  clarify.
8           MR. SELLS:  Nicholas, let her
9  answer the question.  You don't have
10 to clarify.
11          MR. MELITO:  I don't even know
12 what you're talking about.
13          MR. MELITO:  Objection to form
14 and go ahead.
15      A.  So, I'm -- I'm -- there are pieces
16 of the question that don't apply, so I just
17 want to clarify and remind again.  As it
18 pertains to the investigation of the imagery
19 that was presented, that is not an
20 investigation that my office conducted.  Full
21 stop.
22          Next, if it is a question of would I
23 bring in past information, if I were to be
24 the one conducting that investigation, then I
25 would answer yes.

116

D. KEKANA

1
2           As I answered in my previous
3  response, I would -- whenever there is an
4  investigation, we do bring in past
5  performance of the Respondent employee.
6           MR. MELITO:  Ms. Kekana, just
7  because of the technical issues that
8  Derek is having, please just pause so
9  Counsel can raise objections when
10 necessary.  Okay?
11          THE WITNESS:  Yes, I'm sorry.
12 I realize there is a delay.  I'm
13 hearing it now.
14          MR. MELITO:  Yes.
15          (Whereupon, there is a recess
16      at 1:12 p.m. due to technical issues
17      Mr. Sells is having; after which, the
18      proceeding continued at 1:33 p.m. as
19      follows.)
20          MR. SELLS:  Back on the record.
21      Q.  Ms. Kekana, is it F.I.T.'s policy
22 when investigating complaints of
23 discrimination against an employee to look at
24 all available evidence that the employee has
25 in whatever part of their employment that's

117

D. KEKANA

1
2   potentially discriminatory?
3            MR. MELITO:   Objection.
4       A.  That's correct.
5       Q.  Got it.
6            And so, let's say in the middle of
7   an investigation where F.I.T. is
8   investigating a complaint of race
9   discrimination against another employee and
10  your office or F.I.T. becomes aware of
11  discriminatory behavior in another context by
12  that employee, will you use that as part of
13  your investigation?
14           MR. MELITO:   Objection.
15      A.  If that were the case, we would.
16      Q.  Got it.
17           Now, what about if you've already
18  investigated a case --
19           MR. MELITO:   Objection --
20      Q.  -- where an employee was accused of
21  discrimination and you have already come up
22  with findings and evidence comes to your
23  attention that that same employee who had
24  been cleared or not substantiated, would you
25  re-open, as part of F.I.T.'s policy, would

118

D. KEKANA

1
2   you re-open the investigation and utilize
3   information that might be pertinent on
4   whether or not that employee was actually
5   racist or --
6            MR. MELITO:   Objection --
7       Q.  -- acting in a discriminatory
8   fashion?
9            MR. MELITO:   Objection.
10      A.  We would review it.  However, we
11  would not re-open something that has already
12  been investigated and closed.
13      Q.  Okay.
14           What policy are you relying on?
15  What F.I.T. policy are you referring to that
16  would not allow for a re-opening of a closed
17  investigation if new evidence was found?
18           MR. MELITO:   Objection.
19      A.  The policy allows for new evidence
20  to be viewed that may not have been available
21  at the time of the initial investigation.
22  That is the allowance for new evidence as it
23  relates to these types of investigations.
24           If there is something that happens
25  afterwards that is not new completely, it

119

D. KEKANA

1
2   would not -- it would not cause us to re-open
3   a closed matter.
4       Q.  I see.
5            Let's take the situation where an
6   F.I.T. employee makes a complaint against
7   another F.I.T. employee being racist against
8   blacks, let's say, or African-Americans, you
9   investigate and find that you can't
10  substantiate the conduct that was complained
11  of was in fact racist; but six months or a
12  year later, you learn that the employee who
13  had the complaint made against them was part
14  of the Klu Klux Clan.
15           Are you saying you wouldn't
16  re-open -- under F.I.T.'s policies you
17  couldn't re-open that investigation and say,
18  you know, we didn't realize at the time that
19  the employee was part of the Klu Klux Clan.
20           But now that we know the employee is
21  part of the Klu Klux Clan, we could now
22  substantiate that the actions that were taken
23  were racially motivated; you're saying F.I.T.
24  couldn't do that; is that right?
25           MR. MELITO:   Objection; form,

120

D. KEKANA

1
2   speculation.
3       A.  So, when we find -- make findings in
4   an investigation, we do so based upon the
5   evidence that is present.  The evidence as it
6   relates to the incident that is bringing
7   forth the complaint.
8            If there -- in your hypothetical
9   example that you have given, it is possible
10  for a Klu Klux Clan member to act in a way
11  that would not be motivated by race.  So it
12  is not necessarily that just their membership
13  in the Klu Klux Clan would cause us or us
14  learning of their membership in the Klu Klux
15  Clan would then cause us to re-open the case
16  as you defined it in your hypothetical
17  scenario there.
18      Q.  And why not?
19           MR. MELITO:   Objection.
20      A.  As again in your hypothetical
21  example, according to our policies, we're
22  basing this on the evidence and the context
23  under which an event, an incident happens.
24           If the person's motivations become
25  present in that there is pattern of them

121

D. KEKANA

1    doing multiple sorts of aggressive racist
2    discriminatory acts towards a person, that is
3    different.  But their membership alone or
4    affiliation alone, as described in your
5    hypothetical example, would not be something
6    that would automatically cause us to re-open
7    an investigation that has been closed due to
8    it not being able to be substantiated.
9        Q.  So are you saying that under
10   F.I.T.'s antidiscrimination police that a
11   member of the Klu Klux Clan could be an
12   employee at F.I.T.?
13           MR. MELITO:  Objection.  You
14       can answer.
15       A.  That is not what I'm saying.  We are
16   a public institution, part of the State
17   University of New York.  Folks political,
18   personal affiliations with various
19   organizations is not something that is a term
20   of employment.  That is a -- that is a
21   determination that is made at higher.
22           Should they choose to hire that
23   person, they have that right to be an
24   employee.  What they do not have the right to

122

D. KEKANA

1    do is harass anyone in a discriminatory
2    fashion because that is prohibited.
3        What they do not have the right to
4    do is openly discriminate in someone's
5    employment or seeking their education based
6    on any sort of protected characteristics.
7        Q.  Got it.
8        So someone who, let's say, is in a
9    supervisory position at F.I.T. and they have
10   to write, let's say, evaluations for people
11   under their supervision, they have to make
12   decisions regarding the terms and conditions
13   of other employee's employment at F.I.T.,
14   you're saying that a supervisor who is a
15   member of the Klu Klux Clan would be allowed
16   to make those determinations of other F.I.T.
17   employees under their supervision; is that
18   right?
19           MR. MELITO:  Objection.  You
20       can answer.
21       A.  In your hypothetical example, if
22   said Klu Klux Clan member who is in a
23   supervisory capacity is making those
24   decisions as you laid out supervisory --

123

D. KEKANA

1    termination, promotion, et cetera -- in an
2    objective way without any discrimination,
3    they are permitted to do so.
4        Q.  Got it.
5        The same would apply if someone was
6    a member of the Nazi party and they worked as
7    an F.I.T. supervisor, there would be nothing
8    under F.I.T.'s policies that would prevent
9    that person from evaluating other F.I.T.
10   employees under their supervision?
11           MR. MELITO:  Objection.
12       Objection.
13       A.  Again, similarly to your previous
14   hypothetical if someone's membership in the
15   Nazi party were to influence their
16   decisionmaking, their evaluations in a
17   discriminatory fashion, that would be the --
18   the prohibited act.  Their being
19   discriminatory in making said decisions, not
20   their membership in the Nazi party.
21       Q.  So, let's talk about F.I.T.'s
22   policies when an employee -- and let's say
23   it's an African-American employee --
24   complains about their supervisor not giving

124

D. KEKANA

1    them a change in title or a raise and the
2    employee, let's say the employee is
3    African-American, says that the supervisor is
4    discriminating or retaliating against them on
5    the basis of either their race or complaints
6    of retaliation.  What is your responsibility
7    in that regard?
8           MR. MELITO:  Objection.
9        A.  My office's responsibility is to
10   investigate why said decision is made.  So,
11   as part of our promotion process there are
12   justifications that need to be submitted not
13   only for hiring, not only for promotion but
14   also for termination; so if those
15   justifications are objective and not
16   discriminatory, my office would find them --
17   it would not be substantiated under the
18   policy.
19       If we reviewed said justifications
20   and we find that those justifications were
21   discriminatory, we would then substantiate an
22   investigation.
23       Q.  Got it.
24       Let's say the African-American

125

D. KEKANA

1  employee says that I'm being denied a
2  promotion, denied a change in title, denied a
3  raise because my supervisor has discriminated
4  against me on the basis of my race and/or
5  retaliated against me on the basis of my
6  complaints of race discrimination and you
7  conduct an investigation and determine well,
8  it's not substantiated; but then you later
9  learn that supervisor was a member of the Klu
10 Klux Clan, would you re-open the
11 investigation into the denial of a promotion
12 and raise for that employee at the time --
13 assuming that the employee is still at F.I.T. --
14 at the time that you learn of this very
15 racist membership?
16              MR. MELITO:  Objection to form
17         and objection to outside the scope of
18         the 30(b)(6).
19        A.  So if I learn this, again,
20 justifications would need to be promoted.  So
21 the reason why a complaint would not be
22 substantiated is because there would be
23 justifications as well as explanations that
24 should be objectively reached submitted by

126

D. KEKANA

1  the hypothetical Klu Klux Clan supervisor.
2  So there is no reason to re-open it if those --
3  if the decisionmaking was not discriminatory.
4  Their membership into the Klu Klux Clan is
5  not going to change why they justified the
6  employment decision.
7        Q.  Well, what about a situation where
8  an employee is told by the supervisor that
9  the supervisor is going to give them a change
10 in title and a raise and then the employee
11 makes a complaint of race discrimination --
12             MR. DRANOFF:  Object to the
13        form --
14        Q.  -- and then the supervisor does not
15 give the person the raise or the change in
16 title and you learn that they are a member of
17 the Klu Klux Clan --
18             MR. MELITO:  Objection --
19        Q.  -- what would you do under those
20 circumstances?
21             MR. MELITO:  Objection.
22             MR. DRANOFF:  Objection.
23        A.  Based on your hypothetical scenario
24 that you have presented here, I would have to

127

D. KEKANA

1  investigate what is the reason for the job
2  promise, as you laid it out in your
3  hypothetical scenario, not being fulfilled.
4  And if it is not an objective reason that it
5  is not fulfilled, then it would be not
6  substantiate in your hypothetical scenario.
7        If we were to find out that there
8  was a reason that was discriminatory for this
9  promise of the job in your hypothetical
10 scenario to not have been given, then we
11 would substantiate.
12        Q.  Have you ever -- has your office
13 ever substantiated a complaint of
14 discrimination based on race?
15             MR. MELITO:  Objection.
16        A.  Yes.
17        Q.  Tell me how many times?
18             MR. MELITO:  Objection.
19        A.  If i were to -- I don't have all the
20 complaints and the log in front of me, so I
21 really am going off of memory, but I would
22 say about four times.  But this is not all on
23 the basis of race, this is substantiated on
24 different protected characterizations.

128

D. KEKANA

1        Q.  So my question to you is, Has there
2  ever in your tenure at F.I.T., which dates
3  back to -- is it 2008 until now, are you
4  aware of any complaint of race discrimination
5  at F.I.T. where the complaint was
6  substantiated?
7             MR. MELITO:  Objection.
8        A.  Yes.
9        Q.  And when was that?
10             MR. MELITO:  Objection.
11        A.  I cannot recall the exact date.
12        Q.  Tell me what you recall about the --
13 is it just one time?
14        A.  Well, the incident I'm thinking of
15 is one time.
16        Q.  One time; and tell me the
17 circumstances of that incident.
18             MR. MELITO:  Objection.
19        A.  This was a student complaint against
20 a professor.
21        Q.  And what were the circumstances?
22             MR. MELITO:  Objection.
23        A.  The student complained that they
24 were not allowed the same allowances as other

129

D. KEKANA

2  students in the classroom for turning in work
3  late.
4       Q.  And what was the nature of the race
5  complaint?  Was it African-American?  Was it
6  Asian --
7       A.  The race of the student was Asian --
8            MR. MELITO:  Objection --
9       A.  Sorry.
10      Q.  The race of the student was Asian?
11      A.  Yes.
12      Q.  And who did this investigation?
13           MR. MELITO:  Objection.
14      A.  My office.
15      Q.  Were you involved at all in the
16  investigation?
17           MR. MELITO:  Objection.
18      A.  Yes.
19      Q.  Okay.
20           And what role did you play in it?
21           MR. MELITO:  Objection.
22      A.  I took notes as part of the
23  investigation.
24      Q.  Okay.
25           So were you the investigator or --

130

D. KEKANA

2  tell me your role is what I am asking.  You
3  took notes about what?
4            MR. MELITO:  Objection.
5       A.  This was during my tenure as
6  affirmative action specialist.
7       Q.  So, this would have been somewhere
8  between 2008 and -- I'm sorry.  This is when
9  you were a specialist you said?
10      A.  Correct.
11      Q.  So, that would have been 2013?
12      A.  Correct.
13      Q.  So, it would have been between 2013
14  and 2015, right; because you had two years as
15  being a specialist before you became the
16  coordinator, correct?
17           MR. MELITO:  Objection.
18      A.  I --
19           MR. MELITO:  Go ahead.
20      A.  It was actually three years; it was
21  between -- I'm sorry.  Yes, 2013 to 2015 when
22  I was affirmative action specialist; so it
23  would have been during that time, yes.
24      Q.  All right.
25           Were you the one that made the

131

D. KEKANA

2  finding of --
3       A.  No.
4       Q.  -- substantiated?
5       A.  No.
6       Q.  Who did?
7            MR. MELITO:  Objection.
8       A.  This was the previous affirmative
9  action officer.
10      Q.  So, it's fair to say that you did
11  not make that finding, correct?
12           MR. MELITO:  Objection.
13      A.  Correct.
14      Q.  Okay.
15           So, how many investigations of race
16  complaints had you been involved with since
17  you began working at F.I.T.?
18           MR. MELITO:  Objection.  Going
19           outside the scope.
20      A.  I mean, I cannot pinpoint the number
21  going back that far.  I can't recall.  I can
22  say on average, we received about eight to 10
23  complaints in an academic year.
24      Q.  What is an academic year?
25      A.  That is from July 1 through June 30;

132

D. KEKANA

2  that is how we count our year.
3       Q.  All right.
4            So when you say "eight to 10
5  complaints," you're talking about eight to 10
6  complaints of race discrimination; is that
7  correct?
8            MR. MELITO:  Objection.
9       A.  Eight to 10 complaints of
10  discrimination that implicate the
11  non-discrimination and antiharassment policy.
12      Q.  Got it --
13      A.  I don't have the breakdown of how
14  many of those are race in front of me.
15      Q.  All right.
16           And you started in April of 2008, so
17  that would be 13 years; and if we use 10
18  complaints a year that would be,
19  approximately, 130 complaints.
20      Q.  And in those 130 complaints on
21  average, you have not substantiated a single
22  complaint of race discrimination; is that
23  correct?
24           MR. MELITO:  Objection.  Again,
25           this is outside the scope of the

133

D. KEKANA

1
2          30(b)(6).
3      A.  I don't have my files in front of
4   me; so I'm really working off of memory here.
5   You know, there have been a number of
6   complaints that fall under the
7   non-discrimination antiharassment policy.  I
8   don't have the numbers that are based on race
9   readily recalled.  But I can say there have
10  been complaints that have been substantiated
11  under our non-discrimination antiharassment
12  policy.  How many of those have been about
13  race, I -- I cannot recall.
14     Q.  Well, you just told us there was
15  one.
16          MR. MELITO:  Objection --
17     Q.  -- now you taking it back.  Are you
18  taking it back?
19          MR. MELITO:  Objection.
20     Q.  You taking it back?
21          MR. MELITO:  Objection.
22     Q.  I'm just asking, you changing your
23  answer now?
24     A.  I'm not changing my answer.  You
25  asked me to recall, and there was one that

134

D. KEKANA

1
2   popped into my head.  Are there others, yes;
3   but I'm trying to recall as best as possible.
4   It's pretty hard to do when I don't have them
5   at the ready that way.
6      Q.  Got it.
7          But you can't recall as you sit here
8   today a single time during your tenure that
9   you have made a substantiated finding of a
10  race complaint, right?
11          MR. MELITO:  Objection to the
12      form, objection to outside the scope
13      of the 30(b)(6).
14     A.  If I can repeat.  I cannot recall
15  how many complaints that I have substantiated
16  have been on the basis of race.  I can tell
17  you that a number of cases as my time -- at
18  my -- in my role currently that I have
19  substantiated under the non-discrimination
20  and antiharassment policy.
21     Q.  Okay.
22          Is there a file or any type of
23  metric that is kept regarding race
24  complaints?
25          MR. MELITO:  Objection --

135

D. KEKANA

1
2      Q.  -- at F.I.T. in your office?
3      A.  We keep --
4          MR. MELITO:  Objection.
5      A.  We keep an internal log, complaint
6   log of the complaints that are received in
7   the office.
8      Q.  And where is the internal log?
9   Where is that kept?
10          MR. MELITO:  Objection.
11     Q.  Is it a computer file or something
12  else?  That's what I'm trying to find out.
13     A.  It is a computer file.
14     Q.  And where is it kept?
15          MR. MELITO:  Objection.
16     A.  On a shared drive.
17     Q.  And is it something that could be
18  printed out?
19          MR. MELITO:  Objection.
20     A.  Yes.
21          MR. SELLS:  Okay.  We call for
22      the production of the --
23     Q.  Does it have a name, this file?
24     A.  Can you repeat the question?  I
25  couldn't hear you.

136

D. KEKANA

1
2      Q.  Yes.  The file that you have just
3   described that is on an internal drive or
4   shared drive I should say, what is the name
5   of this file?
6      A.  We call that "summary log".
7      Q.  Summary log.
8          MR. SELLS:  We call for the
9      production of the summary log for all
10     race complaints that date back to
11     your tenure at F.I.T.
12          MR. MELITO:  We'll take it
13     under advisement.  Please make a
14     formal request in writing.
15          MR. SELLS:  Definitely.  Let's
16     take break for lunch now.
17          We can return at 2:45.
18          MR. MELITO:  Okay.
19          (Whereupon, a lunch recess was
20     taken at 2:00 p.m., after which, the
21     proceedings continued at 2:46 p.m. as
22     follows.)
23          MR. SELLS:  Back on the record.
24     Q.  Ms. Kekana, before the lunch break
25  you described a document you said is

137

D. KEKANA

1
2      contained within a shared drive that
3      summarizes complaints of racism that have
4      been made in F.I.T.
5            Do you have a similar, I guess,
6      summary document that relates to complaints
7      of retaliation?
8         A.  They all appear on the same summary
9      log.
10        Q.  So, if you could describe how the
11     complaints of retaliation, how they appear on
12     this log.  Is it a separate thing or is it --
13     I mean how does it work?
14        A.  It has its own line on the log; so
15     will contain the date, the nature of the
16     complaint, the parties.
17        Q.  Okay.
18           Have you ever in your tenure at
19     F.I.T., have you ever conducted an
20     investigation into a complaint of
21     retaliation?
22        A.  Yes.
23        Q.  All right.
24           Approximately, how many have you
25     investigated?

138

D. KEKANA

1
2         A.  I do not recall how many I have
3      investigated.
4         Q.  Okay.
5            Would you say on average is it eight
6      to 10 like you described with regard to
7      complaints of race discrimination; eight to
8      10 per month -- per year?  I'm sorry.
9         A.  Okay.  No, I would not describe it
10     as that.
11        Q.  Okay.
12           Have you ever sustained a complaint
13     of retaliation in your tenure at F.I.T.?
14           MR. MELITO:  Objection.
15        A.  Yes, I have substantiated a
16     complaint of retaliation.
17        Q.  How many?
18        A.  I can't recall how many.
19        Q.  Well the one that you can recall,
20     when was that?
21        A.  This was -- there was one I recall.
22     Would have been -- I'm, you know, really
23     reaching here.  I think this would have been
24     2018, summer of 2018.
25        Q.  Summer of 2018.

139

D. KEKANA

1
2         A.  Yes.
3         Q.  And what were the circumstances
4      behind your substantiating the complaint of
5      retaliation?
6            MR. MELITO:  Objection.
7         A.  The one I'm recalling, retaliation
8      in fact of Complainant against the
9      Respondent, where the underlying complaint
10     had been substantiated and the Complainant
11     retaliated against the Respondent.
12        Q.  So, let me understand.
13           What was the nature of the original
14     complaint?
15           MR. MELITO:  Objection.
16        A.  The original complaint involved an
17     argument between two employees.  And I
18     believe this was on the basis of age.  The
19     Complainant lodged it and the Respondent had
20     called the Complainant a quote "old bitch".
21        Q.  Got it.
22           And you or someone in the
23     Affirmative Action Office substantiate that
24     complaint; is that right?
25           MR. MELITO:  Objection.

140

D. KEKANA

1
2         A.  That's correct.
3         Q.  But then the Respondent was still
4      allowed to work, right --
5            MR. MELITO:  Objection --
6         Q.  -- after you substantiated that
7      complaint, the Respondent was still able to
8      work at F.I.T., right?
9            MR. MELITO:  Objection.
10        A.  As I mentioned, I don't have a part
11     in the discipline process.
12        Q.  That is not my question --
13        A.  They remained as an employee; that
14     is correct.
15        Q.  All right.
16           And the Respondent was then allowed
17     to make a complaint about the Complainant
18     retaliating; is that what I'm -- is that what
19     you're saying --
20           MR. MELITO:  Objection --
21        A.  The Respondent did not make a
22     complaint against the Complainant; that is
23     not how the complaint was received.
24        Q.  But you said that there was
25     retaliation from the Complainant against the

141

D. KEKANA

1  Respondent; is that what you just said?
2      MR. MELITO:  Objection.
3      A.  That is what I said, yes.  We have a
4  policy that allows for anyone who witnesses
5  actions that violate the policy to make a
6  complaint of the alleged mis -- violation to
7  the policy.
8      So, it does not have to be the
9  person who is on the receiving end of the
10  treatment, but anyone who witnesses that.
11      Q.  I see.
12      So, you're saying that there was a
13  different person at F.I.T. who made the
14  complaint against the original Respondent
15  saying that that original Respondent
16  retaliated as well; is that correct?
17      MR. MELITO:  Objection.
18      A.  No, that is incorrect.
19      Q.  Tell me, tell me what your
20  understanding is.
21      A.  The complaint -- there were two
22  Complainants of -- there two Complainants.
23  There is a Complainant in the underlying
24  discrimination, and there is a separate

142

D. KEKANA

1  Complainant in the complaint of retaliation.
2      In the complaint of retaliation,
3  Complainant A took retaliatory action against
4  Respondent.
5      Q.  Can you explain to me under F.I.T.'s
6  policies how a Complainant can be the one who
7  retaliates --
8      MR. MELITO:  Objection --
9      Q.  -- just explain to me under F.I.T.
10  policy how that works --
11      MR. MELITO:  Objection --
12      Q.  -- I'm totally confused about that.
13      MR. MELITO:  Objection.
14      A.  So, our policy of retaliation is --
15  covers and includes anyone who participates
16  in the investigatory process.  That could
17  include Complainant, Respondent, witness or a
18  third party on behalf of Complainant,
19  Respondent or witnesses.
20      Q.  Okay.
21      But where is it written in the
22  F.I.T. antidiscrimination policy that someone
23  who is a Complainant can also retaliate;
24  where is that written?

143

D. KEKANA

1      MR. MELITO:  Objection.
2      A.  It is in the policy.  I can't tell
3  you the specific section without looking at
4  it in front of me; but it is included in the
5  non-discrimination antiharassment policy,
6  specifically in and around retaliation.
7      Q.  Okay.
8      So what is -- under F.I.T.'s
9  policies, what is retaliation?
10      A.  Retaliation is taking any adverse
11  action against another person who
12  participated in good faith in the
13  investigation process because they
14  participated in said process.
15      Q.  I got it.
16      Well, isn't that true that you are
17  aware based upon your knowledge and training
18  that if you sustain a complaint of
19  discrimination or retaliation against an
20  F.I.T. employee, that it might be used in
21  connection with a lawsuit against F.I.T.?
22      MR. MELITO:  Objection to form;
23      calls for legal conclusion.
24      A.  (No Response.)

144

D. KEKANA

1      Q.  You can answer.
2      A.  Can you repeat that question?
3      (Whereupon, the requested
4      portion of the transcript was read
5      back.)
6      MR. MELITO:  Same objection.
7      A.  I don't know.
8      Q.  I'm sorry?
9      A.  I don't know.
10      Q.  I see.
11      So, did you not mention that you got
12  training related to Title 9; is that right?
13      MR. MELITO:  Objection.
14      Q.  Title 9, did you mention that?
15      A.  That's correct.
16      Q.  What is "Title 9"?
17      MR. MELITO:  Objection.
18      A.  "Title 9" is a federal law that
19  affords you civil rights and equity on the
20  basis of protected characterizations.
21      Q.  Okay.
22      When you say "civil rights," like
23  what?
24      MR. MELITO:  Objection.

145

```
1                D. KEKANA
2        A.  It provides for equity as far as
3    access with regards to your pursuing in your
4    work environment.
5        Q.  What do you mean by "equity"?
6            MR. MELITO:  Objection.
7        A.  That you will be treated similarly
8    to those who are similarly situated based on
9    your position.
10       Q.  And if someone violates Title 9, are
11   there any remedies?
12           MR. MELITO:  Objection to form
13       and to a legal conclusion.
14       A.  There are number of avenues that
15   folks can seek recourse; one such is filing a
16   complaint in good faith through my office.
17   Another is seeking recourse through outside
18   agencies including the EEOC, New York State
19   Division of Human Rights.
20       Q.  Is that it?
21       A.  As well as lawsuits --
22           MR. MELITO:  Objection.
23       Q.  Lawsuits, I was wondering when you
24   would get to that.
25           So lawsuits, that's when an employer
```

146

```
1                D. KEKANA
2    can be sued by an employee if there is a
3    violation of their civil rights; is that
4    correct?
5            MR. MELITO:  Objection.
6            MR. DRANOFF:  Objection to
7        form.
8            MR. MELITO:  Yes, objection.
9        A.  (No Response.)
10       Q.  You can answer.
11       A.  Correct.
12       Q.  Correct.
13           And so, you know that in order for
14   an employee to be able to succeed in a Title
15   7 case, that they would have to supply proof
16   that they either have been discriminated
17   against and/or retaliated against in order to
18   be able to succeed in that lawsuit, right?
19           MR. MELITO:  Objection.
20       A.  I would presume so; as you would
21   need evidence in any investigation process as
22   well.
23       Q.  Right.
24           And so, if you or your office were
25   to investigate the claim of an employee who
```

147

```
1                D. KEKANA
2    alleged that their civil rights were violated
3    either through discrimination or retaliation
4    on the job, then that could be used as
5    evidence in a Title 7 lawsuit against F.I.T.,
6    correct?
7            MR. MELITO:  Objection.
8        A.  Can you repeat the question?
9            (Whereupon, the requested
10       portion of the transcript was read
11       back.)
12       A.  That is correct.
13       Q.  And that is why out of 130 race
14   complaints you have not sustained a single --
15           MR. MELITO:  Objection --
16       Q.  -- one, right --
17           MR. MELITO:  Objection.
18       A.  That is incorrect.
19       Q.  Okay.  Which part?
20       A.  You stated that the reason why I
21   have not sustained -- as I understand the
22   question, the reason why I have not sustained
23   complaints of race is because they could be
24   used in a lawsuit and that is in correct.
25       Q.  I see.
```

148

```
1                D. KEKANA
2            So out of the 130 or so complaints
3    of race discrimination that you never
4    sustained, it was based upon some other
5    reason; is that right?
6            MR. MELITO:  Objection.
7        A.  If I could clarify, in your question
8    there is something that you are
9    misrepresenting.  Of those 130 complaints
10   that we discussed, they are not specifically
11   of race.  This includes any complaint that
12   implicates it non-discrimination and
13   antiharassment.  I cannot give you a number
14   or even an estimate of how many of those
15   would be on the basis of race.
16       Q.  Well, you just did before lunch.
17   You said that you received eight to 10
18   complaints of race discrimination each year --
19           MR. MELITO:  Objection.
20           Mischaracterizes prior testimony --
21           MR. SELLS:  Excuse me, excuse
22       me, excuse me, excuse me.
23       Q.  -- isn't that right?
24           MR. MELITO:  Objection.
25       A.  (No Response.)
```

149

D. KEKANA

2    Q.  Isn't that what you said before
3    lunch?
4         MR. MELITO:  Objection.
5    A.  I said that I do — I received
6    complaints that implicate the
7    non-discrimination and antiharassment policy.
8    Q.  Is that what you think you said?
9         MR. MELITO:  Objection.  Now
10   you're harassing the witness.
11   A.  (No Response.)
12   Q.  Is that what you think you said —
13        MR. MELITO:  Objection.
14   A.  That is what I believe I said.
15   Q.  Got it.  All right.
16        So now you wish to change your
17   answer?
18        MR. MELITO:  Objection.
19   Mischaracterizes her testimony.
20   Objection to form.
21   Q.  Right, you wish to change it now
22   isn't that right?
23        MR. MELITO:  Objection.
24   Mischaracterizes her prior testimony.
25   Q.  You can answer.

150

D. KEKANA

2    A.  To clarify, I receive eight to 10
3    complaints in an academic year that implicate
4    the non-discrimination and antiharassment
5    policy.
6    Q.  All right.
7         So, let's break this down.  Now
8    you're saying you don't know what you
9    testified to earlier, that there were eight to
10   10 race complaints, now you're saying it's
11   just antidiscrimination, is that right?
12        MR. MELITO:  Objection.
13   Mischaracterizes her testimony —
14        MR. SELLS:  I'm trying to
15   clarify.
16   Q.  Is that what you are saying now,
17   Ms. Kekana?  I want to understand.
18   A.  What I am saying is, I investigate
19   on average in an academic year eight to 10
20   complaints that fall under the
21   non-discrimination and antiharassment policy.
22   Q.  You yourself investigate and you are
23   also the affirmative action director; is that
24   right?
25        MR. MELITO:  Objection.

151

D. KEKANA

2    A.  My title is director of affirmative
3    action and Title 9 coordinator.
4    Q.  Got it.
5         And so, not only do you investigate
6    but you also read the investigative reports
7    of every single complaint that goes into your
8    office; isn't that right?
9         MR. MELITO:  Objection.
10   Mischaracterizes prior testimony.
11   A.  I review any complaints,
12   investigations and reports as it implicates
13   the non-discrimination and antiharassment
14   policy of F.I.T.
15   Q.  All right.
16        And so, that is more than eight to
17   10 complaints a year; isn't that right
18        MR. MELITO:  Objection.
19   A.  Can you rephrase that question?  I'm
20   not understanding.
21   Q.  Yes.  You just indicated that you
22   yourself investigate eight to 10 a year.  And
23   what I am asking you now is that in your role
24   as the affirmative action director, you look
25   at more than just eight to 10 complaints

152

D. KEKANA

2    every year, correct?
3         MR. MELITO:  Objection.
4    A.  In my role as director I am also the
5    principle investigator for affirmative action
6    and Title 9 at F.I.T.
7    Q.  That's not my question.  Please try
8    and follow me.
9         The question is, In your role as
10   director where you oversee every
11   investigation and complaint that comes
12   through your office, there are more than
13   eight to 10 per year; isn't that correct?
14        MR. MELITO:  Objection.
15   A.  There could be more than eight to 10
16   if it implicates a different policy that my
17   office oversees.
18   Q.  Got it.
19        And so the reason you focussed on
20   eight to 10 is because it had to do with race
21   specific --
22   A.  No.
23        MR. MELITO:  Objection to form,
24   argumentative.
25   Q.  Because what you said earlier is

153

D. KEKANA

1    that you sustained, you believe, somewhere
2    around four such complaints; but none were
3    related to complaints of race discrimination.
4    Do you remember that testimony?
5           MR. Melito:  Objection.
6        A.  I do not recall that testimony.
7        Q.  Okay.
8           Well, you said that the only race
9    discrimination claim that you remembered
10   being sustained in your career at F.I.T. was
11   one when you were an assistant -- or you were
12   an affirmative action specialist and had to
13   do with a complaint of an Asian student
14   saying that they were discriminated against
15   on the basis of their race.  Do you remember
16   that testimony?
17          MR. MELITO:  Objection to form.
18      A.  That was misrepresenting the
19   testimony that I had given earlier.  When
20   pressed to remember specifics, I thought of
21   one such instance; but I again want to
22   reiterate that I -- without looking at the
23   log or the records, I can't give a specific
24   number as to how many.  I was working off of

154

D. KEKANA

1    my own recollection.
2       Q.  Okay.
3         But certainly as an affirmative
4    action director over the last six years you
5    have not sustained a single complaint of race
6    discrimination or substantiated one; is that
7    correct?
8          MR. MELITO:  Objection.
9      A.  I cannot say that.
10      Q.  Really.  So you could remember it
11   from back when you were a specialist and the
12   then director substantiated it; but you as
13   director cannot think of a single time that
14   you sustained a complaint of --
15        MR. MELITO:  Objection to form.
16      Q.  -- race discrimination.  I want to
17   be --
18        MR. MELITO:  Objection --
19      Q.  -- to be clear.
20        MR. MELITO:  Objection to form
21     and also harassing.
22      A.  At this time I cannot recall.
23      Q.  But you do recall substantiating
24   four other complaints; is that right?

155

D. KEKANA

1       MR. MELITO:  Objection.
2      A.  Pressed, I'm thinking of most recent
3    substantiations that have been concluded.  I
4    can't say with certainty or a finite number
5    as you wish me to.
6      Q.  Got it.  Thank you for clarifying.
7    Thank you.
8        So now, what is F.I.T.'s policy as
9    it relates to employees who lie during the
10   investigation into complaints of
11   discrimination or retaliation?
12        MR. MELITO:  Objection.
13   Outside the scope of the 30(b)(6) and
14    objection to form.
15        You may answer in your personal
16    capacity.
17      A.  If there were -- if there were
18   someone who were not to participate in this
19   process in good faith, that is to lie, I
20   would -- and I learned of that, I would
21   forward that to HR for discipline.
22      Q.  How would you learn of it --
23        MR. MELITO:  Objection --
24      Q.  -- how would you learn whether or

156

D. KEKANA

1    not an employee who was charged or had a
2    complaint against them for discrimination and
3    retaliation, how would you learn that they
4    would lie during an investigation?
5        MR. MELITO:  Objection to form
6     and also outside the scope of the
7     30(b)(6).
8        You may answer in your personal
9    capacity.
10      A.  I guess if I were to be -- to
11   receive some evidence of a lie.
12      Q.  Okay.  Okay.
13        Has that ever happened where you
14   learned that an employee of F.I.T. during the
15   course of an investigation into
16   discrimination or retaliation lied?
17        MR. MELITO:  Objection to form.
18      A.  I do not recall.
19      Q.  You don't recall; is that right?
20        MR. MELITO:  Objection.
21      A.  I do not recall.
22      Q.  What would you do in the event you
23   did find out that an employee lied during an
24   investigation into allegations of race

157

D. KEKANA

1
2  discrimination and/or retaliation; what would
3  you do about that?
4          MR. MELITO:  Objection to form
5      and outside the scope of the
6      30(b)(6).
7          You may answer in your personal
8      capacity.
9      A.  If I received notice of a violation
10 of any policy, I would refer to that to Human
11 Resources for discipline.
12     Q.  Even if you learned it today, would
13 you do it?
14         MR. MELITO:  Objection.
15     Outside the scope of the 30(b)(6).
16         You may answer in your personal
17     capacity.
18     A.  I cannot say.
19     Q.  Why?
20         MR. MELITO:  Objection.  Same
21     objection as before.
22         I'll just note since I'm not
23     repeating the same objections outside
24     the scope, she may answer in her
25     personal capacity.  I will continue

158

D. KEKANA

1
2  to object to form as well.
3      A.  In my personal capacity, I think I
4  would need to understand the context under
5  which I'm receiving said evidence.  Is it
6  motivated by some other factor?  Is it true?
7  Is it credible?  Is it plausible?  I would
8  want to know the veracity of the evidence
9  that is being received, especially if it's
10 being received outside of the timeliness of
11 the investigation.
12     Q.  What do you mean "timeliness of the
13 investigation"?
14         MR. MELITO:  Objection.
15     A.  Meaning, if it happened during the
16 time of the investigation.
17     Q.  So, F.I.T. doesn't have a policy
18 about what happens to someone who lies during
19 an investigation; is that right?
20         MR. MELITO:  Objection.
21     A.  As I said before, if there's someone
22 who does not participate in the process in
23 good faith, the process is that that
24 violation is then referred to Human
25 Resources.

159

D. KEKANA

1
2      Q.  Okay.
3          Does it have a time limit in the
4  policy that you are talking about; is there a
5  time limit?  Because you raised something
6  about time limits.  And so I'm wondering
7  whether or not if someone lies during the
8  course of an investigation, does F.I.T. have
9  a time limit on when you are required to
10 report that they lied during the
11 investigation?
12         MR. MELITO:  Objection.
13     Outside the scope of the 30(b)(6) and
14     to form.
15     A.  As I understand it, they don't.  I
16 think the question you asked me was what
17 would make me report it.  So I listed the
18 several factors that I would include in my
19 decision to report that learning -- if I were
20 to learn something, as you said, today.
21     Q.  I thought you said F.I.T.'s policy
22 is if someone lied during an investigation,
23 you had a duty to report it to HR; is that
24 right?
25         MR. MELITO:  Objection.

160

D. KEKANA

1
2      A.  That is correct.
3      Q.  Okay.
4          And nowhere in the policy does it
5  say there is a time limit on when you are
6  obligated to report the fact that an employee
7  lied during an investigation, right?
8          MR. MELITO:  Objection.
9      A.  That's correct.
10     Q.  Got it.
11         Now, you became aware of a complaint
12 that my client, Ms. Phillips, made of
13 discrimination, correct?
14         MR. MELITO:  Objection.
15     A.  That's correct.
16     Q.  Okay.
17         Tell me what you remember about
18 that.
19         MR. MELITO:  Objection.
20         Go ahead.
21     A.  In the spring semester of 2018,
22 Ms. Phillips reached out and said -- and
23 provided a complaint against four separate
24 people alleging discrimination on the basis
25 of race.  That race being

161

D. KEKANA

1    African-American/black.

2

3    Q.  It's interesting that you would jump

4    to 2018.  Didn't Ms. Phillips make another

5    complaint that you were aware of?

6            MR. MELITO:  Objection.

7    A.  I'm aware of a complaint that

8    Ms. Phillips filed when I was affirmative

9    action specialist -- actually --

10    Q.  Why did you skip that one?  Well,

11    why did you skip that one --

12    A.  Actually before affirmative action

13    specialist.

14            MR. MELITO:  Objection.

15    A.  I spoke to the most recent

16    complaint.  As I understand, that's what we

17    are here to discuss.

18    Q.  Okay.

19         Well tell me, let's go

20    chronologically.  So what do you recall about

21    the complaint that you remember when you were

22    a specialist; what do you remember about

23    that?

24            MR. MELITO:  Objection.

25    A.  My role was quite different when the

---

162

D. KEKANA

1

2    complaint came in.  What I did learn from the

3    then affirmative action officer as she asked

4    me to meet with one witness in that matter --

5    excuse me, two witnesses I believe it was in

6    that matter is that Ms. Phillips had put

7    forth a complaint against her supervisor at

8    the time, Pamela Elsworth of discriminatory

9    harassment on the basis of race.

10    Q.  Okay.

11         And what was your role in that?

12            MR. MELITO:  Objection.

13    A.  My role was I conducted two

14    investigatory interviews with witnesses and

15    then I met with Ms. Phillips to deliver the

16    outcome of the investigation on behalf of

17    Ms. Gonzales.

18    Q.  Okay.

19         When you say you met with

20    Mrs. Phillips regarding the outcome of the

21    investigation, were there any written

22    materials that you relied upon to do so?

23            MR. MELITO:  Objection.

24    A.  I don't recall.  I cannot say.

25    Q.  So, you were off top of your head as

---

163

D. KEKANA

1

2    you spoke to Ms. Phillips describing what the

3    investigation showed?

4            MR. MELITO:  Objection.

5         Go ahead.

6    A.  No, I am not certain if it was

7    written materials or if it was verbal

8    instructions that I was given by

9    Ms. Gonzales.

10    Q.  Well, would your practice be to take

11    notes of your conversation with Ms. Gonzales,

12    if she were telling you what to say?

13            MR. MELITO:  Objection.

14    A.  At that time, no.

15    Q.  Let me ask you this, In terms of the

16    investigations that are conducted by F.I.T.

17    into complaints of discrimination and

18    retaliation, is there a record retention

19    component to it?

20            MR. MELITO:  Objection.

21    A.  Yes.

22    Q.  What is the record retention policy?

23    A.  The record retention, I believe, is

24    seven years.

25    Q.  What do you mean by "seven years,"

---

164

D. KEKANA

1

2    what do you mean?

3            MR. MELITO:  Objection.

4    A.  I'm sorry?

5    Q.  I'm asking, What do you mean by

6    "seven years --"

7            MR. MELITO:  Same objection --

8    Q.  What records are kept for seven

9    years?

10            MR. MELITO:  Same objection

11        outside the scope of the 30(b)(6).

12        She can answer in the scope of her

13        personal capacity.

14    A.  To my recollection what would be

15    kept would be the investigation file.

16    Q.  And what's an investigation file?

17            MR. MELITO:  Same objection.

18    A.  That would be any statements taken

19    by investigation parties, an investigation

20    report, any evidence as it relates to the

21    investigation.

22    Q.  "Any evidence"; is that right?

23    A.  To my recollection.

24    Q.  All right.

25         So, in the event that the

---

165

D. KEKANA

1
2   affirmative action director tells you at the
3   point in time when you were a specialist that
4   you were to say certain things to an F.I.T.
5   employee who made a complaint relating to how
6   the investigation turned out, were you
7   required to put the notes that you may have
8   taken of that conversation into the
9   investigation file?
10          MR. MELITO:  Same objection.
11      Outside the scope of the 30(b)(6),
12      form.
13      A.  If I had taken any notes, I would
14  have placed them in the investigation file.
15      Q.  That was your practice or was --
16      A.  That have --
17      Q.  -- the policy?
18          MR. MELITO:  Objection.
19      A.  At the time that was the practice.
20      Q.  So, there was no policy that you had
21  to put notes into the file, correct?
22          MR. MELITO:  Objection.
23      A.  That is correct.
24      Q.  Did that policy ever change?
25          MR. MELITO:  Objection.

166

D. KEKANA

1
2      A.  No.
3      Q.  So it's discretionary as to whether
4   or not someone will put notes of a
5   conversation that they had with the
6   affirmative action director into the
7   investigation file; is that correct?
8          MR. MELITO:  Objection.
9      A.  Notes that are taken with regards to
10  meetings would count as an interview with the
11  affirmative action officer; those would be
12  placed.  Handwritten notes or directives,
13  those would not.
14      Q.  You just said you would put -- your
15  practice, even though it wasn't required by
16  policy, was to put notes that you took from
17  the affirmative action director into the
18  file; isn't that right?  That's what you said
19  before?
20          MR. MELITO:  Objection.  Again,
21      this is in her personal capacity.
22      A.  If I had taken notes as part of my
23  meeting with Ms. Phillips under the --
24      Q.  That's not my question.  My question
25  has to do with your notes as a specialist

167

D. KEKANA

1
2   regarding the conversation you had with the
3   affirmative action director; that was my
4   question --
5          MR. MELITO:  Objection.
6      A.  I would --
7          MR. MELITO:  Objection to form.
8      Q.  Sorry.  You just said that you would
9   not put those notes into the file?
10          MR. MELITO:  Objection.
11      A.  Can you repeat your question.
12      (Whereupon, the requested
13      portion of the transcript was read
14      back.)
15      A.  If I was directed from the director
16  of affirmative action, I would not place
17  those notes into an investigation file.  I
18  wish to clarify my previous answer as it is
19  clear I did not understand the question being
20  asked.
21      Q.  Well, why wouldn't you put notes of
22  what the affirmative action director asked
23  you to do into the file?
24          MR. MELITO:  Objection.
25      Outside the scope.  It's in her

168

D. KEKANA

1
2      personal capacity.  Objection to the
3      form.
4      A.  Because those would have been
5   directives as part of a task being given to
6   me.  I would not have included that in the
7   investigation file.
8      Q.  Why not?
9          MR. MELITO:  Objection.
10      A.  I would not have included it as
11  being notes for as pertinent to the
12  investigation file.
13      Q.  Is that a policy of F.I.T. that the
14  investigators who investigate discrimination
15  and retaliation claims are not to put any
16  notes that they take regarding instructions
17  from the affirmative action director into an
18  investigation file?
19          MR. MELITO:  Objection.
20      A.  No, that is not a policy.
21      Q.  Well, who directed you not to put
22  the notes that you took from the affirmative
23  action director into the investigation files?
24          MR. MELITO:  Objection.
25      A.  I was not directed to do so.

169

D. KEKANA

1
2     Q.  So, that was just your own practice;
3  is that right?
4          MR. MELITO:  Objection.
5     A.  Those are the steps I took in my
6  personal capacity.
7     Q.  But now you're the director, right?
8     A.  Yes.
9     Q.  And so had you instructed your
10  investigators or subordinates not to put
11  notes of conversations that you had with them
12  regarding an investigation of retaliation or
13  discrimination into the investigation file?
14          MR. MELITO:  Objection.
15     A.  No.
16     Q.  Okay.
17          So what was it that you recall
18  telling Ms. Phillips about that complaint
19  that she made back in -- do you remember what
20  year it was?
21     A.  I -- I do not recall.  It may have
22  been 2012.
23     Q.  Okay.
24          Now, as part of an investigation
25  into a complaint of discrimination or

170

D. KEKANA

1
2  retaliation, is there supposed to be a
3  written report?
4     A.  Yes.
5     Q.  Was there such a written report done
6  for Ms. Phillips 2012 complaint?
7     A.  I would not have written that
8  report.  I would have supplied the
9  investigation interview notes for that
10  report.  But that report would have been
11  written by the then director.
12     Q.  Do you know if one was ever written?
13     A.  I don't recall.
14          MR. SELLS:  Well, we call for
15     the production of any report that was
16     done late into the 2012 complaint of
17     Ms. Phillips?
18          MR. MELITO:  Is there a
19     question to that?
20          MR. SELLS:  What?
21          MR. MELITO:  Is that a question
22     that --
23          MR. SELLS:  That was to you.
24          MR. MELITO:  To who?
25          MR. SELLS:  You.

171

D. KEKANA

1
2          MR. MELITO:  Okay.
3          MR. SELLS:  We're calling for
4     the production of it.
5          MR. MELITO:  Oh, it sounds -- I
6     was unclear what you were actually
7     saying, so take it under advisement
8     and make a formal request in writing.
9     Q.  Who did you speak to in connection
10  with that 2012 complaint?
11     A.  I met with two witnesses who also
12  worked in the graduate school and then I was
13  instructed to have the meeting with
14  Ms. Phillips to let her know the outcome.
15     Q.  Did you interview Ms. Phillips?
16     A.  I was not there for that.
17     Q.  Do you remember the two witnesses
18  that you spoke to?
19     A.  I do recall the two witnesses.
20     Q.  Who were they?
21     A.  Carol DeSantis and Anton Baptiste.
22     Q.  Now in terms of the witness
23  statements, you said that you took two
24  witness statements.  What is your practice of
25  how these witness statements get taken during

172

D. KEKANA

1
2  the investigation into discrimination and/or
3  retaliation?
4          MR. MELITO:  Objection.
5          Are you asking about F.I.T. or
6     personal, just so I know if I have to
7     raise that objection.
8          MR. SELLS:  First, we'll start
9     with whether or not there is a policy
10     of F.I.T. regarding the taking of
11     statements of witnesses and
12     investigations for discrimination
13     and/or retaliation.
14     A.  There is a practice currently in
15  place in which witnesses -- all investigation
16  parties for interview, there is a note taker
17  who is present who will summarize the
18  conversation and fashion it into a statement.
19  That is then sent to the party for them to
20  review and attest it to be true.
21     Q.  Okay.
22          This is a policy you say?
23     A.  This is a practice, it is not part
24  of the policy.
25     Q.  When did this practice come into

173

D. KEKANA

1    being?
2        A.   This came into being when I stepped
3    in as director for affirmative action.
4        Q.   What was the practice before that
5    regarding witness statements?
6        A.   Witnesses were asked to fashion and
7    write their own statements.
8        Q.   So, witnesses could actually write
9    their own statements before you became
10   affirmative action director; is that correct?
11            MR. MELITO:   Objection --
12       A.   That's correct.
13       Q.   And is that what you did when you
14   investigated Ms. Phillips's initial
15   complaint?  Did you ask --
16            MR. MELITO:   Objection --
17       Q.   -- the witnesses to write their own
18   statements?
19       A.   We were --
20            MR. MELITO:   Objection --
21       Q.   I'm sorry?
22       A.   We requested that.
23       Q.   So, what is the protocol; when they
24   wrote their own statement what would you do
25

174

D. KEKANA

1    then --
2            MR. MELITO:   Objection.
3        A.   If they would write their own
4    statement, that would then be included as
5    part of the investigation file.
6            MR. SELLS:   Can we pull up
7        Exhibit 5.
8            (Whereupon, Plaintiff's Exhibit
9        6, two-page document Bates stamped
10       FIT18 and 19, was marked for
11       identification as of this date.)
12           (Counsel is sharing the
13       computer screen image.)
14       Q.   Now, do you recognize this document
15   which is Bates stamped DF --
16           MR. SELLS:   That' 5.   I think I
17       want Exhibit 6 then.   Can we please
18       pull up 6.
19           For the record, Plaintiff's
20       Exhibit 6 is a two-page document
21       Bates stamped D-F-I-T 18 and 19.
22       Q.   Do you recognize this memo?
23       A.   I do recognize it.
24       Q.   What do you recognize it to be?
25

175

D. KEKANA

1        A.   This is a summary of the interview
2    that Ms. Phillips gave with the then
3    affirmative action officer.
4        Q.   All right.
5            Now, do you know who wrote this
6    summary?
7        A.   I don't recall if it was me.   It may
8    have also been another person, Delica
9    Reduque, who worked at F.I.T. at the time.
10       Q.   Do you know if Delica refers to
11   herself in the third person?  The first
12   person I should say.
13           MR. MELITO:   Objection.
14       A.   I don't understand the question.
15   Can you rephrase that?
16       Q.   Yes.   Does Delica say, "Delica" when
17   she is talking about things that she does
18   herself?
19           MR. MELITO:   Objection.
20       A.   In taking notes, often times, just
21   recalling the way the two of us worked, we
22   would spell out our own names just for the
23   record of what we're writing.
24       Q.   I see.
25

176

D. KEKANA

1        A.   Or somebody may have said "you," and
2    the -- you know, I would write my name or she
3    would write her name.
4        Q.   All right.   All right.
5            So when you said that you might have
6    written this, why do you think you could have
7    been the one that wrote it?
8            MR. MELITO:   Objection.
9        A.   Because it's in the same font that
10   we used at that time.
11       Q.   Okay.   All right.
12           And in reading through it, does this
13   refresh your recollection about your
14   involvement in the investigation of that 2012
15   complaint?
16       A.   I recall what is written here, yes.
17       Q.   Okay.
18           MR. SELLS:   Can we just scroll
19       down.
20       Q.   There is a section down there -- the
21   last paragraph on F.I.T. 18 where you say
22   "this behavior has been happening for a long
23   time.   Milta (phonetic) and Anton in the
24   department witnessed this behavior also."
25

177

D. KEKANA

2      Now, you indicated that you
3  interviewed Anton; is that right?
4      A.  Yes, I did.
5      Q.  So, does that refresh your
6  recollection that this writing was made by
7  you?
8      A.  That didn't mean that I wrote this.
9  I very well may have; but I don't recall.
10         MR. SELLS:  Can we go to the
11     next page.
12     Q.  Now, do you recall speaking to Mary?
13     A.  Not in my capacity at the time.  I
14  did not speak with Mary.
15         Again, at this time, I was the
16  assistant; and so I only spoke with Carol and
17  Anton at the instruction of -- from the
18  director.
19     Q.  Okay.
20         So, in terms of this document, this
21  memo -- would you call it a memo or how would
22  you describe this document?
23     A.  I would call it a summary of an
24  investigation interview.
25     Q.  All right.

178

D. KEKANA

2         So is it practice and policy that in
3  investigating complaints of retaliation that
4  people at F.I.T. doing the investigation and
5  writing these memos, they're not supposed to
6  identify themselves.
7      A.  Can you rephrase question?  I'm not
8  sure I understand.
9      Q.  Nobody identified themselves as
10  having written this document, and I am asking
11  you is that a policy and practice of --
12         MR. MELITO:  Objection.
13     Q.  -- at F.I.T. that as investigators
14  when we write memos we do not have to say who
15  we are.  So we could deny --
16         MR. MELITO:  Objection.
17     Q.  -- ever saying --
18         MR. MELITO:  Objection.
19     Q.  -- is that a policy?
20     A.  That is not a policy of F.I.T.
21     Q.  Okay.
22         Is the policy that you are supposed
23  to identify the document that you write as
24  part of an investigation?
25     A.  At that time, that was not part of

179

D. KEKANA

2  our practice.
3      Q.  Got it.
4         So you could just choose what
5  documents related to an investigation that
6  you wanted to identify as having written or
7  not; is that right?
8      A.  I --
9         MR. MELITO:  Objection.
10     A.  I -- I don't understand the
11  question.
12     Q.  Yes.  It was your choice if I want
13  to put on there that I wrote it, I can; but --
14         MR. MELITO:  Objection --
15     Q.  -- but I don't have to; was that the
16  policy?
17         MR. MELITO:  Objection.
18     A.  No, that was not the policy.
19     Q.  So, what was the policy then?
20     A.  There was no policy.
21     Q.  Got it.
22         So just so I'm clear, in order for
23  an investigation, for example, if someone
24  wanted to review an investigation to find out
25  if it was really fair and impartial, one of

180

D. KEKANA

2  the things that a person might want to see is
3  who is writing the material that's used to
4  either sustain and substantiate the claims or
5  not; wouldn't you agree?
6         MR. MELITO:  Objection.  Can
7      you repeat the question?  I'm not
8      sure I understand what you are
9      asking.
10     Q.  Yes.  Let's say someone wanted to
11  challenge a finding that was made regarding a
12  complaint of discrimination and they wanted
13  to look through the file to see whether or
14  not the investigation was fair and impartial,
15  one of the things that they would want to
16  know is who did what during the
17  investigation; wouldn't you agree with that?
18         MR. MELITO:  Objection.
19     A.  In my personal capacity, I suppose.
20     Q.  Well, how are you going to know if
21  someone acted unfair and wasn't partial or
22  wasn't impartial I should say if you don't
23  know who they are --
24         MR. MELITO:  Objection --
25     Q.  -- how would you determine that?

181

D. KEKANA

2      MR. MELITO:  Objection.
3      A.  I don't know.
4      Q.  Right.
5           So, looking at this memo for
6  example, you had no idea who wrote it; isn't
7  that right?
8      MR. MELITO:  Objection.
9      A.  I know it can be one or two people
10 who would have written this based on how the
11 offices were structured at that time and the
12 way we worked.
13     Q.  You know it's one of two people;
14 isn't that right?
15     A.  That's correct.
16     Q.  Well, how is that an accurate
17 investigation if you have to narrow it down
18 to two people?  Like it could have been the
19 Klu Klux Clan member or someone else.  Is --
20     MR. MELITO:  Objection --
21     Q.  -- is that the way F.I.T. operates?
22 Like if you want to look at what work was
23 done, you have to guess about who it is that
24 did the work?
25     MR. MELITO:  Objection.

182

D. KEKANA

2      A.  (No Response.)
3      Q.  Is that right?
4      A.  I'm not sure I understand what --
5  what question is being asked.
6      Q.  Yes.  Let's say someone wanted to
7  say, Hey, I want to make sure that this is a
8  fair and impartial investigation that was
9  conducted by F.I.T. into the allegations of
10 discrimination and retaliation; do you think
11 that such an investigation could be done if
12 the person doing the investigation about
13 whether it's fair and impartial didn't even
14 know who did what and had to guess about
15 whether it's one person or the other; do you
16 think that's the way it should be done?
17     MR. MELITO:  Objection, form
18     and outside the scope.  She can
19     answer in her personal capacity.
20     A.  I don't know.
21     Q.  Wouldn't you think that the better
22 practice would be every investigator who is
23 supposed to -- who does something during an
24 investigation identifies what it is that they
25 do and what it is that they write as it

183

D. KEKANA

2  pertains to the investigation?
3      MR. MELITO:  Objection to form.
4      Again in her personal capacity.
5      A.  In my personal capacity, it would be
6  appropriate to author all notes and identify
7  who has taken those notes and whose notes
8  they represent.
9      Q.  So you as the affirmative action
10 director, have you mandated that all
11 investigators that investigate claims of
12 retaliation and/or discrimination must
13 identify the notes that they take and put
14 into the investigation file?
15     MR. MELITO:  Objection.
16     A.  Processes since this time has
17 changed.  Obviously, as me coming in as
18 director, I have changed the way that it
19 works based on the resources available to us
20 in the office to identify roles as well as
21 who is present at interviews.
22     Q.  Who is present?  Well, what about if
23 it's a summary?  Are they required to
24 identify who is writing the summary?
25     MR. MELITO:  Objection.

184

D. KEKANA

2      A.  Yes.
3      Q.  And how did you implement this
4  policy?
5      A.  It is a practice I implemented in my
6  office as director, and I instructed the
7  administrative assistant to do so.
8      Q.  And how was this instruction given?
9      A.  I told her verbally to do this.
10     Q.  What was the outcome of that 2012
11 complaint that Ms. Phillips made?
12     A.  To my best recollection, it was not
13 substantiated that Pamela Elsworth's
14 treatment was motivated by race.
15     Q.  Now, you made reference to a 2018
16 complaint that Ms. Phillips made; do you
17 recall that?
18     MR. SELLS:  We can take down
19     the document.
20         (Screen sharing has ended).
21     A.  Yes.
22     Q.  By then, you were the affirmative
23 action director; is that right?
24     A.  Yes.
25     Q.  Okay.

185

D. KEKANA

1
2        What do you recall about the
3    complaint that Ms. Phillips raised in 2018?
4        A.   That I recall, Ms. Phillips came
5    forward with a complaint against four
6    Respondents of behaviors from -- that she
7    alleged were discriminatory against her on
8    the basis of race.
9        Q.   And how was this complaint made?
10       A.   This was made during an
11   investigative interview.
12       Q.   Okay.
13           Do you recall Ms. Phillips
14   subpoenaing any type of written statement
15   regarding her complaint?
16       A.   Ms. Phillips put forward a revision
17   of the summary that was provided by our note
18   taker, Jerilee Fonseca; and that was her
19   written statement that she had edited to
20   attest that it was true to what she said.
21           MR. SELLS:  Can we pull up
22       Exhibit 10.
23           (Whereupon, Plaintiff's Exhibit
24       10, e-mail thread, was marked for
25       identification as of this date.)

186

D. KEKANA

1
2           (Counsel is sharing the
3       computer screen image.)
4           MR. SELLS:  Just for the
5       record, Plaintiff's Exhibit 10 is an
6       e-mail thread with the Bates stamp --
7       this does not have a Bates stamp.
8        Q.   Do you recognize this to be the
9    complaint e-mail that was sent you from
10   Ms. Phillips?
11           MR. SELLS:  We can scroll down
12       little bit.  Yes, stop.
13       Q.   The second page of the exhibit has
14   Marjorie Phillips, the date March 28, 2018
15   and the time 10:00 a.m.; do you see that?
16       A.   Yes.
17       Q.   Without reading through everything,
18   if you could scroll down there is a first
19   incident involving Brenda Cowan; second
20   incident involving Marilyn Barton; and if you
21   go to the third incident, that involved
22   Jonathan Kyle Farmer; then there is a fourth
23   incident that involved Brenda Cowan.  Keep
24   going down, keep going down.  Then you see
25   the paragraph that starts "within an half

187

D. KEKANA

1
2    hour."  There is a section in there that
3    talks about "Dean Davis."  Do you see that?
4        A.   Yes.
5           MR. SELLS:  Keep scrolling
6       down.  Stop.
7        Q.   Okay.
8           So, here there is another -- what
9    I'm talking about here is the following Monday
10   -- you see that paragraph starting "The
11   following Monday when I came into the office,
12   I made an appointment to speak to Dean Mary
13   Davis and told her what was said.  Her first
14   reaction was to chuckle and she said, Well,
15   nobody uses those terms anymore.  These terms
16   are out dated."  And this was it pretty much,
17   and then she talks about "I told Mary.  When I
18   told her what Marilyn said to the student
19   aide, Julia, about African-Americans were
20   considered 3/5th of a human being she replied,
21   Well, historically she is correct."
22           Do you see that?
23       A.   Yes.
24           MR. SELLS:  Keep scrolling
25       down.  Stop.

188

D. KEKANA

1
2        Q.   The next paragraph we have up on the
3    screen starts with "I did not expect Dean
4    Mary Davis to respond this way.  I was deeply
5    hurt and even more offended."
6           Do you see that?
7        A.   Yes.
8        Q.   Okay.
9           Now, this paragraph also contains
10   the language "I told her I didn't -- if
11   someone offends me in the way that she had, I
12   wouldn't feel compelled to educate anyone.  I
13   was expecting more dialogue from the dean.
14   In that moment, I decided to go through the
15   list of incidents and offenses that I had
16   overlooked.  I believe she was not trying to
17   show any emotion."
18           "When I wasn't getting much response
19   I said, 'I did have the option of going to
20   EEO if I wanted.'  Then she said there are
21   institutions in place within the college
22   where I can go.  I responded by 'If I chose
23   to follow up with these institutions, the
24   first question they would ask would be had I
25   spoken with the person in charge?'"

189

D. KEKANA

1
2       "Right from the start of our
3   conversation, unfortunately, I felt the dean
4   was siding with Marilyn Barton.  She wasn't
5   showing any sense of fairness or compassion
6   for what I was clearly very upset about at
7   the time.  I wasn't sure if she just didn't
8   care or was this is the way F.I.T. had
9   trained their managers to respond in
10  situations like this."
11          Do you see that?
12      A.  Yes.
13      Q.  Do you recall reading that when
14  Ms. Phillips e-mailed it to you?
15      A.  Yes.
16          MR. SELLS:  Can we just keep
17      going down -- go backup.  We can take
18      down the document.
19          (Screen sharing has ended).
20      Q.  Now regarding Ms. Phillips' written
21  complaint, do you see that she talked about
22  several incidents of what she considered to
23  be racism, right?
24      A.  Yes.
25      Q.  And discriminatory treatment, right?

190

D. KEKANA

1
2       A.  Yes.
3       Q.  And so, the first thing that the
4   affirmative action office had to do when it
5   received it was to make a determination about
6   whether or not, if the affirmative action
7   department would sustain those allegations,
8   would it rise to the level of a
9   discriminatory act; is that right?
10          MR. MELITO:  Objection.
11      A.  (No Response.)
12          MR. MELITO:  You may answer.
13      A.  Yes.
14      Q.  Got it.
15          And so under F.I.T.'s policy, if you
16  concluded that the allegations Ms. Phillips
17  made had been substantiated, then they would
18  have risen to the level of discrimination,
19  right?
20          MR. MELITO:  Objection.
21      A.  Individually on their merit, no.
22  What Ms. Phillips was presenting was an
23  argument that --
24      Q.  I'm not asking you that.
25          MR. SELLS:  Can you please

191

D. KEKANA

1
2   repeat the question.
3          MR. MELITO:  Can you let her
4      finish her testimony.
5          MR. SELLS:  She is not
6      answering my question.
7      Q.  Listen to the question and answer my
8   question.
9          MR. MELITO:  You objected to
10      the same thing during Plaintiff's
11      deposition.
12          MR. SELLS:  We will have it
13      read back, Nicholas.
14          MR. MELITO:  I'm just noting --
15          MR. SELLS:  Just let her read
16      it back.
17          (Whereupon, the requested
18      portion of the transcript was read
19      back.)
20          MR. SELLS:  That's not the
21      question.  Let me withdraw it, and I
22      will repeat the question.
23      Q.  Now if you had determined -- before
24  you would allow any investigation to go
25  forward, if you had to determine that what

192

D. KEKANA

1
2   Ms. Phillips presented, if it was sustained,
3   would have risen to the level of
4   discrimination or discriminatory practice,
5   correct?
6          MR. MELITO:  Objection.
7      A.  Prior to -- prior to initiating an
8   investigation, I would have to establish that
9   if true, would this rise to a violation of
10  the policy.
11      Q.  And so you didn't because you
12  investigated Ms. Phillips complaint; is that
13  right?
14          MR. MELITO:  Objection.
15      Misstates testimony to form.
16      A.  I initiated an investigation.
17      Q.  Now, part of what Ms. Phillips
18  claimed was that she went to Dean Davis with
19  her complaint and Dean Davis told her if she
20  wanted to take it to the EEO office she
21  could; is that right?
22          MR. MELITO:  Objection.
23      A.  (No Response.)
24      Q.  You could answer.  What did you say?
25      A.  That is correct.

193

D. KEKANA

1
2    Q.  Now, did you report Dean Davis to HR
3    for failing to take Ms. Phillips' complaint
4    to you?
5           MR. MELITO:  Objection.
6    A.  Not at the initial beginning of the
7    investigation.
8    Q.  And why not?
9           MR. MELITO:  Objection.
10   A.  I wish to provide all Respondents,
11   including Ms. Davis, an opportunity to
12   respond, if possible, to what was presented
13   as being alleged prior to me turning that
14   over to HR.
15   Q.  Did you speak or did someone from
16   your office speak to Dean Davis about that
17   very specific allegation?
18   A.  Yes.
19   Q.  And who was it that spoke to Dean
20   Davis?
21   A.  I spoke with Ms. Davis.
22   Q.  And what did she tell you?
23   A.  At that time I -- actually, I do not
24   recall.
25   Q.  Well, did there come a point in time

194

D. KEKANA

1
2    when you referred the complaint of Dean Davis
3    failing to report Ms. Phillips' complaint of
4    discrimination to the affirmative action
5    office?
6           MR. MELITO:  Objection.
7    A.  I forwarded my report, my
8    investigatory report, to HR including all my
9    findings and rational for their appropriate
10   review and action.
11   Q.  Was that one of the things that you
12   put in your report was that Dean Davis failed
13   to report a complaint of discrimination that
14   was made to her as a supervisory reporter?
15          MR. MELITO:  Objection.
16   A.  I don't recall explicitly stating it
17   in that way.
18   Q.  Well, how did you state it, as you
19   recall?
20   A.  I'd have to review the file.
21   Q.  When was the last time you saw your
22   report?
23   A.  I do not recall, but some time ago.
24   Q.  When you say "some time ago," I
25   don't know what that means.  Can you be more

195

D. KEKANA

1
2    specific?
3    A.  Prior to the global pandemic.
4    Q.  So, let me ask you.  How did you
5    learn about the deposition today?
6    A.  I was informed that there would be a
7    deposition.
8    Q.  Got it.
9           And what exactly did you do to
10   prepare for the deposition?
11          MR. MELITO:  Objection.
12   A.  I didn't do much to prepare for the
13   investigation.
14   Q.  Well, tell me what you did do?
15   A.  I spoke with Counsel what to expect --
16          MR. MELITO:  Objection.  Do not
17   -- objection.  Do not go into what we
18   discussed.
19          So, Mr. Sells, if you have a
20   follow up.
21   Q.  What else?  I'm not asking what your
22   lawyer said to you.  You said you met with
23   Counsel.  Did you review any documents?
24          MR. MELITO:  Objection.  Do not
25   answer.

196

D. KEKANA

1
2           MR. SELLS:  On what basis?
3           MR. MELITO:  Same basis you
4    raised when you objected to that
5    question --
6           MR. SELLS:  No, no, no, no --
7           MR. MELITO:  -- in Plaintiff's
8    deposition.
9           MR. SELLS:  I asked first
10   whether you reviewed documents.  I
11   didn't ask which ones.  I just asked
12   did you review documents as part of
13   your preparation.
14          MR. MELITO:  I'll object to
15   that.  If you want to specify and
16   clarify if it's with Counsel or out --
17          MR. SELLS:  Listen, listen,
18   listen, listen.  Please, with the
19   speaking objections -- either you're
20   going to tell her don't answer the
21   question, there is a privilege or
22   you're not -- just say -- just answer
23   the question did you review
24   documents.
25          MR. MELITO:  My apology with

D. KEKANA

1
2      trying to assist you with questioning --
3           MR. SELLS:  I don't need your
4      assistance.  I'm quite capable.
5           MR. MELITO:  Implicates
6      attorney/client privilege the way it
7      is worded.  Do not answer.
8           MR. SELLS:  Whether or not she
9      looked at documents, what is the
10     attorney/client privilege to that?
11     Whether she looked at documents.
12     What is it?  Explain it for the
13     record.
14          MR. MELITO:  Oh, you want me to
15     explain now?
16          MR. SELLS:  Yes, because this
17     is obstructionist.
18          MR. MELITO:  No.
19          MR. SELLS:  This is
20     obstructionist.  Tell me what the
21     attorney/client privilege associated
22     with whether or not she looked at
23     documents in preparation for this
24     deposition.  What is it?
25          MR. MELITO:  Oh, so now I will

D. KEKANA

1
2      explain --
3           MR. SELLS:  No.  What is it?
4      What is it?  Nicholas, answer the
5      question.
6           MR. MELITO:  If you stop
7      cutting me off, I will.  I love to
8      answer my question.
9           It is not so much what
10     documents, it is how you worded it.
11     If you want to know what documents
12     she reviewed --
13          MR. SELLS:  I want to know what
14     the privilege is, that's what I want
15     to know.
16          MR. MELITO:  Attorney/client
17     privilege.
18          MR. SELLS:  What?
19          MR. MELITO:  Work product.
20          MR. SELLS:  Okay, got it.
21     Attorney/client privilege.  I see.
22     Q.  So, you said the last time you saw
23     your report was before the global pandemic;
24     is that what you testified to?
25          MR. MELITO:  Objection.

D. KEKANA

1
2      A.  You asked me when I last read my
3      report; and that is the last time I read my
4      report.
5      Q.  I said when is the last time you saw
6      your report --
7           MR. MELITO:  Objection.
8      Do not answer.
9      Q.  Well, you said it was before the
10     global pandemic; isn't it?
11     A.  (No Response.)
12          MR. MELITO:  Objection to the
13     form.
14          MR. SELLS:  Can we go to
15     Exhibit 29.
16          (Whereupon, Plaintiff's Exhibit
17     29, memo to file from Deliwe Kekana
18     dated October 7, 2019, Bates stamped
19     FTT27 through 43, was marked for
20     identification as of this date.)
21     Q.  Do you recognize this?
22          (Counsel is sharing the
23     computer screen image.)
24     A.  Yes.
25          MR. SELLS:  Okay.  For the

D. KEKANA

1
2      record, Exhibit 29 is a memo to file
3      from Deliwe Kekana, dated October 7,
4      2019; and it is Bates stamped
5      starting page F-I-T27 through 43.
6           MR. DRANOFF:  Would it be
7      possible to take a quick five-minute
8      break?
9           MR. SELLS:  Yes.
10          (Whereupon, a brief recess was
11     taken at 4:12 p.m.; after which, the
12     proceeding continued at 4:31 p.m. as
13     follows.)
14          MR. SELLS:  Back on the record.
15     Please scroll to page 16.
16          (Counsel is sharing the
17     computer screen image.)
18     Q.  Now, looking at what's on the
19     screen.  So, here we see in your
20     investigative report, you talk about
21     Respondent 4 who is Mary Davis, correct?
22     A.  That's correct.
23     Q.  Okay.
24          And just to be clear, when you
25     say -- and I'm reading, you could see my

201

D. KEKANA

1     pointer -- "In reviewing the context and
2     circumstances of this complaint this
3     investigator is unable to substantiate the
4     complaint of discriminatory harassment."
5             Then you write, "This report will be
6     forwarded to the Office of Human Resources
7     Management and Labor Relations for
8     appropriate review."
9             What does that mean?
10        A.  This is with regards to the
11    Respondent's actions as a -- in her
12    supervisory capacity.
13        Q.  Okay.
14            So, is this what you wrote in your
15    investigative summary regarding what you
16    considered to be Dean Davis' failure to report
17    a complaint of discrimination made to her from
18    her subordinate?
19            MR. MELITO:  Objection.
20        A.  This was not my -- my determination
21    as a finding of fact, but rather my
22    recognizing that this matter should be
23    investigated via Human Resources and
24    addressed via Human Resources.

202

D. KEKANA

1     Q.  Let's look at what you wrote.  So
2     Respondent 4, which you indicate as Dean
3     Davis -- do you see where my pointer is?
4         A.  I don't see your pointer, no.
5         Q.  So where it says Respondent 4 stated
6     that when Complainant brought forth
7     complaints against Respondent 3 --" who is
8     Respondent 3 in your report?
9         A.  I believe that Respondent 3 was
10    Marilyn Barton.  I don't have the key -- the
11    legend which says which parties are there.
12    But I believe, if I recall correctly, it's
13    either -- I believe it's Marilyn Barton.
14            MR. MELITO:  Objection.
15            MR. SELLS:  We can scroll up a
16        little bit.  Stop.
17        Q.  So, Respondent 4 -- now it says,
18    "Complainant alleges that Respondent 4 when
19    Complainant brought fourth complaints
20    involving Respondent 3, Respondent 4 did not
21    respond correctly."
22            Do you see that?
23        A.  Yes.
24            MR. SELLS:  If we could just

203

D. KEKANA

1     scroll down a little bit.
2         Q.  "Complainant stated she was deeply
3     hurt and even more offended when Respondent 4
4     told her, 'Well, historically she is
5     correct.'" Respondent 3.
6             Now, that was the 3/5th of a person
7     comment that you are making reference to
8     there, correct?
9             MR. MELITO:  Objection.
10        A.  That is in response to the
11    Complainant's allegation.  That quotation
12    comes from the Complainant's statement.
13        Q.  Right, and you're talking about the
14    3/5th of a person comment that Ms. Phillips
15    complained to Dean Davis about regarding
16    Marilyn Barton speaking to an intern or
17    someone in the office, correct?
18            MR. MELITO:  Objection.
19        A.  This is excerpted from Complainant's
20    statement in which she alleges that
21    Respondent Number 3 was speaking to a
22    work-study student and she then relayed that
23    information to Respondent 4.
24        Q.  Right.  And I am asking you, does

204

D. KEKANA

1     this have to do with the comment that
2     Ms. Phillips complained to Dean Davis about
3     when Marilyn Barton referred to
4     African-Americans as 3/5ths of a person; is
5     that right?
6             MR. MELITO:  Objection.
7             Document speaks for itself.
8             You can answer.
9         A.  I think where I'm getting stuck is
10    there are pieces of your question is accurate
11    and other piece where it's not --
12        Q.  I'm just trying to get you to
13    identify Respondent 3 as Marilyn Barton.  Do
14    you understand that Respondent 3 was the one,
15    Marilyn Barton, who said that
16    African-Americans are 3/5ths of a person; is
17    that correct?
18            MR. MELITO:  Objection --
19        Q.  -- I'm trying to get you to identify
20    Respondent 3 as Marilyn Barton; is that
21    correct?
22        A.  I can identify Respondent 3 as
23    Marilyn Barton.
24        Q.  That's all I'm trying to get you to

205

D. KEKANA
1
2    do.
3         So this was a complaint that
4    Ms. Phillips brought to Dean Davis and Dean
5    Davis, according to your summary and when you
6    look -- when you talk about "complainant,"
7    you're talking about Ms. Phillips, right?
8         MR. MELITO:  Objection.
9    A.  Correct.
10   Q.  And you say what Ms. Phillips says
11   to you in that first sentence is that when
12   she brought forth complaints involving
13   Respondent 3, Marilyn Barton, that Respondent
14   4, Dean Davis, did not respond correctly;
15   that was part of Ms. Phillips's complaint,
16   correct?
17        MR. MELITO:  Objection.
18        MR. DRANOFF:  I'll object to
19   form.
20   A.  That is correct.
21   Q.  Okay.
22        And what you say next is what
23   Ms. Phillips said to Dean Davis was that "she
24   was deeply hurt and even more offended when
25   Dean Davis told her, "Well, historically,

206

D. KEKANA
1
2    she's correct.'"  That's what you have in
3    your summary, correct?
4         MR. MELITO:  Objection.
5    A.  Correct.
6    Q.  And then as you go further what you
7    say is that "and Respondent 4 stated that
8    when Complainant brought forth complaints
9    against Respondent 3, she instructed the
10   Complainant to speak with Respondent 3 and
11   come back to speak with her if she had
12   additional issues she wanted to discuss."
13        You wrote that, right?
14   A.  That is correct.
15   Q.  And you wrote that because you spoke
16   with Dean Davis who told you that when
17   Ms. Phillips came to her with the complaint
18   about Marilyn Barton using 3/5th of a person
19   that instead of taking that directly to HR or
20   to the Affirmative Action Office, she
21   directed Ms. Phillips to go back and speak
22   with Ms. Barton, right?
23        MR. MELITO:  Objection.
24   A.  That is what was stated by
25   Complainant.

207

D. KEKANA
1
2    Q.  No.  No.  You wrote, "Respondent 4
3    stated that when Complainant brought forth
4    complaints against Respondent 3, she
5    instructed the Complainant to speak with
6    Respondent 3."  That's what you wrote about
7    what the dean said, right, or Dean Davis
8    said?
9    A.  I think you're misrepresenting what
10   is --
11   Q.  This is what you wrote.  I'm not
12   misrepresenting anything.  I'm repeating what
13   you wrote.  You said, "Respondent 4 stated
14   that when Complainant brought forth
15   complaints against Respondent 3, she
16   instructed the Complainant to speak with
17   Respondent 3 and come back to speak with her
18   if she had additional issues she wanted to
19   discuss."
20        You wrote that, right?
21        MR. MELITO:  Objection.
22   A.  If I can clarify --
23   Q.  No.  No.  No.  I don't want you to
24   clarify.  I just want you to answer, Did you
25   write that?

208

D. KEKANA
1
2         MR. MELITO:  Objection.
3    A.  (No Response.)
4    Q.  Did you write that?
5         MR. MELITO:  Objection.
6    A.  "Respondent 4 also stated to
7    Complainant --"
8    Q.  No, no.  I'm not asking you about
9    that.  I am asking you about the sentence
10   that I just asked you, Did you write
11   "Respondent 4 stated that when Complainant
12   brought forth complaints against Respondent
13   3, she instructed the Complainant to speak
14   with Respondent 3 and come back to speak with
15   her if she had additional issues she wanted
16   to discuss."
17        Did you write that?
18        MR. MELITO:  Objection to your
19   tone and demeanor; but go ahead and
20   answer.
21   A.  Yes --
22        MR. SELLS:  There's nothing
23   wrong with my tone or demeanor --
24        MR. MELITO:  You're yelling at
25   the witness.

209

```
                    D. KEKANA
1
2          MR. SELLS:  I'm not yelling at
3       anyone.
4          MR. DRANOFF:  It's getting
5       there --
6          MR. SELLS:  Okay.  Okay.  Okay.
7       I'm here in New York sitting in my
8       office.
9       Q.  Now, please, did you write that,
10      ma'am?
11         MR. MELITO:  Again, objection;
12      but go ahead and answer.
13      A.  Yes.
14      Q.  You also wrote, "Respondent 4 also
15      stated to Complainant that she would speak to
16      Respondent 3, which Respondent 4 alleges she
17      did."
18         You wrote that too, correct?
19      A.  Yes.
20      Q.  Okay.
21         So, based upon what Dean Davis told
22      you, she did not report Ms. Phillips'
23      complaints of discrimination to your office or
24      HR; is that correct --
25         MR. DRANOFF:  Objection to
```

210

```
                    D. KEKANA
1
2       form.
3          MR. MELITO:  Objection.
4       Objection.
5          Can you repeat the question?
6          (Whereupon, the requested
7       portion of the transcript was read
8       back.}
9          MR. MELITO:  And objection to
10      the form.
11      A.  That is correct.
12      Q.  And you know that when a dean has an
13      allegation or a complaint that is made to
14      them by the subordinate at F.I.T. regarding
15      race discrimination or retaliation, that they
16      are required to make a complaint to HR and/or
17      your office, correct?
18         MR. MELITO:  Objection.
19      A.  That is correct.
20      Q.  But nowhere in your report did you
21      say that Dean Davis violated F.I.T.'s
22      discrimination policy, did you?
23         MR. MELITO:  Objection.
24      A.  No.
25      Q.  And what you wrote instead was that,
```

211

```
                    D. KEKANA
1
2       "this investigator is unable to substantiate
3       the complaint of discriminatory harassment."
4          That's what you wrote, right?
5          MR. MELITO:  Objection.
6       A.  Yes.
7       Q.  But you were able to substantiate
8       that Dean Davis violated the
9       antidiscrimination policy by failing to
10      report Ms. Phillips' complaints of
11      discrimination to your office or HR, correct?
12         MR. DRANOFF:  Objection to
13      form.
14         MR. MELITO:  Objection.
15      A.  Can you repeat the question?
16         (Whereupon, the requested
17      portion of the transcript was read
18      back.)
19      A.  I did not substantiate that; but
20      rather forwarded that part of the -- of what
21      was discovered to HR for appropriate review.
22      Q.  Well, let's talk about that.
23         Because you just said that Dean
24      Davis, based upon what she told you, she did
25      not report Ms. Phillips' complaints of
```

212

```
                    D. KEKANA
1
2       discrimination to HR or you and your office,
3       correct?
4          MR. MELITO:  Objection.
5          MR. DRANOFF:  Join.
6       A.  That's correct.
7       Q.  Though it was substantiated, she
8       didn't do what she was supposed to do; you
9       were able to substantiate that by asking her,
10      correct?
11         MR. MELITO:  Objection.
12      A.  As a finding of fact, that is what I
13      discovered.
14      Q.  So your answer is, yes, correct, you
15      were --
16         MR. MELITO:  Objection --
17      A.  -- able to substantiate, she did not --
18      when I say she, Dean Davis did not report
19      Ms. Phillips's complaint of discrimination to
20      HR or your office in violation of the
21      antidiscrimination policy for F.I.T.,
22      correct?
23         MR. MELITO:  Objection to form.
24         MR. DRANOFF:  Object as well.
25      A.  I made a finding of fact.
```

213

D. KEKANA

2     Q.  So, is the answer to my question
3  yes?
4          MR. MELITO:  Objection, asked
5      and answered.
6          THE WITNESS:  Am I to answer
7      that question again?
8     Q.  Yes.
9          MR. MELITO:  If you want it
10     read back, if you understand, you can
11     ask to have it read back.
12     A.  Can you read back and the previous
13  response to said question.
14          (Whereupon, the requested
15     portion of the transcript was read
16     back.)
17     A.  The answer is yes.
18     Q.  If we scroll down to "investigator's
19  addendum and notes," did you write this
20  addendum?
21     A.  Yes.
22     Q.  What's the point of an "addendum"?
23     A.  This would be anything that would be
24  extraneous with regards to the matter that
25  was investigated.

214

D. KEKANA

2     Q.  What is F.I.T.'s policy regarding
3  these addendums and notes as they relate to
4  investigators putting them in?
5     A.  There is no such policy on addendums
6  or notes for the file.
7     Q.  Got it.
8          And what is F.I.T.'s policy
9  regarding investigators who feel that they
10  might have been offended by a complaint; is
11  there any policy about that?
12          MR. MELITO:  Objection.  That's
13     out of the scope of the 30(b)(6).
14     It's in a personal capacity.
15     A.  No, there is no such policy.
16     Q.  So, what was your point in saying
17  that "the Complainant was combative and
18  argumentative"; what was your point in saying
19  that?
20     A.  That was noting the demeanor of the
21  Complainant during her meetings and
22  interviews with me as investigator.
23     Q.  Got it.
24          So, certainly by this time, by the
25  time you wrote this document in October of

215

D. KEKANA

2  2019, you knew that Ms. Phillips had already
3  filed suit, right?
4          MR. MELITO:  Objection.
5      Outside the scope of the 30(b)(6).
6      If she knows in her personal
7      capacity.
8     A.  No, I was not aware that she had
9  filed suit.
10     Q.  You were not aware, okay.
11          So you knew that Ms. Phillips had
12  brought her complaint to you in March of
13  2018, right?
14     A.  Correct.
15     Q.  And so, it took you a year and
16  almost six months to put this investigation
17  to rest; is that right?
18          MR. MELITO:  Objection.
19     A.  I'm sorry.  Can you repeat that
20  question?
21     Q.  It took you a year and six months to
22  closeout this investigation, right --
23          MR. MELITO:  Objection.
24     A.  That's...
25     Q.  I'm sorry?

216

D. KEKANA

2          MR. MELITO:  You can answer,
3      Ms. Kekana.
4          THE WITNESS:  Okay.  I wasn't
5      sure if someone else was speaking, so
6      I stopped speaking.
7     A.  That's correct.
8     Q.  All right.
9          Now, you write also in your addendum
10  and notes, "May 2019" you wrote "my office was
11  alerted by Complainant that Respondent
12  attacked her stating I'm going to fucking kill
13  you."
14          Do you see that?
15     A.  Yes.
16     Q.  You say that "the matter was
17  addressed through the disciplinary process by
18  the Office of Human Resources."
19          Do you see that?
20     A.  Yes.
21     Q.  But you know that Ms. Phillips had
22  complained about retaliation when she spoke
23  to you about the May 2019 incident; you know
24  that, right?
25          MR. MELITO:  Objection.

217

D. KEKANA

1
2    A.   What Ms. Phillips let me know what
3    happened in May of 2019 she did not state
4    that this was retaliatory, but rather stated
5    that she was -- that this incident had
6    occurred and that she was fearful.
7    Q.   Are you saying that Ms. Phillips did
8    not say that what Marilyn Barton did was
9    retaliatory; is that what you are claiming?
10    A.   Not in May of 2019.
11    Q.   No?  Well, when did she make the
12    complaint that it was retaliatory?
13    A.   This was during the closeout meeting
14    that was held that summer.
15    Q.   You say "at the investigation
16    closeout meeting, this investigator addressed
17    this with Complainant quoting the EEOC
18    guidance on zero tolerance."
19         What was that about?
20         MR. MELITO:   Objection.
21    A.   During the intake interview as well
22    as in her statement, Complainant alleged that
23    there's a zero tolerance policy on complaints
24    of discrimination.  During the closeout
25    meeting I quoted and read aloud the EEOC

218

D. KEKANA

1
2    guidance on zero tolerance as a policy, which
3    is something the EEOC is not in support of.
4    Q.   And then you say, "this investigator
5    read the definition of retaliation from the
6    college's policy and explained why the
7    incident in May 2019 was not retaliatory."
8         Is that right?
9    A.   That is correct.
10    Q.   Then Ms. Phillips told you that she
11    believed you didn't understand retaliation;
12    is that right --
13         MR. MELITO:   Objection.
14    A.   (No Response.)
15    Q.   Is that right?
16         MR. MELITO:   Objection.
17    A.   That is --
18         MR. MELITO:   Go ahead.
19    A.   That is correct.
20         MR. SELLS:   We can take down
21    this document.
22         (Screen sharing has ended).
23    Q.   Now, let's talk about the May 16,
24    2019 incident that you say was not
25    retaliation.  What's your understanding of

219

D. KEKANA

1
2    that, what happened on that day?
3    A.   As it was reported to me, and this
4    is by the Complainant, Respondent pushed the
5    Complainant right after saying, "I can't take
6    this anymore.  I'm going fucking kill you."
7    Q.   Now when you say "the Respondent,"
8    are you talking about Ms. Barton?
9    A.   Yes, that is what she alleged.
10    Q.   So, Ms. Barton told you that she
11    pushed Ms. Phillips?
12         MR. MELITO:   Objection.
13    A.   No, Complainant Marjorie Phillips
14    told me that Respondent Marilyn Barton had
15    pushed her after making those statements that
16    I had said earlier.
17    Q.   I got it.
18         MR. SELLS:   We can go to
19    Exhibit 20.
20         (Whereupon, Plaintiff's Exhibit
21    20, two-page document Bates stamped
22    FIT141 and 142, was marked for
23    identification as of this date.)
24         (Counsel is sharing the
25    computer screen image.)

220

D. KEKANA

1
2    Q.   Have you seen this before?
3    A.   No, I have not.
4         MR. SELLS:   Okay.
5         This is a two-page document
6    Bates stamped FIT141 and 142.
7    Q.   Do you see that?  Going to the first
8    page it says, "MD Barton statement."
9         MR. MELITO:   I'm going to
10    object to the way you are introducing
11    the exhibits and not allowing the
12    witness to review prior to
13    questioning.
14    Q.   According to the statement, MD
15    Barton's statement, I'm just going to read
16    it.  "I directed the student --" reading from
17    starting on -- "May 16th, 2019, at about
18    10:30 a.m. a student arrived in the dean's
19    office requesting help attaining commencement
20    regalia for graduation."
21         You see that, right?
22    A.   Yes.
23    Q.   Okay.
24         You understand this to be a
25    statement that a defendant in this lawsuit,

221

D. KEKANA

1  Marilyn Barton, gave concerning the May 16th,
2  2019 incident, correct?
3       A.  That is what I read here, yes.
4       Q.  So, now if we scroll down to the
5  paragraph that says "so I suggested to
6  Ms. Phillips she share her concerns with the
7  dean, and that I didn't want to discuss the
8  matter with her.  She continued her critical
9  commentary and questioning of my actions in a
10  strident tone."
11       "In response, I told her loudly and
12  firmly to desist.  She continued and at some
13  point got up and approached and reached
14  toward me in an uncomfortably close manner
15  which made me feel threatened.  The incident
16  ended when another person entered our office
17  and I used the opportunity to remove myself
18  from this stressful situation."
19       "Although I raised my voice in
20  response to Ms. Phillips' unrelenting
21  criticism of my decision, her approach
22  towards me made me feel harassed and then
23  menaced."
24       You see that?

1  D. KEKANA

223

1  don't have to answer that.
2       MR. SELLS:  No, it's a
3  question.
4       Q.  Do you think F.I.T. is making this
5  up?
6       MR. MELITO:  Objection.  Again,
7  you are harassing, tone, demeanor;
8  but you could go ahead and answer in
9  your personal capacity.  You can go
10  ahead and answer.
11       A.  No, I do not think F.I.T. is making
12  this up.
13       MR. SELLS:  Got it.  We can
14  take down the document.
15       (Screen share has stopped.)
16       MR. SELLS:  Now we could put up
17  Exhibit 33.
18       (Whereupon, Plaintiff's Exhibit
19  33, three-page document Bates stamped
20  FIT171 through 173, was marked for
21  identification as of this date.)
22       (Counsel is sharing the
23  computer screen image.)
24       MR. SELLS:  Exhibit 33 is Bates

222

D. KEKANA

1       A.  Yes.
2       Q.  She then goes on to say, "I also
3  feel Ms. Phillips' critical comments were
4  unwanted, unwarranted and abusive.  Things
5  like this make it harder for us to do our job
6  in a quiet, friendly and collegial office
7  setting."
8       "This incident and numerous previous
9  incidents involving Ms. Phillips have created
10  a bullying, unhealthy and unproductive work
11  environment."
12       Do you see that?
13       A.  Yes.
14       Q.  So, this is how Ms. Barton described
15  the incident in her own words; is that right?
16       MR. MELITO:  Objection.  Lacks
17  foundation and to form.
18       A.  (No Response.)
19       Q.  You can answer.
20       A.  I'm not sure.  It says it's her
21  statement.
22       Q.  Well, this came from F.I.T.; do you
23  think F.I.T. is making stuff up?
24       MR. MELITO:  Objection.  You

224

D. KEKANA

1  stamped FIT171 through 173; it is a
2  three-page document.
3       If we could go to the first
4  page again.
5       Q.  Do you recognize this as being a
6  meeting involving Marilyn Barton -- notes, I
7  guess, from a meeting involving Debra Peyton
8  Jones, Felix Rivera Perez, Marilyn Barton,
9  Andre Nunez and Natacha Unelus?
10       MR. MELITO:  Objection.
11       A.  This is --
12       MR. MELITO:  Go ahead.
13       Q.  I'm sorry?
14       A.  This is first I'm seeing of it; but
15  that's what it appears to be --
16       Q.  You indicated that the F.I.T.
17  procedure when investigations of retaliation
18  or discrimination are conducted and someone
19  summarizes the meeting that they identify --
20  or the statement they identify all the people
21  who are in attendance; is that correct?
22       MR. MELITO:  Objection.
23       A.  That is correct.
24       Q.  Who is Debra Peyton Jones; do you

225

D. KEKANA

1  know that person?
2      A.  Debra Peyton Jones is a former
3  employee of the college.  I believe she's
4  also served as a UCE representative.
5      Q.  When you say a "former employee," in
6  what department?
7      A.  In the Department of Student Life.
8      Q.  Okay.
9          Do you know Felix Rivera Perez?
10     A.  I do.
11     Q.  Who is that?
12     A.  He is an employee of the college.
13     Q.  When you say "employee of the
14  college," you talk about F.I.T.?
15     A.  That is correct.  An employee of
16  F.I.T.
17     Q.  In what capacity?
18     A.  I'm not certain.  I cannot recall
19  his title; but he works in the Career and
20  Internship Center.
21     Q.  Andre Nunez, who is he?
22     A.  Andre Nunez is a former employee of
23  the college who worked in Human Resources.
24     Q.  And Natacha Unelus, who is that?

226

D. KEKANA

1      A.  Natacha Unelus is an employee of the
2  college and works in Human Resources.
3      Q.  All right.
4          So now, you see -- and I take it the
5  initials, Andre Nunez, A-N introduces group,
6  the roles, the process and policies,
7  confidentiality and non-retaliation; do you
8  see that?
9      A.  Yes.  I think it just scrolled up;
10  but yes, I see that.
11     Q.  All right.
12         Then the first question comes up,
13  "In your own words, please tell us what
14  happened on May 16th, 2019 between yourself
15  and Marjorie Phillips?"  And this is what
16  Marilyn Barton, MB, this is what she had to
17  say:
18         "I will tell you what happened.  It
19  started about 10:30 shortly after I arrived to
20  Room E-315.  The schedule I work is 10:00 a.m.
21  to 6:00 p.m.  I arrived at work at 10:00.  It
22  was a beautiful day.  Shortly after I
23  arrived -- about 10:10, 10:20 -- a student
24  walked in and said she wanted to participate

227

D. KEKANA

1  in the commencement exercise; but she didn't
2  have regalia.  I let her know that she could
3  run to the book store and talk to Carla
4  Bowens, the store manager.  After 15 minutes,
5  she returned and told me that CB -- Carla
6  Bowens -- said only you, Graduate Studies, can
7  give me the regalia."
8          "The regalia we had, each had one of
9  the student's name labeled on it.  I talked to
10  Carla Bowens -- CB -- and told her we are not
11  sure if we have them; but if the student comes
12  tomorrow, Friday, I can try and help her.  I
13  hung up and thanked her.
14         "The student looked upset.  She told
15  me she needed to tell her family because she
16  invited them to watch commencement.  I knew I
17  was gonna be out Friday and not able to help
18  her, but I wanted to give her one.  We have
19  numerous regalia that people never pick-up.  I
20  told her to keep it on the "QT"; but I would
21  let her borrow regalia and asked her to bring
22  it back when she was done.  She was thankful
23  and she left."
24         "At this point, Marjorie was

228

D. KEKANA

1  observing, then I went back to my seat.  I was
2  in and out.  I was making a cup of coffee and
3  then MP -- Marjorie Phillips -- said to me
4  'What right do you have to privilege one
5  student over all the others?  You don't
6  realize how hard it is for students to come up
7  with money for regalia.'  I'm not gonna ask
8  the student for money.  My feeling was to help
9  the student as quickly as possible because I
10  was out the next day.  Carla Bowens said --"
11  or -- "CB said only the graduate school maybe
12  she didn't make it clear to CB that she didn't
13  prepare."
14         "I loaned her one.  It seemed like
15  the quickest way to help the student.  She
16  said, 'You don't have the right to do that' --
17  and that's in quotes -- 'You don't have the
18  right to do that.'  If MP -- Marjorie
19  Phillips -- had a problem, I told her to take
20  it up to the dean."
21         "I was pushed to it.  I felt bullied
22  and she pushes me to my reaction.  I am
23  ashamed of my behavior.  I felt awful.  I was
24  yelling in impolite language.  I told her to

229

D. KEKANA

1
2  'shut the fuck up.  I will kill you' in a
3  metaphorically way.  I'm really embarrassed;
4  but for years and years, there has been
5  constant belittlement and constant comments.
6  She chatters all day and it is endless.  She
7  says things that are inappropriate, and I have
8  been trying to help in the office.  She talked
9  to people in a denigrating manner.  I'm sorry;
10  it was the last straw over years of
11  commentary."
12       MR. SELLS:  We could scroll
13       down.  Stop.
14       Q.  She then is asked the question by
15  NJ, "Was there anything between you and MB
16  when you approached her?"  That's question.
17  Barton says, "I had coffee cups and stirrers
18  in my hand.  Anton Baptist was behind me.  I
19  told him I was -- AB -- leaving.  I'm not
20  sure if Natacha Degan was there.  I went into
21  AB's office.  It sounds like it went on
22  forever, but it all happened quickly."
23       "She --" Marjorie Phillips "-- was
24  sitting down with her back to me, maybe four
25  feet.  I stopped there and I said, 'Shut the

230

D. KEKANA

1
2  fuck up.  Don't criticize me.'  I was really
3  mad.  I might have been at the divider at her
4  desk with my arm on it.  She got up, started
5  walking towards me, she did put her hands on
6  me.  I think she did, and then AB walked in.
7  I don't think I touched her, it happened so
8  quickly I think I was holding a coffee cuff
9  and told her to keep away from me."
10       Then NJ asks the question, "Do you
11  recall if it was after or before the 'shut
12  the fuck up'?  Walk me through it."  And so,
13  Marilyn Barton says, "It all happened
14  concurrently.  She was telling me to calm
15  down, and that's when AB walked in.  It was a
16  very short altercation and then I left.  I
17  was upset because I feel like it's a bullying
18  environment and it's been years.  There are
19  many things she's said to me.  There was a
20  situation where she accused me of racism."
21       Now, you see that?
22       A.  (No Response.)
23       Q.  Do you see that?
24       A.  Yes.
25       Q.  "There was a situation where she

231

D. KEKANA

1
2  accused me of racism."  Does that ring a bell
3  to you --
4       MR. MELITO:  Objection.
5       Q.  Does that ring a bell to you --
6       MR. MELITO:  Objection.
7       Q.  -- Ms. Kekana?
8       A.  I --
9       Q.  Ms. Kekana, I am asking you a
10  question.  Does that ring a bell that
11  Marjorie Phillips accused Marilyn Barton of
12  racism?  Do you remember that?
13       MR. MELITO:  Objection.
14       A.  Yes, I recall the accusation of
15  racism.
16       Q.  Got it.
17       And just so we're clear, your
18  definition of "retaliation" is when a person,
19  a Respondent, is accused of discriminatory
20  behavior and then acts in a way that is
21  harmful to the person that makes the
22  complaint, right?
23       MR. MELITO:  Objection.
24       A.  Those are not the words I used to
25  define retaliation.  I would define

232

D. KEKANA

1
2  "retaliation" as adverse treatment as a
3  result of someone participating in an
4  investigation.
5       Q.  Got it.
6       And "adverse treatment," would you
7  define "adverse treatment" as an employee
8  having to endure things at work that would
9  negatively impact their ability to do their
10  jobs?
11       MR. MELITO:  Objection.
12       A.  "Adverse treatment" would be
13  treatment that would affect someone's ability
14  to do their job.
15       Q.  And if someone was threatened with
16  being killed, if someone was yelled at and
17  screamed at while they were trying to do
18  their job, would that negatively impact their
19  ability to do their jobs?
20       MR. MELITO:  Objection.  Again,
21       this is in a personal capacity and
22       objection to form.
23       A.  In my personal capacity, that is
24  possible.
25       Q.  Let's go further.

233

D. KEKANA

1
2     The question, "Did you have issues
3  with her prior to the investigation?"  What
4  Marilyn Barton says is, "The environment in
5  the office, it's toxic.  Been like this for
6  years.  I have been pushed and pushed.  Mary
7  Davis knows about the situation.  It is
8  ongoing.  I flinch when she walks in the
9  room, it's uncomfortable.  I have spoken to
10 Mary Davis about it prior.  I don't tell her
11 every single thing.  MP, Marjorie Phillips
12 says certain things even to other people."
13     Question, "MJ: It was alleged that
14 you charged towards MP.  Could you provide a
15 response to that?"  And what Marlin Barton
16 says is, "I was walking out and I stopped at
17 her desk which is when I was yelling at her.
18 I don't deny it.  I am ashamed I lost my
19 temper.  I was pushed.  It was the last
20 straw.  Marjorie complained about me, it went
21 up to Affirmative Action and there still is
22 no resolution."
23     Do you see that?
24     A.  Yes.
25     Q.  That is Marilyn Barton saying that

234

D. KEKANA

1
2  she approached and yelled at Marjorie
3  Phillips because "Marjorie complained about
4  me and it went up to Affirmative Action."
5     Do you see that?
6         MR. MELITO:  Objection.
7     Document speak for itself.  You are
8     testifying on behalf of Marilyn
9     Barton.
10    A.  (No Response.)
11    Q.  Answer the question, please.
12    A.  I see that on this document.  That's
13 what it states.
14    Q.  This is a clear case of retaliation
15 out of the words of Marilyn Barton; isn't
16 that correct?
17        MR. MELITO:  Objection.  You're
18    testifying -- argumentative.  I'll
19    objection to form.
20    A.  Can you repeat, if that is question.
21 I'm not certain what it was.
22        (Whereupon, the requested
23    portion of the transcript was read
24    back.)
25    A.  Yes, I see it.

235

D. KEKANA

1
2     Q.  And this is a clear case, a textbook
3  case of retaliation, when someone who is
4  aware that a person has made a complaint of
5  discrimination against them responds by
6  losing their temper, yelling at them and
7  telling them that they will kill them; is it
8  not?
9         MR. MELITO:  Again, object to
10    form.  Object to legal conclusion.
11    Object to argumentative.
12        And again, you're testifying,
13    but objection.
14    A.  I will not characterize it in manner
15 that you characterized it.  But according to
16 what Marilyn Barton attests, she states that
17 it was retal- --- is evidence that it was
18 retaliatory.
19    Q.  Okay.
20        MR. SELLS:  We can take down
21    the document.
22        (Screen sharing has ended.)
23    Q.  You, in your closeout meeting with
24 Ms. Phillips in October 2019, explained to
25 her how what she said about Marilyn Barton

236

D. KEKANA

1
2  was not retaliation; isn't that right?
3         MR. MELITO:  Objection.
4     A.  Can you repeat?  I'm sorry.  I think
5  when you yell it reverberates on my end --
6     Q.  I'm not yelling; so I don't know
7  what your problem is.
8         MR. MELITO:  Again, object to
9     the witness -- you're yelling.  The
10    witness said -- your yelling; there
11    is no need to go back at the witness.
12        MR. SELLS:  I'm not yelling.
13    I'm not yelling.
14        MR. MELITO:  Please, repeat the
15    question in a normal tone --
16    Q.  In your closeout meeting with
17 Ms. Phillips, when you told her, according to
18 your addendum, that Marilyn Barton did not
19 retaliate against her, she told you that you
20 didn't know what you were talking about,
21 right?
22        MR. MELITO:  Objection.
23    A.  Is the question what she said?
24    Q.  Yes.
25    A.  She stated that she disagreed with

237

```
1              D. KEKANA
2    me because everyone else that she has spoken
3    to didn't see it that way.
4         Q.   Right.
5              But you didn't know that Marilyn
6    Barton admitted that she yelled and screamed
7    at Ms. Phillips and threatened to kill her
8    and told her to "shut the fuck up" because
9    Ms. Phillips had made a complaint of racism
10   against her that went up to Affirmative
11   Action --
12             MR. MELITO:  Objection --
13        Q.   -- you didn't know that, right --
14             MR. MELITO:  Objection to form.
15        Objection, again, to your tone.  You
16        can save the theatrics, the
17        obscenities and emphasizing them.
18             And this is, again, outside the
19        scope of the 30(b)(6).  Please,
20        answer to the best of your ability
21        and your personal capacity.
22        A.   So to my knowledge, when I learned
23   of the complaint in May 2019, I only had what
24   was presented to me by Complainant Marjorie
25   Phillips.  In my estimation, I did not have
```

238

```
1              D. KEKANA
2    and did not participate in the investigation
3    conducted by HR as it is stated in the
4    addendum notes.
5         Q.   Well, you have now seen two very
6    different statements that Marilyn Barton gave
7    in connection with that May 16th, 2019
8    incident, right?
9         A.   I --
10             MR. MELITO:  Objection.
11             THE WITNESS:  Sorry.
12        A.   I see statements that you have
13   presented here.
14        Q.   And they are very different.
15             MR. MELITO:  Objection --
16        Q.   -- right; they are very different?
17             MR. MELITO:  Objection to form,
18        mischaracterizing them; they speak
19        for themselves.
20        Q.   You can answer.
21        A.   I can't attest to them being
22   different --
23        Q.   Oh, you think they're the same?  You
24   think the two statements are the same --
25             MR. MELITO:  Objection.  Can
```

239

```
1              D. KEKANA
2    you stop being combative to the
3    witness, please.
4              MR. SELLS:  I'm not being
5         combative.
6              Look, you can say whatever you
7         want, Nicholas.  You can lie on the
8         record and say whatever you want to
9         and say that the witness is this or
10        that I'm doing that.  You can lie as
11        much as you want.  But you know what,
12        the truth is going to come out, all
13        right.  So, the question that is on
14        the table --
15             MR. MELITO:  No.  Before that --
16             MR. SELLS:  The question on the
17        table --
18             MR. MELITO:  Before you --
19             MR. SELLS:  The question that
20        is on the table is whether or not the
21        two statements are the same and that
22        is the question --
23             MR. MELITO:  Do --
24             MR. MENKEN:  This is going on
25        the entire day, and you have
```

240

```
1              D. KEKANA
2         repeatedly --
3              MR. SELLS:  Listen, Bruce.
4         Bruce.  Stop.  Stop --
5              MR. MENKEN:  Oh, don't tell me
6         to "stop."  Don't tell me to
7         "stop" --
8              MR. SELLS:  Stop --
9              MR. MENKEN:  Don't tell me to
10        stop, pal --
11             MR. SELLS:  Your client lies,
12        right.  It's out there -- you can
13        yell all you want; but the truth is
14        going to come out --
15             MR. MENKEN:  Go in front of the
16        jury and do whatever you want --
17             (Mr. Sells has turned off his
18        camera and microphone and exited the
19        deposition.)
20             MR. MELITO:  Do not go off the
21        record right now.  I have to respond
22        to his allegations of lying.  They
23        are completely inappropriate.  I'm
24        doing the objections for the record.
25        Since this is not a recording, I'm
```

241

D. KEKANA

1
2   well within my rights and entitled to
3   note for the record his demeanor of
4   yelling, his voice, his harassment of
5   the witness and in no way shape or
6   form am I lying about these
7   objections. So, and I will also --
8          MR. MENKEN: Completely agreed --
9          MR. MELITO: I will also note
10  Mr. Sells turned off his mic, turned
11  off his camera and abruptly left the
12  deposition.
13         MR. MENKEN: This is not the
14  way to ask questions of a witness;
15  it's been going on the entire day, to
16  browbeat people like that.
17         MR. MENKEN: Is anyone else
18  from Mr. Sells office on the line?
19         MS. MILNER: I'm on the line,
20  but not on the record.
21         MR. MENKEN: I'm assuming
22  Ms. Milner can reach out to her
23  colleague and remind him that we are
24  still on the record.
25         MS. MILNER: I will.

242

D. KEKANA

1
2          MR. MENKEN: Thank you.
3          MR. MELITO: If he is not back
4   on the record in this deposition by
5   5:35, we are considering this
6   deposition closed. The time is now
7   5:30.
8          (5:31 Mr. Sells has returned to
9   the video.)
10  Q.  So, you think the two statements are
11  the same that Marilyn Barton gave relating to
12  the May 16th 2019 incident; is that right,
13  Ms. Kekana?
14         MR. MENKEN: Objection.
15         MR. MELITO: Objection.
16  A.  It's "Kekana"; and I don't think
17  they are the same.
18  Q.  In what ways are do they differ?
19         MR. MELITO: Objection. Again,
20  this is outside the scope; and it is
21  in her personal capacity.
22  A.  Inasmuch as I can speak to in my
23  brief view of them here today; obviously, one
24  is being transcribed and therefore may not be
25  in her own words as much as what she has

243

D. KEKANA

1
2   indeed written in her own words as her -- and
3   the tone of them, it's different as one is
4   inprompted by questions and she is responding
5   to specific questions. I would characterize
6   those differences there.
7   Q.  That's it?
8          MR. MELITO: Objection.
9   A.  (No Response.)
10  Q.  What about the substance; do you
11  think the substance of both statements are
12  the same?
13         MR. MELITO: Objection. Again,
14  this is -- to form and also I'll just
15  have a standing objection that this
16  line of questioning is outside the
17  scope of the 30(b)(6). She is
18  answering it in a personal capacity.
19  A.  And as much as I can answer from
20  what I have viewed here, one goes into
21  further details with regards to the exchange
22  that she alleges and the reasons for the
23  exchange and what motivated her on that day
24  in May -- I forgot the date. I apologize.
25  Q.  May 16th, 2019.

244

D. KEKANA

1
2          MR. MELITO: Objection.
3   Q.  Right?
4          MR. MELITO: Objection. She
5   doesn't have the document in front of
6   her.
7   Q.  Well, didn't the first statement
8   that I read to you from Marilyn Barton say
9   that it was Ms. Phillips who was the
10  aggressor, that it was Ms. Phillips who
11  bullied her?
12         MR. MELITO: Objection.
13  Q.  -- didn't the first statement say
14  that --
15         MR. MELITO: Objection.
16  Q.  -- Ms. Kekana?
17         MR. MELITO: Objection. And
18  if, Ms. Kekana, if you would like to
19  correct Mr. Sells again --
20         MR. SELLS: You going to keep
21  speaking, Nicholas? You going keep
22  speaking?
23         MR. MELITO: Are you going to
24  keep harassing and disrespecting the
25  witness?

245

```
1              D. KEKANA
2         MR. SELLS:  All right, I get
3    it.  So that means you are going to
4    continue speaking; is that correct?
5         MR. MELITO:  Derek --
6         MR. SELLS:  If you have to
7    lodge an objection, just say it.
8         MR. MELITO:  Logically, yes,
9    since you just said you're going to
10   keep harassing the witness.
11   Q.  So, are you going to now make a
12 referral to HR about Marilyn Barton lying
13 during the course of an investigation; are
14 you going to do that?
15        MR. MELITO:  Objection.
16   Outside the scope, in her personal
17   capacity.  Objection to form and also
18   object to the foundation of the
19   documents that you are asking her
20   about right now.  She had no time to
21   review them.
22   A.  With what I have learned in the
23 brief time that I saw the documents here
24 today for the first time, this would be
25 something that I would review in a different
```

246

```
1              D. KEKANA
2  way than I would have reviewed in 2019.
3    Q.  And how would you have reviewed it?
4         MR. MELITO:  Objection.
5    Q.  How would you review it now knowing
6  what you know?
7         MR. MELITO:  Objection.
8    A.  If I had the statement in which
9  Ms. Barton stated this was retaliatory, I
10 would have investigated it under the same
11 investigation of discrimination.
12   Q.  According to you, under F.I.T.
13 policy, because the investigations is already
14 closed out you can't take new evidence and
15 re-open the investigation; is that right?
16        MR. MELITO:  Objection.
17   A.  That is correct.
18   Q.  Now, as part of your investigation,
19 was there an interview done of any witnesses
20 concerning the incident of May 16th, 2019?
21   A.  My investigation of discrimination?
22   Q.  Yes.  Did you or your office, the
23 Affirmative Action Office, investigate
24 anything having to do with the May 16th, 2019
25 incident?
```

247

```
1              D. KEKANA
2    A.  No.
3    Q.  Did you ever interview Umilta Alsop
4  as part of the investigation?
5    A.  My office interviewed Umilta Alsop.
6    Q.  Okay.
7         What do you recall her saying?
8    A.  I would have to look at her
9  statement to recall the specifics of what she
10 shared.  She spoke to the general environment
11 working in the outer office there.  They were --
12 Umilta, Marjorie, and Marilyn all work as
13 administrative support in the dean's office.
14 So she spoke to that experience.  I can't
15 recall more specifically what she stated
16 without looking at her statement.
17        MR. SELLS:  Can we pull up
18   Exhibit 21.
19        (Whereupon, Plaintiff's Exhibit
20   21, two-page document Bates stamped
21   FIT136 and 137, was marked for
22   identification as of this date.)
23        (Counsel is sharing the
24   computer screen image.)
25   Q.  Do you recognize this?
```

248

```
1              D. KEKANA
2    A.  No, I do not.
3         MR. SELLS:  For the record,
4    this is a document, a two-page
5    document, Bates stamped FIT136 and
6    137.
7    Q.  Have you seen this before?
8    A.  No, I have not.
9    Q.  Well, you see at the top of it
10 says, "Umilta Alsop."  You see that, right?
11   A.  Yes.
12   Q.  Now, do you know whose writing this
13 is?
14   A.  No, I do not.
15   Q.  Well, does it look like it's Umilta
16 writing it in her own hand?
17        MR. MELITO:  Objection; form,
18   foundation.
19   Q.  Just read the first paragraph, "On
20 Thursday, May 16th, a student walked into the
21 Graduate Study Office seeking a cap and gown.
22 Marilyn, Marjorie and I were present as the
23 student explained that she did not place an
24 order for regalia, but wanted to know what
25 her options were."
```

249

D. KEKANA

2  Do you see that?
3  A.  I see that, yes.
4  Q.  Okay.
5  Is it your understanding that back
6  on May 16th, 2019 that Marilyn Barton,
7  Ms. Phillips and Umilta Alsop were in the
8  same office?
9  A.  Yes.
10  MR. MELITO:  Objection.
11  Q.  And from this, do you get that with
12  "Umilta Alsop" at the top that this is her
13  statement?
14  MR. MELITO:  Objection.
15  A.  I'm getting that from having the
16  writing of "Umilta," but there are other
17  people who work in the Graduate Study Office
18  or who could have been present there.  I
19  don't know 'cause I don't know who authored
20  this document.
21  Q.  Got it.
22  So you don't know that this is
23  Umilta Alsop; is that right?
24  MR. MELITO:  Objection.
25  A.  I don't know.

250

D. KEKANA

2  Q.  Got it.  Let's keep going.
3  "Marjorie told her that she should
4  go to the book store and speak with Carla."
5  This is a first person account, a
6  witness account of what occurred on May 16th;
7  would you agree with me than?
8  MR. MELITO:  Objection; form,
9  calls for legal conclusion and again
10  outside the scope of the 30(b)(6).
11  In her personal capacity, she can
12  answer.
13  A.  In my opinion, that is what it
14  appears to be.
15  Q.  Okay.
16  But according to you, and this gets
17  back to the whole investigatory process that
18  F.I.T. uses -- that they'll investigate
19  matters of discriminatory or complaints of
20  discrimination and retaliation -- you cannot
21  even look at it.  As the head affirmative
22  action director, you cannot a even tell who
23  this statement comes from, right?
24  MR. MELITO:  Objection.
25  A.  That is correct.

251

D. KEKANA

2  Q.  Now, how is it that F.I.T. has such
3  policies in existence whereby when
4  investigations of discrimination and
5  retaliation are conducted that you cannot
6  even make out who is the one writing a
7  statement; how is it?
8  MR. MELITO:  Objection; form.
9  A.  I'm not certain if this is involving
10  a complaint of discrimination.  Each office --
11  so the Human Resources Office or the
12  Affirmative Action Office has their own
13  processes that govern the policies that they
14  effect and their own practices in which -- in
15  the manner in which they take statements.
16  Q.  Well, you understand that you're a
17  30(b)(6) Witness for all of F.I.T.; and so,
18  is it your testimony on behalf of F.I.T. that
19  the HR Department has a different
20  investigatory process than the Affirmative
21  Action Office --
22  MR. MELITO:  Objection.
23  Q.  -- as it relates to complaints of
24  discrimination and retaliation?
25  MR. MELITO:  Objection.

252

D. KEKANA

2  Outside the scope of 30(b)(6).
3  A.  I'm answering that question as in my
4  own personal capacity that different offices
5  have different practices in the way that they
6  process and work through the policies that
7  they govern.
8  Q.  So, you're saying that you are not
9  the appropriate 30(b)(6) Witness to talk
10  about F.I.T.'s policies as they relate to
11  investigation of discrimination and
12  retaliation by the HR Department --
13  MR. MELITO:  Objection --
14  Q.  -- is that right?
15  MR. MELITO:  Objection.  That
16  wasn't even noticed in the
17  deposition, and it calls for a legal
18  conclusion; and objection to form,
19  outside the scope of the 30(b)(6).
20  Q.  You can answer the question.
21  A.  I'm not sure of what the definition
22  of 30(b)(6) entails.
23  Q.  That is not part of question.
24  MR. MELITO:  Yes it is.
25  MR. SELLS:  Read back the

253

D. KEKANA

1  question.
2
3         (Whereupon, the requested
4  portion of the transcript was read
5  back.)
6         MR. SELLS:  Let me withdraw the
7  question.  And I'll ask ---
8     Q.  Are you the appropriate witness to
9  testify about F.I.T.'s HR Department's
10 investigatory practices as they relate to
11 complaints of discrimination and retaliation?
12        MR. MELITO:  Objection.
13        Again, calls for legal
14 conclusion, objection to form.
15    A.  I am --- I would not be the person
16 who can speak to how HR investigates.  I can
17 speak to how affirmative action and Title 9
18 investigations take place.
19    Q.  Got it.
20        So, in order for us to better
21 understand how HR investigated the complaint
22 involving the May 16th, 2019 incident between
23 Ms. Phillips and Ms. Barton, we would have to
24 speak to someone from HR; is that correct?
25        MR. MELITO:  Objection.  Same

254

D. KEKANA

1
2  objection; form, legal conclusion.
3     In your personal capacity, go ahead.
4     A.  In my personal capacity, I would say
5  that, yes, you would need to speak with
6  someone from HR.
7     Q.  Okay.
8         MR. MELITO:  And again, Mr. Sells ---
9     Q.  Let's keep going.  We're going to
10 keep going now.
11        MR. SELLS:  Let's go down to ---
12    I'll read this paragraph.
13    Q.  "When Marlin came back into the
14 office, Marjorie asked why the student was
15 given the cap and gown when she did not
16 follow proper procedure to order and pay for
17 the items.  Marilyn explained that she was
18 trying to be nice to the student."
19        "I then asked how we should handle
20 it if another student comes in with a similar
21 situation.  Marilyn said other students would
22 not get a cap and gown.  And I said, okay.
23 Marjorie said that she believed all students
24 should follow the proper procedure and that
25 it is not fair for us to accommodate some

255

D. KEKANA

1
2  students and not all."
3         "Marilyn then said that she didn't
4  care what Marjorie thought.  That she had
5  made an executive decision and that Marjorie
6  should talk to the dean if she had a problem
7  with her choice."
8     A.  Yes.
9     Q.  Got it.
10        Now, do you know that student?  The
11 one that Marilyn Barton decided to give a cap
12 and gown to, do you know what color that
13 student was?  What race that student ---
14        MR. MELITO:  Objection ---
15    Q.  --- was?
16        MR. MELITO:  Objection.
17    A.  No.
18    Q.  Would you agree that this could
19 possibly be preferential treatment where one
20 student is getting a gown from Marilyn Barton
21 and yet no other student would get one; would
22 you agree that that is preferential
23 treatment?
24        MR. MELITO:  Objection and
25        outside the scope of 30(b)(6), to

256

D. KEKANA

1
2  form and to legal conclusion.
3     A.  Personally, I cannot say if that is
4  preferential.  I don't know if in the office
5  they would give out all the leftovers until
6  there were no more or if it was just this one
7  student; I don't know.
8     Q.  Okay.
9         But you understand that
10 discrimination means in part that someone is
11 getting treated better than someone else
12 based on an improper motive; you understand
13 that, right?
14        MR. MELITO:  Objection.
15        MR. DRANOFF:  I'll object to
16        the form ---
17        MR. MELITO:  Objection to form,
18        legal conclusion.  Again, outside the
19        scope of the 30(b)(6).
20    A.  I would not characterize
21 discrimination that way.  "Discrimination" is
22 treating someone due to their belonging to a
23 protected characteristic.
24    Q.  Okay.
25        But the point is that if someone is

257

D. KEKANA

1
2  going to accuse another of preferential
3  treatment, that that could be considered a
4  complaint of discrimination; you understand
5  that, right?
6          MR. MELITO:  Objection.
7       A.  I understand someone could complain
8  of discrimination if they see preferential
9  treatment.
10      Q.  Then according to this witness
11  statement, it says, "Marjorie said she would
12  speak to Mary, the dean, but she was
13  expressing her opinion since we were
14  discussing the situation.  Marilyn then
15  reiterated that she didn't care about
16  Marjorie's opinion and added that she was
17  tired of this shit."
18          Do you see that?
19      A.  Yes.
20      Q.  And when you look at that in the
21  context of Ms. Phillips complaining to
22  Marilyn Barton that Marilyn Barton was
23  exhibiting preferential treatment, then here
24  we go again, right; retaliation --
25          MR. MELITO:  Objection --

258

D. KEKANA

1
2       Q.  -- I'm tired of this shit that you
3  keep complaining about me being racist --
4          MR. MELITO:  Objection --
5       Q.  -- right; isn't that --
6          MR. MELITO:  Argumentative --
7       Q.  -- says to you?
8          MR. MELITO:  Objection.
9          Argumentative.  You're testifying
10         about this document and
11         mischaracterizing what it says.
12      Q.  You can answer the question.
13      A.  What I see this document says is it
14  says that she was "tired of this shit."
15      Q.  Right, and it came into context of
16  Ms. Phillips saying that Ms. Barton was
17  getting preferential treatment, right?
18          MR. MELITO:  Objection.  Again,
19         you're testifying as to what Marjorie
20         is saying.  You're assuming facts not
21         in evidence.  I mean, just -- I am
22         objecting to the whole line of
23         questioning, but go ahead.  Go ahead
24         with your improper question.
25      A.  As I see this document, this is in

259

D. KEKANA

1
2  with regards to the discussion between
3  Marilyn and -- I heard -- I read here that
4  Marilyn said she didn't care about what
5  Marjorie thought and goes on to say that she
6  is tired of this shit.
7       Q.  And then goes on right, "Shut the
8  fuck up.  I will fuck you up."
9          MR. MELITO:  Objection.  Again,
10         this is outside the scope of the
11         30(b)(6); and you also, I believe,
12         noticed this witness who can speak
13         more to it.  You noticed Umilta for a
14         deposition.
15      Q.  Can you answer the question, please?
16      A.  What is the question?
17          MR. SELLS:  Okay.  I'll
18         withdraw the question and ask this
19         one.
20      Q.  "Marilyn then, in what I would
21  describe as an aggressive manner, left her
22  desk area and walked over to Marjorie's while
23  screaming, 'I will fuck you up.  I will
24  fucking kill you.'"
25          "At this point she was within inches

260

D. KEKANA

1
2  of Marjorie.  Marilyn was standing over
3  Marjorie's desk with literal spit/foam coming
4  from her mouth as she repeated this threat
5  over and over."
6          Now let me ask you this question:
7  If an employee who was trying to do their
8  work had another employee approach them, get
9  within inches of them, have literal spit and
10 foam coming from their mouth and yells "I
11 will fuck you up.  I will fucking kill you.
12 I'm tired of your shit, shut the fuck up.  I
13 will fuck you up."  Would that, in your
14 opinion, negatively affect a person's ability
15 to do their job?
16          MR. MELITO:  Objection.
17         Outside the scope of the 30(b)(6),
18         objection to the form, legal
19         conclusion, also out of context about
20         the whole situation that you are
21         testifying about and what this
22         document says.
23      A.  I can't say what is going to make
24 someone be able to do their job and what is
25 going to make someone else be able to do

261

```
          D. KEKANA
1
2    their job.  I can say that if someone feels
3    threatened that they should leave the space,
4    leave the room and seek safety.
5         Q.  Wait a minute.  Wait a minute.  You
6    just said that you don't know -- or I should
7    say you can't say.
8             You can't say whether or not someone
9    who -- an employee who gets up from their
10   desk, walks over to another employee, gets in
11   their face with foam and spit coming from
12   their mouth and starts yelling at them "I
13   will fucking kill you.  Shut the fuck up."
14   You can't say whether that would negatively
15   effect their ability to do their job; is that
16   what I heard you say?
17            MR. MELITO:  Objection.
18        Outside the scope of 30(b)(6).
19        Objection to form, calls for
20        speculation amongst other form
21        objections.
22        A.  What I'm saying is I can't suppose
23   what is in the hearts and minds of how people
24   would react to different situations.
25        Q.  That's not my question.  You're
```

262

```
          D. KEKANA
1
2    saying that an employee's job would not be
3    affected, but you can't say whether a
4    person's ability do their job would be
5    affected by this kind of conduct --
6             MR. MELITO:  Objection --
7         Q.  -- is that what you're saying?
8             MR. MELITO:  Objection to form.
9         Objection, outside the form of the
10        30(b)(6).
11            MR. SELLS:  Listen, are you
12        going to take up 30 seconds every
13        single time I ask a question?
14        Seriously?
15            MR. MELITO:  Ask proper
16        questions, or yes.
17            MR. SELLS:  You're just eating
18        time, Nicholas.
19            MR. MELITO:  I'm not eating
20        time.
21            MR. SELLS:  I tell you what,
22        you have an objection to every
23        question I ask, all right.  Every
24        question.  Whatever objection you
25        could imagine, you have it.  So you
```

263

```
          D. KEKANA
1
2    don't need to say "objection" anymore
3    today --
4             MR. MELITO:  Okay.  So let's --
5             MR. SELLS:  So now -- so now --
6         so now --
7             MR. MELITO:  We cannot --
8         Q.  If you could answer my question?
9             MR. MELITO:  We cannot move on
10        with that statement.
11            MR. SELLS:  I'm taking another
12        five-minute break.
13            MR. MELITO:  No.
14            MR. SELLS:  Nicholas, I can't
15        deal with this.
16            MR. MELITO:  No, I need
17        clarification as far as what you said
18        with regard to the rules of the
19        depositions.
20        (Mr. Sells has turned off his
21        camera and microphone and exited the
22        deposition.)
23            MR. MELITO:  Please note for
24        the record Mr. Sells turned off
25        camera, abruptly left while we were
```

264

```
          D. KEKANA
1
2    in the middle of a conversation
3    regarding what we, I guess, objected
4    to.
5             The time is 6:01 and we are
6         still on the record.  And again out
7         of a courtesy, I will give him until
8         6:05 unless this deposition is
9         closed.
10            MR. MENKEN:  I might add his
11        departure, just like the first
12        occasion, on this second occasion, is
13        because he raised his temper and
14        raised his voice once again.
15        (Mr. Sells has returned to
16        video.)
17            MR. SELLS:  You ready to go
18        forward?
19            MR. MELITO:  If you are.
20        You're the one that left.
21            MR. SELLS:  I'm ready.
22        Q.  So, Ms. Kekana, with someone yelling
23   in the fashion that has been described in
24   this statement, the same way that Marilyn
25   Barton yelled and screamed at Ms. Phillips,
```