# EXHIBIT O

**Page 1**

```
1
2    THE UNITED STATES DISTRICT COURT
3    SOUTHERN DISTRICT OF NEW YORK
4    ---------------------------------------X
     MARJORIE PHILLIPS,
5                            Plaintiff,
6
7        -against-        Civil Action No.:
                          17-cv-00221 (GBD)
8
9    THE FASHION INSTITUTE OF TECHNOLOGY, MARY
10   DAVIS, and MARILYN BARTON,
11                         Defendants.
12   ---------------------------------------X
13              DATE:  December 20, 2021
14              TIME:  10:09 a.m.
15
16
17
18                    DEPOSITION of
19   CYNTHIA GLASS, taken by the Plaintiff,
20   pursuant to a Notice, held via Video
21   Conferencing, before Lesley Simpson, a Notary
22   Public of the State of New York.
23
24
25
```

**Page 3**

```
1
2    A L S O   P R E S E N T :
3
4      MARJORIE PHILLIPS, Plaintiff
5      MARY DAVIS, Defendant
6      MARILYN BARTON, Defendant
7      ANDRE THOMAS, Exhibit Manager
       PFP REPORTING
8
9           *          *          *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
1
2    A P P E A R A N C E S :
3
4    THE COCHRAN FIRM, P.C.
         Attorneys for Plaintiff
5        One Exchange Place
         23rd Floor
6        New York, New York 10006
7    BY: DEREK S. SELLS, ESQ.
         MINA MALIK, ESQ.
8        MONIQUE MILNER, ESQ.
9
10   NIXON PEABODY LLP
         Attorneys for Defendant
11       THE FASHION INSTITUTE OF TECHNOLOGY
         50 Jericho Quadrangle
12       Suite 300
         Jericho, New York 11753
13   BY:  NICHOLAS MELITO, ESQ.
14        ROSE NANKERVIS, ESQ.
15
16   SARETSKY KATZ & DRANOFF LLP
         Attorneys for Defendant
17       MARY DAVIS
         475 Park Avenue South
18       New York, New York 10016
19   BY:  ERIC DRANOFF, ESQ.
20
21   MENKEN SIMPSON & ROZGER LLP
         Attorneys for Defendant
22       MARILYN BARTON
         80 Pine Street
23       33rd Floor
         New York, New York 10005
24
25   BY:  BRUCE MENKEN, ESQ.
```

**Page 4**

```
1
2    F E D E R A L   S T I P U L A T I O N S
3
4        IT IS HEREBY STIPULATED AND AGREED by and
5    between the counsel for the respective parties
6    herein that the sealing, filing and
7    certification of the within deposition be
8    waived; that the original of the deposition
9    may be signed and sworn to by the witness
10   before anyone authorized to administer an
11   oath, with the same effect as if signed before
12   a Judge of the Court; that an unsigned copy of
13   the deposition may be used with the same force
14   and effect as if signed by the witness, 30
15   days after service of the original & 1 copy of
16   same upon counsel for the witness.
17
18       IT IS FURTHER STIPULATED AND AGREED that
19   all objections except as to form, are reserved
20   to the time of trial.
21
22
23
24
25
```

5

1
2      C Y N T H I A   G L A S S, having been first
3      duly sworn before a Notary Public of the State
4      of New York was sworn and testified as
5      follows:
6      EXAMINATION BY
7      MR. SELLS:
8          Q.  Please, state your name and address
9      for the record.
10         A.  Cynthia Glass.  44 West 62nd Street,
11     New York, New York 10023.  Apartment 15C.
12         Q.  Good morning, Ms. Glass.  My name is
13     Derek Sells, and I am one of the attorneys
14     who represents Marjorie Phillips in a lawsuit
15     against F.I.T., Mary Davis and Marilyn
16     Barton.
17             We will be asking you some questions
18     today concerning your involvement in
19     complaints of discrimination and retaliation
20     that Ms. Phillips brought against F.I.T.,
21     Mary Davis and Marilyn Barton.
22             My first question to you is, Are you
23     able to understand questions that are asked
24     of you today?
25         A.  Yes.

6

1                        C. GLASS
2          Q.  So, you are not under the influence
3      of any type of drug, narcotic or anything
4      else that would affect your ability to
5      understand and answer questions.  Is that
6      right?
7          A.  Correct.
8          Q.  So, if I ask you a question and you
9      answer it, I will assume that you understood
10     my question and you are answering my
11     question.  Is that fair enough?
12         A.  Yes.
13         Q.  If for any reason you do not
14     understand a question I have asked you,
15     please tell me and I will try to rephrase it
16     so that you do understand it.  Is that fair?
17         A.  Yes.
18         Q.  If you need to take a break, you can
19     do so almost at any time.  I will just ask
20     that if there is a pending question, that you
21     answer it before you take the break.  Is that
22     fair?
23         A.  Yes.
24         Q.  Ms. Glass, can you briefly go
25     through your educational background?

7

1                        C. GLASS
2          A.  I have a Bachelor's Degree in social
3      science and economics; and a Master's Degree
4      in labor and industrial relations; and a
5      Doctorate Degree in educational technology.
6          Q.  When did you obtain these degrees?
7          A.  In 1988, was my Bachelor's Degree;
8      1989, my Master's; and 2005, with my
9      Doctorate.
10         Q.  When did you begin working at
11     F.I.T.?
12         A.  April of 2019.
13         Q.  In what position were you hired to
14     work at F.I.T.?
15         A.  My current position, Vice President
16     of Human Resources Management and Labor
17     Relations.
18         Q.  Where did you work before then?
19         A.  Henry Ford College.
20         Q.  For how long did you work for Henry
21     Ford College?
22         A.  I believe, 19 years.
23         Q.  In what capacity?
24         A.  Vice President of Human Resources
25     and Labor Relations.

8

1                        C. GLASS
2          Q.  Where is Henry Ford College?
3          A.  Dearborn, Michigan.
4          Q.  Why did you leave Henry Ford
5      College?
6          A.  I was recruited to this position.
7          Q.  I understand you were recruited; but
8      what made you leave?
9          A.  My husband had the opportunity to
10     retire from the Michigan school system and
11     look for employment in another state, so we
12     jointly moved.
13         Q.  So, I take it your husband got
14     employment in New York somewhere?
15         A.  Yes, he is employed in New York.
16         Q.  Where does he work?
17         A.  He is the Superintendent of
18     Eastchester Union Free School District in
19     Westchester County.
20         Q.  So, your husband works in education
21     as well; is that right?
22         A.  Correct.
23         Q.  Is he still at Eastchester?
24         A.  Yes.
25         Q.  What schools are under Eastchester?

9

C. GLASS

2      A.  Eastchester school is K-12 district.
3      Q.  Before Henry Ford College, where did
4  you work?
5      A.  Owens State College in Toledo, Ohio.
6      Q.  How long did you work there?
7      A.  Approximately, five years.
8      Q.  In what capacity?
9      A.  Vice President of Human Resources.
10      Q.  Where did you work for Owens State?
11      A.  St. Clair County Community College
12  in Port Huron, Michigan.
13      Q.  For how long?
14      A.  About 18 months.
15      Q.  In what capacity?
16      A.  Vice President of Human Resources
17  and Labor Relations.
18      Q.  And before St. Claire?
19      A.  Marysville Public Schools.
20      Q.  You said "Marysville"?
21      A.  Marysville, one word.
22      Q.  How long did you work there?
23      A.  10 years.
24      Q.  In what capacity?
25      A.  Director of Human Resources and

10

C. GLASS

2  Labor Relations -- actually, I think it was
3  closer to seven; it's been a while.
4      Q.  Before there where did you work?
5      A.  Blue Water Plastics.
6      Q.  Blue Water Plastics?
7      A.  Corporation -- no.  Actually --
8  actually, Thomas & Betts Corporation.
9      Q.  Did you work for both Thomas & --
10      A.  I did.  I did.  I worked for Thomas
11  & Betts prior to St. Claire -- prior to
12  Marysville.
13      Q.  Okay.
14      A.  And then prior to Thomas & Betts, I
15  worked at Blue Water Plastics Corporation.
16      Q.  Okay.
17          Do you know how long you worked at
18  either or both of those?
19      A.  Thomas & Betts about a year; and
20  Blue Water Plastics about three, four years.
21      Q.  Okay.  In what capacity?
22      A.  Director of HR and Labor.
23      Q.  Have you had any other employment in
24  the HR field besides the places you have just
25  told us about?

11

C. GLASS

2      A.  Yes.  My initial job out of graduate
3  school was with the American Society of
4  Employers.
5      Q.  And how long did you work there?
6      A.  Two years.
7      Q.  And in what capacity?
8      A.  Compensation analyst and research
9  analyst.
10      Q.  Did you get fired from any job?
11      A.  No.
12      Q.  Each of the positions that you have
13  just described to us, you were working for
14  the employer; is that correct?
15      A.  Correct.
16      Q.  And as a professional who handles
17  labor relations, one of the things that you
18  have learned is that your primary job is
19  loyalty to your employer; is that correct?
20          MR. MELITO:  Objection.
21          MR. DRANOFF:  Object to the
22      form.
23      Q.  One of the other instructions is, If
24  you hear the word "objection," you still have
25  the answer the question.

12

C. GLASS

2      A.  Can you repeat the question, please?
3          (Whereupon, the requested
4      portion of the transcript was read
5      back.)
6          MR. MELITO:  Same objection.
7      A.  Yeah, I'm not sure what you mean by
8  "loyalty."
9      Q.  When you hear the word "loyalty,"
10  what do you think the word loyalty means?
11          MR. MELITO:  Objection.
12      A.  I'm employed and compensated to do --
13  fulfill the responsibilities of the job.
14      Q.  No.  No.  No.  That was not my
15  question.  My question was, What do you think
16  "loyalty" means?
17          MR. MELITO:  Objection.
18      A.  To be true to something.
19      Q.  To be true to something.
20          And when you think about being true
21  to something, what is it that you mean?
22          MR. MELITO:  Objection.
23      A.  Sorry.  I really do not understand
24  what you're getting at here.
25      Q.  Well, you said what do you mean by

13

C. GLASS

1
2  loyalty?  And so, I am asking you, When you
3  hear the word "loyalty," what is your
4  definition; and --
5      A.  Yeah --
6      Q.  -- you said, "to be true to
7  something."  So, I am asking you to clarify
8  what does that mean, "to be true" to
9  somebody.  I'm just --
10         MR. MELITO:  Objection --
11     Q.  -- I'm just trying to get your
12 definition.
13         MR. MELITO:  Objection.
14     A.  To be responsible and loyal to
15 something consistent with your own values
16 and...
17     Q.  Is that your answer?
18     A.  Yeah.  Again, I'm really not sure
19 what you're trying to ask.
20     Q.  So, you don't really understand what
21 it means to be loyal; is that what you're
22 saying?
23         MR. MELITO:  Objection.
24         I mean, is this a, you know,
25         English language definition depo?

14

C. GLASS

1
2      Like, what are we getting at here,
3  Derek?
4      MR. SELLS:  I'm not going to go
5      through what we went through the
6      other day, Nicholas.  So stop with
7      the comments.  Okay, stop.  Just stop
8      period.
9          MR. MELITO:  I will raise
10     objections when necessary and add
11     what I need to.  Thank you.
12     Q.  Ms. Glass, what does it mean for you
13 to be loyal --
14         MR. MELITO:  Objection --
15     A.  To be committed to something.
16     Q.  Got it.
17     So, when I ask you as part of your
18 job as an HR director as someone who deals
19 with employee relations for the company that
20 you work for, you understand that your
21 primary job is to be loyal to your employer,
22 correct?
23         MR. DRANOFF:  Objection.
24         MR. MELITO:  Objection.
25     A.  I don't think that is my primary

15

C. GLASS

1
2  objective.  My primary objective is to
3  fulfill the responsibilities of the job.
4      Q.  The job that is given to you by
5  whom; who gives you the job?
6          MR. MELITO:  Objection.
7      A.  The employer.
8      Q.  The employer, right.  And so the
9  employer is hiring you to be loyal to the
10 employer, right?
11         MR. DRANOFF:  Objection.
12         MR. MELITO:  Objection.
13     A.  I am hired to do a job.
14     Q.  By the employer, right?
15     A.  By the employer.
16     Q.  And you serve the employer at the
17 employer's will; is that correct?
18         MR. DRANOFF:  Objection.
19         MR. MELITO:  Objection.
20     A.  (No Response.)
21     Q.  Did you answer the question?
22     A.  Yes.
23     Q.  And you know that as part of your
24 job, you're supposed to protect the employer
25 from harm, correct?

16

C. GLASS

1
2          MR. MELITO:  Objection.
3          MR. DRANOFF:  Join in the
4      objection.
5      A.  I enforce policy and procedure, I am
6  responsible for compliance.  I'm responsible
7  for fulfilling the responsibilities of my
8  position.
9      Q.  And you do that in a way to protect
10 the employer from harm, right?
11         MR. DRANOFF:  Objection to
12     form.
13         MR. MELITO:  Objection.
14         Derek, I really do not want to
15     call --
16         MR. SELLS:  Stop.  Do not even
17     mention my name anymore.
18         MR. MELITO:  No.
19         MR. SELLS:  Nicholas, do not
20     mention my name.
21         MR. MELITO:  She answered it
22     five different ways.  You're asking
23     it a million different ways.  I'm
24     calling --
25         MR. SELLS:  Do not --

17

```
1                    C. GLASS
2          MR. MELITO:  If you do not move
3     on, I will have to call the court.
4          MR. SELLS:  Call the court now.
5     Call the court now.
6          MR. MELITO:  I will.
7          MR. SELLS:  Go ahead.
8          MR. MELITO:  I have to you're
9     just trying to put words --
10         MR. SELLS:  Go ahead.  All
11    right.  All right.  All right.  Are
12    we calling the court?
13         MR. MELITO:  Yeah.
14         MR. SELLS:  I'm off the record.
15         MR. MELITO:  This is on the
16    record, Derek.
17         MR. SELLS:  Nope.  Go ahead.
18    Call the court, Nick.  Go ahead.
19         MR. MELITO:  If you are going
20    to continue.
21         MR. SELLS:  No.  No.  You going
22    to call the court or not?  Don't
23    threaten, just call the court.  Don't
24    threaten.  Don't waste my time with
25    this nonsense.
```

18

```
1                    C. GLASS
2          MR. MELITO:  I'm trying not to
3     waist everyone's team.
4          MR. SELLS:  What was the last
5     question, Lesley?
6          (Whereupon, the requested
7     testimony read by the court reporter.)
8     A.    I protect the employer from
9     liability and reduce risk.
10    Q.    Perfect.
11         And some of the liability that the
12    employer might face comes from lawsuits from
13    employees, correct?
14         MR. MELITO:  Objection.
15    A.    Yes.
16    Q.    Now, the term you mentioned that
17    you're responsible for enforcing certain
18    policies of the employer; is that correct?
19    A.    Correct.
20    Q.    And one of those policies has to do
21    with employee discipline; is that right?
22    A.    Yes.
23    Q.    And in particular at F.I.T., when
24    you joined in April of 2019, was there a
25    policy of discipline at F.I.T.?
```

19

```
1                    C. GLASS
2     A.    Yes.
3     Q.    Can you describe what the policy for
4     F.I.T. discipline of employees what was it?
5          MR. MELITO:  Objection to the
6     form.
7     A.    The disciplinary process is governed
8     by the collective bargaining agreement.
9     Q.    Where?
10    A.    In Section 28 point 28 of the
11    collective bargaining agreement.
12    Q.    What does it say?
13         MR. MELITO:  Objection.
14         Go ahead.
15    A.    I'm sure that you have a copy.  You
16    could bring it up if you want me to review it
17    with you.
18    Q.    No, just tell me.  I want you to
19    explain it.
20         MR. DRANOFF:  Objection to
21    form.
22         MR. MELITO:  Objection.
23    A.    So there is a process that was
24    negotiated with the union regarding terms and
25    provisions for the disciplinary process for
```

20

```
1                    C. GLASS
2     work place infractions.  It's basically
3     informal until an infraction is egregious and
4     charges are brought, served to the employee
5     and a committee -- a joint labor management
6     committee is formed to investigate and make
7     recommendations to the president for final
8     discipline.
9     Q.    Okay.
10         So you are telling us that F.I.T.'s
11    policy was to let the union decide
12    discipline?
13         MR. DRANOFF:  Objection to
14    form.
15    Q.    Is that right?
16    A.    No, there is a joint committee
17    dictated by the collective bargaining
18    agreement that if charges are brought, a
19    joint committee of one management, one labor
20    representative investigate and determine
21    discipline, if charge are brought.
22    Q.    "If charges are brought"; is that
23    what you said?
24    A.    Correct.
25    Q.    Well, who decides whether charges
```

**21**

```
1                    C. GLASS
2    will be brought?
3         A.  I do in consultation with the union.
4         Q.  I see.
5             So you are saying that F.I.T. cannot
6    fire an employee who works for the union
7    unless the union agrees to it; is that right?
8         A.  That is correct.
9         Q.  Really.
10            And so, are you saying that F.I.T.'s
11   policy is that if a unionized worker at
12   F.I.T. punches someone in the face, that
13   F.I.T. can't just fire them without the union
14   saying, Hey, we agree with that; is that
15   right?
16        A.  There is process for --
17        Q.  No.  No.  No, just answer my
18   question.  Is that right, if a unionized
19   employee at F.I.T. punches another employee
20   in the face, are you saying that F.I.T.
21   cannot fire that employee on the spot unless
22   you get union approval to ---
23        A.  I can't --
24        Q.  -- file charges --
25        A.  I can't fire them on the spot,
```

**22**

```
1    period.
2             MR. MELITO:  Objection.
3         Q.  Excuse me.  Excuse me.  Excuse me.
4    Can you just let me finish my question?  Let
5    me finish my question before you answer,
6    okay.  Because the court reporter, as good as
7    she is, cannot take us both down at the same
8    time.  So you need to wait for me to finish
9    my question.
10            Now, my question is, Are you saying
11   that under F.I.T. policy an F.I.T. employee
12   can punch another F.I.T. employee in the face
13   and that F.I.T. employee cannot be fired
14   without union approval; is that correct?
15            MR. MELITO:  Objection.
16            You may answer.
17        A.  I cannot fire someone without
18   engaging in the process which involves the
19   union.
20        Q.  I'm not asking about if you could
21   fire.  I'm asking about --
22        A.  F.I.T.  F.I.T. --
23        Q.  -- if --
24        A.  F.I.T. cannot fire someone without
```

**23**

```
1                    C. GLASS
2    engaging the union.
3         Q.  Under what provision?
4         A.  The disciplinary process outlined in
5    the collective bargaining agreement.
6         Q.  So, under F.I.T. -- I want to be
7    clear.  Under F.I.T.'s policy, a unionized
8    employee at F.I.T. could come to work and
9    shoot another F.I.T. employee with a gun,
10   unprovoked, and F.I.T. could not fire that
11   employee without getting approval from the
12   union first; is that correct?
13            MR. MELITO:  Objection.
14            MR. DRANOFF:  Objection to
15       form.
16            MR. MELITO:  As well.
17        A.  F.I.T. could not fire that person.
18        Q.  So am I to understand that under
19   F.I.T.'s policy, an F.I.T. employee could
20   walk into another F.I.T. employee's office,
21   close and lock the door, rape that employee --
22   viciously rape that employee and under F.I.T.
23   policy the rapist could not be fired without
24   the union's approval; is that right,
25   Ms. Glass?
```

**24**

```
1             MR. MELITO:  Objection.  Do not
2    answer.  Do not answer.  Do not
3    answer.  I'm instructing the witness
4    not to answer that outrageous,
5    hypothetical as it has nothing to do
6    with this case.
7             You could move on.
8             MR. SELLS:  Okay.  Let's call
9        the court.
10            MR. MELITO:  You call it, it's
11       your motion.
12            MR. SELLS:  I want a ruling.
13            MR. MELITO:  Go ahead and call
14       the court.  Call the court; it's your
15       motion.
16            (Whereupon, Mr. Sells calls the
17       court at 10:33 a.m.)
18            MR. SELLS:  Yes, hi.  This is
19       Derek Sells calling in the matter of
20       Marjorie Phillips versus the Fashion
21       Institute of Technology.
22            CHAMBER SECRETARY:  Case
23       number, please.
24            MR. SELLS:  It's 20-cv-00221.
```

25

```
                   C. GLASS
1
2              I'm taking a deposition of the
3    witness for the Fashion Institute of
4    Technology, and there has been an
5    instruction by the lawyer for the
6    witness not to answer the question.
7    There has been no claim of privilege;
8    but he is instructed her not to
9    answer the question, and I would like
10   to get a ruling.
11             CHAMBER SECRETARY:  The judge
12   is not -- is not in at the moment.  I
13   think, you know -- did you call last
14   week about this as well?
15             MR. SELLS:  Well, this is a --
16   yes, we are in the midst of multiple
17   depositions.  This is a new
18   deposition --
19             CHAMBER SECRETARY:  Let me give --
20   I think you had spoken to my co-clerk
21   about this last week.
22             MR. SELLS:  Yes.
23             CHAMBER SECRETARY:  I think she
24   spoke with the judge about it --
25             MR. SELLS:  No.  No.  This is a
```

26

```
                   C. GLASS
1
2    different -- it is same case,
3    different ruling.  So, there's been a --
4              CHAMBER SECRETARY:  Right.  I
5    think the ruling he made -- whatever
6    he told you last week applies today.
7    So I think it was something like
8    sanction issue that should be
9    addressed after the deposition.
10             MR. SELLS:  This is not a
11   sanction issue.  This is a question
12   issue.  I have asked the witness a
13   question, and the attorney for F.I.T.
14   has instructed the witness not to
15   answer.  And --
16             CHAMBER SECRETARY:  Well, sir,
17   I think at this point, like I said,
18   the judge stepped away for a moment --
19             MR. SELLS:  Well, can he call
20   back because this is an important
21   question, and I would like it to be
22   answered.
23             CHAMBER SECRETARY:  I'll take a
24   message down and leave it for him.
25             MR. SELLS:  Thank you, very
```

27

```
                   C. GLASS
1
2    much.  Can he call me back please at
3    347-683-1846.
4              CHAMBER SECRETARY:  1846.  And
5    your name again?
6              MR. SELLS:  Derek, D-E-R-E-K.
7    Last name is Sells, S-E-L-L-S.
8              CHAMBER SECRETARY:  All right.
9    Thank you so much.
10             MR. SELLS:  Thanks, bye.
11             CHAMBER SECRETARY:  Bye.
12             (Whereupon, the call to the
13   court has ended at 10:36 a.m.)
14             MR. SELLS:  Please mark the
15   question, Lesley.
16        Q.   Now, under F.I.T.'s policy, their
17   disciplinary process, if an employee -- an
18   F.I.T. employee, walked into an
19   African-American -- let's say it's a
20   Caucasian employee walks into an
21   African-American's office and calls them a
22   "fucking nigger," are you saying that F.I.T.
23   could not fire that employee without first
24   getting union approval?
25             MR. MELITO:  Objection.
```

28

```
                   C. GLASS
1
2              Eric, you are on mute.  I don't
3    know if you know.
4              MR. DRANOFF:  I was objecting
5    as well.  Objection.
6         A.   The college must follow due process
7    under the collective bargaining agreement.
8         Q.   What is due process under the
9    agreement as far as you understand it?
10        A.   In situations that warrant charges,
11   they are drafted, presented to the employee
12   and the union and a committee is formed to
13   complete an investigation who then make
14   recommendations to the president for possible
15   termination in egregious situations.
16        Q.   You talk about a process where
17   charges are drafted and then sent to the
18   employee and the union; is that correct?
19        A.   The union is copied on the charges
20   sent to the employee.
21        Q.   All right.
22             So in the first instance, under
23   F.I.T.'s disciplinary policy are you saying
24   that F.I.T. is responsible for drafting the
25   charges and then sending them to the union?
```

29

```
1                    C. GLASS
2            MR. DRANOFF:  Objection to
3        form.
4            MR. MELITO:  Objection.
5        A.  Yes.  As management, we're
6    responsible for facilitating the process.
7        Q.  Got it.
8            So am I to understand that if F.I.T.
9    makes a determination not to draft charges,
10   then an employee who would otherwise be
11   subject to possible termination if the union
12   and F.I.T. agreed to it would not have to
13   face possible termination; is that right?
14           MR. MELITO:  Objection.
15       A.  I'm not -- I don't understand the
16   question.
17       Q.  Okay.
18           Well, we're talking about
19   termination, right; where charges have to be
20   drafted or there has to be this due process
21   as you referred to it where the union has an
22   opportunity, the employee has an opportunity
23   to respond to the charges before a
24   termination can occur; is that what we have
25   been talking about?
```

30

```
1                    C. GLASS
2        A.  Correct.
3        Q.  And so my question to you is, If
4    there are no charges, if F.I.T. decides, Hey,
5    we are not going to go down that route of
6    termination, so we're not going to draft
7    charges for termination to be considered.
8    Then isn't it true that that employee will
9    not face the possibility of termination if
10   F.I.T. does not submit charges; is that
11   correct?
12           MR. MELITO:  Objection.
13       A.  There are still opportunities for
14   discipline at an informal or a level where
15   the college believes that there could be a
16   resolution to the issue.
17       Q.  I'm not talking about discipline.
18   I'm talking now in general.  I'm talking now
19   about termination.  Am I correct that if
20   F.I.T. does not submit charges against an
21   F.I.T. unionized employee, that that employee
22   will not face the possibility of termination?
23       A.  For that offense, correct --
24           MR. MELITO:  Objection.
25       Q.  So in the first instance, it's you
```

31

```
1                    C. GLASS
2    in HR that decides whether or not an employee
3    will face charges, correct?
4            MR. MELITO:  Objection.
5        A.  I review the case and consult with
6    the union and talk about appropriate action
7    that both parties, because we are both
8    involved in the disciplinary process, believe
9    could resolve the issue.
10       Q.  Let's say you have this informal
11   talk and at the end of the day it's still
12   your decision whether to press charges.  If
13   you disagree with the union or you think
14   strongly enough about the issue that is
15   involved with the employee -- the unionized
16   employee, then you still can submit charges
17   to be considered; is that correct?
18           MR. MELITO:  Objection.
19       A.  Correct.
20       Q.  And even after you submit charges,
21   if there is still a disagreement, then you
22   could insist that an arbitrator be involved
23   in the case, listen to both sides and make a
24   determination about whether the employee
25   should lose their job or not; isn't that
```

32

```
1                    C. GLASS
2    right?
3            MR. MELITO:  Objection.
4        A.  The college does not engage an
5    arbitrator.
6        Q.  Well, when you say the college does
7    not engage an arbitrator --
8        A.  No, the process is --
9        Q.  -- what do you mean?  Go ahead.
10       A.  The process is such that an
11   arbitrator would come in if the union and the
12   college -- if the college took action and the
13   union disagreed.
14       Q.  Right.
15           So that's when the arbitrator comes
16   in and makes the decision between the union
17   and F.I.T., right?
18       A.  Well, makes a decision on the case,
19   the facts of the case.
20       Q.  I know.  But if the union and the
21   college both agreed, there is no need for an
22   arbitrator; is that right?
23       A.  It would not go to the arbitration.
24       Q.  Right.
25           The only time it goes to arbitration
```

33

C. GLASS

1    is if there is a disagreement between F.I.T.
2    and the union; is that correct?
3        A.   Yes.
4        Q.   Okay.
5            So when you just said that the only
6    way someone could get fired from F.I.T. is if
7    F.I.T. and the union agreed, that is not true --
8        A.   That's not what I said --
9            MR. MELITO:  Objection.
10           Please, Ms. Glass -- Dr. Glass,
11       if you could just pause so I could
12       state my objection; but you can
13       answer.
14       A.   That is not what I said.  That's
15   what you are trying to make me say.
16       Q.   Well, I thought you said that you
17   cannot have a termination without union
18   approval.  I thought that's what you said.
19   Am I mistaken on that?
20           MR. MELITO:  Objection.
21       A.   I think you keep changing the
22   question.
23       Q.   Can you just answer the question,
24   please?

34

C. GLASS

1            MR. MELITO:  Objection.
2        A.   What is your current question?
3            (Whereupon, the requested
4        portion of the transcript was read
5        back.)
6            MR. MELITO:  I will raise the
7        same objection.
8        A.   An employee who goes through the
9    disciplinary process can be terminated and
10   the union can challenge that via arbitration.
11       Q.   Well, that's not what you said
12   earlier, right?  Didn't you say earlier that
13   there is no possibility of an employee being
14   fired unless the union agreed to it?
15           MR. MELITO:  Objection.
16       Q.   Now, you heard me ask those
17   questions whether someone punches someone in
18   the face or someone shoots someone or someone
19   calls someone the N word.  You heard those
20   questions and you said, "No, I can't do
21   anything without the union approval."  Isn't
22   that what your answers were to all of those
23   scenarios?
24           MR. MELITO:  Objection --

35

C. GLASS

1        Q.   -- just answer my question.  Wasn't
2    that your answer?
3            MR. MELITO:  Objection.
4        A.   I'm not understanding your line of
5    questioning, and therefore I feel like you
6    have pressured me into saying something that
7    is -- is not accurate.
8        Q.   You have been pressured?  Really?
9    Okay.  What kind of pressure?  What kind of
10   pressure are you under?
11           MR. MELITO:  Objection.
12           She raised your harassing,
13       mischaracterization as an issue.  No
14       other pressure but your tactics in
15       your deposition questioning --
16           MR. SELLS:  Wow --
17           MR. MELITO:  Again, your --
18       Q.   So, have you used the word
19   harassment?  Have you used the word
20   harassment today?  Ms. Glass --
21           MR. MELITO:  Objection --
22       Q.   -- have you used the word harassment
23   today?
24       A.   I have not.

36

C. GLASS

1        Q.   No.  I got it.  Okay.  I'm just
2    clear -- I just wondered where that word came
3    from --
4            MR. MELITO:  It's an objection --
5        Q.   You have not mentioned it, but
6    someone else has --
7            MR. MELITO:  It's an objection,
8        a legal objection.
9        Q.   So, Ms. Glass how is it that you
10   don't understand my line of questioning --
11           MR. MELITO:  Let me state my
12       objection -- my legal objection based
13       on your demeanor in the deposition.
14       It is harassing underneath Federal
15       Rules of Professional Conduct Civil
16       Procedure just to clarify where
17       "harassing" came from.
18           MR. SELLS:  So that's from you?
19           MR. MELITO:  Yes.  It's an
20       objection to your behavior and
21       conduct --
22           MR. SELLS:  Got it --
23           MR. MELITO:  -- in this
24       deposition.  Again --

37

```
              C. GLASS
1
2          MR. SELLS:  Great.  Beautiful.
3      Q.  Ms. Glass, you say that you are
4  confused about the line of questioning.  And
5  I said right before we started that if you do
6  not understand a question that I have asked
7  you should tell me.  Okay --
8      A.  I have --
9      Q.  Now, you're saying that -- now,
10 you're objecting to a line of questions that
11 have already been asked.  So now you're
12 saying you don't understand; is that correct?
13         MR. MELITO:  Objection.
14     A.  (No response.)
15     Q.  Go ahead.
16     A.  (No response.)
17     Q.  Can you answer the question?
18     A.  (No response.)
19     Q.  Are you refusing to answer the
20 question?  Are you answering the question?
21 I'm trying to see what you're doing here,
22 Ms. Glass, 'cause I'm --
23     A.  I guess I'm not sure that I can
24 answer your questions because they are very
25 confusing and --
```

38

```
              C. GLASS
1
2      Q.  Very confusing --
3      A.  Yeah, and there are multiple
4  objections to the questions; so therefore it
5  tells me that there are issues with your
6  questions.
7      Q.  The objections tell you -- the
8  objections tell you that there are issues
9  with my questions; is that correct --
10         MR. MELITO:  Objection.
11         She's telling you there are
12     issues with your questioning.
13     Q.  Please, answer the question.
14     A.  There are issues with your
15 questions.
16     Q.  Okay.
17         So as we go forward, you tell me
18 before, before you answer the question what
19 the issue is so I could help you to better
20 understand.  Okay?
21         MR. MELITO:  Objection.
22     A.  Okay.
23     Q.  All right.
24         So, if the union and F.I.T.
25 disagreed on whether a unionized employee
```

39

```
              C. GLASS
1
2  should be terminated, then F.I.T. could still
3  fire that employee and allow for an
4  arbitration to take place; is that correct?
5          MR. DRANOFF:  Objection to
6      form.
7          MR. MELITO:  Objection.
8      A.  Correct.
9      Q.  So, it would not be accurate to say
10 that F.I.T. could only fire someone if the
11 union gives them permission; is that right?
12         MR. MELITO:  Objection.
13         You may answer.
14     A.  I never answered your question
15 regarding permission.  There is a process
16 dictated by the contract that the college and
17 the union must go through.
18     Q.  To the best of your knowledge that
19 process is if F.I.T. wants to fire someone,
20 F.I.T. can fire a unionized employee and then
21 the employee, if they object to the
22 termination, can, if they want, arbitrate?
23     A.  The union cannot -- the college
24 cannot fire someone without going through the
25 joint labor management process.  That's where
```

40

```
              C. GLASS
1
2  your question was leading and did not allow
3  me to answer the question.
4      Q.  I didn't allow you to answer the
5  question; is that right?  Is that what you're
6  saying?
7          MR. MELITO:  Objection.
8      A.  (No Response.)
9      Q.  I just want to be clear.  You're
10 saying I did not allow you to answer the
11 question; is that what you're saying?
12         MR. MELITO:  Same objection.
13     A.  (No Response.)
14     Q.  You can answer.
15     A.  Your questions are leading and
16 forcing an answer that you want instead of
17 allowing me to provide the facts of the case.
18     Q.  Is that your answer?
19     A.  That's my answer.
20     Q.  Got it.
21         So, if F.I.T. could in fact fire an
22 employee who it believed -- under the union
23 contract -- if it believed that that employee
24 acted in a racially offensive manner; is that
25 right?
```

41

C. GLASS

1
2      A.  If there was an investigation, a
3  joint labor management committee, an
4  investigation and recommendation to the
5  president for termination.
6      Q.  Is that a joint recommendation that
7  you're talking about?
8      A.  It is.
9      Q.  What about if it is not a joint
10  recommendation?  What about if the union says
11  no and F.I.T. says, you know, we still want
12  to fire person?
13      A.  A committee may not agree and submit
14  independent statements to the president and
15  the president ultimately makes the decision
16  based on the case.
17      Q.  Got it.
18          So, in fact, F.I.T. and the union do
19  not have to agree in order for an F.I.T.
20  unionized employee to be fired, right?
21      A.  Correct.
22      Q.  So, you as an HR director that
23  drives whether or not an F.I.T. employee gets
24  fired, if you believe strongly enough that
25  that employee should be fired, you could take

42

C. GLASS

1  it all the way to the top, right?
2      A.  If the facts of the case warrant
3  that.
4      Q.  So, your answer is yes, right?
5      A.  I can.
6      Q.  Got it.
7          So F.I.T.'s disciplinary process as
8  it relates to unionized employees and whether
9  or not they get terminated rests with you and
10  your decisionmaking about whether to press
11  the charges against that employee; is it fair
12  to say?
13          MR. MELITO:  Objection.
14      A.  No.
15      Q.  Okay.
16          Who else is it apply to at F.I.T.?
17      A.  I consult with many people to make a
18  fair determination about appropriate possible
19  discipline.  My ultimate goal is resolution
20  of the problem.
21      Q.  I understand you consult with many
22  people, but at the end of the day it is your
23  choice whether to seek charges against the
24  unionized employee or not; is that correct?

43

C. GLASS

1
2          MR. MELITO:  Objection.
3      A.  I don't make that in a vacuum; so,
4  no.  I don't agree with that statement.
5      Q.  Well, does someone outrank you on
6  the determination about whether to seek
7  charges for a unionized employee to be
8  terminated?
9      A.  So -- again, I'm trying to
10  understand your question.
11          MR. SELLS:  Can you repeat the
12  question.
13      Q.  And just tell me -- when you listen
14  to the question tell me what about the
15  question you do not understand.
16          (Whereupon, the requested
17  portion of the transcript was read
18  back.)
19      A.  So you're differentiating in the
20  process; because ultimately the president
21  determines what the discipline is.  You are
22  differentiating about my role; is that
23  correct?
24      Q.  Did you hear the question?  My
25  question was, Does anyone outrank you at

44

C. GLASS

1
2  F.I.T. on making the determination of whether
3  to seek charges for an employee to be
4  terminated?  Does someone have more authority
5  than you as it relates to union employees?
6          MR. MELITO:  Objection.
7      A.  It's ultimately my responsibility.
8      Q.  Got it.
9          What is the purpose -- under
10  F.I.T.'s disciplinary process, what is the
11  purpose for it?
12          MR. MELITO:  Objection.
13          MR. DRANOFF:  Objection to the
14  form.
15      A.  The disciplinary process was
16  negotiated.  I was not there when it was
17  negotiated, so I can only assume the intent
18  is to ensure resolution of issues in the
19  workplace.
20      Q.  What is the definition of discipline
21  as relates to F.I.T.'s workplace?
22          MR. DRANOFF:  Object to the
23  form.
24          MR. MELITO:  Objection.
25      A.  You're asking what the purpose of

45

```
1                    C. GLASS
2    discipline is?
3         Q.   I'm asking what the definition of
4    discipline is.
5              MR. MELITO:  Objection.
6         A.   I believe it is defined within the
7    contract in Section 28 that discipline in
8    terms of written warnings, suspension,
9    termination may occur for issues of
10   performance, misconduct.
11        Q.   That's the definition as far as you
12   recall?
13        A.   We could look at the contract
14   language.  I believe that is a summary of it,
15   yes.
16        Q.   As it relates to why discipline
17   imposed for those things -- misconduct,
18   performance issues, whether it's suspension
19   or termination -- what's the point of it for
20   F.I.T.?  Why is it there --
21        A.   To resolve --
22             MR. MELITO:  Objection.
23        A.   To stop the behavior.
24        Q.   Stop the behavior.  Okay.
25             In terms of investigating issues of
```

46

```
1                    C. GLASS
2    potential discipline, how quickly is that
3    supposed to be done?
4         A.   As soon as possible.
5         Q.   Why is that?
6         A.   In order to understand what
7    happened, so that memories of those who
8    observed things or were involved are clear
9    and documented.
10        Q.   Is there a concern at F.I.T., as it
11   implements it's disciplinary process, that an
12   employee who is accused of something or who
13   has potential discipline looming over their
14   head that it be resolved as quickly as
15   possible?
16        A.   That is our goal.
17        Q.   And why, why don't you want issues
18   of discipline hanging over an F.I.T.
19   employee's head for an extended period of
20   time?
21        A.   It's a disruption to all parties.
22        Q.   And in terms of the disruption when
23   you have this aura of discipline hanging over
24   someone's head, is that something that could
25   cause tension?
```

47

```
1                    C. GLASS
2              MR. MELITO:  Objection.
3         A.   I think "discipline" is a
4    contentious issue.
5         Q.   And is it true that the longer the
6    issue remains open the more contention, the
7    more tension in general it can cause?
8              MR. MELITO:  Objection.
9         A.   Depends on the situation.
10        Q.   Okay.
11             Well, tell me a situation where you
12   think it could cause ongoing tension when it
13   is not dealt with in a quick manner.
14             MR. DRANOFF:  Object to the
15             form.
16             MR. MELITO:  Objection.
17             And this is outside the scope,
18             so this would be in Dr. Glass's
19             personal capacity, not as a 30(b)(6).
20        A.   If discipline is -- if the process
21   of the discipline is not -- the length of the
22   process can cause disruption and stress to
23   the parties involved.
24        Q.   That is especially true if there are
25   two F.I.T. employees involved, one complained
```

48

```
1                    C. GLASS
2    against the other, and they have to work
3    together on a daily basis; isn't that
4    correct?
5              MR. MELITO:  Objection.
6              Outside the scope of the 30(b)(6).
7              Objection to form.
8              She may answer in her personal
9              capacity.
10             MR. DRANOFF:  Objection to form
11             as well.
12        A.   My experience has been to ensure
13   that both parties are able to either continue
14   work together or provisions are made so that
15   they do not have to encounter each other
16   unless absolutely necessary.
17             Again, discipline is a process.
18        Q.   When you say discipline is a
19   process; what do you mean by that?
20             MR. MELITO:  Objection.
21             Outside the scope of the
22             30(b)(6).  I will note for the record
23             that, Derek Sells only noted that
24             this deposition as a 30(b)(6); and in
25             her personal capacity, she may
```

49

C. GLASS

2    answer.
3        Q.  Can you answer the question, please?
4        A.  Please repeat the question.
5            (Whereupon, the requested
6        portion of the transcript was read
7        back.)
8        A.  When there is an offense, there is a
9    process of investigation of review that
10   determines what the outcome will be.
11       Q.  And as part of F.I.T.'s disciplinary
12   process is -- and this relates to complaints
13   of discrimination from one F.I.T. employee
14   against another or maybe multiple -- what
15   steps is F.I.T. supposed to take in a
16   situation where the complaint maker who is an
17   F.I.T. employee makes a race discrimination
18   complaint against another F.I.T. employee and
19   they work in the same office?  What is the
20   process for F.I.T. to determine whether or
21   not these two can continue working together
22   while the complaint is being investigated to
23   ensure that the tension as you talked about
24   and stress and disruption does not affect the
25   workplace?

50

C. GLASS

2        MR. MELITO:  Objection.
3        A.  Decisions regarding discrimination
4    complaints are not within my purview; so I
5    don't make those decisions about the
6    individuals involved in that issue.
7        Q.  I'm sorry.  You just said that --
8        A.  Race --
9        Q.  -- decisions related to race
10   complaints do not fall under your purview; is
11   that what you said?
12       A.  The investigation.  So if there is a
13   complaint, it would go to the Title 9 officer
14   who would do the investigation.
15           If the investigation warranted
16   discipline, it would come back to me for
17   discipline.
18       Q.  Right.
19           Well, isn't that part of the
20   disciplinary process when someone is accused
21   of violating policy of F.I.T. that it could
22   end up being a disciplinary matter?
23       A.  Yeah, it could.
24       Q.  Right.
25           And so, as long as that

51

C. GLASS

2    investigation is open, as we just talked
3    about, you have an employee who's had a
4    complaint made against them that could end up
5    in a disciplinary setting; isn't that right?
6        A.  It could.
7        Q.  And that causes stress and
8    disruption the longer it takes for that
9    situation, that complaint to be resolved,
10   correct?
11       MR. MELITO:  Objection.
12           This is in her personal
13       capacity outside the scope of the
14       30(b)(6).  Objection to form.
15           I'll also note for the record
16       that this witness is only -- was only
17       designated to speak about the
18       following 30(b)(6) topics, employee
19       discipline and then employee
20       upgrades; everything outside is
21       outside the scope of the 30(b)(6).
22       A.  I believe what you are referring to
23   is when -- when there is a complaint, who
24   decides the timeline or the circumstances
25   during the investigation?

52

C. GLASS

2        Q.  That's not what I am asking.
3        A.  Then I need you to be more clear.
4        MR. SELLS:  Can you repeat my
5        question.
6        Q.  Please listen to my question.
7            (Whereupon, the requested
8        portion of the transcript was read
9        back.)
10       Q.  Did you get the question now, or do
11   you need me to repeat it?
12       A.  Please repeat it.
13       Q.  Okay.
14           So as part of a potential
15   disciplinary action under F.I.T.'s policy, if
16   an employee has a complaint made against them
17   by another employee that they have acted in
18   either a discriminatory or retaliatory
19   fashion that that employee could face
20   discipline; is that correct?
21       MR. DRANOFF:  Object to the
22       form.
23       A.  If there is a complaint, an employee
24   could face discipline.
25       Q.  Right.

53

```
1                    C. GLASS
2          And in a situation where there is a
3    complaint of discrimination and/or
4    retaliation based on the complaint of
5    discrimination, you indicated in the first
6    instance that it is the Title 9 coordinator
7    or the Affirmative Action person that would
8    investigate; is that correct?
9         A.  Yes.
10        Q.  And during that investigation the
11   employee who has had the complaint made
12   against them understands that there is
13   possible discipline if during the course of
14   the investigation it is determined that they
15   either discriminated or retaliated; is that
16   right?
17             MR. MELITO:  Objection.
18        A.  I don't know that I can speak for
19   every employee's reaction or understanding.
20        Q.  So, there is an employee manual at
21   F.I.T.; is there not?
22             MR. MELITO:  Objection.
23        A.  There is a collective bargaining
24   agreement.
25        Q.  But there is also an employee manual
```

54

```
1    at F.I.T.; is there not?
2         A.  Yes.
3              MR. MELITO:  Objection.
4         Q.  And in the F.I.T. employee manual,
5    it says that discrimination and retaliation --
6    discrimination based on race as well as
7    retaliating against an employee who makes a
8    complaint about race is subject to
9    discipline, right --
10             MR. DRANOFF:  Objection --
11        Q.  -- up to and including termination,
12   right?
13             MR. MELITO:  Objection.
14        A.  F.I.T. has a policy, a
15   non-discrimination policy.
16        Q.  And an employee who violates that
17   policy can be terminated; is that correct?
18        A.  May be terminated.
19        Q.  Right.
20             And that is told to the employee in
21   the employee's manual, correct?
22             MR. MELITO:  Objection.
23        A.  It is stated in the manual.
24        Q.  Right.
```

55

```
1                    C. GLASS
2          So an employee who is now accused of
3    discriminating and/or retaliating against
4    someone based on race or complaints of racism
5    understands that if they are found as part of
6    the investigation to have committed one or
7    the other violation, they can be disciplined
8    up to and including termination, right?
9              MR. MELITO:  Objection.
10        A.  If they understand the policy.
11        Q.  Well, F.I.T. makes sure that the
12   employees that work for the college sign an
13   acknowledgement that they have received the
14   manual; isn't that right?
15        A.  Yeah, that's --
16             MR. MELITO:  Objection.
17        Q.  So, now if an employee receives the
18   manual, they understand that they are subject
19   to possible discipline because one of their
20   colleagues made a complaint of racism against
21   them and they work together.  The longer that
22   situation, that investigation is open, the
23   more stressful it could be for these two
24   employees to work together; isn't that
25   correct?
```

56

```
1                    C. GLASS
2              MR. MELITO:  Objection to form
3         and also, again, I object this is
4         outside the scope of the 30(b)(6).
5         She may answer in her personal
6         capacity.
7         A.  I think it depends on the people
8    involved whether they knew the complaint
9    existed, what their relationship was;
10   multiple factors that would contribute or not
11   to stress.
12        Q.  So my point, my question is, Because
13   there's this possibility of a very stressful
14   and disruptive working environment where you
15   have one employee making a discrimination
16   complaint against another employee, they work
17   together in the same office; what does F.I.T.
18   under it's disciplinary policy, what steps
19   does it take to ensure that those two
20   employees working together while this
21   potential disciplinary issue gets resolved,
22   what does F.I.T. do to ensure that the
23   relationship between those two employees does
24   not get inflamed to the point where a
25   confrontation or some other issue might
```

57

```
 1              C. GLASS
 2    occur?
 3              MR. MELITO:  Objection to form
 4         and also object to outside the scope
 5         of the 30(b)(6).
 6         A.  Again, I -- I -- I think that it
 7    depends on the relationship, the supervisors
 8    who observed the two interactions and whether
 9    the employee even knows that there was a
10    complaint filed against them.  I don't even
11    know that.
12         Q.  My question is, What is F.I.T.'s
13    policy; what does F.I.T. do to make sure that
14    things are okay between these two employees
15    as the investigation is ongoing?
16         A.  I think that's a matter --
17              MR. MELITO:  Object.  I'm
18         sorry.  Let me just object.  This is
19         outside the scope of the 30(b)(6).
20              You may answer in your personal
21         capacity.
22         A.  It would depend on the circumstances
23    of the situation, the relationship and any
24    observed, you know, issues that were -- that
25    were observed.
```

58

```
 1              C. GLASS
 2              Again, I -- I can't speculate as to
 3    what we would do.  Every human interaction is
 4    different.
 5         Q.  Okay.
 6              So, I guess the answer to your
 7    question is that F.I.T. does not have a policy
 8    of how to ensure that two employees that are
 9    working together where one made a race
10    complaint or retaliation complaint against the
11    other, how you to make sure that those two are
12    able to co-exist in the same office; is that
13    right?
14              MR. MELITO:  Objection to form,
15         and objection to outside the scope of
16         the 30(b)(6).
17         A.  In a situation where two employees
18    are working together and there is discord,
19    the college would provide support and
20    resources if there was an identified issue
21    between the two in terms of separation or
22    other kinds of accommodations in order to
23    ensure both parties can work together --
24         Q.  I --
25         A.  -- during the period.
```

59

```
 1              C. GLASS
 2         Q.  So if I understand your answer
 3    correctly, F.I.T.'s policy is a wait and see
 4    policy and until there is some disruption or
 5    some discord between the complainant and the
 6    person who has been complained about, F.I.T.
 7    will take no action and assume that
 8    everything is okay; is that right?
 9              MR. MELITO:  Objection to form,
10         and also objection to outside the
11         scope of the 30(b)(6).  She can
12         answer in her personal capacity.
13         A.  Yeah, I don't believe that it is a
14    wait and see until that is problem.  Again,
15    every situation is different.
16         Q.  Well, tell me a situation under
17    F.I.T.'s policy where they wouldn't wait and
18    see and that they would take some affirmative
19    step if one person made a race complaint
20    against another and yet they worked in the
21    same office space; what would F.I.T. do other
22    than wait and see?
23              MR. MELITO:  Objection to form,
24         and objection to outside the scope of
25         this 30(b)(6).  She may answer in her
```

60

```
 1              C. GLASS
 2    personal capacity.
 3         A.  It depends on a situation.  If the
 4    two parties were -- it was determined that
 5    one requested to not be in the same area, we
 6    have made accommodations for workplace moves,
 7    physical space moves in order to accommodate
 8    those situations during an investigation,
 9    which we try to expedite to the extent that
10    we can based on resources.
11         Q.  So, it would have to be a request by
12    one or the other participants in the
13    complaint before F.I.T. would take a step; is
14    that correct?
15              MR. MELITO:  Objection.
16         A.  Not necessarily.
17         Q.  Not necessarily.  So tell me another
18    situation where F.I.T. -- under F.I.T.'s
19    policies where F.I.T. would take the
20    preventative step of having disruption or
21    some other discord between a race complainant
22    and the recipient of the complaint or the
23    target of the complaint, when would F.I.T.
24    under its policy be proactive and say before
25    it goes anywhere, we're gonna separate these
```

61

```
1               C. GLASS
2    folks?
3           MR. MELITO:  Objection to form;
4    and Derek, would you stipulate to
5    this line of questioning that this is
6    out -- I'll make a --
7           MR. SELLS:  I'm not
8    stipulating.  No, I'm not stipulating
9    to that, Nicholas.
10          MR. MELITO:  No.  No.  No.  Let
11   me rephrase, Derek.  Just so I'm not
12   keep interrupting this line of
13   questioning, I will make a standing
14   objection that this line of
15   questioning is outside the scope of
16   the 30(b)(6).  Will you agree to that
17   standing objection, and I will not
18   raise that objection in this line of
19   questioning?
20          MR. SELLS:  You are going to do
21   whatever you want to do.  Okay.  Keep
22   going.
23          MR. MELITO:  Well, that's --
24          MR. SELLS:  Can we get an
25   answer?  I'm not here to talk about
```

62

```
1               C. GLASS
2    your objections.  I'm here to ask
3    questions.
4           MR. MELITO:  I'll have to keep
5    objecting to outside the scope of the
6    30(b)(6).  Go ahead.
7      Q.   Do you know the question, Ms. Glass?
8      A.   No.
9      Q.   No.  You lost it because of all the
10   nonsense.
11          MR. SELLS:  All right.  Can you
12   just read it back, Lesley.
13          (Whereupon, the requested
14   portion of the transcript was read
15   back.)
16          MR. MELITO:  I'll renew my
17   objection.
18     A.   Again, I can't speculate as to a
19   scenario, and I can't think of one that will
20   help me answer your question.
21          MR. DRANOFF:  Do you folks mind
22   if we take just a quick five-minute
23   break?
24          MR. SELLS:  I don't mind at
25   all.
```

63

```
1               C. GLASS
2           (Whereupon, a brief recess was
3      taken at 11:26 a.m.; after which, the
4      proceedings continued at 11:36 a.m.
5      as follows.)
6           MR. SELLS:  Back on the record.
7      Q.   Ms. Glass, in terms of discipline is
8    an employee suspension considered
9    disciplinary?
10     A.   Yes.
11     Q.   When a disciplinary act of
12   suspending an employee is based on
13   allegations of race discrimination or
14   retaliation, does the suspension come from
15   you in HR or does it come from the
16   Affirmative Action Office?
17     A.   Are you referring to a paid
18   suspension under the contract pending the
19   investigation or suspension as a disciplinary
20   action?  Because a paid suspension during
21   investigation is technically not discipline
22   until there's an investigation.
23     Q.   If someone is put on a paid
24   suspension pending a disciplinary action,
25   that's not considered discipline; is that
```

64

```
1               C. GLASS
2    correct?
3      A.   No, not until there are charges and
4    a determination.
5      Q.   Right.
6           And that's for union employees; is
7    that right?
8      A.   Yes.
9      Q.   Are all employees at F.I.T.
10   unionized?
11     A.   98 percent.
12     Q.   Who are the 2 percent that are
13   not --
14     A.   Administrators.
15     Q.   Administrators; what about deans?
16     A.   Deans are not.
17     Q.   If a dean were to be suspended based
18   on allegations of race discrimination, would
19   that come from your office or would that come
20   from the Affirmative Action Office?
21     A.   A complaint would go to the
22   Affirmative Action Office, and then they
23   would consult with me.  I haven't had one,
24   so -- where there was a suspension involved,
25   so...
```

65

C. GLASS

2    Q.  What did you just say?
3    A.  I haven't had a suspension -- a case
4  where there was a suspension based on a race
5  claim, so...
6    Q.  Who is Kyle Farmer?
7    A.  Oh, Kyle Farmer.
8    Q.  Oh, Kyle Farmer.  Yeah, yeah.  Oh.
9  Is there something funny?  I see you laughing
10  now.
11    A.  No.  I -- I -- I -- I mean, that's a
12  big case.
13        MR. MELITO:  Objection.
14    A.  How could you forgot that?
15    Q.  Wow.  Yeah.  That's a big case.  How
16  do you forgot that one?
17    A.  Right.
18    Q.  Right?
19        MR. MELITO:  Objection.
20    Q.  What about him?  How did he get --
21  he was suspended, was he not?
22    A.  Yes, he was suspended.
23    Q.  And you're saying that it was the
24  Affirmative Action Office that investigated
25  that, right?

66

C. GLASS

2        MR. MELITO:  Objection.
3    A.  No, actually that was an outside law
4  firm that investigated that one.
5    Q.  But the decision to suspend him was
6  made by who?
7        MR. MELITO:  Objection.  To
8      extent it calls for attorney/client
9      privilege, if it -- do not reference
10      anything that you know about that
11      investigation with the outside law
12      firm.
13    A.  No.
14    Q.  Whose decision was it to suspend
15  him?
16        MR. MELITO:  Again, objection.
17      To the extent it implicates
18      attorney/client privilege, I instruct
19      the witness not to answer.
20    Q.  You could answer the question.
21        MR. MELITO:  You cannot answer
22      the question.
23        I'm specifically instructing
24      her not to answer based off of
25      attorney/client privilege.

67

C. GLASS

2    Q.  Wait.  So let me ask you this.
3        Under F.I.T.'s disciplinary process,
4  the decision to discipline an employee, can
5  it be based upon the instructions of lawyers,
6  of outside lawyers?  Does it say anywhere in
7  F.I.T.'s policies that that's the way it
8  conducts or makes decisions about
9  disciplining employees?
10        MR. MELITO:  Objection.
11    A.  (No Response.)
12    Q.  You could answer.
13    A.  I don't recall anything in policy
14  that speaks to that.
15    Q.  Right.
16        The decision is made by you; isn't
17  that right?
18        MR. MELITO:  Objection.
19    A.  Are you speaking generally or with
20  regards to Kyle Farmer?
21    Q.  Well, let's talk generally.
22  Generally, how does it work?
23    A.  I am responsible for reviewing the
24  case and consulting with all parties involved
25  and making the decision to put someone on a

68

C. GLASS

2  paid suspension, if necessary, pending an
3  investigation and charges or -- yeah, really
4  that's it.  I'm responsible for reviewing
5  initially what we know and making a decision
6  to put someone on a paid leave.
7    Q.  And do you have to get the approval
8  of the president?
9    A.  I consult with the president.
10    Q.  Got it.
11        And so it was your decision to put
12  Kyle Farmer on a paid suspended leave; is
13  that correct?
14        MR. MELITO:  Objection.
15    A.  No, I'm not gonna respond to
16  questions about Kyle.
17    Q.  Why is that?
18    A.  Because my -- our attorney advised
19  me not to --
20        MR. MELITO:  I --
21        MR. SELLS:  No, no, no.
22    Q.  He didn't say that.  What he said --
23        MR. MELITO:  Just give me --
24        MR. SELLS:  Excuse me.
25    Q.  What he said to you was do not

69

C. GLASS

1
2    answer if it calls for an answer that would
3    reveal attorney/client privilege.  Now if you
4    did not consult with a lawyer, if a lawyer
5    did not advise you to put Kyle Farmer on a
6    paid suspended leave, then you could answer
7    the question.
8             MR. MELITO:  If you would like
9        me to go off the record and just
10       distinguish between attorney/client
11       privilege with the witness, I'm more
12       than happy to.  Would you like me to
13       take five minutes?
14            MR. SELLS:  No, I don't.
15            MR. MELITO:  So again, to the
16       extent a question does not implicate
17       any advice from outside counsel or
18       your GC's office, your general
19       counsel's office, you may answer.
20       A.  The entire Kyle Farmer situation was
21   involving inside and outside counsel; so I'm
22   not comfortable answering anything related to
23   this.
24       Q.  When you say "the entire Kyle Farmer
25   incident," what incident are you talking

70

C. GLASS

1
2    about?
3        A.  The one I assume that you're
4    referring to in terms of the fashion show
5    complaint --
6        Q.  Tell me about that.  What happened
7    at the fashion show?
8        A.  I think you already know that.  Why
9    are you asking me?
10       Q.  Please, answer the question.
11       A.  See, this is where it gets to be you
12   badgering me.  This is really uncalled for.
13       Q.  You call it "badgering" because I am
14   asking you about your understanding of the
15   fashion show incident; is that right?  'Cause
16   I am asking you --- just because---
17            MR. SELLS:  Off the record.
18            (Whereupon, an off-the-record
19       discussion was held at 11:37 a.m.; after
20       which, the requested portion of the
21       transcript was read back and the
22       proceeding continued at 12:33 p.m. as
23       follows.)
24       A.  No, I am not opposed to answering
25   questions about the Kyle Farmer incident.  I

71

C. GLASS

1
2    was actually not involved in the majority of
3    the case nor the investigation and that's why
4    initially, when you asked me for an example,
5    that one did not come to mind; 'cause I did
6    not -- I was not responsible for that case
7    all the way through the legal proceedings and
8    the ultimate process.
9             So, do you still want me to --
10       go ahead.
11       Q.  So, you're saying that the only
12   reason that the Kyle Farmer incident did not
13   come to mind was because you didn't come here
14   today expecting to answer any questions about
15   Kyle Farmer; is that correct?
16            MR. MELITO:  Objection.
17       A.  That's correct.
18       Q.  Okay.
19            But you did come here expecting to
20   answer questions about Mary Davis, right?
21            MR. MELITO:  Objection.  To the --
22       objection.
23       A.  No, actually I did not; either.
24       Q.  So, you didn't understand that you
25   were coming to this deposition to answer

72

C. GLASS

1
2    questions about the lawsuit that was brought
3    by Ms. Phillips against in part Mary Davis?
4             MR. MELITO:  Objection.
5        A.  My role as a witness is to college
6    policy and procedure related to discipline
7    and re-evaluation.
8        Q.  You're answering questions about
9    your role as well in this case; you are not
10   aware of that?
11            MR. MELITO:  Objection.
12       A.  As it's relates to procedure.
13       Q.  Okay.
14            But one of the things that
15   Ms. Phillips did was she raised a complaint
16   of discrimination, race discrimination; isn't
17   that right?
18       A.  Which was filed in 2018.  I did not
19   come to F.I.T. until one month before the
20   complaint against Marilyn was made; so I was
21   not involved in her complaint -- initial
22   complaint of race discrimination.
23       Q.  All right.
24            But that complaint was still open at
25   the time that you came on board, right?

73

C. GLASS

1
2   A.  Correct.
3   Q.  So Ms. Phillips had this open
4   complaint of discrimination at the time that
5   you came in, which was in April of 2019,
6   right?
7   A.  Yes.
8   Q.  Then in May of 2019 was when
9   Ms. Phillips made another complaint about
10  Ms. Barton retaliating against her for
11  bringing that complaint of race
12  discrimination, right?
13      MR. MELITO:  Objection.
14  A.  I would -- I came to the college in
15  April of 2019.  The incident happened in May,
16  and I was made aware of the complaint during
17  the initial phase of the investigation of the
18  event between the two employees.  I was not
19  involved in the complaint, the initial
20  complaint nor the investigation of that
21  complaint.
22  Q.  But you know that Mary Davis was
23  Ms. Phillips' supervisor as well as
24  Ms. Barton's supervisor, right?
25  A.  Yes.

74

C. GLASS

1
2   Q.  And you knew that Ms. Phillips had
3   an open complaint of discrimination against
4   Mary Davis, right?
5       MR. MELITO:  Again, objection.
6       This is outside the scope of
7       30(b)(6).  She may answer in her
8       personal capacity.
9       MR. DRANOFF:  I'm going to
10      object to form on that.
11  A.  I was made aware that a complaint
12  was filed.  I was not involved or privy to
13  the complaint as a matter of the Title 9
14  Affirmative Action Office.
15  Q.  Well, when you say that you were
16  "made aware" of it, certainly you have
17  communications with Ms. Kekana; is that
18  correct?
19  A.  Yes.
20  Q.  And you share information between
21  the Affirmative Action Office and the HR
22  Office as it pertains to investigations into
23  complaints of discrimination and/or
24  retaliation; isn't that right?
25      MR. DRANOFF:  Objection.

75

C. GLASS

1
2   A.  When it is appropriate and involves
3   each office.
4   Q.  And there is nothing to prevent you
5   if you are confronted with a situation in May
6   of 2019 involving Ms. Barton or Ms. Davis and
7   Ms. Phillips from speaking to Ms. Kekana
8   and/or getting information from her office as
9   to where her investigation stands or stood,
10  correct?
11      MR. MELITO:  Objection.
12  A.  I could.
13  Q.  All right.
14      And you understand that a complaint
15  of discrimination involves, at least with
16  Ms. Phillips' case, it involved race
17  discrimination, correct?
18      MR. MELITO:  Objection.
19  A.  Yes.
20  Q.  And you understand what race
21  discrimination, some people who act in a
22  discriminatory fashion have potentially a
23  discriminatory motive for their actions;
24  isn't that correct?
25      MR. MELITO:  Objection.

76

C. GLASS

1
2   A.  I -- can you be more specific?
3   Q.  Yes.  Someone who is alleged to have
4   discriminated against another person based on
5   their race or some other characteristic can
6   have a motive for acting in a discriminatory
7   way, right?
8       MR. MELITO:  Objection.
9   A.  I can't answer that question.
10  Q.  And why can't you?
11  A.  I -- I can't make that assumption
12  for others.  I don't know how -- how they
13  would react or not.
14  Q.  I get it.  You don't know what's
15  inside their mind; is that what you are
16  saying?
17  A.  Correct.
18  Q.  So when an investigation takes place
19  about whether or not someone acted in a
20  racially discriminatory way, you would have
21  to look at certain things that are alleged,
22  right?
23      MR. MELITO:  Objection.
24      Outside the scope of a 30(b)(6).
25      If you would like, I'll just

77

```
1                C. GLASS
2      keep this objection standing to this
3      line of questioning not to interrupt --
4           MR. SELLS:  That's fine.
5      That's fine.  You could keep it
6      going.
7      A.  Can you repeat the question?
8           (Whereupon, the requested
9      portion of the transcript was read
10     back.)
11     A.  I would look at certain things that
12     were alleged; what does that mean?
13     Q.  Well, if someone made a complaint,
14     that -- you understand a complaint is just an
15     allegation?
16     A.  Correct.
17     Q.  So in order for your office, HR, or
18     the Affirmative Action Office at F.I.T. to
19     determine whether or not that allegation or
20     that complaint should be substantiated, you
21     would have to look at the nature of the
22     complaint; is that right?
23     A.  Yeah, I would look at --
24          MR. MELITO:  Objection.
25     Q.  You can answer.
```

78

```
1                C. GLASS
2           MR. MELITO:  Go ahead.  You can
3      answer.
4      A.  I would look at the witness
5      statements and get an understanding of -- to
6      the best of my ability what actually
7      happened.
8      Q.  And so in addition to whatever might
9      have come with the witness statements and
10     whatever the allegation may have been, if you
11     have other information that the person who's
12     accused of being discriminatory that will
13     help support a discriminatory motive, you
14     would look at that as well, correct?
15          MR. MELITO:  Objection to form.
16     A.  At that time, there was no
17     relationship between the two and it was being
18     handled by another office; so, no.
19     Q.  Right.
20          So did you understand that
21     Ms. Phillips had made a complaint against
22     Kyle Farmer that Kyle Farmer had made a
23     racist comment to her; you were aware of
24     that, right?
25     A.  Not --
```

79

```
1                C. GLASS
2           MR. MELITO:  Objection.
3      A.  Yeah, I'm not sure at what point in
4      the investigation.  That was -- Ms. Kekana's
5      investigation involved that allegation, and
6      it was -- I did become aware of it at some
7      point.
8      Q.  Okay.
9           So you have this situation, let's
10     take Kyle Farmer, where he was alleged to
11     have been acting in a racially discriminatory
12     way by making statements to Ms. Phillips.
13     And then it comes to your attention this
14     fashion show, right; that's the chronology;
15     Ms. Phillips's complaint and then you had to
16     look at Mr. Farmer in connection with this
17     fashion show; is that right?
18     A.  That was --
19          MR. MELITO:  Objection.
20     A.  -- accurate.
21     Q.  Okay.
22          And so when the second complaint
23     comes against Kyle Farmer related to the
24     fashion show, what is it that you can recall
25     the complaint involved?
```

80

```
1                C. GLASS
2           MR. MELITO:  Objection.
3           MR. DRANOFF:  Object to the
4      form.
5      A.  The complaint against Kyle Farmer
6      involved a fashion show that allowed the use
7      of inappropriate accessories.
8      Q.  Were you in attendance at that
9      fashion show?
10     A.  I was not.
11     Q.  How did you learn about that fashion
12     show?
13     A.  I don't recall.
14          MR. SELLS:  Can we pull up
15     Exhibit 31 please.
16          (The image is shared on the
17     computer screen.)
18          MR. SELLS:  It is actually
19     Exhibit 32.
20          (The image is shared on the
21     computer screen.)
22     Q.  As you can see, Exhibit 32 is the
23     New York Post article from February 18th,
24     2020.  Do you see that, Ms. Glass?
25     A.  Yes.
```

81

C. GLASS

1
2      Q.  Is this the fashion show that you
3  were talking about?
4      MR. DRANOFF:  Objection.
5      A.  Yes.
6      Q.  Do you see the accessories that are
7  on this particular model in the photograph?
8      A.  Yes.
9      Q.  Do see the title of the article
10  says, "F.I.T. apologizes for clearly racist
11  alumni fashion show."  Do you see that?
12     A.  I see that.
13     Q.  In quotes is "clearly racist"; do
14  you see that?
15     A.  I do.
16     Q.  All right.
17          And is it true that that phrase,
18  "clearly racist" that is in quotes; did that
19  come from the president of the school?
20     MR. MELITO:  Objection.
21     A.  I don't know.
22     Q.  Well, did you have any part in
23  crafting a statement or letter that President
24  Brown issued following the fashion show?
25     A.  I did not.

83

C. GLASS

1
2  accessory.
3      Q.  Tell me exactly what you mean by
4  that issues were raised, they were not heeded
5  and as a result you believe this to be
6  racist?
7      MR. MELITO:  Objection.
8      Outside the scope of the 30(b)(6).
9          You may answer in a personal
10         capacity.
11     A.  I was not there.  I was not involved
12  in the fashion show; so, all I know is what I
13  heard and read in the newspapers and that
14  students raised objections to the use of the
15  accessories and they were instructed to use
16  them anyway; and that was inappropriate and
17  the interpretation of this is inappropriate.
18     Q.  Now, when you say "inappropriate,"
19  do you mean that the depiction of the lips --
20  'cause you used the term "accessories," the
21  lips accessories, do you believe that to be
22  racially offensive against African-Americans?
23     MR. MELITO:  Objection.  Again,
24     this is a standing objection.  This
25     is outside the scope of the 30(b)(6).

82

C. GLASS

1
2      Q.  Okay.
3          Do you believe that this photograph
4  is depicting this model with those
5  accessories; do you believe that it is
6  clearly racist?
7      MR. MELITO:  Objection.  Out of
8      the scope of the 30(b)(6), to form.
9      She may answer in her personal
10         capacity.
11     A.  I don't think that my personal
12  opinion is relevant.
13     Q.  You might not, But I'm asking you a
14  question.  Do you think that it is clearly
15  racist?
16     MR. MELITO:  Same objection.
17     A.  I think it is absolutely
18  inappropriate.
19     Q.  And why?
20     MR. MELITO:  Objection.  Again,
21     this is in her personal capacity.
22     A.  Because my understanding of the
23  situation is that issues were raised and
24  concerns were raised but not heeded, and no
25  action was taken to change the use of the

84

C. GLASS

1
2      Any responses are in her personal
3         capacity.
4      A.  (No Response.)
5      Q.  You could answer.
6      A.  I think it can be interpreted as
7  offensive to people of color.
8      Q.  What about the ears?  Do you think
9  that the ears likewise --- the accessories of
10  the ears, do you believe that could be
11  offensive, seen as offensive against people
12  of color?
13     A.  Yes --
14     MR. MELITO:  Same objection.
15     MR. SELLS:  We can take down
16     the document.
17     Q.  When you say that objections were
18  raised before the fashion show, what is your
19  understanding of how those objections came
20  about and who were they made to?
21     MR. MELITO:  Objection.
22     Would you agree that this line
23     of questioning outside -- well, just
24     note my objection.  Moving forward so
25     I do not keep interrupting, this is

85

C. GLASS

1
2     outside the scope of the 30(b)(6).  I
3     will only raise form objections.
4          MR. SELLS:  You have the
5     ability to not object.  You don't
6     have to object.  I will assume that
7     you have objected to this line of
8     questioning.  I don't agree with it;
9     but I assume that you have the
10    objection.
11         MR. MELITO:  Thank you.
12    Q.  Do you need the question read back,
13    Dr. Glass?
14    A.  Yes, thank you.
15         (Whereupon, the requested
16    portion of the transcript was read
17    back.)
18    A.  My understanding is that students
19    raised objections to the producer and the
20    faculty member.
21    Q.  When you say that they raised these
22    objections, did they raise them before the
23    show or at some other point in time or both?
24    A.  I understood it to be before the
25    show.

86

C. GLASS

1
2     Q.  Okay.
3          Who was the faculty member that
4     received the complaints?
5     A.  Kyle Farmer.
6     Q.  And what was Mr. Farmer's response
7     to the students?
8          MR. MELITO:  Objection to form.
9     A.  I don't know.
10    Q.  Okay.
11         Well, obviously whatever the
12    complaints were made, Mr. Farmer didn't see
13    fit to stop the show, correct, or to stop the
14    accessories from being used; is that correct?
15         MR. MELITO:  Objection --
16    A.  The show continued -- yeah, sorry.
17    Q.  And is that why you decided to
18    suspend Mr. Farmer?
19         MR. MELITO:  Objection to form.
20    A.  So, my role in this particular case,
21    I was guided by legal counsel; and I do
22    remember now that the letter of paid
23    suspension pending investigation to Kyle was
24    from me under the advice of legal counsel.
25         MR. MELITO:  Just note for the

87

C. GLASS

1
2     record to the extent any
3     attorney/client privilege was just
4     implicated, that is not waived.
5     Q.  All right.
6          Now, who was Kyle Farmer's
7     supervisor at F.I.T. at the time that this
8     fashion show took place?
9     A.  Dean Mary Davis.
10    Q.  And do you know if Dean Davis had
11    any role in the fashion show?
12    A.  Yes.
13    Q.  And what was her role?
14    A.  The primary administrator of the
15    School of Graduate Studies.
16    Q.  And as the primary administrator for
17    Graduate Studies, what was her role
18    specifically with the fashion show?
19    A.  Actually, I'm not sure of the
20    detail.  Again, as the primary administrator,
21    she had oversight of all the degree programs
22    and activities.
23    Q.  Got it.
24         And isn't it true that not only was
25    Kyle Farmer suspended, but so was Mary Davis?

88

C. GLASS

1
2     A.  Correct.
3     Q.  Was it you who suspended Mary Davis
4     as well?
5          MR. MELITO:  Objection.
6     A.  The letter came from me, yes, for a
7     paid suspension pending investigation.
8     Q.  And why did you agree to send that
9     letter to Mary Davis?
10         MR. MELITO:  Objection to the
11    extent it calls for attorney/client
12    privilege.
13         Again, sorry.  To the extent
14    that it calls for attorney/client
15    privilege, do not answer.
16    Q.  Okay.
17         You could answer otherwise.
18         MR. MELITO:  If it would
19    implicate attorney/client privilege,
20    you could state that for the record.
21         THE WITNESS:  Oh, okay.
22    A.  That would fall under
23    attorney/client privilege.
24    Q.  Okay.
25         So am I to understand my question --

89

C. GLASS
2  because my question to you is, Why did you
3  agree to send the letter to Mary Davis --
4      A.  Yeah, I --
5      Q.  -- so you're saying that would
6  implicate attorney/client privilege?
7          MR. MELITO:  Objection.
8      A.  Correct.
9      Q.  Okay.
10         So I thought earlier in the
11 deposition you indicated in response to one
12 of my questions that you would follow your
13 employer's instructions or anyone's
14 instructions that you agreed with.  Is that
15 the case?
16         MR. MELITO:  Objection.
17     A.  I would hope that I would always
18 agree; but yes.
19     Q.  And so did you agree that the
20 suspension of Mary Davis was appropriate?
21     A.  I agreed that the suspension of paid
22 suspension consistent with process was
23 appropriate.
24     Q.  And you agreed with Kyle Farmer's
25 suspension as well; is that correct?

90

C. GLASS
2      A.  Yes.
3      Q.  Now as it relates to both Ms. Davis
4  and Mr. Farmer, is it true that neither of
5  them are union members?
6      A.  Correct --
7          MR. MELITO:  Objection.
8      Q.  And is the policy the same as it
9  relates to suspension with pay as it is not
10 deemed to be a disciplinary act?
11     A.  Kyle Farmer was a union member.
12     Q.  Oh, he was.  All right.
13         But Dean Davis was not, correct?
14     A.  Correct.
15     Q.  Was any discipline administered to
16 either Dean Davis or Kyle Farmer as a result
17 of the fashion show or some other reason?
18     A.  Yes.
19     Q.  With regard to Kyle Farmer, what
20 discipline was administered?
21     A.  He was charged and went through the
22 de-tenure process, which went to the board
23 and was ultimately de-tenured.
24     Q.  Okay.
25         Did he lose his job at F.I.T.?

91

C. GLASS
2      A.  Yes.
3      Q.  Is that what you mean by "the
4  de-tenure process"?
5      A.  Yes, anyone who is -- achieved
6  tenure has a higher threshold for
7  termination; and there is a process they go
8  through under the tenure law for separation.
9      Q.  Now, how is it determined that
10 Mr. Farmer should be charged?
11     A.  That would fall under
12 attorney/client privilege.
13     Q.  Okay.
14         Well, Mr. Farmer is part of the
15 union, correct?
16     A.  Correct.
17     Q.  So, was the same process that you
18 described earlier followed whereby you would
19 first have to consult with the union, that
20 the union would or would not agree to what
21 was contained in the charge and then action
22 taken?
23     A.  Correct.
24     Q.  So you're saying that in Mr. Farmer's
25 case, a different process was followed; is

92

C. GLASS
2  that correct?
3          MR. MELITO:  Objection.
4      A.  I followed the collective bargaining
5  agreement.
6      Q.  Okay.
7          So did you sign Mr. Farmer's
8  charges?
9      A.  I believe I did.
10         MR. SELLS:  We call for the
11     production of the charge sheet that
12     Dr. Glass filled out with regard to
13     Kyle Farmer.
14     Q.  In the charge that you --
15         MR. MELITO:  Follow up with the
16     written request, and we will respond
17     accordingly.
18         MR. SELLS:  Okay.
19     Q.  Now with regard to the charge, do
20 you recall what you put in the charge?
21     A.  I would have to see the document.
22     Q.  Okay.
23         But without seeing the document, as
24 you sit here today do you know what was the
25 basis of you filling out the charge?

C. GLASS

1
2      A. Unprofessional conduct pending --
3   the -- so the charges were -- yeah;
4   inappropriate conduct and I would -- and I
5   would have to read it again.
6      Q. Did any of the charges that you can
7   recall as they related to Mr. Farmer have
8   anything to do with race discrimination or
9   violation of F.I.T.'s policies concerning
10  antidiscrimination?
11     A. Yes, I believe that policy was noted
12  and is part of the charge,
13  antidiscrimination.
14     Q. And so with regard to Mr. Farmer, is
15  it not true then that that allegation of
16  discrimination in violation of the
17  antiharassment policy did not go to the
18  Affirmative Action Office; is that true?
19         MR. MELITO: Objection.
20         You can answer.
21     A. So, again, back to my earlier answer
22  about, you know, the -- the severity of the
23  issue was the OGC was involved immediately,
24  and they engaged an external independent
25  investigation.

C. GLASS

1
2      Q. So, you said the office of -- you
3   used --
4      A. Our internal general counsel, F.I.T.
5   counsel.
6      Q. And why was the internal general
7   counsel, if you know, why were they involved
8   as opposed to the Affirmative Action Office?
9      A. I think the Affirmative Action
10  Office was involved as well --
11     Q. In what way? In what way to your
12  understanding?
13     A. I don't know.
14     Q. Well, what you testified to before
15  was that any complaint on discriminatory
16  conduct by an F.I.T. employee would first be
17  investigated by the Affirmative Action
18  Office; do you remember your testimony on
19  that?
20     A. Yeah, generally that is the case.
21     Q. Okay.
22        So where did this exception come
23  from under F.I.T.'s policy --
24        MR. MELITO: Objection --
25     Q. -- that the internal general counsel

C. GLASS

1
2   would handle race discrimination complaints
3   instead of the Affirmative Action Office,
4   where did that come from?
5         MR. MELITO: Objection.
6         THE WITNESS: Can I answer?
7      Should I?
8         MR. MELITO: Yes. Yes.
9      A. Okay. So, based on the severity and
10  public relations, the times, it was an
11  immediate response that involved legal
12  counsel.
13     Q. And when you say "the severity,"
14  where is there a severity exception in
15  F.I.T.'s policies, if you could just point
16  that out to me?
17     A. I don't believe there is one.
18         MR. MELITO: Objection.
19     Q. I see.
20        So this was just a decision that
21  came about from who; who decided that the
22  internal general counsel would look at this
23  matter as opposed to the Affirmative Action
24  Office?
25         MR. MELITO: Objection.

C. GLASS

1
2      A. I don't know exactly. That's what
3   happened.
4      Q. Well, how did you learn about this
5   exception?
6         MR. MELITO: Objection.
7      A. I don't remember how I learned.
8      Q. So, someone above you made a
9   decision about a potential disciplinary
10  matter and didn't even consult with you; is
11  that right?
12         MR. MELITO: Objection.
13     A. I don't recall.
14     Q. Who was commissioned to do the
15  investigation into the fashion show?
16     A. Our internal counsel secured an
17  outside firm.
18     Q. Do you know who that firm was?
19     A. I don't remember their name.
20         MR. MELITO: Objection.
21     Q. Did they issue a report of any kind
22  related to their investigation?
23     A. They did.
24     Q. What was the result of their
25  investigation?

97

C. GLASS

1
2          MR. MELITO:  Objection.  Calls
3     for attorney/client privilege.
4          MR. SELLS:  I don't think so --
5          MR. MELITO:  It's my
6     understanding --
7          MR. SELLS:  But what we'll do
8     is call for the production of the
9     report that was issued in connection
10    with the investigation.
11         MR. MELITO:  Again, follow up
12    in writing and we'll respond
13    accordingly.
14         MR. SELLS:  We will.
15    Q.  Now, I'm going to ask you questions
16    about Dean Davis.  Again, the decision to
17    suspend with pay Dean Davis, was that
18    something that was decided by someone other
19    than you?
20         MR. MELITO:  Objection.
21    A.  Again, I think that's privileged.
22    Q.  So, the answer would be, yes, right --
23    A.  No -- 'cause I'm not answering --
24    Q.  I'm not asking you who.  I just
25    asked you, Was the decision made by someone

98

C. GLASS

1
2     other than you?
3          MR. MELITO:  Objection.  Calls
4     for attorney/client privilege.
5          MR. SELLS:  No, it doesn't.
6          MR. MELITO:  Again, I think
7     that does.
8     Q.  Let's put it this way.  Did you sign
9     whatever paperwork that was necessary for
10    Dean Davis to be suspended with pay?
11    A.  I did.
12    Q.  Okay.
13         MR. SELLS:  So we call for the
14    production of the suspension.
15    Q.  Now, did you have to fill out
16    charges against Dean Davis?
17    A.  I believe in the suspension letter
18    involved -- included charges.  Dean Davis was
19    an at-will employee.  Did not file -- does
20    not follow the collective bargaining
21    agreement process; she serves at the will of
22    the president.
23    Q.  So, are you saying there were
24    charges or there were not charges?
25    A.  Not charges as we define them in the

99

C. GLASS

1
2     collective bargaining agreement.
3     Q.  But she knew what the allegations
4     were against her; is it fair to say?
5     A.  Yes.
6     Q.  How was she made aware of the
7     allegations against her?
8     A.  In writing.
9     Q.  By who; did you make that writing?
10    A.  That is the letter that I referred
11    to.
12    Q.  And do you recall what you wrote in
13    that letter?
14    A.  That she was being placed on paid
15    suspension pending the investigation and
16    decision for potential discipline.
17    Q.  And did you agree with that
18    decision, to place --
19         MR. MELITO:  Objection --
20    Q.  -- Dean Davis on a paid suspension
21    pending --
22         MR. MELITO:  Objection --
23    Q.  -- the investigation?
24    A.  Yes.
25    Q.  And how long did this investigation

100

C. GLASS

1
2     take to complete?
3     A.  I don't recall the total time; it
4     was extensive.
5     Q.  Okay.
6          During that whatever time it took
7     before the decision came down, was it true
8     that Dean Davis and Mr. Farmer were being
9     paid?
10    A.  Yes.
11    Q.  And what was the outcome of the
12    investigation into Dean Davis's role with
13    respect to the fashion show?
14    A.  That there was overall
15    responsibility and, therefore, termination
16    was recommended.
17         MR. MELITO:  I'll just note for
18    the record to the extent that
19    attorney/client privilege was
20    implicated; it is not waived.
21         THE WITNESS:  Sorry.
22    Q.  Now, do you know whether or not the
23    investigation into this fashion show
24    developed into a larger investigation into
25    the Graduate School that Dean Davis was in

101

```
1                   C. GLASS
2    charge of?
3        A.  Yes.
4            MR. MELITO:  Objection.
5        Q.  And in terms of the larger
6    investigation into the School of Graduate
7    Studies at F.I.T., was it determined that
8    there was a racially hostile environment for
9    individuals of color?
10           MR. MELITO:  Objection, and to
11       the extent it calls for
12       attorney/client privilege; you cannot
13       respond.
14       A.  I believe you'll --- that's in the
15   report.
16       Q.  And when you say "that's in the
17   report --"
18       A.  The answer to your question is in
19   the report.
20       Q.  Right.
21           So did they conclude --- did the
22   report conclude that F.I.T.'s Graduate School
23   operate a racially hostile environment for
24   students of color?
25           MR. MELITO:  Objection.  Please
```

102

```
1                   C. GLASS
2        do not answer as it implicates
3        attorney/client privilege.  The
4        report is subject to attorney/client
5        privilege.
6            MR. SELLS:  Again, we'll put it
7        in writing and try to get a copy of
8        the report.
9        Q.  But whatever that conclusion was,
10   was that relied upon in terminating Dean
11   Davis from her employment with F.I.T.?
12           MR. MELITO:  Objection.
13       A.  (No Response.)
14       Q.  You could answer.
15       A.  Yes.
16           MR. MELITO:  To the extent any
17       attorney/client privilege was
18       implicated; it was not waived with
19       that response.
20       Q.  And did you agree with that decision
21   to fire Dean Davis?
22       A.  Yes.
23       Q.  How was Dean Davis notified of her
24   termination?
25       A.  Via letter from me.
```

103

```
1                   C. GLASS
2            MR. SELLS:  We call for the
3        production of the letter that you
4        sent to Dean Davis informing her of
5        her termination.
6            MR. MELITO:  Just follow up in
7        writing.
8            MR. SELLS:  All right.
9        Q.  Did you send a similar let tore
10   Mr. Farmer notifying him of his termination?
11       A.  I believe it came from me, yes --
12   actually, no, it wasn't the termination;
13   because it was the recommendation and then it
14   goes -- he had to then go through the process
15   of detenure through the board.
16       Q.  All right --
17       A.  Until that was completed, he was not
18   terminated.
19       Q.  And the process of detenure; what's
20   involved in that?
21       A.  In accordance with the tenure law
22   and there is a process that internally OGC,
23   office of general counsel at F.I.T.,
24   facilitated with the board.
25       Q.  Did that process result in Mr. Farmer
```

104

```
1                   C. GLASS
2    being detenured?
3        A.  Yes.
4        Q.  And once he was detenured, was there
5    then another recommendation that he be fired
6    or was that part of the same process?
7        A.  It's the same process.
8        Q.  Now, as a union employee going
9    through the detenure process, did he have a
10   right to arbitrate or dispute the decision?
11       A.  He did.
12       Q.  And did he go through the
13   arbitration process?
14       A.  I believe the process involves an
15   arbitrator who hears the case between the
16   board and the employee, the tenured employee.
17       Q.  And do you know if an arbitrator sat
18   in judgment on Mr. Farmer's case?
19       A.  I think, yes.
20       Q.  All right.
21           And did the arbitrator make a
22   ruling?
23       A.  Yes.
24           MR. SELLS:  We call for the
25       production of the arbitration file
```

105

```
1                    C. GLASS
2          related to Mr. Farmer's termination.
3              MR. MELITO:  Again, follow up
4      in writing and we will respond
5      accordingly.
6              MR. SELLS:  I see it's about
7      1:25 and I have something I have to
8      do at 1:30; so could we come back in
9      let's say 50 minutes?
10             MR. MELITO:  This will be
11     lunch.
12             MR. SELLS:  Yes, let's make it
13     one hour for lunch.  We can come back
14     at 2:30.
15             (Whereupon, a lunch recess was
16     taken at 1:25 p.m.; after which, the
17     proceedings continued at 2:31 p.m. as
18     follows.)
19             MR. SELLS:  Back on the record.
20     Q.  Dr. Glass, I think I asked you prior
21  to lunch; but I'm going to ask you again.
22         Were you in the audience of the
23  fashion show that was the cause into Dean
24  Davis and Mr. Farmer's conduct?
25             MR. MELITO:  Objection to form.
```

106

```
1                    C. GLASS
2      A.  No, I was not.
3      Q.  Okay.
4          So if someone said that you were in
5   the audience, that would not be true; is that
6   right?
7              MR. MELITO:  Objection.
8      A.  That is correct.
9      Q.  Okay.
10             MR. SELLS:  If we could put up
11     on the screen Plaintiff's Exhibit
12     Number 63.
13             (Whereupon, Plaintiff's Exhibit
14     63, part of a filing made via ECF in
15     the New York State system in
16     connection with index number 151757
17     of 2021, was marked for
18     identification as of this date.)
19             (The image is shared on the
20     computer screen.)
21             MR. SELLS:  For the record,
22     Exhibit 63 is part of a filing made
23     via ECF in the New York State system
24     connected to index number 151757 of
25     2021.
```

107

```
1                    C. GLASS
2              MR. MELITO:  Derek, do we have
3      a caption on this?
4              MR. SELLS:  Yes.  It's a
5      caption -- I think it's -- this is
6      the Mary Davis lawsuit.  This is a
7      filing in connection with that.
8      Q.  Do you recognize this letter,
9   Dr. Glass, coming from Dr. Brown to the
10  F.I.T. community; do you recall reading this?
11             MR. MELITO:  Objection.
12             MR. DRANOFF:  Yes, I don't
13     believe this was produced in
14     discovery by Plaintiff.
15             MR. SELLS:  No, this is a
16     public filing made by your client,
17     Mr. Dranoff.
18             MR. DRANOFF:  That's fine.
19     Q.  Are you familiar with this
20  statement, Dr. Glass?
21     A.  Yes, I have seen this.
22             MR. SELLS:  If we could just
23     scroll down a little bit.  I'm going
24     to read starting with "it also
25     appears."
```

108

```
1                    C. GLASS
2      Q.  It says, "It also appears, based
3   upon information available, that the styling
4   and accessorizing used in the show were
5   provided to him rather than at his direction.
6   To us, this indicates that those in charge of
7   and responsible for overseeing the show
8   failed to recognize or anticipate the racist
9   references and cultural insensitivities that
10  were obvious to almost everybody else.
11  That's inexcusable and irresponsible, but
12  also why we are commissioning an independent
13  investigation."
14         Do you see that?
15     A.  Yes.
16     Q.  And do you agree with that?
17             MR. MELITO:  Objection.
18     A.  Yes.
19     Q.  I will now read the name of the firm
20  that was commissioned, Bond, Schoeneck &
21  King.  Are you familiar with that law firm?
22             MR. MELITO:  Objection.
23     A.  Yes.
24     Q.  Were they the ones that conducted
25  this investigation into Dean Davis' conduct
```

109

```
                    C. GLASS
1
2    as well as Mr. Farmer's conduct?
3              MR. MELITO:  Again, objection.
4              MR. DRANOFF:  Objection.
5         A.  Yes.
6         Q.  Okay.
7              MR. SELLS:  We can take down
8         the document.
9         Q.  As you can see the president of the
10   college now as well as yourself, the head of
11   HR, believed that those responsible,
12   including Dean Davis and Mr. Farmer, were
13   responsible for putting on this racially --
14   at best, racially incentive fashion show --
15             MR. DRANOFF:  Objection.
16             MR. MELITO:  Objection.  This
17        is outside the scope of 30(b)(6).
18        This is in her personal capacity.
19        Q.  -- is that correct?
20        A.  Question?
21             (Whereupon, the requested
22        portion of the transcript was read
23        back.)
24        A.  They both had responsibility for the
25   fashion show.
```

110

```
                    C. GLASS
1
2         Q.  You agree with me, right?
3              MR. MELITO:  Objection.
4         A.  Not your entire statement.
5         Q.  Okay.
6              What about my statement don't you
7    agree with?
8         A.  I think both had different roles.
9    You categorized them as both putting on the
10   fashion show.
11        Q.  One had an oversight role, that was
12   Dean Davis, correct?
13        A.  Correct.
14        Q.  And one was Mr. Farmer, correct?
15        A.  Correct.
16        Q.  And in your view Dean Davis failed
17   to properly oversee what it was that Mr. Farmer
18   was doing; is it fair to say?
19             MR. MELITO:  Objection.  She
20        can answer in her personal capacity.
21        A.  Yes.
22        Q.  Was it determined that this was an
23   on-going problem with Dean Davis, that she
24   failed to oversee those individuals under her
25   supervision that acted in a racially
```

111

```
                    C. GLASS
1
2    incentive manner?
3              MR. MELITO:  Objection.  To the
4         extent it implicated attorney/client
5         privilege or the report that was
6         mentioned earlier, I'm instructing
7         the witness not to respond.
8              MR. SELLS:  Okay.
9         Q.  What did Dean Davis do wrong in your
10   opinion that --
11             MR. MELITO:  Again --
12        Q.  -- agree with this statement from
13   the exhibit that I have just put up?
14             MR. MELITO:  Again, in her
15        personal capacity.
16        A.  As the administrator of the Graduate
17   School, it was her responsibility to ensure
18   that such an incident wouldn't occur.
19        Q.  Now, did you learn that Dean Davis
20   had received complaints from students about
21   the fashion show?
22             MR. MELITO:  Objection.
23        A.  Yes.
24        Q.  When she received those complaints
25   about the racist nature of the fashion show,
```

112

```
                    C. GLASS
1
2    did she have an obligation under F.I.T.'s
3    policies to report those complaints?
4              MR. MELITO:  Objection.
5         A.  Yes, I think that she did.
6         Q.  My question is first, Did she have a
7    responsibility; so your answer to that is,
8    yes --
9         A.  Yes --
10        Q.  -- is that correct?
11        A.  Yes.
12        Q.  And who was she required to report
13   that to under F.I.T.'s policies?
14             MR. MELITO:  Objection.
15        A.  Student complaints generally would
16   be to her direct supervisor.
17        Q.  Is that what it says in the policy?
18   She, Dean Davis as the dean, if she receives
19   a complaint of race discrimination --
20        A.  It --
21        Q.  -- excuse me -- that she's supposed
22   to report it to her supervisor; is that the
23   way it works?
24             MR. DRANOFF:  Objection to
25        form.
```

113

C. GLASS

1
2      MR. MELITO:  Objection to form,
3      and also outside the scope of her
4      30(b)(6).  To her personal knowledge.
5      A.  You said complaint, and then you
6   clarified a complaint of discrimination.  The
7   complaint of discrimination would go to the
8   Title 9 Affirmative Action officer.
9      Q.  All right.
10      And if Dean Davis received a
11   complaint on February 11th, 2020 by students
12   who complained to her about the racist nature
13   of the fashion show, her obligation was to
14   report that complaint from students to the
15   Affirmative Action Office; is that right?
16      MR. DRANOFF:  Object to the
17      form.
18      MR. MELITO:  Objection to form.
19      Again, outside the scope of her
20      30(b)(6).
21      You may answer.
22      A.  Yes, it was her obligation to
23   report.
24      Q.  Now, this wasn't the first time that
25   Dean Davis has been accused of not reporting

114

C. GLASS

1
2   complaints of discrimination that were made
3   to her by members of the F.I.T. community,
4   including employees, that she failed to then
5   report that complaint to the Affirmative
6   Action Office; isn't that right?
7      MR. MELITO:  Objection to form.
8      MR. DRANOFF:  Object to the
9      form as well.
10      A.  She failed to do what in this -- in
11   the fashion show instance.
12      Q.  No.  She failed to do it in regard
13   to my client, Ms. Phillips?
14      A.  I don't know that.  I wasn't
15   employed at F.I.T. at that time.
16      Q.  Oh, yes, you were.  You don't recall
17   that?
18      A.  The first complaint?
19      Q.  Yes --
20      A.  In 2018?
21      Q.  No, 2019 --
22      A.  I guess I don't --
23      Q.  You don't recall having a
24   conversation with Ms. Kekana when she spoke
25   to you about how Dean Davis failed to report

115

C. GLASS

1
2   Ms. Phillips' complaint in 2019 to the
3   Affirmative Action Office --
4      MR. MELITO:  Objection --
5      Q.  -- and instead told Ms. Phillips to
6   talk to someone else and then get back to
7   her; you don't recall that?
8      A.  I don't recall --
9      MR. MELITO:  Objection to form,
10      and outside the scope of her 30(b)(6).
11      MR. SELLS:  Can we pull up
12      Exhibit 29.
13      (The image is shared on the
14      computer screen.)
15      Q.  This is a memo to file from
16   Ms. Kekana.  It has to do with the "October
17   7th, 2019 investigation of
18   discrimination-race against Brenda Cowan,
19   Jonathan Farmer, Marilyn Barton and Mary
20   Davis."  Do you see that?
21      A.  Yes.
22      Q.  Are you familiar with this document
23   that was created, I guess it would have been,
24   six months after you were hired?
25      A.  It's familiar.

116

C. GLASS

1
2      Q.  Right.  Because it was e-mailed to
3   you by Ms. Kekana, wasn't it?
4      MR. MELITO:  Objection.
5      A.  Likely.
6      Q.  And in fact, before she even
7   e-mailed it to you, she called you and spoke
8   to you specifically about it; isn't that
9   right?
10      MR. MELITO:  Objection, form.
11      A.  It's possible.
12      Q.  You don't recall; is that your
13   answer?
14      A.  I don't recall it.
15      MR. SELLS:  If we could go to,
16      I guess, it's page -- we can scroll
17      down to the second to last page, I
18      think.
19      Q.  In Ms. Kekana's testimony, she says
20   with regard to Respondent 4, that was Mary
21   Davis.  Respondent 3 was Marilyn Barton.
22   What she says is that, "Complainant alleges
23   that Respondent 4 --" which is Mary Davis "--
24   will always side against people of color.
25   Respondent 4 stated that when Complainant

C. GLASS

brought forth complaints against Respondent 3, she instructed the Complainant to speak with Respondent 3 and come back to speak with her if she had additional issues she wanted to discuss. Respondent 4 also stated to Complainant that she would speak to Respondent 3, which Respondent 4 alleges she did."

Do you see that?

A. Who's Respondent 3 and 4?

Q. Respondent 3 is Marilyn Barton and Respondent 4 is Mary Davis. The Complainant is my client, Marjorie Phillips.

A. Okay.

Q. So this was written, you saw it and had a conversation with Ms. Kekana about Mary Davis failing to report complaints of racial discrimination to the Affirmative Action Office --

MR. DRANOFF: Objection --

MR. MELITO: Objection --

Q. -- is that right?

MR. MELITO: -- to form as well.

C. GLASS

Q. Is that right?

A. According to this, yes.

Q. And notwithstanding that -- just going back to what you said before. When Mary Davis as dean of F.I.T., under F.I.T.'s policies, when she receives a complaint of discrimination from another employee at F.I.T., her responsibility is to report it to the Affirmative Action Office, correct?

MR. DRANOFF: Object to the form.

MR. MELITO: Objection to form.

A. Yes.

Q. And notwithstanding the fact that Ms. Kekana's investigatory summary clearly shows that Mary Davis did not follow the proper protocol, Ms. Kekana still found and I'll read from her report, "In reviewing the context and circumstances of this complaint, this investigator is unable to substantiate the complaint of discriminatory harassment."

Do you see that?

MR. DRANOFF: Object to the form.

C. GLASS

MR. MELITO: Objection to form as well.

Q. You see that?

A. Yes.

Q. All right.

So, just to be clear, you knew that Mary Davis violated the antiharassment policy by failing to escalate the complaint that she received from Ms. Phillips to the Affirmative Action Office, right?

MR. MELITO: Objection to form, and objection to outside the scope of the 30(b)(6).

MR. DRANOFF: Object to the form.

A. According to the Title 9 officer, she did not report it.

Q. But she said that she would forward this report to the Office of Human Resources and Management and Labor Relations for appropriate review; is that right?

A. Correct.

Q. What did you do with it?

A. I believe I reviewed it and that

C. GLASS

this is -- what is the date of this document again?

Q. October 19th -- or October 7th, 2019. Sorry.

A. I don't recall if I had a conversation with Mary about this; but I believe I did. I can't be sure at this point.

Q. A conversation? Why would you have a conversation? Why would you have a conversation?

MR. MELITO: Objection and, again, this line of questioning is outside the scope of 30(b)(6). In her personal capacity, she may answer.

A. In terms of closing this file and the timeliness of this incident and that there were no findings by the Title 9 officer.

Q. So, you think you just had a conversation with her about it?

MR. MELITO: Objection.

A. I -- I don't recall.

121

C. GLASS

1
2    Q.  So, in other words, you didn't take
3    any action, any disciplinary action or
4    corrective action for Dean Davis' failure to
5    follow the antiharassment policy; is that
6    right?
7        A.  I may have had a conversation --
8            MR. DRANOFF:  Objection to
9        form.
10           MR. MELITO:  Object to the form
11       as well in case it was cut off.
12           THE WITNESS:  Sorry.
13           MR. MELITO:  Just remember to
14       pause for moment to allow attorneys
15       to object where necessary.
16           THE WITNESS:  Okay.
17       A.  I may have had a conversation with
18   Mary about the closure of this file.
19       Q.  When you say you may have, what do
20   you think you may have had a conversation
21   about?
22       A.  That there were no findings upon
23   review of the reports and the matter would be
24   closed.
25       Q.  You didn't address her failure to

122

C. GLASS

1
2    forward the complaint to the Affirmative
3    Action Office; is that correct?
4            MR. MELITO:  Objection to form.
5            MR. DRANOFF:  Object to the
6        form as well.
7        A.  I don't recall.
8        Q.  Okay.
9            Well, if you did tell her that if
10   she received complaints of discrimination as
11   dean while at F.I.T., that she had a duty to
12   report it to the Affirmative Action Office
13   and in February of 2020 when the issue came
14   up again and she failed to report it to the
15   Affirmative Action Office, what would that
16   speak to?
17           MR. MELITO:  Objection to form.
18           MR. DRANOFF:  Object to the
19       form.
20           MR. MELITO:  Objection to form
21       as well as this is outside the scope
22       of 30(b)(6).  She may answer in her
23       personal capacity.
24       A.  (No Response.)
25       Q.  If you are going to answer the

123

C. GLASS

1
2    question, answer the question.
3        A.  I'm not sure I understand the
4    question.  Can I rephrase it for you?
5        Q.  No, that's okay.
6            MR. SELLS:  Can we take down
7        the document.
8        Q.  Let's put it this way.  One of the
9    reasons you indicated that there is
10   disciplinary measures taken when it comes to
11   inappropriate conduct or conduct that doesn't
12   meet the level that is required for the job,
13   discipline is administered to either correct
14   that issue or if it can't be corrected to
15   eliminate the person from F.I.T.'s employ; is
16   it fair to say?
17       A.  Yes.
18       Q.  And so, here you have a situation
19   where you are aware and so is the Affirmative
20   Action Office that Dean Davis did not live up
21   to her responsibilities in dealing with
22   Ms. Phillips' complaints of discrimination;
23   you knew --
24           MR. DRANOFF:  Object to the
25       form --

124

C. GLASS

1
2        Q.  -- correct?
3            MR. MELITO:  Objection to form
4        as well.
5        A.  (No Response.)
6        Q.  You can answer the question.
7        A.  I knew that there was a complaint
8    that was filed initially prior to my arrival
9    at F.I.T., and I reviewed the findings.  I
10   may have had a conversation, I don't recall
11   for sure, about closure of the file and there
12   was no discipline that came from this case.
13       Q.  All right.
14           And so, here we are now in February
15   of 2020 when Dean Davis receives a complaint
16   from students, this time of race
17   discrimination, in the way that this fashion
18   show was conducted and she didn't report it
19   to the Affirmative Action Office; is that
20   your understanding?
21           MR. DRANOFF:  Object to the
22       form.
23           MR. MELITO:  Objection.
24       A.  I don't know that she did or she
25   didn't.

125

```
1                    C. GLASS
2        Q.  You don't know.  Okay.
3            MR. SELLS:  We can pull up
4        Exhibit 62.
5                (Whereupon, Plaintiff's Exhibit
6        62, exhibit to Dean Davis'
7        opposition, was marked for
8        identification as of this date.)
9            MR. SELLS:  Just for the
10       record, this is another filing in an
11       affidavit and reply.  This is an
12       exhibit to Dean Davis' I guess
13       opposition.  It's the complaint in
14       the case.  If we could go to page 10 --
15       actually page 11 of the complaint.
16           MR. MELITO:  I'll note, for the
17       record, this is outside the scope of
18       the 30(b)(6), and any questions
19       regarding this Exhibit 62 will be
20       made in Dr. Glass' personal capacity.
21       Q.  If you go to Paragraph 32 in Dean
22   Davis's complaint, she says that "on or about
23   February 11th, 2020 Dr. Davis was first
24   alerted to student concerns about the fashion
25   show when two second year students in the
```

126

```
1                    C. GLASS
2    fashion design MFA program e-mail her.
3    Dr. Davis promptly responded to the students,
4    meeting with both of them the following day."
5            The next paragraph, 33, says,
6    "Immediately after meeting with the students,
7    recognizing the importance and time
8    sensitivity of their concern, Dr. Davis
9    e-mailed her supervisor, VP Oliva.  She
10   alerted him that some students had expressed
11   concerns that the use of certain accessories
12   at the fashion show raised issues about
13   F.I.T.'s lack of racial sensitivity.  VP
14   Oliva replied to Dr. Davis by e-mailing her
15   he was too busy to discuss the matter that
16   day."
17           Paragraph 34, "Dr. Davis, realizing
18   that the students concerns warranted
19   attention, spoke with Professor Farmer and
20   arranged for a meeting with all of the second
21   year fashion design MFA students and
22   discussed these issues.  The meeting was held
23   on February 18th, 2020, which was the first
24   available date for the students."
25           Did I read that correctly?
```

127

```
1                    C. GLASS
2        A.  Yes.
3        Q.  Now, you see from Dean Davis' own
4    mouth that when she received complaints of
5    race discrimination from students, she did
6    not go to the Affirmative Action Office,
7    right?
8            MR. MELITO:  Objection.
9            MR. DRANOFF:  Objection.
10           MR. MELITO:  Again, this is
11       still outside the scope of the
12       30(b)(6).  This is in Dr. Glass'
13       personal capacity.
14       A.  That's what the document says.
15       Q.  And again, as a violation of the
16   antiharassment policy which requires a dean,
17   if they receive a complaint, to go to the
18   Affirmative Action Office, right?
19           MR. MELITO:  Objection.
20           MR. DRANOFF:  Object to the
21       form.
22       A.  Yes.
23       Q.  But instead of going to the
24   Affirmative Action Office, she asked the
25   students to meet with her and the subject of
```

128

```
1                    C. GLASS
2    the complaint, Kyle Farmer, right?
3            MR. MELITO:  Objection.
4        A.  Yes.
5        Q.  And that's very similar to what she
6    did with Ms. Phillips, who she instructed to
7    speak with Marilyn Barton regarding her
8    complaints of discrimination instead of
9    reporting it to the Affirmative Action
10   Office, right?
11           MR. MELITO:  Objection.  Again,
12       this is in Dr. Glass' personal
13       capacity.  Objection to the form as
14       well.
15       A.  Yes.
16       Q.  And so, we have a pattern of Dean
17   Davis violating the antiharassment policy by
18   trying to cover up complaints of
19   discrimination and prevent the Affirmative
20   Action Office from getting these complaints,
21   right?
22           MR. DRANOFF:  Objection.
23           MR. MELITO:  Objection --
24           MR. DRANOFF:  Object to the
25       form.
```

129

C. GLASS

```
1                C. GLASS
2          MR. MELITO:  Objection to form
3      as well, and again this is in
4      Dr. Glass' personal capacity.
5      A.  Or she could have been trying to
6  resolve them at the lowest level, but did not
7  report nonetheless.
8      Q.  But the F.I.T. policy, does it say
9  to resolve race discrimination complaints at
10 the lowest level; is that what it says?
11         MR. MELITO:  Objection.
12     A.  Nope.
13     Q.  No.  But that's what Dean Davis was
14 trying to do, she was trying to cover it up
15 and keep it from the Affirmative Action
16 Office, wasn't she?
17         MR. DRANOFF:  Object to the
18     form.
19         MR. MELITO:  Objection to the
20     form as well and, again, outside the
21     scope of the 30(b)(6).
22     A.  I can't speak to that.
23     Q.  Well, you just did --
24     A.  I don't know that.
25     Q.  -- you --
```

130

C. GLASS

```
1                C. GLASS
2      A.  I don't know that.
3      Q.  Wait.  Hold on.  You just said maybe
4  she was trying to keep it to resolve it at
5  the lowest level possible; isn't that what
6  you just said?
7      A.  I did not say "keep --"
8          MR. DRANOFF:  Objection.
9          MR. MELITO:  Objection.
10         MR. SELLS:  Ms. Simpson, read
11     back the answer that we just received
12     from Dr. Glass on that question.
13         (Whereupon, the requested
14     portion of the transcript was read
15     back.)
16     Q.  So, you hear your words, right?
17     A.  Yes.
18     Q.  Great.  And so, Dean Davis by
19 actually having the accuser meet with the
20 person accused, who both were under her
21 supervision, tried to prevent the escalation
22 of those complaints to the Affirmative Action
23 Office; isn't that right?
24         MR. DRANOFF:  Object to the
25     form.
```

131

C. GLASS

```
1                C. GLASS
2          MR. MELITO:  Objection to form
3      as well.  Again, this is in
4      Dr. Glass' personal capacity.
5      A.  I don't know what Mary Davis was or
6  wasn't doing during that situation.
7      Q.  You said that you may have spoken to
8  her; isn't that right?
9          MR. MELITO:  Objection.
10     A.  You --
11         MR. MELITO:  You may answer.
12     A.  I would like you to be more clear
13 about which incident you are referring to;
14 because if you are referring to the first
15 incident when I wasn't there, I would not
16 know.
17     Q.  Well, you were there in October of
18 2019?
19     A.  So please, refer to the incident
20 that the complaint that you are questioning
21 me about.
22     Q.  Well, you indicated that you spoke --
23 you may have spoken with Dean Davis after you
24 saw that October 7th, 2019 report; isn't that
25 right?
```

132

C. GLASS

```
1                C. GLASS
2      A.  After the report was written,
3  correct.
4      Q.  Okay.
5          That could have been February of
6  2020, could it not?
7          MR. MELITO:  Objection to form.
8      Again, objection this is to --
9      outside the scope of the 30(b)(6).
10     She can answer in her personal
11     capacity.
12     A.  I --
13     Q.  Do you understand my question?
14     A.  I do not.
15     Q.  February of 2020 came after October
16 7th of 2019; is that right?
17     A.  Correct.
18     Q.  So when you said that you may have
19 talked to her after October 7th of 2019, that
20 would include February of 2020 as a
21 possibility of when you could have had this
22 conversation with Dean Davis, correct?
23         MR. MELITO:  Objection to form.
24     A.  If I had a conversation about that
25 October report, it would have been following
```

133

C. GLASS

2  the October report within a month at the most
3  of that report.  It would not have been in
4  February.
5        Q.  Okay.
6            So when you spoke to Ms. Davis, did
7  you talk to her about not trying to resolve
8  race issues, race complaints at the lowest
9  level; did you speak to her about that?
10           MR. DRANOFF:  Object to the
11       form.
12           MR. MELITO:  Object to the form
13       as well; and I'll just make a
14       standing objection that this is
15       outside the 30(b)(6) and any
16       responses are in Dr. Glass' personal
17       capacity.
18       A.  I do not recall the exact
19  conversation, and I don't want to speculate
20  about what that was if I don't recall.
21       Q.  Okay.
22           Now as part of the investigation
23  into Dean Davis' conduct with regard to the
24  fashion show, did the topic of Dean Davis'
25  failure to report student complaints of

134

C. GLASS

2  discrimination to the Affirmative Action
3  Office, did that come up as part of the
4  investigation?
5        MR. MELITO:  Objection.
6        Outside the scope of 30(b)(6).
7        In your personal capacity.
8        A.  Yeah, I believe it did.
9        Q.  And in what way did it come up?
10           MR. MELITO:  Again, objection.
11       A.  That meeting with the students with
12  Kyle Farmer was inappropriate.
13       Q.  And did you speak to Dr. Davis about
14  that?
15       A.  That was the -- I don't think I
16  could talk about this without breaching
17  attorney/client privilege --
18       Q.  Okay.
19           So you're saying that was one of the
20  things that this independent, outside law
21  firm -- Bond, Schoeneck -- that's one of the
22  things they did look at, right?
23           MR. MELITO:  Objection.
24       A.  (No Response.)
25       Q.  But instead and just so we are

135

C. GLASS

2  clear, this independent investigation did not
3  involve the Affirmative Action Office, and at
4  this point, that was run by Ms. Kekana,
5  right?
6        MR. MELITO:  Objection and to
7        the -- I think this is breaching
8        attorney/client privilege.  I would
9        instruct not to answer.
10           MR. SELLS:  Can we have the
11       question read back.
12           (Whereupon, the requested
13       portion of the transcript was read
14       back.)
15           MR. MELITO:  Again, objection.
16       Attorney/client privilege.
17           MR. SELLS:  On what basis?
18           MR. MELITO:  You're asking what
19       a report by outside counsel included
20       or not.
21           MR. SELLS:  No. I didn't say
22       the report.  I said the
23       investigation.
24           MR. MELITO:  The investigation
25       is the report --

136

C. GLASS

2        MR. SELLS:  No, it's not --
3        MR. MELITO:  If you can
4        clarify.
5        Q.  All right.
6            I'll do it this way.  Is it fair
7  to say, is it not, Ms. Glass, that the
8  Affirmative Action Office, Ms. Kekana, did not
9  investigate whether or not Dean Davis violated
10  the antidiscrimination policy by F.I.T. by her
11  failure to report complaints of discrimination
12  made by students, correct?
13           MR. DRANOFF:  Object to the
14       form.
15           MR. MELITO:  Objection to form,
16       and outside the scope of the
17       30(b)(6).
18       A.  Well, that's probably three
19  questions in one.  The college can -- engaged
20  an external firm to do the investigation.  I
21  don't know what Ms. Kekana's involvement in
22  that investigation was or not.
23       Q.  All right.
24           Well, she testified here on -- last
25  week that she had no role in it --

137

```
1                    C. GLASS
2           MR. MELITO:  Objection --
3      Q.  -- so you're saying that you are not
4  aware of that?
5           MR. MELITO:  Objection.
6      A.  I'm not aware of that.  I mean, you
7  got your answer from her, clearly.
8      Q.  Okay.
9           And so with regard to Dean Davis'
10 termination, one of the reasons that she was
11 terminated was for her failure to report
12 complaints of discrimination that were made
13 to her to the Affirmative Action Office;
14 isn't that right?
15          MR. MELITO:  Objection.
16          MR. DRANOFF:  Object to the
17      form.
18     A.  There were multiple findings in the
19 report that lead to her termination.
20     Q.  All right.
21          But I'm not asking you about the
22 report --
23     A.  The investigation --
24     Q.  -- I'm not asking you about the
25 investigation.  I'm asking, The reason F.I.T.
```

138

```
1                    C. GLASS
2  fired Dean Davis was in part for her failure
3  to report complaints of discrimination that
4  were made by students to the Affirmative
5  Action Office; isn't that right?
6           MR. MELITO:  Objection --
7           MR. DRANOFF:  Object to the
8      form.
9           MR. MELITO:  Objection to form,
10     and I'm going to instruct the witness
11     not to respond as it may implicate
12     attorney/client privilege in that
13     report/investigation that has been
14     overlapped in this line of
15     questioning.
16          MR. SELLS:  It has nothing to
17     do with attorney/client privilege.
18     I'm asking the reasons for Dean
19     Davis' termination, and they are very
20     relevant in this case, so --
21          MR. MELITO:  If I may, Derek --
22          MR. SELLS:  What?
23          MR. MELITO:  If I may give you
24     where I'm coming from.  If the report
25     contained information that lead to
```

139

```
1                    C. GLASS
2      the termination, that would be
3      contained in the report which is
4      attorney/client privilege.
5           MR. SELLS:  No.
6      Q.  Let me ask you this.  Were you the
7  one that fired Dean Davis?
8           MR. MELITO:  Objection.
9      A.  I sent Dean Davis the termination
10 letter.
11     Q.  In the letter, did you list the
12 reasons why she was being terminated?
13     A.  Probably.  I'd have to refresh my
14 memory of what it said exactly.
15     Q.  Okay.
16          And so, was one of the reasons that
17 you put in your letter that Dean Davis,
18 instead of reporting the complaints of
19 discrimination to the Affirmative Action
20 Office made by the students, she instead held
21 a meeting with the students on her own with
22 Mr. Farmer without reporting it to the
23 Affirmative Action Office; is that one of the
24 reasons?
25          MR. MELITO:  Objection.
```

140

```
1                    C. GLASS
2           MR. DRANOFF:  Object to the
3      form.
4      A.  Yes.
5      Q.  Now, you had the ability after you
6  read the report that was issued by Ms. Kekana
7  to fire Dean Davis for her failure to report
8  Ms. Phillips' complaints of discrimination to
9  the Affirmative Action Office and instead
10 refer Ms. Phillips to speak with Ms. Barton
11 and indicate to Ms. Phillips that she would
12 would speak with Ms. Barton about those
13 complaints.  You could have fired her for
14 that, correct --
15          MR. DRANOFF:  Object to the
16      form.
17          MR. MELITO:  Objection to form.
18     A.  Certainly, disciplinary action could
19 be taken.
20     Q.  But it was your choice not to in the
21 case of Ms. Phillips' complaint, right?
22          MR. MELITO:  Objection.
23          MR. DRANOFF:  Object to the
24      form.
25     A.  No action was taken -- formal action
```

141

```
1              C. GLASS
2    was taken.
3         Q.  And that's because Ms. Phillips's
4    complaint to the Affirmative Action Office at
5    F.I.T. that was being investigated even when
6    you took over the role of the head of VP or
7    the head of -- the VP of Human Relations, her
8    complaint was not in the news media, right?
9              MR. MELITO:  Objection.
10        A.  Her complaint was unsubstantiated by
11   the Title 9 office.
12        Q.  Right.
13             But there was a difference in the
14   way that F.I.T. implemented its investigation
15   process into complaints of discrimination
16   between Ms. Phillips' complaint and the
17   complaint that came ultimately from the
18   fashion show; isn't that right?
19             MR. DRANOFF:  Object to the
20        form.
21             MR. MELITO:  Objection to form,
22        and objection to outside the scope of
23        the 30(b)(6).
24        A.  (No Response.)
25        Q.  You can answer.
```

142

```
1              C. GLASS
2         A.  Both were investigated.
3         Q.  I'm sorry?
4         A.  Both situations were investigated.
5         Q.  Okay.
6              So let's take a look at that.
7    Ms. Phillips makes a complaint of
8    discrimination in March of 2018.  More than a
9    year before you became the VP of Human
10   Relations; is that right?
11        A.  Yes.
12        Q.  And nothing had been done with
13   regard to Ms. Phillips' complaint as far as a
14   resolution to that complaint until October of
15   2019; is that right?
16             MR. MELITO:  Objection to form.
17        A.  (No Response.)
18        Q.  You could answer.
19        A.  There is a timeline that I'm not
20   familiar with why it took that long.
21        Q.  Okay.
22             Well, that's why I am asking you.
23   You come in April of 2019 and no finish to
24   this complaint that Ms. Phillips makes from
25   March of 2018, so now it's a year and a month
```

143

```
1              C. GLASS
2    that it's still open --
3              MR. MELITO:  Objection --
4         Q.  -- right?
5         A.  (No Response.)
6         Q.  Is that correct?
7         A.  Yes.
8         Q.  And for that whole one year and one
9    month period, there was no media, there was
10   no news media about Ms. Phillips's complaint,
11   correct?
12             MR. MELITO:  Objection.
13        A.  I'm trying to remember if there was
14   any news media.
15        Q.  Well, as you sit there now, you're
16   not aware of any, correct?
17             MR. MELITO:  Objection to form.
18        A.  I seem to recall there was
19   something.
20        Q.  At what point in time?
21        A.  I don't recall.
22        Q.  But it certainly wasn't when there
23   was an internal investigation going on by
24   your Affirmative Action Office, correct?
25             MR. MELITO:  Objection to form.
```

144

```
1              C. GLASS
2         A.  I don't recall.
3         Q.  All right.
4              Anyway, you get there in April and
5    then the very next month, May of 2019 is when
6    Ms. Barton verbally attacks Ms. Phillips and
7    physically confronts Ms. Phillips and you
8    learn about that, right?
9         A.  Yes.
10        Q.  And in fact, Ms. Barton threatened
11   to kill Ms. Phillips; isn't that right?
12        A.  That's what she said.
13        Q.  Okay.
14             That's what who said?
15        A.  It was determined that Marilyn used
16   those words.
17        Q.  Got it.
18             And you learned that as early as May
19   of 2019, right?
20        A.  Yes.
21        Q.  Did you refer that to the
22   Affirmative Action Office for investigation?
23             MR. MELITO:  Objection.
24             You may answer.
25        A.  I was new to the college, and we
```

145

C. GLASS

1
2     received notice of the incident.  And as we
3     started to look at what had happened, I don't
4     know if I e-mailed or called Deliwe Kekana,
5     because someone had indicated that there was
6     a complaint previously; and so yes, we
7     discussed it and it was determined that HR
8     would continue to investigate the complaint,
9     because this was not race-based but a threat
10    between colleagues.
11         Q.  It wasn't race-based.
12             Let me ask you this, Who made the
13    determination it wasn't race-based?
14         A.  From what we knew from the
15    information at the time, it did not appear
16    that it will go to Title 9.  That it would be
17    a workplace incident that HR would
18    investigate.
19         Q.  No.  You said it wasn't race-based.
20    I am asking you, Who made the determination
21    that this was not -- that Ms. Barton's
22    conduct was not race-based?
23         A.  Deliwe and I reviewed Natacha
24    Unelus, who was the HR generalist for the
25    School of Graduate Studies, reviewed it and

146

C. GLASS

1
2     that was not even actually -- it never even
3     came up.  We looked at the facts of the
4     incident and, again, I was not familiar with
5     the details of the case and it didn't occur
6     to anyone that this was a result of her
7     complaint of discrimination or that it was
8     based on discrimination.  So that is why it
9     proceeded that way.
10         Q.  It was determined that -- is that
11    what you just said, that it was determined
12    that this had nothing do with her complaint
13    of discrimination or discrimination period;
14    is that correct?
15         A.  I said that it was not a topic of
16    whether this was -- on it's face, it was a
17    threat in the workplace and we did not -- we
18    said where do we go?  And it was apparent to
19    have HR investigate it because it was a
20    threat in the workplace.
21         Q.  Well --
22         A.  We have a workplace violence policy.
23         Q.  So, what is "retaliation"?
24             MR. MELITO:  Objection.
25         A.  (No Response.)

147

C. GLASS

1
2         Q.  What's "retaliation" under F.I.T.'s
3     policies?
4             MR. MELITO:  Objection.
5             Go ahead.  You may answer.
6         A.  The adverse employment action based
7     on the filing of a complaint of someone who
8     has authority over someone else.
9         Q.  That's your definition?
10            MR. MELITO:  Objection to form.
11        Q.  -- is that right?  Anything else?
12        A.  (No Response.)
13        Q.  Well, what if someone is not a
14    supervisor or has control over their work and
15    they assault a person who's made a complaint
16    of discrimination against them; that's not
17    retaliation?
18            MR. MELITO:  Objection.
19        A.  In my experience, that is an issue
20    to be investigated under a workplace violence
21    policy.
22        Q.  And why not under whether or not
23    it's workplace violence or retaliation; why
24    wouldn't you just make that determination
25    based upon an investigation?  Why would you

148

C. GLASS

1
2     automatically consider it to be workplace
3     violence and rule out any possibility that it
4     could be retaliatory?
5             MR. MELITO:  Objection to form.
6         A.  Based on the information we had, it
7     was clearly a threat.
8         Q.  That wasn't related to the
9     complaints that Ms. Phillips had brought for
10    race discrimination?
11        A.  Not that I was aware of.
12        Q.  No?
13        A.  No.
14        Q.  Well, where were you getting your
15    information?
16        A.  I consulted with the affirmative
17    action officer and -- you'd have to ask her;
18    but I don't know if the investigation was
19    complete, and she didn't have the report
20    complete and that was the delay.  But there
21    was nothing that was indicated from the
22    Affirmative Action Office that this was
23    related to race or retaliation.
24        Q.  What about your office?  Did anyone
25    from your office say, Hey, you know this, you

149

C. GLASS

1  know, Marilyn's conduct threatening to kill
2  Ms. Phillips had to do with complaints that
3  Ms. Phillips had raised about discrimination;
4  did anyone from your office tell you that?
5      A.  I think the HR generalist who
6  investigated indicated that there were
7  problems in the past.  But not -- this was
8  not a result of that, no.
9          MR. SELLS:  Okay.  Can we pull
10  up Exhibit 20.
11          (The image is shared on the
12  computer screen.)
13          MR. SELLS:  Actually, this is
14  not the one that I'm talking about.
15  We can take that down.
16          We could put up Exhibit 33.
17          (The image is shared on the
18  computer screen.)
19          MR. SELLS:  Just for the
20  record, this was marked as
21  Plaintiff's Exhibit 33 in Ms. Deliwe
22  Kekana's deposition.
23      Q.  These are notes.  Do you recognize
24  Natacha Unelus?

150

C. GLASS

1      A.  Yes, she is --
2      Q.  Who is she?
3      A.  She is -- was at the time the HR
4  generalist who was in charge of the
5  investigation.
6      Q.  Who is Andre Nunez?
7      A.  The labor relations analyst who took
8  notes.
9      Q.  Does he report to you?
10      A.  He -- he did, yes.
11      Q.  Okay.
12          Were you informed about this
13  conversation between Ms. Barton, Mr. Nunez,
14  Ms. Unelus, Mr. Rivera-Perez and
15  Ms. Peyton-Jones?
16      A.  Probably.
17      Q.  Okay.
18          You understand that Mr. Nunez was
19  going to be taking notes of that conversation
20  with Ms. Barton; you understood that, right?
21      A.  Yes.
22      Q.  And according to you, these are the
23  notes that he took; is that right?
24      A.  They appear to be.

151

C. GLASS

1      Q.  Had you seen these notes before?
2      A.  I think so.
3      Q.  Was this shared with you at or near
4  the time that this took place?
5      A.  They look familiar.
6      Q.  My question though is, Did you
7  review these notes near the time that
8  Ms. Barton was questioned?
9      A.  I don't recall.
10      Q.  Okay.  Well, let's go through them.
11          You understand that MB is Marilyn
12  Barton and that she was questioned about what
13  happened on May 16th; you see that, correct?
14      A.  I do.
15      Q.  Okay.
16          So let's scroll down.  I will not
17  read it.
18          So she gives her answer.  Now, is
19  that Natacha Unelus?
20      A.  Yes.
21      Q.  All right.
22          She asks the question, "Was there
23  anything between you and MB when you
24  approached her?"

152

C. GLASS

1          MR. SELLS:  Scroll down to MB's
2  answer.  Okay.
3      Q.  She again responds.  All right.  And
4  then a little bit more back and forth.
5          And question, "Did you have issues --"
6  now this is a question from Natacha.  She
7  says, "Did you have issues with her prior to
8  investigation?"  And Marilyn Barton's answer,
9  "The environment in the office, it's toxic.
10  Been like this for years.  I've been pushed
11  and pushed.  Mary Davis knows about the
12  situation, and it is ongoing.  I flinch when
13  she walks into the room.  It's uncomfortable.
14  I have spoken to Mary Davis prior.  I don't
15  tell her every single thing MP --" Marjorie
16  Phillips "-- says certain things even to
17  other people."
18          And the next question through
19  Natacha, "It was alleged that you charged
20  towards MP.  Could you provide a response to
21  that?"  This is what Marilyn Barton says, "I
22  was walking out and I stopped at her desk,
23  which is when I was yelling at her.  I don't
24  deny it.  I'm ashamed I lost my temper.  I

153

```
           C. GLASS
1
2    was pushed.  It was the last straw.  Marjorie
3    complained about me, it went up to
4    Affirmative Action and there still is no
5    resolution."
6          Do you see that?
7    A.  Yup.
8    Q.  Okay.
9          So, when you just told us that it
10   had nothing to do with her complaint, Marilyn
11   Barton says in her own words that this was
12   the last straw, the complaint that went up to
13   Affirmative Action?
14         MR. MELITO:  Objection to form --
15   Q.  Is that right?  This is taken from
16   your own -- this is taken from your own
17   direct report, right?
18         MR. MELITO:  Objection to form.
19   A.  It is, and I was still not aware at
20   this point of what that investigation was
21   about.  So --
22   Q.  Well --
23   A.  -- we were already in the
24   investigation.  This is the HR investigation,
25   so we continued with the investigation.
```

154

```
           C. GLASS
1
2    Q.  I thought you said it had nothing to
3    do with retaliation?
4          MR. MELITO:  Objection.
5    A.  When you asked if it was an HR
6    investigation or a Title 9 -- Affirmative
7    Action investigation, I did not know that at
8    the time.  And --
9    Q.  I thought you spoke to Deliwe Kekana --
10   A.  I think --
11         MR. MELITO:  Objection.
12   A.  I think all of these things -- I
13   don't remember the sequence of how all of
14   this happened.  So I want to make it really
15   clear that, you know, not to misrepresent me
16   because I don't understand where you're going
17   and jumping around with all of your
18   questions.
19         MR. SELLS:  We can take down
20      the document.
21   Q.  You don't understand where I'm going
22   all of my questions?
23   A.  The timing of it.  Throughout this
24   entire deposition you have jumped around a
25   lot, so it's very difficult for me to
```

155

```
           C. GLASS
1
2    understand what exactly you are referring
3    to --
4    Q.  I'm referring to a statement that
5    was taken by your direct report that
6    apparently you read in which Marilyn Barton
7    admits that she lost her temper and started
8    yelling and screaming and threatening
9    Marjorie Phillips; because the last straw was
10   Marjorie Phillips making a complaint against
11   her that went all the way up to the
12   Affirmative Action Office --
13         MR. DRANOFF:  Object to the
14      form.
15         MR. MELITO:  Objection to form --
16   Q.  -- right, and you see that; you see
17   that, correct?
18         MR. MELITO:  Objection to form.
19   A.  I see that, and I still --
20   Q.  Okay.  You see that.
21         But you did not, you did not, send
22   it to the Affirmative Action Office to
23   investigate whether or not that was
24   retaliation from Marilyn Barton to
25   Ms. Phillips as a result of the complaint
```

156

```
           C. GLASS
1
2    Ms. Phillips made that went up to the
3    Affirmative Action Office, right?
4          MR. MELITO:  Objection to form.
5    A.  I talked to Deliwe.  We had
6    conversations about where this was most
7    appropriate to be investigated and that's
8    what was determined.
9    Q.  Even after Ms. Barton says that her
10   attack on Ms. Phillips was because
11   Ms. Phillips reported her to the Affirmative
12   Action Office, right?
13         MR. MELITO:  Objection to form.
14   A.  That's not what the document says.
15   Q.  I'm sorry?
16   A.  The document didn't say that was the
17   cause.  The question that she was asked in
18   the interview was, "Were there issues between
19   you in the past?"
20   Q.  Are you --
21         MR. SELLS:  Can we put this up
22      again.  I dis-- I'm -- can we put up
23      33 again.  And just go to the section
24      that I just read.  It had to do with
25      the last straw.
```

157

C. GLASS

1
2          (The image is shared on the
3      computer screen.)
4          Q.  I'm going to read this again from
5      Marilyn Barton, "I was walking out and I
6      stopped at her desk which is when I was
7      yelling at her.  I don't deny it.  I am
8      ashamed I lost my temper.  I was pushed.  It
9      was the last straw.  Marjorie complained
10     about me, it went up to Affirmative Action
11     and there still is no resolution."
12         Did I read that correctly?
13             MR. MELITO:  Objection.
14         A.  You could read it correctly; but the
15     interpretation, it doesn't say that she --
16             MR. SELLS:  Okay.  You could
17         take it down.
18             MR. MELITO:  You could finish
19         your thought, Dr. Glass.
20             THE WITNESS:  Well, no.  I
21         don't think so.  Thanks.
22         Q.  You said I could read it correctly,
23     but that is not your interpretation --
24         A.  You can read it --
25         Q.  -- is that what you said --

158

C. GLASS

1
2          A.  You could read the words, of course.
3      I --
4          Q.  So you're saying --
5          A.  If you're asking my personal opinion --
6          Q.  No, no, no.  This is your job,
7      right?  This was your job for F.I.T.?
8          A.  I --
9          Q.  -- you were given this information --
10         A.  Do you want --
11         Q.  Hold on.  You were given this
12     information and you chose to view
13     Ms. Barton's own words about being -- this
14     being the "last straw" -- this complaint to
15     Affirmative Action being the last straw and
16     you chose to interpret that as a workplace
17     incident as opposed to an act of retaliation;
18     is that right?  Just so I'm clear, is that
19     correct?
20             MR. DRANOFF:  Object to the
21         form.
22             MR. MELITO:  Object --
23         A.  No.
24         Q.  It is not correct?
25         A.  No, you are not correct.

159

C. GLASS

1
2          Q.  In what way am I not correct?
3          A.  When you refer to, "it," the
4      affirmative action complaint was not the last
5      straw.  If you read it, she is referring to
6      the pattern of behavior that she endured
7      overtime, which included a complaint.
8          Not that this was a result of a
9      complaint which was then retaliation, which
10     then would have gone to the Office of
11     Affirmative Action.  It did not in
12     consultation with the Office of Affirmative
13     Action.
14         Q.  So, what was the other conduct that
15     lead to this outburst that you consider not
16     to be retaliatory; what was the other
17     conduct?
18         A.  The conduct was the interaction --
19     well --
20         Q.  Tell me one thing --
21         A.  A particular incident -- that
22     particular incident, that incident of that
23     day is in the statement.
24         Q.  That incident made her go off and
25     start saying to Ms. Phillips -- Marilyn

160

C. GLASS

1
2      Barton said to Ms. Phillips, "I will fucking
3      kill you.  I will fucking kill you.  Shut the
4      fuck up.  I'm tired of your shit."  All of
5      that was related to that one incident and not
6      to the ongoing complaint and investigation by
7      the Affirmative Action Office into
8      Ms. Barton's discriminatory acts; is that
9      what you are saying?
10             MR. MELITO:  Objection to form.
11         A.  There was a pattern of a toxic
12     relationship between the two and there was an
13     incident that my office investigated.
14         Q.  I see.
15         So that's the way you chose to
16     interpret it.  But you never asked Ms. Barton
17     directly, Were you retaliating against
18     Ms. Phillips when you made those statements,
19     right?
20             MR. MELITO:  Objection to form.
21         A.  Correct.
22         Q.  And she never denied that she was
23     attacking Ms. Phillips verbally and
24     physically because it was retaliation, right?
25     She never denied that, did she?

161

C. GLASS

1
2       MR. MELITO:  Objection to form.
3       A.  She was not asked.
4       Q.  So, it was your department's
5   decision not to ask those questions, not to
6   even get a denial from Ms. Barton that she
7   wasn't retaliating?  You chose to make that
8   determination on your own; is that right?
9       MR. MELITO:  Objection to form.
10      A.  We chose to investigate it the best
11  way we knew how considering the seriousness
12  of the events.
13      Q.  I see.  So let me get this right.
14  Dean Davis, when there is no press
15  involved, does not report Ms. Phillips'
16  complaint to the Affirmative Action Office.
17  She tries to treat it at the lowest level
18  possible between her, Ms. Phillips and the
19  accused, Ms. Barton.  She didn't get a
20  reprimand, she didn't get disciplined, there
21  is no action taken against her in
22  Ms. Phillip's case; is that right?
23      MR. MELITO:  Objection.
24      MR. DRANOFF:  Objection.
25      MR. MELITO:  Objection to form.

162

C. GLASS

1
2       A.  (No Response.)
3       Q.  Did you answer?  I need an answer.
4       A.  Again, I am not sure what you are
5   trying to get at here.
6       Q.  I just want an answer.  I'm not
7   getting at anything.  I just want an answer?
8       A.  Yeah, but your answers are not just --
9   I cannot answer "Yes" or "No" to your
10  questions.
11      MR. SELLS:  Please repeat the
12      question.  Please repeat the
13      question.
14      (Whereupon, the requested
15      portion of the transcript was read
16      back.)
17      MR. MELITO:  Note my objection.
18      A.  Yes.
19      Q.  Okay.
20      And there we have a situation,
21  again, with Ms. Phillips, she makes a
22  complaint of retaliation and your office
23  chooses to treat the allegation against
24  Ms. Barton as a workplace incident as opposed
25  to an act of retaliation without getting a

163

C. GLASS

1
2   denial from Ms. Barton that she was
3   retaliating against Ms. Phillips, having
4   Ms. Barton say in a statement to two of your
5   direct reports that this was the last straw,
6   that a complaint that Ms. Phillips made to
7   her went up to Affirmative Action.  You
8   choose not to have the Affirmative Action
9   look at it as a possible retaliation, but you
10  treat it as a workplace incident instead,
11  right?
12      MR. MELITO:  Objection to form.
13      A.  I don't believe Ms. Phillips ever
14  used the word "retaliation" during the
15  investigation; so therefore, we did not.  We
16  treated it as -- on it's face, a workplace
17  violence issue.
18      Q.  Oh.  So now you're changing.  You're
19  saying Ms. Phillips never used the term
20  "retaliation;" is that right?
21      A.  That's one piece of it, yeah --
22      MR. MELITO:  Objection to form --
23      Q.  Oh --
24      A.  You're trying to lead me into saying
25  some things that, you know, that based on

164

C. GLASS

1
2   that one statement about the affirmative
3   action complaint there were -- there were --
4   again, there were -- there were no
5   conclusions at that point in time, and we
6   treated it as a workplace violence issue,
7   period.
8       Q.  But you're saying that Ms. Phillips
9   never said, never said that this was
10  retaliation --
11      A.  I never heard --
12      Q.  -- from the --
13      A.  No, I never heard that.  I never
14  heard that word from anyone.
15      Q.  You mean you didn't hear it
16  directly, but you just saw the notes --
17      A.  And I disagree with the notes or
18  what the intent of that is.
19      Q.  Hold on.  Hold on.  Hold on.
20      The notes indicate that Ms. Barton
21  lost her temper because this was the last
22  straw.  Ms. Phillips had gone, made a
23  complaint that was being investigated with
24  the Affirmative Action Office, and it still
25  has not been resolved.

165

```
                    C. GLASS
1
2            You saw that, right?
3                 MR. MELITO:  Objection to form.
4         A.   We disagree about the interpretation
5    of that language.  I believe that it is the
6    incident not the complaint.
7                 MR. SELLS:  Can we have Exhibit
8         23 again.
9                 (The image is shared on the
10             computer screen.)
11        Q.   If we could go to the second page.
12             Do you recognize this handwriting?
13        A.   Yeah, I do.
14        Q.   Whose is it?
15        A.   It's mine.
16        Q.   What does it say?
17        A.   Can we scroll up a little bit.
18        Q.   Yes.
19        A.   These are notes related to this
20   issue.  Marjorie went to the president's
21   office.  She said she went to the New York
22   PD.  Somebody from her church reached out to
23   SUNY and made it a -- that's where the PR
24   issue came in.  So this did become a PR issue
25   for F.I.T. in terms of SUNY, the notification
```

166

```
                    C. GLASS
1
2    to SUNY, calling the -- I don't know who
3    Dr. Butts is or what he did, but there was an
4    issue there so -- this is very helpful for
5    refreshing my memory.  All right.  So...
6         Q.   How does it refresh your
7    recollection?
8         A.   Because you asked a question about,
9    you know, the media.  Like there was no media
10   issue here, so therefore you're --
11        Q.   What's the media?
12        A.   -- the college --
13        Q.   I'm asking what the media is?  Tell
14   me about the media.  What's refreshing my
15   recollection about the media?
16        A.   Yeah.  So this is about making it --
17   threatening to go public by going the
18   chancellor's office in Albany.
19        Q.   So, you're saying that Ms. Phillips
20   threatened to take this public?
21        A.   I believe that Dr. Butts did.
22                MR. MELITO:  Objection.
23        Q.   Dr. Butts threatened to take it
24   public?
25                MR. MELITO:  Objection.
```

167

```
                    C. GLASS
1
2         Q.   Is that right?
3         A.   That is my understanding.
4         Q.   In what capacity did he say he will
5    make this public?
6         A.   I don't know.  That he's very --
7    he's an elder or something in the Abyssinian
8    Church and could make this into a huge PR
9    issue for the college.
10        Q.   That's what you recall about the
11   conversation?
12        A.   That is what I recall.
13        Q.   Did it become public?
14        A.   I don't -- I don't remember what
15   happened with that.  I wasn't in the
16   president's office when this happened, and I
17   don't know what conversations happened after
18   that with him.
19        Q.   But this is your handwriting; is
20   that right?
21        A.   Correct.
22        Q.   If we go up you can see it says May
23   23rd, right?
24        A.   Right.  Right.
25        Q.   Okay.
```

168

```
                    C. GLASS
1
2             May 23rd of 2019, right?
3         A.   Right.
4         Q.   So that would have been seven days
5    after the incident.
6                 MR. SELLS:  Let's scroll to the
7         second page now.  Stop there.
8         A.   Yeah.  This is actually good because
9    this does document my conversation with
10   Deliwe when we, obviously, talked about
11   whether this is retaliation or not; and she
12   said no, that complaint was over a year ago.
13   So, yeah.  This actually is exactly the
14   conversation with Deliwe.  I just did not
15   remember it.
16        Q.   Just so we're clear, you write
17   Deliwe --
18        A.   Her name --
19        Q.   Excuse me.  You put a dash then you
20   put retaliation, right, with an exclamation
21   point --
22                MR. MELITO:  Objection --
23        Q.   -- correct?
24        A.   I --
25        Q.   Is that what you wrote?
```

169

C. GLASS

1
2       A.  I don't know if that's an
3    exclamation mark or a colon.
4       Q.  Oh.  It looks like an exclamation
5    point, but you're saying it could be a colon;
6    is that correct?
7       A.  It could be a colon.  Yeah, because
8    this was about -- this was actually saying,
9    "Deliwe, would this be retaliation?"  And her
10   response was, "No, it was a year ago."
11      Q.  So, you're saying if a person makes
12   a complaint of discrimination and that
13   complaint was a year before and the
14   investigation still has not concluded when
15   someone threatens -- when the person who has
16   been accused threatens the person that made
17   the accusation that cannot be
18   retaliation?  Is that what you're saying?
19          MR. MELITO:  Objection.
20      A.  That's what the Title 9 officer and
21   I discussed; and she said, "No, it was a year
22   ago."  And below, again, "Discrimination
23   allegation year ago."
24      Q.  Got it.
25          So now, when you had this

170

C. GLASS

1
2    conversation with Ms. Kekana, did you show
3    her or tell her that Marilyn Barton said that
4    she lost her temper, that this was the last
5    straw, that the complaint that Ms. Phillips
6    made against her went to the Affirmative
7    Action Office and that the investigation was
8    still ongoing?  Did you say that to Ms. Deliwe
9    Kekana before she gave you this answer?
10          MR. MELITO:  Objection to form.
11      A.  You included a lot of things in that
12   laundry list, but ---
13      Q.  Would you like it read back?
14      A.  Yeah, I'll take it piece by piece.
15          (Whereupon, the requested
16          portion of the transcript was read
17          back.)
18      A.  We had a conversation and discussed
19   the issues and what we had known at that
20   time.  Again, I don't know when that -- the
21   notes were actually typed and sent to me and
22   I don't recall the specifics.  Obviously I
23   barely remembered I had notes on this.  So I
24   don't know.
25      Q.  Is that what your answer is?

171

C. GLASS

1
2       A.  I don't recall.
3          MR. MELITO:  Can we have a
4       short five-minute break.
5          MR. SELLS:  Let's come back
6       4:15.
7          (Whereupon, a brief recess was
8          taken at 3:59 p.m.; after which, the
9          proceeding continued at 4:18 p.m. as
10         follows.)
11      Q.  I think we had your notes up on the
12   screen that was Exhibit 23.
13          (The image is shared on the
14          computer screen.)
15          MR. SELLS:  Matter of fact, we
16      are done with this.  You could take
17      it down.
18      Q.  Would it surprise you, Dr. Glass,
19   that when I showed Ms. Kekana the statement
20   from Marilyn Barton -- let me -- you know
21   what, before I do that.
22          What's F.I.T.'s policy about
23   re-opening investigations when you get new
24   information?
25          MR. MELITO:  Objection.

172

C. GLASS

1
2       Q.  Is there a policy that says when
3    F.I.T. completes an investigation into race
4    discrimination and/or retaliation that it
5    will not re-open those investigations even if
6    it discovers new information?
7          MR. MELITO:  Objection.
8       Outside the scope of 30(b)(6).
9          In your personal capacity you
10      can answer.
11      A.  I'm not aware of anything like that.
12      Q.  Oh, okay.  You are not aware of it.
13          So it's possible that someone could
14   re-open an investigation if new evidence
15   comes to light; is that right?
16          MR. MELITO:  Objection.
17      A.  I think it depends on the situation,
18   yeah.
19      Q.  Okay.
20          Like what; what are some of the
21   things that it would depend on?
22          MR. MELITO:  Again, same
23      objection.  This is in her personal
24      capacity.
25      A.  If someone came forward and recanted

173

C. GLASS

1    what they had provided in information
2    originally in the investigation, something
3    like that.
4         Q.   Are you looking at another screen
5    right now?
6         A.   Nope.
7         Q.   Where is your cell phone?
8         A.   On the table.
9         Q.   Okay.
10             What are you looking at now?
11        A.   You.
12        Q.   Oh.  Okay.
13        A.   You're in the top right corner of my
14   screen.
15        Q.   Got it.  Got it.  Okay.
16             Ms. Kekana, when I read her Marilyn
17   Barton's statement about this being the last
18   straw and about how she lost her temper
19   because of the complaint that Ms. Phillips
20   made against her that was elevated to the
21   Affirmative Action Office and that was still
22   an ongoing investigation, she indicated if
23   she knew that she would have asked the case
24   be investigated by her for retaliation.  Did

174

C. GLASS

1    you know that?
2         MR. MELITO:  Objection to form.
3         Q.   And so I asked her, I said, Well, if
4    you could re-open the investigation, would
5    you do that and she said that she would, but
6    that under F.I.T.'s policies once an
7    investigation was completed, it couldn't be
8    re-opened.  Did you know that?
9         MR. MELITO:  Objection.
10             Outside the scope of the 30(b)(6).
11             She may answer in her personal
12             capacity.
13        A.   I'm not aware of anything formal on
14   that.
15        Q.   Okay.
16             But certainly based upon your notes
17   as of May 23rd at least, 2019, you were
18   already considering whether or not
19   Ms. Barton's actions towards Ms. Phillips
20   constituted retaliation, right?
21        MR. MELITO:  Objection to form.
22        A.   Yes.
23        Q.   And nowhere in your notes do you say
24   that Ms. Phillips did not raise retaliation

175

C. GLASS

1    as an issue.  And therefore, you were not
2    going to look at it as retaliation.  Nowhere
3    in your notes do you say that, right?
4         MR. MELITO:  Objection.
5         A.   We clearly ended up talking about
6    it.
7         Q.   That's not my question.  Not my
8    question.  My question was very specific.
9    Nowhere in your notes do you say that you're
10   not going to treat the investigation into
11   Ms. Barton's conduct on May 16th, 2019 as
12   retaliatory because Ms. Phillips did not
13   raise that as a complaint; you didn't write
14   that, did you?
15        A.   No.
16        MR. MELITO:  Objection.
17        Q.   In fact what you wrote and what you
18   said was the only reason that you were going
19   to treat it as not retaliation was because
20   the complaint happened more than a year ago,
21   right?
22        MR. MELITO:  Objection to form.
23        A.   That's what Deliwe said.  In my
24   notes that's what I recorded.

176

C. GLASS

1         Q.   Got it.
2              And nothing to do with Ms. Phillips
3    not mentioning retaliation, correct?
4         MR. MELITO:  Objection to form.
5         A.   Ms. Phillips did not mention
6    retaliation, no.
7         Q.   That is not my question.  My
8    question is, it is not in your notes, right?
9         A.   Not in my notes.
10        Q.   Got it.
11             But you considered retaliation as a
12   possible issue for the May 16th, 2019 conduct
13   of Marilyn Barton, right?
14        MR. MELITO:  Objection.
15        A.   Yes, it did come up.
16        Q.   Okay.
17             Now at this point, May 23rd or so of
18   2019, where you are aware that Ms. Phillips
19   had made these complaints, you're aware that
20   Ms. Barton had admitted to the conduct that
21   she had been accused of on that May 16th,
22   2019 date.  Did you get an independent
23   investigator to come in and look at it?
24        MR. MELITO:  Objection to form.

177

```
                    C. GLASS
1
2        A.   No.
3        Q.   Now, with regard to the complaints
4   that were made about the fashion show, was it
5   you that recommended an independent
6   investigator come in?
7        MR. MELITO:   Objection.
8        Outside the scope of 30(b)(6).  This
9        will be in her personal capacity.
10       A.   No.
11       Q.   Okay.  Who was it that said we need
12  an independent investigation going on?
13       A.   Legal counsel.
14       Q.   I see.
15            So if I understand, do you remember
16  what date the fashion show came on?
17       A.   February of '20.
18       Q.   Okay.
19            But do you remember the exact date?
20       A.   I don't.
21       Q.   But you saw the statement, right,
22  that the president, Brown, gave about the
23  whole we're going to have an independent
24  investigator looking at this; do you remember
25  that?
```

178

```
                    C. GLASS
1
2        A.   Yes.
3        Q.   That happened within a month of the
4   fashion show, right, that statement was from
5   March 2020?
6        MR. MELITO:   Objection.
7        A.   Yes.
8        Q.   But even before the outside lawyers
9   were brought in to do this investigation, you
10  as well as the president of the college had
11  already decided that there was some
12  misconduct, or at least that's what you
13  opine.  That there was misconduct in the way
14  that Mary Davis and Kyle Farmer oversaw and
15  engaged with the producer of the fashion
16  show, correct?
17       MR. IRANOFF:   Objection --
18       MR. MELITO:   Objection to form.
19       A.   I guess you'll have to ask it again.
20       Q.   I don't need to.  I'll just move on.
21            At the time that the president,
22  President Brown made the statement, that
23  public statement, he wrote that public
24  letter, that was a time when F.I.T. was
25  coming under a lot of public scrutiny about
```

179

```
                    C. GLASS
1
2   whether they were operating a racially
3   insensitive program; isn't that right?
4        MR. MELITO:   Objection to form,
5        and objection to outside the scope of
6        the 30(b)(6).
7        A.   Correct.
8        Q.   And it was out of your control at
9   this point -- when I say your control, I'm
10  talking about you as the HR director.  It was
11  out of your control as to how you were going
12  to be able to either fashion it as race
13  discrimination or whether it was some other
14  form of complaint, you weren't the one making
15  those calls that the point, right?
16       MR. MELITO:   Objection to form.
17       Objection to outside the scope of the
18       30(b)(6).
19       A.   Correct.
20       Q.   And that's because at this point,
21  you needed to try, as we come full circle,
22  you needed to try and protect the college, to
23  protect your employer from liability, right?
24       MR. MELITO:   Objection to form,
25       and objection to outside the scope of
```

180

```
                    C. GLASS
1
2        the 30(b)(6).
3        A.   At that point, it was out of my
4   hands.
5        Q.   Exactly.
6            And so now, because it was coming
7   down, you saw the pictures.  Obviously
8   "clearly racist fashion show."  Someone
9   needed to be taken down, right?
10       MR. MELITO:   Objection to form.
11       Objection.  Outside the scope of the
12       30(b)(6).
13       A.   There was an investigation to
14  determine accountability.
15       Q.   Got it.
16            That was done by someone other than
17  you and someone other than Ms. Kekana,
18  correct?
19       A.   Yes.
20       Q.   And when the outside investigators,
21  as you indicated, came up with whatever
22  conclusions they came up with, you and
23  President Brown decided you were going to
24  fire Mrs. Davis and detenure Mr. Farmer,
25  correct?
```

181

```
1                    C. GLASS
2          MR. MELITO:  Objection to form
3       and, again, outside the scope of the
4       30(b)(6).
5       A.  I was involved in the process.
6       Q.  Right.
7          And as you indicated, one of the
8       things that you fired Dean Davis for was her
9       holding a meeting with students that had
10      complained about race discrimination with
11      Mr. Farmer without first addressing the
12      complaint to the Affirmative Action Office?
13          MR. DRANOFF:  Object to the
14      form.
15          MR. MELITO:  Objection to form
16      as well, and outside the scope of the
17      30(b)(6).
18      A.  That was part of the decision.
19      Q.  Right.
20          But when Ms. Phillips made her
21      complaint that Dean Davis didn't bring her
22      complaint to the Affirmative Action Office,
23      no harm no foul, right; you didn't make that
24      an issue at all, right?
25          MR. MELITO:  Objection to form.
```

182

```
1                    C. GLASS
2       Outside the scope of the 30(b)(6).
3       A.  We were dealing with the issue under
4       the workplace violence policy.
5       Q.  No.  No.  No.  No.  This is separate
6       and apart from that.  This is a complaint, as
7       we read before, where, you know, we had the
8       Respondent 3 and Respondent 4 and
9       Ms. Phillips complained that Respondent 4,
10      who was Dean Davis, did not report her
11      complaint to the Affirmative Action Office ---
12          MR. DRANOFF:  Object to the
13      form --
14      Q.  -- and instead told her to meet with
15      Respondent 3 and then get back to her about
16      what she wanted to do, right --
17          MR. MELITO:  Objection to form --
18      Q.  -- you didn't discipline Dean Davis
19      for that, right?
20          MR. MELITO:  Objection to form.
21      And again, outside the scope of the
22      30(b)(6).
23      A.  She was not disciplined for that.
24      Q.  Right.  And that's because if you
25      made a finding that Dean Davis violated the
```

183

```
1                    C. GLASS
2       antidiscrimination policy as it related to
3       Ms. Phillips, that your employer, F.I.T.,
4       could be held responsible, could be liable in
5       a lawsuit, right?
6          MR. MELITO:  Objection to form.
7          MR. DRANOFF:  Object to the
8       form as well.
9       A.  I don't understand the question.
10      Q.  What about the question don't you
11      understand?
12      A.  You're asking me a "yes" or "no"
13      question that has a lot of context that needs
14      to be explained in order for me to answer it.
15          MR. SELLS:  Can we have the
16      question repeated.
17      Q.  Tell me what context that you need.
18          (Whereupon, the requested
19      portion of the transcript was read
20      back.)
21      A.  So, no, I did not make that
22      connection, I guess, if that is what you are
23      asking.  I did not make that connection nor
24      did I predict a lawsuit.
25      Q.  Right.
```

184

```
1                    C. GLASS
2          That's because you made these
3       findings that there was no violation.  So you
4       thought that would eliminate any chance that
5       there would be a lawsuit in this case,
6       correct?
7          MR. MELITO:  Objection to form.
8       Outside the scope of the 30(b)(6) as
9       well.
10      A.  What findings are you referring to?
11      Q.  The findings that Dean Davis did
12      nothing wrong as it related to Marjorie
13      Phillips, she did nothing wrong?
14      A.  The college took appropriate action
15      and investigated and intervened.  That was
16      the appropriate action.
17      Q.  They intervened?  You just said that
18      Dean Davis received no discipline for her
19      failure to report Ms. Phillips' complaint to
20      the Affirmative Action Office --
21          MR. DRANOFF:  Object to the
22      form --
23      Q.  -- but you made a finding that she
24      did nothing wrong in Ms. Phillips', correct?
25          MR. MELITO:  Objection to form.
```

185

```
1                    C. GLASS
2         A.  I — you know, I don't believe that --
3    when the report -- when Deliwe's report came
4    out and there were no findings, there was no
5    further action taken.
6         Q.  But you know that Dean Davis
7    violated the policy when it came to her
8    failure to report Ms. Phillips' complaints of
9    discrimination to the Affirmative Action
10   Office, right?
11             MR. MELITO:  Objection --
12             MR. DRANOFF:  Object to the
13        form.
14             MR. MELITO:  Objection to form
15        as well.
16        A.  There was a policy violation.
17        Q.  Got it.
18             That same policy violation, Dean
19   Davis' failure to report complaints of
20   discrimination made by students regarding the
21   fashion show, got her fired in the case where
22   there was an independent investigation not
23   controlled by you or Ms. Kekana; isn't that
24   right?
25             MR. DRANOFF:  Objection.
```

186

```
1                    C. GLASS
2              MR. MELITO:  Objection.
3         Objection to the form.
4         A.  That is not the sole reason she was
5    terminated.
6         Q.  It was one of the reasons, correct?
7              MR. DRANOFF:  Object to the
8         form.
9              MR. MELITO:  Objection.
10        Objection to the form as well.
11        A.  Yes.
12        Q.  And again, that's because the school
13   was trying to cover its own negative image
14   that resulted from the fashion show that was
15   clearly racist, right?
16             MR. DRANOFF:  Object to the
17        form.
18             MR. MELITO:  Objection to form
19        as well.
20        A.  (No Response.)
21        Q.  You going to answer the question?
22        A.  Sorry.  I didn't know you were
23   waiting for a response.
24        Q.  Yeah, I am.
25        A.  (No Response.)
```

187

```
1                    C. GLASS
2         Q.  Do you need the question read back?
3         A.  I do.
4              MR. SELLS:  Okay.
5              (Whereupon, the requested
6         portion of the transcript was read
7         back.)
8              MR. MELITO:  Same objection.
9              MR. DRANOFF:  You have our
10        objections.
11        A.  The college was responding to an
12   issue that involved students and a fashion
13   show and decided to conduct an external
14   investigation.
15        Q.  Okay.
16             That was into Dean Davis and Kyle
17   Farmer, correct?
18        A.  Yes, and the events of the show.
19   Yes.
20        Q.  Did you know that part of
21   Ms. Phillips' complaint was against Mr. Farmer;
22   did you know that?
23        A.  At some point, yes.
24        Q.  And when did you learn that?
25             MR. MELITO:  Noting this is in
```

188

```
1                    C. GLASS
2         Dr. Glass' personal capacity.
3         A.  Probably when I got the report from
4    Deliwe.
5         Q.  And that was the first time that you
6    learned that Kyle Farmer was part of the
7    complaint that Ms. Phillips had raised
8    regarding discrimination in the workplace; is
9    that correct?
10             MR. MELITO:  Objection.
11        A.  I had heard; but that was the first
12   time that I had anything in writing or
13   related to it.  I had heard things that
14   were -- his name had come up.
15             MR. SELLS:  Can we pull up
16        Exhibit 29.
17             (The image is shared on the
18        computer screen.)
19             MR. SELLS:  If we could scroll
20        to "Respondent 2."  Right there.
21        Q.  Just to be clear, "The
22   Complainant --" Ms. Phillips "-- alleged back
23   in 2017 Respondent 2 --" this is Kyle Farmer
24   "-- subjected Complainant to discriminatory
25   harassment when he stated Complainant looked
```

189

C. GLASS

1 like she was going to the hood as the
2 Complainant put her hat on. Complainant
3 states that the Respondent apologized
4 profusely and he thanked me for saying
5 something to him.
6 Respondent states that his apology
7 was accepted by Complainant and they had
8 since the incident had a very good and
9 cordial working relationship.
10 Based on a preponderance of the
11 evidence and the context and circumstances,
12 this is investigator finds that the incident
13 does not meet the severe persistent or
14 pervasive standard of discriminatory
15 harassment.
16 However, this investigator finds
17 this may be more appropriately handled by
18 another office. This report will be
19 forwarded to the Office of Human Resources
20 Management and Labor for appropriate review."
21 So with this decision that this
22 incident does not meet the severe persistent
23 and pervasive standard, what does that have
24 to do with F.I.T.'s policies as they relate

190

C. GLASS

1 to complaints and investigations of
2 allegations of discriminatory conduct?
3 MR. MELITO: Objection.
4 Outside the scope of the 30(b)(6).
5 A. The Affirmative Action Office does
6 an investigation and as it states, if there
7 are interventions that can be taken from an
8 HR perspective, they allow us to take a look
9 at it.
10 Q. Okay.
11 What did your office do with regard
12 to Mr. Farmer and the referral from the
13 Affirmative Action Office?
14 A. We discussed cultural competence
15 training and ended up scheduling it and
16 requiring everyone in the department to
17 attend.
18 Q. Cultural, what was it -- competence?
19 A. Cultural competence. It's called --
20 right now it's called the equity series.
21 That is what it is referred to.
22 Q. Got it.
23 So let me just understand. Mr. Farmer
24 says to Ms. Phillips' based upon

191

C. GLASS

1 Ms. Phillips's putting on her hat that she
2 looks like she's coming from the hood; is
3 that right?
4 MR. DRANOFF: Objection. You
5 misread it.
6 MR. MELITO: Objection.
7 A. It states, "going to the hood."
8 Q. Got it.
9 "Going the hood" simply because she
10 was putting on her hat; is that right?
11 A. Correct.
12 MR. MELITO: Objection.
13 Q. So, how is that not considered a
14 severe form of discrimination that --
15 MR. DRANOFF: Object to the
16 form --
17 Q. -- simply an African-American woman
18 putting on her hat suggests that she's going
19 the hood; how is that not severe?
20 MR. MELITO: Objection to form
21 and, again, to outside the scope of
22 30(b)(6).
23 A. I was not involved in that
24 complaint. So you would have to ask Deliwe.

192

C. GLASS

1 Q. No. She referred it to you.
2 A. She --
3 Q. -- forward it to the Office of Human
4 Resources Management.
5 A. Your question was that you asked me
6 how was this not severe and pervasive.
7 Q. Okay.
8 You're saying I would have to ask
9 Deliwe, and I cannot get an answer from you?
10 A. She investigated this and determined
11 that it was not. I don't -- I wasn't there.
12 Q. I see.
13 But now when Kyle Farmer is charged
14 with racist behavior as it relates to him
15 picking out accessories for a clearly racist
16 fashion show and an outside investigator
17 looks at it, he gets fired, right?
18 MR. MELITO: Objection to form.
19 A. Clearly two different situations.
20 Q. Oh, clearly. Tell me how they're
21 different?
22 MR. MELITO: Objection. Again,
23 outside the scope of her 30(b)(6).
24 She may answer in her personal

193

C. GLASS

1  capacity.
2  
3      A.  I think making a comment that is
4  clearly uneducated and incentive is not the
5  same as insisting that a student wear
6  accessories in public.  So I think there is a
7  degree of difference.
8          MR. DRANOFF:  Object to the
9      form.
10     Q.  So, let's talk about that.  Because
11 what does someone look like who's going to
12 the hood?  Tell me what that person looks
13 like.
14         MR. MELITO:  Objection to form.
15     Also objection, this is outside the
16     scope of the 30(b)(6).
17     A.  I don't know.
18     Q.  You don't know?
19     A.  I don't know.
20     Q.  Well in the context of Ms. Phillips'
21 complaint, obviously she looked like someone
22 going to the hood.  So when you say you don't
23 know -- you know what Ms. Phillips looks
24 like, right?  You met her, correct?
25         MR. MELITO:  Objection.

194

C. GLASS

1      A.  Yes, I've met her.
2      Q.  And as a matter of fact, you can see
3  her face on this Zoom deposition, can't you?
4          MR. MELITO:  Objection.
5      Q.  Look at her.  Does she look like she
6  is going to the hood to you?
7          MR. MELITO:  Objection.  This
8      is outside the scope of the 30(b)(6).
9      A.  This is not about what I think.
10     Q.  Are you refusing to answer my
11 question?
12     A.  I think it's an inappropriate
13 question.
14     Q.  My question to you is, Does
15 Ms. Phillips look like someone to you who is
16 going to the hood?  That's my question.
17         MR. MELITO:  Objection.  Again,
18     this is outside the scope of the
19     30(b)(6).
20     A.  I don't know what "going to the
21 hood" means.
22     Q.  Well then, how could your office
23 make determinations about whether someone's
24 conduct is severe if you don't even know or

195

C. GLASS

1  choose not to learn what's the basis of the
2  comment while you make these decisions?
3          MR. MELITO:  Objection to form,
4      and also object to outside the scope
5      of the 30(b)(6), and asked and
6      answered.
7      A.  Deliwe made the determination about
8  the degree of severity of that comment.
9      Q.  And you were the one that she
10 referred this to, correct?
11         MR. MELITO:  Objection to form.
12     A.  She referred this to me, and we took
13 action.
14     Q.  Well, did you discipline Mr. Farmer?
15     A.  It -- it does not meet the severe
16 persistent or pervasive standard of
17 discriminatory harassment which would dictate
18 discipline.  However, it may be handled by
19 another office and forwarded to HR.
20         We did address the fact that
21 inappropriate comments, regardless of whether
22 I know what they mean or not, the fact that
23 she was offended resulted in training and
24 development for the entire department.

196

C. GLASS

1      Q.  How is that fair?  How is that fair
2  that Kyle Farmer could make a statement that
3  is wholly racially offensive and the whole
4  department has to sit through training
5  because of his statement; how is that fair?
6          MR. MELITO:  Objection, and
7      objection to outside the scope of the
8      30(b)(6).
9      A.  That was the college's response
10 whether you believe it was fair or not.
11     Q.  Well, that was your response --
12     A.  Yeah --
13     Q.  -- that was your decision, right --
14     A.  Yeah, in order to --
15         MR. MELITO:  Objection.
16         Go ahead.
17     A.  That was our response in order to
18 ensure that people had an understanding about
19 what might be inappropriate language or
20 comments that were, according to what I read
21 here, apologized profusely and whether -- I
22 mean, he's uneducated or whatever.  The fact
23 that it happened, the college was taking
24 measures so that it wouldn't happen again.

197

C. GLASS

1              C. GLASS
2    Q.  Oh, really; is that what you
3 consider this to be?
4       MR. MELITO:  Objection to form,
5    if that is a question.
6    A.  (No Response.)
7    Q.  Did you understand my question?
8    A.  Do I consider this to be; is this
9 what I consider this to be?
10    Q.  Do you consider this to be a measure
11 that was aimed at preventing Mr. Farmer from
12 making other racially offensive statements or
13 comments or exhibit racially offensive
14 behavior; did you think that this would
15 prevent it?
16       MR. MELITO:  Objection.  Go
17    ahead.
18    Q.  I'm sorry?
19    A.  That was the intent.
20    Q.  Oh.  So who had to sit through this
21 training?
22    A.  The expectation was that the
23 department, everyone in the department would
24 participate.
25       MR. SELLS:  Okay.  We can take

198

C. GLASS

1 down the document.
2    Q.  And that would include Ms. Phillips?
3    A.  Yes.
4    Q.  Why was Ms. Phillips included in it?
5       MR. MELITO:  Objection.  Again,
6    outside the scope of the 30(b)(6).
7    A.  She is a member of that team.
8    Q.  Yeah, but she made the complaint.
9 Did anyone say that Ms. Phillips had acted in
10 a racially incentive or discriminatory way;
11 did anyone do that --
12       MR. MELITO:  Objection.
13    Q.  I'm sorry?  I'm sorry?
14       MR. MELITO:  I'm just going to
15    renew my objection to this line of
16    questioning being outside the scope
17    of the 30(b)(6).
18    A.  There were many people who didn't
19 exhibit those behaviors that were included in
20 the training for the team.
21    Q.  All right.
22      Well, was Marilyn Barton one of
23 them?
24    A.  Yes.

199

C. GLASS

1    Q.  And so, this training that was put
2 in place that Ms. Phillips and Ms. Barton,
3 Mr. Farmer and other people in the division
4 were -- they were required to go, right?
5    A.  That was the expectation.
6    Q.  Okay.
7    So, this training obviously took
8 place sometime after October 7th of 2019,
9 when that memo was written, correct?
10       MR. MELITO:  Objection to form.
11    A.  Correct.
12    Q.  And so you forced Ms. Phillips to
13 sit in a room with Ms. Barton, a woman who
14 had threatened to kill her and who had told
15 her to "shut the fuck up" and who had pushed
16 her in her chest.  You made Ms. Phillips sit
17 in a room with her to receive this racial
18 sensitivity training; is that correct?
19       MR. MELITO:  Objection to form.
20    Objection to outside the scope of the
21    30(b)(6).
22    A.  We asked everyone to participate.
23    Q.  Could you answer my specific
24 question?

200

C. GLASS

1    A.  We asked everyone to participate.
2    Q.  So the answer is yes, you forced
3 Ms. Phillips to sit in a room with
4 Ms. Barton, a woman who had told her to "shut
5 the fuck up" that she "was gonna fucking kill
6 her" and she had pushed her in the chest, you
7 made them sit in the same room to receive
8 racial sensitivity training; is that right?
9       MR. MELITO:  Objection to form.
10    Objection to outside the scope of the
11    30(b)(6) --
12    Q.  It is either "yes" or "no"?
13    A.  No.
14    Q.  You did not?
15    A.  I did not make anyone sit in that
16 room.  She actually left the room after she
17 was on the phone being consulted -- she was
18 participating until -- is what I heard --
19 until she was on her phone and someone told
20 her to leave.  So she went actually was
21 sharing.
22    Q.  Who told you that?  Who told you she
23 left after -- who told you that Ms. Phillips
24 left after speaking to someone on the phone?

201

C. GLASS

1
2     A.   The dean that was in the room.
3     Q.   The dean, someone else who
4   Ms. Phillips made a complaint of racial
5   discrimination against; is that right?  This
6   is -- this is way you operate F.I.T.'s
7   antidiscrimination policies; is that right?
8          MR. MELITO:  Objection to form.
9          Objection to outside the scope of the
10          30(b)(6).
11     A.   (No Response.)
12     Q.   You can answer.
13     A.   The team was expected to participate --
14     Q.   Got it.
15     A.   -- whether they did or did not, I
16   don't know.
17     Q.   So, Ms. Phillips is told you got to
18   go to this training and in the training is
19   Dean Davis, the person that she reports to
20   and the person that she made a complaint of
21   discrimination about --
22          MR. DRANOFF:  Object to the
23          form --
24     Q.   -- she was asked -- that was one of
25   the people in the room, correct?

202

C. GLASS

1
2          MR. MELITO:  Objection.
3     A.   Yes.
4     Q.   Marilyn Barton, another person who
5   Ms. Phillips made a complaint about.  And
6   after the complaint, Ms. Barton -- who is
7   aware of the complaint -- accosts her in the
8   way that we described, she was also
9   there, correct?
10          MR. MELITO:  Objection to form.
11     A.   After --
12          MR. MELITO:  Again --
13     A.   -- after she, Marilyn Barton, was
14   assessed by the EAP and had gone through
15   counseling prior to being asked to
16   participate in that training.
17     Q.   And Mr. Farmer, the one who -- this
18   Mr. Hood -- "going to the hood" man, right;
19   he was in there too, correct?
20          MR. MELITO:  Objection to form.
21     A.   He was asked to attend.
22     Q.   Right.
23          And he was the one that picked out
24   those accessories that were used in the
25   fashion show that you found to be clearly

203

C. GLASS

1   racist, correct?
2
3          MR. MELITO:  Objection to form,
4          and outside the scope of the
5          30(b)(6).
6     A.   Kyle was expected to be at that
7   training.
8     Q.   That is not my question.
9     A.   But you're asking two questions yes
10   or no, and they cannot be answered that way.
11     Q.   All right.
12          Was Mr. Farmer the one who selected
13   the accessories that were used in that
14   clearly racist fashion show?
15          MR. MELITO:  Objection to form.
16     A.   Mr. Farmer was responsible for the
17   accessories used in the fashion show.
18     Q.   Got it.
19          So that training must have really
20   helped, right?
21     A.   Unfortunately not.
22          MR. MELITO:  Objection.
23     Q.   Maybe if you had suspended him or
24   given him some type of discipline as a result
25   of Ms. Phillips' complaint, then he would

204

C. GLASS

1   have learned his lesson and F.I.T. wouldn't
2
3   have had those racist accessories, right?
4          MR. MELITO:  Objection to form,
5          Objection, outside the scope of the
6          30(b)(6).
7     A.   I think that's impossible to answer.
8     Q.   Right, because it didn't happen --
9          MR. MELITO:  Objection --
10     Q.   -- he never got disciplined, so he
11   just escalated it, right?
12          MR. MELITO:  Objection.
13     A.   (No Response.)
14     Q.   Right?
15          MR. MELITO:  Objection.
16     A.   Right, what?
17     Q.   His behavior, his racially incentive
18   behavior escalated, got worse --
19     A.   Correct --
20     Q.   -- right?
21          MR. MELITO:  Objection to form,
22          and just note outside the scope of
23          30(b)(6).
24     Q.   Just like Dean Davis, she did not
25   get any discipline as a result of violating

C. GLASS

1  the antiharassment policy based on
2  Ms. Phillips' complaint and her behavior got
3  worse when she received other complaints from
4  students regarding the fashion show, correct?
5      MR. DRANOFF:  Object to the
6      form.
7      MR. MELITO:  Objection to form,
8      and objection to outside the scope of
9      30(b)(6).
10     A.  (No Response.)
11     Q.  You can answer.
12     A.  It was escalated, correct.
13     Q.  Now, you mentioned something about
14  Marilyn Barton undergoing some type of --
15  what was it; counseling?
16     A.  Correct.
17     Q.  How did that come about?
18     A.  It was clear that the event that
19  happened was inappropriate and the college
20  requested that she --- actually mandated that
21  she have a waiver of confidentiality so that
22  the director of the Employee Assistance
23  Program could relay information to us whether
24  there was a determination of whether she was

C. GLASS

1  any danger to herself or others and
2  subsequent counseling to discuss the matter
3  and what it was that triggered her.  I don't
4  know anymore specifics.
5      Q.  Okay.
6          And who was this counselor that she
7  was assigned to go see?
8      A.  The director of the Employee
9  Assistance Program, Robin Zarel.
10     Q.  Was anyone else asked to go consult
11  with Ms. Zarel?
12     A.  Kyle had already been consulting
13  with Robin Zarel.
14     Q.  As part of what?
15     A.  As part of his own personal
16  counseling.  And so, we asked that -- we
17  wasn't mandated, but I think that we -- we
18  knew that he was already in counseling.
19     Q.  Okay.
20          So, what was he in counseling for?
21     MR. MELITO:  Objection.
22     A.  I can't say.
23     Q.  Was it related to a complaint
24  Ms. Phillips made or to something else?

C. GLASS

1      A.  To something else.
2      Q.  Did it have anything to do with race
3  complaints?
4      A.  It did not.
5      MR. MELITO:  Objection.
6      MR. SELLS:  I'm calling for the
7      production of records related to Kyle
8      Farmer's consultation as well as
9      Marilyn Barton's consultation.
10     MR. MELITO:  Just follow up in
11     writing, and we will respond
12     accordingly.
13     Q.  Now, did you ask Ms. Phillips to go
14  through counseling with Marilyn Barton?
15     A.  When they were reinstated when, I
16  believe, Marjorie was on vacation for five
17  weeks and there was a cooling off period,
18  Marilyn was in counseling.  Marjorie then
19  took a leave of absence; and by the time that
20  both were returning to work, we attempted the
21  training session as well as a joint
22  mediation; because clearly there was an issue
23  between the two of them.
24     Q.  So, nothing you said so far

C. GLASS

1  indicates that Marilyn Barton received any
2  discipline; is that right?
3      A.  She did --
4      MR. MELITO:  Objection --
5      A.  -- she did receive discipline.
6      Q.  What was her discipline?
7      A.  Her discipline was counseling and
8  requirement in training; and she was put on
9  notice that if anything like that happened in
10  the future, it could result in additional
11  discipline up to and including termination.
12     Q.  So, you're saying giving someone
13  notice that if they act in a hostile way or
14  some way that violated F.I.T. policy could
15  result in further discipline or termination;
16  that is a disciplinary measure?
17     MR. MELITO:  Objection.
18     A.  That is a written warning, yes.
19     Q.  Well, that's the same warning that's
20  in the employee handbook, isn't it?
21     MR. MELITO:  Objection.
22     A.  There's a general statement in the
23  employee handbook.  There's also language in
24  the collective bargaining agreement; and any

209

```
               C. GLASS
1
2      first offense typically does not result in
3      charges, although it could.
4          Q.  So, let me understand.  So anyone
5      reading the collective bargaining agreement,
6      that section that says misbehavior can result
7      in termination or discipline, is a written
8      warning --
9              MR. MELITO:  Objection --
10         Q.  -- right?
11         A.  In a progress discipline situation
12     when there is nothing on the record and no
13     instances of previous behavioral problems, a
14     written warning is appropriate.
15         Q.  No.  My question to you is, If I
16     pick up the employee manual and I read the
17     section that says "violation of this policy
18     could result in discipline or termination,"
19     you're saying I have just been given a
20     written warning?
21             MR. MELITO:  Objection to form.
22         A.  I think that's semantics.  That is
23     the policy statement; and if there is an
24     incident and it's a first offense, then part
25     of the progress disciplinary letter indicates
```

210

```
               C. GLASS
1
2      that if there is a future offense, it's very
3      likely that it will result in additional
4      discipline.
5          Q.  Got it.
6              And so that was your answer to how
7      to handle Marilyn Barton's threat to kill
8      Ms. Phillips; is that right?
9              MR. MELITO:  Objection to form.
10     Objection outside the scope of the
11     30(b)(6).
12         A.  Based on the review of the
13     investigation and consultation with the union
14     about the best way to move forward and
15     resolve the issue and having had Marilyn on
16     suspension, counseling and having it
17     determined that she was not a threat to
18     herself or others and could be returned to
19     the workplace, it was determined that an
20     intervention -- my battery is running low,
21     which is not good.  Charging.
22             MR. MELITO:  Derek, let's go
23     off the record.
24             MR. SELLS:  Yes, let's go off.
25             (Whereupon, a brief recess due to
```

211

```
               C. GLASS
1
2      technical issues was taken at 5:11 p.m.;
3      after which, the proceeding continued at
4      5:18 p.m. as follows.)
5              MR. SELLS:  Please, read back
6      the last question and answer.
7              (Whereupon, the requested
8      portion of the transcript was read
9      back.)
10         A.  So, yes.  The college determined
11     that would be an appropriate intervention,
12     and we identified three consultants who do
13     mediation work, and we asked the director of
14     the EAP to look at their bio's to see which
15     one would be most effective because she was
16     familiar with this case, and Dr. Kirkland
17     Vaughans was selected, and we asked that each
18     of them meet with Dr. Vaughans individually
19     and then he would determine next steps in
20     approach of repairing the relationship.
21         Q.  Okay.
22             Then coming up with this
23     determination that counseling and mediation
24     and training in a notice would be the proper
25     way to handle this, who did you consult with?
```

212

```
               C. GLASS
1
2          A.  I consulted with union officers.  I
3      believe the vice president of the union and
4      maybe the vice president of the staff union
5      officers about how best to resolve this.
6      They felt that --
7          Q.  What are their names?
8          A.  Ellen Lynch, Isolina Perez and Amy
9      Zaborowski.  The union -- each, Marilyn and
10     Marjorie, had representation during this
11     entire period, and we were consulting on the
12     appropriate way to resolve this.  They agreed
13     and supported this resolution.
14         Q.  Let me just ask you.
15             Ellen Lynch, does she work for
16     F.I.T.?
17         A.  Yes.
18         Q.  In what capacity?
19         A.  She is a faculty member who is also
20     the vice president of the UCE bargaining
21     unit.
22         Q.  Isolina Perez, is she also an F.I.T.
23     employee?
24         A.  Yes.
25         Q.  Amy Zaborowski, is she an F.I.T.
```

213

```
                    C. GLASS
 1
 2    employee?
 3        A.  Yes.
 4        Q.  I see.
 5            So you call them union officers, but
 6    in fact they also work for F.I.T., right --
 7            MR. MELITO:  Objection.
 8        A.  They are employees of the college
 9    and receive release time to serve as
10    officers.
11        Q.  Got it.
12            But at the end of the day, they
13    still have to answer to F.I.T. if they want
14    to keep their job, correct?
15            MR. MELITO:  Objection to form.
16        A.  I think they have a duty to
17    represent that is equally important to them
18    in their union roles.
19        Q.  I'm not asking that.
20            At the end of the day, F.I.T. will
21    decide whether Ellen Lynch, Isolina Perez or
22    Amy Zaborowski are doing their F.I.T. jobs
23    appropriately enough to keep them; is that
24    correct?
25            MR. MELITO:  Objection to form,
```

214

```
                    C. GLASS
 1
 2    and outside the scope of the
 3        30(b)(6).
 4        A.  If they were not performing their
 5    jobs or there was an issue, they would be
 6    subject to the collective bargaining
 7    agreement like the rest of them are.
 8        Q.  Just so I'm clear.
 9            When Marilyn Barton said repeatedly
10    to Marjorie Phillips that she was gonna
11    fucking kill her, oh, you thought that, oh,
12    she just needs a little counseling, right?
13            MR. MELITO:  Objection to form,
14        and objection to outside the scope of
15        the 30(b)(6).
16        A.  I thought it was a serious situation
17    that could ultimately be resolved through
18    mediation, yes.
19        Q.  Okay.
20            How much counseling did she receive?
21        A.  I don't know that.
22        Q.  But yet she was allowed to come back
23    even if you do not know how much counseling
24    she went through, correct?
25            MR. MELITO:  Objection to form.
```

215

```
                    C. GLASS
 1
 2        A.  I do know that it was determined by
 3    the counselor that she was fit for duty.
 4        Q.  Oh.  The counselor that was being
 5    paid by F.I.T.; is that correct?
 6            MR. MELITO:  Objection.
 7        A.  The counselor who is employed as the
 8    director of the joint labor management
 9    Employee Assistance Program.
10        Q.  Is that F.I.T. run?
11        A.  It is governed by both parties.  It
12    is paid for by F.I.T. as part of the
13    agreement.
14        Q.  F.I.T.  There you go.
15            And the mediation, the mediator, who
16    paid to the best of your recollection that?
17        A.  The --
18            MR. MELITO:  Objection --
19        A.  -- the college.
20        Q.  F.I.T., got it.  Okay.
21            So, Ms. Phillips makes a complaint
22    of discrimination and retaliation; although
23    you say it was a -- it was a what, a colon
24    not an exclamation point -- but nonetheless,
25    you considered retaliation and you know that
```

216

```
                    C. GLASS
 1
 2    under the law an employee who raised
 3    complaints of discrimination and retaliation
 4    can also sue their employer for compensation
 5    related to those allegations, correct?
 6            MR. MELITO:  Objection to form.
 7        A.  Yes.
 8        Q.  And you know that in order for an
 9    employee to win a liability judgment against
10    their employer, they would have to prove that
11    they were discriminated against and/or
12    retaliated against before they could actually
13    win that liability judgment; you know that,
14    right?
15            MR. MELITO:  Objection to form,
16        objection to the conclusion and
17        objection outside the scope of the
18        30(b)(6).
19        A.  I'm not an attorney, so I don't know
20    the intricacies of the lawsuit.
21        Q.  So because you are not an attorney,
22    are you saying that you don't realize that a
23    plaintiff in a civil suit related to
24    discrimination in the workplace has to prove
25    their case with evidence; you are not aware
```

217

C. GLASS

1
2   of that?
3            MR. MELITO:  Objection to form,
4        and outside the scope of the
5        30(b)(6).
6        A.   That was different than your first
7   question.  I am aware that they have to prove
8   their case.
9        Q.   Got it.
10            And do you think it would be easier
11   to prove their case if the HR director or the
12   Affirmative Action director for their
13   employer made a determination that they were
14   discriminated against?
15            MR. MELITO:  Objection to form.
16        And again, outside the scope of the
17        30(b)(6).
18        A.  What is your question?
19            MR. SELLS:  Please read it
20        back.
21            (Whereupon, the requested
22        portion of the transcript was read
23        back.)
24        A.   Would it be easier?  Perhaps, but
25   that is not how I go into investigations.

218

C. GLASS

1
2        Q.   When you say "perhaps," what does
3   "perhaps" mean?  Wouldn't it be easier -- if
4   an employee has to prove that they were
5   discriminated against, they make a complaint
6   to their employer, their employer has an HR
7   director and/or an Affirmative Action
8   coordinator who looks at the complaint and
9   says you know what, yeah, you were
10   discriminated against.  You're saying that
11   wouldn't make it easier for them to prove
12   their case in court?
13            MR. MELITO:  Objection to form.
14        And again, outside the scope of the
15        30(b)(6).
16        A.  I could speculate it could depending
17   upon the allegations in the case.
18        Q.   And if the same employee made the
19   same complaint and the HR director and the
20   Affirmative Action coordinator decide, no,
21   your allegations are not substantiated; that
22   would make it more difficult for them to
23   prove their case in court, right?
24            MR. MELITO:  Objection to form.
25        And outside the scope of the

219

C. GLASS

1
2        30(b)(6).
3        A.  I think it depends on the facts of
4   the case and what actually happened.
5        Q.   So are you saying that, no, that it
6   wouldn't make it more difficult?
7        A.   I don't know that in and of itself.
8   I don't know that.  I'm not an attorney.  I'm
9   not making an assumption about how a case
10   would land; I can't do that.
11        Q.   I'm not asking how it's going to
12   land.  I'm asking, would it make it more
13   difficult?  If on one hand they sustain it
14   and say yes, you were discriminated against,
15   that would make it easier.  You're saying if
16   you said no, if an HR person and an
17   Affirmative Action coordinator would say no,
18   that somehow it wouldn't make it more
19   difficult?  I'm not saying impossible, but
20   more difficult?
21            MR. DRANOFF:  Object to the
22        form.
23            MR. MELITO:  Objection to form
24        and again, outside the scope of the
25        30(b)(6).

220

C. GLASS

1
2        A.  I don't know.
3        Q.   Okay.
4            What about that don't you know?
5            MR. MELITO:  Objection.
6        A.  I don't know the decision, how much
7   weight that would carry or the burden of
8   whatever it is that has to be proven.  So, I
9   can -- I don't know.  I think that it's...
10        Q.   Got it.
11            Getting back to, "I will fucking
12   kill you."  Is that a -- is that like --- has
13   anyone ever threatened to kill you?
14            MR. MELITO:  Objection to form.
15        Outside the scope of the 30(b)(6),
16        teetering on harassing the witness.
17        A.  (No Response.)
18        Q.   You could answer.
19        A.  No, actually I'm not going to answer
20   that.
21        Q.   And why not?  Why won't you answer
22   it?
23        A.  I think that's an inappropriate
24   question.
25        Q.   Okay.

221

C. GLASS

1
2      You might think so; but why won't
3  you answer it?  That's not a basis not to
4  answer --
5          MR. MELITO:  Derek, if I may.
6      Unless I instruct you not to, please
7      answer the question.
8      A.  I have been threatened.
9      Q.  Tell me.
10     A.  And I'm not going into anymore
11 details.
12     Q.  Was it very traumatizing for you?
13         MR. MELITO:  Now, I will cut
14     this off.  It is obviously a personal
15     matter, and it is not subject to this
16     lawsuit.
17         I'm instructing the witness not
18     to answer.
19         MR. SELLS:  Okay.  Well, I hear
20     your -- I respect your objection.
21     I'm going to pursue this.
22     Q.  You were the one that decided that
23 when Ms. Phillips had those words said to her
24 that she was going to be killed, it was your
25 decision to tell the person that said that to

222

C. GLASS

1
2  her that you could stay in your job and get
3  paid, which is not discipline, that you would
4  get read a warning that says if you do
5  something like this again, you could be
6  disciplined and possibly fired, that the
7  person would have to undergo some kind of
8  counseling and training and mediation and you
9  are able to talk about that, about
10 Ms. Phillips who received a threat, a death
11 threat; isn't that right?  You just did that,
12 correct?
13         MR. MELITO:  Objection to form.
14     Objection, outside the scope of the
15     30(b)(6).
16     A.  We dealt with a workplace violence
17 issue.
18     Q.  Got it.
19         That's the way you describe it.
20 Ms. Phillips described it as a threat to be
21 killed on multiple occasions, right?
22         MR. MELITO:  Objection to form.
23     A.  No.
24     Q.  No?
25     A.  What are multiple occasion?  She was

223

C. GLASS

1
2  threatened multiple times --
3          MR. SELLS:  Can we pull up
4      Exhibit 21.
5          (The image is shared on the
6          computer screen.)
7      Q.  Now, do you recall Umilta Alsop was
8  interviewed in connection with this May 16th,
9  2019 incident by your direct reports?
10     A.  Yes.
11     Q.  Do you recognize this to be her
12 statement, her witness statement?
13     A.  Yes.
14         MR. SELLS:  If we could just
15     scroll down.  Stop.
16     Q.  I will read.  "Marlin then
17 reiterated that she didn't care about
18 Marjorie's opinion and added that she was
19 tired of this shit.  Marilyn continued on in
20 a progressively loud tone saying to Marjorie,
21 'I don't care what you think.  I'm sick of
22 you.  Shut the fuck up.'  Marjorie then said,
23 'I will not shut up.  This is my opinion.'"
24 Okay?
25         "Marilyn seemed to grow angry as she

224

C. GLASS

1
2  began screaming even louder saying, 'I'm
3  tired of your shit.  Shut the fuck up.  I
4  will fuck you up.'  Marilyn then, in what I
5  would describe as an aggressive manner, left
6  her desk area and walked over to Marjorie
7  while screaming, 'I will fuck you up.  I will
8  fucking kill you.'  At this point, she was
9  within inches of Marjorie.  Marilyn was
10 standing over Marjorie's desk with literal
11 spit, foam coming from her mouth as she
12 repeated this threat over and over."
13         Do you hear that?  Over and over.
14 "I will fuck you up.  I will fucking kill
15 you."  Over and over.  Let's keep going.
16         "I tried to get Marilyn's attention
17 by calling out to her a few times, but she
18 did not appear to hear me.  She continued to
19 yell and scream while standing over
20 Marjorie's desk.  'I am serious —'" quote,
21 unquote 'I am serious.  I will fuck you up.
22 I will fucking kill you.'"
23         Do you see that?
24     A.  (No Response.)
25     Q.  Do you see that?

225

C. GLASS

1
2     A.  I do.
3     Q.  And you read this, right?
4     A.  I read this.
5          MR. SELLS:  You can take down
6     the document.
7     Q.  And after that you said, Oh, whoa.
8  You can't -- we're gonna pay you, you're
9  gonna keep your job, don't worry.  All you
10 have to do is get some counseling, do a
11 little mediation and go through training and
12 that's it, right?  That is what you decided
13 to do when it came to the complaint that
14 Ms. Phillips made that she was threatened on
15 multiple occasions, that she was gonna be
16 fucking killed and that the woman who told
17 her that she was gonna be fucking killed said
18 that she was serious, right?
19          MR. MELITO:  Objection --
20    Q.  Is that right --
21          MR. MELITO:  -- to form.
22    Objection.
23    Q.  Is that right?
24    A.  Your earlier question about multiple
25  occasions was unclear --

226

C. GLASS

1
2     Q.  Unclear, what do you mean?
3     A.  Multiple statements in one event is
4  accurate.
5     Q.  Okay.
6          So, you're able to talk about how
7  you handled it with Marjorie Phillips; but
8  your event, whenever it was, that you were
9  threatened to be killed, you're so traumatized
10 that you can't even talk about it; is that
11 right?
12          (The witness is laughing.)
13          MR. MELITO:  Objection to form.
14    Q.  Is there something funny?
15    A.  Yeah, actually there is --
16          MR. MELITO:  Objection.  You do
17    not need to respond.  We already put
18    our objection to that line of
19    questioning on the record.
20    Q.  So, can you explain how you were
21  able to discern that all Ms. Barton needed
22  was some counseling, training and a repeat
23  warning that if she engaged in this kind of
24  behavior again that she could be punished,
25  disciplined or fired?

227

C. GLASS

1
2          MR. MELITO:  I'm just going to
3     object to form.
4     A.  That was consistent with the
5  approach to discipline at the college in
6  terms of first offenses.  And to my
7  knowledge, there was -- there were other
8  egregious -- this was egregious.  There were
9  other egregious cases in the past that I
10 don't have -- I'm not privy to, that did not
11 result in discharge.
12    Q.  But in Ms. Barton's case, she didn't
13 even get disciplined, right?
14    A.  I disagree.
15          MR. MELITO:  Objection to form.
16    Q.  Okay.
17          But you already indicated that a
18 suspension without pay is not discipline,
19 right?
20          MR. MELITO:  Objection to form.
21    A.  It is part of the disciplinary
22 process and there was written documentation
23 in her file, which in this environment is
24 significant.
25    Q.  I'm sorry.  Are you changing your

228

C. GLASS

1
2  answer?  Are you saying that suspension with
3  pay is disciplinary?
4     A.  No --
5          MR. MELITO:  Objection to form.
6     A.  I said it is part of the process.
7     Q.  Part of the process, okay.
8          Let's talk about -- you're saying
9  that what happened to Ms. Barton was
10 disciplinary in nature; is that right?
11    A.  Yes.
12    Q.  Okay.
13          Well, we know that suspension
14 without pay is not disciplinary, correct?
15          MR. MELITO:  Objection to form.
16    A.  If you read the collective
17 bargaining agreement, you will --
18    Q.  I'm asking you a simple question --
19    A.  --it --
20    Q.  -- a very simple question.  I'm not
21 talking about the policy.  I am asking you
22 whether or not suspension with pay is
23 disciplinary?  You already answered it
24 earlier today.  You said it wasn't.  Now, are
25 you changing your answer?

229

C. GLASS

2    MR. MELITO:  Objection to
3    form --
4    A.  It is not discipline in and of
5    itself.
6    Q.  Got it.
7    The other thing you said is she had
8    to go to an mediation, correct?
9    A.  Correct.
10   Q.  Is that disciplinary?
11   A.  Yes, I think it is.
12   Q.  Okay.
13   A.  For her.  For her --
14   Q.  Okay.
15   A.  -- yes.
16   Q.  Well, in order for her to go to
17   mediation, so would Ms. Phillips, correct?
18   A.  No, I misspoke.
19   Q.  Wait.  Hold on.  Excuse me.  Excuse
20   me.  Excuse me.
21   A.  No, you put words in my mouth.
22   Q.  Okay.  I said --
23   A.  -- mediation --
24   Q.  I said mediation -- what?
25   A.  Counseling is mediation; and

230

C. GLASS

2    counseling is the discipline and mediation
3    was the intervention to get them both back to
4    work.
5    Q.  I asked you about mediation.  You
6    said yes, it was.  It was mediation for her;
7    is that what you said?
8    MR. MELITO:  Objection.  She's
9    trying to clarify.
10   Go ahead, Dr. Glass.
11   A.  I thought you were referring to
12   counseling.  You said, "mediation."  I'm
13   clarifying.  I was -- my answer was in
14   response to counseling.
15   Q.  Counseling --
16   A.  Counseling --
17   MR. MELITO:  May you --
18   MR. SELLS:  Can we have the
19   previous answer repeated.  Read back
20   the last question and answer.
21   (Whereupon, the requested
22   portion of the transcript was read
23   back.)
24   Q.  Go ahead.  What were you saying,
25   that I put words in your mouth?  What words

231

C. GLASS

2    did I put in your mouth?  You just heard the
3    questions and the answers.  I just want to
4    know, Ms. Glass or Dr. Glass, what words did
5    I put in your mouth?
6    MR. MELITO:  Objection.
7    A.  Your line of questioning I took it
8    to understand -- I was thinking about and I
9    was responding with regard to counseling.
10   When you finally got to your question about
11   then both of them would have to go to
12   mediation, I realized you were talking about
13   mediation and not counseling and I asked to
14   clarify.
15   Q.  I asked three questions about
16   mediation in a row so you're saying that each
17   of those questions I put in your mouth the
18   word "counseling"?  Is that -- I'm trying to
19   figure out 'cause you said I put words in
20   your mouth --
21   A.  No, you're trying to --
22   Q.  I wanted to hear my questions and
23   your answers so I could see -- I shouldn't
24   say "so I could see."  So you could tell me
25   what words I put in your mouth.

232

C. GLASS

2    MR. MELITO:  Objection and
3    again, Dr. Glass is merely trying to
4    clarify the statement.
5    Continue Dr. Glass.
6    Q.  I want you to tell me what words I
7    put in your mouth?
8    MR. MELITO:  Objection.
9    Go ahead.
10   A.  You continued to ask questions that
11   were -- this entire deposition have been all
12   over the place, not clear to me and then when
13   I realized what you're talking about, I asked
14   to clarify.  And then you continued to talk
15   over me and tell me what I said and didn't
16   say until we have to go back to the record.
17   So, I am...
18   Q.  You still haven't told me what words
19   I put in your mouth.  I'm still waiting for
20   that.  So tell me which words --
21   A.  Let's go back -- let's go back to --
22   Q.  -- what words that I put in your
23   mouth.  Please help me out.  Please help me
24   out.  Make me understand --
25   A.  You said that --

233

C. GLASS

1
2   Q.  -- I asked --
3   A.  Are you gonna let me talk?
4   Q.  -- you said she had to go to
5   mediation.  I said, okay.  Did you consider
6   that disciplinary?  You said, yes.  You know,
7   for her.  And so I put those words in your
8   mouth; is that what you're saying?
9        MR. MELITO:  Objection.
10       Would you like me to step in
11   here and try to move this along that
12   it wasn't -- it didn't sound like it
13   was put words in your mouth.  It was
14   more misunderstood the question; and
15   now she is clarifying that when you
16   were talking about mediation, she was
17   thinking counseling.  Can we just
18   move on?  Or do you want to go back
19   and forth some more?
20       MR. SELLS:  I don't believe it.
21   I don't believe her answer.
22   Q.  I think you absolutely knew that I
23   was talking about mediation, but then when
24   you realized --
25       (The witness is laughing).

234

C. GLASS

1
2   Q.  -- that Ms. Phillips also had to go
3   to mediation, then you said, ut-oh.  I made a
4   mistake, because now if I consider it
5   disciplinary for Ms. Barton, then it also
6   disciplinary for Ms. Phillips and that's
7   what?  Retaliation, right?
8        MR. MELITO:  Objection.
9   Q.  That's retaliation; isn't it
10   Dr. Glass?
11       MR. MELITO:  Objection --
12   Q.  -- if you are punishing Ms. Phillips
13   for mediation --
14       MR. MELITO:  Objection --
15   Q.  If you are punishing her with
16   mediation because she made a complaint
17   against Ms. Barton --
18   A.  That is not true --
19   Q.  -- then that would be considered
20   retaliation.
21   A.  So -- so if you continue to put word
22   in my mouth and you are telling me what I
23   did, then stop, please.  That is why this is
24   just unacceptable, and for you to make
25   assumptions about the threats that I have

235

C. GLASS

1
2   received is unacceptable; and that's just to
3   put on the record what you think it was,
4   which you're wrong, is unacceptable.
5        MR. MELITO:  Okay.  So I'm
6   going to just step in here and ask
7   Dr. Glass to clarify her testimony,
8   what she -- we all know she has every
9   right to do on the record in
10   realtime.  So we could move on.
11       MR. SELLS:  I'm going to move
12   on.  I'm going move on.
13   Q.  So did you know that Ms. Phillips
14   also had to see a therapist, a counselor for
15   this incident?
16   A.  I was aware that she took a medical
17   leave.
18   Q.  So, when Ms. Phillips got counseling
19   for this incident, was that disciplinary?
20       MR. MELITO:  Objection to form.
21       And objection, outside the scope of
22       the 30(b)(6).
23   A.  I did not control her counseling,
24   her voluntary participation in whatever
25   treatment she had.

236

C. GLASS

1
2   Q.  Okay.
3        So, what you are saying is that
4   people who need to see counselors are somehow --
5   it's a punitive -- that somehow it's a
6   punitive measure, a disciplinary measure; is
7   that what you are suggesting, that F.I.T.'s
8   policy is --
9        MR. MELITO:  Objection.
10       Objection to form.
11   A.  For Marilyn Barton, she was required
12   by the college to see a counselor to evaluate
13   her state of mind; and yes, I believe that
14   that could be considered discipline because
15   she was required by the college to do that in
16   the context of this process.
17   Q.  Wow.  So, if there is an employee at
18   F.I.T. that has a drug problem and they seek
19   counseling, or you require them to seek
20   counseling, that is considered disciplinary?
21       MR. MELITO:  Objection to form.
22   A.  As a result of an incident on
23   campus, yes.
24   Q.  And in what way is that
25   disciplinary?

237

C. GLASS

1
2       MR. MELITO:  Objection to form.
3       Outside the scope of the 30(b)(6).
4       A.   Because it's not voluntary and it's
5   a condition of continued employment or moving
6   further down the disciplinary process.
7       Q.   Okay.
8            So where is it in the collective
9   bargaining agreement that it says requiring
10   someone to get counseling is disciplinary;
11   where is that at so I could find it?
12       MR. MELITO:  Objection.
13       A.   It doesn't say that in the
14   collective bargaining agreement.
15       Q.   It doesn't.  I thought the
16   collective bargaining agreement dealt with
17   disciplinary matters; is that right?
18       A.   It does to an extent.
19       Q.   Oh, so that is not the Bible then.
20   So when you said earlier then that everything
21   is under the collective bargaining agreement,
22   that's only true up until you decide that
23   it's not true; is it fair to say?
24       MR. MELITO:  Objection to form.
25       A.   Discipline falls under the

238

C. GLASS

1
2   collective bargaining agreement and the
3   provisions of the agreement dictate the
4   process.
5       Q.   What are you looking at right now?
6            (The witness holds up a pen.)
7       A.   I'm looking at a pen.  Wow, this is
8   really -- this is harassment.
9       MR. MELITO:  Objection -- note
10   objection.  Just please, Dr. Glass,
11   only answer the questions that
12   Mr. Sells presents.
13       THE WITNESS:  I am requesting a
14   break.
15       Q.   You have to answer the question
16   first.
17       MR. MELITO:  She did.  The last
18   question on the record was, what are
19   you looking at?  She answered, a pen.
20       MR. SELLS:  But there is an
21   open question about discipline in the
22   collective bargaining agreement,
23   where it says counseling is
24   discipline.  I'm asking where in the
25   collective bargaining agreement that

239

C. GLASS

1
2   exists.
3       A.   It doesn't.
4       MR. MELITO:  Objection to form.
5       That is asked and answered, but she
6       can give her response so we can go on
7       break.
8            I believe she just did.  I'm
9       sorry.  I was speaking when she
10       answered.  Ms. Simpson, did you get
11       that?
12       A.   It does not exist in the collective
13   bargaining agreement.
14       MR. MELITO:  Thank you.
15       MR. SELLS:  We can take a
16       break.  How long do you need?
17       MR. MELITO:  How long would you
18       like; five or 10 minutes?
19       MR. SELLS:  Come back at 6:10.
20       MR. MELITO:  Okay.
21            (Whereupon, a brief recess was
22       taken at 5:55 p.m.; after which, the
23       proceeding continued at 6:11 p.m. as
24       follows.)
25       MR. MELITO:  I want to note for

240

C. GLASS

1
2   the record during the break Dr. Glass
3   was emotionally distraught.
4       MR. SELLS:  Is she able to
5   continue?  Do you want to adjourn and
6   resume at a later time?
7       MR. MELITO:  Bottom of the 9th
8   here, let's just push through.
9   Hopefully we can get through without
10   anymore issues, just like we have
11   been doing this whole time.  So let's
12   just push through.
13       MR. SELLS:  Okay.
14       Q.   Now, during the course of your
15   office's investigation of a matter, and in
16   particular the incident that arose on May
17   16th, 2019, what role did Dean Davis play in
18   that investigation, if any?
19       A.   The dean and Natacha Unelus, the HR
20   generalist who was assigned to that business
21   unit, worked together to request witness
22   statements; and I believe Natacha then worked
23   with Andre to continue the actual interviews
24   with those people.
25       Q.   Did you ask Dean Davis to

241

C. GLASS

2  participate in this part of the
3  investigation?
4       A.  I don't recall.
5       Q.  Well, let me ask you.  Is it
6  F.I.T.'s policy --- let me ask you this.
7       Under F.I.T.'s policy, is it
8  appropriate for someone who has been accused
9  of discriminatory behavior towards a
10 complaining employee to participate in an
11 investigation concerning another complaint by
12 the employee who has already made a complaint
13 against the dean?
14      MR. MELITO:  Objection.
15      A.  No.
16      Q.  So why did you have her participate?
17 Here you have Ms. Phillips who's made a
18 complaint about Dean Davis saying that Dean
19 Davis acted in a discriminatory way and that
20 Dean Davis was never going to do anything to
21 support the complaint, why would you have
22 Dean Davis engaged in investigating conduct
23 of Marilyn Barton towards Ms. Phillips; why
24 would you do that?
25      MR. MELITO:  Objection.

242

C. GLASS

2       A.  I had just arrived at the college
3  and this event was serious and I don't know
4  that it was necessarily planned or anything
5  else.  But we wanted to get the witness
6  statements so that we could understand what
7  really happened, and I think that's the
8  extent to which she was involved.
9       Q.  But Dean Davis had a bias, right?
10 She had a bias against Ms. Phillips who made
11 a complaint of discrimination against her; so
12 why would you choose her, Dean Davis, to get
13 statements in a matter that involved
14 Ms. Phillips?
15      MR. MELITO:  Objection to form.
16      A.  I --- go ahead.
17      MR. MELITO:  I noted my
18      objection to the form.
19      A.  In my four weeks time, I was not
20 aware of that complaint.
21      Q.  I thought you spoke with Deliwe
22 Kekana about whether or not Ms. Barton's
23 threats to kill Ms. Phillips among other
24 things that it was possible retaliation or
25 not?

243

C. GLASS

2       A.  I think if you check the dates ---
3       MR. MELITO:  Objection ---
4       A.  That ---
5       MR. MELITO:  Go ahead ---
6       A.  --- that conversation was after the
7  statements were requested.
8       Q.  That's not the point.  The point is
9  you selected Dean Davis who had an open --- a
10 still open investigation involving her
11 violations of the antidiscrimination policies
12 by Ms. Phillips and you selected her to do
13 this, to be involved in this second
14 investigation.  That's wholly inappropriate;
15 isn't that right?
16      MR. MELITO:  Objection to form.
17      A.  She was not selected to be involved
18 in the investigation.  She volunteered to
19 request statements from the witnesses that
20 day because of the severity of the issue.  At
21 that the point, I did not know there was a
22 claim, a prior claim.
23      Q.  So, let me get this.  Dean Davis has
24 an open investigation going on about her that
25 you, as the head of employee relation, HR,

244

C. GLASS

2  employee relations and labor is not aware of ---
3       A.  That's correct ---
4       Q.  --- correct?
5       MR. MELITO:  Objection to form.
6       Q.  And so is it that you are saying
7  that your lack of understanding the overall
8  picture was what lead you to allow Dean Davis
9  to get involved in securing statements from
10 people that ultimately reported up to her; is
11 that right?
12      MR. MELITO:  Objection to form.
13      A.  When I was made aware of the
14 incident, I did not know there was a claim
15 filed by Marjorie in 2018.  We reacted
16 immediately to the situation to get
17 information around what was seen and what was
18 heard.
19      MR. SELLS:  Can we pull up
20      Exhibit 36.
21      (Whereupon, Plaintiff's Exhibit
22      36, two-page document Bates stamped
23      F.I.T.237 to 238, was marked for
24      identification as of this date.)
25      (The image is shared on the

245

```
1              C. GLASS
2     computer screen.)
3          MR. SELLS:  This looks like a
4     three-page document Bates stamped
5     F.I.T. 236 to 238.  If we could
6     scroll just a little bit up so we
7     could see the first e-mail.  Stop.
8          MR. MELITO:  I only have two
9     pages.  I don't know if that's --- I
10    have 237 to 238 on this exhibit.
11         MR. SELLS:  Maybe you're right.
12    I correct myself.  It is a two-page
13    document Bates stamped 237 to 238.
14         MR. MELITO:  Thank you.  Sorry
15    for interrupting.
16    Q.  Here on May 20th, 2019 at 6:31
17    Isolina Perez, she works for F.I.T., correct?
18         MR. MELITO:  Objection.
19    A.  Yes.
20    Q.  And she also works for the union,
21    you said; is that correct?
22    A.  She is a union officer.
23    Q.  Okay.
24         She writes as of Monday, May 20th,
25    "Dear Eric and Cynthia."  Do you know who she
```

246

```
1              C. GLASS
2     is referring to?  Who is "Eric" and who is
3     "Cynthia"?
4     A.  Eric Bowden was the interim vice
5     president of HR prior to me coming to the
6     college; Cynthia, is me.
7     Q.  Got it.
8         So Eric, was he still at F.I.T. at
9     the time?
10    A.  Yes, he moved to the Office of
11    General Counsel.
12    Q.  Got it.
13        But he was aware of Ms. Phillips'
14    complaint, was he not; the one that she made
15    back in March of 2018?
16         MR. MELITO:  Objection to form.
17    A.  I don't know.
18    Q.  Well, did you ask him?
19    A.  I didn't know; so why would I ask
20    him?
21    Q.  I'm not asking you why or anything
22    else.  I am asking you, Did you ask him?
23    A.  No.
24    Q.  Okay.
25        And who is "Cynthia"?
```

247

```
1              C. GLASS
2     A.  I'm Cynthia.
3     Q.  All right.  Got it.
4         So she writes, "I need to meet with
5     you as soon as possible to discuss the
6     serious incident that occurred last week in
7     the Graduate Studies between Marilyn Barton
8     and Marjorie Phillips.  I reached out to Mary
9     Davis, and she said she needed to find out
10    the protocol before discussing the incident."
11        Do you know what she is talking
12    about there?
13         MR. MELITO:  Objection.
14    A.  I do not.
15    Q.  Okay.
16        She then says, "I also reached out
17    to Natacha this morning asking her to reach
18    out to Mary Davis."
19        Now, why did Natacha what to speak
20    to Mary Davis?
21         MR. MELITO:  Objection to form.
22    A.  Natacha was the HR generalist
23    assigned to that business unit.
24    Q.  Got it.  All right.
25        "Since Marjorie doesn't feel safe in
```

248

```
1              C. GLASS
2     the same office with Marilyn, I have reached
3     out to Mario Cabrera to ask for security
4     escort for Marjorie until further action is
5     taken."
6         Do you see that?
7     A.  Yes.
8     Q.  So, as of May 20th, 2019 you knew
9     Ms. Phillips did not feel safe being in the
10    same space as Marilyn Barton, correct?
11    A.  Yes.
12    Q.  Then you respond, "Hello, Isolina.
13    We are currently investigating the incident
14    and I expect to have a report from campus
15    safety in the a.m."
16        Now, what report were you referring
17    to?
18    A.  The workplace violence policy states
19    that campus safety does a report.
20    Q.  And do you know if they did one in
21    this case?
22    A.  I believe they did take a report
23    from Marjorie.
24    Q.  And you then write, "Until an
25    assessment, there is no imminent danger or
```

249

C. GLASS

2  other safety concerns.  She may elect to
3  remain home until we discuss and determine
4  what may be necessary to resolve this issue."
5       When you talk about "until we
6  discuss and determine what may be necessary
7  resolve this issue," what were your choices
8  at this point that you were contemplating?
9       MR. MELITO:  Objection.
10      A.  I think I was trying to understand
11  what the process was at F.I.T.
12      Q.  So, you didn't really know what was
13  going on; you didn't know what the next steps
14  were; is it fair to say?
15      MR. MELITO:  Objection.
16      A.  Yes.
17      Q.  Okay.
18      MR. SELLS:  Can we scroll up.
19      Q.  So, then there's an e-mail from Mary
20  Davis on the same thread where she says, "Hi,
21  Sharon.  Thanks very much."
22      What's she talking about?
23      MR. MELITO:  Objection.
24      A.  I don't know.
25      Q.  Okay.

250

C. GLASS

2       But then she writes, "FYI, I left a
3  voicemail with Isolina this afternoon around
4  1:00 p.m. letting her know that I was
5  gathering information and would like to wait
6  until that process was complete before
7  meeting."
8       What was she talking about?
9       MR. MELITO:  Objection.
10      A.  With regard to the workplace
11  violence incident, she had asked, I guess,
12  anyone in the department who had observed the
13  incident and could provide information.
14      Q.  So, was Dean Davis thanking you very
15  much for allowing her to do her own
16  investigation before she was required to meet
17  with HR?
18      MR. MELITO:  Objection to form.
19      A.  I don't believe that is what that
20  means.
21      Q.  Well, why she thanking you?
22      MR. MELITO:  Objection to form.
23      A.  I don't know.
24      Q.  And what was your response to this
25  e-mail?

251

C. GLASS

2       MR. MELITO:  Objection.
3       A.  I don't know.
4       MR. SELLS:  I'm calling for the
5  production of the full e-mail thread.
6  There is clearly e-mails missing from
7  this.
8       If we could just scroll up May
9  20th, 2019, 8:46 that is 8:46 p.m.
10      Q.  You wrote, "Sorry.  Forgot to CC you
11  Mary."
12      And so, is that when you informed
13  Mary Davis about the communications you were
14  having internally with your staff and with
15  Marilyn Barton's union representative,
16  Isolina?
17      MR. MELITO:  Objection to form.
18      A.  I believe, based on Isolina's
19  e-mail, that she had reached out to Mary and
20  there were multiple people involved; and
21  therefore, I forgot to send Mary a courtesy
22  copy so that she would understand be in the
23  loop as to what was happening.
24      Q.  Okay.
25      Is it your understanding that

252

C. GLASS

2  Isolina Perez represented Ms. Barton in this
3  investigation?
4       A.  Or Marilyn, either or both.  I
5  didn't know that the point.
6       Q.  I'm sorry?  Who?
7       A.  Marilyn Barton and Marjorie Phillips
8  are both union employees that fall under the
9  representation of Isolina Perez; and whether
10  that was designated to others -- I think at
11  this time there wasn't a designation besides
12  Isolina was handling it from their
13  perspective.
14      Q.  I see.  All right.
15      But you understood, certainly by
16  this point, that Ms. Phillips had made a
17  complaint against Ms. Barton for
18  discrimination, right?
19      MR. MELITO:  Objection to form.
20      A.  I don't remember at what point.  I
21  think I talked to Deliwe on the 23rd because
22  I was clearly aware at that point and asked
23  her if it was retaliation or if that was
24  going to be a concern.  So I don't know on
25  May 20th.

253

C. GLASS

2  Q.  Okay.

3     Well as you look at it now, do you
4  think it's wholly inappropriate that Dean
5  Davis was assigned to do an investigation
6  into this matter where Ms. Phillips had an
7  open discrimination complaint against her and
8  Ms. Barton?

9     MR. MELITO:  Objection to form.
10    Objection, outside the scope of the
11    30(b)(6).

12  A.  Dean Davis was not assigned.  Dean
13  Davis was part of the process of information
14  gathering as the dean and leader of the
15  department in which this incident happened.

16    MR. SELLS:  Can we just go up
17    to the previous --

18  Q.  I'm going to read this again.

19     "FYI, I left --" this is from Dean
20  Davis to you at 9:53 p.m. on Monday May 20th.
21  "FYI, I left a voicemail with Isolina this
22  afternoon around 1:00 p.m. letting her know
23  that I was gathering information and would
24  like to wait until that process was complete
25  before meeting."

254

C. GLASS

2     Now when she writes that that "I was
3  gathering information," did she tell you how
4  she was going to gather this information?

5     MR. MELITO:  Objection.

6  A.  Yeah, I believe the understanding
7  was that she was going to ask those people in
8  the department who observed the incident to
9  put it in writing as soon as possible so that
10  we could ensure it was documented.

11  Q.  Okay.

12     Isn't that HR's function if they're
13  going to do an investigation; isn't it their
14  function to get statements from witnesses and
15  not Mary Davis' function?

16    MR. MELITO:  Objection.

17  A.  Typically, yes.  In this situation,
18  because it was so serious, I think we were
19  all hands on deck to ensure the safety of the
20  employees.

21  Q.  Really?  So Natacha was part of this
22  chain, wasn't she?

23  A.  Yes.

24  Q.  And Natacha was the one along with
25  the other person -- who was the other person

255

C. GLASS

2  from HR that spoke to Marilyn Barton?  What
3  was his name?  The one who took the notes?

4     MR. MELITO:  Objection.

5  A.  Andre Nunez.

6  Q.  Andre, okay.

7     They could have easily spoken to the
8  witness, right?

9     MR. MELITO:  Objection to form.

10  A.  We are not located in the same
11  building on campus, and it would not have
12  been as efficient.

13  Q.  Let me just ask, is it F.I.T.'s
14  policy that if it is a serious matter that
15  needs to be investigated immediately that the
16  dean of the college can go ahead and assist
17  or that anyone that is nearby that is in a
18  supervisory capacity could take statements
19  that are to be used in an HR investigation;
20  is that F.I.T.'s policy?

21    MR. MELITO:  Objection.

22  A.  That was reasonable in this
23  situation.  I don't know what --

24  Q.  Okay.  Okay --

25  A.  -- yeah.

256

C. GLASS

2  Q.  So, let's take a look at the -- oh,
3  the fashion show.  That was certainly an
4  emergency.  You had the president of the
5  college making statements about it.  Did you
6  assign Dean Davis to go ahead and do the
7  information gathering for the fashion show
8  complaint?

9     MR. MELITO:  Objection to form.
10    Outside the scope of 30(b)(6).

11  A.  Legal counsel facilitated --

12    MR. MELITO:  Objection.  To the
13    extent that -- just --

14  Q.  Okay.  Well --

15    MR. MELITO:  -- attorney/client
16    privilege --

17  Q.  -- are you sure about that; because
18  I already read to you what was marked as
19  Exhibit B from Mary Davis' --

20    MR. SELLS:  Let me just get
21    that exhibit.  Sorry.  Let's pull up
22    Exhibit C.  Hang on.  Let's pull up
23    Exhibit 64, please.

24    (Whereupon, Plaintiff's Exhibit
25    64, attachment to affirmation in

257

C. GLASS

1
2   support of motion to dismiss, was
3   marked for identification as of this
4   date.)
5        (The image is shared on the
6   computer screen.)
7        MR. SELLS:  For the record,
8        Exhibit 64 is something that has been
9        filed with the New York County clerk
10       through ECF and it is an attachment
11       to an affirmation in support of a
12       motion to dismiss.  And this is
13       meeting notes from Mary Davis meeting
14       with Kyle Farmer and the students.
15       Can we just flip through this.
16   Q.   This is a memo to the file dated
17   February 18th of 2020, "Meeting with MFA
18   fashion design second year cohort, present
19   Kyle Farmer and students in the second year
20   cohort."
21        And this is a note from Mary Davis
22   explaining how she gathered information
23   concerning the complaint of these students,
24   right?
25        MR. MELITO:  Objection.

258

C. GLASS

1
2   Q.   You can read through it if you need
3   to.
4        MR. MELITO:  Objection.  Lacks
5        foundation.
6   Q.   Are you reading through it?
7   A.   I am.
8   Q.   Okay.
9        Do you need the screen to be moved
10   so you could read the rest of it?
11   A.   Please.
12        MR. SELLS:  We can scroll up.
13   Q.   Now, I don't need you to know
14   everything; but you see here she is meeting
15   with students who made complaints of
16   discrimination related to the fashion show;
17   is it fair to say?
18        MR. MELITO:  Objection to form,
19        lacks --
20   Q.   I mean, if you need to keep reading;
21   that is fine.  But I'm just saying, Is that
22   what this is?
23        MR. MELITO:  Objection.
24   Q.   Tell me when you need to have the
25   screen moved up.

259

C. GLASS

1
2   A.   Roll up, please.
3   Q.   Okay.
4        Now, you see -- I will just focus on
5   one thing.  "Students said they were made to
6   feel that their work was not valued and said
7   this feeling became especially sharp during
8   critiques that are part of the program.
9        Again, I stated that these behaviors
10   are not to be tolerated and should be
11   reported directly to me."
12        Now, is that accurate that
13   complaints of discrimination or retaliation
14   had to be reported to the dean or could it
15   be --
16        MR. DRANOFF:  Object to the
17        form --
18   Q.   -- reported to other people?
19        MR. DRANOFF:  Object to the
20        form.
21        MR. MELITO:  Objection to form
22        as well.  And again, this is outside
23        the scope of the 30(b)(6).
24   A.   It could be reported to others.
25   Q.   Okay.

260

C. GLASS

1
2        Keep reading and tell me when you
3   need to scroll up.
4   A.   Scroll up, please.
5   Q.   Tell me when you need to scroll up
6   again.
7   A.   Scroll up.
8   Q.   Tell me when you need to scroll up.
9   A.   Scroll up.
10   Q.   All right.  That's it.  Okay.
11        MR. SELLS:  We could take this
12        document down.
13   Q.   Now, with the investigation into
14   Ms. Phillips' complaint of May 16th, 2019 you
15   allowed Dean Davis to gather that
16   information, right?
17        MR. DRANOFF:  Object to the
18        form.
19        MR. MELITO:  Objection.
20   A.   I did not know Dean Davis was
21   meeting with the students until after.
22   Q.   No, I'm not asking about this -- I'm
23   not asking about meeting with the students.
24   I'm asking about, With Ms. Phillips'
25   complaint of May 16th, 2019 you allowed Dean

261

C. GLASS

1
2  Davis the time to gather and the permission
3  to gather information concerning her
4  complaint, correct?
5              MR. MELITO:  Objection to form.
6              MR. DRANOFF:  Object to the
7       form.
8       A.  Yes.
9       Q.  Okay.
10         But when Ms. Davis did the same
11  exact thing with regard to the fashion show
12  complaints, where she took it upon herself to
13  immediately investigate because it was such
14  an uproarious thing, that was used as part of
15  the reason to terminate her that she did not
16  go through the Affirmative Action Office and
17  instead tried to gather information on her
18  own, right?
19             MR. DRANOFF:  Object to the
20        form.
21             MR. MELITO:  Objection to form,
22        and outside the scope of the
23        30(b)(6).
24        A.  I think the situations were
25  different; yes, she did collect information

262

C. GLASS

1
2  in both of them.  The workplace violence
3  situation, I don't know that was
4  inappropriate to have the senior executive
5  involved in understanding quickly what had
6  happened.
7       Q.  Well, Dean Davis had a complaint --
8  an open investigation into Ms. Phillips'
9  complaint of discrimination and
10  discriminatory conduct on the part of Dean
11  Davis, did she not?
12             MR. MELITO:  Objection.
13        A.  I don't believe she was involved
14  beyond the collection of the statements,
15  which were an initial step to ensure the
16  safety of employees.
17        Q.  Well, let me understand this.  Who
18  did she get statements from?
19        A.  I think she requested them from the
20  employees who were in that vicinity when it
21  happened.
22        Q.  Okay.
23         Do you know what vicinity that was?
24        A.  The Graduate School office.
25        Q.  That is where her office is, where

263

C. GLASS

1
2  Dean Davis's office; is that right?
3        A.  Yes.
4        Q.  And the people who she was getting
5  statements from were under her supervision
6  and direction, right?
7              MR. MELITO:  Objection.
8        A.  Yes.
9        Q.  Now, do you know the names of people
10  that she got statements from?
11        A.  Well, you showed one, Umilta Alsop.
12        Q.  What makes you think that that came
13  from Dean Davis?  What makes you think she is
14  the one that got Umilta statement?
15        A.  I don't for sure.
16        Q.  You don't.  Okay.
17          Well, who else do you think that she
18  got a statement from?
19              MR. MELITO:  Objection.
20        A.  Actually, I don't know who she
21  actually got the statements from.  I know
22  that she requested them.  I don't know if
23  they ended upcoming to Natacha or to Mary
24  directly.
25        Q.  Okay.

264

C. GLASS

1
2              MR. SELLS:  If we could pull up
3        Exhibit 39.
4              (Whereupon, Plaintiff's Exhibit
5        39, Anton Baptiste's statement, was
6        marked for identification as of this
7        date.)
8              MR. SELLS:  If we could just
9        scroll down to the beginning.
10        Q.  This is Anton Baptiste's statement;
11  is that right?
12              MR. MELITO:  Objection.
13        A.  Yes.
14        Q.  How did Dean Davis get this
15  statement; do you know?
16        A.  I do not --
17              MR. MELITO:  Objection.
18        Q.  And from looking at this statement,
19  can you discern how she got it?
20              MR. MELITO:  Objection.
21        A.  I don't know.
22        Q.  Do you know if Anton Baptiste
23  actually even wrote this statement?
24        A.  I do not.
25        Q.  All right.

C. GLASS

1
2       So let's scroll up.  All you have is
3   this from Mary Davis to you as well as Natacha
4   Unelus, "FYI," right?
5           MR. MELITO:  Objection.
6       Q.  This statement was forwarded to you
7   from Mary Davis, correct?
8       A.  To Natacha, copying me and Tasha is
9   the primary.
10      Q.  So, HR had nothing to do with this
11  statement from Anton Baptiste other than
12  receiving it from Mary Davis, correct?
13          MR. MELITO:  Objection.
14      A.  Correct.
15      Q.  So you don't know how Mary Davis got
16  this statement from Anton Baptiste, right?
17          MR. MELITO:  Objection.
18      A.  Correct.
19      Q.  You don't know what it was that Mary
20  Davis may have said to Anton Baptiste about
21  this statement, right?
22          MR. MELITO:  Objection.
23      A.  Correct.
24      Q.  And you didn't even follow up with
25  Anton Baptiste after you received this

C. GLASS

1
2   statement for any clarifying information or
3   anything else, did you?
4           MR. MELITO:  Objection.
5       A.  I did not, but Natacha was the
6   primary investigator.
7       Q.  Well, did she speak to Anton
8   Baptiste after this statement?
9       A.  I do not know that.
10      Q.  Okay.
11          MR. SELLS:  We can take down
12      that document.
13          Could we put up exhibit 40.
14          (Whereupon, Plaintiff's Exhibit
15      40, statement from Henry Wallace, was
16      marked for identification as of this
17      date.)
18          (The image is shared on the
19      computer screen.)
20      Q.  Now, you indicated that there was
21  such a rush, that this was such a serious
22  matter that it needed to be investigated
23  immediately and so it was fully appropriate
24  for Dean Davis to take the lead in securing
25  witness statements.  Is that what you

C. GLASS

1
2   testified to?
3           MR. MELITO:  Objection to form.
4           MR. DRANOFF:  Object to the
5       form.
6       A.  To request the statements so that
7   the witnesses could prepare their statements
8   as soon as possible.
9       Q.  Got it.
10          So and so here we are now, Mary
11  Davis delivering to you and Natacha Unelus a
12  statement from Henry Wallace on Wednesday,
13  May 22nd, 2019 at 8:53 p.m.  Two full days,
14  correct?
15          MR. MELITO:  Objection.
16      A.  It appears that Henry sent it to her
17  at 5:03 p.m. that same day.
18      Q.  That's the way it appears.  Do you
19  know if that was, in fact, accurate?
20      A.  That's what the e-mail says.
21      Q.  Got it.
22          So why did it take three hours for
23  it to be forwarded to you; did your find out?
24          MR. MELITO:  Objection.
25      A.  (No Response.)

C. GLASS

1
2       Q.  I'm asking, Did you find out?
3       A.  I did not ask.
4       Q.  Why not?
5           MR. MELITO:  Objection.
6       A.  I work a lot of hours.  I don't know
7   that that three hour difference to me was
8   significant.
9       Q.  Okay.
10          MR. SELLS:  We could scroll
11      down.
12      Q.  Do you know if Mr. Wallace's -- if
13  this is Mr. Wallace's statement?
14      A.  According to the e-mail, it is.
15      Q.  All right.
16          Now, what is the difference between
17  Mr. Baptiste's statement and Mr. Wallace's
18  statement?
19          MR. MELITO:  Objection.
20      A.  You could bring the other one up and
21  I can read them both again.
22      Q.  Okay.
23          Why don't you read this one first.
24  Tell me when you are finished.
25          (Whereupon, Witness is reading the

269

```
1              C. GLASS
2      exhibit.)
3      Q.  Are you finished?
4      A.  No.
5      Q.  Where are you?
6      A.  I'm almost finished.
7      Q.  Okay.
8          If it's easier, I can read it for
9  you.
10     A.  I'm capable.
11     Q.  Can we put up the next one?
12     A.  Yes.
13     Q.  You just read Mr. Wallace's
14 statement.  Let's take a look at Exhibit 39.
15         MR. SELLS:  If we could just
16     scroll up to the statement.  There it
17     is.
18     Q.  So, now I want you to read Mr. Baptiste's
19 statement and tell me what's different.
20         MR. MELITO:  I'm going to
21     object; and object, this is outside
22     the scope of the 30(b)(6).
23     Q.  What's different so far?
24         MR. MELITO:  Objection.
25     A.  They both seem to have observed the
```

270

```
1              C. GLASS
2  same thing.
3      Q.  Whoa.  And they are two days apart
4  when they were written and they are exactly
5  the same; is that right?
6          MR. MELITO:  Objection.  They
7      are not exactly the same.
8      Q.  Well, both of them both indicate
9  that "Marilyn entered the office and said
10 that the cause of the altercation was due to
11 Marilyn issuing graduation regalia to a
12 student who had not gone through the steps to
13 purchase the materials online by the
14 deadline."  Right?  Is that what it --
15         MR. MELITO:  Objection.
16     Q.  Is that what they both say?
17         MR. MELITO:  Objection.
18     A.  Yes.
19         MR. SELLS:  Okay.  We can take
20     down the document.
21     Q.  Now, you saw Marilyn Barton's own
22 statement about the incident, and you saw
23 when Marilyn Barton said that this was the
24 last straw.  That Ms. Phillips had made a
25 complaint against her that had gone up to
```

271

```
1              C. GLASS
2  Affirmative Action, and that it was still an
3  ongoing investigation and that she lost her
4  temper, right?
5          MR. MELITO:  Objection.
6      A.  Yes.
7      Q.  But Dean Davis handed you two
8  identical statements from two people that
9  worked for her that do not even address
10 Marilyn Barton's statement about the open
11 Affirmative Action investigation, right?
12         MR. MELITO:  Objection to form.
13     Again, outside the scope of the
14     30(b)(6).
15     A.  No.
16     Q.  So again, I ask you, Did Dean Davis
17 write those statements for both of them to
18 sign which are identical or did she ask them,
19 Oh, can you just give me a statement and they
20 happened to come up with the exact same
21 language in both statements two days apart?
22 Explain that to me.
23         MR. MELITO:  Objection to form.
24     A.  I can't explain that to you.
25     Q.  Well, does that seem a little
```

272

```
1              C. GLASS
2  strange that if --
3          MR. MELITO:  Objection.
4      Q.  -- Dean Davis isn't trying to pull
5  the puppet strings, that when two statements --
6          MR. MELITO:  Objection.
7      Q.  -- that she would get from two
8  different people would have the same exact
9  language, the same exact words just signed by
10 a different person; does that seem a little
11 strange to you and unusual?
12     A.  Yeah, the strange --
13         MR. MELITO:  Objection to form.
14     A.  The strange part is that there's --
15 more likely than Dean Davis intervening is
16 one of the employees have a language barrier
17 and perhaps they wrote it together; that
18 would be my assumption.
19     Q.  And why would that be your
20 assumption?
21     A.  Because I believe that Natacha said
22 that one of the employees is not a native
23 English speaker.
24     Q.  So that means that they cannot write
25 English; is that your understanding?
```

273

```
1                    C. GLASS
2            MR. MELITO:  Objection to form.
3        Again, outside the scope of the
4        30(b)(6).
5   A.  It means --
6            MR. MELITO:  Go ahead.
7   A.  It means that they may not have been
8   comfortable putting in writing their
9   statement and had assistance.  I don't know.
10  Q.  Yes, but that's the problem, right?
11  Because you had Dean Davis gather the
12  information and so -- is that right, you had
13  Dean Davis gather the information, correct?
14           MR. MELITO:  Objection to form.
15  A.  Dean Davis gathered it the
16  information -- actually, Dean Davis asked for
17  the statements.
18  Q.  How do you know?
19           MR. MELITO:  Objection.
20  A.  That's my understanding.
21  Q.  From who?
22  A.  Dean Davis.
23  Q.  When did you speak the her about it?
24  A.  Clearly from the e-mails that is
25  what was happening, is she was soliciting the
```

274

```
1                    C. GLASS
2   statements from the witness.
3   Q.  Which e-mail are you referring to;
4   something that we have seen or something that
5   we haven't seen yet?
6   A.  The one that you had put up to
7   Natacha copying me with --
8   Q.  She is gonna gather information?
9   A.  -- that Anton's statement was
10  attached to.  She forward it had statement.
11           MR. SELLS:  Can we pull that
12       backup, Exhibit 39.
13           (The image is shared on the
14       computer screen.)
15  Q.  Now, we are at Exhibit 39.  This is
16  part of the statement.  If we could just
17  scroll down.  This is F.I.T. 151.  It is a
18  one-page document.
19       Now, where in this statement does it
20  say from Dean Davis to Anton Baptiste, please
21  provide me with a statement?  Where does it
22  say on here what Dean Davis' instructions
23  were to Mr. Baptiste about this statement?
24  Just show it to me so that I could be clear
25  as to where you're getting your opinion that
```

275

```
1                    C. GLASS
2   Mary Davis asked Anton Baptiste simply to
3   write a statement?
4            MR. MELITO:  Objection to form.
5        Objection, outside the scope of
6        30(b)(6) and lacks foundation.
7   A.  The e-mail thread indicates that
8   Mary received a statement from Anton, who
9   then forwarded it to Natacha and copied me.
10  Q.  Right.  But I am asking you where
11  the instructions were; what instructions did
12  Dean Davis give to Anton Baptiste about what
13  was --
14           MR. MELITO:  Objection --
15  Q.  -- supposed to be in this statement
16  or how it is supposed to be written?
17           MR. MELITO:  Objection to form.
18  A.  I don't know.
19  Q.  And did you tell or did you find out
20  from Dean Davis whether she asked Anton
21  Baptiste to keep this confidential and not
22  talk to any other employee about what his
23  observations were --
24           MR. MELITO:  Objection --
25  Q.  -- so that whatever he observed
```

276

```
1                    C. GLASS
2   couldn't be used by someone else, to just
3   simply take what his observations were; do
4   you know if she gave that instruction?
5   A.  I do not.
6   Q.  Well if the HR specialist were to
7   take the statement, isn't that one of the
8   things they're supposed to do?  The HR
9   specialist is supposed to say, keep this
10  confidential and do not discuss it with
11  anyone; isn't that one of the standard
12  instructions?
13  A.  Yes.
14           MR. MELITO:  Objection to form.
15  Q.  Now, did you tell Dean Davis that
16  she was supposed to use that protocol that HR
17  uses in every investigation that when you
18  collect these statements that you must tell
19  the witness to keep it confidential and not
20  share whatever their observations were with
21  anyone else?
22           MR. MELITO:  Objection.
23  A.  These statements were an initial --
24  Q.  I didn't ask you that.  Please,
25  answer my question.
```

277

C. GLASS

1
2       MR. SELLS:  Please read back my
3    question, Lesley.
4          (Whereupon, the requested
5       portion of the transcript was read
6       back.)
7    A.  No.
8    Q.  Okay.
9       Why didn't you tell her that?
10         MR. MELITO:  Objection.  It's
11   outside the scope.
12   A.  Natacha was going to be conducting
13   the formal -- the investigation and this was
14   an initial collection of facts.  I don't know
15   what -- to what extent that these were even
16   used in Natacha's investigation.
17   Q.  So basically, what you allowed Dean
18   Davis to do was to lock-in at least two
19   witnesses to the version that she wanted them
20   to tell so that when HR, whenever Natacha did
21   her investigation, if they said anything
22   different then they could get in trouble for
23   possibly lying in an investigation, right?
24         MR. MELITO:  Objection to form.
25   A.  So what is the question?

278

C. GLASS

1
2       MR. SELLS:  Repeat my question,
3    please.
4          (Whereupon, the requested
5       portion of the transcript was read
6       back.)
7    A.  So there are two parts to that
8    question.  The first part is, did I allow
9    Mary Davis to lock them into their
10   statements?  No, I did not.
11      The second part of whether they
12   would get in trouble in an investigation for
13   changing their statements, that's not
14   accurate either.
15      We would want to understand why this
16   happened if it had to do with -- Natacha may
17   have asked the question whether it was due to
18   language issues or, you know, whatever was
19   behind the statement.
20         MR. SELLS:  We can take down
21   the document.
22      Can we pull up Exhibit 42.
23   Q.  You wrote a letter to Ms. Barton
24   suspending her with pay, did you not?
25   A.  Correct.

279

C. GLASS

1
2    Q.  Okay.
3          (Whereupon, Plaintiff's Exhibit
4       42, one-page document Bates stamped
5       145, was marked for identification as
6       of this date.)
7          (The image is shared on the
8       computer screen.)
9    Q.  Is this the letter?
10   A.  Can you scroll down?
11         (Whereupon, Witness is reading
12      exhibit.)
13   A.  Yes, I drafted this letter for
14   Dr. Brown's signature.
15         MR. SELLS:  Scrolling backup.
16   Just for the record, Plaintiff's
17   Exhibit Number 42 is a one-page
18   document Bates stamped 145.
19      Go to the first paragraph of
20   the letter, please.
21   Q.  In the letter President Brown says
22   that the specific disciplinary charges may be
23   following; is that correct?
24   A.  Yes.
25   Q.  Okay.

280

C. GLASS

1
2       MR. SELLS:  We can take down
3    the document.
4    Q.  So, the suspension took place on
5    March 24th, 2019?
6         MR. MELITO:  Objection.
7         MR. SELLS:  Can we just pull it
8       backup for a second?
9    A.  I wasn't employed in March.
10   Q.  Sorry.  May 24th.  May 24th, right?
11   Effective May 24th; is that correct?
12   A.  Correct.
13   Q.  So, it took eight days from the
14   incident of May 16th, 2019 where Marilyn
15   Barton threatened to kill multiple times
16   Ms. Phillips, where she told her multiple
17   times to, "shut the fuck up," where she was
18   told on multiple times "I will fuck you up."
19   It took eight days for you to draft this
20   letter for President Brown to sign, right?
21         MR. MELITO:  Objection.
22      Objection to form.
23   Q.  Right?
24   A.  Yes, and during that -- those eight
25   days, I believe, that neither one of them

281

C. GLASS

1                 C. GLASS
2    were in the office.
3         Q.   Right.
4              But no determination had been made
5    at that point by anyone whether Marilyn
6    Barton was a homicidal maniac --
7              MR. MELITO:  Objection --
8         Q.   -- right; there was no counseling,
9    there was nothing that F.I.T. or you or
10   anyone else could use to say that Marilyn
11   Barton was not going to kill or try and kill
12   Ms. Phillips; isn't that correct?
13             MR. MELITO:  Objection to form.
14        A.   I'd have to check the date of when
15   she spoke with -- when she was assessed by
16   the EAP.
17        Q.   All right.
18             MR. SELLS:  We can take down
19        the document.
20             MR. MELITO:  I have us on the
21        record for over seven hours and
22        that's including our little colloquy,
23        our little conversation that was
24        stricken.
25             MR. SELLS:  Yeah.  Well, I

282

1                 C. GLASS
2    haven't even asked about the pay
3    differential.  So, I need time to go
4    through that and I intend to do that.
5             MR. MELITO:  Sorry, but you get
6    seven hours.
7             MR. SELLS:  You know what, no.
8    You know she is here for two reasons
9    okay.
10             MR. MELITO:  No, she is not.
11   She was only noticed for 30(b)(6).
12   You didn't send the personal notice
13   to her.  She was only noticed for
14   30(b)(6).  30(b)(6) on three limited
15   topic, and I have given you extensive
16   leeway off of those three topics --
17             MR. SELLS:  Well, then I'll
18   just re-subpoena her.  I mean, you
19   tell me what you want to do.  Do you
20   want to bring her back?  I'll
21   re-subpoena her.
22             MR. MELITO:  You're gonna have
23   to go through court process to get
24   her back on the stand 'cause you used
25   up your time with her --

283

C. GLASS

1                 C. GLASS
2             MR. SELLS:  No, this is on a
3    particular topic.  All right.  I have
4    been asking her --
5             MR. MELITO:  Derek.
6             MR. SELLS:  Look, we have
7    already done this.  Okay?  And I have
8    given leeway.  You have three
9    different people, right?  Three
10   different defendants.  I have given,
11   with regard to Ms. Phillips, she was
12   deposed for well more than seven
13   hours.  She went for at least 10,
14   maybe 11 hours.  So, you want to try
15   and play that game, you could go
16   ahead and try and play that game.  I
17   got a few questions left and I would
18   like to finish.
19             MR. MELITO:  I'm not trying to
20   play any game.  My interpretation is --
21             MR. SELLS:  You know what,
22   let's calculate the time.  Let's
23   calculate the time.  We're at 7:12
24   and there was a lengthy discussion
25   about whether we were even going to

284

1                 C. GLASS
2    continue the deposition.  And so, we
3    had a lunch break that was an hour
4    and, you know, there is no way we
5    were doing seven hours of
6    questioning.  So.
7             MR. MENKEN:  Ms. Simpson, can
8    calculate the time.
9             MR. DRANOFF:  Before we
10   calculate the time, I would like to
11   add one thing.  I just got a text
12   that someone at my house has COVID.
13   So, I can go with this for a little
14   longer; but I certainly would like to
15   have some time to check out exactly
16   what that is about.
17             MR. SELLS:  Yes, obviously that
18   takes priority.
19             MR. DRANOFF:  So, let's see
20   what Lesley's calculations are; then
21   we could talk about how much more
22   time we think we have to go.  I'm
23   perfectly willing to power through it
24   while I'm not laying in bed; but
25   let's see what we could come up with.

285

```
1                 C. GLASS
2          (Whereupon, an off-the-record
3     discussion was held at 7:13 p.m.;
4     after which, the proceeding continued
5     at 7:25 p.m. as follows.)
6          MR. SELLS:  Back on the record.
7     Q.  You wrote a letter to Marilyn Barton
8  lifting her suspension; is that correct?
9     A.  Yes.
10         MR. SELLS:  If we could pull up
11    Exhibit 47.
12         (Whereupon, Plaintiff's Exhibit
13    47, letter to Marilyn Barton lifting
14    her suspension Bates stamped F.I.T.
15    144, was marked for identification as
16    of this date.)
17         (The image is shared on the
18    computer screen.)
19    Q.  Is this the letter that you wrote?
20    A.  Yes.
21    Q.  So, now from May 24th, 2021 until
22 June 18th Ms. Barton was suspended; is that
23 correct?
24    A.  Yes.
25    Q.  And she got paid for those 24 days
```

286

```
1                 C. GLASS
2  of suspension; is that correct?
3     A.  Per the contract.
4     Q.  What?
5     A.  Per the collective bargaining
6  agreement there is no option for unpaid
7  suspension.
8     Q.  Okay.  All right.
9          So, let's just go through her
10 conditions of return.  It says, "You must
11 successfully complete a program of individual
12 and/or group session therapies as recommended
13 by the Employee Assistance Program in the
14 Office of Human Resources and approved by
15 F.I.T."
16         Now, this is what you considered to
17 be disciplinary; is that right?
18         MR. MELITO:  Objection.
19    A.  Disciplinary counseling, yes.
20    Q.  She was excused from her duties for
21 the rest of the day, and she had to
22 participate in the School of Graduate Studies
23 radical empathy seminar on June 19th; is that
24 right?
25    A.  Yes.
```

287

```
1                 C. GLASS
2     Q.  Was this considered disciplinary?
3          MR. MELITO:  Objection.
4     A.  I believe that this entire
5  conditions of return were required of her and
6  part of discipline in order for her to
7  return.
8     Q.  She was already in, right?  She was
9  already back --
10    A.  No --
11         MR. MELITO:  Objection.
12    A.  Her return --
13    Q.  I'm sorry.  In order for her to
14 return she had to do what?
15    A.  It says "conditions of return."
16    Q.  Okay.
17         But the suspension had already been
18 lifted, right?
19         MR. MELITO:  Objection.
20    A.  It says, "Effective immediately your
21 employment suspension is lifted"?
22    A.  Contingent on and the conditions of
23 that employment suspension being lifted
24 Number 1, 2, 3 and 4 applied."
25    Q.  Oh.
```

288

```
1                 C. GLASS
2          MR. SELLS:  Can you scroll
3     down -- or up I should say.
4     Q.  Now, this is endorsed by Ms. Oliva;
5  is that correct?
6     A.  Correct.
7          MR. SELLS:  And it's Bates
8     stamped F.I.T. 144.
9          We can take down the document.
10    Q.  You also met with Ms. Barton before
11 she came back; do you recall that?
12         MR. MELITO:  Objection.
13    A.  Vaguely, not very well.
14         MR. SELLS:  Can we put up
15    number 48.
16         (Whereupon, Plaintiff's Exhibit
17    48, description, was marked for
18    identification as of this date.)
19         (The image is shared on the
20    computer screen.)
21    Q.  Do you recognize this?
22    A.  Yes.
23    Q.  Now, who prepared this document?
24    A.  Andre Nunez.
25    Q.  Okay.
```

289

```
1                    C. GLASS
2              Were these you're talking points
3    that you were going to use in this meeting?
4         A.  This is the summary of the meeting
5    as documented by Andre.
6         Q.  In explaining this, you said to
7    Ms. Barton -- and this is in the second
8    bullet point -- "There will be no charges nor
9    committee."  Is that what you wrote?
10        A.  Yes.
11        Q.  So, that means there is no
12   discipline, right?
13             MR. MELITO:  Objection.
14        Q.  Well under the collective bargaining
15   agreement, can't an employee dispute
16   discipline that is given to them?
17        A.  Your first question was if it
18   doesn't go to charges, it is not discipline.
19   And that is not accurate.
20        Q.  Okay.
21        A.  A written warning to the file is
22   discipline --
23        Q.  All right.  Let's keep going through
24   it.  Let's keep going through it.
25             What you write is, "What I would
```

290

```
1                    C. GLASS
2    like to do is address the underlying issue
3    with the relationship with MP --"  is that
4    Marjorie Phillips?
5         A.  Correct.
6         Q.  "-- and department."  Is that
7    correct?
8         A.  Correct.
9             MR. MELITO:  Sorry.  Where are
10        we?
11             MR. SELLS:  The second bullet
12        point.
13             MR. MELITO:  Okay.
14        Q.  You write, "I hope you can breath
15   easy knowing we aren't going to the
16   disciplinary committee."
17             Is that what you wrote?
18        A.  I did -- actually, that is not what
19   I wrote.  That is what I said to her in this
20   meeting when she was distraught.
21        Q.  Okay.
22             "However, you'll go through a formal
23   EAP intake, and Robin Zarel will let us know
24   what intervention she thinks is appropriate.
25   We will have her propose something and the
```

291

```
1                    C. GLASS
2    union and college will agree to that
3    program."
4             Is that what you said?
5         A.  That is what I said.
6         Q.  Where in your meeting closeout do
7    you tell Marilyn Barton that she's being
8    given a written warning?
9         A.  If you go to the letter, there is --
10   either here or the last document you brought
11   up, it says that nothing but the letter will
12   be placed in her file.
13        Q.  Do you see it in this file that
14   there is something that is going to go into
15   her personnel file?
16        A.  If you could scroll up, I think it's
17   actually in the written letter.  It states in
18   the written letter that it would go to her
19   file.
20        Q.  So it's not in this document,
21   correct?
22             MR. MELITO:  Objection.
23        A.  If you could scroll up.  I can't see
24   the whole thing.
25             MR. SELLS:  Yes, scroll up.
```

292

```
1                    C. GLASS
2         Thank you.
3         A.  So it states that it is not going to
4    the disciplinary committee.  However, she is
5    mandated to go through the formal EAP intake
6    process and participate in the training,
7    which was outlined in the letter to her --
8         Q.  Okay.
9             But you don't see anything in here
10   about a written warning or any kind of verbal
11   warning or any kind of warning at all, do
12   you?
13             MR. MELITO:  Objection.
14        A.  No, there is nothing in here.  I
15   gave her the letter at this meeting, I
16   believe.  So the two go together.
17        Q.  So let's put the letter up.
18             (The image is shared on the
19        computer screen.)
20        Q.  Do you see in the first paragraph?
21        A.  That's not the right letter.
22             MR. SELLS:  Can you put up
23        Exhibit 47.
24             (The image is shared on the
25        computer screen.)
```

293

```
1                    C. GLASS
2        Q.  Are you talking about "except for
3    this letter, no other information will be
4    placed in your personnel file."  Is that
5    correct?
6        A.  Correct.
7        Q.  So what about this letter is a
8    written warning?
9        A.  The conditions of return and what --
10    what -- in order to come back to work and not
11    be resuspended, there were conditions placed
12    on this.
13              MR. SELLS:  Can we just scroll
14        up.
15        A.  Can you scroll down to the CC's.
16    Personnel file -- that is a copy to the
17    personnel file is considered discipline when
18    it goes to the personnel file.  When a
19    document goes to as a result of an incident.
20        Q.  Well, you said that there was a
21    written warning and she was given a written
22    warning; is that correct?
23              MR. MELITO:  Objection.
24        Q.  This is considered a written
25    warning?
```

294

```
1                    C. GLASS
2              MR. SELLS:  We can take down
3        the document.
4        Q.  Doesn't a written warning say
5    "written warning"?
6              MR. MELITO:  Objection.
7        A.  This is letter she received.
8        Q.  That is not what I am asking you.  I
9    am asking you, If someone is given written
10    warning, is that a formal disciplinary
11    action?
12        A.  They get a letter.
13        Q.  Does it say "written warning"?
14              MR. MELITO:  Objection.
15        A.  It could or it couldn't.  It is a
16    letter about communication about
17    expectations.
18        Q.  Have you ever written a written
19    warning letter for someone?
20        A.  I'm sure I have.
21        Q.  Okay.
22              And who does the written warning
23    come from?
24        A.  Either a supervisor or HR.
25        Q.  All right.
```

295

```
1                    C. GLASS
2              That letter wasn't written by Dean
3    Davis, was it?
4        A.  No.
5        Q.  And that letter wasn't signed by
6    you, was it?
7        A.  Those were the conditions for -- it
8    was considered discipline, and we actually --
9    the interesting thing was because when I got
10    there, the practice had been for the VP to do
11    the suspension and bring the person back as a
12    formality.  That's since changed because --
13        Q.  I'm asking about a written warning.
14        A.  Yeah.
15        Q.  You said the written warning either
16    comes from the person's -- the employee's
17    supervisor or HR?
18        A.  It does now.
19        Q.  I'm sorry?
20        A.  I'm trying to explain the fact that
21    there was a change in procedure after -- I
22    don't know, after I got the lay of the land
23    and it -- a letter would typically -- a
24    written -- a written reprimand would come
25    from the supervisor or HR.  At that point in
```

296

```
1                    C. GLASS
2    time, the college had -- the process was that
3    the -- the senior administrator of the area,
4    the vice president would sign the letter.
5        Q.  I see.  So you changed the policy?
6        A.  I did.
7        Q.  But just to be clear, nowhere in
8    that communication did you tell -- in that
9    written communication or the points that you
10    raised with Ms. Barton in her return did you
11    say she was being given a written warning,
12    right?
13              MR. MELITO:  Objection.
14        A.  Those notes are what Andre
15    transcribed.  I can't tell if I did or did
16    not say written warning specifically in that
17    meeting.
18        Q.  You didn't say verbal warning,
19    right?
20        A.  No --
21              MR. MELITO:  Objection
22        A.  It wasn't verbal.
23        Q.  Got it.  Okay.
24              In terms of compensation, following
25    Ms. Barton's verbal tirade against
```

297

C. GLASS

1
2    Ms. Phillips and her threats to kill her, she
3    was given raise and a change in title,
4    correct?
5              MR. MELITO:  Objection.
6         A.  She was -- I don't know when that
7    was.  She went through the reclassification
8    process, I believe, in the contract where a
9    change in duties can be sent to a joint labor
10   management committee for review.
11        Q.  And she got a raise and a
12   reclassification, correct?
13             MR. MELITO:  Objection.
14        A.  I believe so.
15        Q.  And that happened after she
16   threatened to kill Ms. Phillips multiple
17   time, right?
18             MR. MELITO:  Objection.
19        A.  I can't answer that.  I don't know
20   the date.
21             MR. SELLS:  All right.  We call
22        for the production of documents
23        reflecting the reclassification of
24        Marilyn Barton's job.
25        Q.  Let me ask you this --

298

C. GLASS

1
2              MR. MELITO:  Follow up your
3         request in writing.
4         Q.  You didn't get there at F.I.T. until
5    April of 2019, correct?
6         A.  Late April.
7         Q.  Right.
8              This incident happened May of 2019,
9    right; the incident involving Ms. Barton and
10   Ms. Phillips happened on May 16th of 2019,
11   correct?
12        A.  Yes.
13        Q.  So, certainly the reclassification
14   didn't come in April or before May 16th of
15   2019, right?
16        A.  There's an entire process --
17             MR. MELITO:  Objection --
18        A.  -- that it has to go through before
19   it would ever come to me.  So I don't know at
20   what point in time that was submitted or --
21        Q.  The point is, it didn't happen
22   before the incident?
23        A.  Well, it could have been submitted.
24   It could takes months and months and months
25   for this to happen.  It's not --

299

C. GLASS

1
2         Q.  Well, the decision to give her the
3    raise and the reclassification happened after
4    this incident, correct?
5              MR. MELITO:  Objection.
6         A.  I answered that I do not know the
7    date of the reclassification.
8         Q.  Well, did you sign off on it?
9         A.  If it happened after I arrived, yes.
10             MR. SELLS:  I call for the
11        production of the reclassification
12        and raise process Marilyn Barton went
13        through following the May 2019
14        incident.
15             MR. MELITO:  Put the request in
16        writing, and we will respond
17        accordingly.
18        Q.  What is involved in the
19   reclassification and raise process for union
20   employees?
21        A.  If there is a significant change in
22   duty, the employee or the supervisor can
23   request a review of their job duties, and the
24   contract dictates the process and the fact
25   that whenever the request is submitted to HR,

300

C. GLASS

1
2    it's date stamped in order to ensure whatever
3    decision is made or how much time it takes
4    for that decision to be made that any
5    potential change is retroactive to the date
6    that it was submit.
7         Q.  Got it.
8              Now did you understand that
9    Ms. Phillips, as part of her retaliation
10   claim in this lawsuit, indicated that
11   following -- that before she made her
12   complaint to Dean Davis about discrimination
13   in March of 2018 that she had had discussions
14   with Dean Davis about getting a change in her
15   classification and a raise?
16             MR. MELITO:  Objection to form.
17        A.  I don't recall.
18        Q.  And then following the complaints of
19   discrimination and retaliation that she made,
20   that she is not been reclassified and she has
21   not gotten a raise than Dean Davis said she
22   would get, are you aware of that?
23             MR. MELITO:  Objection to form.
24             MR. DRANOFF:  Object to the
25        form.

301

C. GLASS

1
2       A.  So first part is, I'm not aware of a
3   reclassification.  I have not signed one.
4       Second part, I have no idea
5       what Dean Davis said, but it would
6       take a change in the job description
7       and a reclassification committee for
8       that to happen.
9       Q.  Got it.
10      And as dean of the Graduate School
11  and Ms. Phillips' direct supervisor, she had
12  the authority and ability to ask HR for this
13  reclassification and raise; is that correct?
14      MR. MELITO:  Objection.
15      MR. DRANOFF:  Object to the
16      form.
17      A.  She had the ability through the
18  contract to propose a change to the job to
19  the vice president who would then have to
20  sign off in order for the re-evaluation
21  committee to be enacted to --
22      Q.  So, when you say she had the ability
23  to ask the VP, you're talking about the VP in
24  charge of Human Resources, right?
25      A.  No.

302

C. GLASS

1
2       Q.  Who?
3       A.  Her VP of Academic Affairs.
4       Q.  That would have been Olivia or who
5   was the person?
6       A.  Jack Oliva.
7       Q.  Jack Oliva, right.  All right.
8       And have you looked at whether or
9   not Jack Oliva ever received from Ms. Davis a
10  request on behalf of Ms. Phillips to
11  reclassify her and get her a raise?
12      MR. MELITO:  Objection to form.
13      A.  I'm not -- I'm not aware of any.
14      Q.  And have you seen any documents
15  related to Ms. Phillips being -- or any
16  documents that would reflect a request on
17  behalf of Ms. Phillips to receive a new job
18  description as well as a raise request?
19      MR. MELITO:  Objection.
20      A.  Not that I'm aware of.
21      MR. SELLS:  I'm going to go off
22      the record.  I just need a couple of
23      minutes to just review my notes.
24      I'll be back shortly and then
25      hopefully we can close this out.  All

303

C. GLASS

1
2   right?
3       MR. MELITO:  I'm going to note
4       that we have six minutes back on the
5       record once you come back.
6       MR. SELLS:  That's cool.  All
7       right.  Thank you.
8       (Whereupon, a brief recess was
9       taken at 7:49 p.m.; after which, the
10      proceeding continued at 7:51 p.m. as
11      follows.)
12      MR. SELLS:  I have no further
13      questions of, Ms. Glass.
14      MR. MELITO:  Could I just -- on
15      the record I want to make one note
16      for the record.  I would just like to
17      call for the production of any notes
18      that Ms. Phillips took during this
19      deposition and as well as the
20      deposition of Ms. Kekana.
21      MR. SELLS:  If you could just
22      follow that up in writing, we'll
23      respond.
24      MR. MELITO:  Okay.  That's it
25      for me.

304

C. GLASS

1
2       MR. SELLS:  Okay.
3       (Time Ended:  7:53 p.m.)
4
5       *           *           *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

305

```
1                    C. GLASS
2            A C K N O W L E D G M E N T
3
4          I, CYNTHIA GLASS, do solemnly swear
5     under the penalty of perjury that I have read
6     the foregoing deposition transcript, which was
7     taken under oath reflecting the questions
8     elicited from me and my answers thereto.
9          This transcript is true and complete.
10    If I deemed it necessary, I indicated
11    additions, changes or corrections on the
12    attached errata sheet.
13
14
15    _____
16           CYNTHIA GLASS
17
18    Subscribed and sworn to before me
19    this ____ day of _____ 2022.
20
21    _____
22           Notary Public
23
24
25
```

307

```
1                    C. GLASS
2              I N D E X
3
    EXAMINATION BY                       PAGE
4
5   MR. SELLS:                            5
6
7
8            R U L I N G S
9   Page 28
10  Q.  So am I to understand that under F.I.T.'s
        policy, an F.I.T. employee could walk into
11      another F.I.T. employee's office, close and
        lock the door, rape that employee -- viciously
12      rape that employee and under F.I.T. policy the
        rapist could not be fired without the union's
13      approval; is that right, Ms. Glass?
14
15
16
17
18
19
20
21
22
23
24
25
```

306

```
1                    C. GLASS
2              E X H I B I T S
3
    PLAINTIFF'S EXHIBITS:
4
5   EXHIBIT   EXHIBIT                          PAGE
    NUMBER    DESCRIPTION
6   63        Part of a filing made via ECF    106
              in the New York State system in
7             connection with index number
              151757 of 2021
8
9   62        Exhibit to Dean Davis'           125
              opposition
10  36        Two-page document Bates          244
              stamped F.I.T.237 to 238
11
12  64        Attachment to affirmation in     256
              support of motion to dismiss
13  39        Anton Baptiste's statement       264
14  40        Statement from Henry Wallace     266
15  47        Letter to Marilyn Barton         285
              lifting her suspension Bates
16            stamped F.I.T.144
17
18
19
20
21
22
23
24
25
```

308

```
1                    C. GLASS
2   D O C U M E N T S   &   R E Q U E S T S
3   DESCRIPTION                               PAGE
4   (Request Index By:  Mr. Sells)
5
6   Production of the charge sheet that       92
    Dr. Glass filled out with regard to Kyle
7   Farmer.
8   Production of the report that was issued  97
    in connection with the investigation.
9   Production of the suspension.             98
10  Again, we'll put it in writing and try    102
    to get a copy of the report.
11
12  Production of the letter that you sent    103
    to Dean Davis informing her of her
13  termination.
14  Production of the arbitration file related 104
    to Mr. Farmer's termination.
15  Production of records related to Kyle     207
    Farmer's consultation as well as Marilyn
16  Barton's consultation.
17  Production of the full e-mail thread.     251
    There is clearly e-mails missing from this.
18
19  Production of documents reflecting the    297
    reclassification of Marilyn Barton's job.
20  Production of the reclassification and    299
    raise process Marilyn Barton went through
21  following the May 2019 incident.
22  (Request Index By:  Mr. Melito)
23  Production of any notes that Ms. Phillips 303
    took during this deposition and as well
24  as the deposition of Ms. Kekana.
25
```

```
 1                      C. GLASS
 2              C E R T I F I C A T E
 3
 4          The undersigned stenographer hereby
 5     certifies:
 6              That the foregoing deponent was duly
 7     sworn by myself and this transcript is a true
 8     record of the testimony by the witness and of
 9     all objections made by counsel at the time and
10     place detailed herein.
11              That I am not related to any of the
12     parties in this action by blood or by marriage
13              That I am in no way interested in the
14     outcome of this litigation.
15              IN WITNESS WHEREOF, I have hereunto
16     set my hand this 5th day of January 2022.
17
18
19     _____
20            LESLEY SIMPSON
21
22
23
24
25
```