# EXHIBIT P

**1**

1
2   THE UNITED STATES DISTRICT COURT
3   SOUTHERN DISTRICT OF NEW YORK
4   -------------------------------------------X
    MARJORIE PHILLIPS,
5                           Plaintiff,
6
7       -against-        Civil Action No.:
8                        17-cv-00221 (GBD)
9
    THE FASHION INSTITUTE OF TECHNOLOGY, MARY
10  DAVIS, and MARILYN BARTON,
11                        Defendants.
    -------------------------------------------X
12              DATE:  December 21, 2021
13
14              TIME:  10:09 a.m.
15
16
17                           DEPOSITION
18  of the Defendant, MARY E. DAVIS, Ph.D., s/h/a
19  MARY DAVIS, by the Plaintiff, pursuant to a
20  Notice, held via Video Conferencing, before
21  Lesley Simpson, a Notary Public of the State
22  of New York.
23
24
25

**2**

1
2   A P P E A R A N C E S:
3
4   THE COCHRAN FIRM, P.C.
        Attorneys for the Plaintiff
5       One Exchange Place, 23rd Floor
        New York, New York 10006
6
    BY:  DEREK S. SELLS, ESQ.
7        MINA MALIK, ESQ.
         MONIQUE MILNER, ESQ.
8
9
10  NIXON PEABODY LLP
        Attorneys for the Defendant
11      THE FASHION INSTITUTE OF TECHNOLOGY
        50 Jericho Quadrangle, Suite 300
12      Jericho, New York 11753
13  BY:  NICHOLAS MELITO, ESQ.
         ROSE NANKERVIS, ESQ.
14
15
16  SARETSKY KATZ & DRANOFF LLP
        Attorneys for the Defendant
17      MARY DAVIS
        475 Park Avenue South
18      New York, New York 10016
19  BY:  ERIC DRANOFF, ESQ.
20
21  BERANBAUM MENKEN LLP
        Attorneys for the Defendant
22      MARILYN BARTON
        80 Pine Street, 33rd Floor
23      New York, New York 10005
24  BY:  BRUCE MENKEN, ESQ.
25

**3**

1
2   A L S O   P R E S E N T:
3
4   MARJORIE PHILLIPS, Plaintiff
5   MARILYN BARTON, Defendant
6   ANDRE THOMAS, Exhibit Manager
    PFP REPORTING
7
8          *           *           *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1
2   F E D E R A L   S T I P U L A T I O N S
3
4       IT IS HEREBY STIPULATED AND AGREED by and
5   between the counsel for the respective parties
6   herein that the sealing, filing and
7   certification of the within deposition be
8   waived; that the original of the deposition
9   may be signed and sworn to by the witness
10  before anyone authorized to administer an
11  oath, with the same effect as if signed before
12  a Judge of the Court; that an unsigned copy of
13  the deposition may be used with the same force
14  and effect as if signed by the witness, 30
15  days after service of the original & 1 copy of
16  same upon counsel for the witness.
17
18      IT IS FURTHER STIPULATED AND AGREED that
19  all objections except as to form, are reserved
20  to the time of trial.
21
22
23
24
25

5

1
2      M A R Y   E.   D A V I S, Ph.D, having been
3      first duly sworn before a Notary Public of the
4      State of New York was sworn and testified as
5      follows:
6      EXAMINATION BY
7      MR. SELLS:
8          Q.  Please, state your name and address
9      for the record.
10         A.  Mary E. Davis.  82 Litchfield
11     Turnpike, Bethany, Connecticut 06524.
12     L-I-T-C-H-F-I-E-L-D.
13         Q.  Good morning, Dr. Davis.
14         A.  Good morning.
15         Q.  My name is Derek Sells.  I represent
16     Marjorie Phillips in a lawsuit against F.I.T.
17     as well as yourself and Marilyn Barton.  I
18     will be asking you some questions today in
19     connection with the lawsuit, some of the
20     claims that have been made in the lawsuit.
21             My first question to you is whether
22     or not you will be able to understand
23     questions that are asked of you today?
24         A.  I fully expect to.
25         Q.  So, you are not taking any medicine

6

1                      DAVIS, Ph.D.
2      or any other substance that will affect your
3      ability to understand questions; is that
4      correct?
5          A.  No, I am not.
6          Q.  If I ask a question you do not
7      understand, please let me know so that I can
8      rephrase it's or ask the question in a way
9      that you do understand it.  Is that fair?
10         A.  Fair enough.
11         Q.  If I ask you a question and you
12     answer the question, I will assume that you
13     understood my question and that you are just
14     answering my question.  Is that good?
15         A.  That's fine.
16         Q.  You are allowed to take a break
17     almost at any time today, just let me know
18     and we can take a break.
19             I just ask if there is a pending
20     question, that you answer the question before
21     you take a break.
22         A.  Okay.
23         Q.  Can you give us a run down of your
24     career?
25         A.  Sure.  I graduated from St. Mary's

7

1                      DAVIS, Ph.D.
2      College in Notre Dame, Indiana in 1981 with a
3      Bachelor's Degree in music; piano
4      performance.
5              Then I went onto the Peabody
6      Conservatory in Baltimore where I earned a
7      Master's Degree in piano performance.  That
8      would have been in 1983.
9              And then I entered the workforce.  I
10     worked briefly as a paralegal in Washington
11     D.C. for a firm called Jordan Coyne & Savits.
12     And that firm split up and I worked for one
13     group of the partners who started a new firm
14     called Jordan & Lee.  This is all in the
15     1980s now.
16             And I went from there to work for
17     the President's Commission on Organized Crime
18     where I wrote the report on drug trafficking
19     and organized crime.
20             And from there, I went to the
21     Architectural and Barriers -- Architectural
22     Transportation Barriers Compliance Board
23     where I worked for a year as legislative
24     aide.
25             And then, I went to the law firm of

8

1                      DAVIS, Ph.D.
2      Dewey Ballantine in DC where I worked for
3      about five years as a legislative specialist.
4              And then, I went back to school
5      around 1990 and earned another Master's
6      Degree in music history from the New England
7      Conservatory in Boston and entered the Ph.D.
8      program at Harvard on completion of that
9      degree in 1992.
10             So, I earned another Master's Degree
11     at Harvard on the way to Ph.D., which I
12     completed 1997; that was a Ph.D. in
13     musicology.
14             After that, I worked for one
15     semester at the University of South Carolina
16     as a sabbatical replacement faculty member
17     and got a full-time tenure track faculty
18     position at Case Western Reserve University
19     in Cleveland, Ohio where I was a member of
20     the faculty in the Music Department.  I
21     started as an assist professor and earned
22     sequential promotions there to associate
23     professor and then full professor.  I was
24     appointed the chair of the Department of
25     Music.  I also served as associate director

9

DAVIS, Ph.D.

1    of the Baker North Center for Humanities for
2    a number of years.  And I was the university
3    liaison to the Rock & Roll Hall of Fame and
4    Museum; that was 1998 to 2012 when I was
5    recruited by F.I.T. to the job of dean of the
6    Graduate School -- School of Graduate
7    Studies.
8        Q.  Have you published any books or
9    papers?
10       A.  I have.  I have published four
11   non-fiction books, scholarly books, and many
12   book chapters, numerous essays in scholarly
13   journals.  I've also published some in ---
14   they're not specifically scholarly press,
15   press for more general readership.  I
16   published online.  I have given many
17   conference presentations and participated in
18   many scholarly dialogues over the years.
19       Q.  Now, have ever been accused of
20   racist behavior?
21       A.  I don't know what you mean by
22   "racist behavior."
23       Q.  What do you mean you don't know what
24   I mean by racist behavior?

10

DAVIS, Ph.D.

1        A.  I'm trying to discern whether you
2    are referring to the matter before us right
3    now in which I am accused of various things
4    related to race discrimination or whether
5    there is something else that you are asking
6    about.  I don't understand.
7        Q.  The question was, Have you ever been
8    accused of racist behavior?  So, the answer
9    is, yes, I have been or no, I haven't been.
10   Then we can explore those.
11       A.  I would like to restate that I don't
12   understand what you mean by "racist
13   behavior."
14       Q.  When you say you don't know what I
15   mean by "racist behavior," what do you
16   understand the definition of "racist
17   behavior" to mean?
18       A.  I don't have a standard definition
19   for "racist behavior."  I would understand
20   individual situations based on the context
21   and the content of the situations.
22       Q.  So as you sit here now, are you
23   saying you do not know whether you have been
24   accused of racist behavior before?

11

DAVIS, Ph.D.

1        A.  No, sir.  I'm saying I don't
2    understand what your terminology of "racist
3    behavior" refers to.  I don't understand what
4    you mean by that.
5        Q.  So, you understand what "racist
6    behavior" is, right?
7        A.  I do not have -- have a blanket
8    understanding of what you are calling "racist
9    behavior."
10       Q.  Okay.  All right.
11           MR. SELLS:  Can we pull up
12       Exhibit 32.
13           (The image is shared on the
14       computer screen.)
15       Q.  I'm showing you what's been
16   previously marked as Exhibit 32, Plaintiff's
17   Exhibit 32.  This is a picture that was in
18   the New York Post article of February 18 of
19   2020.  It's captioned, "F.I.T. apologizes for
20   clearly racist alumni fashion show."  Do you
21   see that?
22       A.  I do.
23       Q.  Looking at that picture, do you
24   believe that that is a clearly racist

12

DAVIS, Ph.D.

1    photograph or does that depict a clearly
2    racist image?
3        A.  I personally do not believe this is
4    a racist image.
5        Q.  Okay.  Why is that?
6        A.  It could be because I have a context
7    for understanding that image.
8        Q.  You said you have a context as to
9    why you believe the image is not racist?
10       A.  That's correct.
11       Q.  What is that context?
12       A.  I know the history of how this look
13   came to be.
14       Q.  What is your history of how this
15   look came to be?
16       A.  This is the work of one alumni
17   fashion designer who by the time this
18   photograph was taken was a professional
19   designer.  A young man named Jung Ki Wang who
20   had been a student in the MFA fashion design
21   program.
22           As part of the curriculum in that
23   program, students were required to develop a
24   thesis idea over the course of two years.

---

13

DAVIS, Ph.D.

1  Jung Ki's thesis had to do with distortions
2  and conceptions of beauty.
3            As I understand it, having spoken to
4  him, he broke a finger at some point in the
5  first semester I believe of his F.I.T.
6  education; and he became fascinated with the
7  idea of what happens when one body part is
8  distorted.  And so his collection, which is
9  documented in thesis material for all four
10 semesters of his work, his thesis documents
11 his explorations of that concept of beauty.
12 And so, this look was an end result of that
13 thesis work.
14           However, the accessories, which are
15 depicted here in this photograph, were
16 selected by Jung Ki last minute prior to show
17 because he did not have time to make the
18 accessories that he intended to make to
19 accompany his garments.  The accessories that
20 he intended to make based on his thesis
21 materials -- which were displayed at F.I.T.
22 in May, I believe, of 2019 -- the accessories
23 were meant to be made of the same material as
24 the garments.  So, the accessories that he

---

14

DAVIS, Ph.D.

1  ended up using were not part of his original
2  conception, but they were his choice.
3       Q.   That's why the big lips and the big
4  ears are not racist to you; is that correct,
5  Dr. Davis?
6       A.   That is correct.  I certainly can
7  understand that these would be offense to
8  others.
9       Q.   Why?  Why do you think it would be
10 offensive to others?
11      A.   I can imagine that it could invoke
12 racist tropes including tropes of minstrelsy
13 that would be offensive to certain people.
14      Q.   Got it.
15           You know and you left out of your
16 answer that those accessories, the big lips
17 and the big ears, came from Kyle Farmer,
18 someone who is a direct report to you at the
19 time, correct?
20      A.   No, Mr. Sells, that is not --
21      Q.   Oh, really --
22      A.   Yes -- that is not correct --
23      Q.   Okay.  Okay --
24      A.   Mr. Farmer did not select those

---

15

DAVIS, Ph.D.

1  accessories.  Mr. Wang asked for
2  recommendations, for help in the days
3  preceding the fashion show.  He asked for
4  assistance in identifying accessories that
5  could perhaps fill the gaps between what he
6  intended and nothing at all.  And to my
7  understanding, Mr. Farmer provided a list of
8  options for him based on what he could find
9  on Amazon, and these were the accessories
10 that -- among the accessories, to my
11 understanding, that were included in the list
12 that Jung Ki selected from.
13      MR. SELL:  We can take down the
14           photograph.
15      Q.   Dr. Davis, you're saying that Kyle
16 Farmer had no responsibility in the
17 accessories that were used in the fashion
18 show; is that correct?
19      MR. DRANOFF:  Object to the
20           form.  You can answer.
21      A.   No, Mr. Sells, that is not correct.
22 As I just stated, Mr. Farmer provided Mr. Wang,
23 at Mr. Wang's request, with a list of options
24 he pulled from Amazon that Mr. Wang could

---

16

DAVIS, Ph.D.

1  choose from, if he wanted to, to accessorize
2  his designs for the show.
3       Q.   Well, that's not what you said in
4  your lawsuit, right?
5       A.   No; that is exactly what I said in
6  my lawsuit.
7       Q.   Oh, okay.
8       MR. SELLS:  Can we pull up
9           Exhibit 59.
10          (Whereupon, Plaintiff's Exhibit
11          59, lawsuit between F.I.T. and Dr. Brown,
12          was marked for identification as of
13          this date.)
14          (The image is shared on the
15          computer screen.)
16      Q.   You recognize this; this is your
17 lawsuit between F.I.T. and Dr. Brown, right?
18      A.   Yes.
19      MR. SELLS:  If we could go to
20          last page of the exhibit.
21      Q.   You put a verification on this;
22 isn't that right?
23      A.   That's correct.
24      Q.   Okay.

17

DAVIS, Ph.D.

1
2       And so, you swore that the contents
3   of this document and the allegations therein
4   were true; right?  You swore to that, right?
5       A.  If you read the sentence it says,
6   "The contents are true to my knowledge except
7   as to matters therein stated to be alleged
8   upon information and belief".
9       Q.  All right.  Good.
10          MR. SELLS:  Could we now go to
11      page 13 of the complaint, Paragraph
12      42.
13          (The image is shared on the
14      computer screen.)
15      Q.  What you said in your complaint was
16  that "following the Post article, both
17  Professor Farmer and Mr. Thornn, at the
18  behest of the administration, publicly took
19  responsibility for the decisions that have
20  been made with respect to the accessories."
21      A.  Yes, sir.
22      Q.  That's what you wrote?
23      A.  That's correct.  These are --
24      Q.  Okay.
25          So, Kyle Farmer and Richard Thornn

18

DAVIS, Ph.D.

1
2   took responsibility for the decisions that had
3   been made with respect to the accessories;
4   that's what you wrote under oath in your
5   complaint; is that correct?
6       A.  Yes, sir.  What I wrote is --
7       Q.  No.  No --
8       A.  No.  No.
9       Q.  This is a "yes" or "no" question.
10          Now --
11          MR. SELL:  We could take down
12      the document.
13      Q.  But here today you're saying that
14  Mr. Farmer had no responsibility other than
15  giving the links to the designer.  But yet,
16  they took, according to your complaint, they
17  took responsibility, Mr. Farmer took
18  responsibility for the decisions that had
19  been made with respect to the accessories.
20          So now you're changing it up, right?
21          MR. DRANOFF:  Object to the
22      form.  She is not changing it up.
23      Objection to form.
24      A.  Mr. Sells, these are two separate
25  things.  My complaint states that at the

19

DAVIS, Ph.D.

1
2   behest of the administration Mr. Farmer took
3   responsibility.  It does not state that
4   Mr. Farmer selected the accessories.  There
5   is a difference between those two things.
6       Q.  Okay.
7           So you're saying that Mr. Farmer
8   took responsibility only because F.I.T. asked
9   him to take responsibility; is that correct?
10      A.  I cannot speak as to why Mr. Farmer
11  did that.  I believe he is on record about
12  that in another matter.
13      Q.  Okay.
14          So when you say at the behest, who
15  asked him to take full responsibility or part
16  responsibility along with Mr. Thornn for
17  those accessories?
18      A.  I was in meetings where this was
19  discussed with professor -- with Vice
20  President Loreta Keane, dean for
21  communication and external relations.  But I
22  was not privy to the full conversation.
23      Q.  So, you are saying that
24  administrators at F.I.T. asked Mr. Farmer to
25  lie and apologize for something he had no

20

DAVIS, Ph.D.

1
2   responsibility for; is that right?
3       A.  No, sir.
4           MR. MELITO:  Objection to form.
5       A.  No, sir.  Those are -- again, it is
6   not an accurate representation.  Kyle was
7   asked, I believe, to take responsibility for
8   the decisions and did so, as was Richard
9   Thornn, the show producer.  They issued these
10  apologies publicly and that is a different
11  matter from Kyle selecting the accessories.
12          Kyle select -- Kyle did not select
13  the accessories.  He provided a list of the
14  accessories from which Mr. Wang selected.
15  That doesn't mean that Kyle was unable take
16  responsibility for the decisions.
17      Q.  Got it.
18          So how is it that you know that
19  Mr. Farmer did not select the accessories;
20  how do you know that?
21      A.  Because I was in meetings and
22  discussions where he -- this was -- he
23  explained this.  And also where Jung Ki Wang
24  attested to it.
25      Q.  And you know that they were telling

21

DAVIS, Ph.D.

1
2      the truth, of course, right?
3          A.  I -- I believe what was told to -- I
4      believe the -- that it is the truth.
5          Q.  Oh, okay.
6              And why do you believe it's the
7      truth?
8          A.  In Jung Ki's case, because I know
9      where he was aiming -- I know what the
10     original designs were and I know that based
11     on what he -- he reported after the fashion
12     show that this was what happened.  That he
13     selected the accessories.
14         Q.  Because in your complaint, you
15     allege that you had no knowledge of any
16     decisions that were made with respect to the
17     fashion show; isn't that what you say in your
18     complaint?
19         A.  Yes, Mr. Sells.  I did add in my
20     complaint, but I said I had no knowledge
21     about them prior to seeing them come down the
22     runway.  I had no advanced knowledge of the
23     accessories that were selected --
24         Q.  Okay.
25             So --

22

DAVIS, Ph.D.

1
2          A.  As far as --
3          Q.  -- opinions about who selected the
4      accessories, do you have personal knowledge
5      of, right?  You weren't present --
6          A.  I'm sorry?
7          Q.  You weren't present when those
8      accessories were chosen?
9          A.  I was not present.
10         Q.  Okay.
11             And you have chosen to believe your
12     version of how those accessories got on the
13     models lips and ears, right?
14         A.  No, sir.  I'm not choosing to
15     believe my version.  I'm -- I'm reporting
16     what was told to me in the weeks following
17     the fashion show about the ways in which the
18     accessories were selected.
19         Q.  Got it.
20             Now, let me ask you something.  In
21     your career working for various companies and
22     institutions, have you learned how to read
23     and look at -- read and understand, I should
24     say, antidiscrimination policies?
25         A.  In my career --

23

DAVIS, Ph.D.

1
2          Q.  Yes --
3          A.  -- as part of my jobs, yes.  I have
4      learned to read and understand many kinds of
5      policies including those that you have
6      referenced.
7          Q.  Got it.
8              And in the various positions that
9      you have occupied in your career, have you
10     read antidiscrimination policies in a way so
11     that you could understand what your role is
12     in the event that an issue of discrimination
13     is presented to you; have you done that?
14         A.  Yes, I believe I have.
15         Q.  Now, did you do that with regard to
16     your career at F.I.T. when you became a dean?
17         A.  Yes.
18         Q.  And when did you become a dean?
19         A.  2012.
20         Q.  Okay.
21             MR. SELLS:  Can we go to
22         Plaintiff's Exhibit 3.
23             (The image is shared on the
24         computer screen.)
25         Q.  Do you recognize this, Dr. Davis?

24

DAVIS, Ph.D.

1
2          A.  Yes, I do.
3          Q.  You understand that this is F.I.T.'s
4      non-discrimination and antiharassment policy --
5          A.  Yes --
6          Q.  -- 2017?
7          A.  Yes, sir.
8          Q.  What was your understanding of your
9      responsibility as a dean if you received a
10     complaint from an e-mail regarding racism?
11         A.  This policy speaks to
12     non-discrimination and antiharassment; and I
13     understood my responsibility in this to be to
14     report incidents of non-discrimination and
15     antiharassment as defined in the policy.
16         Q.  Report, when you say "report,"
17     report to who?
18         A.  To the Title 9 officer.  I believe
19     there is -- I have not worked at F.I.T. for
20     quite some time now.  I believe there is a
21     section to this that also addresses students.
22         Q.  What was your responsibility as the
23     dean if a student reported an allegation of
24     race discrimination?
25         A.  The practice of discrimination in --

25

```
1                DAVIS, Ph.D.
2    in regards to students just had another layer
3    to it where I would report the incidents to
4    my immediate supervisor, Giacomo Oliva.
5        Q.  Okay.
6             And where did you get that from?
7        A.  That was a practice.
8        Q.  That was a practice; but it is not
9    in this policy; is that correct?
10       A.  I believe that's correct.
11       Q.  What do you believe is correct?
12       A.  I believe that it was a practice
13   that had been in place in the college before
14   I joined, and that it is not written into the
15   policy.
16       Q.  Okay.
17            So, where did this practice come
18   from?
19       A.  I don't know.
20            MR. SELLS:  If we could go to
21       page 6 where it says "investigation
22       and disciplinary procedures."
23       Q.  You see it says, "For purposes of
24   this policy, the status of the Respondent
25   will determine the applicable disciplinary
```

27

```
1                DAVIS, Ph.D.
2    dean, department director, department
3    chairperson or coordinator or any other
4    person with supervisory responsibility."
5             Then it says, "Although such
6    complaints need not be in writing, F.I.T.
7    strongly encourages individuals to file a
8    written complaint.  Any person with
9    supervisory responsibility who receives a
10   complaint formally or informally in writing,
11   orally or otherwise of discrimination,
12   discriminatory harassment or retaliation,
13   must report such information to the
14   affirmative action officer immediately."
15            Is that what the policy says?
16       A.  Yes; you just read it to me.
17       Q.  And was that your understanding of
18   the policy back in 2017, 2018, 2019 and '20?
19       A.  Yes, that is the policy.
20       Q.  Got it.
21            MR. SELLS:  We can take down
22       the document.
23       Q.  Did you understand as part of the
24   antidiscrimination policy that when you as a
25   supervisory official, as a dean in fact,
```

26

```
1                DAVIS, Ph.D.
2    procedures; for example, if the Respondent is
3    a student, procedures used will be those
4    delineated for students in this policy.
5             If Respondent is an employee, the
6    procedures used will be those delineated for
7    employees in this policy."
8             So, you see there's a distinction
9    between complaints against students and
10   complaints against employees.  You understand
11   that, right?
12       A.  Yes.
13       Q.  So, now let's get to the reporting
14   complaints investigation procedure where a
15   student is the Respondent.
16            So, "Under the policy, any person
17   who believes they may have been a victim of
18   or believes they may have witnessed
19   discrimination, discriminatory harassment or
20   retaliation permitted by a student should
21   report the incident to the Affirmative Action
22   Office in the Office of Compliance and
23   Audit."  And then it gives the address.
24            "Alternatively, such incidents may
25   be reported to any senior administrator,
```

28

```
1                DAVIS, Ph.D.
2    received a complaint of discrimination that
3    you were supposed to investigate it yourself?
4        A.  I'm sorry.  Could you state that
5    question again?
6             MR. SELLS:  Lesley, read back
7        the question, please.
8             (Whereupon, the requested
9        portion of the transcript was read
10       back.)
11       A.  No, I was not supposed to
12   investigate it myself per the policy.  I was
13   supposed to report it.
14       Q.  And so, if you did undertake to
15   investigate a complaint of discrimination
16   yourself that would be in violation of the
17   policy, right?
18       A.  I'm not understanding your question.
19   I'm sorry.  I'll tell you --- I'm not
20   understanding the word "investigate."
21       Q.  What did you say?
22       A.  I'm not understanding what you mean
23   by the word "investigate. "
24       Q.  "Investigate," okay.
25            What about the word "investigate" do
```

29

DAVIS, Ph.D.

1
2  you not know?
3      A.  I'm -- I'm just not understanding
4  what you mean by that word in this context.
5      MR. SELLS:  Can we put the
6      policy backup again, please.
7      Q.  We just went through the report and
8  complaints.  Let's go to the next page, page
9  7.  Then it talks about "you must report such
10  information to the affirmative action officer
11  immediately."
12      You saw that, right?  We went
13  through that.
14      A.  Yes.
15      Q.  Now, the next part of the equation
16  talks about what?  Can you just read that out
17  loud for us?
18      A.  Yes.  It's pre-investigation.
19      Q.  Pre-investigation, okay.
20      So, I thought you said you
21      understood what the policy was --
22      A.  I --
23      Q.  -- did you understand or did you not
24  understand, Dr. Davis?
25      MR. DRANOFF:  Object to the

30

DAVIS, Ph.D.

1
2      form.
3      A.  So again, it has been several years
4  since I have been engaged with this policy.
5  When I was on the job at F.I.T., I was very
6  attuned to this policy and aware of it's
7  provision.
8      Q.  All right.  So you're saying it's
9  been several years; is that what you just
10  said?  It's been several years since you
11  understood this policy?
12      A.  I said it's been -- it's now been
13  almost two years since I have worked at
14  F.I.T.
15      Q.  Okay.
16      A.  And so I have not been engaged with
17  this policy for that period of time as to
18  it's specifics.
19      Q.  So when you say "several," you
20  exaggerated?
21      A.  I'm sorry.  It has been since
22  February 2020.
23      Q.  So, the report is supposed to go to
24  the affirmative action officer immediately.
25      Now, what is your understanding of

31

DAVIS, Ph.D.

1
2  the word "immediately"?
3      A.  As -- as -- as it states
4  "immediately."
5      Q.  I know; but what is your
6  understanding of immediately?  What does that
7  mean to you as it relates to this policy?
8      A.  I -- I think it means immediately.
9      Q.  Okay.
10      So, what is your definition of
11  immediately?
12      A.  My definition of immediate is the
13  definition of immediate, right away.
14      Q.  Right away, as soon as you get it,
15  right?
16      A.  Yes.
17      Q.  Okay.
18      So now, the next thing is
19  "pre-investigation."  So the policy says that
20  "once the affirmative action officer gets the
21  complaint, the affirmative action officer
22  will review the reported complaint and
23  conduct an initial assessment to determine if
24  the case falls within the scope of this
25  policy and it's procedures."

32

DAVIS, Ph.D.

1
2      Do you see that?
3      A.  I do.
4      Q.  So under this policy, if you as dean
5  receive a complaint of discrimination, then
6  you're supposed to immediately inform the
7  affirmative action officer who will then --
8  the affirmative action officer will then do
9  the assessment of whether or not that
10  complaint is something that they will
11  investigate --
12      A.  That is --
13      Q.  -- is that right?
14      A.  That is correct, but it hinges on
15  the definitions of the three topics that are
16  covered here in the policy and which are
17  defined in the policy which are
18  discrimination, discriminatory harassment and
19  retaliation.
20      So in the role that I held at
21  F.I.T., I was guided by the definitions in
22  the policy in making the determination about
23  whether a complaint in any of those areas had
24  been lodged.
25      Q.  So, you took it upon yourself --

33

```
DAVIS, Ph.D.
1
2    A.  No.
3    Q.  -- to decide whether or not if you
4    heard something that might be discriminatory
5    or might be harassment or might be
6    retaliation, you took it upon yourself to
7    investigate whether it actually fit one of
8    those definitions before you would then pass
9    on the complaint to the affirmative action
10   officer; is that right?
11   A.  No, sir, that is not correct.  I was
12   guided in my decisionmaking regarding this
13   policy by the terms of the policy which
14   included definitions.
15   Q.  Okay.
16        So you understood the policy to
17   leave that assessment to the affirmative
18   action officer, didn't you?
19   A.  No, sir.  I understood that when a
20   complaint of discrimination, discriminatory
21   harassment or retaliation was lodged in
22   compliance with the terms as outlined in the
23   definitions included in this policy that I
24   was then to refer it to the affirmative
25   action officer who would then begin the
```

34

```
DAVIS, Ph.D.
1
2    investigation.
3    Q.  Okay.
4        You received complaints from
5    students --
6        MR. SELLS:  We can take down
7        the document.
8    Q.  You received complaints from
9    students about the fashion show being
10   discriminatory in nature; did you not?
11   A.  No, that is not correct.
12   Q.  No?
13   A.  No.
14   Q.  Okay.
15        Let's talk about that for minute.
16   Because obviously in your complaint you talk
17   about receiving complaints from students
18   concerning the racial insensitivity of the
19   fashion show; isn't that right?
20   A.  That is correct.
21        MR. DRANOFF:  Object to the
22        form.
23        What is the answer?
24        THE WITNESS:  That is correct.
25        The phrase "racial insensitivity" was
```

35

```
DAVIS, Ph.D.
1
2    used in the complaint.
3    Q.  Now, is that a complaint of a racial
4    nature?
5    A.  That was a complaint that came in a
6    broad context from students who wanted to
7    discuss with me not -- not specifically the
8    fashion show but the -- the larger scope of
9    activities in the fashion design studio.  So
10   I -- that was -- that was the context for
11   that comment.
12   Q.  Okay.
13        So this came about after the fashion
14   show, but before you got fired, right?
15   A.  Yes, sir.
16   Q.  All right.
17        And your reaction to the complaint
18   was to do your own investigation, correct?
19   A.  No, that is not correct.
20   Q.  No?  So, you didn't receive e-mails
21   from three students or two students
22   suggesting that there were issues with the
23   show that were racist in nature?
24   A.  I received e-mails from the
25   students, which as I recall voiced concern
```

36

```
DAVIS, Ph.D.
1
2    about the show and the fallout from the show.
3    There were concerns about Mr. Wang.
4        By the time the students reached out
5    to me, social media had already erupted
6    around the show and Mr. Wang was under
7    tremendous pressure.  At that point, the
8    students were concerned about him.  There
9    were numerous issues that the students wished
10   to discuss with me, and they asked for a
11   meeting with me and with Mr. Farmer.
12   Q.  They asked for it, you said?
13   A.  They did.
14   Q.  Okay.
15        So now when you say issues about
16   Mr. Wang, these issues centered on him
17   putting on a racist fashion design, correct?
18   A.  No, that is not correct.
19   Q.  Well, they weren't concerned that
20   his reputation was now being that of a
21   racist; that wasn't their concern?  Is that
22   right?
23   A.  They were concerned that he was
24   being unfairly pillared in the press and at
25   that point in social media.
```

37

```
1               DAVIS, Ph.D.
2     Q.  As what?
3     A.  That he was fearful as somebody who
4  was incentive to the possible perception of
5  the accessories he used to compliment his
6  looks as being cultural incentive.
7     Q.  Can you not say the word?  That he
8  was being unfairly -- if you believe it, that
9  he was being unfairly criticized as a racist?
10    A.  I don't recall that -- the use of
11 that word for a fact.  It may be that that
12 word was used; but I don't recall it.
13    Q.  So, does the word need to be used in
14 order for you to feel as though someone is
15 being described as a racist?
16    A.  I'm not sure I understand your
17 question.  Are you talking about in
18 connection with Mr. Wang specifically?
19    Q.  Or yourself.  Does someone need to
20 say that you're a racist in order for you to
21 understand that to be a complaint of racist
22 behavior; does someone have to actually say,
23 Dean Davis you're a racist in order for you
24 to understand an allegation that you are a
25 racist?
```

38

```
1               DAVIS, Ph.D.
2     A.  Well, that would certainly
3  constitute an allegation that I was a racist.
4     Q.  But is that the only way that
5  someone could refer to you as being a racist
6  by actually calling you the word "racist"?
7     A.  No, there are other ways.
8     Q.  Right.  It could be implied, right?
9     A.  I'm sorry.  I didn't hear what you
10 said.
11    Q.  It could be implied by a certain use
12 of words, right?
13    A.  Certainly.
14    Q.  You could use the words cultural
15 insensitive.  That's another way of saying
16 hey, someone's a racist, right?
17    A.  It can be.
18    Q.  Right.  And so that's why F.I.T.'s
19 policy is to leave it up to the affirmative
20 action officer to make an initial assessment
21 about whether an allegation itself
22 constitutes a complaint of racial
23 discrimination, retaliation or harassment,
24 right.
25    A.  That is not my view of the policy.
```

39

```
1               DAVIS, Ph.D.
2     Q.  Got it.
3         So when you got the complaint, the
4  e-mail complaint from the students, you did
5  not refer that to the affirmative action
6  office, correct?
7     A.  That is correct.
8     Q.  What you did is you met individually
9  with those students that e-mailed you,
10 correct?
11    A.  That's correct.
12    Q.  And then again after you met with
13 them, you still did not report that to the
14 affirmative action officer, did you?
15    A.  That's correct.
16    Q.  No.  Instead what you did was you
17 called for the entire second year class, the
18 cohort -- what is a "cohort" by the way?
19    A.  A "cohort" is a class of students.
20    Q.  Okay.
21        You called for the cohort to meet
22 with you and Mr. Farmer; isn't that right?
23    A.  That was at the students' request
24 and after consultation with my immediate
25 supervisor, VP Oliva.
```

40

```
1               DAVIS, Ph.D.
2     Q.  Really.  Okay?
3         MR. SELLS:  Can we pull up
4     Exhibit 64.
5         (Counsel is sharing the
6     computer screen image.)
7         MR. SELLS:  For the record,
8     this is a document marked Exhibit C.
9     Exhibit C to the motion to dismiss
10    Mary Davis' lawsuit, and it -- if we
11    could scroll up, I think, it's a
12    three-page document.
13    Q.  Now, Dean Davis --
14    A.  Sir, I'm no longer a dean --
15    Q.  Okay.
16        Ms. Davis, you wrote this memo,
17 correct?
18    A.  I did.
19    Q.  And this was a memo to file dated
20 18th of February 2020, correct?
21    A.  That is correct.
22    Q.  Your meeting with MFA fashion design
23 second year cohort; is that right?
24    A.  Yes.
25    Q.  The cohort, you said, it was entire
```

41

DAVIS, Ph.D.

2 second year class; is that correct?

3    A.  We invited everyone from the second

4 year.  I don't -- I can't attest to the fact

5 that everyone attended.

6    Q.  All right.  I see.

7        So you just said that you invited

8 everyone to the cohort, right?

9    A.  Everyone in second year cohort was

10 invited to this meeting.

11    Q.  Yes, but just a few seconds ago you

12 said that the students asked for the meeting?

13    A.  They did.

14    Q.  They did.  So let's read your memo.

15        "This meeting was called following

16 my individual meetings with Students AB --"

17 it's blocked out "-- and LR who are the

18 second year cohort in the MFA fashion design

19 program which took place on Wednesday,

20 February 12th.  During those meetings both

21 students raised issues about the MFA fashion

22 show, as well as more general concerns about

23 their experience in the program.  In

24 particular, A noted that she had perceived a

25 possible problem with the styling of Jung Ki

42

DAVIS, Ph.D.

2 Wang's collection, and had warned the show

3 producer, Richard Thornn, and Kyle --" I take

4 it that's Kyle Farmer?

5    A.  Correct.

6    Q.  "-- that the models felt

7 uncomfortable wearing the styling elements.

8        She also indicated that Richard told

9 her that she would never walk in my show

10 after she had issued this warning.  Most of

11 the discussion with both students was focused

12 more broadly on the culture in the MFA

13 studio.

14        After my discussion with them, I

15 contacted Kyle and set a meeting with him to

16 review the student concerns.  This meeting

17 took place on Thursday, February 13th.

18 Following the meeting with Kyle, he and I

19 called a meeting with the second year cohort

20 for the morning of February 18th.  This

21 meeting took place from 10:30 a.m. to 12 p.m.

22 in the MFA studio."

23        Now, did I read that correctly?

24    A.  Yes, you did.

25    Q.  Okay.

43

DAVIS, Ph.D.

2        So nowhere in your introduction of

3 this second year cohort meeting did you say

4 that the students asked for the meeting,

5 correct?

6    A.  I did not include that in this

7 summary, but that does not mean that did not

8 happen.  It did.

9    Q.  Got it.

10        And even though a student perceived

11 a possible problem with the styling of Wang's

12 collection and warned the show producer that

13 the models felt uncomfortable wearing the

14 styling elements, you did not report this

15 immediately to the affirmative action

16 officer, did you?

17    A.  That's correct.

18    Q.  Okay.

19        Instead, what you did was you

20 alerted Kyle Farmer who reported directly to

21 you that there was an issue with regard to

22 the accessories, correct?

23    A.  Not correct.

24    Q.  Okay.

25        So when they say that -- when you

44

DAVIS, Ph.D.

2 write that "the students perceived a possible

3 problem with the styling of Wang's collection

4 and warned the show producer," what were you

5 talking about?  What were they talking about?

6    A.  As I recall, one student that I

7 reported here thought that the styling of

8 Jung Ki's collection was offensive.  She did

9 not -- well, I'll just stop there.

10    Q.  And who was this student?  What was

11 his or her name?

12    A.  It's a -- it's a woman.  Her name is

13 AB, second year student in the fashion design

14 program.  She was also on a dean's fellow,

15 which is a program that --

16    Q.  I just asked for her name.

17        MR. MELITO:  If we could mark

18    that name confidential this part of

19    the transcript is confidential it may

20    implicate other statutes that schools

21    have to follow.

22        MR. SELLS:  Yes, I don't have a

23    problem with that.

24    Q.  Now, you said that a student said

25 that she felt that Wang's selection and the

45

```
1                DAVIS, Ph.D.
2    styling elements were offensive; is that
3    correct?
4        A.  I don't recall her exact words.
5        Q.  Well, you just said that they were
6    offense --
7        A.  I know.  I -- my recollection is
8    that she was concerned, as I wrote here -- I
9    think -- I think it is best to stick with
10   what I wrote here, that she perceived a
11   possible problem with the styling of Jung
12   Ki's collection.
13       Q.  That's what she said.  I think there
14   was a possible problem, so I better go warn
15   the producer that there's a possible problem.
16   Is that what she said to you?
17       A.  I can't say for sure.  I can tell
18   you what I wrote in this memo.
19       Q.  Got it.
20           Did you take notes of your
21   conversation?
22       A.  I think --
23       Q.  -- with the student?
24       A.  I believe these are my notes.
25       Q.  Okay.
```

46

```
1                DAVIS, Ph.D.
2           Well, you met with her on February
3    12th, did you not?
4        A.  I did.
5        Q.  Okay.
6           So this memo was written on February
7    18th, right?
8        A.  That's correct.
9        Q.  So, you didn't take contemporaneous
10   notes of your conversation with the student?
11       A.  I can't say.
12       Q.  Was it your practice back then to
13   take notes?
14       A.  It depended on the situation; but I
15   took a fair amount of notes.  I don't know
16   whether I have notes.
17       Q.  Got it.
18           So a student tells you, look, it was
19   offensive what I had seen, but you didn't
20   bring that to the attention of the
21   affirmative action officer, correct, on
22   February 12th, right?
23       A.  I -- I did not.
24       Q.  Got it.
25           What did the other student say you?
```

47

```
1                DAVIS, Ph.D.
2        A.  I don't recall specifically.
3        Q.  All right.
4           But what you wrote is, "In
5    particular, A noted that she had perceived a
6    possible problem with the styling of Jung Ki
7    Wang's collection and had warned the show
8    producer, Richard Thornn, and Kyle that the
9    models felt uncomfortable wearing the styling
10   elements."
11          Now, what about the models feeling
12   uncomfortable wearing them; what was your
13   understanding of the nature of this
14   complaint?
15       A.  First of all, I would like to point
16   out that the models were professional models
17   who were engaged by the producer.  They were
18   not students or in any way related to F.I.T.
19          So my responsibility regarding
20   models was -- it did not really exist.  As
21   far as what the student said about the models
22   feeling uncomfortable wearing the styling
23   elements, I recall that there were issues of
24   literally feeling uncomfortable particularly
25   with the lips because those were designed to
```

48

```
1                DAVIS, Ph.D.
2    stretch the mouth; and one of the models, as
3    I recall, said that that was not comfortable
4    for her.  I don't -- I can't attest to what
5    else that means in this context.
6        Q.  Got it.
7           So according to you, when you wrote
8    that the models felt uncomfortable wearing
9    the styling element, it had nothing to do
10   with the big lips and the big ears.  It had
11   to do with the fact that they literally felt
12   uncomfortable because it was painful for them
13   to put these accessories on; is that your
14   understanding of it, Dean Davis?
15       A.  That is not --
16       Q.  I mean -- sorry, Dr. Davis.
17       A.  That is not my complete
18   understanding.  I'm just pointing out that I
19   do recall that the word related to actual
20   physical discomfort as well.  I think it's
21   worth keeping in mind that the styling
22   elements here are not simply ears and the
23   exaggerated lips, but they also included long
24   gloves -- again, designed to emphasize a
25   distortion of body parts -- and eyebrows,
```

49

DAVIS, Ph.D.

1
2  oversized eyebrows.
3       So, the characterization of all of
4  the accessories as possibly invoking racist
5  tropes or being offensive in ways that relate
6  to racism is a sort of oversimplification of
7  what was really going on with the design.
8       Q.  Got it.
9       So, you're twisting it.  Your
10  twisting it to fit --
11       MR. DRANOFF:  Objection.
12       Q.  You're twisting it to fit your
13  narrative --
14       MR. DRANOFF:  Object to the
15       form.
16       Q.  Is that what you are trying to do?
17       A.  No, sir.  No, sir.
18       MR. DRANOFF:  Just like you
19  are, Derek.
20       A.  No, sir.  I'm not twisting anything.
21  I'm simply trying to answer your question.
22       Q.  Got it.
23       And that is why you didn't present
24  it to the affirmative action officer
25  immediately, right?

50

DAVIS, Ph.D.

1
2       A.  No, that is not correct.  I did not
3  present it to the affirmative action officer
4  immediately because, per the policy and its
5  definitions, I did not consider anything that
6  had happened to meet the definition terms
7  that invoked the need to report to the
8  affirmative action officer.
9       Q.  Okay.  Let's keep going.
10       "After my discussions with them, I
11  contacted Kyle."
12       So, you don't reach out to the
13  affirmative action officer; but you reach out
14  to Mr. Farmer --
15       A.  That's correct --
16       Q.  -- someone you supervise and someone
17  who was intimately associated with the
18  accessories that were used with Mr. Wang's
19  collection, correct?
20       A.  Kyle was included in this meeting
21  because he was the chair of the Fashion
22  Design Department.  This was his program and
23  the concerns were coming from students in the
24  program.
25       Q.  Okay.

51

DAVIS, Ph.D.

1
2       But he was also intimately
3  associated with the selection of the
4  accessories used by Mr. Wang, correct?
5       MR. DRANOFF:  Object to the
6       form.
7       A.  No.
8       Q.  No, okay.
9       So, "I contacted Kyle and set a
10  meeting with him to review the student
11  concerns."
12       And "student concerns," just so I'm
13  clear, had to do with Wang's collection and
14  the warning -- and the warning that the
15  student had given to Mr. Thornn and Mr. Farmer,
16  correct?
17       A.  No, sir.  If you return to the first
18  paragraph, the sentence that begin, "most of
19  the discussions with both students was
20  focused more broadly on the culture in the
21  MFA studio"; that was the crux of the
22  discussion that they wanted to have.
23       Q.  And what about the culture?
24       A.  Pardon me?
25       Q.  What about culture?

52

DAVIS, Ph.D.

1
2       A.  There were concerns from the
3  students that the culture was not positive
4  for them.  There were some students who I
5  learned that day felt that there was a
6  culture of overly -- sort of an overly
7  critical culture in the studio and that there
8  was a sort of harshness to the way in which
9  they were treated and -- and that was --
10  those were general -- general perceptions.
11       Q.  So, there was never a discussion
12  about the program being bigoted and racist?
13       A.  The program itself being bigoted and
14  racist?
15       Q.  Yes.
16       A.  No.
17       Q.  Oh, okay.
18       MR. DRANOFF:  Derek, before
19       your next question can we just take
20       five minutes?
21       MR. SELLS:  Yes, that's fine.
22       (Whereupon, at 11:13 a.m. a brief
23       recess was taken; after which, the
24       proceeding continued at 11:21 a.m. as
25       follows.)

53

DAVIS, Ph.D.

1
2     Q.  So, Dr. Davis, just to be clear you
3  have sat through most of the depositions in
4  the case, correct?
5     A.  I have sat through, I believe, four
6  depositions -- three depositions in this
7  case.
8     Q.  Got it.
9        So you understand, as you sit here
10 today, that one of the allegations that's
11 been made about you with regard to my client,
12 Marjorie Phillips, is that when she went to
13 you with a complaint of race discrimination
14 or even multiple complaints of race
15 discrimination you did not report it to the
16 affirmative action office, right, you
17 understand that?
18    A.  Yes, I do.
19    Q.  Okay.
20       So when I was talking to you earlier
21 today and asking you questions earlier today
22 about the different narratives between your
23 lawsuit where you're trying to get money
24 damages and defending against Ms. Phillips'
25 complaints where you might have to pay money

54

DAVIS, Ph.D.

1
2  damages, you're trying to walk a very fine
3  line; isn't that correct?
4     A.  No, that is a mischaracterization I
5  believe and is incorrect.
6     Q.  Got it --
7     A.  -- I'm hear to tell you --
8     Q.  Well --
9     A.  -- I'm here to tell you the truth.
10    Q.  Got it.
11       So when you say you're here to tell
12 me the truth, one of the things you just said
13 was that when you met with these students
14 that you didn't know whether they were
15 complaining about the accessories as being
16 uncomfortable or being racist in nature;
17 isn't that what you said?
18    A.  No, I don't believe that's what I
19 said.
20    Q.  What did you say?
21    A.  I said -- I believe that I said --
22 actually the court reporter can read back
23 what I said.
24       MR. SELL:  Okay.  If we could
25       just read back.

55

DAVIS, Ph.D.

1
2       (Whereupon, the requested
3       portion of the transcript was read
4       back.)
5     Q.  Did you hear your answers?
6     A.  Yes, I did.
7     Q.  Okay.
8        So now you indicated that you didn't
9  know whether your meeting with the students
10 implicated the policy that required you to
11 report the complaints to the affirmative
12 action officer; is that right?
13       MR. DRANOFF:  Object to the
14       form.
15    A.  I -- based on the definitions
16 included in the policy, I did not believe
17 that it -- it triggered my responsibility to
18 report to the affirmative action officer.
19    Q.  Got it.
20       And that is what you're saying
21 today, right?
22    A.  Are you asking me do I believe that
23 today?
24    Q.  Yes.
25    A.  I don't believe that the -- yes, I --

56

DAVIS, Ph.D.

1
2  I -- I am saying that today.  I don't believe
3  that --
4     Q.  So, you didn't --
5     A.  I --
6     Q.  -- just to be clear, you did not
7  understand the students who you spoke to as
8  raising issues of racial -- of a racial
9  nature; is that right?
10    A.  The policy speaks specifically and
11 defines specifically discrimination,
12 discriminatory harassment and retaliation.  I
13 worked from the policy and it's definitions
14 of those three categories.
15    Q.  Got it.
16       And so the depiction of a person
17 with big lips and the big ears and a
18 student's belief that that's racially
19 incentive and that they were offended in your
20 view does not trigger the policy; is that
21 correct?
22    A.  It did not -- it -- it did not
23 correlate to the definitions included in the
24 policy in a way that would have triggered the
25 need to report to the affirmative action

57

```
1                DAVIS, Ph.D.
2    officer; that is correct.
3         Q.  And that is your own reading of it;
4    is that correct?
5         A.  The policy is clear.  It is --
6         Q.  That is your definition?  That is
7    your definition --
8         A.  No, sir, it is not my definition --
9         Q.  Okay --
10        A.  -- it is my reading of the policy.
11        Q.  Got it.
12            In your complaint --
13            MR. SELLS:  If we could put up
14        Exhibit 59 again.
15            (The image is shared on the
16        computer screen.)
17            MR. SELLS:  If we could go to
18        Paragraph 32.  We'll start at 32.
19        Q.  Now, in your own lawsuit where you
20    are seeking money damages -- by the way, how
21    much money are you seeking --
22        A.  This is a defamation lawsuit, and it
23    is -- I'm seeking 10 million dollars in
24    damages.
25        Q.  10 million?
```

58

```
1                DAVIS, Ph.D.
2         A.  Yes.
3         Q.  Why are you seeking 10 million
4    dollars?  What was it about F.I.T.'s actions
5    and President Brown's actions that you feel
6    defamed you?
7         A.  It's explained in the pages of the
8    suit.
9         Q.  No, I am asking you.
10        A.  I'm telling you.  It is explained
11    thoroughly in the legal document.
12        Q.  Okay.
13            But I am asking you --
14        A.  I'm not going to summarize for you
15    beyond saying that this is a defamation suit
16    against F.I.T. and President Brown in her
17    capacity for -- for defaming.
18        Q.  In what way were you defamed?
19        A.  Every point -- every point in the
20    legal papers speaks to that.
21        Q.  Got it.  All right.  So, let's look
22    at Paragraph 32.
23            "On or about February 11th,
24    Dr. Davis was first alerted to student
25    concerns about the fashion show when two
```

59

```
1                DAVIS, Ph.D.
2    second year students in the fashion design
3    MFA program e-mailed her.  Dr. Davis promptly
4    responded to the students, meeting with both
5    of them the following day."
6            That's what you sworn to --
7         A.  That's correct and consistent with
8    my memo.
9         Q.  All right.
10            So, I'm going to call for the
11    production of the e-mails that you referenced
12    in Paragraph 32.  Do you still have those
13    e-mails?
14        A.  I no longer have access to my F.I.T.
15    e-mail.
16            MR. SELLS:  All right.  So, I
17        direct this request to F.I.T.  Can
18        you, please, provide us with those
19        e-mails.
20            MR. MELITO:  Again, just follow
21        up in writing, Derek.
22
23            MR. SELLS:  Okay.
24        Q.  And then 33, the next paragraph you
25    write, "Immediately after meeting with the
```

60

```
1                DAVIS, Ph.D.
2    students, recognizing the importance and time
3    sensitivity of their concerns, Dr. Davis
4    e-mailed her supervisor, VP Oliva.  She
5    alerted him that some students had expressed
6    concerns that the use of certain accessories
7    at the fashion show raised issues about
8    F.I.T.'s lack of racial sensitivity."
9            Do you see that?
10        A.  I do.
11        Q.  Okay.
12            And so, it's clear from your
13    complaint that you knew that this was an
14    important and sensitive issue, right?
15        A.  That's correct.
16        Q.  And you knew that because the
17    students themselves said that the use of
18    those accessories reflected on F.I.T.'s
19    F.I.T.'s lack of racial sensitivity, correct?
20        A.  I wrote that the students had
21    expressed concerns that the use of certain
22    accessories raised issues about F.I.T.'s lack
23    of racial sensitivity --
24        Q.  Okay.
25            So it's not about the fashion show,
```

61

```
1                    DAVIS, Ph.D.
2      it's about how the use of the accessories at
3      the fashion show raised issues about F.I.T.'s
4      lack of racial sensitivity; right; the
5      school's lack of racial sensitivity, that was
6      what the complaint was, correct?
7          A.  The complaint was --
8              MR. DRANOFF:  Hold on there.
9          I just want to object to the
10         form, Derek.
11         Go ahead.
12         A.  Let me put it this way.  The
13     concerns --
14         Q.  You already put it.  It's already in
15     the question.  You wrote and you swore to it
16     that you alerted VP Oliva that some students
17     had expressed concerns that the use of
18     certain accessories at the fashion show
19     raised issues about F.I.T.'s lack of racial
20     sensitivity, right, F.I.T.'s lack of racial
21     sensitivity, correct?
22         A.  That's correct.
23         Q.  That's what you wrote --
24         A.  That's correct.
25         Q.  And so, when you talk about a
```

62

```
1                    DAVIS, Ph.D.
2      complaint about the school's lack of racial
3      sensitivity, that is something that directly
4      impacts the policy and should directly go to
5      the affirmative action officer, correct?
6          A.  I believe that's your opinion.  I
7      don't believe that it's correct.  I think
8      that --
9          Q.  When you talk about F.I.T.'s "lack
10     of racial sensitivity," your school's, your
11     employer's lack of racial sensitivity, which
12     is a complaint about racial discrimination at
13     the school, correct?
14         A.  Um.  Mr. Sells, I would refer you,
15     once, again to the definitional section --
16         Q.  You don't have to refer me to
17     anything.  I just want you to answer the
18     question.
19         A.  I am answering the question.
20         Q.  Okay.
21         So if someone complains to you and
22     says, "You know, Dean Davis, I think the
23     school lacks racial sensitivity;" you're
24     saying that wouldn't invoke the policy that
25     requires you to report it to the affirmative
```

63

```
1                    DAVIS, Ph.D.
2      action officer?
3          A.  I return to the policy and it's
4      categories of discrimination, discriminate
5      harassment and retaliation.  A lack of racial
6      sensitivity in the definitional section of
7      that policy, I don't consider it to -- I
8      considered this sentence to be a broad
9      representation in contrast to the specifics
10     that are included in the policy.
11         Q.  Got it.
12         So this is no big deal --
13         A.  No --
14         Q.  Wait.  Wait.  This is no big deal,
15     you know, et cetera.  Just a lack of racial
16     sensitivity.  Okay.  We could all live with
17     that.  We don't need to have an investigation
18     by the Affirmative Action Office.  Even
19     though it involves my own direct report, it
20     is not problem --
21         A.  Mr. Sells --
22         Q.  -- is that what you are saying?
23         A.  No, that is a gross
24     mischaracterization of what I --
25         Q.  Gross --
```

64

```
1                    DAVIS, Ph.D.
2          A.  -- am saying and what I have
3      written.  It is the fact that I am alerting
4      my supervisor, the vice president for
5      Academic Affairs, about this is an indication
6      that we were all taking it quite seriously.
7          Q.  Oh, is that right?  So let's look at
8      the very next sentence.  "VP Oliva replied to
9      Dr. Davis by e-mail that he was too busy to
10     discuss the matter that day."
11         That's how serious you and your
12     supervisor took it, right?
13         A.  Sir, I can tell you that my
14     supervisor as I reported in these legal
15     papers that he replied to me by e-mail that
16     he was too busy to discuss it that day.  That
17     did not stop me from continuing to take it
18     seriously.
19         Q.  Got it.
20         So let's see how seriously you took
21     it.  You don't contact the Affirmative Action
22     Office and say, hey, my supervisor is too
23     busy to look at it.  You do not contact HR.
24     Instead, you take it upon yourself to get
25     your direct supervisor, someone -- I mean,
```

65

DAVIS, Ph.D.

1
2  your direct report, right, someone who
3  reports directly to you, under your
4  supervision, you decide to bring him in so
5  that he can hear the concerns about F.I.T.'s
6  racial sensitivity, right?
7      A.  No.  Once again, Kyle Farmer was in
8  the meeting in his capacity as chairperson of
9  the MFA Fashion Design Department.  This was
10  a departmental matter, and the students asked
11  to meet with -- with us.
12      Q.  Okay.
13          So, it's his responsibility, Mr. Farmer's
14  responsibility to address issues of F.I.T.'s
15  lack of racial sensitivity; is that what you
16  are saying?
17      A.  Theses are two different -- you are
18  two different issues, as you see in Paragraph
19  33 of the document that we are looking at.  I
20  alerted Vice President Oliva of that concern.
21  The student meeting was about numerous
22  issues, including the culture in the MFA
23  fashion design studio.
24      Q.  F.I.T.'s lack of racial sensitivity
25  is what you wrote in your lawsuit papers,

66

DAVIS, Ph.D.

1
2  right?
3      A.  What I wrote in my lawsuit paperers
4  is that I alerted VP Oliva that some students
5  expressed concerns that the use of certain
6  accessories at the fashion show raised issues
7  about F.I.T.'s lack of racial sensitivity.
8      Q.  Got it.
9          And it was for you and Mr. Farmer to
10  address these issues about F.I.T.'s lack of
11  racial sensitivity with the students, right?
12      A.  No, it was not.
13      Q.  Okay.
14          Let's go to the next paragraph.
15  "Dr. Davis --" that's you "-- realizing that
16  the students concerns warranted attention,
17  spoke with Professor Farmer and arranged for
18  a meeting with all of the second year fashion
19  design MFA students to discuss these issues."
20          You wrote that too, right or you
21  swore to that too, correct?
22      A.  Yes, it --
23      Q.  Yes.  Okay.
24          So now I don't see anywhere in your
25  lawsuit paper where the students said to you

67

DAVIS, Ph.D.

1
2  that want to meet and have you and Kyle
3  Farmer address the issues about F.I.T.'s lack
4  of racial sensitivity --
5          MR. DRANOFF:  Hold on, Marry.
6      Q.  -- do you see it in your papers?
7          MR. DRANOFF:  Hold on, Marry.
8          Just objection to form.
9      A.  It is not relevant to my defamation
10  suit.
11      Q.  No.  I'm just asking you.  Do you
12  see it in your lawsuit papers that the
13  students asked you to meet with them about
14  their concerns?
15      A.  No.
16      Q.  Okay.
17          And we just went through your note
18  of the February 18th meeting where you don't
19  say in there that the students asked you to
20  meet with them either, correct?
21      A.  Correct.
22      Q.  So the only place that this comes up
23  about how these students want to meet with
24  you to talk about F.I.T.'s lack of racial
25  sensitivity is from your own words, correct?

68

DAVIS, Ph.D.

1
2      A.  Once again, sir, the students asked
3  to meet with me not about F.I.T.'s lack of
4  racial sensitivity, but about their concerns
5  that the use of certain accessories at the
6  fashion show raised issues about F.I.T.'s
7  lack of racial sensitivity.
8          They raised concerns with me that
9  were much broader and that had to do with the
10  culture of the studio for the MFA fashion
11  design program.
12      Q.  Got it.
13          So how did the students say to you
14  that we want to meet with you; how did they
15  say that?
16      A.  When I met with the two students who
17  e-mailed me, they both indicated that they
18  wanted -- that they felt they wanted to have
19  a meeting, they wanted to air their issues.
20      Q.  Okay.
21          But you did not say that in any of
22  your notes or any of your writings, correct?
23      A.  That's correct.
24      Q.  Okay.
25          So, what you write is, "Dr. Davis,

69

DAVIS, Ph.D.

1          DAVIS, Ph.D.
2    realizing that the students concerns warranted
3    attention --"
4          Now, you didn't say, "Dr. Davis, in response
5    to the students asking for a meeting, spoke
6    with Professor Farmer and arranged for a
7    meeting," right?  You didn't write that, did
8    you?
9          A.   No.
10         Q.   No.  It was, "Dr. Davis, realizing
11   that the students concerns warranted
12   attention, spoke with Professor Farmer and
13   arranged for meeting with all of the second
14   year fashion design MFA students to discuss
15   these issue," right?
16         A.   That's correct.
17         Q.   But today you're saying that these
18   two students that you met with said, hey,
19   let's have a meeting with the whole second
20   year -- with all the second year students so
21   we could discuss these issues; is that what
22   you are saying?
23         A.   Yes --
24         Q.   Okay --
25         A.   -- those two things are not

70

1          DAVIS, Ph.D.
2    incompatible.
3          Q.   Got it.
4          So the two students said we want
5    everyone to meet with you, Dr. Davis, so you
6    could just take us through and explain why
7    F.I.T. is not being racially insensitive,
8    right --
9          A.   No, I didn't say any of those
10   things.
11         Q.   You didn't?
12         A.   No, I did not.
13         Q.   And that's because at this point you
14   were trying to save your job and Mr. Farmer's
15   job because all around you -- all around you
16   the media was talking about how racist this
17   fashion show was, including your own
18   students, right?
19         A.   I think that is an
20   mischaracterization and overgeneralization of
21   a --
22         Q.   Okay -- okay --
23         A.   -- in time.
24         Q.   Got it.
25          So what you wanted to do was control

71

1          the narrative internally.  You wanted to
2    stamp out any possible student uprising that
3    would lead to your termination, right?
4          A.   That is -- that is absolutely false.
5          Q.   Got it.
6          Then following the meeting --
7    because this is why you're speaking to your
8    direct report because you know that he is the
9    one that could pull the trigger on you and
10   get you fired, right?
11         A.   I -- I -- I have lost you in this
12   theory, Mr. --
13         Q.   No --
14         A.   -- I have lost you --
15         Q.   You have lost me.  Okay.
16          So following the meeting, you texted
17   and briefed -- orally briefed your boss,
18   Oliva, on the concerns expressed by students
19   and then followed up with a detailed written
20   memo, right?  That's what you wrote?
21         A.   That's correct.
22         Q.   And that's what you did, right?
23         A.   Yes.
24          MR. SELLS:  Okay.  Can we

72

1          DAVIS, Ph.D.
2    scroll up.
3          Q.   And you address it to him and to VP
4    Glass, right?
5          A.   That's correct.
6          Q.   And neither director suggested that
7    you take any further action?
8          A.   That's correct.
9          Q.   Okay.
10          But you didn't give it to the
11   affirmative action officer, right?
12         A.   This issue by this time was not only
13   with the vice president and senior leadership
14   of F.I.T.; but it was with the president's
15   office directly.
16         Q.   Now, talking about this issue and
17   about the different narratives, let me ask
18   you --
19          MR. SELLS:  We can take down
20   the document.
21         Q.   Let me ask you.  You saw Ms. Glass's
22   deposition yesterday, correct?
23         A.   I did.
24         Q.   You saw where she said she did not
25   attend the fashion show; you saw that, right?

73

DAVIS, Ph.D.

1      A.  Yes, I thought that she had.
2      Q.  Okay.
3          So in order to again give the
4  different narrative and buildup your case for
5  court where you could get the 10 million
6  dollars you're looking for, you wanted to
7  make it seem that the HR rep. who may have to
8  pass on whether or not the accessories that
9  your supervisor selected were racist you
10  wanted to put her in the audience too,
11  correct?
12        MR. DRANOFF:  Object to the
13     form.
14     A.  That is -- actually, that is not
15  correct --
16     Q.  No.  Okay --
17     A.  I -- may I --
18        MR. SELLS:  Could we put backup
19     Exhibit 59 and go to paragraph 24.
20        (The image is shared on the
21        computer screen.)
22     Q.  What you write in your sworn to
23  complaint in paragraph 24 is, "Dr. Brown,
24  members of her cabinet and Dr. Davis watched

74

DAVIS, Ph.D.

1  the show from the front rows of the venue.
2  Cabinet members in the audience included VP
3  Oliva, who has noted above was Dr. Davis'
4  direct supervisor, Cynthia M. Glass, vice
5  president for Human Resources Management and
6  labor relations."
7         You put that in there, correct?
8      A.  That was in error.
9      Q.  Oh.  Okay.  Okay.  Got it.
10     A.  Allow me to finish, please --
11     Q.  But if we could go --
12        MR. DRANOFF:  Let her finish
13     the answer, please.
14     A.  Allow me to finish my answer,
15  please.
16     Q.  Sure, go ahead.
17     A.  I believe -- I believed that Dr. Glass
18  was in the audience.  She was invited.  I did
19  not control the invitation list, nor did I
20  control any kind of admission to the fashion
21  show.  I believed her to have been there.
22  That was a mistake, according to her test- ---
23  according to her testimony.
24     Q.  Mistake --

75

DAVIS, Ph.D.

1      A.  According to her testimony.
2         MR. SELLS:  So, let's go to the
3      last page of the document.  Let's go
4      to the verification.
5      Q.  "I am the plaintiff in the within
6  action.  I have read the foregoing Verified
7  Complaint and know the contents thereof.  The
8  contents are true to my knowledge except as
9  to matters therein stated to be alleged upon
10  information and belief; and as to those
11  matters, I believe them to be true."
12        MR. SELLS:  Now let's go back
13     to paragraph 24 again.
14     Q.  Now, on paragraph 24 you don't
15  allege on information and belief Cynthia
16  Glass was present, right?
17        MR. DRANOFF:  Note my objection
18     to the form.
19     A.  If Dr. Glass's testimony is correct,
20  then this is an error.
21     Q.  Or it's a lie, correct?  You could
22  be lying --
23     A.  No, it's not.
24     Q.  Obviously, if you swear to tell the

76

DAVIS, Ph.D.

1  truth and then it turns out that you get
2  caught, then you could say, "Oh, it was an
3  error."  Or it's a lie, right?
4      A.  Is there a question?
5      Q.  Yes.
6      A.  I already explained.  I believed
7  that Dr. Glass was in the audience when this
8  complaint was filed.
9      Q.  You believed, so you should have put
10  on information and belief --
11     A.  Oh.
12     Q.  -- right?
13        MR. DRANOFF:  Object to the
14     form.
15     A.  I believed that she was there.
16     Q.  No, you knew she was there because
17  you swore to tell the truth on matters that
18  appear in here.  You said they are true.  You
19  swore to it that they are true; and as to
20  matters that are mentioned on information and
21  belief, you believed them to be true.
22        And here you do not say "on
23  information and belief."  You say she was
24  there, which under your own verification is a

DAVIS, Ph.D.

1 lie itself; not true --

2 A. You --

3 Q. -- right?

4 A. You may characterize it however

5 you'd like.

6 Q. Well, you used "on information and

7 belief." You used it in your complaint,

8 right?

9 A. Again, yes, I did.

10 Q. Okay.

11 But for this paragraph, you said she

12 was there --

13 A. You can ---

14 Q. -- that turns out to be a lie,

15 correct?

16 MR. DRANOFF: Object to the

17 form.

18 A. You can --

19 MR. DRANOFF: A mistake is not

20 a lie, Bruce --- excuse me, Derek. If

21 in fact it was a mistake even.

22 Q. Now, you indicated that that Mr. Farmer

23 received death threats; is that right?

24 A. Yes, as did Mr. Thornn.

DAVIS, Ph.D.

1 Q. Who did these death threats come

2 from?

3 A. I do not know.

4 Q. What did F.I.T. do in response to

5 the death threats?

6 A. I do not know.

7 Q. Well, how do you know they got the

8 death threats?

9 A. Because both of them in -- I'm

10 trying to think if it was in meetings or -- I

11 believe it was with Mr. Thornn in e-mails

12 indicated that he had received death threats.

13 Kyle Farmer reported not just to me but to

14 others that he had received death threats on

15 social media.

16 Q. And why? What were the death

17 threats for?

18 A. I did not see them; so I cannot

19 speak to them.

20 Q. Okay.

21 But you just believe them; you just

22 believe whatever they told you, correct?

23 A. I have -- I'm just reporting what

24 they said.

DAVIS, Ph.D.

1 Q. Okay.

2 So, again in paragraph 39, even

3 though you did not see the death threats

4 yourself, you swear that they were -- that

5 they happened, correct?

6 A. I'm just reading the paragraph.

7 I would need to refresh my memory on

8 whether I saw the e-mail -- an e-mail from

9 Richard Thornn regarding death threats. I

10 believe -- I believe I saw an e-mail

11 regarding that from Mr. Thornn.

12 Q. Oh. So you're changing your

13 testimony again when you don't put it in on

14 information and belief and you actually swear

15 to it, now all of a sudden -- whereas before

16 you said, Oh, I didn't see them. They just

17 told me about them.

18 But now when you get called to the

19 carpet on them you say, Oh, wait. Wait.

20 Maybe I did see it. Maybe I did see it --

21 A. I --

22 Q. -- do you see?

23 MR. DRANOFF: Object to the

24 form.

DAVIS, Ph.D.

1 Q. Do you see what you are doing?

2 MR. DRANOFF: Object to the

3 form.

4 Q. Do you see how you are trying to

5 walk this fine line between trying to get 10

6 million dollars and how you are trying to

7 defend against lawsuit, right?

8 A. This is --

9 MR. DRANOFF: Just one second.

10 This objection is based on

11 harassment.

12 Go on, Mary.

13 A. Mr. Sells, I am trying to answer

14 your questions as thoroughly as I possibly

15 can. I will need or would need to see

16 documents from Richard Thornn to recall if

17 this paragraph was based on seeing an e-mail

18 from him or if it was based on reporting from

19 him or others.

20 I do know that he reported --

21 Mr. Thornn reported death -- that he had had

22 death threats.

23 Q. Okay --

24 A. Also, may I ask you --

81

DAVIS, Ph.D.

1
2  Q.  No.  --
3      MR. DRANOFF:  No.  No.  No.
4  No.  Don't --
5  Q.  You have to answer.  You cannot just
6  go on with what you want to say.
7      Now, Dr. Davis, you allege broadly
8  that President Brown, in conjunction with
9  trying to defend F.I.T.'s reputation, crafted
10  a false narrative about how F.I.T. was not
11  acting in a racist way, but rather that you
12  and Mr. Farmer were responsible; isn't that
13  right?
14  A.  No, that is a mischaracterization of
15  my lawsuit.
16  Q.  I see.
17      So, you didn't say that President
18  Brown lied?
19  A.  I'm --
20      MR. DRANOFF:  Object to the
21  form.
22  A.  I'm -- can you -- can you -- can you
23  clarify that question to -- to give me a time
24  or a document to which that relates.
25  Q.  No.  I am asking you a question.

82

DAVIS, Ph.D.

1
2  A.  No, I can't --
3  Q.  Did you allege that Dr. Brown lied
4  in blaming you in part for the clearly racist
5  fashion show?
6  A.  Are you referring to -- these are --
7  does your question go to whether I made that
8  statement in this legal paper, in this
9  lawsuit?
10  Q.  Yes.  I'm saying it.
11  A.  So let's take a look, as long as we
12  have the document up, if you could show me
13  what you are referring to that would be very
14  helpful.
15  Q.  No.  I am asking you as you sit here
16  now, did you allege that Dr. Brown lied in
17  creating a false narrative about how the
18  racist fashion show was done?
19      MR. DRANOFF:  Object to the
20  form.
21  A.  I don't recall if I used the word
22  "lie" in this document.  That is why I would
23  like to see the language that you are
24  referring to.
25  Q.  I'm asking you a question.

83

DAVIS, Ph.D.

1
2  A.  I'm answering it.
3  Q.  So, you need to see the document to
4  know whether or not you alleged that
5  Dr. Brown lied?
6  A.  I need to know if I used that word.
7  Q.  And what happens if you didn't?
8  A.  I just need to know whether I did.
9  If you're -- if you're saying -- if you're
10  putting those words in my mouth, I would like
11  to see them particularly since we have the
12  document up in front of us.
13  Q.  So, you don't know whether or not
14  Dr. Brown lied; is that correct?
15  A.  I am not sure what you are referring
16  to, if you are referring to a specific
17  instance or whether you are referring to a
18  general instance.
19      Also, I'm not sure if you are
20  referring to language in this lawsuit or
21  something else.  So I need for you to clarify
22  those points for me, please.
23  Q.  What is your understanding of
24  "defamation"?
25      MR. DRANOFF:  Object to the

84

DAVIS, Ph.D.

1
2  form.  She is not a lawyer.
3  A.  Yup, I'm not a lawyer.  My --
4  Q.  I asked what your understanding of
5  "defamation" is?
6  A.  "Defamation" is -- see, I actually
7  can't answer that question; because I know
8  what it is and how it is being used regarding
9  me and in my case.
10      But I can't speak to the legal
11  principle of defamation or the broader issues
12  around it.
13  Q.  Okay.
14      Well, why do you think you were
15  defamed?
16  A.  I think I was defamed because I was
17  used, as I have said in other legal papers,
18  as a scapegoat in this case when F.I.T.
19  wished to blame someone for what happened at
20  the fashion show for the -- for the use of
21  accessories that were assumed to be racist by
22  some people and reported in the press as
23  being racist.
24      I think F.I.T. wanted to blame --
25  wanted to place blame on me for that unfairly

85

DAVIS, Ph.D.

1
2  and improperly.
3      Q.  That's your understanding of your
4  lawsuit; that you were made a scapegoat?
5      A.  That is part of my lawsuit, yes.
6      Q.  Okay.
7          I don't understand that as being
8  defamation.  Tell me how that's defamation?
9          MR. DRANOFF:  Object, and she
10         is not going to testify about that
11         cases allegations from a legal
12         perspective, Derek.  That's why --
13         MR. SELL:  I'm asking her --
14     Q.  Did you authorize a suit, a 10
15  million dollar suit for defamation?
16     A.  I did.
17     Q.  So, you're saying you authorized a
18  10 million dollar lawsuit for defamation, you
19  signed a verification stating that everything
20  in the complaint is true, but you don't
21  understand what "defamation" is; is that
22  correct?
23         MR. DRANOFF:  Object to the
24         form.
25         Derek, again, you are asking

86

DAVIS, Ph.D.

1
2          her legal opinions and that is not an
3          appropriate question.
4      Q.  Okay.
5          So, Dr. Davis, just so I'm clear,
6  you don't know whether or not you are
7  accusing Dr. Brown and other people at F.I.T.
8  of lying as part of your lawsuit; is that
9  correct?
10     A.  I, again, am concerned about your
11  use of the word "lie" in -- in connection
12  with this.
13     Q.  Okay.
14         Well, would you consider someone
15  making a false statement to be a lie?
16     A.  Not necessarily.
17     Q.  Okay.
18         So, tell me what situation would
19  someone making a false statement about you not
20  be a lie?
21     A.  Someone could make an honest mistake
22  and say something that wasn't factually true.
23  That is --
24     Q.  Did --
25     A.  -- that is different -- go ahead.

87

DAVIS, Ph.D.

1
2      Q.  Do you think that's what F.I.T. and
3  Dr. Brown did here, they made a false
4  statement that could have been a mistake and
5  not really been a lie; is that correct?
6      A.  No, that -- that is not if case in --
7  in this situation.
8      Q.  So, you think that the false
9  statements that Dr. Brown and F.I.T. made
10  were lies, correct?
11     A.  Once again, I would want to see the
12  language in the suit to -- to affirm that the
13  word "lie," is used in the legal documents.
14         MR. SELLS:  I would like to go
15         to page 24.
16     Q.  This is the second claim in your
17  lawsuit, right?
18     A.  Yes.
19     Q.  What you allege is that "Defendant's
20  statements regarding Dr. Davis were false and
21  defamatory in multiple ways."  There is a
22  whole list.  "The false claim is that
23  Dr. Davis was in charge of and responsible
24  for overseeing the show."
25         Right, that is one thing you said

88

DAVIS, Ph.D.

1
2  F.I.T. and Dr. Brown lied about, right?
3          MR. DRANOFF:  Object to the
4          form.
5          Derek, these are specific legal
6          allegations in the complaint relating
7          to defamation.  They will be taken on
8          the face of what they are in the
9          context of that particular pleading.
10         This is far beyond Dr. Davis's
11         ability to interpret the nuisances of
12         the actual legal principles involved.
13         The document says what it says,
14         and I think we should put an end to
15         this inquire.  I'll let you go a
16         little longer, but it's getting
17         beyond what is appropriate.
18         MR. SELLS:  I think you will
19         see where I'm going, Eric.
20         MR. DRANOFF:  All right.  I'm a
21         patient man.
22         MR. SELLS:  All right.
23     Q.  So, one of the things that F.I.T.
24  did was lie about you being in charge of and
25  responsible for overseeing the show?

89

```
1                DAVIS, Ph.D.
2         MR. DRANOFF:  Continued
3    objection --
4         Q.  Is that right?
5         A.  As stated in the document, they made
6    a false claim.
7         Q.  Okay.
8         So, you don't think it was just a
9    mis-statement of fact or an opinion on their
10   part, right?
11        MR. DRANOFF:  Again, Derek, you
12   are asking her things of legal
13   significance within the context of
14   her defamation --
15        MR. SELLS:  No, I'm not.
16        MR. DRANOFF:  When you are
17   talking about an opinion that relates
18   directly to the deformation case --
19        MR. SELLS:  No.  No, you will
20   see where I'm going.  Just hear me
21   out.
22        MR. DRANOFF:  I'm hearing you
23   out, but --
24        MR. SELLS:  I'm just trying to
25   figure out whether your client
```

90

```
1                DAVIS, Ph.D.
2    believes in the lawsuit that she
3    filed.  I mean, it's really simple to
4    me that defamation means that someone
5    lied and said something that is not
6    true that was harmful to one's
7    reputation.  I'm just --
8         MR. DRANOFF:  Well, that's --
9         MR. SELLS:  It's a question.  I
10   would think she would say yes, that's
11   a lie.
12        MR. DRANOFF:  That is where the
13   misstep is, Derek.  In a defamation
14   case --
15        MR. SELLS:  Okay --
16        MR. DRANOFF:  -- something does
17   not have to be a lie.
18        MR. SELLS:  I understand it.
19   I'm asking her for her -- these are
20   her own allegations.  I'm just asking
21   her whether she believes that she was
22   defamed because, you know, F.I.T.
23   created a lie about what happened so
24   that she could be scapegoated.  I
25   thought that's what this lawsuit was
```

91

```
1                DAVIS, Ph.D.
2    about.  But maybe I'm -- maybe I
3    missed it.  But anyway I'll ask.
4         Q.  Is part of your claim, Dr. Davis,
5    that F.I.T. lied about your involvement with
6    this show?
7         A.  As you see here in the claim, I
8    assert that they made false claims about my
9    role.
10        Q.  Okay.
11        But you just said that when you say
12   "false claims," that it might not be a lie.
13   It might be a mistake, and I'm trying to
14   understand what your allegation is.
15        Are you saying that they mistakenly
16   made a false claim, or are you saying that
17   they affirmatively created a lie so as to
18   scapegoat you and avoid negative publicity on
19   them?
20        MR. DRANOFF:  You know what,
21   Derek, I think I can make this easier
22   for you.  If you scroll down, it may
23   be allegations regarding the
24   nature -- specific nature of that
25   conduct.  All right?  I don't want
```

92

```
1                DAVIS, Ph.D.
2    her paraphrasing.
3         MR. SELLS:  All right.  I got
4    you.
5         Q.  So, we have all the list of false
6    claims here, right?  Let's talk about those.
7         That F.I.T., they said falsely that
8    you were "in charge of and responsible for
9    overseeing the show," correct?
10        A.  Correct.
11        Q.  And you say that another false claim
12   that F.I.T. and Dr. Brown made was that you
13   provided accessories at issue to a student;
14   is that right?
15        A.  Correct.
16        Q.  And they also, Dr. Brown and F.I.T.,
17   claim that it was obvious to everyone, except
18   for you and Kyle Farmer, that the accessories
19   were racist, right?
20        A.  Correct.
21        Q.  They also made the false claim --
22   and again, by they I mean Dr. Brown and
23   F.I.T. -- that by providing accessories to a
24   student or failing to stop their inclusion in
25   the fast, you failed to recognize or
```

93

```
1                    DAVIS, Ph.D.
2    anticipate the racist references or cultural
3    insensitivities obvious to everyone else,
4    right?
5        A.   Correct.
6        Q.   And you made the claim that Dean Brown
7    and F.I.T. made the false claim your actions
8    and inactions were failures that were
9    inexcusable and irresponsible, correct?
10       A.   Correct.
11       Q.   And you also made the allegation
12   that F.I.T., through it's President and
13   others, made the false claim that you were
14   not fit to be dean of the School of Graduate
15   Studies, correct?
16       A.   Correct.
17       Q.   And you also make the claim that
18   Dr. Brown and F.I.T. and those that were
19   involved in creating the statement said that
20   your actions and inactions constituted
21   inexcusable and irresponsible failures
22   demonstrating that you are a racist and unfit
23   to be dean; is that correct?
24       A.   Correct.
25       Q.   And that you and --- that President
```

94

```
1                    DAVIS, Ph.D.
2    Brown and F.I.T., their claim that an
3    independent investigation would uncover how
4    and why you and Professor Farmer failed to
5    recognize or anticipate the racist references
6    and cultural insensitivities that were
7    obvious to everyone else was another false
8    claim; is that right?
9        A.   That is correct.
10       Q.   Then if we go further, you say that --
11           MR. DRANOFF:  I think you are
12       looking for paragraph --
13           MR. SELLS:  84.
14           MR. DRANOFF:  -- 83 and 84.
15       Q.   "Defendants published a false
16   statement about Dr. Davis knowing they were
17   false."
18           Do you see that?
19       A.   I do.
20       Q.   And that would constitute a lie; is
21   that correct?
22       A.   That would constitute a lie.
23       Q.   Okay.
24           So your allegations are that F.I.T.
25   and Dr. Brown, the president, lied about you
```

95

```
1                    DAVIS, Ph.D.
2    so that they could cover up their own
3    involvement in a racist fashion show; is that
4    right?
5        A.   No, that is not right.
6            And also, looking again at the
7    language in Number 83, it's very specific;
8    and again, I'm not an attorney, but it's --
9    it's purposeful in saying that they
10   "published the false statements knowing they
11   were false."
12           I'm not sure because I don't have a
13   dictionary in front of me, I'm not sure if
14   that meets the definition of a lie.  That
15   seems to me like very specific and very
16   purposeful.
17       Q.   Well, I'm not asking you for your
18   legal definition.
19       A.   Well, you're asking me to --
20       Q.   I'm just asking your opinion.  Do
21   you think it was a lie?  Do you think it was
22   a lie?  And if you are saying you don't know,
23   then okay --
24       A.   I --
25       Q.   -- you don't know.  All right --
```

96

```
1                    DAVIS, Ph.D.
2        A.   No, that is not my answer, sir.  My
3    answer is that there is a difference between
4    saying something and publishing something
5    that's false with knowledge that it's false
6    and lying.
7            MR. DRANOFF:  Again, let me
8        object.  The pleadings say what the
9        pleadings say for whatever particular
10       legal significance they have.  This
11       is not a deposition in her defamation
12       action.
13           MR. SELLS:  Okay.
14       Q.   The point though is -- well, let me
15   ask you this --
16           MR. SELLS:  We can take down
17       the document.
18       Q.   Who worked with Dr. Brown to create
19   these false statements about you?
20       A.   I can't say for certain.
21       Q.   Well, you said that when the media
22   started getting mobilized about this storey,
23   how F.I.T. put on this racist fashion show,
24   that you were part of a team with the
25   President that met multiple times to figure
```

DAVIS, Ph.D.

2  out a strategy on how to deal with these
3  issues; is that right?
4      A.  That's correct.
5          First of all, though, I would like
6  to just --
7      Q.  Well, no.  No.  You can't just talk.
8  You have to answer the questions, all right.
9  I get it.  You want to get your word out and
10  your lawyer can ask you questions at the end,
11  if he would like.  But just answer my
12  questions.
13         So when you had these meetings, who
14  was part of that team that was responding to
15  this?  Just tell me who they were.
16     A.  Loretta Keane, the Vice President
17  for Communications and External Relations.
18  Jennifer Loturco, L-O-T-U-R-C-O, who was the
19  deputy to the President.  It's possible that
20  Alex Mann, the communication specialist, was
21  in one of those meetings.  Mann with two Ns.
22         I cannot recall if Vice President
23  Oliva was in one or more of those meetings.
24  I think that's it.
25     Q.  What about VP Glass, was she in

DAVIS, Ph.D.

2  those meetings?
3      A.  I'm trying to recall.  I don't know.
4  I don't recall.
5      Q.  In those meetings that you attended,
6  no one indicated that you had any
7  responsibility for the fashion show; isn't
8  that right?
9      A.  Those meetings were about
10  communication strategy.  They were not about
11  identifying responsibility for the show as I
12  recall it.
13     Q.  Well in your complaint, what you
14  allege is that at the behest of the
15  administration -- and we read through this --
16  Professor Farmer, Kyle Farmer, and Thornn
17  publicly took responsibility for the
18  decisions that had been made with respect to
19  the accessories; isn't that right?
20     A.  I did.
21     Q.  So is that something that was
22  discussed in the these meetings that you
23  attended?
24     A.  I was in one meeting where Kyle's
25  apology was discussed.

DAVIS, Ph.D.

2      Q.  Tell me about that meeting.
3      A.  As I recall, Kyle was asked by Vice
4  President Keane about Jung Ki's accessories.
5  He explained his role, as I have explained it
6  already; and as I recall, it was at Vice
7  President Keane's suggestion that Kyle worked
8  on a statement that he published taking
9  responsibility for the use of the
10  accessories.
11     Q.  All right.
12         So, as you sat there and you
13  listened first to what you claimed Mr. Farmer
14  said, which was I didn't select those
15  accessories, Vice President Keane still said
16  to Mr. Farmer that he should take
17  responsibility; is that right?
18     A.  I don't recall the exact words that
19  were used in that meeting; but that was being
20  part of the meeting as I recall.
21     Q.  So, you sat there and you witnessed
22  F.I.T. trying to come up with a false
23  narrative that somehow Mr. Farmer should take
24  responsibility for something that he claims
25  he did not do --

DAVIS, Ph.D.

2         MR. DRANOFF:  Object to the
3  form --
4      Q.  -- is that right?
5      A.  No, that is not right.  I don't
6  believe it was a false narrative.  I believe
7  that Kyle -- and you would need to speak to
8  him about this -- but I think that the issue
9  was, again, an issue related to term --
10  terminology and responsibility was the word
11  that was at issue there.
12         Because Mr. Thornn was a contract
13  employee and not an in-house employee at
14  F.I.T., I believe that -- well, I'll just
15  leave it there.  Mr. Thornn was a contract
16  employee.
17     Q.  So, I'm not following you.
18         You said earlier that Mr. Farmer had
19  no role in the selection of the accessories --
20     A.  No, sir.
21     Q.  -- is that right?
22     A.  No, sir, that is not correct.
23     Q.  So, he did have a role?
24     A.  I explained his role.  I -- I -- as
25  I said before, Jung Ki Wang reached out to

101

DAVIS, Ph.D.

Kyle Farmer as he was trying to complete the
preparations for the fashion show and had not
finalized the designs that he intended to use
as accessories.  He asked Mr. Farmer for
recommendations on how he could address the
problem.

    Mr. Farmer went to Amazon, pulled up
some websites for -- from Amazon and sent the
list to Mr. Wang who then selected the
accessories.

    Q.  So, how did Kyle Farmer have
anything, any responsibility in what
accessories Mr. Wang chose if he just --

    MR. DRANOFF:  One second.  One
    second --

    Q.  -- if he --

    MR. DRANOFF:  Lesley, can you
    read that back.

    (Whereupon, the requested
    portion of the transcript was read
    back.)

    Q.  -- if he just sent Mr. Wang some
websites from which to choose whatever
accessories he ultimately chose?

102

DAVIS, Ph.D.

    A.  I can't speak for Kyle and what he
did or did not feel.  But he did provide the
list from which Jung Ki selected.

    Q.  Okay.

    So you thought that the
administration or VP Keane saying to Mr. Farmer,
"We want you to write a public apology for --"
as you put in your complaint "-- for the
decisions that had been made with respect to
the accessories" was perfectly okay, right?

    A.  I'm not sure what you mean that I
thought it was perfectly okay.

    Q.  Well, you didn't complain about it,
did you?

    A.  I don't recall complaining about it.

    Q.  Yes.  And you didn't say, "Oh, my
goodness.  You know, why are you trying to
create this false narrative when in fact
Mr. Farmer didn't have anything to do with
the selection of the accessories?  He only
provided a list from which the selections
could be made."

    A.  So I -- I -- I don't believe that
your characterization of this as a false

103

DAVIS, Ph.D.

narrative is accurate.  And secondly, Kyle
Farmer did provide a list from which Mr. Wang
worked.  So Kyle Farmer was in fault in the
selection of the accessories to that extent.

    Q.  Okay.

    So, he did have involvement?

    A.  As I have explained, yes.

    Q.  Got it --

    A.  Not in the selection, but in
providing a list from which Mr. Wang
selected.

    Q.  Now, you also took offense at
Dr. Brown's public statement that you contend
contained false allegations about you and
your role in this; is that correct?

    A.  I don't know which statement you are
referring to.

    Q.  Well, you were the one who claims to
be defamed, right?

    A.  Are you referring to her public
statement of February 21, 2020?

    Q.  Well, you tell me.  You tell me.
Which one did you --

    A.  You --

104

DAVIS, Ph.D.

    Q.  -- that you felt defamed about?

    A.  That is -- that statement from
February 21st, 2020 is the statement at issue
in the lawsuit.

    Q.  Okay.

    So what about that statement was
false?

    A.  Again, the question of things being
false and the way in which they added up to
being defamatory is the subject of the entire
lawsuit.  And so it is complicated and it is
fully explained in the document that you
have.

    Q.  Okay.  Let's talk about that and how
you characterize it in your lawsuit papers.

    Again, as you try and parse through
whether it's a lie or false statement.  Let's
talk about --

    MR. SELL:  If we could go back
    to Exhibit 59 and just starting with
    paragraph 48.

    Q.  So, this is the way you swear to it
in your complaint.  First you say,
"Dr. Brown's statement was false and can be

105

DAVIS, Ph.D.

1  proven to be false in at least three material
2  ways.
3      First, Dr. Brown's statement was
4  false in asserting that Dr. Davis, the dean
5  of the School of Graduate Studies, was in
6  charge of and responsible for overseeing the
7  content of the show, including the choice of
8  accessories; and that she failed in those
9  professional responsibilities.
10     As set forth above, that statement
11  was completely untrue and that Dr. Davis had
12  no responsibility and there could not
13  have failed in the discharge of those
14  duties."
15     Right?  That's one thing that you
16  put if your lawsuit, correct?
17     A.  Correct.
18     Q.  Then in Paragraph 49 you say, "Next,
19  Dr. Brown's statement that almost everyone,
20  i.e. except Dr. Davis and Professor Farmer,
21  recognized the obvious racist references and
22  cultural insensitivities in the accessories
23  was false."
24     I'm going to just stop there for a


105

DAVIS, Ph.D.

1  proven to be false in at least three material
2  ways.
3      First, Dr. Brown's statement was
4  false in asserting that Dr. Davis, the dean
5  of the School of Graduate Studies, was in
6  charge of and responsible for overseeing the
7  content of the show, including the choice of
8  accessories; and that she failed in those
9  professional responsibilities.
10     As set forth above, that statement
11  was completely untrue and that Dr. Davis had
12  no responsibility and there could not
13  have failed in the discharge of those
14  duties."
15     Right?  That's one thing that you
16  put if your lawsuit, correct?
17     A.  Correct.
18     Q.  Then in Paragraph 49 you say, "Next,
19  Dr. Brown's statement that almost everyone,
20  i.e. except Dr. Davis and Professor Farmer,
21  recognized the obvious racist references and
22  cultural insensitivities in the accessories
23  was false."
24     I'm going to just stop there for a

106

DAVIS, Ph.D.

1  second.  When you say that was false, what
2  about that statement was false?
3      A.  I ---
4      MR. DRANOFF:  Objection.
5      Again, Derek, you are asking
6      questions concerning her defamation
7      claim.
8      MR. SELLS:  No, I'm just trying
9      to figure out what --- what's false
10     about that.
11     Q.  When you say, "Dr. Brown's statement
12  that almost everyone, i.e. except Dr. Davis
13  and Professor Farmer, recognized it the
14  obvious racist references and cultural
15  insensitivities --"both of which are in
16  quotations "-- in the accessories was false."
17     And so --
18     MR. DRANOFF:  I think the rest
19     of the context to that is expressed
20     in that paragraph.
21     Q.  Okay.  So it declares as a factual
22  matter that the accessories referred to
23  racial tropes and were culturally
24  insensitive.  "However, as set forth above,

107

DAVIS, Ph.D.

1  neither Dr. Brown nor a single member of her
2  cabinet nor any of the F.I.T. foundational
3  board of trustees who attended the show
4  voiced any such reaction, nor had the vast
5  majority of the spectators who attended it
6  the fashion show or watched the video
7  online."
8      I see.  So is what you are saying
9  that in fact most people who looked at the
10  accessories on Wang's -- from Wang's fashions
11  did not find those accessories to be racially
12  offensive; is that what you are saying?
13     MR. DRANOFF:  Object to the
14     form.
15     A.  No, it doesn't say that they didn't
16  feel that way.  It says they did not voice
17  any such reaction.
18     Q.  Got it.
19     So in other words, you're saying
20  that since Dr. Brown nor the F.I.T.
21  foundation or board of trustees nor a single
22  member of her cabinet had this reaction at
23  the time that the fashion show took place,
24  that their subsequent statement, this

108

DAVIS, Ph.D.

1  statement, of the 21st wherein the alleged
2  that almost everyone knew it to be racist at
3  the time except for you and Mr. Farmer was
4  untrue, right?
5      A.  I'm just -- I'm pausing because of
6  the phrase "any such reaction" can you repeat
7  your question just so I can understand --
8      Q.  You know what.  I will rephrase it
9  this way.  I will take that question back --
10     A.  Okay.
11     Q.  What you are saying is in this
12  paragraph that President Brown made the false
13  allegation that at the time of the fashion
14  show when Mr. Wang's fashions were coming out
15  with those accessories that she and the board
16  of trustees and her cabinet believed it to be
17  racist when in fact at the time they did not
18  believe it to be racist; is that accurate?
19     A.  I can't speak to belief.  I think
20  that the word that's used in her statement,
21  which I believe if you scroll up and we could
22  even look at, is "recognized," not believed.
23     Q.  Okay, "recognized."
24     But either way, you believed that

109

DAVIS, Ph.D.

1
2  that statement was false -- knowingly false,
3  correct?
4      A.  Yes, I did.
5      Q.  Okay.
6          In Paragraph 51 you also say,
7  "Dr. Brown's statement that F.I.T. was
8  commissioning an independent investigation to
9  uncover how and why Dr. Davis and Professor
10 Farmer failed to recognize or anticipate the
11 racist references and cultural
12 insensitivities that were obvious to almost
13 everybody else was designed to show that she,
14 Dr. Brown, was taking affirmative steps to
15 prevent more racist events in the future.
16         The reason given for that
17 investigation, however, was predicated on a
18 lie that Dr. Davis had been involved in the
19 selection or approval of the accessories or
20 the pressuring of the models to wear them
21 when F.I.T. already knew that Dr. Davis had
22 no such role, authority or responsibility. "
23         Is that right?
24     A.  That's correct.
25     Q.  By doing this, by making that

110

DAVIS, Ph.D.

1
2  allegation you're saying that the President
3  of F.I.T., and those that work for F.I.T. in
4  helping her to craft this lie, did so to give
5  the belief that Dr. Brown and F.I.T. were
6  trying to prevent future racist events from
7  occurring; is that right?
8      A.  No, it was designed to show -- I'm
9  reading from Paragraph 51. "Her statement
10 was designed to show that she, Dr. Brown, was
11 taking affirmative steps --" not that she was
12 doing it, but that she was showing it.
13     Q.  Right.
14         So she was making it -- given the
15 false impression based upon a lie, right?
16     A.  I -- I stand by the language in the
17 complaint.
18     Q.  Got it.
19         And so F.I.T. would lie to show that
20 it is taking steps to prevent racism when in
21 fact they are not, right?
22     A.  Again, sir, the point in Paragraph
23 51 is specific about racist events not
24 racism.
25     Q.  Okay.

111

DAVIS, Ph.D.

1
2          So, how do you see the two as being
3  different?
4      A.  Well, I think that the fashion show
5  was an event and that the intent of this
6  language is -- the word "racist events" is
7  related to that, racist activities, racist --
8  events it says what it says.
9      Q.  Okay.
10         So, by trying to protect against
11 future racist events does not protect against
12 racism; is that what you are saying?
13     A.  I think that the problem of racism
14 is arguably a much larger issue than the
15 issue of a racist event.
16     Q.  If that's your opinion, that's your
17 opinion --
18     A.  It is.
19     Q.  Okay.
20         MR. SELLS:  Please go to
21     Paragraph 54.
22     Q.  There is another statement that you
23 talk about, right, this is in addition to the
24 February 21st, statement --
25     A.  That's right --

112

DAVIS, Ph.D.

1
2      Q.  -- I'll get to the March 5th
3  statement where you allege "Dr. Brown
4  escalated her rhetoric in an e-mail to all
5  F.I.T. employees and she wrote, 'Since the
6  MFA fashion show, we, the F.I.T. community,
7  have been going through a very painful
8  period.  What happened that evening was
9  appalling and indefensible; and as president
10 of this college, I was angry and embarrassed
11 that we allowed F.I.T. to be represented in
12 this way.
13         Following the show, I immediately
14 commissioned an independent investigation,
15 which is ongoing.  People who know me, know I
16 often say that you cannot legislate good
17 behavior.  As someone who has felt the sting
18 of racism, I am constantly reminded of it's
19 intractability and it is never less than
20 shocking.
21         Our commitment going forward must be
22 constant and real and authentic enough to
23 transform our pain into the kind of
24 meaningful change that characterizes the best
25 of us.'

113

DAVIS, Ph.D.

1
2      These lies added to her false
3  narrative amplifying her previous defamation
4  of Dr. Davis."
5      Did you write or did you swear to
6  that?
7      A.  I swore to that.
8      Q.  Then you write in Paragraph 55, "The
9  fact that these lies came from the black
10  president of Fashion Institute of Technology
11  made them especially believable and damaging
12  because they were made by someone with
13  authority in the areas of racism as someone
14  who has felt the sting of racism.  Fashion
15  and academic administration including the
16  duties of an academic dean.  They were also
17  especially believable and damaging because
18  the average person would assume the president
19  of F.I.T. knew facts about the incident that
20  they did not."
21      Did you swear that?
22      A.  I did.
23      Q.  Then you write in Paragraph 56,
24  "Moreover, Dr. Brown made these statements in
25  her capacity as president of F.I.T., speaking

114

DAVIS, Ph.D.

1
2  on behalf of F.I.T. and representing her
3  statements to the public as reflecting the
4  conclusions, determinations, factfinding and
5  decisions of F.I.T.  She was at all times
6  authorized to speak on behalf of F.I.T. and
7  was within the scope of her authority and
8  employment when she made these statements.
9  As such, her false statements, innuendos,
10  insinuations, remarks and implied criticisms
11  regarding Dr. Davis are attributable to and
12  indistinguishable from those events from
13  those of F.I.T."
14      Did you swear to that?
15      A.  I did.
16      MR. SELLS:  We can take that
17  down.
18      Q.  Now, Dr. Davis, you have given us
19  your qualifications, your experience.  You
20  have held a lot of positions that are high up
21  in academia and elsewhere; would you agree
22  with that?
23      A.  I have been a department chair and a
24  dean, and I suppose that's -- that is high
25  up.

115

DAVIS, Ph.D.

1
2      Q.  And so if F.I.T. can throw you under
3  the bus, use you as a scapegoat to get out of
4  allegations that it acted in a racist manner,
5  they could do that to anybody, right?
6      MR. DRANOFF:  Object to the
7  form.
8      A.  I can't speculate about what they
9  could do regarding other people.  I speak to
10  what they did to me.
11      Q.  What they did to you and what they
12  did to Kyle Farmer, correct?
13      A.  My suit does not involve Kyle
14  Farmer.  It is -- I speak to what they did to
15  me.
16      Q.  Got it.
17      So what were the reasons that they
18  gave for terminating you?
19      A.  They produced a letter -- I was
20  given a letter -- e-mailed a letter actually
21  that had several points that were used for
22  justification for my termination.  Would you
23  like me to summarize what those are?
24      Q.  Yes, I would.  Tell me.  I want to
25  know the reasons that they gave you.

116

DAVIS, Ph.D.

1
2      A.  Well, I might not recall all of the
3  specifics.  One, there were two things
4  related to the MFA show, neither of which had
5  to do with anything with the accessories
6  specifically or any allegations of racism.
7  One of them was that I -- when I overheard
8  that communications specialist, Alex Mann,
9  report to her boss, VP Keane, after the show
10  that she felt there might be some blow back
11  about the show, that I failed to act on that.
12      A second thing connected to the show
13  was the meeting that we have already
14  discussed with the students, the MFA
15  students, following the fashion show.
16      The other points did not have
17  anything to do with the fashion show.  They
18  had to do with my administrative duties; and
19  one point was -- had to do with the
20  admissions of Chinese students to the MFA
21  program.  They were -- I don't remember the
22  specifics of those, but they were
23  administrative, related to my administrative
24  responsibilities.
25      Q.  Can you go through the rest?  So

117

DAVIS, Ph.D.

1
2    admission of Chinese students; what about
3    that?
4        A.  There were questions or -- I mean, I
5    don't know about questions but one of the
6    reasons given for my termination was that too
7    many Chinese students were admitted to the
8    MFA fashion design program, and I failed to
9    do anything about that.
10       Q.  Anything else regarding
11   administrative duties?
12       A.  I don't -- I don't recall the
13   specifics.
14       Q.  Okay.  With regard to the statement
15   that part of the reason for your termination
16   had to do with the meeting with students, can
17   you describe that further?  What did they say
18   about it?
19       A.  It was just -- it was also not
20   specific.  It -- it just said that I chose to
21   meet -- I don't want to paraphrase.  I don't
22   recall what it says.
23       Q.  All right.
24           When was the last time you saw this
25   letter?

118

DAVIS, Ph.D.

1
2        A.  I don't recall.
3        Q.  Well, you know it came up just
4    yesterday in VP Glass's testimony, right?
5        A.  I don't recall --
6        Q.  You were --
7        A.  I'm sorry.  I don't recall that we
8    looked at it though.
9        Q.  No, we didn't.  We didn't look at
10   it.
11       A.  No, that is why I don't remember the
12   specifics.
13       Q.  Do you still have the letter?
14       A.  Yes.
15       Q.  Okay.
16           MR. SELLS:  I call for the
17       production of the letter.
18           MR. DRANOFF:  Standard, just
19       put it in writing.
20           MR. SELLS:  I got it, but is it
21       possible that we could get a copy of
22       this letter for the afternoon so that
23       I could go through it?  I just don't
24       want to have to --
25           MR. DRANOFF:  No, I get that.

119

DAVIS, Ph.D.

1
2        I tell you what.  If you want to talk
3        about it off the record a little bit,
4        I would be happy to.
5            MR. SELLS:  Okay.  Okay.
6            MR. DRANOFF:  All right.
7            MR. SELLS:  Got it.  All right.
8        Q.  Now in terms of the suggestion that
9    you were terminated in part because you
10   overheard a statement that was made after --
11   right after the fashion show, and I think you
12   were talking about the word blow back,
13   something like that, that you failed to act.
14   Can you be more specific about that
15   allegation?  I mean, what was it that they
16   said you heard, and then just tell us is it
17   true that you heard something of that nature
18   or not?
19       A.  I was -- first of all, I don't
20   recall the specifics.  I was standing after
21   the show with Vice President Keane and Alex
22   Mann and they were talking.  I was not part
23   of their group.  I overheard Alex Mann say to
24   Loretta Keane that there might be -- I don't
25   remember the word she used -- problems

120

DAVIS, Ph.D.

1
2    related to the press following the show.
3            So I assumed these were two people
4    from the Communications Department, one
5    senior administrator from the Communications
6    Department, this was their business.
7        Q.  So, when you heard this discussion
8    about problems related to the press following
9    the show, did you know they were talking
10   about the accessories and how they could be
11   characterized as racially insensitivity?
12       A.  I don't believe there was anything
13   specific.
14       Q.  And so, when you saw -- and you saw
15   the models walking with these accessories,
16   right?  The big lips and the big ears, you
17   saw that --
18       A.  Yes.
19       Q.  -- as it happened, right?
20       A.  Yes.
21       Q.  And not a bone in your body or not a
22   thought in your head came across to you as,
23   Wow, that's -- that could be interpreted as
24   racist; is that right?
25       A.  I thought that the looks -- the

121

DAVIS, Ph.D.

1
2  accessories were ugly.  I thought that they
3  detracted from the beauty of Jung Ki's
4  designs.  I thought they were unnecessary.
5  They did not come across to me as racist.
6      Q.  Not even a -- you didn't even have
7  an inkling like, Whoa, it is possibly racist
8  or anything like that?  To you it was just,
9  these are ugly and unnecessary; is that
10 correct?
11     A.  That is what I recall.
12     Q.  Oh.  That's not going to be a good
13 answer on this transcript.  When you say,
14 "that's what I recall"; are you talking about
15 my question, which was that you didn't see
16 this as being possibly racist at all --
17     A.  I don't believe that was your exact
18 question.  My -- my comment was -- or my
19 answer related to the fact that this was a
20 show featuring 10 different designers showing
21 multiple looks; so there was -- I believe
22 that show lasted over an hour and that each
23 student was presenting a different kind of
24 concept; so we saw a lot of things come down
25 the runway.  I don't recall thinking at the

122

DAVIS, Ph.D.

1
2  time that Jung Ki's accessories were racist.
3      Q.  How do you know Marjorie Phillips?
4      A.  I met Marjorie when I came to work
5  in the School of Graduate Studies in 2012.
6      Q.  All right.
7          When you came to the School of
8  Graduate Studies in 2012, who were your
9  direct reports?
10     A.  At that time Marilyn Barton, Umilta
11 Alsop, Marjorie Phillips and Anton Baptiste,
12 Carol DeSantis.
13     MR. DRANOFF:  Derek, and
14     everyone else, it seems, Derek, you
15     might have moved onto a different
16     topic.  Do you think maybe now we
17     should take a half hour for some chow
18     and come back after lunch?
19     MR. SELLS:  Yes, that's fine.
20 We can break for lunch now.
21     Eric, did you want to talk off
22 the record --
23     MR. DRANOFF:  Yes.
24     MR. SELL:  We can come back at
25 1:00 p.m.

123

DAVIS, Ph.D.

1
2      (Whereupon, a lunch recess was
3  taken 12:53; after which, the
4  proceedings continued at 2:00 p.m. as
5  follows.)
6      MR. SELLS:  Back on the record.
7      Q.  So, Ms. Davis, the people that
8  reported to you and you gave us their names
9  before the break.  Can you just tell us when
10 you describe their -- when you talk about
11 their names; can you just tell us what race
12 they are?
13     A.  Certainly.  Umilta Alsop, is black;
14 Marilyn Barton, is white; Marjorie Phillips,
15 is black; Anton Baptiste, is black; Carolyn
16 DeSantis, is white.
17     Q.  Okay.
18         And what time in 2012 did you take
19 over?
20     A.  I believe I started on July 1st.
21     Q.  Of the people that worked directly
22 for you and reported to you, were any of them
23 union members?
24     A.  I believe all of them were union
25 members.

124

DAVIS, Ph.D.

1
2      Q.  Got it.
3          And what was your understanding of
4  how the employees who work for you as part of
5  the union; how was it they could get raises
6  and/or promotions?
7      A.  There is a process that is described
8  and articulated in the collective bargaining
9  agreement that governs that.
10     Q.  Well, what's your understanding; how
11 does it work?
12     A.  The various components to it
13 depending on what's happening; whether it is
14 a re-evaluation of a staff member, whether it
15 is a reclassification of a staff member,
16 whether it's a hiring of the staff member.  I
17 believe that there are slightly different
18 procedures that govern those different
19 categories.
20     Q.  Okay.
21         As supervisor of them, did you have
22 any role in making sure or ensuring that a
23 raise could be given to people that are below
24 you?
25     A.  I --

125

DAVIS, Ph.D.

1
2      MR. DRANOFF:  Object to the
3   form and it is a clarity thing,
4   Derek.
5      MR. SELLS:  All right.  I will
6   rephrase.
7      MR. DRANOFF:  Yes.
8   Q.  So, with regard to -- we'll take one
9   at a time.  With regard to Marjorie Phillips,
10  did you have an understanding that in order
11  for her to get a raise or a promotion that
12  you needed to do something?
13  A.  I could trigger the request for
14  consideration of re-evaluation of a position.
15  I trigger that -- I trigger that process by
16  writing a request to the vice president of
17  Academic Affairs; so he is the first or
18  whoever is in that seat would be the first up
19  to consideration of whether or not it was
20  possible.
21  Q.  Got it --
22     MR. DRANOFF:  Just again,
23  further on my clarification and,
24  Derek, it is only because I don't
25  know, just being accurate.  Just so

126

DAVIS, Ph.D.

1
2   we are all clear, I would suspect
3   that perhaps the CBA has its own
4   provisions for incremental raises
5   irrespective of any other process.
6   That is why I'm making that
7   clarification.
8      MR. SELLS:  All right.  I'm
9   just asking about her understanding
10  of it.
11     MR. DRANOFF:  Okay.
12  Q.  So, Dr. Davis, while Ms. Phillips
13  was under your supervision, did you ever
14  trigger that for her?  Did you ever make a
15  request that she be given a change in title
16  or a raise?
17  A.  I did not.
18  Q.  Okay.
19     Anton Baptiste, what was your
20  understanding of how you could get him a
21  raise and/or a promotion?
22  A.  Same process.
23  Q.  Same process --
24  A.  I would need to request that -- make
25  the initial request to the VP for Academic

127

DAVIS, Ph.D.

1
2   Affairs.
3   Q.  Got it.
4      Did you ever do that for Anton
5   Baptiste --
6   A.  I did not.
7   Q.  You got to let me finish.
8      So you never tried to give Anton
9   Baptiste a raise or a promotion; is that
10  right?
11     MR. DRANOFF:  Object to the
12  form.
13  A.  I did not send a letter to the VP
14  with that request.
15  Q.  Okay.
16     Umilta Alsop, while you were in your
17  position as dean, what was your understanding
18  of how she could get a raise and/or a
19  promotion?
20  A.  The same process, as I have
21  described.
22  Q.  Did you ever do that for Umilta
23  Alsop?  Did you --
24  A.  I did not -- sorry.  Sorry --
25  Q.  -- ever try to trigger --

128

DAVIS, Ph.D.

1
2   A.  Sorry.
3   Q.  You didn't?
4      MR. DRANOFF:  Object to the
5   form.
6   A.  I did not.
7   Q.  Got it.
8      Marilyn Barton, what was yours
9   understanding of how you could assist her in
10  getting a raise or a promotion?
11  A.  My consideration in Marilyn's case
12  wasn't about whether I could get her a raise
13  or a promotion.
14  Q.  Did you understand my question?
15  A.  I did.  I answered your question.
16  Q.  Okay.
17     So my question was, What was your
18  understanding of how you could assist her in
19  getting a raise or a promotion?
20  A.  Marilyn, as a union employee, in
21  matters of a raise or promotion would go
22  through the same process -- the same process
23  would apply.
24  Q.  Got it.
25     And did you ever write a letter for

129

DAVIS, Ph.D.

1       her to get a raise or a promotion?
2           A.  I wrote a letter to get a
3       re-evaluation of her position.
4           Q.  Okay.
5               When did you write this letter?
6           A.  I believe some time in 2017.
7           Q.  2017?
8           A.  Yes, sir.
9           Q.  And was there a reconsideration?
10          A.  Yes, there was.
11          Q.  When did that happen?
12          A.  After -- I believe this was in the
13      fall of 2017.  After I submitted my
14      recommendation, it was out of my hands.  I
15      actually don't know when the re- -- when the
16      final decision was made about Marilyn's
17      position.  I don't recall.
18          Q.  And why wouldn't you know?
19          A.  I would have been notified; but I
20      would not have been involved in the final
21      process.
22              MR. SELLS:  Okay.  I call for
23          the production of Marilyn Barton's
24          raise request.  And the decision

130

DAVIS, Ph.D.

1       associated with her getting the --
2               MR. DRANOFF:  You're making
3           that request of all parties, Derek?
4               MR. SELLS:  No, of F.I.T. and
5           Ms. Barton, to the extent that she
6           might have it; but we'll follow it up
7           with writing.
8               I think we asked yesterday as
9           well for the same information.
10          Q.  Carol DeSantis, how long did she
11      work for you?
12          A.  She was there when I arrived in
13      2012, and she retired before I left F.I.T.;
14      so I'm not sure of what date she retired.
15          Q.  Okay.
16              What is your understanding of how
17      you could assist her in getting a raise
18      and/or promotion?
19          A.  I -- the same process would apply.
20      I would write a letter making a request to
21      the VP of Academic Affairs.
22          Q.  All right.
23              And did you do that for Ms. DeSantis?
24          A.  I did not.

131

DAVIS, Ph.D.

1           Q.  Why didn't you do it for Ms. DeSantis?
2           A.  I don't believe that there was a
3       reason.  I don't believe there was a reason
4       to make a request.
5           Q.  All right.
6               And why didn't you do that for
7       Ms. Alsop?
8           A.  I don't believe there was a reason
9       to make a request.
10          Q.  And Mr. Baptiste, why didn't you do
11      it for him?
12          A.  I don't believe there was a reason
13      to make a request.
14          Q.  And Ms. Phillips, why didn't you do
15      it for her?
16          A.  I don't believe there was a reason
17      to make a request.
18          Q.  Okay.
19              Marilyn Barton, why did you do it
20      for her?
21          A.  Marilyn Barton was technically
22      working out of classification.  She had job
23      duties that were not reflected in her
24      position description; and so, per the

132

DAVIS, Ph.D.

1       collective bargaining agreement, that
2       situation needed to be remedied.
3           Q.  And what duties did she have that
4       fell out of her job description?
5           A.  Again, as I recall, Marilyn was
6       doing additional work for the school as a
7       whole; handling administrative matters for
8       the school as a whole, assisting me directly.
9       I would have to look at her position -- at
10      the documents related to this to be certain.
11          Q.  When you talk about assisting the
12      school as a whole, for what?  Like what?
13      What did she do to assist the school as
14      whole?
15          A.  Well, what I'm differentiating there
16      is that other assistants -- other
17      administrative assists were tasked with
18      assisting departments -- specific
19      departments.  Whereas Marilyn had duties to
20      assist the school more generally in it's
21      administrative needs.
22          Q.  I see.
23              So are you saying that Ms. Phillips
24      wasn't handling responsibilities that were

133

DAVIS, Ph.D.

1
2  outside of her job description?
3     A.  I don't believe that she was.
4     Q.  Why don't you believe that she was?
5     A.  Because I don't believe that she was
6  handling duties that were outside of her job
7  description.
8     Q.  Well, what was her job description?
9     A.  We would need to look at that
10  document.
11     Q.  Well, why would we need to look at
12  it?
13     A.  Because I don't recall.
14     Q.  Well, you don't recall.  Then how
15  could you say with certainty that you don't
16  believe she was working out of her job
17  description?
18     A.  Because I said the word "believe."
19  I don't believe she was working out of her
20  job description.  I would need to see that
21  job description and re-visit the facts in
22  order to make a definitive statement about
23  that.
24     Q.  Okay.
25        So, when you say you "don't believe"

134

DAVIS, Ph.D.

1
2  something, it has to be based on fact and
3  you, ma'am, have no recollection of what her
4  job duties were?
5     A.  Oh, that is --
6     Q.  Isn't that true?
7     A.  No, that is not true.
8     Q.  Okay.
9        So what were her job duties?
10     A.  I cannot re- -- recite the full list
11  of her job duties without a document in front
12  of me; but one of her primary duties was
13  serving as the administrative assistant to
14  the Fashion and Textile Studies Department.
15  So she had specific tasks related to that
16  department, it's faculty and it's students as
17  well as it's programs and events.
18     Q.  Okay.
19        She didn't do anything outside of
20  that?
21     A.  Well, there was an earlier time in
22  my tenure at F.I.T. when she was assisting a
23  second program.  It was the Sustainable
24  Interior Environments Program, and that
25  program -- I'm not going to recall the year,

135

DAVIS, Ph.D.

1
2  but it was probably 2014 or 2015, I'm
3  guessing, when that program was closed under
4  a provision of a contract called
5  Retrenchment; and so that program support
6  that Marjorie had been providing, she no
7  longer needed to provide because the program
8  no longer existed.
9     Q.  Got it.
10        So what you're saying is that
11  Ms. Phillips, for two years, worked outside
12  of her job description assisting this other
13  program; but you didn't see fit to move that
14  she be reclassified during that two year
15  period --
16     A.  No.
17     Q.  -- is that what I understand you to
18  say?
19     A.  No, that is -- that is not correct.
20     Q.  No?
21     A.  When I first arrived Marjorie was
22  supporting two departments.  One department
23  was closed under the F.I.T. provision of
24  Retrenchment and Marjorie was not working
25  outside of the stipulated job description,

136

DAVIS, Ph.D.

1
2  and I would need to see a copy of the job
3  description in order to explain exactly why
4  to you.
5     Q.  So again, you can't tell me why; but
6  you are just saying I'll remember but I need
7  to see the document?
8     A.  I --
9     Q.  Don't you see what you're doing --
10        MR. DRANOFF:  Derek --
11     Q.  -- Dr. Davis?  Don't you see what
12  you're doing?
13        MR. DRANOFF:  Derek, objection.
14        MR. SELLS:  Okay.
15     Q.  Don't you see what you're doing,
16  Dr. Davis?
17     A.  I am telling you the truth that I
18  need to see the position description in order
19  to make a statement about this.
20     Q.  But you already made a statement.
21  You already made a statement.  You just said
22  that for two years Ms. Phillips was
23  supporting two programs, but that she wasn't
24  working out of her job description --
25     A.  Her job description --

137

DAVIS, Ph.D.

1
2     Q. -- but then you said but I need to
3  see the job description in order to tell you
4  why she wasn't working out of her title --
5     MR. DRANOFF:  Objection.
6     Objection.
7     Q. -- isn't that what you are saying?
8     A.  No --
9     Q.  So --
10     A.  I think --
11     Q.  Tell me why --
12     A.  I think --
13     Q. -- tell me why Ms. Phillips was
14  working within her job description for the
15  two years that she was assisting the two
16  different programs.  Tell me why?
17     A.  Because her job description did not
18  relate specifically to either program.  The
19  job description was written for all of the
20  administrative staff of the Graduate School
21  does not specify the programs to which they
22  are assigned, at least during my tenure it
23  did not.  It described --
24     Q.  Okay --
25     A.  Derek, excuse me --

138

DAVIS, Ph.D.

1
2     MR. DRANOFF:  Let her finish.
3     MR. SELLS:  All right.  Go
4     ahead.
5     A.  It describes more generic duties;
6  and in terms of support of departments,
7  faculty and students, that's what I -- that's
8  what I would need to have in front of me in
9  order to refresh my memory.
10     Q.  Did everybody who worked for you,
11  did they have a job description?
12     A.  Everyone -- everyone who worked for
13  me had a job description.  Many of those job
14  descriptions had not been updated for a long
15  time when I arrived, and part of what --
16  another component of what was happening in
17  the Graduate School was that there was growth
18  and the addition of new staff members and new
19  faculty members; so new job descriptions were
20  written for those people.
21     Q.  All right.
22     So one of the people that had a job
23  description was Carol DeSantis, right?
24     A.  Yes.
25     Q.  Yes.  And when Carol DeSantis

139

DAVIS, Ph.D.

1
2  retired, it was Marjorie Phillips who took
3  over Ms. DeSantis' job responsibilities;
4  isn't that right?
5     A.  She did not take over all of --
6     Q.  I didn't see "all" --
7     A.  She did not take over --
8     Q.  She took over some of her
9  responsibility, right?
10     A.  Can you be more specific, please.
11     Q.  Oh.  Like what do you want me to be
12  more specific about?
13     Did Ms. Phillips take over some of
14  Ms. DeSantis' job responsibilities when she
15  retired?
16     A.  I would like to understand better.
17  I would like a clarification on what job
18  responsibilities you are referring to.
19     Q.  Well, what did Ms. DeSantis do?
20     A.  Mrs. DeSantis, her primary
21  responsibility was handling admissions.
22     Q.  Okay.
23     And did Ms. Phillips have some
24  responsibilities that Ms. DeSantis had?
25     A.  I can't recall.

140

DAVIS, Ph.D.

1
2     Q.  Did you have something called an
3  illustration of the Graduate Program?
4     A.  Yes, we do.
5     Q.  What is that?
6     A.  That is the Master of Fine Arts
7  Program.
8     Q.  Did Ms. Phillips take over the
9  illustration of the Graduate Program?
10     A.  Ms. DeSantis when -- I'm sorry.
11  Ms. Phillips, when Ms. DeSantis retired and
12  the Sustainable Interior Environments Program
13  was closed, I believe she did pick up the
14  duties for the Illustration Department.
15     Q.  Oh.  And that was not in
16  Ms. Phillips job description, was it?
17     A.  Yes, it was; because again,
18  Ms. Phillips's job description was not tied
19  to any single department.  It's a generic
20  description of support for the school and the
21  department's of the school.
22     Q.  I see.
23     So Ms. DeSantis was given the
24  specific job responsibility of illustration
25  for the Graduate School Program.  That was

141

DAVIS, Ph.D.

1  very specific, right?
2  A.  No.
3  Q.  Oh, no -- okay --
4  A.  Ms. DeSantis' job description would
5  not have included a reference to the
6  Illustration Department.
7  Q.  So, she was working out of her job
8  description?
9  A.  No, sir, that's not how the job
10  descriptions in the school of graduate
11  studies worked.  They were not specific to
12  academic departments.  That changed during my
13  tenure.
14  Q.  Oh, it did?
15  A.  It did.
16  Q.  Oh, when did that happen?
17  A.  That happened in the context of the
18  effort to build the school and to add staff
19  to assist the -- specifically the master
20  study programs and the Master of Fine Arts
21  Programs.
22  MR. SELLS:  Okay.  I'm calling
23  for the production of job
24  descriptions that were given to each

142

DAVIS, Ph.D.

1  of the people that worked under
2  Dr. Davis.
3  Q.  Each of the descriptions were
4  written out, correct?
5  A.  So the descriptions for staff that I
6  mentioned -- Marjorie Phillips, Marilyn
7  Barton, Umilta Alsop, Anton Baptiste and
8  Carol DeSantis -- those job descriptions were
9  done by my predecessor, the interim dean,
10  Joanne Arbuckle.
11  The descriptions for the jobs that
12  were added during my tenure were written
13  freshly and in collaboration with Academic
14  Affairs and Human Resources.
15  Q.  Yes, but these are both in writing,
16  right --
17  A.  They are.
18  Q.  -- both set of job descriptions are
19  in writing --
20  A.  Yes, that's correct.
21  Q.  Okay.
22  Your predecessor, Ms. Arbuckle,
23  there was a job description was there not for
24  each of these individuals; was there not?

143

DAVIS, Ph.D.

1  A.  There was.
2  Q.  Okay.
3  So when Ms. Phillips was given
4  responsibilities that Ms. DeSantis had, were
5  those responsibilities in the previous
6  administration's job description or was it
7  from yours?
8  A.  No, they were -- they were from
9  Dr. Arbuckle.
10  Q.  Got it.
11  Just so I'm clear.  So, when
12  Ms. Phillips took over Dr. Arbuckle's set of
13  descriptions that were given to Ms. DeSantis,
14  they were not the same description of job
15  that Ms. Phillips had, correct?
16  A.  No, that is not correct --
17  Q.  They had the same job description,
18  exact same job description; is that what you
19  are saying?
20  A.  I'm not sure about the question.
21  Who had the same job description?
22  Q.  Ms. Phillips and Mrs. DeSantis.
23  A.  They did not probably.  I would have
24  to, again, look and the reason for that would

144

DAVIS, Ph.D.

1  be because Ms. DeSantis was also handling
2  admission.
3  MR. SELLS:  Okay.  So, I call
4  for the production of the job
5  descriptions for Ms. DeSantis,
6  Mr. Baptiste, Ms. Alsop, Ms. Barton
7  and Ms. Phillips both when Ms. Arbuckle
8  was there and then when you were
9  there.
10  MR. MELITO:  Follow up in
11  writing please, Derek.
12  I'll just make a standing
13  request any document requests just
14  follow up in writing.
15  MR. SELLS:  We will.
16  Q.  All right.
17  So you are going to swear it to,
18  right, Dr. Davis, you are going to swear that
19  Ms. Phillips did not take over separate duties
20  that were not part of her job description when
21  Ms. DeSantis retired; is that correct?
22  A.  No, that is not correct.  And again --
23  Q.  Oh.  You are not going to swear to
24  it --

145

DAVIS, Ph.D.

1
2      A.  Again, I have said that I would need
3  to see the document, the job description, in
4  order to give you an answer to that question.
5      Q.  Got it.
6          So you're saying then, just so we
7  are clear, you are not sure whether or not
8  Ms. Phillips was working out of her job
9  description; is that correct?
10     A.  Ms. Phillips would not have been
11 working out of her job description if she --
12 because her job description did not specify
13 that she was supporting any specific
14 department.
15     Q.  I see.
16         And under whose definition of her
17 job description did it become so amorphous
18 that you couldn't tell whether she was
19 working outside of her job description; is
20 that your description of her job or is that
21 from before?
22     A.  That is the position description
23 that was in Human Resources for Ms. Phillips.
24     Q.  Okay.
25         But who wrote it?  Was it's you --

146

DAVIS, Ph.D.

1
2      A.  I did not write it --
3      Q.  -- was it Ms. Arbuckle?
4      A.  I do not know.
5      Q.  Okay.
6          So what did Ms. Phillips' job
7  description say that was so amorphous that it
8  couldn't be said that she ever worked outside
9  of her job description; what were the words
10 used about it?
11     A.  First of all, I never described it
12 as an amorphous.  I simply said that in order
13 to answer your question, I would need to see
14 that job description.
15     Q.  I'm confused because you keep saying
16 that Ms. Phillips could not have worked
17 outside of her job description because her
18 job description encompassed all the things
19 that Ms. Phillips did.  Yet, when I ask you
20 to describe the language that said it was so,
21 you know, broad that it encapsulated
22 everything, you keep saying, "I need to see
23 the document --"
24     A.  That's correct.
25     Q.  They are two different things --

147

DAVIS, Ph.D.

1
2      A.  No, they aren't.
3      Q.  Okay.
4          So then you're going to say right
5  now under oath that Ms. Phillips' job
6  description encompassed everything that she
7  did; is that right?
8      A.  No, sir.  I'm saying that in order
9  for --
10     Q.  This is funny --
11     A.  -- in order to answer your question,
12 I would need to see the document.
13     Q.  But yet you're saying that
14 Ms. Phillips did not qualify for a
15 reclassification of her job because
16 everything she did was already put in her job
17 description; you're saying two different
18 things.  Don't you see what you're saying,
19 Doctor?
20     A.  I am not saying two different
21 things.  In fact, I am saying the same thing
22 repeatedly.  It is -- it is the same thing.
23     Q.  All right.  I got it.  I'll just
24 move on.
25         But certainly you recall helping

148

DAVIS, Ph.D.

1
2  Ms. Barton try and get a raise, right?
3      A.  No, that is a mischaracterization.
4  Ms. Barton was working out of class, clearly
5  working out of her classification; and under
6  the union rules in those instances, there
7  needs to be a re-evaluation of the -- of the
8  position and that is what I asked for.  That
9  is what the content of my letter to the vice
10 president reflects that and the process that
11 was followed was a process for re-evaluation.
12     Q.  All right.
13         Was there a point in time when
14 Umilta Alsop went out on FMLA leave?
15     A.  Not that I recall.
16     Q.  You don't?  So you don't remember
17 Umilta Alsop going out on FMLA leave and you
18 assigning to Ms. Phillips the duties that she
19 had related to Art Market?
20     A.  I don't recall specifically.
21     Q.  Oh.
22     A.  But that may have happened --
23     Q.  Oh.
24         So when Ms. Phillips did the job of
25 the Art Market, that was not part of her job

149

DAVIS, Ph.D.

1
2  description, correct?
3       A.  No, sir.
4          Again, the job descriptions are not
5  specific to departments.  So the tasks that
6  are described in the job description do not
7  relate to specific departments.  That's all.
8       Q.  Okay.  All right.
9          So suffice it to say that all the
10  African-American people that reported to you
11  you never saw fit to write a letter for them
12  to get a reclassification or a raise?
13          MR. DRANOFF:  Object to the
14          form.
15       Q.  Right?
16       A.  I was engaged in discussions with
17  all members of the staff about reorganization
18  as the school was growing and we were adding
19  new faculty to departments and adding an
20  entirely new department.
21          So, we were all working, in my view
22  at least, to try to more precisely define
23  what the staff roles were going to be and how
24  the staff that we had was going to be
25  distributed in order to make the organization

150

DAVIS, Ph.D.

1
2  as functional as possible.
3       Q.  I don't really understand your
4  answer.
5          My question was, During your tenure,
6  the African-American employees that worked on
7  your staff, you never saw fit to write a
8  letter to reclassify them or get them a
9  raise --
10          MR. DRANOFF:  Object to the
11          form --
12       Q.  -- is that right?
13       A.  I -- first of all, I am not in the
14  position or was not in the position as dean
15  of granting anyone a raise.  I was simply in
16  the position of being able to request
17  consideration of the process that would
18  facilitate that; and I did not have the
19  opportunity to request any such consideration
20  for any of the employees that you mentioned.
21       Q.  Just the white one, right?  Just the
22  Caucasian one, Marilyn Barton, right?  She is
23  the only one you saw fit to be able to make
24  that request of, right?
25       A.  I made the request for Marilyn

151

DAVIS, Ph.D.

1
2  Barton because she was working out of
3  classification and because, per the union
4  contract, that is not allowable.
5       Q.  Now, the responsibilities that you
6  claim Marilyn Barton had that were outside of
7  her job description, how did she get them?
8          MR. DRANOFF:  Object to the
9          form.
10       A.  Marilyn was not assigned to -- to a
11  specific program.  When I came to F.I.T., she
12  was sitting outside the dean's office and
13  doing work to support the dean; and so, we
14  just continued with that work.
15          Also, as the school grew and there
16  were more things that needed to be school
17  wide initiatives, Marilyn was involved in
18  those.
19       Q.  Can you answer my question now?  Can
20  you, please, listen to the question and
21  answer it?  Who gave Ms. Barton her job
22  responsibilities?
23       A.  I did.
24       Q.  You did --
25       A.  Yeah --

152

DAVIS, Ph.D.

1
2       Q.  -- so you chose to give her
3  responsibilities that were outside of her job
4  description so you could then give her or
5  make a request for her to be reclassified and
6  given a raise --
7       A.  No --
8          MR. DRANOFF:  Object to the
9          form --
10       Q.  -- isn't that right?
11       A.  No --
12       Q.  No, okay.  Okay --
13       A.  That is not right --
14       Q.  -- but you were responsible for
15  giving job duties to Ms. Alsop, to
16  Ms. Phillips as well as to Mr. Baptiste as
17  well, correct?
18       A.  They had assignments -- so no, I was
19  not singularly responsible for that.  For
20  example --
21       Q.  No.  No.  No.  I'm not asking you
22  for all of that.  I'm saying, Did you not
23  give Ms. Phillips her responsibilities?
24       A.  Ms. Phillips when I came to F.I.T.
25  already had some of her responsibilities.

153

DAVIS, Ph.D.

1
2     Q.  No.  No.  No.  No.  No.  I am
3  asking you, Did you give her
4  responsibilities?  Were you able to give her
5  responsibilities since she worked for you?
6     A.  Yes.
7     Q.  Okay.
8        You gave her, for example, the
9  illustrations that were done by Ms. DeSantis,
10 right?
11    A.  That's correct.
12    Q.  And you gave her, when Ms. Alsop
13 went out on FMLA, you gave her
14 responsibilities that Ms. Alsop had, you did
15 that, correct?
16    A.  In collaboration with Marjorie.
17    Q.  Okay --
18    A.  We discussed it.
19    Q.  All right.
20       And so you could have given her
21 other responsibilities that fell outside of
22 her job description like you did for
23 Ms. Barton, right?
24    A.  Ms. Barton was already performing
25 some of those duties when I arrived; because

154

DAVIS, Ph.D.

1
2  she was assisting the person who preceded me
3  and the people who preceded me; so I
4  inherited a situation where Ms. Barton was
5  already working out of classification and
6  over time was able to make the request, per
7  the union contract, to have this evaluated.
8     Q.  Okay.
9        Wasn't it Ms. Alsop that had the
10 responsibility of doing the work of the
11 dean's assistant?
12    A.  That preceded me by a long time.
13    Q.  So, she stopped doing the dean's
14 work when you got there?
15    A.  When I arrived, she was doing budget
16 work and administrative work.
17    Q.  Okay.
18       So, are you saying here under oath
19 that Ms. Alsop did not do the work of the
20 dean's assistant while you were the dean?
21    A.  When I arrived Ms. Alsop was not the
22 dean's assistant.
23    Q.  That's not my question.
24    A.  That's my answer.
25    Q.  No.  The question was, Are you

155

DAVIS, Ph.D.

1
2  saying under oath that Ms. Alsop did not do
3  work as the dean's assistant when you became
4  the dean at any point in time that you were
5  the dean?
6     A.  There was no position as assistant
7  to the dean when I arrived.
8     Q.  Is that my question?
9     A.  You asked if she was performing the
10 work of assistant to the dean.  The answer is
11 there was no such position.
12    Q.  Did she do work as assistant to the
13 dean without there being a title for it?
14    A.  Umilta did -- her special area was,
15 and I believe still is, budget work; and
16 that -- in the capacity that that is
17 assisting the dean, yes.
18    Q.  You know Ms. Alsop is going to
19 testify, right --
20    A.  Yeah --
21    Q.  -- okay.  So you are saying under
22 oath that she didn't do any of the work that
23 Ms. Barton got credit for; is that correct?
24    A.  I am not saying that, and I don't
25 know what you mean by "work that Ms. Barton

156

DAVIS, Ph.D.

1
2  got credit for."
3     Q.  Well, Ms. Barton was the one that
4  was given your blessings to get reclassified
5  and a raise because you said that you gave
6  her responsibilities that fell outside of her
7  job title?
8     A.  I said that when I arrived
9  Ms. Barton was already doing jobs that were
10 outside of her job description and that over
11 time as those duties increased, it became
12 necessary to seek a re-evaluation of her
13 position; because she was working -- that she
14 was working outside of the job description
15 and that is not permissible under the laws of
16 the collective bargaining agreement.
17    Q.  Okay.
18       And so as these responsibilities
19 increased on Ms. Barton, you're saying that
20 none of those responsibilities were shared
21 with Ms. Alsop; is that right?
22    A.  No, I'm not saying that.
23    Q.  Well, were they or were they not?
24    A.  I don't know what you mean by
25 shared.

157

DAVIS, Ph.D.

1
2      Q.  You were the one that was assigning
3  the work?
4      A.  I still don't know what you mean by
5  "shared."  What do you mean?  That -- what do
6  you mean by "shared"?
7      Q.  You don't know what it means to
8  share work?
9      A.  I don't know what you are referring
10  to when you say that some of those duties
11  were shared.
12      Q.  All right.
13          What do you think I mean?
14      A.  I don't know.
15      Q.  Okay.
16          You don't know what I mean?
17      A.  I don't know.
18      Q.  So, if someone has the duty of
19  copying papers and it becomes very burdensome
20  so that the duty of copying papers has to be
21  shared; you don't understand what that means?
22      A.  I do, but I don't understand what --
23      Q.  So tell me what that means --
24      A.  I --
25      Q.  No.  No.  No --

158

DAVIS, Ph.D.

1
2      A.  Would you allow me --
3      Q.  No.  No.  Before we go on to -- I
4  just asked you a hypothetical.  I said
5  someone has the duty of making copies and the
6  duty becomes so burdensome that it has to be
7  shared; and I asked you do you understand
8  what that means and you said yes, you
9  understand what that means; is that right?
10      A.  I understand your hypothetical --
11      Q.  Okay.
12          So now, since you understand what
13  that means, then you also understand that
14  Ms. Barton had job duties that you say were
15  so immense and so out of title for that
16  you need to go and write this letter for her
17  to get a reclassification, otherwise it would
18  be in violation of the collective bargaining
19  agreement, right; that's what you said,
20  correct?
21      A.  No, that is not what I said.  I did
22  not use the word "immense."
23      Q.  Okay.
24          You said as the duties increased?
25      A.  Yes.

159

DAVIS, Ph.D.

1
2      Q.  Right?
3      A.  Yes.
4      Q.  It got to the point where you need
5  to go get a reclassification; is that what
6  you said?
7      A.  That is what I said.
8      Q.  And so my question is, Well, these
9  duties that increased, were they shared with
10  Ms. Alsop?"  And you said, "I don't know what
11  you mean.  I don't know what you mean when
12  you talk about "shared duties.  What do you
13  mean by "shared duties --"
14      A.  No.
15      Q.  So again, I ask you, Were these
16  duties shared between Ms. Barton and
17  Ms. Alsop?
18      A.  I will need a clarification on --
19      Q.  You will need it --
20      A.  -- on which duties -- in order to
21  answer this question, I would need a
22  clarification on which duties you are
23  referring to that are shared by Ms. Alsop and
24  Ms. Barton.
25      Q.  Okay.

160

DAVIS, Ph.D.

1
2          Sitting here right now, you don't
3  know, right --
4      A.  I don't know --
5      Q.  Right --
6      A.  -- I don't know what you are
7  referring to.
8      Q.  Okay.  Let's go on, and we will move
9  on to another topic.
10          Do you recall receiving a complaint
11  of race discrimination from Ms. Phillips?
12      A.  Are you speaking about a written
13  complaint or an oral complaint?
14      Q.  Under the policy of
15  antidiscrimination, does it matter?
16      A.  No, it didn't matter under the
17  policy; but I'm cure- -- I just wanted a
18  clarification about what we are talking about
19  here.
20      Q.  Why?
21      A.  So that I could answer the question
22  to the best of my ability.
23      Q.  Okay.
24          So the question was, Do you recall
25  getting a complaint of discrimination from

161

DAVIS, Ph.D.

1
2  Marjorie Phillips?
3      A.  I do not recall getting a complaint
4  that would rise -- from Ms. Phillips -- that
5  would rise to the level of discrimination as
6  defined in the policy, in the F.I.T. policy.
7      Q.  Okay.
8          So your answer is no, you didn't get
9  a complaint of discrimination; is that right?
10     A.  My complaint -- my answer is as I
11 stated, that I did not get a complaint from
12 Ms. Phillips that met the requirements of the
13 antidiscrimination policy and it's definition --
14 definition sections.
15     Q.  And just again for my understanding,
16 what was it that Ms. Phillips said to you
17 that you didn't believe rose to the level of
18 a discrimination complaint under the policy?
19     A.  There were four instances which are
20 all recorded in Ms. Phillips' affirmative
21 action complaint that -- that I -- that I
22 would point to.  That I would -- yeah, there
23 were those four instances that are reflected
24 in her complaint.
25     Q.  Okay.  What were they?

162

DAVIS, Ph.D.

1
2      A.  So the first one was an incident
3  involving Brenda Cowan and Unilta Alsop.
4  Marjorie overhearing a conversation -- a
5  fragment of a conversation between the two of
6  them.  I was not present.
7          The second one was --
8      Q.  What was the comment that
9  Ms. Phillips told you about?
10     A.  Again, I was not there; but the
11 report to me was from both Brenda, who is
12 white, and Unilta, who is black, and
13 Marjorie; so separate reports.  Saying that
14 Unilta and Brenda were speaking in the open
15 part of the office and joking about
16 something, and Marjorie came in; and as I
17 understand it, Brenda said something to the
18 effect of why don't you come and join us in
19 the back of the school bus?
20     Q.  In the back of the bus?
21     A.  I -- I recall the words "school bus"
22 as coming up in the reports to me; but I -- I
23 can't be sure.
24     Q.  Okay.
25          So, "the back of the bus."  Do you

163

DAVIS, Ph.D.

1
2  know why -- now, did Ms. Phillips say, when
3  she described this conversation, that she
4  believed it to be offensive?
5      A.  Yes, I believe she said the word
6  "offensive."
7      Q.  And did she say it was offensive to
8  her as an African-American woman?
9      A.  I don't recall specifically, but
10 perhaps.
11     Q.  And she felt like this was
12 discriminatory; is that right?
13     A.  I don't believe that she ever used
14 the word "discriminatory."
15     Q.  So, she just said, you know,
16 Ms. Cowan said something about the back of
17 the bus and I was offended, but it wasn't a
18 discriminatory statement; is that -- do you
19 really want us to believe that?
20     A.  Well, you can believe what you would
21 like to believe.  But I can tell you that
22 Marjorie reported to me that that was
23 offensive and she probably said, although I
24 cannot recall the specifics of that
25 conversation, that it was offensive to her

164

DAVIS, Ph.D.

1
2  specifically as a black person.
3      Q.  Right.
4          And because you know the reference
5  to "back of the bus" relates to Jim Crow,
6  right?
7      A.  I don't know that the reference to
8  "back of the bus" in this instance, this
9  fragment of a conversation that Ms. Phillips
10 overheard, refers to Jim Crow in any way.
11     Q.  Have you ever heard of Rosa Parks?
12     A.  Yes, sir.
13     Q.  When did you first hear about Rosa
14 Parks?
15     A.  When I was a child.
16     Q.  And what do you remember about Rosa
17 Parks that made it so that you as a child
18 learned about her?
19     A.  I know about Rosa Parks as the civil
20 rights hero who got on a bus.
21     Q.  "Got on a bus"?
22     A.  On a segregated bus and broke
23 barriers by doings so.
24     Q.  Okay.  A segregated bus.
25          And why in your memory or retelling

165

```
 1              DAVIS, Ph.D.
 2   of the Rosa Park's story, why was the bus
 3   segregated?
 4       A.  Because as -- as it was case in this
 5   country buses were segregated so that black
 6   people, people of color, were made to sit at
 7   that time back of the bus.
 8       Q.  Oh.  The "back of the bus."  That's
 9   where the black folks had to sit, right?
10       A.  Historically, yes.
11       Q.  Oh.  But you couldn't see how that
12   might be perceived as offensive to
13   Ms. Phillips?
14       A.  What I --
15       Q.  -- is that right?
16       A.  No --
17       Q.  -- is that right?
18       A.  What I had a report of was a white
19   woman and a black woman joking and laughing,
20   and Marjorie coming in and overhearing a
21   fragment of their conversation in which the
22   phrase "join us at the back of the bus" was
23   used.
24       Q.  And so you didn't think it was your
25   responsibility to bring that to the attention
```

166

```
 1              DAVIS, Ph.D.
 2   of the affirmative action officer; is that
 3   right?
 4       A.  Under the policy and the terms of
 5   the policy, the definitions included in the
 6   policy, I did not.
 7       Q.  Okay.
 8           So what did you do -- well, let me
 9   ask you that.  When Ms. Phillips told you
10   about that incident, was that her only
11   complaint or did she come to you with
12   multiple complaints at the same time?
13       A.  I don't recall.
14       Q.  Okay.
15           But this was one of the complaints
16   that she made, correct?
17       A.  This was a complaint -- this
18   complaint, I believe, goes back to 2014; so
19   this complaint, I believe, was made on its
20   own.
21       Q.  Okay.
22           What did you do when she came to you
23   with that complaint?
24       A.  I listened to her respectfully.  I
25   heard what her reaction was.  We talked about
```

167

```
 1              DAVIS, Ph.D.
 2   it, and I believe she spoke to Brenda Cowan
 3   directly about it --
 4       Q.  Did you ask her to speak to Brenda
 5   Cowan?
 6       A.  I would not have asked her to do it.
 7   I would have suggested that in order to get
 8   the fuller picture of what was being said,
 9   rather than just the fragment of what she
10   overheard, that she have a conversation with
11   Brenda.  But I would not have required in any
12   way that she do so.
13       Q.  Well, one thing you did not do is
14   report it to the Affirmative Action Office,
15   correct?
16       A.  That's correct.
17       Q.  And that is because you believed
18   that this did not rise to the level that was
19   required for you to have to report it, right?
20       A.  That's correct.
21       Q.  All right.
22           MR. SELLS:  Can we go to
23       Exhibit 3.
24           (The image is shared on the
25       computer screen.)
```

168

```
 1              DAVIS, Ph.D.
 2           MR. SELLS:  If we could go to
 3       page 9.  Go to "Complaint and
 4       investigation procedure where an
 5       employee is the Respondent."
 6       Q.  This is the section of the
 7   antidiscrimination policy that we looked at
 8   earlier that deals with the "complaint and
 9   investigation procedure where an employee is
10   the Respondent."  Is that right?
11       A.  Yes.
12       Q.  Okay.
13           So, what it says is "Any person who
14   believes they may have been a victim of or
15   believes they may have witnessed
16   discrimination, harassment or retaliation
17   committed by an employee should report the
18   incident to the affirmative action officer
19   in the Office of Compliance and Audit."
20           MR. DRANOFF:  I'm not reading
21       that same thing, Derek.
22           MR. SELLS:  What?
23           MR. DRANOFF:  I'm trying to --
24           MR. SELLS:  It says "Office of
25       Compliance and Audit at 212-217 --"
```

169

```
1                   DAVIS, Ph.D.
2          MR. DRANOFF: I see that. I
3     see that.
4          MR. SELLS: "-- or 333 7th
5     Avenue, 16th floor.
6     Q. "Alternatively, such incidents may
7     be reported to F.I.T.'s Office of Human
8     Resources or any senior administrator, dean,
9     department director, department chairperson
10    or coordinator or any other person with
11    supervisory responsibility.
12          Although such complaints need not be
13    in writing, F.I.T. strongly encourages
14    individuals to file a written complaint. Any
15    person with supervisory responsibility who
16    receives a complaint formally or informally
17    in writing, orally or otherwise, of
18    discrimination, harassment or retaliation
19    must report such information to the
20    affirmative action officer immediately."
21          So you understand that is the
22    policy, right?
23    A. I do.
24    Q. Okay.
25          So, Ms. Phillips believed that she
```

170

```
1                   DAVIS, Ph.D.
2     was either a victim of or a witness to a
3     discriminatory statement regarding black
4     people being at the back of the bus; isn't
5     that right?
6     A. I don't believe that's correct.
7     Q. You don't believe that was correct --
8     A. Well, actually I can't say what
9     Ms. Phillips's believed.
10    Q. You can't say --
11    A. I --
12    Q. And so in that situation, it's your
13    understanding of this policy that you don't
14    have to report it even though you don't know
15    what Ms. Phillips had in her mind; is that
16    right?
17    A. I think that the key issue here is
18    the terminology "discrimination, harassment
19    or retaliation." As you looked at the
20    definitions of those terms, I believe you
21    will find a -- a differential between what an
22    employee's view of discrimination, harassment
23    or retaliation can be versus what is policy.
24    Q. I see. This says that "any person
25    who believes they may have been..." It
```

171

```
1                   DAVIS, Ph.D.
2     doesn't say that they have to fit the
3     definition of discrimination or retaliation
4     or harassment. It just says if the "employee
5     believes that they have." Will you agree
6     with me on that?
7     A. Yes. But that --
8     Q. Okay. Okay. Yes, you agree.
9          It doesn't say that any person who
10    Dean Davis believes faced discrimination,
11    harassment or retaliation has to be reported
12    to the affirmative action officer, right? It
13    doesn't say that, does it?
14    A. It says, "Any person who believes
15    they have -- may have been a victim of or who
16    believes they may have witnessed
17    discrimination --"
18    Q. I understand that. I just read
19    that.
20          I said, it does not say that any
21    person that Dean Davis believes may have been
22    a victim of or who believes they may have
23    witnessed discrimination, harassment or
24    retaliation; it doesn't say that, right?
25    A. No, but the --
```

172

```
1                   DAVIS, Ph.D.
2     Q. No, it doesn't. Okay --
3     A. No. However, the paragraph --
4     Q. There is no "however." I'm not
5     asking you about the paragraph. I am asking
6     you whether it says any person who Dean Davis
7     believes; you understand your name does not
8     appear in there as to whose belief controls;
9     it's not your name in there, is it?
10    A. It is not my name.
11    Q. Okay.
12          So, in a situation where an employee
13    believes that they have been a witness to or
14    a victim of discrimination, it's the dean's
15    requirement to inform the affirmative action
16    officer immediately, right?
17    A. If the dean gets a report of
18    discrimination, harassment or retaliation --
19    Q. Is that the way you read it? Where
20    does it say "if the dean gets a complaint"?
21    Doesn't it say, "Any person who believes"?
22    "Any person who believes" whether or not the
23    belief is true or not, whether the --
24          MR. DRANOFF: Derek. Derek you
25          are not letting the witness -- you
```

173

DAVIS, Ph.D.

1
2      the witness' answer.  Let her
3      respond, please.
4      A.  Yes, I think that the key words here
5  are "discrimination, harassment or
6  retaliation."  Not the word "believes."
7      Q.  You read it without the word
8  believes -- that's --
9      A.  I --
10         MR. DRANOFF:  She is drawing
11      your attention to last sentence,
12      Derek.
13      A.  I'm drawing your attention to the
14  last sentence.  Discrimination, harassment or
15  retaliation.  Ms. Phillips' report of the
16  incident was not aligned with the definitions
17  of any of those things, nor do I recall her
18  using -- speaking about "discrimination" in
19  this instance.
20      Q.  Right.  Got it.
21         So, "back of the bus," Rosa Parks,
22  segregated bus, nothing do with
23  discrimination, right?
24      A.  Ms. Phillips never raised Rosa Parks
25  or any of the things that you have brought

174

DAVIS, Ph.D.

1
2  into this discussion when we spoke.
3      Q.  Oh, no?  She said "back of the bus,"
4  right?
5      A.  Ms. Phillips did not say "back of
6  the bus."  Ms. Phillips overheard Brenda
7  Cowan speaking to you Unilta Alsop.  She
8  overheard, in my understanding, a fragment of
9  a sentence that included the phrase "back of
10  the bus."  Join us -- meaning Brenda, a white
11  woman, and Unilta a black woman -- here in
12  the back of the bus.
13      Q.  Okay.  Okay.
14         So that's the way you took it?  Oh,
15  no discrimination there.  No need to report.
16  Right?
17      A.  Under the provisions of the policy
18  and the definitional description under the
19  policy, that's correct.
20      Q.  Okay.
21         MR. SELLS:  We can take this
22      down.
23      Q.  Well, what was the next complaint
24  that you heard from Ms. Phillips as it
25  related to a --

175

DAVIS, Ph.D.

1
2      A.  These, again --
3      Q.  -- racial issue?
4      A.  -- action complaints -- and I'm
5  making them out of sequence -- but I believe
6  that the next one was when Kyle Farmer, who
7  was in the office, made a remark about
8  Ms. Phillips who was putting on her hat
9  saying to her, "You -- you look like you're
10  going to the hood."
11      Q.  "You look like you're going to the
12  hood."  Okay.
13         What did Ms. Phillips say about
14  that?
15      A.  I believe that Ms. Phillips -- when
16  she reported it to me, is that your question?
17      Q.  Yes.
18      A.  She took offense at the comment --
19      Q.  Why --
20      A.  -- of -- well, I can't speak to why
21  Ms. Phillips took offense to it.  She told me
22  that she took offense to the phrase, "look
23  like you're going the hood."
24      Q.  Did you ask her why?
25      A.  I don't recall, specifically.

176

DAVIS, Ph.D.

1
2      Q.  Well, what's your understanding of
3  "the hood"?  What's that mean?
4      A.  My understanding of "the hood" is
5  there is -- there is -- it could be multiple
6  definitions of what constitutes the hood.
7      Q.  Okay.
8         So here you have Ms. Phillips, an
9  African-American woman, hearing from your
10  colleague, Mr. Farmer, who is a white male,
11  correct?
12      A.  That is correct.
13      Q.  Saying to Ms. Phillips, you need to
14  go -- "you look like you're going the hood."
15  Right?
16      A.  I don't know that that was -- that
17  sentence was delivered with the affect that
18  you just provided.
19      Q.  Would it make a difference?
20      A.  It could.
21      Q.  How?
22      A.  It could have been a joke.  I don't
23  know.  I don't know what was Kyle's intent in
24  saying that.
25      Q.  But you didn't find that to be

177

DAVIS, Ph.D.

1  discriminatory, harassment or retaliatory
2  either; is that right?
3      A.  Under the terms of the policy, no.
4      Q.  Got it.
5          So, you didn't report that to
6  Affirmative Action, did you?
7      A.  That's correct.
8      Q.  Okay.
9          What did you do instead?
10     A.  I did — I again spoke with
11  Marjorie, and I spoke with Kyle separately,
12  to try to understand the situation.  Without
13  my involvement, Kyle, I'm told, apologized
14  profusely to Marjorie.  Went to the to the
15  extra effort of making a hat for Marjorie as
16  a sort of token of, you know, apology to her;
17  and that they resolved the issue between the
18  two of them.
19     Q.  Why did Mr. Farmer — why did he
20  apologize?
21     A.  I — I — I believe — again, I was
22  not there, so I don't know definitively.  But
23  I believe he apologized because Marjorie was
24  offended.  He did not intend to offend her.

178

DAVIS, Ph.D.

1      Q.  Why was Ms. Phillips offended?
2      A.  I don't know other than what I told
3  you.
4      Q.  So, she didn't tell you that she
5  thought this was racially offensive that he
6  said to her, simply because she was putting
7  on her hat, that she looked like she was
8  going to hood?  You don't know why she was
9  offended by that?
10     A.  I can't speak to Ms. Phillips'
11  emotions at that — in that incident.
12     Q.  Got it.
13         But one thing you certainly didn't
14  do was report to the Affirmative Action —
15     A.  That's —
16     Q.  — as the policy said you should,
17  right?
18     A.  No, that's incorrect.  I acted in —
19  I acted in —
20     Q.  Your own self-interest, right?
21     A.  Oh.  No, sir.
22         MR. IRANOFF:  You are not
23     letting her finish the answer, Derek.
24     Q.  Go ahead.

179

DAVIS, Ph.D.

1      A.  My self-interest had nothing to do
2  with it.  I acted in accordance with the
3  policy and the definitions laid out therein.
4      Q.  Got it.
5          What was the next incident?
6      A.  I believe that the next incident was
7  Ms. Barton coming back from a funeral of a
8  elderly relative — and again these are
9  detailed in Ms. Phillips' complaint, so I'm
10  recalling to the best of my ability what is
11  contained therein, what I recall from the
12  incident itself.
13         So Marilyn had come back from the
14  funeral of an elderly relative and was
15  relaying the anecdote about that funeral to a
16  student aide, Julia, and was telling her
17  something about finding out that one of her
18  uncles, I think, had a birth date that was a
19  year earlier than anybody had believed it to
20  be.
21         So it had come out in the funeral
22  that he had been born before his parents were
23  married, and Marilyn apparently — and again,
24  I was not present — Marilyn apparently said

180

DAVIS, Ph.D.

1  something like, "Well, I guess that makes him
2  a bastard," or she was relating that somebody
3  at the funeral said that.
4          And it's my understanding that
5  Ms. Phillips came in during that conversation
6  in the open office and overheard the use of
7  the term "bastard" and took offense at the
8  use of that term and later came to talk to me
9  about that.
10     Q.  Did you report that to HR — sorry.
11         Did you report that to Affirmative
12  Action?
13     A.  No.
14     Q.  Why not?
15     A.  Because again, it did not meet the
16  requirements laid out in the policy and it's
17  definitions.
18     Q.  Okay.
19         Were there any other complaints that
20  she raised?
21     A.  I think I'm forgetting one.  I'm
22  sorry.  I just can't recall.  If you could
23  just —
24         MR. SELLS:  Why don't we bring

181

DAVIS, Ph.D.

1     up Exhibit 29.
2          (The image is shared on the
3     computer screen.)
4          MR. SELLS:  Let's just scroll --
5     A.  Oh, yes.  I'm sorry.  I see it.
6          MR. SELLS:  Keep scrolling up.
7     Q.  Which one?
8     A.  The comment about the 3/5th rule.
9     Q.  So, Ms. Phillips brought this to you
10    as well, right?
11    A.  She did.
12    Q.  Okay.
13         So what happened?
14    A.  Again, I listened respectfully and
15    attentively as she told me her concerns and
16    the fact that she had, again, overheard a
17    fragment of a conversation, not the entire
18    conversation, and that she took offense at
19    any comment about the 3/5th's rule happening
20    in the office; and I explained to her that my
21    understanding was this was simply a
22    discussion about history and facts.  This is
23    a part of American history, and I believe
24    that this topic of discussion -- again, I was

182

DAVIS, Ph.D.

1     not there -- but that seems to have been what
2     the discussion between Ms. Barton and the
3     student aide was.
4          And I don't believe that the
5     Complainant disputes that.
6     Q.  That who, "the Complainant"?
7     A.  Ms. Phillips.  I'm looking at the
8     language that is on the screen.
9     Q.  Okay.
10         MR. SELLS:  Can we scroll down.
11    Stop.
12    Q.  Did there come a time when you
13    learned that a complaint was brought against
14    you for failing to adhere to the
15    antidiscrimination policies?
16    A.  No complaint was brought against me
17    for that.
18    Q.  No?
19    A.  To my knowledge.
20    Q.  So, you heard Ms. Kekana when she
21    testified about Respondent 4; you remember
22    that?
23    A.  Yeah.
24    Q.  And you remember Respondent 4 and

183

DAVIS, Ph.D.

1     you were interviewed as part of this process,
2     right?
3     A.  I was.
4     Q.  Okay.
5          Do you remember when you were
6     interviewed?
7     A.  It was late -- I believe I was the
8     last person because of scheduling issues.  It
9     was probably in May.
10    Q.  May of 2018?
11    A.  I believe that's correct.
12    Q.  Okay.
13         And what is written here for
14    Respondent 4; is that accurate?
15    A.  I believe it is.
16    Q.  Okay.  So then where it says,
17    "Respondent 4 stated that when Complainant
18    brought forth complaints against Respondent
19    3, she instructed the Complainant to speak
20    with Respondent 3 and come back to speak with
21    her if she had additional issues she wanted
22    to discuss."
23         Is that right?
24    A.  I would -- I would not be certain of

184

DAVIS, Ph.D.

1     the word "instructed"; but certainly in the
2     workplace having Ms. Barton and Ms. Phillips
3     have a conversation to clear this up was a
4     goal -- an effort at resolution and better
5     understanding of what Ms. Phillips overheard.
6     Q.  Okay.
7          And is it true that -- by the way,
8     you understand that Respondent 3 is Marilyn
9     Barton, right?
10    A.  Yes.
11    Q.  Okay.
12         So, was it also true that you told
13    Ms. Phillips that you would speak to Marilyn
14    Barton too; is that right?
15    A.  That's true.
16    Q.  And did you speak to Marilyn Barton?
17    A.  I recall that I did.
18    Q.  And you spoke to her about this
19    complaint, correct?
20    A.  I did not speak to her about this
21    complaint as it's laid out here.  I spoke to
22    her about the fact that Marjorie had come to
23    me with -- with her concerns about what she
24    had overheard in the office, and I asked

DAVIS, Ph.D.

Marilyn to give me context for that fragment of the conversation that Ms. Phillips had heard.

Q. But again, with regard to anything that Ms. Phillips complained to you about that she was offended by, you never brought that to the Affirmative Action Office, right?

A. That's correct, per -- per the policy and its definitions.

MR. SELLS: Okay. We can take down the document.

Q. So when Ms. Phillips came to you with all four of her complaints regarding Ms. Barton, regarding Mr. Farmer and regarding Ms. Cowan, you didn't see any of those complaints rising to the level of discrimination, harassment or retaliation --

MR. DRANOFF: Objection --

Q. -- is that right?

A. Those complaints were brought to me over a period of, I believe, four years; and the answer is yes, I did not take them to the Affirmative Action Office per the policy and it's definition.



DAVIS, Ph.D.

Q. And instead, Ms. Phillips brought them to the Affirmative Action Office herself, right?

A. Yes.

Q. And not only did she bring those complaints to the Affirmative Action Office, but she also complained about you always siding with Caucasians over African-Americans, right?

MR. DRANOFF: Object to the form.

A. I don't know what she spoke to the Affirmative Action Office about.

Q. Well, we just saw in the last exhibit, Exhibit 29, where that was a statement that she made?

A. Actually, we did not look at that statement --

Q. Okay. Let's pull it backup.

MR. SELL: Can we put up Exhibit 29 and go to Respondent 4.

(The image is shared on the computer screen.)

Q. It says, "Complainant alleges that



DAVIS, Ph.D.

Respondent 4 will always side against people of color."

Do you see that?

A. I do.

Q. All right.

MR. SELLS: We can take it down.

Q. So, let's see. Umilta Alsop, Ms. Phillips, Anton Baptiste; you never tried to get them a reclassification or a raise, right?

A. Again, it is outside my power or it was outside of my power as a dean to get either of those things for them. I had the power to trigger the process by sending a recommendation to my supervisor.

Q. Right.

Never did that; but you were able to do it for Marilyn Barton, who's not a person of color, right?

A. That's correct.

Q. Got it.

Ms. Phillips raises four allegations of discrimination to you and you side on the



DAVIS, Ph.D.

favor of Ms. Cowan, Mr. Farmer and Ms. Barton who are all white, right?

A. No.

MR. DRANOFF: Object to the form.

A. Not correct. I did not side with anyone. I listened to everyone involved in those four incidents, and I made the determination that in each case the offensive language or behavior, under F.I.T.'s policy, it did not merit or did not trigger requirement to report to Affirmative Action.

Q. Ms. Barton, she's white, right?

A. That's correct.

Q. Mr. Farmer is white, right?

A. That's correct.

Q. Ms. Cowan is white?

A. That's correct.

Q. Once the Affirmative Action Office gets the complaint from Ms. Phillips, there's an investigation that occurs, correct?

A. Yes.

Q. And that investigation started in March of 2018, right?

189

```
 1                DAVIS, Ph.D.
 2       A.  I can't say definitively.
 3       Q.  Okay.
 4           Well, you want to pull up the
 5   exhibit again?
 6       A.  I'm just saying, I was not part of
 7   the investigation.
 8       Q.  All right.  Whatever.  We don't have
 9   to do that.
10           Anyway, the point is that by May of
11   2018 you knew that this investigation was
12   taking place, correct?
13       A.  I knew the part of it that related
14   to me.  I knew the part to which I was made
15   to respond.
16       Q.  Right.
17           And that had to do with Marilyn
18   Barton, right?  With Marilyn Barton and the
19   3/5th of the person, it had to do with
20   Marilyn Barton and the comments about being
21   illegitimate or a bastard, right?
22       A.  No.  I was asked to respond only to
23   the 3/5ths — the issue of the 3/5ths
24   provision.
25       Q.  All right.
```

190

```
 1                DAVIS, Ph.D.
 2           Well, the point is you knew that a
 3   complaint had been made by Ms. Phillips
 4   against you, right?
 5       A.  I knew that I was being asked to be
 6   a Respondent in that complaint, yes.
 7       Q.  And that was in May of 2018,
 8   correct?
 9       A.  I believe it was the end of May
10   2018.
11       Q.  And you knew that Ms. Barton had
12   been implicated in that complaint by
13   Ms. Phillips too, correct?
14       A.  Well, Marilyn was the one who made
15   the comment about the 3/5ths rule, so yes.
16       Q.  Okay.
17           When did you ever learn that that
18   investigation was completed?
19       A.  It was a very long time before I
20   knew that that investigation was completed.
21   I can't say specifically.
22       Q.  All right.
23           Was it about the time that that
24   closeout memo was written in October of 2019?
25       A.  I'm sorry?  Could you repeat your
```

191

```
 1                DAVIS, Ph.D.
 2   question again?  I lost track.
 3       Q.  Was it about the time that the memo
 4   that we have just read from, the one that was
 5   written in October of 2019, was that about
 6   the time that you learned that the
 7   investigation had concluded?
 8       A.  I am not sure when I received a copy
 9   of that memo.
10       Q.  All right.
11           MR. DRANOFF:  Can we take just
12       five minutes?
13           MR. SELLS:  Yes, of course.
14           MR. MENKEN:  I need to take a
15       call from 4:00 to 4:10.
16           MR. SELLS:  That's fine.  So
17       you want to come back, you want to
18       say 3:40.  Then we'll go for another
19       20 minutes.
20           MR. DRANOFF:  I'm going to be
21       less than five minutes.
22           MR. SELLS:  We'll come back at
23       3:35.
24           MR. MENKEN:  Thank you.
25           MR. SELL:  All right.
```

192

```
 1                DAVIS, Ph.D.
 2           (Whereupon, a brief recess was
 3       taken at 3:29 p.m.; after which, the
 4       proceeding continued at 3:35 p.m. as
 5       follows.)
 6           MR. SELLS:  Back on the record.
 7       Q.  Now, Ms. Davis, when you indicated
 8   that none of Ms. Phillips' complaints rose to
 9   the level that you felt you needed to see in
10   order to report it to the Affirmative Action
11   Office, was that based on some training that
12   you had received?
13       A.  That was — that was based on my
14   reading of the policy and it's provisions.
15       Q.  Okay.
16           Did you ask anybody whether or not
17   you're reading was correct?
18       A.  I don't recall specifically doing
19   that.
20       Q.  All right.
21           So, you had this mental image as you
22   were reading the policy that, you know, I
23   just don't see it.  I don't see, you know, a
24   comment about "the hood," or the comment
25   about "the back of the bus," or a comment
```

193

DAVIS, Ph.D.

1 about "3/5ths of a person" rising to the
2 level of discrimination or harassment or
3 retaliation that was necessary to report it?
4 A. The policy has substantial and
5 substantive definitional sections that
6 provide guidance in making those judgements;
7 and as I have explained, the comments that
8 you have just repeated back were fragments --
9 overheard fragments in most cases of
10 conversations that had more context around
11 them.
12 Q. How did you learn that the fragments
13 had more context around them? How did you
14 know that?
15 A. Because they were simply fragments
16 of conversations. Both Ms. Phillips and
17 other -- the other people involved in those
18 incidents reported them to me as Marjorie
19 coming in and overhearing things, parts of
20 conversations. Marjorie herself reported
21 that to me, that she overheard parts of the
22 conversations; so that's how.
23 Q. So everybody that Ms. Phillips
24 complained about, you spoke to and got their
25

194

DAVIS, Ph.D.

1 side of the story as well; is that right?
2 A. Yes.
3 Q. Got it.
4 Just like you did with the students
5 who complained about the fashion show --
6 A. The students --
7 Q. -- you met with them and you met
8 with Mr. Farmer, but you didn't report it to
9 the affirmative action coordinator, correct?
10 A. The students did not complain about
11 the fashion show. The students raised
12 concerns about the program, the culture in
13 the program, the accessories, possible --
14 possible issues that were arising around the
15 accessories, as we have described already
16 today.
17 Q. Right.
18 But in all of those situations you
19 did not see it as rising to the level of
20 discrimination, harassment or retaliation?
21 A. That's correct.
22 Q. And so you investigated it yourself --
23 A. That's --
24 Q. -- just to make sure, correct?
25

195

DAVIS, Ph.D.

1 A. No --
2 Q. You didn't investigate it?
3 A. I did not.
4 Q. Okay.
5 You just spoke to the people that
6 raised the complaints and you spoke to the
7 people who the complaints were made about --
8 A. I did not.
9 Q. -- is that right?
10 A. I spoke to people who were -- in the
11 case of the employee incidents relating to
12 Marjorie's formal complaint, I spoke to the
13 people who were involved in those incidents
14 in realtime around those incidents to
15 understand what had happened. That was not
16 an investigation, those were conversations.
17 And in the case of the students, I
18 met with the students at their request, as we
19 have already discussed.
20 Q. Now by doing so, you didn't allow
21 the Affirmative Action Office to get the
22 first opportunity to speak to the people who
23 were involved in the complaints, right?
24 A. My understanding is that the person
25

196

DAVIS, Ph.D.

1 who has a complaint also has the right to go
2 directly to the Affirmative Action Office,
3 and I believe that is in the policy that we
4 just looked at recently -- I mean, within the
5 last hour.
6 Q. What's that got to do with anything?
7 A. I'm just -- that has do with your
8 comment about --
9 Q. It's a question --
10 A. Oh, sorry. Your question about --
11 actually, it was more of a comment about the
12 Affirmative Action Office not having the
13 first opportunity to interview people.
14 Q. Right.
15 So anybody that has brought a
16 complaint that touches upon race or race
17 insensitivity, you spoke to them first and
18 the people they complained about you spoke to
19 them first before the Affirmative Action
20 Office did; is that correct?
21 A. In these cases the -- the complaint
22 from Ms. Phillips --
23 Q. It is just a simple question. I
24 mean, we don't need a speech. Either yes, I
25

197

DAVIS, Ph.D.

1
2  did speak to them first or no, the
3  Affirmative Action people spoke to them
4  first.  Just give me a straight answer on
5  that.
6      A.  I spoke to them first.
7      Q.  Got it.
8          And did you memorialize your
9  conversations with any of the people that you
10 spoke to, other than the students, in that
11 February 18th, 2020 memo that you wrote?
12     A.  I don't believe so.
13     Q.  So, let's talk about the May 16th,
14 2019 incident.  Do you remember that?
15     A.  I do.
16     Q.  All right.
17         Now, this happened right outside
18 your office; is that correct?
19     A.  I was not in the office; so I cannot
20 tell you exactly where it happened.
21     Q.  Well, where did it -- as far as you
22 know, where did it happen?
23     A.  As far as I know, it happened in the
24 outer suite of the dean's office; which is
25 where Ms. Phillips, Mrs. Alsop and Ms. Barton

198

DAVIS, Ph.D.

1
2  were located.
3      Q.  Got it.
4          Now, how did you learn about this
5  May 16th, 2019 incident?
6      A.  I was in a meeting and got a text
7  message calling me back to the office.
8      Q.  Who texted you?
9      A.  I believe it was Anton who texted
10 me; but I'm not certain of that.
11     Q.  Do you still have that text?
12     A.  I probably do not.
13     Q.  Well this text that you received,
14 was it on your personal device or did you
15 have --
16     A.  It was on my personal device.
17     Q.  All right.
18         Were you ever instructed not to
19 destroy, erase or get rid of documents related
20 to this case?
21     A.  The lawsuit that we are discussing
22 today?
23     Q.  Yeah.
24     A.  Yes.
25     Q.  Mm-hmm --

199

DAVIS, Ph.D.

1
2      A.  But that text message, I would have
3  received that text message long before the
4  filing for this case.
5      Q.  Okay.
6          Well, I just asked if you had ever
7  been instructed not to destroy any evidence
8  related to the claims in this case --
9      A.  I --
10     Q.  -- and so --
11     A.  Yes --
12     Q.  -- my question is, Do you recall
13 when you received that instruction?
14     A.  I would have received that
15 instruction when I received notification of
16 the filing of the case.
17     Q.  All right.
18         And so you are saying you destroyed
19 the text or erased the text before you were
20 told not to destroy any information; is that
21 correct?
22     A.  No, I'm not saying either one of
23 those things.
24         First of all, I don't know if I
25 still have the text on my personal device;

200

DAVIS, Ph.D.

1
2  and secondly, I believe that I would have
3  received the text before I received
4  notification of this case.
5      Q.  Got it.
6          So was it often that you had text
7  messages with Anton Baptiste?
8      A.  No.
9      Q.  And so, do you have your personal
10 device handy now?
11     A.  I don't; it's upstairs.
12     Q.  Okay.
13         So at the next break, would you be
14 so kind as to look through your device and
15 see if there is a text?
16     A.  If I'm advised to do so by my
17 counsel.
18         MR. DRANOFF:  Take it under
19     advisement.  Next break.
20         MR. SELLS:  All right.
21     Q.  Now, what do you recall the text
22 saying?
23     A.  "Come back to the office as soon as
24 you can.  There is an --" I think it said
25 something, you know -- "there's an incident."

201

DAVIS, Ph.D.

1     I don't believe that it was specific.
2         Q.  All right.
3             And when do you recall seeing that
4     text?
5         A.  It would have been in -- I believe
6     it was probably in the late morning.  I don't
7     recall exactly.
8         Q.  Do you recall where you were when
9     you saw the text?
10        A.  I think I was in a dean's meeting up
11    on the 9th floor of the -- of the F.I.T.
12    building.
13        Q.  And did you respond to the text?
14        A.  I believe -- again, I don't recall;
15    but I believe I said, "I'm on my way."
16        Q.  Okay.
17            Did you show up at your office
18    following that text?
19        A.  I did.
20        Q.  When was that?
21        A.  I'm not sure.
22        Q.  Was it on May 16 --
23        A.  Oh, yeah --
24        Q.  -- 2019 --
25

202

DAVIS, Ph.D.

1         A.  Yes, it was on that day.  I'm not
2     sure of the hour.
3         Q.  Okay.
4             When you got there, what do you
5     recall seeing as you entered the outer space
6     to your office?
7         A.  I recall -- again, to my
8     recollection, I recall seeing Marjorie at her
9     desk.  I recall you Umilta being there.  I
10    recall that Marilyn was not in that part of
11    the office, and I don't recall anyone else
12    being there.
13        Q.  Okay.
14            So upon entering the office what did
15    you do?
16        A.  I asked what had happened?
17        Q.  To who?
18        A.  To both Umilta and Marjorie who were
19    there.
20        Q.  So, why did you ask them?
21        A.  Because they were there.
22        Q.  But did you have any idea what the
23    incident was about?
24        A.  I don't believe so.
25

203

DAVIS, Ph.D.

1         Q.  So, why would you ask them as
2     opposed to anything else?
3         A.  Because they were Tom people in the
4     office.
5         Q.  Did Marilyn Barton text you?
6         A.  I don't believe so.
7         Q.  So, you didn't receive any message,
8     e-mail, text, phone call from Marilyn Barton
9     following this incident?
10        A.  Again, I don't remember.
11        Q.  Okay.  All right.
12            So you come in and you just announce
13    out loud "what happened?" to both Umilta and
14    Marjorie Phillips?
15        A.  No.  I asked both of them, and I
16    think -- I'm trying to remember if they
17    started talking first or if I started talking
18    first.  I actually don't remember.  But I
19    remember that I -- I felt that I needed to
20    learn what had happened.
21        Q.  And why did you feel that way?
22        A.  Because something clearly had
23    happened that had upset Marjorie.  Umilta, as
24    I recall again, was comforting Marjorie at
25

204

DAVIS, Ph.D.

1     that point.  Marilyn was not in her usual
2     work place.
3         Q.  Isn't it a fact you and Marilyn
4     Barton walked into your office together?
5         A.  I don't remember.
6         Q.  And then you met privately with
7     Marilyn before you spoke to Ms. Phillips and
8     anyone else; isn't that right?
9         A.  I don't remember.
10        Q.  Do you remember speaking with
11    Ms. Barton in your office following this
12    incident?
13        A.  I do.
14        Q.  Tell me what the conversation was
15    about?
16        A.  The conversation was about finding
17    out what had happened.
18        Q.  Okay.
19            What did you say and what did she
20    say?
21        A.  I'm not gonna be able to recall
22    word-for-word a conversation that happened
23    that long ago.  The import of the
24    conversation was that there had been an

205

DAVIS, Ph.D.

1
2 incident with the student who had come
3 looking -- who had been unable for whatever
4 reason to get a cap and gown regalia for the
5 graduation which was coming up and there had
6 been -- the student had come looking for it
7 and she had been sent back to the book store,
8 which is where caps and gowns are given out.
9       Because the student had not ordered
10 one in advance, as I recall, she was sent
11 back to the School of Graduate Studies.  We
12 kept a supply of caps and gowns in the school
13 because this happened every year.  Some
14 student would forget and so we had extras on
15 hand.  I was told that Marilyn made the
16 decision to give the student regalia and that
17 there was a back and forth between
18 Ms. Phillips and Ms. Barton about this, and
19 as we heard yesterday that this escalated
20 rapidly.
21       But as to what Marilyn Barton told
22 me, those are the -- the -- those are -- she
23 related those facts to me.
24    Q.   Okay.
25       Well you said it "escalated

206

DAVIS, Ph.D.

1
2 rapidly."  Escalated by who?
3    A.   By Marilyn.
4    Q.   So, what did Marilyn Barton say to
5 you about how she escalated this rapidly?
6    A.   She was remorseful.  She said that
7 she had become very -- I don't remember,
8 again, the exact words that she uses -- that
9 she used.  But that she had become angry and
10 had yelled at Ms. Phillips.  She told me, I
11 believe, that she had used the words "I will
12 fucking kill you."  With -- she had addressed
13 those words to Ms. Phillips.
14       And again, Marilyn was quite upset
15 about all of this and just sort of -- yeah,
16 the -- other part of this that she told
17 me was that she just snapped and that she --
18 she didn't know why, but she just snapped.
19    Q.   You said "she didn't know why"?
20    A.   She -- again, I don't recall exactly
21 what she said to me; but the import of it was
22 that she had become so frustrated with
23 Ms. Phillips over time that she just snapped
24 over this; because she felt like she was
25 making -- Marilyn was making a decision about

207

DAVIS, Ph.D.

1
2 this regalia and giving it off to the
3 student, Ms. Phillips was objecting to that
4 and apparently there was some back and forth
5 between them over that and Ms. Barton lost
6 it.
7    Q.   And so, Marilyn Barton told you that
8 she -- did she say that she was yelling?
9    A.   I believe she did.
10    Q.   And she told you that she told
11 Ms. Phillips that she would "fucking kill
12 her"; is that right?
13    A.   I believe she did.
14    Q.   And did she say that she told
15 Ms. Phillips that she would fuck her up?
16    A.   I'm not sure how many of the -- how
17 much of the language that we now know she
18 related to me in that moment after the
19 incident.
20    Q.   All right.
21       But you don't recall what it is that
22 she said specifically about why she snapped;
23 is that right?
24    A.   I think she just said I -- it's been --
25 this is been building for a long time.  I

208

DAVIS, Ph.D.

1
2 don't recall specifically, no.
3    Q.   So, what did you say to Ms. Barton
4 after she told that to you?
5    A.   I recall telling her to go compose
6 herself.  I also spoke with Ms. Phillips --
7    Q.   Well, no.  No.  No.  No.  No.  No, I
8 want you to tell me everything you said to
9 Ms. Barton.
10    A.   All right.  I'm trying to recall
11 everything that I said to her.  I might have
12 told her -- I recall telling her to compose
13 herself.  I'm not sure I recall any other
14 specific things that I said to her.
15    Q.   So, you didn't ask her any
16 questions?
17    A.   I don't recall whether what I
18 learned was as a result of asking questions
19 or she just told me.
20    Q.   So, how was it that you and
21 Ms. Barton met to go into your office?
22    A.   As I said, I didn't recall that we
23 went into my office together; so I don't
24 recall how we would have met to do that.
25    Q.   All right.

209

DAVIS, Ph.D.

1
2      And so, now when you hear that
3   Ms. Barton had -- in her own words -- snapped
4   and threatened to kill Ms. Phillips, what did
5   you do next?
6      A.  I'm not sure that I will remember
7   the sequence of events exactly as they
8   happened.  I definitely spoke with Marjorie
9   to make sure that she was okay.  I remember
10  that she was very composed and very calm, and
11  I remarked that and said something like,
12  "Given what I have just heard, I'm surprised
13  that you are this calm."  And she was upset
14  but very, very composed.
15      I asked her what she wanted to do, I
16  would think.  I called security, I believe.
17      Q.  When you asked Ms. Phillips what she
18  wanted to do, why did you do that?
19      A.  Because I was concerned for her
20  well-being.
21      Q.  But at this point in time, you knew
22  that there was an open investigation about
23  whether you had discriminated against
24  Ms. Phillips, right?
25      A.  Oh, it never -- those two things

210

DAVIS, Ph.D.

1
2   never collided in my thinking when this was
3   happening.
4      This was very in the moment of
5   taking care of a very charged situation that
6   I wanted to make sure -- where I wanted to
7   make sure that the employees were safe and
8   that there was no further escalation of
9   anything.  I was --
10      Q.  So, do you have training in that?
11  Do you have training on making employees feel
12  safe after they get threats, after they get
13  death threats?  Do you have training in that?
14      A.  I am not speaking in an official
15  capacity that would require training.  I'm
16  speaking in a human capacity of compassion
17  and empathy.
18      So, I was not the last person to be
19  involved in this.  I notified Human
20  Resources --
21      Q.  How did you do that?
22      A.  I believe I called to Natacha Unelus
23  the generalist; but again, I cannot be -- I
24  cannot be certain about any of these details.
25      MR. MENKEN:  Can we take that

211

DAVIS, Ph.D.

1
2   10-minute break now, Derek?
3      MR. SELLS:  Yes.  Yes, sorry.
4      MR. MENKEN:  I'll be back 4:10.
5      MR. SELLS:  Why don't you just
6   tell us when you are ready to come
7   back on?
8      MR. MENKEN:  I'll do that.
9   Thank you.
10      (Whereupon, a brief recess was
11  taken at 4:00 p.m.; after which, the
12  proceedings continued at 4:10 p.m. as
13  follows.)
14      MR. DRANOFF:  Derek, just so
15  you know, during the break we did
16  have Ms. Davis check her phone and
17  there was no text message.
18      MR. SELL:  Got it.
19      Q.  Do you have text messages with
20  Marilyn Barton?
21      A.  I do.
22      Q.  All right.
23      And have you shown these text
24  messages to anyone?
25      A.  I have not.

212

DAVIS, Ph.D.

1
2      Q.  So, you have not shared these text
3   messages with your attorney or anyone at
4   F.I.T.; is that right?
5      A.  The text messages that I'm referring
6   to are texts about meetings being
7   rescheduled, logistics.  I don't believe that
8   there is anything substantive in those
9   e-mails -- text messages.  I have not
10  reviewed them.  I just took a brief look at
11  them during the break.
12      Q.  So, do you have any text messages
13  regarding the date May 16th, 2019 from
14  Marilyn Barton?
15      A.  I did not see any when I reviewed my
16  messages just now.
17      Q.  Did you look specifically for that?
18      A.  I did not.
19      Q.  So, this text message that you
20  remember seeing, you don't know who it was
21  from?
22      A.  I now wonder if I just misremembered
23  the entire thing and did not receive a text
24  message.  I really believe it was Anton, but
25  I do not recall.

213

DAVIS, Ph.D.

1
2    Q.  Got it.
3        Anyway we were talking about your
4    meeting with Ms. Phillips following this May
5    16th, 2019 meeting and you asked her what did
6    she want you; is that right?  Or what did you
7    to do you asked her, right?
8    A.  I don't recall what I asked her.
9    Q.  Okay.
10       But your concern at that the point
11   was for everyone's safety; is that right?
12   A.  I was concerned for everyone's
13   safety.  I was concerned for Ms. Phillips'
14   having heard about what had happened.
15   Q.  You said that you called security;
16   is that right?
17   A.  I recall that I called Human
18   Resources, and I'm not sure if I called
19   security directly or if they called security.
20   Q.  Why did you call Human Resources?
21   A.  To let them know -- I called --
22   again, I'm remembering this and I don't
23   believe that I have any notes or anything
24   about it.  But I believe that I called our
25   generalist in Human Resources to say that we

214

DAVIS, Ph.D.

1
2    had had a serious incident in the School of
3    Graduate Study office?
4    Q.  Okay.
5        And what was the point of calling
6    the HR generalist?
7    A.  The Human Resources generalist was
8    responsible for issues -- work place issues
9    in our office and was my point person for
10   those things.
11   Q.  Okay.
12       Well, why didn't you call the
13   Affirmative Action Office?
14   A.  I did not call the Affirmative
15   Action Office because I did not believe this
16   was an incident related to discrimination,
17   discriminatory harassment or retaliation per
18   the policy.
19   Q.  Had you ever seen Marilyn Barton
20   threaten to kill a Caucasian person?
21   A.  I had never seen Marilyn Barton
22   threaten to kill anyone.  I did not see
23   Marilyn Barton threaten to kill Ms. Phillips.
24   Q.  Okay.
25       Well, she told you that's what she

215

DAVIS, Ph.D.

1
2    told to Ms. Phillips, right?
3    A.  She did.
4    Q.  So my question is, You certainly
5    know Ms. Phillips is African-American,
6    correct?
7    A.  I do.
8    Q.  And you just decided on your own
9    that this incident was not an act of
10   discrimination, right?
11   A.  In the moment of the incident, my
12   concern was for everyone's safety and
13   security.
14   Q.  That is not my question.
15   A.  I know.
16   Q.  So if your concern was just about
17   everyone's safety and security, then why
18   would you choose HR to make the call to as
19   opposed to the Affirmative Action Office?
20   A.  Because, again, I did not perceive --
21   based on the description given to me -- that
22   what had happened was the result of discrim-
23   -- discrimination -- just -- discriminatory
24   harassment or retaliation.
25   Q.  Well, does the policy say

216

DAVIS, Ph.D.

1
2    discriminatory harassment?
3    A.  I believe it does.  I don't recall --
4    Q.  You believe it does?  Okay.
5    A.  We can look at it again.
6    Q.  No, we can't.
7        So you just assume that it wasn't
8    discriminatory harassment as opposed to just
9    harassment, right?
10   A.  I did not believe that what had
11   happened, based on what was described to me
12   about the incident, was related to
13   discrimination or retaliation?
14   Q.  What's retaliation?
15   A.  Retaliation is defined in the
16   policy.  I'm not comfortable summarizing what
17   the policy says about.
18   Q.  No, I just want to know what your
19   understanding is about retaliation.
20   A.  I have multiple understandings of
21   retaliation depending upon the context.
22   Q.  Okay.
23       So tell me what they are?
24   A.  I would have to know what the
25   context would be in order to give you a

217

DAVIS, Ph.D.
1
2    definition of retaliation.
3        Q.  Well, we're talking about the
4    antiharassment policy at F.I.T., aren't we?
5        A.  If we are talking about the
6    antiharassment policy I would not be
7    comfortable at this point talking about it
8    without seeing the language in the policy.
9        Q.  Why?
10       A.  Because I have not been at F.I.T.,
11   as I have said, now since February of 2020.
12   My memory of the details of that policy, it's
13   not -- my memory is not comprehensive, and I
14   would not feel comfortable summarizing or
15   paraphrasing what is in the policy.
16       Q.  Okay.
17           So, did you pull out the policy
18   before you made the call to HR to see if the
19   definition of retaliation fit with the
20   description of what occurred on --
21       A.  As I have said --
22       Q.  -- on May 16th, 2019?
23       A.  As I said in the immediate moment of
24   that incident, my concern was with
25   understanding --

218

DAVIS, Ph.D.
1
2        Q.  Listen.  Look -- Dean -- look --
3        A.  Excuse me.
4        Q.  Dr. Davis, I simply asked you, Did
5    you look at the policy before you called HR?
6    That's all I asked you.
7        A.  No.
8        Q.  It's either yes or no.  You said you
9    didn't?
10       A.  No.
11       Q.  But in order to answer the question
12   now about whether the conduct that was
13   described to you by Marilyn Barton fit into
14   the definition of retaliation, you would need
15   to look at the policy?
16       A.  That's correct.
17       Q.  But you didn't do it then, but you
18   need to do it now that you have been sued,
19   right?
20           MR. DRANOFF:  Object to the
21       form.
22       A.  No.
23       Q.  Okay.
24       A.  The reason I would need to do it now
25   is because I have not been at F.I.T. since

219

DAVIS, Ph.D.
1
2    February of 2020, and I do not recall the
3    provisions of the policy.
4        Q.  Okay.
5            So, you made a decision without
6    looking at the policy that it wasn't
7    something that you should report to the
8    Affirmative Action Office, correct?
9        A.  In the moment, correct.
10       Q.  But you also knew that the
11   Affirmative Action Office was investigating
12   you on May 16th, 2019, correct?
13       A.  I am not sure when I -- I -- as I
14   said, I believe I gave my statement late in
15   May.  I am not sure when I knew that the
16   Affirmative Action Office was investigating
17   me.  And I'm not sure that I knew that they
18   weren't investigating me on matters that
19   extended beyond the 3/5th's rule issue.
20       Q.  Okay.
21           Well, your answer before was that
22   you were interviewed about the incidents in
23   May of 2018.  This is a year later, right?
24   This is May of 2019, right?
25       A.  Yes.  Again, I --

220

DAVIS, Ph.D.
1
2        Q.  So you knew that the Affirmative
3    Action Office had an open investigation into
4    your conduct as well as Marilyn Barton's
5    conduct because of complaints that
6    Ms. Phillips had raised to them, right?
7        A.  I knew that there was a complaint
8    that related to me to which I was responding.
9        Q.  And so, you chose not to go to the
10   Affirmative Action Office to report Marilyn
11   Barton's conduct as potentially being
12   retaliatory, right?
13       A.  I'm not sure what your question is.
14       Q.  Do you want it read again?
15       A.  No, I thought you were in the middle
16   of a question there.
17       Q.  No.  You chose not to report
18   Ms. Barton's conduct to the Affirmative
19   Action Office as possibly being retaliatory,
20   correct?
21       A.  Correct.
22       Q.  But you know that retaliation is
23   when an adverse action is taken against an
24   employee who makes a complaint of
25   discrimination, harassment or some other

221

DAVIS, Ph.D.
1
2   protected category, right?
3       A.  Yes, I'm aware of the policy.
4       Q.  Got it.
5           And so, you knew that Ms. Barton's
6   conduct towards Ms. Phillips and threatening
7   to kill her and cursing at her and disturbing
8   her ability to do her job was an adverse
9   employment action; you knew that, right?
10      A.  I did -- I'm sorry.  Could you
11  repeat the question?  I lost track in the
12  middle.
13          (Whereupon, the requested
14          portion of the transcript was read
15          back.)
16          MR. MELITO:  Objection to form.
17          MR. DRANOFF:  Object to the
18  form.
19      A.  I'm not sure in the moment that I
20  would have characterized it in that way as an
21  "adverse employment action."
22      Q.  You don't think that was an adverse
23  employment action?
24      A.  I've said that in the moment -- in
25  that moment of that event, I'm not sure I

222

DAVIS, Ph.D.
1
2   would have categorized it in that way.
3       Q.  Well, how would you characterize it?
4       A.  I characterized it as -- well, first
5   of all, I characterized it as highly
6   unfortunate; but also as a possible assault.
7       Q.  "As a possible assault"; is that
8   what you said?
9       A.  Yes, base --
10      Q.  So --
11      A.  On --
12      Q.  -- so an assault is not an adverse
13  employment action?  When one employee has a
14  complaint lodged against them by another
15  employee assaults the employee who makes the
16  complaint, but you can't characterize that as
17  an adverse action; is that correct?
18      A.  No, that is not correct.
19      Q.  Okay.
20          Well, certainly assaulting
21  Ms. Phillips was not part of Marilyn Barton's
22  job description, right?
23      A.  Correct.
24      Q.  Okay.
25          So, did you try and reclassify her

223

DAVIS, Ph.D.
1
2   because she did something outside of her job
3   description?
4       A.  I'm not sure I follow your question.
5       Q.  Sure.
6           Marilyn Barton was subject to a
7   complaint of discrimination by Ms. Phillips,
8   correct?
9       A.  Correct.
10      Q.  And you were the subject of a
11  complaint by Ms. Phillips, right?
12      A.  Correct.
13      Q.  And you were the one who put in a
14  request and recommendation that Ms. Barton be
15  given reclassification of her job and a
16  raise, right?
17      A.  I put in that request in 2017.  And
18  again, it was not within my duties and
19  responsibilities or power to request a raise.
20      Q.  Got it.
21          But you could have withdrawn that
22  request, right?
23      A.  No, that committee -- that request
24  goes out of my hands when it goes into the
25  committees that do the reassignment and the

224

DAVIS, Ph.D.
1
2   evaluation of the requests and.
3       Q.  Got it.
4           You could have had Ms. Barton fired
5   for her conduct, right?
6       A.  That is not true.  I had no --
7       Q.  Oh --
8       A.  -- I have no power or had no power
9   in my position.
10      Q.  So you can't make a recommendation
11  that an employee who you supervise could be
12  fired; you don't have the power to do that?
13      A.  Ms. Barton is a member of the
14  collective bargaining unit and those matters
15  are handled between that unit and Human
16  Resources.
17      Q.  So let me understand, you as a
18  supervisor have the ability to recommend and
19  request a reconsideration through the union
20  for one of your supervisees to get a raise
21  and a reclassification; you could do that,
22  right?
23      A.  No.
24      Q.  -- as you described --
25          MR. DRANOFF:  Just note my

225

```
1              DAVIS, Ph.D.
2         objection to form.
3         A.  No, I can request, as I did for
4    Ms. Barton, a re-evaluation.  But the
5    decisions about --
6         Q.  I'm not asking about a decision.
7    I'm asking about a request --
8         A.  I can make --
9         Q.  Just listen to my question.
10            You could request that an employee
11   of yours, someone that you supervised, get a
12   reclassification and a raise; you could
13   request that, right?
14        A.  No.
15            MR. DRANOFF:  Object to the
16       form.
17        Q.  You can't request it?  I thought you
18   did?
19        A.  I can request a re-evaluation or a
20   reclassification.  I cannot request any
21   adjustment to salary.
22        Q.  Well, that's what the
23   reclassification does, right?  Because if
24   someone get's reclassified under the
25   collective bargaining agreement, if they get
```

226

```
1              DAVIS, Ph.D.
2    reclassified to a different position, then
3    that different position would have different
4    pay; isn't that right?
5         MR. DRANOFF:  Object to the
6         form.  Objection.  That's inaccurate.
7         A.  It's inaccurate, and it --
8         Q.  Oh, it's not -- it's not accurate.
9    Well, tell me how it's inaccurate?
10        A.  It is not accurate in that you could
11   be reclassified into a position that had the
12   same pay scale but that was in a different
13   unit, that had a different job title; it
14   doesn't necessarily invoke a pay raise.  It
15   can invoke --
16        Q.  What did it do with Ms. Barton?
17        A.  The committee ultimately
18   reclassified her to a higher level, and I
19   believe there was a pay increase that
20   accompanied that reassignment.
21        Q.  Right.
22            And this happened after Ms. Barton
23   threatened to kill Ms. Phillips?
24        A.  The paperwork that I submitted was
25   submitted in 2017.
```

227

```
1              DAVIS, Ph.D.
2         Q.  I'm not asking about that.
3         A.  I know, but I --
4         Q.  So, you just want to answer your own
5    questions since you know that my question did
6    not ask you when you submitted the paperwork.
7    It asked you specifically when the raise and
8    reclassification came through, you chose to
9    answer by saying, "I submitted the paperwork
10   in 2017."
11        A.  I --
12        Q.  I mean, look.  Look.
13        A.  I was going to finish --
14        Q.  Dr. Davis.  Dr. Davis, I'll raw the
15   question.
16            Dr. Davis, do you understand what
17   you are doing today the way that you are
18   answering these question; do you understand
19   what you are doing?
20            MR. DRANOFF:  Object to the
21       form.
22            There is no reason to ask that
23       question.  Ask about facts in this
24       case.
25            MR. SELLS:  No, I'm just
```

228

```
1              DAVIS, Ph.D.
2         asking.
3         Q.  Whether you are doing it
4    intentionally?
5             MR. DRANOFF:  That is not --
6         Q.  When I ask you a question
7    specifically about when the raise and the
8    reclassification came through as being after
9    the incident with Ms. Phillips and Ms. Barton
10   and you chose to say, "I put the paperwork in
11   in 2017."
12            So I am asking you, are you doing
13   this purposefully so as to try and deflect
14   liability for your conduct in this case or is
15   there some reason why you are not answering
16   the questions that are being asked of you?
17            MR. DRANOFF:  Object to the
18       form.
19            Ask your question, Derek, and
20       she will answer your question.
21            MR. SELLS:  I just asked a
22       question.
23            MR. DRANOFF:  That is not an
24       appropriate question.  It has nothing
25       to do with the case.
```

229

DAVIS, Ph.D.

1
2    MR. SELLS:  It has everything
3    to do with the case.
4    Q.  It has everything to do with the way
5    you're answering questions today, and that's
6    why I'm trying to find out —
7        MR. DRANOFF:  Note a harassment
8        objection.
9        MR. SELLS:  Okay.
10   Q.  You can answer the question.
11   A.  I will happily answer the question.
12   I was halfway through answering the question
13   when I was interrupted.
14      So the second part of my answer is,
15   I do not recall exactly when Marilyn Barton's
16   upgrade came through.
17   Q.  Got it.
18      But you didn't seek to change
19   anything having to do with Marilyn Barton's
20   job following her threats to kill
21   Ms. Phillips, right?
22   A.  I did not.
23   Q.  Okay.
24      You didn't ask that she be moved out
25   of the office that was right outside of your

230

DAVIS, Ph.D.

1
2    office, correct?
3    A.  I did not.
4    Q.  And even though you talked about
5    trying to make sure everyone was safe, you
6    took no steps to determine whether or not
7    Marilyn Barton was homicidal, right?
8    A.  That was outside the scope of my job
9    or my expertise.
10   Q.  And you did not report Marilyn
11   Barton's conduct as being retaliatory to the
12   Affirmative Action Office, correct?
13   A.  Correct.
14   Q.  But you willingly allowed
15   Ms. Phillips to be moved out of that office
16   space, right?
17   A.  Ms. Phillips requested a move.
18   Q.  And you willingly allowed it,
19   correct?
20   A.  I worked with Human Resources to
21   evaluate the best option for relocation —
22   Q.  Got it —
23   A.  Yes.
24   Q.  And the other thing that you did was
25   you did the initial investigation into this

231

DAVIS, Ph.D.

1
2    May 16th, 2019 incident, right?
3    A.  I would not characterize what I did
4    as an investigation.
5    Q.  Okay.
6        Well, you collected statements, did
7    you not?
8    A.  I didn't — I was asked by Human
9    Resources to obtain statements from people
10   who had been a witness — people who had
11   witnessed the events.
12   Q.  You were asked by Human Resources;
13   who asked you to do it?
14   A.  I believe that Natacha Unelus asked
15   me to do it, and I simply asked the people
16   who had been witnesses to the event to
17   provide me with a witness statement and
18   collected those statements and forwarded them
19   onto Human Resources.
20       MR. SELLS:  Can we put up
21       Exhibit 36, please.
22       (The image is shared on the
23       computer screen.)
24       MR. SELLS:  For the record,
25       this was shown yesterday.  It is a

232

DAVIS, Ph.D.

1
2    document that copies an e-mail
3    thread, so if we could start from —
4    this is a two-page document, F.I.T.
5    237 and 238.
6    Q.  The thread first starts with Isolina
7    Perez who talks about needing to meet, not
8    with you, but with Eric and Cynthia.
9        Do you know who they are?
10   A.  I do.
11   Q.  Who are they?
12   A.  Eric Oden and Cynthia Glass.
13   Q.  Okay.
14      Now, one of the things that she says
15   in her e-mail to them is that she reached out
16   to you and — and this is on May 20th, 2019 —
17   that she had reached out to you and you said
18   that you need to find out the protocol before
19   discussing the incident.
20       MR. DRANOFF:  Object to the
21       form.
22   Q.  Now, do you remember having that
23   conversation with Ms. Perez?
24   A.  I do not.
25   Q.  Do you have any reason to believe

233

```
                    DAVIS, Ph.D.
1
2    that she is lying about this statement?
3         A.  I do not.
4         Q.  Why would you tell Isolina Perez
5    that you need to find out the protocol before
6    you could discuss the incident?
7         A.  I don't know what I meant by
8    "protocol" or what Isolina is referring to
9    when she characterizes what I say as to
10   "protocol."  I don't know that --- what that
11   precisely refers to.
12        Q.  All right.
13             But as of May 20th of 2019, one of
14   the things that Ms. Perez indicates os that
15   Ms. Phillips didn't feel safe in the same
16   office with Ms. Barton; is that right?
17        A.  I see it there, yes.
18        Q.  Okay.
19             And so she, Isolina Perez, had to
20   reach out to Mario Cabrera to ask for a
21   security escort for Ms. Phillips; do you see
22   that?
23        A.  I do.
24        Q.  So, you didn't reach out to security
25   to get an escort for Ms. Phillips, did you?
```

234

```
                    DAVIS, Ph.D.
1
2         A.  I don't know that those two things
3    are mutually exclusive; but I do not recall.
4         Q.  Okay.
5             So let's scroll up a little bit
6    more.  Then there is an e-mail from Cynthia
7    Glass.  What Cynthia Glass writes to Isolina
8    is, "Hello, Isolina.  We are currently
9    investigating the incident, and I expect to
10   have a report from Campus Safety in the a.m.
11             Until an assessment that there is no
12   imminent danger or other safety concerns, she
13   may elect to remain home until we discuss and
14   determine what may be necessary to resolve
15   this issue."
16             All right.  So you see that?
17        A.  Yes, I do.
18        Q.  And so what Cynthia Glass is saying
19   is that we -- and you were not part of HR,
20   right?
21        A.  No.
22        Q.  So the we that she is talking about
23   does not include you, does it?
24        A.  I can't be sure of that.  It doesn't
25   say specifically that this is related -- this
```

235

```
                    DAVIS, Ph.D.
1
2    is limited to HR.
3         Q.  Then you see that Cynthia Glass
4    writes, "Sorry.  Forgot to CC you Mary."
5             And so she sends this to you, right?
6         A.  I can't tell without scrolling up to
7    see if that happened --
8         Q.  Well, we'll get to that.  Right?
9    But she wouldn't write, "Sorry.  Forgot to CC
10   you, Mary" unless she was sending it to you,
11   correct?  She's not gonna write that for
12   herself, is she?
13        A.  I would assume so.
14        Q.  All right.  So let's scroll up.
15             And you now have the underlying
16   thread, you can read it, and then you respond
17   back to Cynthia and you put Natacha on the
18   e-mail thread, right?
19        A.  That's correct.
20        Q.  You say, "Hi, Cynthia.  Thanks very
21   much.  FYI, I left an voice mail with Isolina
22   this afternoon around 1:00 p.m. letting her
23   know that I was gathering information and
24   would like to wait until that process was
25   complete before meeting."
```

236

```
                    DAVIS, Ph.D.
1
2             Do you see that?
3         A.  I do.
4         Q.  Cynthia didn't ask you to gather
5    information; you did that on your own, right?
6         A.  No, that is not true.
7         Q.  So, when did she ask you to
8    investigate?
9         A.  First of all, no one asked me to
10   investigate; but my recollection is that
11   Natacha Unelus as the HR generalist assigned
12   to the Graduate School asked me to gather
13   statements from the people who witnessed the
14   incident or were involved in the incident;
15   and I was doing that.
16        Q.  Did --
17        A.  Nothing more than collecting
18   statements from the people who had witnessed
19   or been involved in the incident.
20            MR. SELLS:  Okay.  Let's pull
21   this down.
22        Q.  Where in the F.I.T. policies does it
23   say that where an employee has an open
24   complaint that's being investigated by
25   another employee and then faces a situation
```

237

```
              DAVIS, Ph.D.
1
2    where a possible retaliation matter happens
3    that the employee who has an open
4    investigation and complaint should lead the
5    investigation into the next possible
6    complaint?  Where does it say that in
7    F.I.T.'s policies?
8         MR. DRANOFF:  Object to the
9         form.
10        A.  I don't know that that's covered
11   anywhere in F.I.T.'s policy.
12        Q.  Got it.
13            But you know what a "conflict of
14   interest" is, don't you?
15        A.  I believe I do.
16        Q.  Okay.
17            What is a "conflict of interest"?
18        A.  A conflict of -- I'm not going to
19   define "conflict of interest" because, again,
20   that could be a very situational definition.
21        Q.  Okay.
22            You already said that you made a
23   determination that the incident between
24   Ms. Barton and Ms. Phillips was not
25   retaliation such that you have to report it
```

238

```
              DAVIS, Ph.D.
1
2    to the Affirmative Action Office, right?
3         A.  I said that in the moment of the
4    incident I did not consider what happened to
5    be retaliation or discrimination within the
6    provisions of the policy at F.I.T.
7         Q.  Right.
8             But that's in your own self-interest
9    because Affirmative Action was already
10   investigating you and Marilyn Barton, right?
11        A.  I disagree with your
12   characterization; but yes, there was an
13   Affirmative Action investigation ongoing.
14        Q.  Got it.
15            Now, you collected statements from
16   who?
17        A.  I believe I collected statements
18   from you Umilta.  I believe from Marilyn and
19   Marjorie, although I'm not 100% sure of that,
20   from Anton Baptiste and from Henry Wallace;
21   and I believe those were the only people who
22   were party to the incident.
23        Q.  Okay.
24            So, tell me how did you ask Marilyn
25   Barton for her statement?
```

239

```
              DAVIS, Ph.D.
1
2         A.  I don't recall.
3             MR. SELLS:  Could we pull up
4         Exhibit 20.
5         Q.  Is this a statement you got from
6    Marilyn Barton?
7         A.  I believe it is.
8             MR. SELLS:  Just for the
9         record, this is Marilyn Barton's
10        statement on May 16th, 2019 that's
11        been previously marked.
12            (The image is shared on the
13        computer screen.)
14        Q.  Now, did you read Ms. Barton's
15   statement before you submitted it anywhere?
16        A.  I don't recall.
17        Q.  Did you help her prepare this
18   statement?
19        A.  I don't believe so.
20        Q.  Well, how did you get it from her;
21   what did you tell her?
22        A.  I don't recall what it -- what I
23   instructed everyone who was involved to
24   provide.  I -- I don't recall.
25        Q.  Well, in this statement does
```

240

```
              DAVIS, Ph.D.
1
2    Ms. Barton anywhere talk about how she
3    threatened to kill Ms. Phillips?
4         A.  Not in the portion that I could see
5    on --
6             MR. SELLS:  Okay, scroll up.
7             (The document is scrolling.)
8         A.  Not that I could see in that part of
9    the screen.
10            MR. SELLS:  Okay.  Keep going.
11        Q.  And now, in response to your
12   statement that you collected from Ms. Barton
13   and sent to HR, Cynthia Glass writes you back
14   and says, "Thanks.  Contrary to our earlier
15   conversation, it appears that she is in fact
16   alleging bullying, hostile work environment
17   and this could be construed as a complaint.
18        Thought it could be dealt with
19   informally; but seeing this, I will need to
20   speak with Deliwe to see what she recommends
21   as next steps.  This does not change our
22   course on the investigation of the behavior
23   she allegedly exhibited.  Thanks, Cynthia."
24            Thanks, Cynthia; is that correct?
25        A.  Yes, I think you read it accurately.
```

241

DAVIS, Ph.D.

1
2    Q.  So, let me get this straight.  The
3    statement that you collected from Ms. Barton
4    was now being used by Cynthia Glass to try
5    and bring charges against Ms. Phillips for
6    bullying and a hostile work environment,
7    right?
8        A.  I cannot tell from this
9    communication whether this bullying
10   allegation relates to Marilyn Barton or
11   Marjorie Phillips.
12       Q.  If you look at the last full
13   sentence it says, "This does not change our
14   course of the investigation of the behavior
15   she allegedly exhibited."
16           And so that's in reference to
17   Marilyn Barton, "the behavior she exhibited,"
18   right?
19       A.  I can't be sure of that without
20   knowing the context of this communication.
21       Q.  Oh, really.  Okay.
22       A.  Yes.
23       Q.  So, you think that there's going to
24   be an investigation into alleged bullying and
25   a hostile work environment by Marilyn Barton?

242

DAVIS, Ph.D.

1
2        A.  I think that is entirely possible.
3        Q.  You think so?  That's not the way --
4    well, let's take a look at the statement.
5        MR. SELLS:  Can we scroll
6        backup.
7        A.  Can we --
8        Q.  Let's take a look at the statement.
9    Where in the statement -- and you are reading
10   it now.  Where in the statement is there any
11   allegation that Ms. Barton bullied
12   Ms. Phillips?
13       A.  Can you explain to me how these
14   two-page documents are related?  It's not
15   clear to me that Cynthia Glass' e-mail refers
16   to this report.
17       Q.  I'm sorry?  These were produced by
18   your lawyers --
19       A.  Yes --
20       Q.  -- and F.I.T.'s lawyers.
21       A.  My --
22       Q.  -- so, you know, you can ask them.
23   But the point is, I asked you where in her
24   statement, the statement that you collected
25   from Ms. Barton, where does it say that

243

DAVIS, Ph.D.

1
2    Ms. Barton engaged in bullying conduct?
3    Tell me.  Point it out.
4        A.  It does not use those words.
5        Q.  Got it.
6           So let me read the third paragraph.
7    "I suggested to Ms. Phillips she share her
8    concerns with the dean and that I didn't want
9    to discuss the matter with her.  She
10   continued her critical commentary and
11   questioning of my actions in a strident tone.
12          In response, I told her loudly and
13   firmly to desist.  She continued, and at some
14   point got up and approached and reached
15   toward me in an uncomfortably close manner
16   which made me feel threatened.  The incident
17   ended when another person entered our office
18   and I used the opportunity to remove myself
19   from the stressful situation."
20          Did I read that correctly?
21       A.  You did.
22       Q.  Now, that was not something -- when
23   I asked you earlier, that was not something
24   that Marilyn Barton told you in her office,
25   was it?

244

DAVIS, Ph.D.

1
2        A.  As I said when I answered your first
3    question, I don't recall details or the
4    complete content of the discussion that I had
5    with Marilyn that day.
6        Q.  No, but what you believed had
7    happened was that Marilyn Barton assaulted
8    Ms. Phillips.  That's the way you described
9    it.  The context was such that I believed
10   this could be an assault.  That Ms. Barton
11   could have assaulted Ms. Phillips; isn't that
12   right?
13       A.  I was concerned about that, yes.
14       Q.  But this paragraph, in this
15   statement you collected from Ms. Barton, says
16   it in the opposite way.  Says that
17   "Ms. Phillips continued her critical
18   commentary and questioning my actions in a
19   strident tone.
20          In response, I told her loudly and
21   firmly to desist.  She continued and at some
22   point got up and approached and reached
23   toward me in an uncomfortably close manner
24   which made me feel threatened."
25          That's a lie, right?

245

DAVIS, Ph.D.

1
2    A.  That's Ms. Barton's statement.
3    Q.  That you collected, right?
4    A.  I was simply collecting e-mails.  I
5  was not --
6    Q.  Yes, got it --
7    A.  -- reviewing them, reading them or
8  contributing to them.
9    Q.  And you and Ms. Barton were both
10  under investigation for discriminating
11  against Ms. Phillips, right?
12    A.  Correct.
13        MR. SELLS:  Let's scroll up.
14    Q.  "Although I raised my voice in
15  response to Ms. Phillips's unrelenting
16  criticism of me and my decision, her approach --
17  her approach toward me made me feel harassed
18  and then menaced.  I also feel that
19  Ms. Phillips' critical comments were
20  unwanted -- unwarranted and intrusive."
21        So you and Ms. Barton concocted this
22  story so that an investigation could be
23  launched against Ms. Phillips for bullying
24  conduct, right?
25    A.  That is not true.

246

DAVIS, Ph.D.

1
2    Q.  "This incident and numerous previous
3  incidents involving Ms. Phillips have created
4  a bullying, unhealthy and unproductive work
5  environment."
6        That is in her statement, right?
7    A.  That is in Ms. Barton's statement.
8    Q.  Got it.
9        About Ms. Phillips, right?
10    A.  Yes.
11    Q.  Now, let's go to the e-mail.
12        And sure enough after you deliver
13  this lie, this false statement to Cynthia
14  Glass, Cynthia Glass says, "It appears that
15  she is in fact alleging bullying, hostile
16  work environment and this could be construed
17  as a complaint."
18        Right, a complaint from Marilyn
19  Barton against Ms. Phillips?
20    A.  What I cannot discern from this
21  e-mail is what Cynthia is referring to.
22    Q.  What do you mean "what she is
23  referring to"?  She is referring to the
24  comment that Ms. Barton feels like she is
25  part of a bullied and hostile work

247

DAVIS, Ph.D.

1
2  environment.  What don't you get?
3    A.  Again, this is Cynthia Glass'
4  statement --
5    Q.  No, it's not Ms. Glass' statement.
6  It's Ms. Barton's statement that you
7  collected in your role as the investigator in
8  Ms. Phillips' complaint, right?
9    A.  No, incorrect.
10        Once again, I was not an
11  investigator.  I was simply tasked with
12  collecting statements.
13    Q.  Well, you know that's a lie because
14  Ms. Barton told you something completely
15  different in your office.  You knew that
16  statement was a lie when you delivered it to
17  Cynthia Glass; you knew it, right?
18    A.  I did not review Marilyn Barton's
19  statement, as I have said.  I simply
20  collected the statements and passed them on
21  to Human Resources as it was requested of me.
22    Q.  So, what conversation is Cynthia
23  Glass talking about?  "Thanks --"  "Contrary
24  to our earlier conversation.  It appears that
25  she is in fact alleging bullying, hostile

248

DAVIS, Ph.D.

1
2  work environment and this could be construed
3  as a complaint."
4    A.  I don't recall.
5    Q.  You don't recall?
6    A.  I don't.
7    Q.  So you and Cynthia Glass were
8  working together to try and undermine
9  Ms. Phillips's complaint?
10    A.  No, that is not correct.
11    Q.  And you tried to defuse the
12  situation where Marilyn Barton threatened to
13  kill Ms. Phillips, told her that she "was
14  gonna fuck her up," told her to "shut the
15  fuck up"?
16        MR. DRANOFF:  All right, Derek
17     you don't need to -- I can't hear you --
18    Q.  You --
19        MR. DRANOFF:  I can't hear you
20     when you raise your voice to that
21     level.
22        MR. SELLS:  Okay.  Okay.
23    Q.  You tried to turn this against
24  Ms. Phillips, didn't you?
25    A.  No, I did not.